## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

SHORELINE AVIATION, INC.,                          Case No.: _____

                    Plaintiff,

                                                    **COMPLAINT**

          -against-

CYNTHIA L. HERBST, SOUND AIRCRAFT
FLIGHT ENTERPRISES, INC., and RYAN A. PILLA,

                    Defendants.

-------------------------------------------------------------------X

Plaintiff Shoreline Aviation, Inc. ("Shoreline Aviation"), by its attorneys, Kriegsman

PC, as and for its Complaint against Defendants Cynthia L. Herbst ("Herbst"), Sound Aircraft

Flight Enterprises, Inc. ("SAFE"), and Ryan A. Pilla ("Pilla") (collectively, "Defendants"),

alleges, upon knowledge as to itself and upon information and belief as to all other matters, as

follows:

### NATURE OF THE ACTION

1.      Shoreline Aviation brings this action to recover damages it suffered as the result

of Defendants' (a) failure to honor their obligations as Shoreline Aviation's exclusive booking

agent to provide booking services for Shoreline Aviation's customers; (b) wrongful diversion

of Shoreline Aviation's customers to its competitors; (c) tortious interference with Shoreline

Aviation's business; and (d) false statements to Shoreline Aviation's customers and regulators

about Shoreline Aviation.

### PARTIES

2.      Plaintiff Shoreline Aviation is a Connecticut corporation, an aviation company

that ran commuter and charter flights in New York and the Northeast, including flights in and

out of East Hampton Airport in New York.

1

3.      Upon information and belief, Defendant Herbst is a New York resident with a principal address of 3705 Noyac Road, Unit D, Sag Harbor, New York 11963. Herbst is the president, chief executive officer, and owner of SAFE.

4.      Upon information and belief, Defendant Pilla is a New York resident with a principal address of 3705 Noyac Road, Unit D, Sag Harbor, New York 11963. Upon information and belief, Pilla is Herbst's live-in boyfriend and works with her in a professional capacity.

5.      Upon information and belief, Defendant SAFE is a New York corporation with a principal address of 200 Daniels Hole Road, P.O. Box 438, Wainscott, New York 11975-0438. SAFE is an air charter broker that links prospective charter and commuter customers with direct air carriers flying to and from East Hampton Airport in New York and New York City. From 1994 through April 2018, Herbst and SAFE exclusively represented Shoreline Aviation for seaplane operations.

## JURISDICTION AND VENUE

6.      This Court has original subject matter jurisdiction over Shoreline Aviation's claims pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

7.      This Court has personal jurisdiction over Defendants because they do business in Suffolk County, New York and because this action arises out of conduct that took place in Suffolk County, New York.

8.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendants reside in this District and because a substantial part of the events or omissions giving rise to Shoreline Aviation's claims occurred in this District.

# FACTS

**I.     Herbst agreed to serve as Shoreline Aviation's exclusive booking agent.**

9.      Shoreline Aviation is an aviation company that, until April 2020, had been offering seaplane services beginning in 1980. Shoreline Aviation operated a fleet of ten Cessna Caravan Amphibians and ran commuter and charter flights in New York and the Northeast, including flights in and out of East Hampton Airport in New York.

10.     Shoreline Aviation began providing regular seaplane commuter service to The Hamptons in 1994. For approximately 24 years, Shoreline Aviation contracted services with Sound Aircraft Services, Inc. ("SAS"), a company which, until 2017, was owned by a married couple, Steven Tuma ("Tuma") and Herbst. Tuma handled the fixed-base operation portion of SAS's business, fueling aircraft and providing maintenance and line service. Herbst was responsible for broker services, exclusively booking Shoreline Aviation's seaplane commuter flights through SAS until her divorce in April 2017 at which time she transitioned to an affiliated entity already in place, SAFE.

11.     In 1994, Shoreline Aviation entered into an agreement with Herbst (the "Contract") pursuant to which she would provide booking services exclusively for Shoreline Aviation's commuter and charter flights to and from the East Hampton Airport in return for commissions.

12.     As Shoreline Aviation's exclusive booking agent, Herbst handled Shoreline Aviation's reservation requests, payment processing, customer communications, correspondence, flight manifests, and passenger check-in procedures at East Hampton Airport.

Accordingly, she thoroughly understood Shoreline Aviation's business and had clear insight into the consequences of her actions and their impact on Shoreline Aviation's business.

