**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------------X

SHORELINE AVIATION, INC.,                          Case No.: 2:20-cv-02161-JMA-SIL

               Plaintiff,

      -against-                                      **AMENDED COMPLAINT**

CYNTHIA L. HERBST, SOUND AIRCRAFT
FLIGHT ENTERPRISES, INC., RYAN A. PILLA,
BLADE URBAN AIR MOBILITY, INC. a/k/a
FLY BLADE, INC., MELISSA TOMKIEL, and
ROBERT S. WIESENTHAL,

               Defendants.

------------------------------------------------------------------X

      Plaintiff Shoreline Aviation, Inc. ("Shoreline Aviation"), by its attorneys, Kriegsman

PC, as and for its Amended Complaint against Defendants Cynthia L. Herbst ("Herbst"),

Sound Aircraft Flight Enterprises, Inc. ("SAFE"), Ryan A. Pilla ("Pilla"), Blade Urban Air

Mobility, Inc. a/k/a Fly Blade, Inc. ("Blade"), Melissa Tomkiel ("Tomkiel"), and Rob

Wiesenthal ("Wiesenthal") (collectively, "Defendants"), alleges, upon knowledge as to itself

and upon information and belief as to all other matters, as follows:

**NATURE OF THE ACTION**

      1.     Shoreline Aviation brings this action to recover damages it suffered as the result

of Herbst and SAFE's failure to honor their obligations as Shoreline Aviation's exclusive

booking agent to provide booking services for Shoreline Aviation's customers; and

Defendants' (a) misappropriation of Shoreline Aviation's trade secrets and other confidential

information; (b) wrongful diversion of Shoreline Aviation's customers to its competitors; (c)

tortious interference with Shoreline Aviation's business; and (d) false statements about

Shoreline Aviation to its customers and regulators.

**PARTIES**

2.      Plaintiff Shoreline Aviation is a Connecticut corporation, an aviation company that ran commuter and charter flights in New York and the Northeast, including flights in and out of East Hampton Airport in New York.

3.      Upon information and belief, Defendant Herbst is a New York resident with a principal address of 3705 Noyac Road, Unit D, Sag Harbor, New York 11963. Herbst is the president, chief executive officer, and owner of SAFE.

4.      Upon information and belief, Defendant Pilla is a New York resident with a principal address of 3705 Noyac Road, Unit D, Sag Harbor, New York 11963. Upon information and belief, Pilla is Herbst's live-in boyfriend and works with her in a professional capacity.

5.      Upon information and belief, Defendant SAFE is a New York corporation with a principal address of 200 Daniels Hole Road, P.O. Box 438, Wainscott, New York 11975-0438. SAFE is an air charter broker that links prospective charter and commuter customers with direct air carriers flying to and from East Hampton Airport in New York and New York City. From 1994 through April 2018, Herbst and SAFE exclusively represented Shoreline Aviation for seaplane operations.

6.      Upon information and belief, Defendant Blade is a Delaware corporation with a principal address of 499 East 34th Street, New York, New York 10016. Upon information and belief, Blade is an air charter broker and urban air mobility platform founded in 2014. Blade operates a mobile application that arranges helicopter and seaplane flights and was a competitor to Shoreline Aviation.

2

7.      Upon information and belief, Defendant Tomkiel is a New York resident with a principal business address of 499 East 34th Street, New York, New York 10016. Tomkiel is Blade's general counsel and president of its Fixed Wing Operations.

8.      Upon information and belief, Defendant Wiesenthal is a New York resident with a principal business address of 499 East 34th Street, New York, New York 10016. Wiesenthal is Blade's founder and chief executive officer.

## JURISDICTION AND VENUE

9.      This Court has original subject matter jurisdiction over Shoreline Aviation's claims pursuant to (a) 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states; and (b) 28 U.S.C. § 1331 because the action arises under the laws of the United States.

10.     This Court has personal jurisdiction over Defendants because they do business in Suffolk County, New York and because this action arises out of conduct that took place in Suffolk County, New York.

11.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Shoreline Aviation's claims occurred in this District.

## FACTS

**I.      Herbst and SAFE agreed to serve as Shoreline Aviation's exclusive booking agent.**

12.     Shoreline Aviation is an aviation company that, until April 2020, had been offering seaplane services beginning in 1980. Shoreline Aviation operated a fleet of ten Cessna Caravan Amphibians and ran commuter and charter flights in New York and the Northeast, including flights in and out of East Hampton Airport in New York.

13.     Over its 40 years of business, Shoreline Aviation painstakingly developed a reputation for an impeccable safety record, superior customer service, consistent on-time arrivals, and the most well-maintained aircraft in the industry.

14.     Shoreline Aviation began providing regular seaplane commuter service to The Hamptons in 1994. For approximately 24 years, Shoreline Aviation contracted services with Sound Aircraft Services, Inc. ("SAS"), a company which, until 2017, was owned by a married couple, Steven Tuma ("Tuma") and Herbst. As General Manager of SAS, Herbst was responsible for establishing the relationship between SAS and Shoreline Aviation in 1993.

15.     Tuma handled the fixed-base operation portion of SAS's business, fueling aircraft and providing maintenance and line service. Herbst was responsible for broker services, exclusively booking Shoreline Aviation's seaplane commuter flights through SAS until her divorce in April 2017 at which time she transitioned to an affiliated entity already in place, SAFE.

16.     The Town of East Hampton, Shoreline Aviation, and SAS entered into an operating agreement, dated May 12, 1994, a true copy of which is annexed hereto as **Exhibit A**. The agreement was for a term of one year and was renewed annually for the first few years and every three years in subsequent years. Pursuant to this agreement, SAS agreed to provide ticketing, check-in, baggage handling, and related customer services to Shoreline Aviation. Ex. A ¶ 3(B)(1).

17.     In 1994, Shoreline Aviation entered into an oral agreement with SAS and Herbst (the "Contract"), pursuant to which Herbst would provide booking services exclusively for Shoreline Aviation's flights to and from the East Hampton Airport in return for commissions.

18.     In connection with Shoreline Aviation's expansion to include a number of scheduled commuter flights between East Hampton and New York City, SAS and Shoreline Aviation entered into a separate written operating agreement on July 16, 1996 (the "Operating Agreement"), a true copy of which is annexed hereto as **Exhibit B**, pursuant to which SAS agreed to "continue to offer flight reservation services and ground handling" for Shoreline Aviation's charter and commuter services at East Hampton Airport. (Ex. B ¶¶ II(B), II(D).)

19.     The Operating Agreement between SAS and Shoreline Aviation was not intended to embody the entire agreement between the parties and did not contain an integration clause.

20.     Accordingly, SAS, Shoreline Aviation, and Herbst supplemented the Contract to address the specifics of the commission arrangement for both charter and commuter flights, which were not covered by the terms of the Operating Agreement.

21.     Under the Contract, Herbst and SAS agreed to continue to act as Shoreline Aviation's exclusive broker in return for a 10% commission on each commuter seat and charter flight booked.

22.     Herbst and SAS also agreed to continue acting as Shoreline Aviation's ground handler for its seasonal seaplane commuter service between New York City and East Hampton, and Shoreline Aviation agreed to continue to be the exclusive provider of seaplane services for SAS.

23.     The Contract was evidenced by the parties' course of performance over a period of 24 years.

24.     Under the Contract, either party could terminate the agency relationship with reasonable notice to the other party.

25.     As Shoreline Aviation's exclusive booking agent, Herbst and SAFE handled Shoreline Aviation's reservation requests, payment processing, customer communications, correspondence, flight manifests, and passenger check-in procedures at East Hampton Airport. Accordingly, Herbst thoroughly understood Shoreline Aviation's business and had clear insight into the consequences of her actions and their impact on Shoreline Aviation's business.

26.     Under the Contract's terms, Herbst and SAFE had a duty to act on behalf of Shoreline Aviation, and Shoreline Aviation entrusted its reservation system to their care.

27.     Shoreline Aviation advertised SAS's phone number in its website, advertisements, publications, travel guides, and signage beginning in the early 1990s and continuing into 2018. True copies of Shoreline Aviation's website from 2014 to 2018 and advertisements published in 1994 are annexed hereto as **Exhibit C**.

28.     Through the parties' course of dealing over 24 years, Herbst and SAFE have acknowledged the existence, essential terms, and the validity of the Contract.

29.     In 2017, a charter flight between East Hampton and New York City cost $3,695.00 and Herbst's commission was 10%. On commuter flights, Herbst's commission for each commuter passenger was 10%, which was $59.50 per passenger in 2017 and $65.00 per passenger in 2018. Between October 2016 and September 2017, Shoreline Aviation paid Herbst and SAFE $291,315.00 in commissions. Annexed hereto as **Exhibit D** is a true copy of a table detailing the commissions Shoreline Aviation paid to Herbst and SAFE from 2001 to 2018.

30.     Prior to and during each summer season, Shoreline Aviation customers made reservations for seats on Shoreline Aviation's air carriers through Herbst and SAFE over the phone or by email.

