**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK**

$- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -$X

SHORELINE AVIATION, INC.,                      :          Case No. 2:20-cv-02161-JMA-SIL

                                    *Plaintiff*,    :

                          v.                        :

CYNTHIA L. HERBST, SOUND AIRCRAFT          :
FLIGHT ENTERPRISES, INC., RYAN A.          :
PILLA,

                                  *Defendants*.    :

$- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -$ X


## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT


GLENN AGRE BERGMAN & FUENTES LLP

Reid Skibell
Jewel K. Tewiah
1185 Avenue of the Americas, 22nd Fl
New York, New York 10036

*Attorneys for Defendants Cynthia L. Herbst,
Sound Aircraft Flight Enterprises, Inc., &
Ryan A. Pilla*

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 3

    A.    Ms. Herbst's Early Career.................................................................... 3

    B.    Shoreline Enters into a Booking Arrangement with SAS...................... 3

    C.    SAS and Shoreline Enter into Two Written Contracts ......................... 4

    D.    SAS and Shoreline Work Together between 1993 and 2017 .................. 5

    E.    SAFE Begins Working with Shoreline ................................................. 6

    F.    Shoreline and SAFE Explore New Business Opportunities, and Shoreline Attempts to Buy SAFE's Customer Data. ............................ 7

    G.    Shoreline Unilaterally Terminates the Booking Arrangement with SAFE. ........... 9

    H.    Cape Air Buys Shoreline's Assets and then Shutters the Company ...................... 10

    I.    Ryan Pilla's Limited Role in the Underlying Events............................. 10

ARGUMENT .................................................................................................................. 11

    I.    THE CONTRACT CLAIMS ................................................................. 12

        A.  Kelly and Herbst Agreed to a Non-binding Booking Arrangement. ................. 13

        B.  Even if There Was an Enforceable Oral Contract, Neither SAFE Nor Ms. Herbst Were Parties to It. ........ 16

        C.  Even if There Was an Enforceable Oral Contract, It was Supplanted by a Written Contract. .............. 18

    II.    The "Booking Agent" Claims .............................................................. 19

        A.  The "Booking Agent" Claims are Based on a Mistake of Law ........................ 19

        B.  There Are No Protectable Trade Secrets .......................................... 23

    III.    The Tortious Interference and Unfair Competition Claims.................... 25

    IV.    Damages and Causation ....................................................................... 27

    V.    The Purported Bases for Individual Liability ....................................... 30

CONCLUSION ............................................................................................................... 32

i

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*839 Cliffside Ave. LLC v. Deutsche Bank Nat'l Tr. Co. for First Franklin Mortg.*
*  Loan Tr. 2006-FF3 Mortg. Pass-Through Certificates, Series 2006-FF3,*
  2018 WL 4608198 (E.D.N.Y. Sept. 25, 2018) ................................................... 12, 29

*Allstate Ins. Co. v. Singh,*
  2022 WL 3929885 (E.D.N.Y. Aug. 12, 2022),
  *report and recommendation adopted*, 2022 WL 3914965 (E.D.N.Y. Aug. 31, 2022).............. 11

*Ashland Mgmt. Inc. v. Janien*,
  624 N.E.2d 1007 (N.Y.1993) .................................................................... 23

*Atlantis Info. Tech., GmbH v. CA, Inc.*,
  485 F.Supp.2d 224 (E.D.N.Y.2007) .............................................................. 22

*Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co.*,
  1 F. Supp. 3d 224 (S.D.N.Y. 2014) ........................................................... 23, 24

*Brasport, S.A. v. Hoechst Celanese Corp.*,
  747 F. Supp. 199 (S.D.N.Y. 1990) .............................................................. 22

*Broker Genius, Inc. v. Zalta*,
  280 F. Supp. 3d 495 (S.D.N.Y. 2017) ........................................................... 24

*Brookhaven Hous. Coal. v. Solomon*,
  583 F.2d 584 (2d Cir. 1978) .................................................................... 14

*Cambridge Cap. LLC v. Ruby Has LLC*,
  565 F. Supp. 3d 420 (S.D.N.Y. 2021) ........................................................... 25

*Cambridge Valley Machining, Inc. v. Hudson MFG LLC*,
  470 F. Supp. 3d 230 (N.D.N.Y. 2020) ........................................................... 18

*Celi v. Canadian Occidental Petroleum Ltd.*,
  804 F. Supp. 465 (E.D.N.Y. 1992) .............................................................. 13

*Chutko v. Ben-Ami*,
  150 A.D.3d 582 (1st Dep't 2017) ............................................................... 25

*Coddington v. Adelphi Univ.*,
  45 F. Supp. 2d 211 (E.D.N.Y. 1999) ............................................................ 18

*Cruikshank & Co. v. Sorros*,
  765 F.2d 20 (2d Cir.1985) ................................................................................... 17

*D3 Int'l, Inc. v. AGGF Cosm. Grp. S.p.A.*,
  2023 WL 2390552 (S.D.N.Y. Mar. 7, 2023) .......................................................... 14

*Delaney v. Bank of Am. Corp.*,
  908 F. Supp. 2d 498 (S.D.N.Y. 2012), *aff'd*, 766 F.3d 163 (2d Cir. 2014) ............... 13

*Fed. Ins. Co. v. Mertz*,
  2015 WL 5769945 (S.D.N.Y. Sept. 29, 2015) ....................................................... 22

*Front, Inc. v. Khalil*,
  24 N.Y.3d 713 (N.Y. 2015) .................................................................................. 25

*Gottlieb v. Simon*,
  1998 WL 684839 (S.D.N.Y. Sept. 30, 1998), *aff'd sub nom.*
  *RKG Holdings, Inc. v. Simon*, 182 F.3d 901 (2d Cir. 1999) ................................... 13

*Highlands Ins. Co. v. PRG Brokerage, Inc.*,
  2004 WL 35439 (S.D.N.Y. Jan. 6, 2004) ........................................................ 17, 18

*In Touch Concepts, Inc. v. Cellco P'ship*,
  949 F. Supp. 2d 447 (S.D.N.Y. 2013), *aff'd*, 788 F.3d 98 (2d Cir. 2015) ............... 26

*Integra FX3X Fund, L.P. v. Deutsche Bank, AG*,
  2016 WL 1169514 (S.D.N.Y. Mar. 22, 2016) ........................................................ 18

*Integrated Const. & Power Systems, Inc. v. Radha Krishna Corp.*,
  2019 WL 10292281 (N.Y. Sup. Ct. Jan. 30, 2019) ................................................ 27

*Learning Annex Holdings, LLC v. Gittelman*,
  48 A.D.3d 211 (1st Dep't 2008) ........................................................................... 26

*Lehman v. Dow Jones & Co.*,
  783 F.2d 285 (2d Cir. 1986) ................................................................................. 23

*Marcus v. Lominy*,
  2022 WL 493688 (S.D.N.Y. Feb. 17, 2022) ..................................................... 14, 16

*MedQuest Ltd. v. Rosa*,
  2023 WL 2575051 (S.D.N.Y. Mar. 20, 2023) ......................................................... 30

*Muhlstock v. Cole*,
  245 A.D.2d 55 (1st Dep't 1997) ...................................................................... 13, 15

*Ne. Gen. Corp. v. Wellington Advert., Inc.*,
  82 N.Y.2d 158, 164 (N.Y. 1993), aff'd, 328 F. App'x 695 (2d Cir. 2009) ............... 20

iii

*New York v. B.B.& S. Treated Lumber Corp.*,
   2006 WL 8441333 (E.D.N.Y. Mar. 16, 2006)..................................................... 31

*Newton v. Meyer*,
   2023 WL 2563115 (S.D.N.Y. Mar. 17, 2023) ..................................................... 21

*Nicholls v. Brookdale Univ. Hosp. Med. Ctr.*,
   2004 WL 1533831 (E.D.N.Y. July 9, 2004)........................................................ 17

*Pellegrini v. Landmark Travel Grp.*,
   165 Misc. 2d 589 (N.Y. City Ct. 1995) ............................................................. 21

*Plant Performance Servs. Int'l, Ltd. v. Gen. Elec. Int'l, Inc.*,
   2009 WL 10741320 (S.D.N.Y. Dec. 2, 2009) ............................................... 20, 21

*Reed v. Luxury Vacation Home LLC*,
   2022 WL 4624839 (S.D.N.Y. Sept. 30, 2022) ................................................... 20

*Reynolds v. Lifewatch, Inc.*,
   136 F. Supp. 3d 503 (S.D.N.Y. 2015) ............................................................... 31

*Rodgers v. Roulette Recs., Inc.*,
   677 F. Supp. 731 (S.D.N.Y. 1988) ................................................................... 22

*Rosenblatt v. Christie, Manson & Woods Ltd.*,
   2005 WL 2649027 (S.D.N.Y. Oct. 14, 2005),
   *aff'd sub nom. Rosenblatt v. Christie*, 195 F. App'x 11 (2d Cir. 2006)...................... 21

*RSL Commc'ns PLC v. Bildirici*,
   649 F. Supp. 2d 184 (S.D.N.Y. 2009), *aff'd sub nom. RSL Commc'ns PLC, ex rel.*
   *Jervis v. Fisher*, 412 F. App'x 337 (2d Cir. 2011) ................................................ 28