13.     Under the Contract's terms, Herbst had a duty to act on behalf of Shoreline Aviation, and Shoreline Aviation entrusted its reservation system to her care.

14.     Shoreline Aviation advertised SAS's phone number in its website, publications, travel guides, and signage.

15.     Prior to and during each summer season, Shoreline Aviation customers made reservations for seats on Shoreline Aviation's air carriers through Herbst over the phone or by email.

16.     Herbst would then provide Shoreline Aviation with the flight manifest, which included the customers' names and weights.

17.     In December of each year, customers were able to purchase coupon books of ten seats in order to get a 10% discount prior to the summer season, paying Shoreline Aviation directly by check or wire services. Another letter went out in March making the same offer for a 5% discount. Customers were required to pay Shoreline Aviation by check or wire transfer.

18.     In 2017, a charter flight between East Hampton and New York City cost $3,695.00 and Herbst's commission was 5%. On commuter flights, Herbst's broker's fee was $59.50 per passenger in 2017 and $65.00 per passenger in 2018. Between October 2016 and September 2017, Shoreline Aviation paid Herbst and SAFE $291,315.00 in commissions.

19.     Herbst's administrative duties for Shoreline Aviation included mailing out a letter to Shoreline Aviation customers, once in December and again in March of each year, asking them to buy books of ten tickets to receive a 10% discount for purchasing ahead of the

summer season. As Shoreline Aviation's flights filled up early, customers generally booked their seats for the summer season in April and May.

## II. Herbst and Tuma divorced, SAFE split from SAS, and Herbst and SAFE's booking services began to deteriorate.

20.     Upon information and belief, in or about 2015, Herbst began an extra-marital relationship with Pilla.

21.     Pilla's relationship with Herbst also extended into the professional realm. Pilla began attending business meetings with Herbst and often negotiated and spoke on behalf of Herbst.

22.     On or about April 27, 2017, as part of Herbst's divorce settlement with Tuma, SAS split into two separate companies – SAS and SAFE. Tuma became the sole owner of SAS, and Herbst became the sole owner of SAFE, which continued with the booking services previously handled under SAS.

23.     When Herbst and SAFE continued Shoreline Aviation's booking services after Herbst's divorce, customer service began to deteriorate. Herbst and SAFE failed to reliably answer phone calls from customers, and when calls were answered, newly hired staff made several costly mistakes, including providing incorrect dates and times for flights, passenger counts, and direction of flights.

24.     Due to Herbst's frequent absences, commuter and charter sales from SAFE decreased approximately 20% during the 2017 summer season.

25.     In the fall of 2017, John Kelly ("Kelly"), Shoreline Aviation's then-president, met with Herbst and Pilla to discuss shortcomings from the summer season. At that meeting, Pilla complained that Herbst worked too hard, and Herbst asked for an increase in commissions and vowed to stay on top of the business going forward.

26.     As had been the practice in prior years, in January, February, and March of 2018, Shoreline Aviation paid Herbst her ten-percent commission in advance for customer booking and handling on the upcoming 2018 summer season in the amount of $65,522 for 1,100 seats sold.  In addition, SAFE and Herbst continued to book charter flights with Shoreline Aviation between the fall of 2017 and April of 2018.

**III.    Herbst and SAFE stopped booking seats for Shoreline Aviation without notifying Shoreline Aviation and began to work as booking agent for Shoreline Aviation's competitor Blade.**

27.     In March 2018, Herbst failed to send a follow-up letter to Shoreline Aviation's commuter customers regarding the pre-purchase of tickets at a 5% discount price, as she had done in previous years.

28.     Customers began to call Shoreline Aviation stating that SAFE would not book their seats for the coming season. They were told by Herbst and SAFE that seats could not be booked because Shoreline Aviation had not set the schedule. This statement was false. Shoreline Aviation's schedule had been the same every year.

29.     Upon information and belief, in or about April 2018, the airport license agreement between the Town of East Hampton and Fly Blade, Inc. ("Blade"), an app program that books flights and a competitor to SAFE and Shoreline Aviation, was in jeopardy because Blade was falsely representing itself to be an air carrier.

30.     As a result, upon information and belief, Blade approached Herbst and Pilla to persuade them to provide booking services for Blade, which would ensure that Blade would have a counter at the East Hampton Airport.

31.     In April 2018, Pilla asked Kelly to meet with him, Herbst, and Blade representatives at the Gabreski Airport in Westhampton, New York.