31.    Herbst and SAFE would then provide Shoreline Aviation with the flight manifest, which included the customers' names and weights.

32.    Each week, Herbst and SAFE would provide a weekly recap report detailing sales, expenses, and fees. Herbst would then send Shoreline Aviation a check for the total sales minus fuel fees and her commission. True copies of three such reports and corresponding checks for weeks ending September 26, 2004; June 13, 2011; and April 16, 2018 are annexed hereto as **Exhibit E**.

33.    In December of each year, customers were able to purchase coupon books of ten seats in order to get a 10% discount prior to the summer season, paying Shoreline Aviation directly by check or wire services. Another letter went out in March making the same offer for a 5% discount. Customers were required to pay Shoreline Aviation by check or wire transfer.

34.    Herbst's administrative duties for Shoreline Aviation included mailing out a letter to Shoreline Aviation customers, once in December and again in March of each year, asking them to buy books of ten tickets to receive a 10% discount for purchasing ahead of the summer season. Herbst and SAFE sent out these letters on behalf of Shoreline Aviation, and they required Shoreline Aviation's approval. As Shoreline Aviation's flights filled up early, customers generally booked their seats for the summer season in April and May.

**II.    Herbst and SAFE had full access to Shoreline Aviation's customer, pricing, and business practices information.**

35.    As the exclusive booking agent for Shoreline Aviation, Herbst and SAFE maintained a list of Shoreline Aviation customers for booking and communications purposes. Such customer information was available to Herbst and SAFE only by virtue of their role as Shoreline Aviation's booking agent.

36.     Three subsets of Shoreline Aviation's customers consisted of (1) coupon customers, (2) charter customers, and (3) management clients, lists of which were maintained separately by Shoreline Aviation.

37.     Management clients owned their own aircraft, but Shoreline would maintain their planes, operate them for the clients, and use the planes on charter flights for other passengers.

38.     Shoreline Aviation's proprietary customer information, including the identities, addresses, and contact information of customers and their individual preferences, credit card information, and contact information for individual contact people with whom Herbst and SAFE dealt in booking seaplane passengers for Shoreline Aviation, was not available to the public and was cultivated over Shoreline Aviation's nearly 38 years in the aviation industry.

39.     Shoreline Aviation developed this information through years of effort and advertisement, expending substantial time, effort, and money to do so. These considerable efforts included thousands of dollars spent in advertisements in local newspapers and signage at the 23rd Street Seaplane Base in Manhattan to identify those individuals interested in seaplane services flying in and out of East Hampton Airport.

40.     Given the amount of effort and money Shoreline Aviation expended to develop its customer list, Shoreline Aviation took several measures to guard the secrecy of this information, including restricting access to the customer database in Shoreline Aviation's computer system, which was password protected, and instructing all of its employees and agents, including Herbst and SAFE, not to disclose confidential company information to anyone outside the company.

41.     Shoreline Aviation's 2000 employee handbook, a copy of which was provided to Herbst and a true copy of which is annexed hereto as **Exhibit F**, prohibited employees from disclosing customer information, stating, "no employee shall disclose customer and client information to outsiders" and "Protecting our company's information is the responsibility of every employee and we all share a common interest in making sure it is not improperly or accidently [sic] disclosed. Do not discuss the company's confidential business with anyone who does not work for us." Ex. F at 19, 22

42.     As an established seaplane operator in business for 38 years, Shoreline Aviation had cultivated a customer list containing information that had great value to both Shoreline Aviation and its competitors, including new booking services like Blade and air carriers like Fly The Whale, LLC ("Fly The Whale"). The information was not known outside of Shoreline Aviation's business and could not have been properly acquired without great difficulty by competitors.

43.     Herbst and SAFE also had unfettered access to Shoreline Aviation's proprietary pricing information for its charter and commuter flights and confidential business practices, including policies regarding refunds, carry-overs on season tickets, missed flights, and change/cancellation fees.

44.     Herbst and SAFE were aware of Shoreline Aviation's business practices and policies because Herbst was an integral part of forming them over the years.

45.     For example, customers purchasing coupon books were obligated to use them by the end of October. In addition, Herbst and SAFE charged $75.00 any time a customer changed a flight time. They established a policy of not giving refunds to anyone, regardless of the circumstances.

III.  **Herbst and Tuma divorced, SAFE split from SAS, and Herbst and SAFE's booking services began to deteriorate.**

46.  Upon information and belief, in or about 2015, Herbst began an extra-marital relationship with Pilla.

47.  Pilla's relationship with Herbst also extended into the professional realm. Pilla began attending business meetings with Herbst and often negotiated and spoke on behalf of Herbst.

48.  On or about April 27, 2017, as part of Herbst's divorce settlement with Tuma, SAS split into two separate companies – SAS and SAFE. Tuma became the sole owner of SAS, and Herbst became the sole owner of SAFE, which continued with the booking services previously handled by Herbst and SAS under the Contract. At that time, Herbst went to great lengths to assure Shoreline Aviation that the transition to SAFE would be seamless.

49.  But when Herbst and SAFE continued Shoreline Aviation's booking services after Herbst's divorce, customer service began to deteriorate. Herbst and SAFE failed to reliably answer phone calls from customers, and when calls were answered, newly hired staff made several costly mistakes, including providing incorrect dates and times for flights, passenger counts, and direction of flights.

50.  As a direct result of Herbst's frequent absences and Herbst and SAFE's poor customer service, commuter and charter sales from SAFE decreased approximately 20% during the 2017 summer season. Annexed hereto as **Exhibit G** is a true copy of a May 14, 2018 email from ██████, a former Shoreline Aviation customer, to John Kelly ("Kelly"), Shoreline Aviation's then-president, directly attributing his decision to switch to Fly The Whale to Herbst and SAFE's poor customer service and lack of flexibility.

51.     In or around November 2017, Kelly met with Herbst and Pilla to discuss shortcomings from the summer season. At that meeting, Pilla complained that Herbst worked too hard, and Herbst asked for an increase in commissions and vowed to stay on top of the business going forward.

52.     Following the meeting, Kelly sent Herbst a written proposal, a true copy of which is annexed hereto as **Exhibit H**, outlining the parties' agreement to date and offering to pay Herbst the full 10% commission on the prepaid commuter books if she was willing to absorb the ramp fees.

53.     As had been the practice in prior years, in January, February, and March of 2018, Shoreline Aviation paid Herbst her 10% commission in advance for customer booking and handling on the upcoming 2018 summer season in the amount of $65,522 for 1,100 seats sold. In addition, SAFE and Herbst continued to book charter flights with Shoreline Aviation between the fall of 2017 and April of 2018.

**IV.     Herbst and SAFE stopped booking seats for Shoreline Aviation without notifying Shoreline Aviation and began to work as booking agent for Shoreline Aviation's competitor Blade.**

54.     In March 2018, Herbst failed to send a follow-up letter to Shoreline Aviation's commuter customers regarding the pre-purchase of tickets at a 5% discount price, as she had done in previous years.

55.     When Kelly asked Herbst why she had not sent the letter offering the discount on pre-purchases of tickets, Herbst had no satisfactory answer and stalled.

56.     Customers began to call Shoreline Aviation stating that SAFE would not book their seats for the coming season. They were told by Herbst and SAFE that seats could not be

booked because Shoreline Aviation had not set the schedule. This statement was false. Shoreline Aviation's schedule had been the same every year.

57.     One assistant for a customer informed Shoreline Aviation that she had tried booking flights for the customer through SAFE for two months and was unsuccessful.

58.     Upon information and belief, in late March 2018, Herbst began instructing SAFE employees, including Eduardo Fernandes ("Fernandes"), not to book Shoreline Aviation customers on Shoreline Aviation flights but to "stall" the customers.

59.     Upon information and belief, Herbst intended to hold off on booking flights for these customers while she finalized her agreement with Blade so that she could ultimately divert Shoreline Aviation customers to Blade's air carriers.

60.     On April 19, 2018, the Town of East Hampton revoked Blade's airport license agreement because Blade was falsely representing itself to be an air carrier. The Town Attorney also filed a complaint against Blade with the Office of Aviation Enforcement and Proceedings of the United States Department of Transportation for unfair and deceptive business practices and/or unfair methods of competition in violation of federal law.

61.     As a result, upon information and belief, Wiesenthal and Tomkiel of Blade approached Herbst and Pilla in or around March 2018 to persuade them to provide booking services for Blade, which would ensure that Blade would have a counter at the East Hampton Airport.

62.     In April 2018, Pilla asked Kelly to meet with him, Herbst, and Blade representatives at the Gabreski Airport in Westhampton, New York.

63.     At that meeting, on April 6, 2018, Tomkiel and Wiesenthal, on behalf of Blade, offered to provide booking services for Shoreline Aviation and pay 70 cents on the dollar for each flight.