*Sanshoe Trading Corp. v. Mitsubishi Int'l Corp.*,
   470 N.Y.S.2d 991 (N.Y. Sup. Ct. 1984), *aff'd*, 104 A.D.2d 337 (1st Dep't 1984) .................. 22

Schroeder v. Pinterest Inc.,
   133 A.D.3d 12, 30 (1st Dep't 2015) ........................................................... 30, 31

*Semi-Tech Litig., LLC v. Bankers Tr. Co.*,
   353 F. Supp. 2d 460 (S.D.N.Y. 2005), *aff'd sub nom. In re Bankers Tr. Co.*,
   450 F.3d 121 (2d Cir. 2006) ............................................................................ 26

*Sengillo v. Valeo Elec. Sys., Inc.*,
   328 F. App'x 39 (2d Cir. 2009) ....................................................................... 18

*SourceOne Dental, Inc. v. Patterson Companies, Inc.*,
   328 F. Supp. 3d 53 (E.D.N.Y. 2018) ................................................................ 25

iv

*Speedfit LLC v. Chapco Inc.*,
  2016 WL 5793738 (E.D.N.Y. June 29, 2016) ........................................................ 20

*Staudinger+Franke GMBH v. Casey*,
  2015 WL 3561409 (S.D.N.Y. June 8, 2015) ............................................... 18, 21, 23

*Sys. Mgmt. Arts Inc. v. Avesta Techs., Inc.*,
  87 F. Supp. 2d 258 (S.D.N.Y. 2000) ................................................................... 26

*Texas State Aquarium v. Fishman Chem. of N. Carolina, LLC*,
  2016 WL 4765057 (S.D. Tex. Sept. 13, 2016) ........................................................ 27

*Town & Country Linen Corp. v. Ingenious Designs LLC*,
  556 F. Supp. 3d 222 (S.D.N.Y. 2021) ............................................................. 17, 30

*TransPerfect Glob., Inc. v. Lionbridge Techs., Inc.*,
  2022 WL 195836 (S.D.N.Y. Jan. 21, 2022) ........................................................... 30

*Van Brunt v. Rauschenberg*,
  799 F. Supp. 1467 (S.D.N.Y. 1992) ..................................................................... 13

*Volunteers of Am. of W. New York, Inc. v. Rochester Gas & Elec. Corp.*,
  2014 WL 3510495 (W.D.N.Y. July 14, 2014) ........................................................ 13

*Wagner v. JP Morgan Chase Bank*,
  2011 WL 856262 (S.D.N.Y. Mar. 9, 2011) ............................................................ 27

*Waterville Inv., Inc. v. Homeland Sec. Network (NV Corp.*,
  2010 WL 2695287 (E.D.N.Y. July 2, 2010) .......................................................... 23

*Wilson v. Dantas*,
  746 F.3d 530 (2d Cir. 2014) ............................................................................ 13

*World Wrestling Ent., Inc. v. Jakks Pac., Inc.*,
  530 F. Supp. 2d 486 (S.D.N.Y. 2007) ................................................................. 20

**Rules**

Fed. R. Civ. P. 56 (a) ........................................................................................ 11

## PRELIMINARY STATEMENT

Although this dispute covers events that took place over an extended period of time, it is, at base, an oral contract case. It was brought by the current owner of Shoreline Aviation, Inc. ("Shoreline"), Andrea Collingwood, who is the widow of Shoreline's founder, John Kelly. Shoreline claims—based on a double hearsay conversation that Ms. Collingwood supposedly had with Mr. Kelly *in 1994* about a conversation that Mr. Kelly had with defendant Cindy Herbst— that Mr. Kelly and Ms. Herbst agreed to an oral contract. That oral contract allegedly committed Ms. Herbst and two companies, non-party Sound Aircraft Services, Inc. ("SAS") and defendant Sound Aircraft Flight Services, Inc. ("SAFE"), to be Shoreline's exclusive "booking agent." Shoreline further alleges that Ms. Herbst and SAFE became, by virtue of the oral contract, legal agents who owed fiduciary duties to their principal, Shoreline. As a result, Shoreline allegedly owns the customer data SAS/SAFE collected and held on their internal computer systems.

If true, abundant documentary evidence should support those allegations. Shoreline worked with SAS/SAFE between 1993 and 2017, and contractual obligations, particularly those involving a principal's control of an agent, should logically be clear to all of the parties and documented even if the contract was orally reached. And Shoreline has received voluminous discovery in this case, a portion of which the Court has observed first-hand piled high in Your Honor's courtroom. Yet there is no such evidence.

The substance of Shoreline's complaints appeared for the very first time in its pleadings, which was filed *26 years after Ms. Collingwood's conversation with Mr. Kelly*. During Mr. Kelly's lifetime, Shoreline did not assert that it had a contract with SAFE or Ms. Herbst, that Shoreline was a principal with SAFE and Ms. Herbst as its agents, or that it owned SAFE's customer data. There is not a single written document the parties have produced that evidences

1

the existence of the claimed oral contract—for example, there was not an off-hand reference to a contract in an email, a listing of the contract in internal records, or an assignment of the contract when SAFE started booking flights instead of SAS. The evidentiary record is equally bereft of documents that should exist if, as it claims, Shoreline owns SAS/SAFE's customer data. The parties never entered into an agreement covering the data or requiring SAS/SAFE to protect the data, and Shoreline did not, even once, ask to inspect or audit the data.

Indeed, the evidence that does exist is at odds with Shoreline's allegations. For example, Mr. Kelly acknowledged in written documents that Shoreline had a "booking arrangement" with SAS and SAFE, which is far different than a contract establishing a principal-agent relationship. Moreover, Mr. Kelly offered in 2017 to purchase certain of SAFE's assets—the most valuable of which was its customer data—for $325,000. Plainly, it would make no sense for Shoreline to purchase an asset that it already owned. And when Ms. Herbst did not respond to his purchase offer within short deadline he set, Mr. Kelly decided to stop working with SAFE, which he announced in a public email blast. He did not claim that she had wronged him by misappropriating intellectual property or breaching a contract, as Shoreline's pleadings now allege.

Worst yet, there are *two written contracts* between Shoreline and SAS that cover the very services that Shoreline alleges are the centerpiece of the purported oral contract. As a matter of established law, the merger clause in the first of those two contracts means any oral contract was supplanted long ago by the written contracts. Since Shoreline does not allege that the written contracts were breached or that the parties entered into an oral contract that post-dates the written contracts, Shoreline's claims are legally deficient on their face.

It is time for this misconceived case to come to an end. Shoreline's claims are unsupported by the evidence, and there is no reason to have an expensive jury trial. Summary judgment should be granted in favor of the Herbst Defendants.

## FACTUAL BACKGROUND

### A.  Ms. Herbst's Early Career

Cynthia Herbst has booked airplane flights with multiple operators out of East Hampton's airport since the 1980s. Cynthia L. Herbst's and Sound Aircraft Flight Enterprise's Rule 56.1 Statement of Undisputed Material Facts ("SOMF") ¶ 1. In 1990, after working for a software developer for a short period of time, Ms. Herbst started as an employee for Sound Aircraft Services ("SAS"), a fixed base operator that was owned by her then husband, Steven Tuma. *Id.* ¶ 2. In 1992, Ms. Herbst formed another company, Sound Aircraft Flight Enterprises ("SAFE"), which she owned.  *Id.* ¶ 3. SAFE primarily provided pilot training, aerial sightseeing, and chartered flights, while SAS offered chartered airplane, seaplane, and helicopter flights with Ms. Herbst as the employee taking the lead on booking flights. *Id.* ¶ 8. Through Ms. Herbst's efforts, SAS began developing a customer base for booking passengers on flights. *Id.* ¶ 6.

### B.  Shoreline Enters into a Booking Arrangement with SAS

In 1993, Ms. Herbst spontaneously met John Kelly, the principal of Shoreline, and had an impromptu discussion concerning a potential working relationship. SOMF ¶ 12. Shoreline offered flights on seaplanes and other aircraft between Manhattan and East Hampton. *Id.* ¶ 14. At the time, SAS also provided services to Shoreline, such as fuel and airplane servicing. *Id.* ¶ 13. Ms. Herbst and Mr. Kelly agreed to a business arrangement whereby, in exchange for commissions, SAS would book passengers for seaplanes and chartered planes departing from or flying to East Hampton, New York. *Id.* ¶ 15. They agreed to a 10 percent  commission for each passenger that SAS booked, and that the arrangement could be cancelled at the convenience of Shoreline or SAS.

*Id.* ¶ 15. There was no discussion of exclusivity, treatment of customer data, ownership of customers, advertising, changes to the commission terms, or additional duties. *Id.* ¶¶ 17-20. As Mr. Kelly succinctly put it when later describing the relationship, "[t]his was merely a booking arrangement . . . ." Ex. 5 (SAI0000255)[1].

**C.  SAS and Shoreline Enter into Two Written Contracts**

On May 15, 1994, SAS, Shoreline, and the town of East Hampton entered into an operating agreement, which dictated the terms under which Shoreline, with SAS's assistance, could operate out of the East Hampton Airport (the "Operating Agreement"). SOMF ¶ 25-27. The Operating Agreement was intended "to formally establish procedures to be followed to insure the safe, orderly and compatible conduct of [Shoreline]'s operation, including the ground operation services to be provided by [SAS], one of the Airport's fixed base operators." Ex. 6 ¶ 1 (SAI000360). The Operating Agreement required SAS to provide ticketing, check-in, baggage handling, and related customer services to Shoreline. Ex. 6 ¶ 3 (B) (1) (SAI000361). As Shoreline has acknowledged, these are the same services that SAS had already been providing to Shoreline pursuant to the putative oral contract. Ex. 2 at 160:11-161:20 (Collingwood Dep. Tr.).