32.     At that meeting, on April 6, 2018, Blade offered to provide booking services for Shoreline Aviation and pay 70 cents on the dollar for each flight.

33.     One of the Blade representatives in attendance at this meeting was Melissa Tomkiel ("Tomkiel"), Blade's president and legal counsel. Shoreline Aviation representatives expressed concern that Tomkiel was a minority shareholder in one of Shoreline Aviation's competitors, Fly the Whale/Lima Corp., and about the impact that conflict of interest would have on the amount of business Blade would direct to Shoreline Aviation should the deal go through.

34.     In addition, it became apparent from the conversation that if Shoreline Aviation used Blade's booking services, there would be no guarantee that Shoreline Aviation's long-time passengers would continue to get preferred access to its flights, and no way for a customer to be sure that they would be placed on a Shoreline Aviation aircraft and not an aircraft operated by another of Blade's providers.

35.     Upon information and belief, Pilla spearheaded the April 6 meeting and was personally invested in making an arrangement between Shoreline Aviation and Blade work.

36.     Between April 9 and April 11, Pilla texted Kelly every day trying to convince him to take Blade up on its offer and pressuring him to make a quick decision.

37.     Because a partnership with Blade would be disadvantageous to both Shoreline Aviation and its customers, Shoreline Aviation declined Blade's offer.

38.     In response, Herbst and SAFE unilaterally ended their relationship with Shoreline Aviation without informing Shoreline Aviation. And no seats were booked for Shoreline Aviation's customers despite commissions having been paid to Herbst and SAFE for the coming season.

39.     Upon information and belief, Herbst and SAFE instructed their staff to put Shoreline Aviation's customers on Blade flights.

40.     Unaware that Herbst and SAFE had unilaterally terminated the Contract and had gone to work for Blade, and in an effort to maintain continuity for its passengers, Shoreline Aviation offered Herbst and SAFE $375,000 to purchase select assets of SAFE, with the $65,522.00 of unearned commissions serving as a down payment, by letter dated April 20, 2018, a true copy of which is annexed hereto as **Exhibit A**.

41.     When Shoreline Aviation did not hear back from SAFE, Kelly followed up with an email to Herbst on April 23, 2018, a true copy of which is annexed hereto as **Exhibit B**. In that email, Kelly wrote, in part, "As you know, we are already at a point in the season where, according to our longstanding exclusive agreement, you should be booking passengers, yet Eduardo, in your office, says he has not been authorized to do so. In addition, the second Coupon Book letter which was to go out in early April has yet to be sent." Kelly also asked for a refund of the $65,500 in advance commissions if Herbst and SAFE did not intend to book Shoreline Aviation's passengers.

42.     Herbst and SAFE neither accepted nor declined Shoreline Aviation's offer but stalled for time to answer.

43.     As Pilla was Shoreline Aviation's main point of contact during these negotiations, Kelly sent a text message to Pilla on April 27, 2018 asking for an update or response to Shoreline Aviation's offer. Pilla promised Kelly that he would speak to Herbst over the weekend and stated, "I'm doing the best I can my friend." That message was Shoreline Aviation's last communication with Pilla, SAFE, or Herbst.

IV.    **Herbst sent a letter to Shoreline Aviation's customers containing false statements about the dissolution of the relationship between SAFE and Shoreline Aviation.**

44.    Throughout April, several Shoreline Aviation customers called Shoreline Aviation directly, stating that they were unable to book seats for the summer. When Shoreline Aviation asked Herbst and SAFE for an explanation, they refused to comment.

45.    On April 22, 2018, during Shoreline Aviation's peak booking season, Eric Weaver ("Weaver"), Shoreline Aviation's Chief Pilot, was at the East Hampton Airport and saw Eduardo Fernandes ("Fernandes"), a SAFE employee.

46.    Weaver asked Fernandes if SAFE was booking flights for the summer commuters. Fernandes appeared very uncomfortable and would only respond that "people are calling" and pointed to Cindy's empty office.

47.    Upon information and belief, Herbst and SAFE sold Shoreline Aviation's customer database to Blade and began to book flights for Blade in early 2018 without informing Shoreline Aviation.

48.    Herbst and SAFE never informed Shoreline Aviation that they would stop booking tickets for Shoreline Aviation. Indeed, Shoreline Aviation did not discover that they had ceased doing so until customers began calling Shoreline Aviation's offices after they tried but failed to book Shoreline Aviation tickets through Herbst and SAFE.