64.     Shoreline Aviation representatives expressed concern that Tomkiel was a minority shareholder in Fly The Whale, one of Shoreline Aviation's competitors, and about the impact that conflict of interest would have on the amount of business Blade would direct to Shoreline Aviation should the deal go through.

65.     ████████████████████████████████
████████████████████████████████████
████████████████████████████████
██████████████████████████

66.     In addition, it became apparent from the conversation that if Shoreline Aviation used Blade's booking services, there would be no guarantee that Shoreline Aviation's long-time passengers would continue to get preferred access to its flights, and no way for a customer to be sure that they would be placed on a Shoreline Aviation aircraft and not an aircraft operated by another of Blade's providers.

67.     Moreover, the proposed deal would have given Blade control over Shoreline Aviation's customer list and booking process. And once Blade had established itself with Shoreline Aviation's customers and adapted them to Blade's booking system, Blade would have no incentive to continue to work with Shoreline Aviation.

68.     Upon information and belief, Pilla spearheaded the April 6 meeting and was personally invested in making an arrangement between Shoreline Aviation and Blade work.

69.    Between April 9 and April 11, Pilla texted Kelly every day trying to convince him to take Blade up on its offer and pressuring him to make a quick decision.

70.    Because a partnership with Blade would be disadvantageous to both Shoreline Aviation and its customers, Shoreline Aviation declined Blade's offer.

71.    In response, Herbst and SAFE unilaterally ended their relationship with Shoreline Aviation without informing Shoreline Aviation. And no seats were booked for Shoreline Aviation's customers despite commissions having been paid to Herbst and SAFE for the coming season.

72.    Upon information and belief, Herbst and SAFE instructed their staff to put Shoreline Aviation's customers on Blade flights.  Unaware that Herbst and SAFE had unilaterally terminated the Contract and had gone to work for Blade, and in an effort to maintain continuity for its passengers, Shoreline Aviation offered Herbst and SAFE $375,000 to purchase select assets of SAFE, with the $65,522.00 of unearned commissions serving as a down payment, by letter dated April 20, 2018.

73.    When Shoreline Aviation did not hear back from SAFE, Kelly followed up with an email to Herbst on April 23, 2018, a true copy of which is annexed hereto as **Exhibit I**. In that email, Kelly wrote, in part, "As you know, we are already at a point in the season where, according to our longstanding exclusive agreement, you should be booking passengers, yet Eduardo, in your office, says he has not been authorized to do so. In addition, the second Coupon Book letter which was to go out in early April has yet to be sent." Kelly also asked for a refund of the $65,500 in advance commissions if Herbst and SAFE did not intend to book Shoreline Aviation's passengers.

74.     Herbst and SAFE neither accepted nor declined Shoreline Aviation's offer but stalled for time to answer. It has since become clear that, during this time, Pilla, Herbst, and SAFE were negotiating multiple agreements with Tomkiel and Wiesenthal of Blade, as described more fully below.

75.     As Pilla was Shoreline Aviation's main point of contact during these negotiations, Kelly sent a text message to Pilla on April 27, 2018 asking for an update or response to Shoreline Aviation's offer. Pilla promised Kelly that he would speak to Herbst over the weekend and stated, "I'm doing the best I can my friend." That message was Shoreline Aviation's last communication with Pilla, SAFE, or Herbst.

**V.     Herbst and SAFE agreed to provide booking services for Blade and to disclose Shoreline Aviation's proprietary business information.**

76.     Throughout April, several Shoreline Aviation customers called Shoreline Aviation directly, stating that they were unable to book seats for the summer. When Shoreline Aviation asked SAFE for an explanation, its employees refused to comment. Meanwhile, Shoreline Aviation was unable to speak with Herbst because she was consistently unreachable.

77.     On April 22, 2018, during Shoreline Aviation's peak booking season, Eric Weaver ("Weaver"), Shoreline Aviation's Chief Pilot, was at the East Hampton Airport and saw Fernandes, a SAFE employee.

78.     Weaver asked Fernandes if SAFE was booking flights for the summer commuters. Fernandes appeared very uncomfortable, would only respond that "people are calling," and pointed to Herbst's empty office.

79.     Upon information and belief, Herbst and SAFE sold Shoreline Aviation's customer database to Blade and began to book seaplane flights for Blade as early as April 2018 without informing Shoreline Aviation.

80.     Herbst and SAFE never informed Shoreline Aviation that they would stop booking tickets for Shoreline Aviation. Indeed, Shoreline Aviation did not discover that they had ceased doing so until customers began calling Shoreline Aviation's offices after they tried but failed to book Shoreline Aviation tickets through Herbst and SAFE.

81.     Moreover, Herbst and SAFE never returned to Shoreline Aviation the $65,522.00 in pre-paid and unearned commissions from Shoreline Aviation.

82.     On May 4, 2018, Kelly and Andrea Collingwood, Shoreline Aviation's marketing director, attended a meeting at the East Hampton Airport and witnessed Fernandes, the SAFE staff member, answering the phone while behind the Blade booth.

83.     At that point, it became clear to Shoreline Aviation that SAFE was not honoring its commitment to provide services to Shoreline Aviation's customers and was working on behalf of Shoreline Aviation's competitor instead.

84.     After 24 years as Shoreline Aviation's exclusive broker, Herbst never notified Shoreline Aviation that she would no longer be representing Shoreline Aviation.

85.     Knowing that Herbst and SAFE were Shoreline Aviation's exclusive booking agent, Tomkiel and Wiesenthal deliberately solicited Herbst and SAFE to work with Blade before their agency relationship with Shoreline Aviation had been terminated.

86.     ██████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████



91.　　Upon information and belief, Herbst and SAFE instructed their staff to put Shoreline Aviation's customers on Blade flights and covertly furnished Shoreline Aviation's customer, pricing, and other proprietary information to Blade.

92.　　Upon information and belief, Defendants colluded with one another to use Herbst and SAFE's access to Shoreline Aviation's proprietary customer, pricing, and business practices information to improperly solicit and divert Shoreline Aviation's customers to Blade and its affiliated air carriers.

93.　　Upon information and belief, Tomkiel and Wiesenthal received additional Blade shares as a result of their wrongful actions against Shoreline Aviation, including their

misappropriation of Shoreline Aviation's confidential information and tortious interference with Shoreline Aviation's business.

94. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

95.     Facing the potential loss of counter space at East Hampton Airport and to gain an unfair competitive advantage, Blade thus paid Herbst and SAFE money and stock options in exchange for counter space and access to Shoreline Aviation's trade secrets and proprietary information, including the identity of all of its seaplane customers (both commuter and charter) and its management clients, proprietary pricing and rate information, and confidential business practices, including policies regarding carry-overs on season tickets, missed flights, and change/cancellation fees.

**VI.    Herbst sent a letter to Shoreline Aviation's customers containing false statements about the dissolution of the relationship between SAFE and Shoreline Aviation.**

96.     Because Herbst stopped booking for Shoreline Aviation, Shoreline Aviation had to scramble in early May 2018 to set up its own reservations and database management systems and hire and train new dispatchers to help book its flights.

97.     In addition, Shoreline Aviation had to contact all of its customers to set up their flights for the season.

98.     On May 7, 2018, Shoreline Aviation sent a letter to all of its customers explaining that all bookings would now be handled directly by Shoreline Aviation. Annexed hereto as **Exhibit N** is a true copy of Shoreline Aviation's letter.

18

99.     Later that day, Herbst sent an email to all of Shoreline Aviation's customers, falsely stating that Shoreline Aviation had ceased working with SAFE without notice, even though she had signed a consulting agreement with Blade on May 1, 2018. Annexed hereto as **Exhibit O** is a true copy of Herbst's May 7, 2018 email. Specifically, Herbst wrote, in relevant part, "Unfortunately it appears that Shoreline Aviation no longer wishes to work with Sound Aircraft Flight Enterprises. Without notice to us."

100.     Herbst and SAFE had unilaterally ceased booking Shoreline Aviation flights without informing Shoreline Aviation and was ignoring all attempts by Shoreline Aviation to communicate with them. And Herbst and SAFE had clearly begun working with Blade prior to Herbst's May 7, 2018 email, in violation of the Contract. Notwithstanding these facts, Herbst's email claimed that Shoreline Aviation had made the decision to discontinue the relationship and that the decision was unexpected, stating, "We truly appreciate and value the relationship we have built together and we would like to continue this relationship regardless of Shoreline's unexpected decision." Ex. O.

101.     Herbst then attempted to divert Shoreline Aviation's customers to Shoreline Aviation's competitors, stating that she had "transitioned to a new aviation platform" managed by Blade and that customers would have "many more route choices and aircraft options" by using this new platform. *Id.* She also advised the customers to seek a refund from Shoreline Aviation for their pre-paid tickets, even though it was Herbst who, prior to this time, had insisted on a no-refund policy for Shoreline Aviation customers. *Id.*

102.     Following Herbst's May 7, 2018 email, several Shoreline Aviation customers emailed and called Shoreline Aviation demanding their money back.