As is particularly relevant here, the Operating Agreement also includes an integration clause confirming that it reflected "the complete understanding of the parties" and that it could only be modified "by written endorsement pursuant to a resolution of the Town Board."  Ex. 6 ¶ 18 (SAI000369). Moreover, the Operating Agreement explicitly states that "[i]t is clearly understood and agreed that nothing in this agreement shall be construed to grant or authorize the granting of an exclusive right to [Shoreline]." Ex. 6 ¶ 16 (SAI000368).

---

[1] "Ex." refers to the exhibits attached to the Declaration of Reid Skibell, dated June 16, 2023, in Support of the Herbst Defendants' Motion for Summary Judgment.

On July 16, 1996, SAS and Shoreline entered into a new operating agreement, to which East Hampton was not a party (the "Supplemental Operating Agreement"). The Supplemental Operating Agreement reaffirmed the duties and obligations between the parties: "[SAS] shall continue to offer flight reservation services and ground handling . . . in accordance with its current operating agreement in place between the parties." Ex. 8 ¶ II.B (SAI000406). With respect to SAFE, the Supplemental Operating Agreement states that it or a Shoreline subsidiary will offer flight instruction. Ex. 8 ¶ V (SAI000407).

**D.  SAS and Shoreline Work Together between 1993 and 2017**

Beginning after Shoreline and SAS began their informal booking arrangement in 1993, and continuing through the two Operating Agreements, SAS and Shoreline worked together, without interruption, until 2017. SOMF ¶ 35.

At all times during this period, Ms. Herbst was an employee of SAS. SOMF ¶ 36. Ms. Herbst and other SAS employees booked customers for Shoreline flights, as well as flights on Liberty Helicopters, Associated Aircraft Group, and Action Airlines, and others. *Id.* ¶ 37. They also checked-in customers on those flights, responded to customer inquiries, and handled administrative matters. *Id.* ¶ 38. Ms. Herbst and the other employees worked in SAS's offices, used SAS's computers, and their salaries were paid by SAS. *Id.* ¶ 39. Ms. Herbst's salary was independent of any commissions received by SAS. *Id.* ¶ 40.

Originally, SAS used a Shoreline credit card reader to process payments, and Shoreline then paid SAS its earned commissions. SOMF ¶ 41. After Shoreline filed for bankruptcy protection in the early 200s, however, SAS began collecting payments and remitting the money to Shoreline to avoid payment delays. *Id.* ¶ 42. Since SAS did not have the proper Federal Aviation Administration certificate that would permit it to collect and remit passenger taxes, SAFE would run the credit cards and remit the money to SAS. *Id.* ¶ 43.

With respect to customers, SAS collected customer information on its own and maintained that information on its computer systems, and SAS used that data to communicate with its customers. *Id.* ¶ 45. In fact, Shoreline did not ever seek access to any customer data held by SAS or SAFE. *Id.* ¶ 22. Shoreline also did not inquire into how SAS or SAFE collected, stored, or safeguarded any customer data. *Id.* ¶ 23.

For a period of time, Shoreline collected customer information that was saved in an internal Excel spreadsheet. SOMF ¶ 46. At some point after 2016, Shoreline uploaded this customer list to a software application called Constant Contact. *Id.* ¶ 47. Shoreline sent out less than 10 customer communications using Constant Contact, it and let its subscription lapse in 2019. *Id.* ¶ 48.

### E.  SAFE Begins Working with Shoreline

In 2017, Mr. Tuma and Ms. Herbst divorced. As a part of the divorce, the parties entered into an agreement which stipulated that SAS would remain Mr. Tuma's company, while SAFE would remain Ms. Herbst's company. SOMF ¶ 50. The parties also agreed that the companies would not compete with each other, and agreed that SAS would provide fueling to aircraft, aircraft storage, and other related services while SAFE would provide booking services for aircraft flights. *Id.* ¶ 51.

Although Mr. Kelly eventually objected to the inconvenience of having to work with both SAS and SAFE, he did not claim that SAS had breached a contract or an assignment was required. *Id.* ¶ 54. In July 2017, Mr. Kelly sent Ms. Herbst a letter to discuss the change in circumstances between Shoreline and SAS (the "2017 Letter"). SOMF ¶¶ 53, 55. Instead, Mr. Kelly seized on this situation and unilaterally proposed a new fee structure that paid SAFE less than SAS for the bookings. *Id.* ¶ 55. Ms. Herbst, on SAFE's behalf, was forced to accept this lower commission rate because Mr. Kelly was withholding money that Shoreline owed SAFE for customers that it had

already booked and there was no agreement or contract that granted SAFE any rights. *Id.* ¶¶ 56-57.

**F.  Shoreline and SAFE Explore New Business Opportunities, and Shoreline Attempts to Buy SAFE's Customer Data.**

In the fall of 2017, John Kelly decided that he wanted to sell Shoreline, and he started negotiations with Hyannis Air Service, Inc., d/b/a as "Cape Air", which is a commercial airline that provides flights to 40 destinations in the United States and Caribbean. SOMF ¶¶ 58, 60. Mr. Kelly concealed the existence of these negotiations from SAFE and Ms. Herbst. *Id.* ¶ 59.

In late January 2018, Cape Air started due diligence on the potential transaction, and sent Shoreline a checklist of materials that it required, including all of Shoreline's "Material Contracts." SOMF ¶ 61. In connection with these due diligence requests, however, Shoreline did not provide Cape Air with any information indicating that it had a contract with either SAS or SAFE. *Id.* ¶ 62.

After months of negotiations, Shoreline and Cape Air executed a letter of intent, dated March 5, 2018, indicating that Cape Air would merge with Shoreline. Cape Air agreed to pay Shoreline $5,000,000, with $1.5 million of the consideration being assigned to an employee stock purchase plan ("ESOP"). Ex. 15 ¶ 1(c) (HAS0002245). An ESOP is a type of qualified employee benefit plan that permits employees to become beneficial owners of a company's stock common stock whereby the ESOP provides retirement benefits to employees based upon the value of the company's shares. SOMF ¶ 65. Shoreline desired an ESOP to be part of the transaction because John Kelly and Andrea Collingwood, Shoreline's principals, would have had a reduced tax burden. *Id.* ¶ 66.

Around this same time, Ms. Herbst was presented with a new opportunity. In early 2018, Blade Air Mobility, Inc. ("Blade") reached out to Ms. Herbst to discuss a partnership between SAFE and Blade. SOMF ¶ 67. Blade is the creator of a smartphone application that people can use

7

to find seats on flights, including flights to the Hamptons. *Id.* ¶ 68. During the early discussions with Blade, Ms. Herbst informed Blade that she wanted Shoreline to be involved in any potential transaction. *Id.* ¶ 69. Blade's representative agreed, and subsequently on April 6, 2018, Blade's representatives, Ms. Herbst, Mr. Kelly, and others participated in a meeting. *Id.* ¶ 70.

Already having a deal with Cape Air in hand, however, Mr. Kelly had no interest in partnering with Blade. SOMF ¶ 72. On or about April 11, 2018, Mr. Kelly sent Ms. Herbst a letter informing her that Shoreline would not participate in anything having to do with Blade. *Id.* ¶ 73. In the beginning of the letter, Mr. Kelly explains why a deal with Blade would be bad for both Shoreline and SAFE. *Id.* ¶ 74. Tellingly, Mr. Kelly informed Ms. Herbst that Blade would take advantage of her by misusing *SAFE's customer data*—the very data Shoreline claims it owns in this case. Specifically, Mr. Kelly stated:

> [O]nce they have established themselves with our customers and adapted them to their booking system Blade would have no incentive to continue to work with either [SAFE] or Shoreline. . . . Likewise, *once the bulk of the [SAFE] contact list was converted to Blade's marketing platform, there would be no need for [SAFE]'s services*. At that point, any contract you might have with them is only valuable in it gives you the right to sue them when they fail to honor their commitments.

Ex. 9 (SAI000040-43 (emphasis added)).

Mr. Kelly proceeded to offer $325,000 to purchase certain of SAFE's assets, including its "customer lists, contact information, booking records and accounting records for the last 5 years." *Id.*, at SAI000041. He further stated that Mr. Herbst would need to be bound by a three-year non-compete, and that she "would agree not to release *your customer* list to any other person or business entity." *Id.*, (emphasis added). Mr. Kelly set a short deadline for Ms. Herbst to respond to the offer, and his rush may have reflected the exigencies of the Cape Air deal. SOMF ¶ 78. SAFE was unable

in the timeframe given, and Shoreline proceeded to cancel the booking arrangement. SOMF ¶ 79, 83.

### G.  Shoreline Unilaterally Terminates the Booking Arrangement with SAFE.

In early 2018, Shoreline began discussions with a company called TakeFlight about building its own customer booking platform, and they eventually entered into a contract. SOMF ¶ 80. This customer booking platform would enable Shoreline to perform the tasks that had previously been handled by SAS/SAFE. *Id.* ¶ 81. Once Shoreline learned about Ms. Herbst's conversations with Blade, it accelerated the development of this system. *Id.* ¶ 82.