49.    Moreover, Herbst and SAFE never returned to Shoreline Aviation the $65,522.00 in pre-paid and unearned commissions from Shoreline Aviation.

50.    On May 4, 2018, Kelly and Andrea Collingwood, Shoreline Aviation's marketing director, attended a meeting at the East Hampton Airport and witnessed Fernandes, the SAFE staff member, answering the phone while behind the Blade booth.

51.     At that point, it became clear to Shoreline Aviation that SAFE was not honoring its commitment to provide services to Shoreline Aviation's customers and was working on behalf of Shoreline Aviation's competitor instead.

52.     Because Herbst stopped booking for Shoreline Aviation, Shoreline Aviation had to scramble in early May 2018 to set up its own reservations and database management systems and hire and train new dispatchers to help book its flights.

53.     In addition, Shoreline Aviation had to contact all of its customers to set up their flights for the season.

54.     On May 7, 2018, Shoreline Aviation sent a letter to all of its customers explaining that all bookings would now be handled directly by Shoreline Aviation. Annexed hereto as **Exhibit C** is a true copy of Shoreline Aviation's letter.

55.     Later that day, Herbst sent an email to all of Shoreline Aviation's customers, falsely stating that Shoreline Aviation had ceased working with SAFE without notice. Annexed hereto as **Exhibit D** is a true copy of Herbst's May 7, 2018 email. Specifically, Herbst wrote, in relevant part, "Unfortunately it appears that Shoreline Aviation no longer wishes to work with Sound Aircraft Flight Enterprises. Without notice to us."

56.     Notwithstanding the fact that it was Herbst and SAFE that had unilaterally ceased booking Shoreline Aviation flights without informing Shoreline Aviation and was ignoring all attempts by Shoreline Aviation to communicate with them and that there were clear indications that Herbst and SAFE had begun working with BLADE prior to that time, in violation of the Contract, Herbst's email claimed that Shoreline Aviation had made the decision to discontinue the relationship and that the decision was unexpected, stating, "We

truly appreciate and value the relationship we have built together and we would like to continue this relationship regardless of Shoreline's unexpected decision." Ex. D.

57.     Herbst then attempted to divert Shoreline Aviation's customers to Shoreline Aviation's competitors, stating that she had "transitioned to a new aviation platform" managed by Blade and that customers would have "many more route choices and aircraft options" by using this new platform and advising the customers to seek a refund from Shoreline Aviation for their pre-paid tickets, even though it was Herbst who, prior to this time, had insisted on a no-refund policy for Shoreline Aviation customers. *Id.*

58.     Following Herbst's communication, several Shoreline Aviation customers emailed and called Shoreline Aviation demanding their money back.

59.     To keep customers happy, Shoreline Aviation was forced to run flights with fewer than four people on board, at great cost to Shoreline Aviation.

60.     Shoreline Aviation was also forced to assure its customers that they could carry over their tickets to the 2019 season, even though the prior policy, established by Herbst, required customers to use their tickets by the end of October.

61.     As a result of Defendants' actions, Shoreline Aviation's total commuter revenue decreased approximately 33% in 2018 and 40% in 2019.

62.     In 2018, Shoreline Aviation suffered damages in the approximate amount of $1,653,747, consisting of $1,350,000 from lost revenue from both commuter and charter flights, $238,225 to replace SAFE's staff, and $65,522 for unearned commissions paid to Herbst and SAFE.

63.     In 2019, Shoreline Aviation suffered damages in the approximate amount of $1,720,000, consisting of $1,480,000 from lost revenue from both commuter and charter flights and $240,000 of additional staff.

**V.      Defendants aggressively interfered with Shoreline Aviation's business.**

64.     Between May and August 2018, Herbst and Pilla actively sought to interfere in Shoreline Aviation's business in other ways.

65.     Upon information and belief, Herbst and Pilla attempted to get Shoreline Aviation thrown out of East Hampton Airport, misrepresenting to Jim Brundidge, the airport manager, and the East Hampton town attorney that Shoreline Aviation had no right to operate there, even though Shoreline Aviation had been operating at East Hampton Airport for 37 years.

66.     These false statements prevented Shoreline Aviation from selling commuter or charter flights in the East Hampton Airport throughout the summer seasons of 2018 and 2019.