103.     To keep customers happy, Shoreline Aviation was forced to run flights with
fewer than four people on board, at great cost to Shoreline Aviation. Had Herbst and SAFE
complied with their obligation to book passengers, these flights would have been full.

104.     Shoreline Aviation was also forced to assure its customers that they could carry
over their tickets to the 2019 season, because Herbst and SAFE were doing the same for Blade
customers, even though the prior policy, established by Herbst, required customers to use their
tickets by the end of October.

105.     Because all of Shoreline Aviation's existing signage and advertisements
contained the phone number for SAFE, Shoreline Aviation was forced to spend approximately
$80,000.00 in advertising during the 2018 season to remove references to SAFE and correct
the contact information.

**VII.     Defendants used Shoreline Aviation customer, pricing, and business practices
information to actively poach Shoreline Aviation customers.**

106.     For the remainder of 2018 and continuing through 2019 and 2020, Defendants
exploited Shoreline Aviation's customer list in multiple attempts to divert them to Shoreline
Aviation's competitors.

107.     For example, upon information and belief, the following were included among
the regular Shoreline Aviation commuter coupon customers Defendants diverted to Blade's air
carriers in May 2018: (1) ████████, (2) ████████████, (3) █████████████, (4) ████
███, (5) ███████████, (6) ██████████, (7) █████████, (8) ██████████, (9)
███████, (10) ███████, (11) ███████████, (12) █████████████, (13) ████████████,
(14) ████████, (15) █████████, (16) ███████████ (17) █████████████, (18)
████████, (19) ████████████, (20) █████████, (21) ███████████, (22) ████████,
(23) ████████, (24) ███████, (25) ████████████, (26) █████████, (27) ████████,

(28) ███████, (29) █████████, (30) ██████████, (31) ███████████, (32) ███████, (33) █████████, and (34) ████████████ (the "Diverted Coupon Customers").

108.    Moreover, upon information and belief, Tomkiel learned the identities of Shoreline Aviation's management clients, with the assistance of Herbst and SAFE, and tried to steal those clients away by making false representations to them about how they would save more money if they went with Blade instead.

109.    On December 6, 2018, Herbst and SAFE emailed ████████████, a Shoreline Aviation customer, and offered to book flights from him on behalf of Blade and its carriers. A true copy of this email is annexed hereto as **Exhibit P**.

110.    In addition to sending emails, upon information and belief, Herbst also called Shoreline Aviation customers directly in May 2018 to solicit their business for Blade and its air carriers. One such customer was ███████████, who had been a Shoreline Aviation customer since 1980.

111.    Armed with intimate knowledge of Shoreline Aviation's business practices, Herbst, SAFE, and Blade used the same policies that Herbst herself had established against Shoreline Aviation, easing up on her no-refund policy and permitting customers to carry over tickets to the following season.

**VIII.   Defendants aggressively interfered with Shoreline Aviation's business in other ways.**

112.    Between May 2018 and April 2020, Defendants actively sought to interfere in Shoreline Aviation's business in other ways.

113.    Upon information and belief, Herbst and Pilla attempted to get Shoreline Aviation thrown out of East Hampton Airport, misrepresenting to Jim Brundige, the airport manager, and the East Hampton town attorney that Shoreline Aviation had no right to operate

there, even though Shoreline Aviation had been operating at East Hampton Airport for 37 years.

114.     In addition to poaching Shoreline Aviation's broker and customers, Blade worked aggressively to sabotage Shoreline Aviation's business in other ways. For example, Blade representatives blocked Shoreline Aviation's advertisements and signage at the dock so that customers had difficulty finding Shoreline Aviation.

115.     Furthermore, Blade consistently failed to comply with normal protocols of operation in the East River. Blade's pilots refused to communicate by radio with Shoreline Aviation's pilots. Blade scheduled their flights between East Hampton and New York City earlier than Shoreline Aviation did, ignoring established curfews in the city that prohibited landing earlier than 8:00 a.m. in consideration of area residents.

116.     In a deliberate effort to delay Shoreline Aviation's flights and force its customers to wait to board or disembark, Blade's aircraft would sit on the dock for up to 20 minutes while Shoreline Aviation's aircraft bobbed in the river. Because Blade's flights left 15 minutes earlier than those of Shoreline Aviation, Blade had the ability to delay the deplaning of Shoreline Aviation customers at the dock on Monday mornings.

117.     On at least one occasion, a Blade staff member told one of Shoreline Aviation's customers that his flight with Shoreline Aviation would be cancelled because of a mechanical problem with the aircraft. The Blade staff member then persuaded the customer to fly with Blade even though Shoreline Aviation had another aircraft ready to fly ten minutes later.

118.     Defendants' false statements, including the false allegations in Herbst and SAFE's lawsuit against Shoreline Aviation seeking $2,000,000.00 in damages and a restraining

order (described in Section IX below), prevented Shoreline Aviation from selling commuter or charter flights in the East Hampton Airport throughout the summer seasons of 2018 and 2019.

119.   In addition, Herbst and Pilla repeatedly harassed Shoreline Aviation's staff and customers by continuously filming them, including attempts to surreptitiously film Shoreline Aviation's proprietary check-in programs. Herbst would also stand at the doors leading to the outdoor waiting area or directly across from Shoreline Aviation's location trying to talk to Shoreline Aviation's customers. She would stand at her front counter and listen or look over at Shoreline Aviation's computer screen as people checked in.

120.   Given Herbst's intimate knowledge of Shoreline Aviation's business model, Defendants understood the effect her actions would have on Shoreline Aviation's revenues and intentionally sought to destroy the business.

121.   As a result of Defendants' actions, Shoreline Aviation's total commuter revenue for flights in and out of East Hampton Airport decreased approximately 33% in 2018 and 40% in 2019, suffering damages in the amount of $850,000 in 2018 and $980,000 in 2019.

122.   In 2018, Shoreline Aviation suffered damages in the approximate amount of $1,653,747, consisting of $1,350,000 from lost revenue from both commuter and charter flights, $238,225 to replace SAFE's staff, and $65,522 for unearned commissions paid to Herbst and SAFE.

123.   In 2019, Shoreline Aviation suffered damages in the approximate amount of $1,720,000, consisting of $1,480,000 from lost revenue from both commuter and charter flights and $240,000 for additional staff.

**IX.     Herbst and SAFE filed suit against Tuma and Shoreline Aviation.**

124.    Claiming that Shoreline Aviation tortiously interfered with a non-compete provision in her divorce settlement with Tuma, Herbst and SAFE filed a complaint against Tuma, Shoreline Aviation, and Kelly individually on August 22, 2018, based on the untenable theory that Herbst and SAFE somehow acquired exclusive rights to sell flights at the East Hampton Airport as part of a private divorce agreement between Herbst and Tuma.

125.    Herbst and SAFE also alleged that Shoreline Aviation entered into a license agreement and fee sharing arrangement with Tuma and/or SAS.

126.    In their complaint, Herbst and SAFE acknowledged the existence of the booking agreement they had with Shoreline Aviation, alleging that (1) prior to the divorce settlement in April 2017, SAFE utilized Shoreline Aviation as its operator of flight services; (2) from April 2017 until May 2018, Herbst and SAFE continued to retain and utilize Shoreline Aviation as its operator of flight services; and (3) Shoreline Aviation "operated their business exclusively with" Herbst from May 2017 to May 2018.

127.    On May 18, 2020, Judge Joseph Farneti of New York Supreme Court granted Shoreline Aviation's motion to dismiss all of Herbst and SAFE's claims against Shoreline Aviation for failure to state a claim.

128.    Prior to the filing of Herbst and SAFE's suit against Shoreline Aviation, Shoreline Aviation had been poised to launch an Employee Stock Ownership Plan (the "ESOP") in 2018. Over the course of the ten years that Shoreline Aviation planned to finance the ESOP, approximately $3,000,000 in tax benefits would have been realized.

129.    But the filing of Herbst and SAFE's frivolous lawsuit prevented Shoreline Aviation from implementing the ESOP, resulting in millions of dollars in damages for the company.

130.     Moreover, in 2018, Shoreline Aviation had been in negotiations to sell the business to Cape Air, an FAA air carrier corporation based in Massachusetts.

131.     As a result of the pending litigation against Shoreline Aviation, Cape Air declined to purchase Shoreline Aviation's business, electing instead to purchase only its assets on December 27, 2018.

132.     Also as a direct result of Defendants' actions, Shoreline Aviation was forced to cease operations on April 1, 2020, after 40 years in the seaplane business.

133.     That same day, Herbst sent a letter to Shoreline Aviation's customers informing them that Shoreline Aviation was no longer operating and that they could contact her to book their flights for the coming season.

134.     Prior to his death on June 27, 2019, Kelly had spent 40 years of his life, painstakingly building up Shoreline Aviation's business. He also helped Herbst build up her business for more than 24 years.

135.     Notwithstanding that fact, Herbst responded by systematically attacking Shoreline Aviation's business and succeeded in destroying the company through her malicious acts.