In a document which indicates it was sent on May 6, 2018, Shoreline contacted the customers for whom it had contact information and informing them that Shoreline was no longer working with SAFE: "Beginning May 1st 2018, our seaplane commuter and charter customers will be able to book directly with Shoreline Aviation, using our website, email or toll free 800 number." Ex. 9 (SAI000047-48). This communication further informed customers that "check-in staff will be at the [SAS] booth located in the main terminal." *Id.* In other words, Shoreline decided to use SAS's location in the airport, which was run by Ms. Herbst's ex-husband, to check-in customers. Ex. 2 at 111:3-112:17 (Collingwood Dep. Tr.).

 Shoreline provided no notice to SAFE or Ms. Herbst prior to sending this email effectively terminating SAFE. SOMF ¶ 85. At that point, Ms. Herbst decided that she had no choice but to partner with Blade. Declaration of Cynthia L. Herbst, dated June 16, 2023 ¶ 51 ("Herbst Declaration"). In the afternoon of May 7, 2018, Ms. Herbst unilaterally executed a Memorandum of Terms, which was a precursor to Blade and SAFE negotiating a definitive agreement. Ex. 20 (BLADE609-616). Later that evening, Ms. Herbst sent an email to SAFE's customer list which informed them that SAFE would be working with Blade because "[u]nfortuantely, it appears that Shoreline Aviation no longer wishes to work with [SAFE]." Ex. 19 (SAI000033).

Negotiations continued between SAFE and Blade, and the final agreements were executed on May 17, 2018. SOMF ¶¶ 90, 92. SAFE received $175,000 in exchange for selling its assets to Blade. *Id.* ¶ 90. Ms. Herbst also agreed to serve as a consultant to Blade for $5,000 a month. *Id.* ¶ 91.

### H.  Cape Air Buys Shoreline's Assets and then Shutters the Company

While the original version of the Cape Air-Shoreline transaction was envisioned as a $5 million merger, Cape Air subsequently decided that it preferred an asset sale. SOMF ¶ 97. In November 2018, Shoreline began working on a revised version of the transaction that would address the increased tax liabilities from an asset sale. *Id.* ¶ 98.

Those discussions continued into December 2018, and Shoreline and Cape Air finally agreed to a deal where Shoreline received slightly in excess $6.37 million—a substantial increase over the $5 million that Cape Air had originally offered. Ex. 23 (HAS0002267-68). Shoreline received an increase sum to offset the tax benefit loss from the canceled ESOP transaction. SOMF ¶ 100. A portion of the $6.37 million was paid directly to Mr. Kelly and Ms. Collingwood as part of the transaction. Ex. 23 (HAS0002267-68).

After the asset purchase closed at the end 2018, Shoreline existed as a corporate entity operated by Cape Air. SOMF ¶ 103. Shoreline had not been a profitable business in the years before Cape Air's purchase, and that did not change after the transaction closed; its performance was unchanged. *Id.* ¶¶ 104-105. In 2020, Cape Air decided to shutdown Shoreline because it did not receive approval for a seaplane route between Boston and New York.  *Id.* ¶ 106.

### I.  Ryan Pilla's Limited Role in the Underlying Events

Ryan Pilla is Ms. Herbst's longtime boyfriend. Ryan A. Pilla Statement of Undisputed Facts ("PSOMF") ¶ 1. Mr. Pilla operates a successful automotive repair business, which has been based out of the Hamptons since the late 1990s. PSOMF ¶ 2.  Although he was named a defendant

in this lawsuit, Mr. Pilla does not have any interest, ownership or otherwise, in Ms. Herbst's business ventures, including SAFE. *Id.* ¶ 4. He merely provided advice and guidance to Ms. Herbst regarding the operations of SAFE as her significant other. *Id.* ¶ 5.

During the time Ms. Herbst was negotiating the transaction between SAFE and Blade, Mr. Pilla corresponded with Mr. Kelly on a handful of occasions. PSOMF. ¶ 7.  Ms. Herbst was dealing with medical and personal issues, so, for example, Mr. Pilla texted Mr. Kelly to coordinate the scheduling of the meeting with Blade. *Id.* ¶ 8. Although Blade copied Mr. Pilla on correspondence with Ms. Herbst and mistakenly listed him as a principal of SAFE in certain draft agreements, he did not negotiate any part of the transaction with Blade. *Id.* ¶¶ 13-16.

Mr. Pilla also did not have any relationships or contracts with Shoreline, and he did not agree to keep information confidential on Shoreline's behalf. PSOMF ¶¶ 10-11.  Mr. Pilla has never accessed any of Shoreline's or SAFE's intellectual property, customer information, or other proprietary business information. *Id.* ¶¶ 12. Mr. Pilla had no control or involvement in SAFE's operations or business plans during the period at issue. *Id.* ¶ 5.

## ARGUMENT

A party is entitled to summary judgment when it establishes that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. *See Allstate Ins. Co. v. Singh*, 2022 WL 3929885, at *2 (E.D.N.Y. Aug. 12, 2022) (citing Fed. R. Civ. P. 56 (a), report and recommendation adopted, 2022 WL 3914965 (E.D.N.Y. Aug. 31, 2022). Here, the Herbst Defendants' are entitled to summary judgment because Shoreline's legal claims assume facts to be true that are, in actuality, contradicted by documentary evidence, testimony, and, not least of all, commonsense. Although Shoreline tries to finesse an unfavorable evidentiary record

by labelling, on its own authority, SAFE and Ms. Herbst an "agent," that attempt fails as a matter of New York law. All of Shoreline's claims should be dismissed.

## I.   THE CONTRACT CLAIMS

The heart of Shoreline's case is a purported oral contract, which serves as the basis for Shoreline's breach of contract (Count I), promissory estoppel (Count II), and constructive trust claims (Count X) claims, and it is the factual predicate for Shoreline's claims grounded in fiduciary duty or agency, as detailed below. Shoreline contends that during a meeting held at an unidentified time in 1994, John Kelly, on behalf of Shoreline, and Cindy Herbst, who was supposedly "d/b/a SAFE and [SAS]", agreed to an oral contract pursuant to which: "Herbst" was responsible for "exclusively booking" Shoreline flights, and "Herbst/SAFE" would receive a 10% commission for each seat booked; Herbst would be "Shoreline's exclusive booking agent," and as such both had access to Shoreline's proprietary data, and was required to guard it; and either party could terminate the agreement on "reasonable notice." According to Shoreline, Herbst and SAFE terminated the contact "without reasonable notice . . .  in April or May 2018."

Shoreline's claims related to this alleged oral contact must be dismissed because the evidence overwhelmingly demonstrates that there was no such contract. Rather, there are two written contracts that cover the provision of booking services between the parties and that therefore bar Shoreline's claims. Those written contracts equally mean Shoreline's unjust enrichment (Count III) must be dismissed. *See 839 Cliffside Ave. LLC v. Deutsche Bank Nat'l Tr. Co. for First Franklin Mortg. Loan Tr. 2006-FF3 Mortg. Pass-Through Certificates, Series 2006-FF3,* 2018 WL 4608198, at *11 (E.D.N.Y. Sept. 25, 2018) (Locke, J.) (dismissing unjust enrichment claim due to existence of a contract).

## A.  Kelly and Herbst Agreed to a Non-binding Booking Arrangement.

The legal requirements for an oral contract are firmly established: "Before a court will impose a contractual obligation based on an oral contract, the proponent must establish that a contract was made and that its terms are definite." *Volunteers of Am. of W. New York, Inc. v. Rochester Gas & Elec. Corp.*, 2014 WL 3510495, at *11 (W.D.N.Y. July 14, 2014) (quoting *Muhlstock v. Cole*, 245 A.D.2d 55, 58 (1st Dep't 1997)). By contrast to a written contract, a plaintiff alleging the existence of an oral contract "faces a heavier burden" of proof: "To ensure that parties are not trapped into surprise contractual obligations that they never intended, more than agreement on each detail is required, there must be an overall agreement to enter into the binding contract." *Delaney v. Bank of Am. Corp.*, 908 F. Supp. 2d 498, 514 (S.D.N.Y. 2012), *aff'd*, 766 F.3d 163 (2d Cir. 2014). If no reasonable factfinder could find based "on the record and in the face of the documentary evidence," that the parties the parties intended to, and, in fact, did form an oral contract, then the court must grant summary judgment to the defendant. *Gottlieb v. Simon*, 1998 WL 684839, at *3 (S.D.N.Y. Sept. 30, 1998) (citation omitted), *aff'd sub nom. RKG Holdings, Inc. v. Simon*, 182 F.3d 901 (2d Cir. 1999).

Shoreline's claims for promissory estoppel and constructive trust similarly require a promise, which must be clear and unambiguous in the case of promissory estoppel, on which it reasonably relied. *See Celi v. Canadian Occidental Petroleum Ltd*., 804 F. Supp. 465, 470 (E.D.N.Y. 1992); *Van Brunt v. Rauschenberg*, 799 F. Supp. 1467, 1474 (S.D.N.Y. 1992). Where, as here, there is no such promise, the claims must be dismissed. *See Wilson v. Dantas*, 746 F.3d 530, 538 (2d Cir. 2014) (promissory estoppel); *Van Brunt*, 799 F. Supp.  at 1474 (constructive trust).