67.     And as a direct result of Defendants' false statements, Shoreline Aviation lost over 30% of its commuter customer base, suffering damages in the amount of $850,000 in 2018 and $980,000 in 2019. During those two years, they also lost over $1,000,000 in charter revenues formerly booked through SAFE. These flights were booked through Blade instead.

68.     In addition, Herbst and Pilla repeatedly harassed Shoreline Aviation's staff and customers by continuously filming them. Herbst would also stand at the doors leading to the outdoor waiting area or directly across from Shoreline Aviation's location trying to talk to Shoreline Aviation's customers. She would stand at her front counter and listen or look over at Shoreline Aviation's computer screen as people checked in.

69.     Given Herbst's intimate knowledge of Shoreline Aviation's business model, Defendants understood the effect their actions would have on Shoreline Aviation's revenues and intentionally sought to destroy the business.

**VI.     Herbst and SAFE filed suit against Tuma and Shoreline Aviation.**

70.     Claiming that Shoreline Aviation tortiously interfered with a non-compete provision in her divorce settlement with Tuma, Herbst and SAFE filed a complaint against Tuma, Shoreline Aviation, and Kelly individually on August 22, 2018, based on the untenable theory that Herbst and SAFE somehow acquired exclusive rights to sell flights at the East Hampton Airport as part of a private divorce agreement between Herbst and Tuma.

71.     Herbst and SAFE also alleged that Shoreline Aviation entered into a license agreement and fee sharing arrangement with Tuma and/or SAS.

72.     Shoreline Aviation moved to dismiss all claims against it on December 7, 2018, which motion is pending before the Suffolk County Supreme Court.

73.     Separately, on July 9, 2018, Herbst sought an order to show cause in her matrimonial action to punish Tuma for alleged willful contempt of the divorce judgment.

74.     Prior to the filing of Herbst and SAFE's suit against Shoreline Aviation, Shoreline Aviation had been poised to launch an Employee Stock Ownership Plan (the "ESOP") in 2018. Over the course of the ten years that Shoreline Aviation planned to finance the ESOP, approximately $3,000,000 in tax benefits would have been realized.

75.     But the filing of Herbst and SAFE's frivolous lawsuit prevented Shoreline Aviation from implementing the ESOP, resulting in millions of dollars in damages for the company.

76.     Moreover, Herbst and SAFE's suit had a negative impact on Shoreline Aviation's ability to sell the business to Cape Air.

77.     As a result of the pending litigation against Shoreline Aviation, Cape Air, an FAA air carrier corporation based in Massachusetts, declined to purchase Shoreline Aviation's business, electing instead to purchase only its assets on December 27, 2018.

78.     Also as a direct result of Defendants' actions, Shoreline Aviation was forced to cease operations on April 1, 2020, after 40 years in the seaplane business.

79.     That same day, Herbst sent a letter to Shoreline Aviation's customers informing them that Shoreline Aviation was no longer operating and that they could contact her to book their flights for the coming season.

80.     Prior to his death on June 27, 2019, Kelly had spent 40 years of his life, painstakingly building up the Shoreline business.  He also helped Herbst build up her business for more than 24 years.

81.     Notwithstanding that fact, Herbst responded by systematically attacking Shoreline Aviation's business and succeeded in destroying the company through her malicious acts.

## COUNT I
### Breach of Contract – Against Herbst and SAFE

82.     Shoreline Aviation realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

83.     In or about 1994, Shoreline Aviation and Herbst entered into the Contract, pursuant to which she would provide booking services exclusively for Shoreline Aviation's commuter and charter flights to and from the East Hampton Airport in return for commissions.

84.    Shoreline Aviation performed all of its obligations under the contract, including by paying Herbst and SAFE its commissions.

85.    Herbst and SAFE breached the Contract by, among other things, (a) failing to honor their obligation to book reservations for Shoreline Aviation flights beginning in or around April 2018; (b) failing to mail out letters to Shoreline Aviation customers in March or early April 2018 offering discount coupons for the summer; (c) failing to reliably answer phone calls from customers; (d) failing to accurately inform customers as to the availability of seats on Shoreline Aviation's flights; (e) failing to book reservations exclusively for Shoreline Aviation; and (f) terminating the Contract without a valid basis.

86.    As a result, Shoreline Aviation suffered damages in an amount to be determined at trial but in no event less than $3,000,000.00.