**X.     Herbst is SAFE's alter ego.**

136.     Upon information and belief, while Herbst purports to operate SAFE as a separate entity, it is in fact her alter ego, and she exercises complete domination and control over it.

137.     Upon information and belief, Herbst fails to observe corporate formalities and utilizes SAFE for personal purposes, including by (1) shuttling funds between personal and corporate accounts, (2) utilizing a vehicle owned or leased in the name of SAFE for personal

errands, travel, and other purposes, (3) utilizing a vehicle owned or leased in Herbst's name for business errands, travel, and other purposes, (4) utilizing a phone number and/or email address established in the name of SAFE for Herbst's personal use; and (5) otherwise operating SAFE as Herbst's own alter ego.

## COUNT I
### Breach of Contract – Against Herbst and SAFE

138.    Shoreline Aviation realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

139.    In or about 1994, Shoreline Aviation and Herbst and SAFE entered into the Contract, pursuant to which they would provide booking services exclusively for Shoreline Aviation's commuter and charter flights to and from the East Hampton Airport in return for commissions.

140.    Because Herbst and SAFE's right to receive commissions was limited to commuter seats and charter flights sold on a weekly basis and because either party could terminate the Contract with reasonable notice to the other party, the Contract was capable of being performed within one year.

141.    The Contract was evidenced by the parties' course of performance over 24 years.

142.    Moreover, through the parties' course of performance over 24 years, Herbst and SAFE have acknowledged the existence, essential terms, and the validity of the Contract.

143.    And, in a complaint filed in a separate action, Herbst and SAFE acknowledged the existence of the exclusive booking agreement they had with Shoreline Aviation.

144.    Shoreline Aviation performed all of its obligations under the Contract, including by paying Herbst and SAFE its commissions.

145.    Herbst and SAFE breached the Contract by, among other things, (a) failing to honor their obligation to book reservations for Shoreline Aviation flights beginning in or around April 2018; (b) failing to mail out letters to Shoreline Aviation customers in March or early April 2018 offering discount coupons for the summer; (c) failing to reliably answer phone calls from customers; (d) failing to accurately inform customers as to the availability of seats on Shoreline Aviation's flights; (e) failing to book reservations exclusively for Shoreline Aviation; and (f) terminating the Contract without reasonable notice to Shoreline Aviation.

146.    As a result, Shoreline Aviation suffered damages in an amount to be determined at trial but in no event less than $3,373,747.00.

### COUNT II
**Promissory Estoppel – Against Herbst and SAFE**

147.    Shoreline Aviation realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

148.    Herbst and SAFE made a clear and unambiguous promise to act as Shoreline Aviation's exclusive booking agent and safeguard Shoreline Aviation's trade secrets and other confidential information.

149.    Shoreline Aviation reasonably and foreseeably relied on that promise to Shoreline's detriment.

150.    As a result of Shoreline Aviation's reliance, Shoreline Aviation sustained injury when Herbst and SAFE failed to honor their promise in an amount to be determined at trial but in no event less than $3,373,747.00.

151.    It would be unconscionable not to enforce Herbst and SAFE's promise because the injury Herbst and SAFE caused by actively seeking to destroy Shoreline Aviation's business went beyond the damages that would naturally flow from Herbst and SAFE's mere

non-performance of the Contract. Shoreline Aviation's damages were not limited to lost revenues from flights that Herbst and SAFE failed to book. Because Herbst and SAFE disclosed Shoreline Aviation's trade secrets and other proprietary information to a competitor and deliberately sabotaged Shoreline Aviation's business, Shoreline Aviation lost millions in revenue from customers that were maliciously poached by Herbst and SAFE and was ultimately forced to close its operations after 40 years in the industry.

<u>COUNT III</u>
**Unjust Enrichment – Against Herbst and SAFE**

152.    Shoreline Aviation realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

153.    Herbst and SAFE were enriched by receiving commissions from Shoreline Aviation in the amount of $65,522.00 in exchange for a benefit that has never been fully conferred.

154.    Herbst and SAFE's unjust enrichment was at Shoreline Aviation's expense.

155.    It is against equity and good conscience to permit Herbst and SAFE to retain the unearned commissions.

156.    As a result, Shoreline Aviation has been damaged in the amount of $65,522.00.

<u>COUNT IV</u>
**Breach of Fiduciary Duty – Against Herbst and SAFE**

157.    Shoreline Aviation realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

158.    Shoreline Aviation placed trust and confidence in Herbst and SAFE, who were the exclusive booking agent for Shoreline Aviation.

159.    By virtue of Herbst and SAFE's agency relationship with Shoreline Aviation, they owed a fiduciary duty to Shoreline Aviation.

160.    Herbst and SAFE breached that duty and committed misconduct by (a) diverting Shoreline Aviation's customers to Shoreline Aviation's competitors; (b) making false and disparaging statements about Shoreline Aviation to its customers, including that Shoreline Aviation had made the decision to cease working with SAFE without notice to SAFE even though Herbst and SAFE themselves had unilaterally stopped booking Shoreline Aviation flights; (c) making false and disparaging statements to the East Hampton airport manager and East Hampton town attorney to get Shoreline Aviation thrown out of East Hampton Airport, including that Shoreline Aviation had no right to operate at that airport; (d) misappropriating Shoreline Aviation's customer, pricing, business practices, and other proprietary information for Herbst and SAFE's own purposes and to assist Blade in unfairly competing with Shoreline Aviation; (e) refusing to book seats for Shoreline Aviation customers based on a false premise; (f) secretly working with Blade without informing, and while still affiliated with, Shoreline Aviation; and (g) otherwise failing to act in Shoreline Aviation's best interests.

161.    As a result, Shoreline Aviation suffered damages in an amount to be determined at trial, but in no event less than $10,000,000.00.

162.    Herbst and SAFE's conduct evinces a high degree of moral culpability, is so flagrant as to transcend mere carelessness, and/or constitutes willful or wanton negligence or recklessness. Specifically, Herbst and SAFE intentionally stole Shoreline Aviation's customers and made false statements about Shoreline Aviation to its customers with malice and with an intent to harm Shoreline Aviation's business out of a desire to pocket substantial amounts of money at the expense of Shoreline Aviation, because they were already working on behalf of

Shoreline Aviation's competitors at the time, and because, upon information and belief, Herbst desired to retaliate against Shoreline Aviation for what she perceived to be its cooperation with her ex-husband Tuma against her interests in acrimonious divorce proceedings.

163.    By reason of the foregoing, Shoreline Aviation has been damaged and is entitled to punitive damages in an amount to be determined at trial, but in no event less than $20,000,000.00.

164.    Herbst is individually liable for SAFE's breach of fiduciary duty because she was the sole and primary agent of such actions and she exercised complete domination of SAFE to breach its fiduciary duty to Shoreline Aviation.

<u>COUNT V</u>
**Violation of the Faithless Servant Doctrine – Against Herbst and SAFE**

165.    Shoreline Aviation realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

166.    As an agent to Shoreline Aviation, Herbst and SAFE owed Shoreline Aviation a duty of good faith and loyalty and was obligated to act in Shoreline Aviation's best interests.

167.    Shoreline Aviation was entitled to place its trust and confidence in Herbst and SAFE and to expect them to act with the utmost good faith toward Shoreline Aviation in performance of their duties.

168.    As an agent of Shoreline Aviation, Herbst and SAFE were responsible for certain duties, including but not limited to (a) customer communications, (b) booking reservations for Shoreline Aviation's flights, (c) sending out letters to Shoreline Aviation's customers offering discount coupons for the summer, (d) processing payments, (e) creating flight manifests, and (f) handling passenger check-in procedures.

169.   As an agent of Shoreline Aviation, Herbst and SAFE had access to confidential information, including information about Shoreline Aviation's customer, pricing, business practices, and other proprietary information.

170.   As a result, Shoreline Aviation relied heavily on Herbst and SAFE's loyalty and integrity and their faithful performance of their duties and responsibilities.

171.   Herbst and SAFE breached their fiduciary duty by acting to the detriment of Shoreline Aviation in a number of ways, including but not limited to (a) diverting Shoreline Aviation's customers to Shoreline Aviation's competitors; (b) making false and disparaging statements about Shoreline Aviation to its customers, including that Shoreline Aviation had made the decision to cease working with SAFE without notice to SAFE even though Herbst and SAFE themselves had unilaterally stopped booking Shoreline Aviation flights; (c) making false and disparaging statements to the East Hampton airport manager and East Hampton town attorney to get Shoreline Aviation thrown out of East Hampton Airport, including that Shoreline Aviation had no right to operate at that airport; (d) misappropriating Shoreline Aviation's customer, pricing, business practices, and other proprietary information for Herbst and SAFE's own purposes and to assist Blade in unfairly competing with Shoreline Aviation; (e) refusing to book seats for Shoreline Aviation customers based on a false premise; (f) secretly working with Blade without informing, and while still affiliated with, Shoreline Aviation; and (g) otherwise failing to act in Shoreline Aviation's best interests.