Shoreline cannot establish that there was a meeting of the minds that would form the basis for a contract or valid promise. What Mr. Kelly and Ms. Herbst negotiated was an informal

booking arrangement: Ms. Herbst, on behalf of SAS, her husband's company where she was employed, agreed to book and check-in customers on Shoreline seaplanes in exchange for commissions. Nothing else was discussed between the two of them, as Ms. Herbst, Mr. Kelly, and Ms. Collingwood (Shoreline's corporate representative) *have all confirmed*. They did not negotiate a contract with definite terms or elucidated obligations, much less one with the specific obligations proffered by Shoreline. Although that lack of precision is normal for an informal arrangement, an enforceable contract requires a meeting of the minds on material terms. *See Brookhaven Hous. Coal. v. Solomon*, 583 F.2d 584, 593 (2d Cir. 1978) ("To consummate an enforceable agreement, the parties must not only believe that they have made a contract, they must also have expressed their intent in a manner susceptible of judicial interpretation."). Simply put, a reasonable factfinder could not find an oral contract or enforceable promise on this evidentiary record.[2]

*First*, Ms. Herbst testified that she only discussed with Mr. Kelly a commission-based booking arrangement that could be cancelled at the convenience of Shoreline or SAS. There was no discussion of, much less agreement on, exclusivity, treatment of customer data, who owned the customers, advertising, changes to the commission terms, or additional duties. SOMF ¶¶ 15-19.

*Second*, documents produced by Shoreline show that Mr. Kelly held the *same view* as Ms. Herbst.  In the July 2017 Letter, Mr. Kelly summarized the terms of the "past relationship" between Shoreline and SAS. SAI010912. Notably, he claimed neither that there was a contract nor that the relationship extended beyond the booking of flights in exchange for commissions:

> In the past Shoreline Aviation has agreed that Sound Aircraft Services
> may retain 10% of all commuter sales, both prepaid and retail . . . . We

---

[2] *See ,e.g.*, *D3 Int'l, Inc. v. AGGF Cosm. Grp. S.p.A.*, 2023 WL 2390552, at \*8 (S.D.N.Y. Mar. 7, 2023) (granting summary judgment where there was no "meeting of the minds on the essential terms of an oral contract"); *Marcus v. Lominy*, 2022 WL 493688, at \*10 (S.D.N.Y. Feb. 17, 2022) (granting summary judgment on an oral contract where a key term was not "sufficiently definite").

> have also allowed Sound to collect 3.5% on all Credit Card transactions, a fee to which no other broker is entitled.
>
> For this 13.5% of the gross, we have received an array of services which have included Commuter Reservations, charter bookings and fee collections, along with the preparation of flight manifests, check in services, baggage handling and expediting fueling into and out of East Hampton.

Ex.4 (SAI010912); *see also* Ex. 5 (SAI0000255) (quoting Mr. Kelly: "This was merely a booking arrangement which just wasn't working anymore."). Mr. Kelly's statements prove this was not a contract, much less one with the features Shoreline has alleged here.

*Third*, Shoreline's corporate representative, Ms. Collingwood, testified that the company's knowledge of the existence of the putative oral contract was primarily based on discussions she had with Mr. Kelly. Ex. 2 at 106:1-107:13(Collingwood Dep. Tr.).  She further explained that Mr. Kelly told her this was nothing more than a "booking arrangement":

> Q:  What did you recall discussing with Mr. Kelly?
>
> A:  We talked about him setting up the *arrangement* with [Ms. Herbst*]:  the booking arrangement where she would help us with our customers in exchange for commissions*.

Ex. 2 at 33:18-23 (Collingwood Dep. Tr.) (emphasis added); (*see also id.*, at 154: 20-23 ("So the terms of the agreement were that she would provide our booking services in exchange for commission, and that oral contract lasted for 24 years.").

Relatedly, Ms. Collingwood could not articulate who Ms. Herbst was supposedly negotiating on behalf—SAS, SAFE, or herself— during the formation of the putative oral contract. Ex. 2 at 30:15-31:2; 34:6-20 (Collingwood Dep. Tr.) (claiming that the three are "interchangeable"). That lack of precision is inconsistent with the existence of an oral contract. Further, she does not know if Mr. Kelly and Ms. Herbst discussed treatment of customer data (*Id.*, at 149:10-14. "Q: So if I understand correctly, when Ms. Herbst and Mr. Kelly had a conversation

about working together, they didn't discuss customer data, right? A: No, not that I'm aware of.") (*see also id.*, 109:11-18, 206:12-16.); or booking exclusivity (*id.*, at 150:3-151:21) (Q:  I'm asking now what was discussed in 1994. To your knowledge did they discuss one way or the other whether Ms. Herbst could book flights for other seaplane operators? A:  I really don't know the answer to that."). Since Shoreline is uncertain if those issues were discussed, it logically cannot prove there was a meeting of the minds on them.

As for the parties' course of conduct, it was also inconsistent with the existence of an oral contract. If as Shoreline alleges, SAS/SAFE/Ms. Herbst had entered into an oral contract with Shoreline pursuant to which Ms. Herbst and those companies agreed that Shoreline owned their customer data and they would act as Shoreline's fiduciaries, then there should be documents evidencing this contract. But there are *none*. Additionally, Shoreline never claimed that it had rights to SAS and SAFE's customers or that it owned the data SAS and SAFE collected about those customers. SOMF ¶¶ 18, 24. And Shoreline never inquired how SAS and SAFE stored or protected that customer data or asked them to inspect the data. Any of those facts, in of themselves, should be sufficient to prove that there was no such contract.

As noted above, Shoreline also attempted to buy SAFE's customer data, which is at odds with its allegation that it owned SAFE's customer data. Similarly, during the course of due diligence with Cape Air, Shoreline identified all of the contracts that then existed. SOMF ¶ 62. It did not, however, indicate in those due diligence materials that it had a contract with SAS/SAFE/Ms. Herbst. *Id.*

### B.  Even if There Was an Enforceable Oral Contract, Neither SAFE Nor Ms. Herbst Were Parties to It.

Even putting aside that Mr. Kelly and Ms. Herbst did not agree to an enforceable contract, Shoreline's contract-based claims should be dismissed because any such agreement would have

been between Shoreline and SAS, which merely employed Ms. Herbst. SAFE and Ms. Herbst cannot be liable for a contract to which they were not a party.[3]

In fact, Shoreline has conceded that its only basis for imputing personal liability to Ms. Herbst on the alleged oral contract is veil-piercing, which is an admission that she was not an individual party to the contract. Ex. 26 (Shoreline's Response to Interrogatory No. 18). Shoreline is bound by such an admission. *See Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 260 (S.D.N.Y. 2021) (interrogatory responses are "admissions" that are "binding" on summary judgment).

That admission is hardly surprising. The evidence is overwhelming that Mr. Kelly and Ms. Kelly merely discussed SAS—not SAFE or Ms. Herbst— booking flights on Shoreline seaplanes. Ms. Herbst' testimony on this point is corroborated by the 2017 Letter, in which Mr. Kelly described the working relationship between Shoreline and SAS. Likewise, in the customer communication announcing that Shoreline would cease working with SAFE, Mr. Kelly explained that for the past 24 years Shoreline had worked together with SAS. Ex. 28 (SAI006764.) In other words, Shoreline conceded in both correspondence with Ms. Herbst and with customers that it had only worked with SAS between 1994 and 2017.

The documentary evidence also shows that Shoreline understood it was working with SAS—not Ms. Herbst individually or SAFE. For example, Shoreline never paid any commissions to Ms. Herbst. SOMF ¶¶ 20, 41. The only payments made to SAFE were after Shoreline's

---

[3] *See Cruikshank & Co. v. Sorros,* 765 F.2d 20, 26 (2d Cir.1985) ("[Appellant], not a party to the contract at issue, cannot be found liable for damages resulting from its breach, notwithstanding his status as an agent of one of the parties in breach."); *Nicholls v. Brookdale Univ. Hosp. Med. Ctr.*, 2004 WL 1533831, at *12 (E.D.N.Y. July 9, 2004) (dismissing breach of contract claim brought against individual where the employer was the party to the contract); *Highlands Ins. Co. v. PRG Brokerage, Inc.*, 2004 WL 35439, at *8 (S.D.N.Y. Jan. 6, 2004) ("[Plaintiff] may not hold [defendant] liable for breaching a contract to which it was not a party.").

bankruptcy, which was more than a decade after the purported oral contract was reached. SOMF ¶ 42. There is simply no evidence that would support the contention that Shoreline agreed to an oral contract with Ms. Herbst or SAFE. *See Staudinger+Franke GMBH v. Casey*, 2015 WL 3561409, at *7 (S.D.N.Y. June 8, 2015) (dismissing oral contract claim against an individual where the "[company] invoiced the clients, the plaintiffs invoiced [the company], and [the company] paid the plaintiffs".).

Further, Shoreline's breach of contract claim against Ms. Herbst fails because Shoreline never directly compensated her. The contract-based claims brought against her individually must be dismissed for lack of consideration. *See Coddington v. Adelphi Univ.*, 45 F. Supp. 2d 211, 219 (E.D.N.Y. 1999) (dismissing breach of contract claims against individual defendants because "plaintiff pleads only the payment of consideration to [corporate defendant] and pleads no consideration paid to any defendant in furtherance of a contract entered into between plaintiff and any other defendant"); *see also Highlands Ins. Co..*, 2004 WL 35439, at *8 (dismissing breach of contract claim for lack of consideration).