### COUNT II
### Promissory Estoppel – Against Herbst and SAFE

87.    Shoreline Aviation realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

88.    Herbst and SAFE made a clear and unambiguous promise to act as Shoreline Aviation's exclusive booking agent.

89.    Shoreline Aviation reasonably and foreseeably relied on that promise to Shoreline's detriment.

90.    As a result of Shoreline Aviation's reliance, Shoreline Aviation sustained injury when Herbst and SAFE failed to honor their promise in an amount to be determined at trial but in no event less than $3,000,000.00.

91.    It would be unconscionable not to enforce Herbst and SAFE's promise.

## COUNT III
### Conversion – Against Herbst and SAFE

92.     Shoreline Aviation realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

93.     Shoreline Aviation had legal ownership of or an immediate superior right of possession to the $65,522.00 it paid to Herbst and SAFE with the understanding that they would earn those pre-paid commissions by providing booking services for Shoreline Aviation.

94.     Herbst and SAFE exercised unauthorized dominion over those funds to the exclusion of Shoreline Aviation's rights by refusing to provide booking services for Shoreline.

95.     Shoreline Aviation demanded return of the unearned commissions, but Herbst and SAFE refused to return the funds.

96.     Shoreline Aviation was damaged as a result in the amount of $65,522.00.

## COUNT IV
### Unjust Enrichment – Against Herbst and SAFE

97.     Shoreline Aviation realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

98.     Herbst and SAFE were enriched by receiving commissions from Shoreline Aviation in the amount of $65,522.00 in exchange for a benefit that has never been fully conferred.

99.     Herbst and SAFE's unjust enrichment was at Shoreline Aviation's expense.

100.    It is against equity and good conscience to permit Herbst and SAFE to retain the unearned commissions.

101.    As a result, Shoreline Aviation has been damaged in the amount of $65,522.00.

## COUNT V
## Breach of Fiduciary Duty – Against Herbst and SAFE

102.    Shoreline Aviation realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

103.    Shoreline Aviation placed trust and confidence in Herbst and SAFE, who were the exclusive booking agent for Shoreline Aviation.

104.    By virtue of Herbst and SAFE's agency relationship with Shoreline Aviation, they owed a fiduciary duty to Shoreline Aviation.

105.    Herbst and SAFE breached that duty and committed misconduct by (a) diverting Shoreline Aviation's customers to Shoreline Aviation's competitors; (b) making false and disparaging statements about Shoreline Aviation to its customers, including that Shoreline Aviation had made the decision to cease working with SAFE without notice to SAFE even though Herbst and SAFE themselves had unilaterally stopped booking Shoreline Aviation flights; (c) making false and disparaging statements to the East Hampton airport manager and East Hampton town attorney to get Shoreline Aviation thrown out of East Hampton Airport, including that Shoreline Aviation had no right to operate at that airport; (d) misappropriating Shoreline Aviation's customer list for Herbst and SAFE's own purposes; (e) refusing to book seats for Shoreline Aviation customers based on a false premise; (f) secretly working with Blade without informing, and while still affiliated with, Shoreline Aviation; and (g) otherwise failing to act in Shoreline Aviation's best interests.

106.    As a result, Shoreline Aviation suffered damages in an amount to be determined at trial, but in no event less than $10,000,000.00.

107.    Herbst and SAFE's conduct evinces a high degree of moral culpability, is so flagrant as to transcend mere carelessness, and/or constitutes willful or wanton negligence or recklessness. Specifically, Herbst and SAFE intentionally stole Shoreline Aviation's customers and made false statements about Shoreline Aviation to its customers with malice and with an intent to harm Shoreline Aviation's business out of a desire to pocket substantial amounts of money at the expense of Shoreline Aviation, because they were already working on behalf of Shoreline Aviation's competitors at the time, and because, upon information and belief, Herbst desired to retaliate against Shoreline Aviation for what she perceived to be its cooperation with her ex-husband Tuma against her interests in acrimonious divorce proceedings.

108.    By reason of the foregoing, Shoreline Aviation has been damaged and is entitled to punitive damages in an amount to be determined at trial, but in no event less than $20,000,000.00.

## <u>COUNT VI</u>
**Violation of the Faithless Servant Doctrine – Against Herbst and SAFE**

109.    Shoreline Aviation realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

110.    As an agent to Shoreline Aviation, Herbst and SAFE owed Shoreline Aviation a duty of good faith and loyalty and was obligated to act in Shoreline Aviation's best interests.

111.    Shoreline Aviation was entitled to place its trust and confidence in Herbst and SAFE and to expect them to act with the utmost good faith toward Shoreline Aviation in performance of their duties.