172.   Indeed, Herbst and SAFE acted directly against Shoreline Aviation's interests by usurping its business opportunities.

173.   Herbst and SAFE's disloyalty to Shoreline Aviation and breach of their fiduciary duty directly and proximately caused damage to Shoreline Aviation.

174.     As a result, Shoreline Aviation is entitled to disgorgement from Herbst and SAFE of all monies paid to them during the period of disloyalty.

175.     Herbst is individually liable for SAFE's violation of the faithless servant doctrine because she was the sole and primary agent of such actions and she exercised complete domination of SAFE to breach its duty of loyalty to Shoreline Aviation.

**COUNT VI**
**Misappropriation – Against All Defendants**

176.     Shoreline Aviation realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

177.     Shoreline Aviation's proprietary customer information, including the identities, addresses, and contact information of customers and their individual preferences, credit card information, and contact information for individual contact people with whom Herbst and SAFE dealt in booking seaplane passengers for Shoreline Aviation, is an asset and trade secret of the corporation, developed through years of effort and advertising and after expending substantial time and money.

178.     Given the amount of effort and money Shoreline Aviation expended to develop its customer information, Shoreline Aviation took several measures to guard the secrecy of this information, including restricting access to the customer database in Shoreline Aviation's computer system, which was password protected, and instructing all of its employees and agents, including Herbst and SAFE, not to disclose confidential company information to anyone outside the company.

179.     As an established seaplane operator in business for 38 years and with a stellar reputation in the industry, Shoreline Aviation had cultivated a customer list containing information that had great value to both Shoreline Aviation and its competitors, including new

booking services and air carriers like Blade and Fly The Whale. The information was not known outside of Shoreline Aviation's business and could not have been properly acquired without great difficulty by competitors.

180.     Customers who previously booked with Shoreline Aviation and attempted to do so with Herbst and SAFE constituted business opportunities for Shoreline Aviation.

181.     For the purpose of securing a competitive advantage, Defendants misappropriated Shoreline Aviation's trade secrets, confidential proprietary information, assets, and business opportunities when Herbst and SAFE improperly used Shoreline Aviation's customer, pricing, and business practices information and diverted Shoreline Aviation's customers to Blade's air carriers both while Herbst and SAFE were still Shoreline Aviation's exclusive booking agent and after they stopped booking for Shoreline Aviation in May 2018.

182.     Herbst and SAFE used and disclosed Shoreline Aviation's trade secrets and confidential information in breach of the Contract and the fiduciary duty they owed to Shoreline Aviation.

183.     Herbst is individually liable for SAFE's misappropriation because she was the sole and primary agent of such actions and she exercised complete domination of SAFE to misappropriate Shoreline Aviation's trade secrets and confidential information.

184.     Blade, Tomkiel, Wiesenthal, and Pilla discovered and used Shoreline Aviation's trade secrets and confidential information as a result of improper means, namely by exploiting Herbst and SAFE's wrongful disclosure of the information entrusted to them as Shoreline Aviation's exclusive booking agent.

33

185.    Upon information and belief, at the time Herbst and SAFE disclosed this information to Blade, Tomkiel, Wiesenthal, and Pilla, they knew that Herbst and SAFE had done so without Shoreline Aviation's authorization.

186.    Tomkiel and Wiesenthal participated in Blade's exploitation of Shoreline Aviation's trade secrets and confidential information by instructing Herbst and SAFE to target Shoreline Aviation's customers to divert them to Blade's booking system and air carriers and authorizing Blade's purchase of Shoreline Aviation's customer list from SAFE, which had taken that information without authorization from Shoreline Aviation.

187.    Herbst contacted each of Shoreline Aviation customers, including without limitation ██████████ and the Diverted Coupon Customers, on May 7, 2018, falsely stating that Shoreline Aviation had ceased working with SAFE without notice and attempting to divert them to Shoreline Aviation's competitors.

188.    In this communication, Herbst stated that she had "transitioned to a new aviation platform" managed by Blade and that customers would have "many more route choices and aircraft options" by using this new platform. She also advised the customers to seek a refund from Shoreline Aviation for their pre-paid tickets.

189.    Upon information and belief, Defendants agreed to misappropriate Shoreline Aviation's trade secrets, confidential information, and business opportunities while Herbst and SAFE were still acting as Shoreline Aviation's exclusive booking agent.

190.    Defendants then used that information to solicit Shoreline Aviation's customers in furtherance of that agreement.

191.    As a result, Shoreline Aviation suffered damages in an amount to be determined at trial, but in no event less than $10,000,000.00

192.    Herbst and SAFE's conduct evinces a high degree of moral culpability, is so flagrant as to transcend mere carelessness, and/or constitutes willful or wanton negligence or recklessness. Specifically, Herbst and SAFE intentionally stole Shoreline Aviation's customers, trade secrets, confidential information, and business opportunities with malice and with an intent to harm Shoreline Aviation's business out of a desire to pocket substantial amounts of money at the expense of Shoreline Aviation, because they were already working on behalf of Shoreline Aviation's competitors at the time, and because, upon information and belief, Herbst desired to retaliate against Shoreline Aviation for what she perceived to be its cooperation with her ex-husband Tuma against her interests in acrimonious divorce proceedings.

193.    The conduct of Pilla, Blade, Tomkiel, and Wiesenthal evinces a high degree of moral culpability, is so flagrant as to transcend mere carelessness, and/or constitutes willful or wanton negligence or recklessness. Specifically, Pilla, Blade, Tomkiel, and Wiesenthal intentionally stole Shoreline Aviation's customers, trade secrets, confidential information, and business opportunities with malice and with an intent to harm Shoreline Aviation's business out of a desire to pocket substantial amounts of money at the expense of Shoreline Aviation.

194.    By reason of the foregoing, Shoreline Aviation has been damaged and is entitled to punitive damages in an amount to be determined at trial but in no event less than $20,000,000.00.

## COUNT VII
**Violation of Defend Trade Secrets Act (18 U.S.C. § 1831 *et seq.*) – Against All Defendants**

195.    Shoreline Aviation realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

196.    Shoreline Aviation's customer, pricing, and business practices information constituted trade secrets used in, and intended for use in, interstate commerce.

197.    Shoreline Aviation took reasonable measures to keep such information secret by restricting access to the customer database, and instructing all of its employees and agents, including Herbst and SAFE, not to disclose confidential company information to anyone outside the company.

198.    Shoreline Aviation made clear to Herbst and SAFE that they were to make use of the information only for the purpose of performing their duties as the exclusive booking agent for Shoreline Aviation.

199.    Shoreline Aviation's employee handbook prohibited employees from disclosing customer information, stating, "no employee shall disclose customer and client information to outsiders" and "Protecting our company's information is the responsibility of every employee and we all share a common interest in making sure it is not improperly or accidently [sic] disclosed. Do not discuss the company's confidential business with anyone who does not work for us." Ex. F at 19, 22.

200.    The trade secrets could be accessed only through password-protected entry points.

201.    Such information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. Shoreline Aviation used significant amounts of time and money developing the customer information, and disclosure of such information would – and did – enable Shoreline Aviation's competitors to use such data to divert Shoreline Aviation's customers.

202.    Defendants acquired, used, and disclosed the trade secrets without Shoreline

Aviation's consent, used improper means to acquire the secrets, and knew the information was

acquired by improper means, including theft and breach of the duty to maintain the secrecy of

the information by Herbst and SAFE and inducement of a breach of that duty by Pilla, Blade,

Tomkiel, and Wiesenthal.

203.    Defendants used the trade secrets to solicit Shoreline Aviation's customers to

book seats with Shoreline Aviation's competitors.

204.    Defendants knowingly conspired with one another to steal Shoreline Aviation's

trade secrets and acted to effect the object of the conspiracy by stealing and using the trade

secrets for their own economic benefit.

205.    Tomkiel and Wiesenthal participated in Blade's acquisition and use of Shoreline

Aviation's trade secrets and confidential information without consent by instructing Herbst and

SAFE to target Shoreline Aviation's customers to divert them to Blade's booking system and

air carriers and authorizing Blade's purchase of Shoreline Aviation's customer list from SAFE,

which had taken that information without authorization from Shoreline Aviation.

206.    As a result, Shoreline Aviation is entitled to damages for actual loss and unjust

enrichment caused by the misappropriation of the trade secrets.

207.    Because the trade secrets were willfully and maliciously misappropriated,

Shoreline Aviation is entitled to exemplary damages amounting to twice the amount of

damages for actual loss and unjust enrichment and reasonable attorney's fees.

### COUNT VIII
**Unfair Competition – Against All Defendants**

208.    Shoreline Aviation realleges and incorporates the allegations in the preceding

paragraphs as if fully set forth herein.

209.    For their own commercial advantage, Defendants misappropriated Shoreline Aviation's customer list, cultivated by Shoreline Aviation over 38 years of doing business as a provider of commuter and charter flights.