## C. Even if There Was an Enforceable Oral Contract, It was Supplanted by a Written Contract.

As a matter of established law, a contractual merger clause indicating it is a complete agreement between the parties will nullify a pre-existing oral contract covering the same subject. *See Sengillo v. Valeo Elec. Sys., Inc.*, 328 F. App'x 39, 42 (2d Cir. 2009) (holding that "any claim based on an alleged oral contract . . . is barred by the merger clauses contained in the [written agreement]"); *Integra FX3X Fund, L.P. v. Deutsche Bank, AG*, 2016 WL 1169514, at *3 (S.D.N.Y. Mar. 22, 2016) (holding that a merger clause "requires dismissal of any claim founded on [an] earlier alleged oral agreement between the parties."). Similarly, a promissory estoppel claim will not lie where the parties subsequently entered into a written agreement. *See Cambridge Valley*

*Machining, Inc. v. Hudson MFG LLC*, 470 F. Supp. 3d 230, 262 (N.D.N.Y. 2020) (dismissing promissory estoppel claim because "there is no genuine dispute that a written contract existed").

Here, the "booking arrangement" discussion between Mr. Kelly and Ms. Herbst predated Shoreline, SAS, and the Town of East Hampton entering into the Operating Agreement. The Operating Agreement also pertains to the subject matter of Shoreline's and SAS's booking arrangement. SOMF ¶¶ 25-29. Indeed, Shoreline has conceded that it covers SAS's responsibilities to, among other things, provide ticketing, check-in, baggage handling, and other related customer services to Shoreline. Ex. 7 (Shoreline's Response to RFA No. 10).

The Operating Agreement also contains a merger clause, which states "[t]his agreement contains the complete understanding of the parties and may be modified only by written endorsement pursuant to a resolution of the Town Board." SOMF ¶ 30. Given the existence of that clause, it cannot be disputed that the Operating Agreement supplanted any purported oral contract. Further, the Supplemental Operating Agreement, to which only Shoreline and SAS are parties, reaffirms the Original Operating Agreement and states that "[SAS] shall continue to offer flight reservations services . . . in accordance with its current operating agreement in place between the parties." SOMF ¶ 33.

In short, Shoreline and SAS understood and agreed that the Operating Agreements governed the terms of any booking or ticketing services. Since Shoreline does not claim the Operating Agreements were breached, its contract claims must be dismissed.

## II.   The "Booking Agent" Claims

### A.   The "Booking Agent" Claims are Based on a Mistake of Law

As a threshold matter, Shoreline's breach of fiduciary duty (Count IV), faithless servant (Count V), misappropriation (Count VI), Defend Trade Secrets Act (Count VII), unfair competition (Count VIII), tortious interference (Count IX), and constructive trust (Count X) claims

are all predicated on the same foundation. Shoreline claims that Ms. Herbst was a "booking agent," and thus, according to the plaintiff, this means that she was acting on its behalf as an agent, she supposedly owed fiduciary duties to Shoreline, and it purportedly owned all of the customers and the data collected by SAS/SAFE and held on SAS/SAFE's computer systems about those customers. Ex. 26 (Shoreline's Response to Interrogatory No. 10). With the exception of this label, Shoreline has provided no explanation for why it has a protectable interest in the customers SAS/SAFE developed and the data relating to those customers. Dkt. No. 145, at 2 (acknowledging the "booking agent" assertion is the basis for Shoreline's claims)]. Shoreline's contention that the label "booking agent" carries legal significance is the predicate for the majority of its claims. Shoreline, however, is wrong on the law. It cannot create duties where none exist by tagging Ms. Herbst with a label.

Absent "extraordinary circumstances," parties to an arm's length business relationship—such as Shoreline, SAS, and SAFE—do not owe fiduciary duties to one another. *Speedfit LLC v. Chapco Inc.*, 2016 WL 5793738, at *9 (E.D.N.Y. June 29, 2016) (Locke, J.) Moreover, as is particularly relevant here, "'the dispositive issue of fiduciary-like duty or no such duty is determined *not by the nomenclature 'finder' or 'broker' or even 'agent,' but instead by the services agreed to under the contract between the parties*.'" *World Wrestling Ent., Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 504 (S.D.N.Y. 2007) (emphasis added) (quoting Ne. Gen. Corp. v. Wellington Advert., Inc., 82 N.Y.2d 158, 164 (N.Y. 1993), aff'd, 328 F. App'x 695 (2d Cir. 2009); *see also Plant Performance Servs. Int'l, Ltd. v. Gen. Elec. Int'l, Inc.*, 2009 WL 10741320, at *5 (S.D.N.Y. Dec. 2, 2009) ("[t]alismanic language alone does not determine an agency relationship . . . [and] [c]ourts must look to the substance of the relationship.") (citation omitted). Consistent with that legal principle, courts have specifically rejected the argument that being colloquially

20

referred to as an "agent" is enough to create a principal-agent relationship. *See, e.g.*, *Reed v. Luxury Vacation Home LLC*, 2022 WL 4624839, at *19 (S.D.N.Y. Sept. 30, 2022) (dismissing breach of fiduciary duty claim based on allegation that defendants were "booking agents").[4]

Here, there are no contracts other than the Operating Agreements. Each is an arm's length contract that requires SAS, as a fixed base operator, to provide booking, ticketing, and related services to Shoreline. Nothing in those Agreements evidences the existence of a fiduciary or agency relationship between Shoreline and SAS. Shoreline has *conceded* as much. Ex. 2 at 162:9-15 (Collingwood Dep. Tr.) ("Q: So [the Operating Agreement] does not set forth that Ms. Herbst or SAS have any fiduciary obligations to Shoreline, correct? A: I'm not a lawyer, but I would say that's – that's the case.").

But even if there was an oral contract between Shoreline and SAFE/Ms. Herbst, and the parties thereto had specifically agreed that SAFE/Ms. Herbst would be a "booking agent"—neither which is accurate—Shoreline' claims would still fail. Any casual use of the term "booking agent" would have reflected the fact that SAFE and Ms. Herbst had longstanding relationships with *their customers*. *Cf. Pellegrini v. Landmark Travel Grp.*, 165 Misc. 2d 589, 595 (N.Y. City Ct. 1995) (holding that that travel agents are agents for consumers). It is not probative of the relationship between Shoreline and SAFE/Ms. Herbst, which was purely commercial.

If Shoreline desired SAFE or Ms. Herbst to be its fiduciaries, it would have specifically bargained for them to have those duties. Instead, Mr. Kelly and Ms. Herbst discussed a commissioned sales arrangement, which "does not make one a fiduciary." *Rosenblatt v. Christie,*

---

[4] *See also Newton v. Meyer*, 2023 WL 2563115, at *10 (S.D.N.Y. Mar. 17, 2023) (rejecting argument that a "talent agent" was a fiduciary); *Staudinger+Franke GMBH v. Casey*, 2015 WL 3561409, at *12 (S.D.N.Y. June 8, 2015) (same); *Plant Performance*, 2009 WL 10741320, at *5 (defendant was an "independent contractor" even though it was referred to as an "agent" in the contract).

*Manson & Woods Ltd.*, 2005 WL 2649027, at *10 (S.D.N.Y. Oct. 14, 2005) (rejecting argument that payment of commissions created a fiduciary relationship), *aff'd sub nom. Rosenblatt v. Christie*, 195 F. App'x 11 (2d Cir. 2006).[5] A commissioned sales arrangement is a "commercial relationship, pure and simple" that is not accompanied by special duties or obligations. *Brasport, S.A. v. Hoechst Celanese Corp.*, 747 F. Supp. 199, 202 (S.D.N.Y. 1990). At most, SAFE/Ms. Herbst were required to perform commercial booking services for Shoreline. *See Fed. Ins. Co. v. Mertz*, 2015 WL 5769945, at *5 (S.D.N.Y. Sept. 29, 2015) (holding that independent contractors cannot be faithless servants because they only perform bargained for services).

The parties' course of dealing is also inconsistent with the existence of any special duties— fiduciary or otherwise—between Shoreline and SAS/SAFE.[6] Prior to this litigation, Shoreline failed to assert that SAS/SAFE owed it duties that went beyond the provision of ticketing and booking services. And Shoreline did not treat SAS/SAFE like an agent. For example, while Shoreline claims that it owns all of the customer data that SAS/SAFE collected by virtue of an agency relationship, Mr. Kelly tried to purchase SAFE's customer data. His conduct demonstrates a recognition that Shoreline had no rights to the data.

---

[5] *See also Rodgers v. Roulette Recs., Inc.*, 677 F. Supp. 731, 739 (S.D.N.Y. 1988) (explaining that "the fact that [defendants] collected royalties or fees which it had an obligation to pass on to plaintiff did not make them plaintiff's fiduciaries"); *Smw Consulting, LLC v. CDX Diagnostics, Inc.*, 2016 WL 10575032, at *2 (N.Y. Sup. Ct. Jan. 04, 2016) (commissioned sales arrangement not fiduciary in nature); *Sanshoe Trading Corp. v. Mitsubishi Int'l Corp.*, 470 N.Y.S.2d 991, 993 (N.Y. Sup. Ct. 1984) (same), *aff'd*, 104 A.D.2d 337 (1st Dep't 1984).