112.    As an agent of Shoreline Aviation, Herbst and SAFE were responsible for certain duties, including but not limited to (a) customer communications, (b) booking reservations for Shoreline Aviation's flights, (c) sending out letters to Shoreline Aviation's

customers offering discount coupons for the summer, (d) processing payments, (e) creating flight manifests, and (f) handling passenger check-in procedures.

113.    As an agent of Shoreline Aviation, Herbst and SAFE had access to confidential information, including information about Shoreline Aviation's customers.

114.    As a result, Shoreline Aviation relied heavily on Herbst and SAFE's loyalty and integrity and their faithful performance of their duties and responsibilities.

115.    Herbst and SAFE breached their fiduciary duty by acting to the detriment of Shoreline Aviation in a number of ways, including but not limited to (a) diverting Shoreline Aviation's customers to Shoreline Aviation's competitors; (b) making false and disparaging statements about Shoreline Aviation to its customers, including that Shoreline Aviation had made the decision to cease working with SAFE without notice to SAFE even though Herbst and SAFE themselves had unilaterally stopped booking Shoreline Aviation flights; (c) making false and disparaging statements to the East Hampton airport manager and East Hampton town attorney to get Shoreline Aviation thrown out of East Hampton Airport, including that Shoreline Aviation had no right to operate at that airport; (d) misappropriating Shoreline Aviation's customer list for Herbst and SAFE's own purposes; (e) refusing to book seats for Shoreline Aviation customers based on a false premise; (f) secretly working with Blade without informing, and while still affiliated with, Shoreline Aviation; and (g) otherwise failing to act in Shoreline Aviation's best interests.

116.    Indeed, Herbst and SAFE acted directly against Shoreline Aviation's interests by usurping its business opportunities.

117.    Herbst and SAFE's disloyalty to Shoreline Aviation and breach of their fiduciary duty directly and proximately caused damage to Shoreline Aviation.

118.    As a result, Shoreline Aviation is entitled to disgorgement from Herbst and SAFE of all monies paid to them during the period of disloyalty.

### COUNT VII
**Misappropriation – Against Herbst and SAFE**

119.    Shoreline Aviation realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

120.    Shoreline Aviation's proprietary customer information is an asset of the corporation.

121.    Customers who previously booked with Shoreline Aviation and attempted to do so with Herbst and SAFE constitute business opportunities for Shoreline Aviation.

122.    Herbst and SAFE misappropriated Shoreline Aviation's assets and business opportunities when Herbst and SAFE diverted Shoreline Aviation's customers to Blade's air carriers.

123.    As a result, Shoreline Aviation suffered damages in an amount to be determined at trial, but in no event less than $10,000,000.00

124.    Herbst and SAFE's conduct evinces a high degree of moral culpability, is so flagrant as to transcend mere carelessness, and/or constitutes willful or wanton negligence or recklessness. Specifically, Herbst and SAFE intentionally stole Shoreline Aviation's customers and business opportunities with malice and with an intent to harm Shoreline Aviation's business out of a desire to pocket substantial amounts of money at the expense of Shoreline Aviation, because they were already working on behalf of Shoreline Aviation's competitors at the time, and because, upon information and belief, Herbst desired to retaliate against Shoreline Aviation for what she perceived to be its cooperation with her ex-husband Tuma against her interests in acrimonious divorce proceedings.

125.    By reason of the foregoing, Shoreline Aviation has been damaged and is entitled to punitive damages in an amount to be determined at trial but in no event less than $20,000,000.00.

**COUNT VIII**
**Unfair Competition – Against All Defendants**

126.    Shoreline Aviation realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

127.    For their own commercial advantage, Defendants misappropriated Shoreline Aviation's customer list, cultivated by Shoreline Aviation over 38 years of doing business as a provider of commuter and charter flights.

128.    Defendants intentionally stole Shoreline Aviation's customers and business opportunities with malice and with an intent to harm Shoreline Aviation's business because they were already working on behalf of Shoreline Aviation's competitors at the time and because, upon information and belief, Herbst desired to retaliate against Shoreline Aviation for what she perceived to be its cooperation with her ex-husband Tuma against her interests in acrimonious divorce proceedings.