210.    Herbst and SAFE intentionally stole Shoreline Aviation's customer, pricing, business practices, and other proprietary information, customers, and business opportunities with malice and with an intent to harm Shoreline Aviation's business because they were already working on behalf of Shoreline Aviation's competitors at the time and because, upon information and belief, Herbst desired to retaliate against Shoreline Aviation for what she perceived to be its cooperation with her ex-husband Tuma against her interests in acrimonious divorce proceedings.

211.    Herbst and Pilla waged a campaign of harassment against Shoreline Aviation, routinely filming their customers and staff, talking to Shoreline Aviation's customers as they attempted to check in, and making false statements to the East Hampton airport manager and East Hampton town attorney in an attempt to get Shoreline Aviation thrown out of East Hampton Airport.

212.    Herbst is individually liable for SAFE's unfair competition because she was the sole and primary agent of such actions and she exercised complete domination of SAFE to unfairly compete with Shoreline Aviation.

213.    Blade, Tomkiel, and Wiesenthal poached Herbst and SAFE from Shoreline Aviation and solicited Shoreline Aviation's customers by exploiting Shoreline Aviation's proprietary customer, pricing, and business practices information that Blade, Tomkiel, and Wiesenthal knew was improperly taken and used by Herbst and SAFE in violation of their fiduciary duty to Shoreline Aviation.

214.    Blade routinely blocked Shoreline Aviation's signage at the dock so that customers had difficulty finding Shoreline Aviation and landed earlier than 8:00 a.m. in New York City, ignoring established curfews in the city that prohibited landing earlier than 8:00 a.m. in consideration of area residents, and deliberately leaving its aircraft on the dock for up to 20 minutes to intentionally delay Shoreline Aviation's flights and prevent Shoreline Aviation's customers from deplaning in a timely manner.

215.    Upon information and belief, Tomkiel and Wiesenthal participated in Blade's unfair competition by conspiring with Herbst and SAFE to target Shoreline Aviation's customers to divert them to Blade's booking system and air carriers and authorizing Blade's purchase of Shoreline Aviation's customer list from SAFE, which had taken that information without authorization from Shoreline Aviation. Upon information and belief, the customer list purchased by Blade was known to Blade, Tomkiel, and Wiesenthal to be Shoreline Aviation's stolen customer list.

216.    Upon information and belief, Defendants agreed to unfairly compete with Shoreline Aviation by stealing its trade secrets and other confidential information, harassing its customers and staff, blocking its signage, causing its planes to be delayed, and making false statements about Shoreline Aviation to its customers and regulators.

217.    Defendants acted in furtherance of that agreement by misappropriating trade secrets and other confidential information, soliciting Shoreline Aviation customers, harassing its customers and staff, blocking its signage, causing its planes to be delayed, and making false statements about Shoreline Aviation to its customers and regulators.

218.    As a result, Shoreline Aviation suffered damages in an amount to be determined at trial but in no event less than $10,000,000.00.

**COUNT IX**
**Tortious Interference with Prospective Business Relations – Against All Defendants**

219.    Shoreline Aviation realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

220.    Shoreline Aviation had existing business relations with its customers of which Defendants were aware, as Herbst and SAFE were Shoreline Aviation's exclusive booking agent for approximately 24 years, Pilla is Herbst's live-in boyfriend and also works closely with Herbst professionally, and Blade has had a presence in East Hampton Airport since approximately May 2014.

221.    For over 38 years, Shoreline Aviation worked to cultivate and develop an extensive list of customers who returned as passengers on its seaplanes every summer.

222.    Defendants were aware that such repeat customers, including without limitation the Diverted Coupon Customers and Shoreline Aviation's management clients, represented valuable business opportunities for Shoreline Aviation.

223.    Defendants deliberately interfered with those relationships by inducing Shoreline Aviation's returning and prospective customers to book their reservations with Shoreline Aviation's competitors.

224.    Herbst and SAFE acted with the wrongful purpose of harming Shoreline Aviation and used improper means to do so including by (a) diverting Shoreline Aviation's regular customers, including without limitation the Diverted Coupon Customers and Shoreline Aviation's management clients, to Shoreline Aviation's competitors; (b) making false and disparaging statements about Shoreline Aviation to its customers, including that Shoreline Aviation had made the decision to cease working with SAFE without notice to SAFE even though Herbst and SAFE themselves had unilaterally stopped booking Shoreline Aviation

flights; (c) refusing to book seats for Shoreline Aviation customers based on a false premise; (d) secretly working with Blade without informing, and while still employed with, Shoreline Aviation; (e) misappropriating Shoreline Aviation's customer information for Defendants' own purposes; and (f) filing a frivolous civil suit against Shoreline Aviation in an effort to destroy its business at East Hampton Airport.

225.    Pilla inflicted intentional harm on Shoreline Aviation without excuse and justification and used wrongful means to interfere with Shoreline Aviation's business relationships, including misrepresentation and by misappropriating Shoreline Aviation's trade secrets and confidential information.

226.    Blade inflicted intentional harm on Shoreline Aviation without excuse and justification and used wrongful means to interfere with Shoreline Aviation's business relationships, including by misappropriating Shoreline Aviation's trade secrets and confidential information; blocking signage at the dock so that customers had difficulty finding Shoreline Aviation; landing earlier than 8:00 a.m. in New York City, ignoring established curfews in the city that prohibited landing earlier than 8:00 a.m. in consideration of area residents; and deliberately leaving its aircraft on the dock for up to 20 minutes to intentionally delay Shoreline Aviation's flights and prevent Shoreline Aviation's customers from deplaning in a timely manner.

227.    Tomkiel and Wiesenthal personally participated in Blade's tortious interference by conspiring with Herbst and SAFE to target Shoreline Aviation's customers to divert them to Blade's booking system and air carriers and authorizing Blade's purchase of Shoreline Aviation's customer list from SAFE, which had taken that information without authorization

from Shoreline Aviation. Upon information and belief, the customer list purchased by Blade was known to Tomkiel and Wiesenthal to be Shoreline Aviation's stolen customer list.

228.   Herbst, SAFE, and Pilla also waged a campaign of harassment against Shoreline Aviation, routinely filming their customers and staff, talking to Shoreline Aviation's customers as they attempted to check in, and making false statements to the East Hampton airport manager and East Hampton town attorney in an attempt to get Shoreline Aviation thrown out of East Hampton Airport, including that Shoreline Aviation had no right to operate at that airport.

229.   Herbst is individually liable for SAFE's tortious interference because she was the sole and primary agent of such actions and she exercised complete domination of SAFE to tortiously interfere with Shoreline Aviation's prospective business relations.

230.   Upon information and belief, Defendants agreed to interfere with Shoreline Aviation's prospective business relations in a concerted effort as set forth above.

231.   Defendants acted in furtherance of that agreement by following through with such actions as set forth above.

232.   But for Defendants' improper actions, Shoreline Aviation's customers would have reserved seats on Shoreline Aviation's air carriers because those customers were either existing Shoreline Aviation customers and/or had contacted Herbst and SAFE with the intent to book seats on Shoreline Aviation's flights.

233.   As a result of Defendants' actions, existing and prospective customers did not purchase tickets for Shoreline Aviation flights and purchased through Blade instead, causing Shoreline Aviation to permanently lose future revenue from those relationships and damages to Shoreline of no less than $10,000,000.00.

234.    Herbst and SAFE's conduct evinces a high degree of moral culpability, is so flagrant as to transcend mere carelessness, and/or constitutes willful or wanton negligence or recklessness. Specifically, Herbst and SAFE intentionally stole Shoreline Aviation's trade secrets, confidential information, customers, and business opportunities with malice and with an intent to harm Shoreline Aviation's business out of a desire to pocket substantial amounts of money at the expense of Shoreline Aviation, because they were already working on behalf of Shoreline Aviation's competitors at the time, and because, upon information and belief, Herbst desired to retaliate against Shoreline Aviation for what she perceived to be its cooperation with her ex-husband Tuma against her interests in acrimonious divorce proceedings.

235.    The conduct of Pilla, Blade, Tomkiel, and Wiesenthal evinces a high degree of moral culpability, is so flagrant as to transcend mere carelessness, and/or constitutes willful or wanton negligence or recklessness. Specifically, Pilla, Blade, Tomkiel, and Wiesenthal intentionally stole Shoreline Aviation's trade secrets, confidential information, customers, and business opportunities with malice and with an intent to harm Shoreline Aviation's business out of a desire to pocket substantial amounts of money at the expense of Shoreline Aviation.

236.    By reason of the foregoing, Shoreline Aviation has been damaged and is entitled to punitive damages in an amount to be determined at trial but in no event less than $20,000,000.00.

## COUNT X
### Constructive Trust – Against Herbst, Tomkiel, Wiesenthal, and Blade

237.    Shoreline Aviation realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

238.    By virtue of Herbst's agency relationship with Shoreline Aviation, she owed a fiduciary duty to Shoreline Aviation.