[6] To the extent that Shoreline would point to the length of time the parties worked together as evidence of a fiduciary relationship, that argument would fail. Merely having an effective business arrangement is not enough to create fiduciary duties. *See, e.g., Atlantis Info. Tech., GmbH v. CA, Inc.*, 485 F.Supp.2d 224, 231–32 (E.D.N.Y.2007) ("Both parties are commercial companies and although the Plaintiff contends that it had trust and confidence in the Defendant, that is not extraordinary.").

In short, SAS/SAFE was no more Shoreline's agent than Shoreline was their agent by virtue of the fact that it flew the airplanes carrying the customers booked by SAS/SAFE. Shoreline's claims predicated on a special relationship of trust should because the evidentiary record contradicts its legal theory. *See Staudinger*, 2015 WL 3561409, at \*12 (dismissing breach of fiduciary duty claim where plaintiff could not produce evidence of an agency relationship).

### B.  There Are No Protectable Trade Secrets

Shoreline's misappropriation, DTSA, and unfair competition claims predicated on trade secret claims should be dismissed on the additional ground that the information that Shoreline points to does not constitute a trade secret. In New York, courts use the following factors to determine if information constitutes a trade secret:  [i] the extent to which the information is known outside of the business; [ii] the extent to which it is known by employees and others involved in the business; [iii] the extent of measures taken by the business to guard the secrecy of the information; [iv] the value of the information to the business and its competitors; [v] the amount of effort or money expended by the business in developing the information; and [vi] the ease or difficulty with which the information could be properly acquired or duplicated by others." *Waterville Inv., Inc. v. Homeland Sec. Network (NV Corp.)*, 2010 WL 2695287, at \*3 (E.D.N.Y. July 2, 2010) (citing *Ashland Mgmt. Inc. v. Janien,* 624 N.E.2d 1007, 1013 (N.Y.1993)). The most important consideration, however, is "whether the information was secret." *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 298 (2d Cir. 1986). A plaintiff must demonstrate that it took "substantial measures to protect the secret nature of its information." *Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 267 (S.D.N.Y. 2014).

Here, Shoreline has only identified customer information as trade secrets purportedly misappropriated by the Herbst Defendants that were created and held by parties other than

Shoreline: SAS and SAFE. Ex. 2 at 230:6-19 (Collingwood Dep. Tr.) (claiming that the misappropriated information was "[Ms. Herbst's] list"). Shoreline, however, did not seek access to such data. SOMF ¶ 22. Shoreline also failed to inquire into how SAS or SAFE collected, stored, or safeguarded this customer data. *Id.* ¶ 23. And it neglected to put into place an agreement with SAS or SAFE that would require the customer information to be protected in some manner. *Id.* ¶ 17.

The closest Shoreline comes to alleging action taken to safeguard its purported trade secrets is an assertion that it gave Ms. Herbst an employee handbook containing a confidentiality provision. Dkt. No. 33 ¶ 41. However, Mr. Herbst was not a Shoreline employee and thus would not have been bound by anything in the handbook. And Ms. Collingwood testified that the handbook referenced in the pleadings is not the one supposedly presented to Ms. Herbst. Ex. 2 at 211:8-212:25 (Collingwood Dep. Tr.,). Ms. Collingwood further clarified that the confidentiality provision only applied to planes Shoreline managed for private owners (*i.e.*, not passengers SAS/SAFE booked). *Id.*, at 213:2-22.)

Having done essentially *nothing* for more than twenty years to safeguard this customer data—which was created, curated, and held by others—it is farcical for Shoreline to claim the data is entitled to legal protection. *See Big Vision Priv. Ltd..*, 1 F. Supp. 3d at 267 (holding that plaintiff failed to identify trade secret because information belonged to another company and "there was virtually no contemporaneous documentary or testimonial evidence . . . indicating that [plaintiff] took any steps to ensure the confidentiality of the information . . ."); *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 522 (S.D.N.Y. 2017) (holding that plaintiff failed to protect purported trade secret it disclosed to customers without protection of a confidentiality agreement). The trade secrets claims must all be dismissed.

### III.    The Tortious Interference and Unfair Competition Claims

Separate from its tortious interference and unfair competition allegations based on purported misappropriation of data, Shoreline has a scattershot range of alternative theories. It asserts that the Herbst Defendants tortiously interfered with unspecified customer relationships by allegedly harassing its customers, working with Blade and, commencing a lawsuit against Shoreline, and that the Herbst Defendants unfairly competed by supposedly harassing Shoreline's customers. Each claim should be dismissed.

To begin with, "[f]or a tortious inference claim in which the defendant's interference is intended, at least in part, to advance its own competing interest, New York law requires the party seeking relief to prove that the tortfeasor interfered with the prospective relationship using criminal or fraudulent means." *SourceOne Dental, Inc. v. Patterson Companies, Inc.*, 328 F. Supp. 3d 53, 69 (E.D.N.Y. 2018).

Here, the Herbst Defendants were plainly attempting to advance their economic interests by working with Blade to book customers. And Shoreline cannot even come close to identifying criminal or fraudulent conduct because none has been alleged and none exists. Further, Ms. Herbst filed the lawsuit against Shoreline based on the advice of her attorney at the time. Herbst Decl. ¶ 58. A lawsuit brought in good faith does not constitute tortious conduct—much less satisfy the higher standard required when the defendant is advancing a personal interest—because the commencement of a lawsuit is a protected activity under the *Noerr-Pennington* doctrine and New York law. *See Cambridge Cap. LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420, 475 (S.D.N.Y. 2021) (dismissing tortious interference claim because counter-defendant was "shielded from liability for filing the complaint by the *Noerr-Pennington* doctrine"); *Chutko v. Ben-Ami*, 150 A.D.3d 582, 583 (1st Dep't 2017) (dismissing tortious interference claim based on litigation privilege) (citing *Front, Inc. v. Khalil*, 24 N.Y.3d 713, 718 (N.Y. 2015).

A claim for tortious interference with prospective business relations also requires the plaintiff to identify specific business relationships that were lost as a result of the tortious conduct. *See In Touch Concepts, Inc. v. Cellco P'ship*, 949 F. Supp. 2d 447, 478 (S.D.N.Y. 2013) (dismissing claim for failure to allege lost relationships), *aff'd*, 788 F.3d 98 (2d Cir. 2015). Shoreline has not identified any customers it would have booked on flights absent the Herbst Defendant's alleged tortious conduct. Instead, Shoreline's tortious interference claim is supported by flawed, backwards reasoning: if a former Shoreline customer decided to fly with Blade the Herbst Defendants must be at fault. Ex. 2 at 285:16-20 (Collingwood Dep. Tr.) ("Q: You are assuming that because these persons stopped booking with you, that they did it because of actions by Ms. Herbst, correct? A: That is correct."); *see also id.*, 279:8-280:9; 283:8-11; 292:19-25. In itself, that dooms the tortious interference claim. *See, e.g.*, *Learning Annex Holdings, LLC v. Gittelman*, 48 A.D.3d 211, 211 (1st Dep't 2008) (upholding grant of summary judgment because "plaintiff has failed to identify any specific customers it would have obtained but for defendant's actions").

The unfair competition claim should be dismissed because Shoreline cannot adduce evidence to show that the Herbst Defendants engaged in bad faith. *See Sys. Mgmt. Arts Inc. v. Avesta Techs., Inc.*, 87 F. Supp. 2d 258, 272 (S.D.N.Y. 2000) (dismissing claim for lack of evidence of bad faith). SAFE's communications with the customers after Shoreline cancelled the booking arrangement was entirely proper: SAS/SAFE had relationships with the customers going back decades, some of which predated any business relationship with Shoreline. While Shoreline may have also had relationships with certain customers, it did not own the customers by virtue of flying the airplanes any more than SAS/SAFE owned the customers by booking them on those airplanes.

26

IV.     **Damages and Causation**

In most cases, the existence of cognizable damages and "but for" causation would both be a given. "That is, in the usual case, it is undisputed that the complained-of loss would not have occurred had the defendant not committed the relevant breach." *Semi-Tech Litig., LLC v. Bankers Tr. Co.*, 353 F. Supp. 2d 460, 482 (S.D.N.Y. 2005), *aff'd sub nom. In re Bankers Tr. Co.*, 450 F.3d 121 (2d Cir. 2006). But this is not the usual case, as the Court is aware. Shoreline can neither show cognizable damages nor that the Herbst Defendants are the factual cause of such damages.

To begin with, Shoreline claims that it suffered five types of losses:

(a) $839,848.51, the approximate amount of 2018 lost revenue as a result of Defendants' actions; (b) $189,605.87, the approximate cost to replace SAFE's staff in 2018 and change Shoreline's advertising to remove references to SAFE and correct the contact information; (c) $65,522.00, the amount of unearned commissions paid to Herbst and SAFE; and (d) $513,425.00, the approximate amount of the loss of tax benefits to Shoreline Aviation from the Employee Stock Ownership Plan that Shoreline Aviation could not implement in 2018 as a result of the filing of Herbst and SAFE's frivolous suit against Shoreline Aviation.

Ex. 26 (Shoreline's Response to Interrogatory No. 13).