129.    Defendants waged a campaign of harassment against Shoreline Aviation, routinely filming their customers and staff, talking to Shoreline Aviation's customers as they attempted to check in, and making false statements to the East Hampton airport manager and East Hampton town attorney in an attempt to get Shoreline Aviation thrown out of East Hampton Airport.

130.    As a result, Shoreline Aviation suffered damages in an amount to be determined at trial but in no event less than $10,000,000.00.

## COUNT IX
**Tortious Interference with Prospective Business Relations – Against All Defendants**

131.    Shoreline Aviation realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

132.    Shoreline Aviation had existing business relations with its customers of which Defendants were aware, as Herbst and SAFE were Shoreline Aviation's exclusive booking agent for approximately 24 years, and Pilla is Herbst's live-in boyfriend and also works closely with Herbst professionally.

133.    For over 38 years, Shoreline Aviation worked to cultivate and develop an extensive list of customers who returned as passengers on its seaplanes every summer.

134.    Defendants were aware that such repeat customers represented valuable business opportunities for Shoreline Aviation.

135.    Defendants deliberately interfered with those relationships by inducing Shoreline Aviation's returning and prospective customers to book their reservations with Shoreline Aviation's competitors.

136.    Defendants acted with the wrongful purpose of harming Shoreline Aviation and used improper means to do so including by (a) diverting Shoreline Aviation's customers to Shoreline Aviation's competitors; (b) making false and disparaging statements about Shoreline Aviation to its customers, including that Shoreline Aviation had made the decision to cease working with SAFE without notice to SAFE even though Herbst and SAFE themselves had unilaterally stopped booking Shoreline Aviation flights; (c) refusing to book seats for Shoreline Aviation customers based on a false premise; (d) secretly working with Blade without informing, and while still employed with, Shoreline Aviation; and (e) misappropriating Shoreline Aviation's customer list for Defendants' own purposes.

137.     Defendants also waged a campaign of harassment against Shoreline Aviation, routinely filming their customers and staff, talking to Shoreline Aviation's customers as they attempted to check in, and making false statements to the East Hampton airport manager and East Hampton town attorney in an attempt to get Shoreline Aviation thrown out of East Hampton Airport, including that Shoreline Aviation had no right to operate at that airport.

138.     But for Defendants' improper actions, Shoreline Aviation's customers would have reserved seats on Shoreline Aviation's air carriers because those customers were either existing Shoreline Aviation customers and/or had contacted Herbst and SAFE with the intent to book seats on Shoreline Aviation's flights.

139.     As a result of Defendants' actions, existing and prospective customers did not purchase tickets for Shoreline Aviation flights and purchased through Blade instead, causing Shoreline Aviation to permanently lose future revenue from those relationships and damages to Shoreline of no less than $10,000,000.00.

140.     Defendants' conduct evinces a high degree of moral culpability, is so flagrant as to transcend mere carelessness, and/or constitutes willful or wanton negligence or recklessness. Specifically, Defendants intentionally stole Shoreline Aviation's customers and business opportunities with malice and with an intent to harm Shoreline Aviation's business out of a desire to pocket substantial amounts of money at the expense of Shoreline Aviation, because they were already working on behalf of Shoreline Aviation's competitors at the time, and because, upon information and belief, Herbst desired to retaliate against Shoreline Aviation for what she perceived to be its cooperation with her ex-husband Tuma against her interests in acrimonious divorce proceedings.

141.    By reason of the foregoing, Shoreline Aviation has been damaged and is entitled to punitive damages in an amount to be determined at trial but in no event less than $20,000,000.00.

## DEMAND FOR TRIAL BY JURY

142.    Shoreline Aviation hereby demands a trial by jury.

**WHEREFORE**, Shoreline Aviation prays for judgment and relief as follows: (1) compensatory and consequential damages to Shoreline Aviation in an amount to be proven at trial but no less than $10,000,000.00; (2) punitive damages to Shoreline Aviation amounting to no less than $20,000,000.00; (3) disgorgement of all monies paid to Herbst and SAFE during the period of disloyalty; (4) costs and disbursements of this action; (5) pre- and post-judgment interest; and (6) such other and further relief as the Court deems just and proper.

Dated: Sag Harbor, NY
       May 13, 2020

KRIEGSMAN PC

*s/ Alex Kriegsman*
Alex Kriegsman
Kriegsman PC
*Attorneys for Plaintiff*
279 Main Street
Sag Harbor, NY 11963
(631) 899-4826 (tel.)
(631) 919-5182 (fax)
alex@kriegsmanpc.com