239.    Herbst made a clear and unambiguous promise to act as Shoreline Aviation's exclusive booking agent and safeguard Shoreline Aviation's trade secrets and other confidential information.

240.    In reliance on that promise, Shoreline Aviation gave Herbst access to its trade secrets and other confidential information.

241.    Herbst improperly exploited and disclosed Shoreline Aviation's trade secrets and other confidential information to Blade in exchange for a lucrative consulting agreement, an asset purchase agreement, and the Stock Option Agreement.

242.    As a result of her wrongful use of Shoreline Aviation's confidential information, Herbst was unjustly enriched in the form of, among other things, shares of Blade.

243.    Upon information and belief, Tomkiel and Wiesenthal approached Herbst and SAFE in or around March 2018 and entered into a consulting agreement with them specifically because their 24 years as Shoreline Aviation's exclusive booking agent would grant Blade access to Shoreline Aviation's customer list, pricing information, business practices, and other proprietary information.

244.    Knowing that Herbst and SAFE were Shoreline Aviation's exclusive booking agent, Blade, Tomkiel, and Wiesenthal deliberately solicited Herbst and SAFE to work with Blade before their agency relationship with Shoreline Aviation had been terminated.

245.    Blade, Tomkiel, and Wiesenthal poached Herbst and SAFE from Shoreline Aviation and solicited Shoreline Aviation's customers by exploiting Shoreline Aviation's proprietary information concerning pricing, customers, and business practices that Blade, Tomkiel, and Wiesenthal knew was improperly taken and used by Herbst and SAFE.

246.    Upon information and belief, Tomkiel and Wiesenthal received additional Blade shares as a result of their wrongful actions against Shoreline Aviation, including their misappropriation of Shoreline Aviation's confidential information and tortious interference with Shoreline Aviation's business.

247.    Accordingly, Shoreline Aviation is entitled to the imposition of a constructive trust of Herbst's shares of Blade acquired pursuant to the Stock Option Agreement and of Blade shares acquired by Tomkiel and Wiesenthal after March 2018. Shoreline Aviation is also entitled to the imposition of a constructive trust of all Blade shares.

## <u>COUNT XI</u>
### Tortious Interference with Contract – Against Blade, Tomkiel, and Wiesenthal

248.    Shoreline Aviation realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

249.    A valid contract existed between Shoreline Aviation and Herbst and SAFE, pursuant to which Herbst and SAFE agreed to provide exclusive booking services in exchange for commissions.

250.    Given the extensive discussions among Defendants and Shoreline Aviation in April 2018 about the role of Herbst and SAFE as Shoreline Aviation's exclusive booking agent, Blade, Tomkiel, and Wiesenthal knew about the Contract, its essential terms, and the role of Herbst and SAFE as Shoreline Aviation's exclusive booking agent.

251.    Blade, Tomkiel, and Wiesenthal intentionally procured Herbst and SAFE's breach of the Contract without justification.

252.    Upon information and belief, Blade, Tomkiel, and Wiesenthal approached Herbst and SAFE in or around March 2018 and entered into a consulting agreement with them specifically because their 24 years as Shoreline Aviation's exclusive booking agent would

grant Blade access to Shoreline Aviation's customer list, pricing information, business practices, and other proprietary information.

253.    Upon information and belief, Tomkiel and Wiesenthal participated in Blade's tortious interference with the Contract by actively recruiting Herbst and SAFE to provide booking services for Blade while Herbst and SAFE were still under agreement with Shoreline Aviation and personally negotiating the terms of the consulting agreement with Herbst and SAFE.

254.    Herbst and SAFE breached the Contract by among other things, (a) failing to honor their obligation to book reservations for Shoreline Aviation flights beginning in or around April 2018; (b) failing to mail out letters to Shoreline Aviation customers in March or early April 2018 offering discount coupons for the summer; (c) failing to reliably answer phone calls from customers; (d) failing to accurately inform customers as to the availability of seats on Shoreline Aviation's flights; (e) failing to book reservations exclusively for Shoreline Aviation; and (f) terminating the Contract without reasonable notice to Shoreline Aviation.

255.    As a result of that breach, Shoreline Aviation suffered damages in in an amount to be determined at trial but in no event less than $3,373,747.00.

256.    But for the actions of Blade, Tomkiel, and Wiesenthal in inducing Herbst and SAFE to breach the Contract, Herbst and SAFE would not have breached the Contract.

### COUNT XII
**Aiding & Abetting Breach of Fiduciary Duty – Against Blade, Tomkiel, and Wiesenthal**

257.    Shoreline Aviation realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

258.    Herbst and SAFE breached their fiduciary duty to Shoreline Aviation by (a) diverting Shoreline Aviation's customers to Shoreline Aviation's competitors; (b) making false

and disparaging statements about Shoreline Aviation to its customers, including that Shoreline Aviation had made the decision to cease working with SAFE without notice to SAFE even though Herbst and SAFE themselves had unilaterally stopped booking Shoreline Aviation flights; (c) making false and disparaging statements to the East Hampton airport manager and East Hampton town attorney to get Shoreline Aviation thrown out of East Hampton Airport, including that Shoreline Aviation had no right to operate at that airport; (d) misappropriating Shoreline Aviation's customer, pricing, business practices, and other proprietary information for Herbst and SAFE's own purposes and to assist Blade in unfairly competing with Shoreline Aviation; (e) refusing to book seats for Shoreline Aviation customers based on a false premise; (f) secretly working with Blade without informing, and while still affiliated with, Shoreline Aviation; and (g) otherwise failing to act in Shoreline Aviation's best interests.

259.    Given the extensive discussions among Defendants and Shoreline Aviation in April 2018 about the role of Herbst and SAFE as Shoreline Aviation's exclusive booking agent, Blade, Tomkiel, and Wiesenthal had actual knowledge of Herbst and SAFE's breach of fiduciary duty because, upon information and belief, Blade, Tomkiel, and Wiesenthal knew that they were still contractually obligated to provide exclusive booking services to Shoreline Aviation at the time that Blade entered into a consulting agreement and asset purchase agreement with SAFE.

260.    Blade, Tomkiel, and Wiesenthal substantially assisted Herbst and SAFE's breach of fiduciary duty by (1) inducing them to disclose Shoreline Aviation's customer, pricing, business practices, and other proprietary information; (2) entering into a consulting agreement with SAFE while it was still under an exclusive broker agreement with Shoreline Aviation; and (3) purchasing the assets of SAFE, including what was purported to be SAFE's

customer list but was actually Shoreline Aviation's stolen customer list and was known to Blade, Tomkiel, and Wiesenthal to be Shoreline Aviation's stolen customer list. By these acts, Blade, Tomkiel, and Wiesenthal facilitated the breach.

261.    Blade, Tomkiel, and Wiesenthal poached Herbst and SAFE from Shoreline Aviation and solicited Shoreline Aviation's customers by exploiting Shoreline Aviation's proprietary information concerning pricing, customers, and business practices that Blade, Tomkiel, and Wiesenthal knew was improperly taken and used by Herbst and SAFE in violation of their breach of fiduciary duty to Shoreline Aviation.

262.    Upon information and belief, Tomkiel and Wiesenthal participated in Blade's aiding and abetting Herbst and SAFE's breach of fiduciary duty by inducing Herbst and SAFE to disclose Shoreline Aviation's proprietary information and personally negotiating the terms of the consulting agreement and asset purchase agreement with SAFE, knowing that such actions constituted breaches of fiduciary duty by Herbst and SAFE.

263.    As a result of the breach of fiduciary duty, Shoreline Aviation suffered damages in an amount to be determined at trial, but in no event less than $10,000,000.00.

## DEMAND FOR TRIAL BY JURY

264.    Shoreline Aviation hereby demands a trial by jury.

**WHEREFORE**, Shoreline Aviation prays for judgment and relief as follows: (1) compensatory and consequential damages to Shoreline Aviation in an amount to be proven at trial but no less than $13,373,747.00; (2) punitive damages to Shoreline Aviation amounting to no less than $20,000,000.00; (3) disgorgement of all monies paid to Herbst and SAFE during the period of disloyalty; (4) imposition of a constructive trust of all Blade shares, including Herbst's shares of Blade acquired pursuant to the Stock Option Agreement and Blade shares

acquired by Tomkiel and Wiesenthal after March 2018; (5) reasonable attorney's fees pursuant

to 18 U.S.C. § 1836(b)(3)(D); (6) costs and disbursements of this action; (7) pre- and post-

judgment interest; and (8) such other and further relief as the Court deems just and proper.


Dated: Sag Harbor, NY
      April 1, 2021

                                                KRIEGSMAN PC

                                                *s/ Alex Kriegsman*
                                                Alex Kriegsman
                                                Kriegsman PC
                                                *Attorneys for Plaintiff*
                                                279 Main Street
                                                Sag Harbor, NY 11963
                                                (631) 899-4826 (tel.)
                                                (631) 919-5182 (fax)
                                                alex@kriegsmanpc.com