The first purported harm is not a typographical error: Shoreline has consistently maintained in this case that it is seeking lost revenue, not lost profits. Ex. 2 at 308:2-16 (Collingwood Dep. Tr. (testifying that Shoreline is "seeking loss of revenue"); Dkt. No. 33, at ¶122 (alleging that in 2018 Shoreline "suffered damages . . . consisting of $1,350,000 from lost revenue from both commuter and charter flights"). This category of damages should be rejected "because lost revenue is not a proper measure of damages." *Integrated Const. & Power Systems, Inc. v. Radha Krishna Corp.*, 2019 WL 10292281, at *2 (N.Y. Sup. Ct. Jan. 30, 2019); s*ee also Texas State Aquarium v. Fishman Chem. of N. Carolina, LLC*, 2016 WL 4765057, at *5 (S.D. Tex. Sept. 13, 2016) (explaining that "a proper measure of damages looks to lost net profits, not lost net revenues"). It is too late for Shoreline now to claim it is pursuing lost profits and to belatedly attempt to calculate lost profits at a later date. *See Wagner v. JP Morgan Chase Bank*, 2011 WL 856262, at *7

(S.D.N.Y. Mar. 9, 2011) ("Failure to demonstrate .. . non-speculative damages will result in summary judgment in favor of the defendant.").

In any event, Cape Air's corporate representative confirmed that Shoreline, which it acquired in 2018, was as profitable after the transaction as it was historically.  Ex. 12 at 97:20-101:17 (Migliore Dep Tr.). Cape Air made the decision to shutter Shoreline because it could not get regulatory approval for a seaplane route.  Ex. 12 at 98:22-101:17 (Migliore Dep Tr.). Plainly, the Herbst Defendants are not responsible for Shoreline's closure.

The second category of damages is equally puzzling because Shoreline has never argued that SAFE/Ms. Herbst were prohibited from canceling the putative oral contract; rather, it has claimed that they had to give approximately one month's notice before doing so. Ex. 2 at 153:10-24; 299:11-24 (Collingwood Dep. Tr.). As a logical matter, however, Shoreline still would have needed to hire replacement staff and amend its advertising irrespective of the length of notice. (*Id.*. 300:6-301:7) (notice did not impact need to hire replacement staff). The Herbst Defendants' purported failure to give less notice than required could not have caused the claimed damages. For that reason, this damages claim should be dismissed on causation grounds. *See, e.g.*, *RSL Commc'ns PLC v. Bildirici*, 649 F. Supp. 2d 184, 220 (S.D.N.Y. 2009) (dismissing damages claim at summary judgment for failure to show "but for" causation), *aff'd sub nom. RSL Commc'ns PLC, ex rel. Jervis v. Fisher*, 412 F. App'x 337 (2d Cir. 2011).

As for the supposedly unearned commissions, Shoreline has conceded that it received the *full amount* of compensation it was due for the commissions it paid to SAFE:

Q: So you paid her approximately $65,000 in commissions, correct?

A:  That is correct.

Q: And you received all the money from the flights related to those

28

commissions, right?

A   Yes, we did.

Ex. 2 at 258:6-12 (Collingwood Dep. Tr.).

Although Shoreline may subjectively believe that SAFE should have checked-in the customers on the flights, that is not a basis for it to recover the *entire value* of those commissions. That would be a windfall to Shoreline. And, in any event, Shoreline prevented SAFE from checking-in the customers by cancelling the booking arrangement through an email sent to the entire customer base. There is nothing unjust here because Shoreline prevented SAFE from carrying out the obligation it contends SAFE was required to do.[7]

Finally, the stated ESOP damages are not cognizable damages. Although Shoreline has provided no support for the specific calculation set forth in the interrogatory, it appears to represent supposed tax losses due to Shoreline *and* its two owners (*id.*, at 335:22-336:5; ), the latter of which are not parties to this case. Moreover, Shoreline's accountant, who calculated the ESOP tax losses in an earlier affidavit, was asked to assume that the entirety of the $5 million consideration would be applied to the ESOP. Ex. 27 (SAI007875-78). However, Shoreline only agreed to apply $1.5 million to the ESOP (HAS0002245); her calculation was based on inaccurate inputs.

Nonetheless, even if the number represented genuine tax losses to Shoreline, any losses on the transaction were made up for by $1.3 million in additional consideration that Cape Air paid on the deal. *See* Ex. 2 at 336:6-15 (Collingwood Dep. Tr.) ("Q:  Do you know if the changed version

---

[7] Additionally, with respect to Shoreline's unjust enrichment claim, the claim is further deficient because Ms. Herbst and SAFE did not earn any benefit at Shoreline's expense as it received all the money from the flights related to the commissions at issue. *839 Cliffside Ave. LLC v. Deutsche Bank Nat'l Tr. Co. for First Franklin Mortg. Loan Tr.*, 2018 WL 4608198, at *11 (E.D.N.Y. Sept. 25, 2018) (noting that unjust enrichment claim must be dismissed unless it is demonstrated that one party has received money or a benefit at the expense of another).

of the transaction made up for any tax losses to you and Mr. Kelly or to Shoreline? A: Yes, it did."); *See* Ex. 12 at 82:20-88:14 (Migliore Dep. Tr.). For personal taxes reasons, Mr. Kelly asked for most of this additional consideration to be paid to him and his wife directly in the form of a $2,000,000 bonus for adhering to a non-compete.  Ex. 12 at 40:1 – 41: 21 (Miglore Dep. Tr.); Ex. 2 at 331:4-336:9 (Collingwood Dep. Tr.).  The Herbst Defendants are not responsible for Mr. Kelly's decision to have that additional consideration paid to him and his wife instead of Shoreline.

## V.     The Purported Bases for Individual Liability

Most of Shoreline's arguments for individual liability are unavailing on their face. With respect to Mr. Pilla, the undisputed evidence shows that he emotionally supported Ms. Herbst during her conversations with Blade (Ex. 24 at 26:1-21 (Pilla Dep. Tr.)), and that Blade mistakenly named him as a principal of SAFE in drafts of certain documents. PSOMF ¶ 14.  That thin reed of connection to this case does not support the existence of any legal claims.

Mr. Pilla cannot be held liable for misappropriation under New York law or the DTSA because he never possessed, received, transferred, or accessed the customer data that are the alleged trade secrets. *See MedQuest Ltd. v. Rosa*, 2023 WL 2575051, at \*3 (S.D.N.Y. Mar. 20, 2023) (DTSA and misappropriation require disclosure of a trade secret); *TransPerfect Glob., Inc. v. Lionbridge Techs., Inc.,* 2022 WL 195836, at \*9 (S.D.N.Y. Jan. 21, 2022) (granting summary judgment because defendant never had access to confidential information). Further, common claims based on misappropriation are only viable where a party has "has . . . undertaken [a] duty contractual or otherwise to the plaintiff not to misuse the plaintiff's information." *Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 257 (S.D.N.Y. 2021); *see also Schroeder v. Pinterest Inc.*, 133 A.D.3d 12, 30 (1st Dep't 2015) (dismissing misappropriation

claim for lack of duty). Here, Mr. Pilla has no duty, confidential or otherwise, to Shoreline as he never had a relationship with the entity.[8] PSOMF ¶¶ 10-11.

As set forth above, Ms. Herbst is not a party to any contract with Shoreline and she received no individual consideration that would support the enforceability of any such contract. Nor is there any evidence that Ms. Herbst agreed to individually serve as a "booking agent" or that she personally acted as a legal agent to Shoreline. Moreover, Shoreline seems to have abandoned any attempt to demonstrate a basis for veil-piercing. It pursued virtually no discovery on this issue, and the evidence is overwhelming that SAFE, at all times, respected the corporate form.[9] Summary judgment is thus appropriate on veil-piercing. *See, e.g.*, *New York v. B.B.& S. Treated Lumber Corp.*, 2006 WL 8441333, at *7 (E.D.N.Y. Mar. 16, 2006) (granting summary judgement).

Although Shoreline claims that Ms. Herbst can be found individually liable irrespective of whether it can prove alter-ego liability, the doctrine on which it relies is limited to situations where a corporate executive engages in willful, tortious conduct. *See Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 526 (S.D.N.Y. 2015). The only torts Shoreline has alleged are predicated on the basis of a fictional agency relationship that would create a duty to Shoreline.

---

[8] Although Shoreline's claim for unfair competition against Mr. Pilla is partly based on allegations that he harassed its customers and otherwise interfered in its business, the claim must be dismissed because the record is void of any evidence corroborating Shoreline's allegations.

[9] Specifically, Ms. Herbst respected the corporate form by: (1) not commingling her personal funds and assets with SAFE's funds and assets; (2) not using SAFE's as her personal bank; (3) making sure that SAFE is adequately funded; and (4) handling booking services via SAFE, instead of in her personal capacity. SOMF ¶¶ 10-11, 51.

## **CONCLUSION**

For the foregoing reasons, the Herbst Defendants' respectfully submits the Court should

grant the Motion.

Dated: New York, New York
      June 16, 2023

GLENN AGRE BERGMAN &
FUENTES LLP

By: */s/ Lindsey (Reid) Skibell*
Lindsey Reid Skibell
Jewel K. Tewiah
1185 Avenue of the Americas
New York, New York 10036
rskibell@glennagre.com
jtewiah@glennagre.com
(212) 970-1610

*Attorneys for Cynthia L. Herbst, Sound Aircraft
Flight Enterprises, Inc., and Ryan A. Pilla*

**PROOF OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served via email, on June 16, 2023, upon counsel for Shoreline Aviation:

**Alex Kriegsman**
Kriegsman PC
279 Main Street
Sag Harbor, NY 11963
KriegsmanPC.com


  _/s/ Lindsey (Reid) Skibell_

L. Reid Skibell