**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK**

---------------------------------- X

| | | |
|---|---|---|
| SHORELINE AVIATION, INC., | : | Case No. 2:20-cv-02161-JMA-SIL |
| *Plaintiff,* | : | |
| v. | : | |
| CYNTHIA L. HERBST, SOUND AIRCRAFT FLIGHT ENTERPRISES, INC., RYAN A. PILLA, | : | |
| | : | |
| *Defendants.* | : | |

---------------------------------- X

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1 IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

GLENN AGRE BERGMAN & FUENTES LLP

Reid Skibell
Jewel K. Tewiah
1185 Avenue of the Americas, 22nd Fl
New York, New York 10036

*Attorneys for Defendants Cynthia L. Herbst, Sound Aircraft Flight Enterprises, Inc., & Ryan A. Pilla*

Pursuant to Federal Rule of Civil Procedure 56 (c) and Local Rule 56.1, defendants Sound Aircraft Flight Enterprise, Inc., Cynthia L. Herbst, and Ryan A. Pilla (the "Herbst Defendants") respectfully submits this Statement of Undisputed Material Facts.

### CYNTHIA L. HERBST'S AND SOUND AIRCRAFT FLIGHT ENTERPRISE'S STATEMENT OF UNDISPUTED FACTS

**Ms. Herbst's Early Professional Activities and Business Ventures**

1. Cynthia Herbst worked as an employee at the East Hampton Airport for East Hampton Air from 1984 to 1987, booking flights with multiple operators. Ex. 1 at 11:6-15 (Herbst Dep. Tr.);[1] Herbst Declaration ¶ 3.

2. In 1990, after working for a software developer for a short period of time, Ms. Herbst started work as an employee for Sound Aircraft Services ("SAS"), a fixed based operator, that was wholly owned by her former husband, Steven Tuma. Ex. 1 at 11:6-15, 14:19-15:4 (Herbst Dep. Tr.); Herbst Decl. ¶ 4.

3. Initially, SAS leased ramp and tie-down spaces, which are parking spaces for aircraft, and it also sold aviation fuel at Easton Hampton airport. Ex. 1 at 18:22-19:3 (Herbst Dep. Tr.); Herbst Decl. ¶ 5.

4. In late 1992, SAS started to offer booking services for chartered airplane, seaplane, and helicopter flights, and Ms. Herbst was the company's booking agent. Herbst Declaration ¶ 6; Ex. 1 at 19:19-20:10; 58:10-22 (Herbst Dep. Tr.).

5. SAS booked flights on behalf of many companies. Herbst Declaration ¶ 7.

6. Through Ms. Herbst's efforts, SAS began developing a customer base for booking passengers on flights. Herbst Declaration ¶ 8.

---

[1] "Ex." refers to the exhibits attached to the Declaration of L. Reid Skibell in Support of Defendants' Motion for Summary Judgment.

7. In 1992, Ms. Herbst formed another company, Sound Aircraft Flight Enterprises ("SAFE"), which she wholly owned. Ex. 1 at 132:23-133:10 (Herbst Dep. Tr.); Herbst Decl. ¶ 9.

8. SAFE primarily provided pilot training, aerial sightseeing, and chartered flights. Ex. 1 at 19:10-16 (Herbst Dep. Tr.); Herbst Declaration ¶ 10.

9. At all times, SAS and SAFE observed corporate formalities. Ex. 1 at 16:13-17:4, 22:20-24:9 (Herbst Dep. Tr.).

10. SAS and SAFE had separate bank accounts, and the funds were never intermingled. Ex. 1 at 20:21-22:7 (Herbst Dep. Tr.).

11. Ms. Herbst also did not intermingle her personal funds with those of SAS or SAFE. Ex. 1 at 22:8-19 (Herbst Dep. Tr.).

**SAS Enters into a Booking Arrangement with Shoreline**

12. In 1993, Ms. Herbst spontaneously met John Kelly, the principal of Shoreline Aviation ("Shoreline") and had an impromptu discussion concerning a potential working relationship. Ex. 1 at 25:12-25 (Herbst Dep. Tr.).

13. SAS provided services to Shoreline, such as fueling and airplane servicing. Ex. 2 at 29:7-12 (Collingwood Deposition Transcript); Herbst Decl. ¶ 12.

14. At the time, Shoreline offered flights on seaplanes and other aircraft between Manhattan and East Hampton. Ex. 1 at 25:12-27:20 (Herbst Dep. Tr.).

15. Ms. Herbst and Mr. Kelly agreed to a non-exclusive business arrangement whereby, in exchange for commissions, SAS would book passengers for seaplanes and chartered planes departing from or flying to East Hampton, New York. Herbst Decl. ¶ 13; Ex. 1 at 26:22-30:8 (Herbst Dep. Tr.); Ex. 2 at 31:3-33:23 (Collingwood Dep. Tr.) ("[Mr. Kelly and Ms. Collingwood] talked about him setting up the arrangement with [Ms. Herbst]: the booking arrangement where she would help us with our customers in exchange for commissions."); *Id.* at 154: 20-23 ("So the

terms of the agreement were that she would provide our booking services in exchange for commission, and that oral contract lasted for 24 years."); Ex. 4 (SAI010911-913); Ex. 5 at Interrogatory Response No. 18 (alter ego liability is Shoreline's lone theory for why the alleged oral contract binds Ms. Herbst individually).

16. They agreed to 10 percent commission for each passenger that SAS booked. Ex. 1 at 31:21-32:4, 54:20-58:20 (Herbst Dep. Tr.); Herbst Declaration ¶ 14; Ex. 4 (SAI010911-913).

17. The parties did not agree to a contract that formalized the terms, length, or conditions of their arrangement, and both parties were free to cease working with each other at any time. Ex. 1 at 41:11-23 (Herbst Dep. Tr.); Herbst Declaration ¶ 15; Ex. 4 (SAI010911-913).

18. The parties did not agree that Shoreline would own the rights to the data for any customers that SAS booked or that Ms. Herbst booked on SAS's behalf. Herbst Declaration ¶ 16; Ex. 2 at 149: 10-14 (Collingwood Dep. Tr.) ("Q: So if I understand correctly, when Ms. Herbst and Mr. Kelly had a conversation about working together, they didn't discuss customer data, right? A: No, not that I'm aware of."); Ex. 4 (SAI010911-913).

19. The parties did not agree that either SAS or Ms. Herbst would be Shoreline's exclusive booking agent. Herbst Declaration ¶ 18; Ex. 2 at 150:4-151:21 (Collingwood Dep. Tr.) (Q: I'm asking now what was discussed in 1994. To your knowledge did they discuss one way or the other whether Ms. Herbst could book flights for other seaplane operators? A: I really don't know the answer to that."); *Id.* at 47:15-22 (Shoreline was aware SAS/SAFE booked flights for Action Airlines and Liberty Helicopters).

20. Ms. Herbst and Mr. Kelly only formalized the commission structure, pursuant to which Shoreline regularly paid SAS for booked flights. Ex. 1 at 54:20-58:17 (Herbst Dep. Tr.); Herbst Declaration ¶ 14; Ex. 4 (SAI010911-913).

21. After Shoreline and SAFE ceased working together, Mr. Kelly described Shoreline's relationship with SAFE as "merely a booking arrangement which just wasn't working anymore." Ex. 6 at SAI000255 (SAI000254 to SAI000257).

22. During the course of their business relationship, Shoreline did not ever seek access to any customer data held by SAS, SAFE, or Ms. Herbst. Ex. 2 at 43:3-15 (Collingwood Dep. Tr.) ("Q: My questions is have you ever viewed – and by you I mean Shoreline ever viewed the customer data held on Ms. Herbst's computer system?  A: I can only speak for myself, and I have not. Q: To your knowledge has anyone at Shoreline Aviation reviewed the customer information on Ms. Herbst's computer system?  A: I really don't know.")

23. During the course of their business relationship, Shoreline did not ever inquire into how SAS, SAFE, or Ms. Herbst collected, stored, or safeguarded any customer data. Ex. 2 at 43:21–25 (Collingwood Dep. Tr.) (Q: Do you know which database [Ms. Herbst] uses to store this information? . . . . A: I really don't know."); *Id.* at 44:2-8 ("Q: Do you know if the database is password protected? . . . . A: I do not know for sure."); *Id.* at 44:15-21 ("Q: Besides Ms. Herbst, do you know if anyone else has access to that customer database? . . . A: At -- at this time, I don't know.")

24. During the course of their business relationship, Shoreline did not ever claim that it owned any customer data held by SAS, SAFE, or Ms. Herbst. Ex. 2 at 149:8-14 (Collingwood Dep. Tr.) ("Q: I'm asking about the conversation they had, Ms. Collingwood. So if I understand correctly, when Ms. Herbst and Mr. Kelly had a conversation about working together, they didn't discuss customer data, right? A: No, not that I'm aware of.")

**SAS and Shoreline Enter into Two Written Contracts**

25. On May 15, 1994, SAS, Shoreline, and the town of East Hampton entered into an operating agreement (the "Operating Agreement"). Ex. 7 (SAI000358 to SAI000371); Ex. 8 at 9 (Shoreline's Response to RFA No. 8).

26. The Operating Agreement was for a term of one year and was renewed annually for the first few years and every three years in subsequent years. Ex. 8 at 9-10 (Shoreline's Response to RFA No. 9).

27. The Operating Agreement dictated the terms under which Shoreline, with SAS's assistance, could operate out of the East Hampton Airport. Ex. 7 (SAI000358 to SAI000371); Ex. 2 at 156:15-157:15 (Collingwood Dep. Tr.).

28. The Operating Agreement was intended "to formally establish procedures to be followed to insure the safe, orderly and compatible conduct of [Shoreline]'s operation, including the ground operation services to be provided by [SAS], one of the Airport's fixed base operators." Ex. 7 at § 1 (SAI000358 to SAI000371).

29. The Operating Agreement set forth that SAS was a fixed-based operator who was required to provide, among other things, ticketing, check-in, baggage handling, and related customer services for Shoreline. Ex. 7 at § 3(B)(1) (SAI000358 to SAI000371); Ex. 8 at 10 (Shoreline's Response to RFA No. 10).

30. The Operating Agreement also included an integration clause confirming that it reflected "the complete understanding of the parties" and could only be modified "by written endorsement pursuant to a resolution of the Town Board." Ex. 7 at § 18 (SAI000358 to SAI000371).

31. The Operating Agreement also stated that that "[i]t is clearly understood and agreed that nothing in this agreement shall be construed to grant or authorize the granting of an exclusive right to [Shoreline]." Ex. 7 at § 16 (B) (SAI000358 to SAI000371).

32. On July 16, 1996, SAS and Shoreline executed a supplemental written operating agreement (the "Supplemental Operating Agreement"). Ex. 9 (SAI000406 to SAI000411); Ex. 8 at 11 (Shoreline Response to RFA No. 13).

33. The Supplemental Operating Agreement reaffirmed the duties and obligations between the parties. Ex. 9 at 1 (SAI000406 to SAI000411) (stating that "[SAS] shall continue to offer flight reservations services . . . in accordance with its current operating agreement in place between the parties."); Ex. 8 at 11-12 (Shoreline Response to RFA No. 14).

34. The Supplemental Operating agreement was the last contract executed by Shoreline and SAS related to booking and ticketing services. Ex. 9 (SAI000406 to SAI000411); Ex. 2 at 177:20-178:22 (Collingwood Dep. Tr.).

**SAS and Shoreline Work Together between 1993 and 2017**

35. For approximately twenty-four years, SAS and Shoreline continued their booking arrangement. Ex. 10 at SAI000040 (SAI000034 to SAI000050) (Kelly: "For twenty-four years we have operated under an arrangement. . ."); Herbst Declaration ¶ 22.

36. At all times during this period, Ms. Herbst was an employee of SAS. Herbst Declaration ¶ 23; Ex. 1 at 123:10-17 (Herbst Dep. Tr.); Ex. 2 at 29:13-30:14 (Collingwood Dep Tr.)

37. Ms. Herbst and other SAS employees booked customers for Shoreline flights, as well as flights on Liberty Helicopters, Associated Aircraft Group, and Action Airlines, and others. Ex. 11 ¶ 4 (SAI003256 to SAI003258) (stating that SAS booked Shoreline flights); Herbst Declaration ¶ 24.

6

38. Ms. Herbst and other SAS employees also checked-in customers on those flights, responded to customer inquiries, and handled administrative matters. Herbst Declaration ¶ 25; Ex. 2 at 29:13-30:14 (Collingwood Dep. Tr.); Ex. 11 ¶ 5 (SAI003256 to SAI003258).

39. Ms. Herbst and the other employees worked in SAS's offices, used SAS's computers, and their salaries were paid by SAS. Herbst Declaration ¶ 25.

40. Ms. Herbst's salary was independent of any commissions received by SAS. Herbst Declaration ¶ 26.

41. Originally, SAS used a Shoreline credit card reader to process payments, and Shoreline then paid SAS its earned commissions. Herbst Declaration ¶ 28.

42. After Shoreline filed for bankruptcy protection in the early 2000s, however, SAS began collecting payments and remitting the money to Shoreline to avoid payment delays. Herbst Declaration ¶ 29.

43. Since SAS did not have the proper Federal Aviation Administration certificate that would permit it to collect and remit passenger taxes, SAFE would run the credit cards and remit the money to SAS. Herbst Declaration ¶ 30.

44. SAFE earned nothing for processing these payments on SAS's behalf. Herbst Declaration ¶ 31.

45. With respect to customers, SAS collected customer information on its own and maintained that information on its computer systems, and SAS used that data to communicate with its customers. Ex. 2 at 104:6-105:6 (Collingwood Dep. Tr.); Ex. 12 (SAI003161 to SAI003233); Herbst Declaration ¶ 32

46. For a period of time, Shoreline collected customer information on its own that was saved in an internal Excel spreadsheet. Ex. 2 at 79:22 to 94:10 (Collingwood Dep. Tr.); Ex. 12 (SAI003161 to SAI003233).

47. At some point after 2016, Shoreline uploaded this customer list to a software application called Constant Contact. Ex. 2 at 79:22 to 94:10 (Collingwood Dep. Tr.).

48. Shoreline sent out less than ten customer communications using Constant Contact, it and let its subscription lapse in 2019. *Id.*

**SAFE Begins Working with Shoreline**

49. Unfortunately, Ms. Herbst and Mr. Tuma's marriage deteriorated with them separating in 2016, and then fully divorcing in 2017. Ex. 1 at 12:2-18 (Herbst Dep. Tr.)

50. As a part of the divorce, the parties entered into a formal agreement and stipulated that SAS would remain Mr. Tuma's company, while SAFE would remain Ms. Herbst's company. Ex. 1 at 131:15-132:15 (Herbst Dep. Tr.); Herbst Declaration ¶ 34.

51. The parties agreed that the companies would not compete with each other, and agreed that SAS would provide fueling to aircraft, aircraft storage, and other related services while SAFE would provide booking services for aircraft flights. Ex. 1 at 131:15-132:15 (Herbst Dep. Tr.); Herbst Decl. ¶ 35.

52. Mr. Kelly was informed of the divorce agreement, and he did not object to SAFE providing the booking services that SAS previously provided. Ex. 1 at 134:17-136:10 (Herbst Dep. Tr.); Ex. 3 at 340:4-8 (Collingwood Dep. Tr.) ("Q: Did Mr. Tuma communicate to you at or around that time about the stipulation in the divorce decree? A: He had a conversation with my husband about it."); Herbst Decl. ¶ 36.

53. In July 2017, Mr. Kelly sent Ms. Herbst a letter to discuss the change in circumstances between Shoreline and SAS (the "July 2017 Letter"). Ex. 4 (SAI010911 to SAI010913).

54. Although Mr. Kelly eventually objected to the inconvenience of having to work with both SAS and SAFE, he did not claim that SAS had breached a contract or an assignment was required. Herbst Declaration ¶ 37.

55. In July 2017, Mr. Kelly decided to take advantage of Ms. Herbst while she was dealing with her divorce, and unilaterally proposed a new fee structure that paid SAFE less than SAS for the bookings. Herbst Declaration ¶ 38; Ex 4 (SAI010911 to SAI010913).

56. Ms. Herbst, on SAFE's behalf, was forced to accept the lower commission because Mr. Kelly was withholding money that Shoreline owed SAFE for customers that it had already booked. Herbst Declaration ¶ 39.

57. There was also no agreement or contract that granted SAFE any rights. Herbst Decl. ¶ 40.

**Shoreline and SAFE Explore New Business Opportunities, and Shoreline Attempts to Buy SAFE's Customer Data**

58. In the fall of 2017, John Kelly decided that he wanted to sell Shoreline, and started negotiating with Hyannis Air Service, Inc., d/b/a as "Cape Air." Ex. 2 at 49:3-50:16 (Collingwood Dep. Tr.); Ex. 13 at 8:3-11:4 (Migliore Dep. Tr.); Ex. 14 (SAI005163 to SAI005170)

59. Mr. Kelly did not inform SAFE or Ms. Herbst that he intended to sell his company to Cape Air. Herbst Decl. ¶ 41; Ex. 8 at 20 (Shoreline's Response to RFA No. 35).

60. Cape Air is a commercial airline that provides flights to 40 destinations in the United States and Caribbean. Ex. 13 at 9:11-16 (Migliore Dep. Tr.).

9

61. In late January 2018, Cape Air started due diligence on the potential transaction, and sent Shoreline a checklist of materials that it required, including all of Shoreline's "Material Contracts." Ex. 15 at SAI004787 (SAI004784 to SAI004788); Ex. 13 at 24:7-25:5, 91:22-93:23 (Migliore Dep. Tr.).

62. In connection with these due diligence requests, however, Shoreline did not provide Cape Air with any information indicating that it had a contract with either SAS or SAFE. Ex. 13 at 95:3-7 (Migliore Dep. Tr.); Ex. 2 at 68:7-69:16 (Collingwood Dep. Tr.).

63. After months of negotiations, Shoreline and Cape Air executed a letter of intent, dated March 5, 2018, indicating that Cape Air would merge with Shoreline. Ex. 13 at 32:24-33:8 (Migliore Dep Tr.); Ex. 16 at (1)(a) (HAS0002244 to HAS0002249).

64. Cape Air agreed to pay Shoreline $5,000,000, with $1.5 million of the consideration going towards an employee stock purchase plan ("ESOP"). Ex. 16 at (1)I (HAS0002244 to HAS0002249); Ex. 13 at 39:3-11 (Migliore Dep Tr.).

65. An ESOP is a type of qualified employee benefit plan that permits employees to become beneficial owners of a company's stock common stock whereby the ESOP provides retirement benefits to employees based upon the value of the company's shares. Ex. 13 at 26:21-27:6 (Migliore Dep. Tr.); Ex. 17 ¶ 5 (SAI007755 to SAI007774).

66. Shoreline desired an ESOP to be part of the transaction because John Kelly and Andrea Collingwood, Shoreline's principals, would have had a reduced tax burden. Ex. 13 at 46:8-17 (Migliore's Dep. Tr.)

67. In early 2018, Blade Air Mobility, Inc. ("Blade") reached out to SAFE to discuss a potential business partnership. Ex. 1 at 136:18-25 (Herbst Dep. Tr.); Herbst Decl. ¶ 42.

68. Blade is the creator of a smartphone application that people can use to find seats on seaplane flights, including flights to the Hamptons. Herbst Decl. ¶ 43.

69. During the early discussions with Blade, Ms. Herbst informed Blade that SAFE wanted Shoreline to be involved in any potential transaction. Ex. 1 at 138:12-139:2 (Herbst Dep. Tr.); Herbst Decl. ¶ 44.

70. Blade's representative agreed, and subsequently on April 6, 2018, Blade's representatives, Ms. Herbst, Mr. Kelly, and others participated in a meeting. Ex. 1 at 138:12-142:24 (Herbst Dep. Tr.); Herbst Decl. ¶ 45.

71. During the meeting, the parties discussed how SAFE could provide bookings through Blade's app, and how Shoreline would become Blade's preferred aircraft operator. Ex. 1 at 142:3-24 (Herbst Dep. Tr.)

72. Although Mr. Kelly was prohibited by his letter of intent with Cape Air from participating in the discussion with Blade, he did not convey this to Ms. Herbst. Ex 16 at § 3 (HAS0002244 to HAS0002249); Ex. 8 at 20 (Shoreline's Response to RFA No. 35); Herbst Decl. ¶ 46.

73. On or about April 11, 2018, Mr. Kelly sent Ms. Herbst a letter informing her that Shoreline would not participate in anything having to do with Blade. Ex. 10 at SAI000040 (SAI000034 to SAI000050).

74. Mr. Kelly explained that a deal with Blade would be bad for both Shoreline and SAFE because, in his view, Blade would take advantage of SAFE's customer list:

> [O]nce they have established themselves with our customers and adapted them to their booking system Blade would have no incentive to continue to work with either [SAFE] or Shoreline. . . . Likewise, once the bulk of the [SAFE] contact list was converted to Blade's marketing platform, there would be no need for [SAFE]'s services. At that point, any contract you might have with them is only

11

>valuable in it gives you the right to sue them when they fail to honor their commitments.

Ex. 10 at SAI000040 (SAI000034 to SAI000050).

75. In the April 11, 2018 letter, Mr. Kelly also offered $325,000 to purchase certain of SAFE's assets, including its "customer lists, contact information, booking records and accounting records . . . for the last 5 years." Ex. 10 at SAI000041 (SAI000034 to SAI000050); Ex. 1 at 177:20-178:24 (Herbst Dep. Tr.); Ex. 2 at 68:7-69:13 (Collingwood Dep. Tr.)

76. Shoreline also indicated that as conditions of the purchase Mr. Herbst would need to be bound by a three-year non-compete, and that she "would agree not to release your customer list to any other person or business entity." Ex. 10 at SAI000041 (SAI000034 to SAI000050).

77. Shoreline's offer to purchase included the customer data that Shoreline alleges belongs to it in this litigation. Ex. 2 at 242:3-24, 245:10-250:16 (Collingwood Dep. Tr.).

78. Shoreline informed SAFE that its offer would expire by April 26, 2018. Ex. 10 at SAI000042-43 (SAI000034 to SAI000050).

79. SAFE was unable to respond in the timeframe given, and the offer expired. Ex. 1 at 180:12-182:17 (Herbst Dep. Tr.).

**Shoreline Unilaterally Terminates its Booking Arrangement with SAFE**

80. In early 2018, Shoreline began discussions with a company called TakeFlight about building its own customer booking platform, and they eventually entered into a contract. Ex. 2 at 97:15-98:19 (Collingwood Dep. Tr.); Ex. 18 (SAI007421 to SAI007422).

81. This customer booking platform would enable Shoreline to perform the tasks that had previously been handled by SAS/SAFE. Ex. 2 at 98:20-99:8 (Collingwood Dep. Tr.)

82. Shoreline learned about Ms. Herbst's conversations with Blade, it accelerated the development of this system. Ex. 2 at 102:7-103:3 (Collingwood Dep. Tr.).

12

83. On May 6, 2018, Shoreline unilaterally terminated its arrangement with SAFE by emailing the customers for whom it had contact information and informing them that Shoreline was no longer working with SAFE: "Beginning May 1st 2018, our seaplane commuter and charter customers will be able to book directly with Shoreline Aviation, using our website, email or toll free 800 number." Ex. 1 at 38:6-40-13 (Herbst Dep. Tr.); Ex. 19 (SAI00047); Ex. 20 (SAI000033); Ex. 8 at 22 (Shoreline's Response to RFA No. 39); Herbst Decl. ¶ 48.

84. This communication further informed customers that "check-in staff will be at the [SAS] booth located in the main terminal." Ex. 19 (SAI00047)

85. Shoreline did not provide any notice to SAFE before terminating the arrangement. Ex. 1 at 42:3-17 (Herbst Dep. Tr.); Ex. 2 at 122:15-123:3 (Collingwood Dep. Tr.); Ex. 20 (SAI000033); Herbst Decl. ¶ 49.

86. At the conclusion of Shoreline's and SAFE's arrangement, Shoreline demanded that SAFE repay it for purported unearned commissions for tickets sold. Ex. 8 at 25 (Shoreline's Response to RFA No. 46).

87. Shoreline, however, received $655,220 from customers who purchased those tickets. Ex. 8 at 25 (Shoreline's Response to RFA No. 46); Ex. 2 at 258:6-12 (Collingwood Dep. Tr.).

88. In the afternoon of May 7, 2018, Ms. Herbst unilaterally executed a Memorandum of Terms, which was a precursor to Blade and SAFE negotiating a definitive agreement. Ex. 21 (Blade 0000609 to Blade 0000616); Herbst Decl. ¶ 52.

89. On May 7, 2018, in the evening, Ms. Herbst emailed SAFE's customer list which informed them that SAFE would be working with Blade because "[u]nfortuantely, it appears that

13

Shoreline Aviation no longer wishes to work with [SAFE]." Ex. 20 (SAI000033); Herbst Decl. ¶ 53.

90. SAFE and Blade ultimately entered a deal that entailed SAFE selling its customer list to Blade and SAFE agreeing to book passengers using Blade's platform for $175,000. Ex. 1 at 187:2-17 (Herbst Dep. Tr.); Ex. 22 (Blade 0008161 to Blade 0008172); Herbst Decl. ¶ 54.

91. Ms. Herbst also agreed to serve as a consultant to Blade for $5,000 a month. Ex. 1 at 187:2-17 (Herbst Dep. Tr.); Ex. 22 (Blade 0008161 to Blade 0008172); Herbst Decl. ¶ 55.

92. Blade's and SAFE's deal was finalized on approximately May 17, 2018. Ex. 8 at 23 (Shoreline's Response to RFA Nos. 41 and 42); Herbst Decl. ¶ 56.

93. During the summer of 2018, Ms. Herbst discovered that Mr. Tuma had violated the terms of their divorce agreement by entering into an improper business relationship with Shoreline and Mr. Kelly. Herbst Decl. ¶ 57.

94. Ms. Herbst had discovered, among others things, that Shoreline was using SAS's kiosk at the East Hampton airport to check in customers for flights, contravening the divorce agreement. *Id.*

95. After conferring with legal counsel, Ms. Herbst decided to sue Shoreline, Mr. Kelly, SAS, and Mr. Tuma, seeking damages for breach of contract and tortious interference with contract. Herbst Decl. ¶ 58.

96. Shoreline and Mr. Kelly were eventually dismissed from the lawsuit in 2020, and Ms. Herbst is still seeking relief from SAS and Mr. Tuma. Herbst Decl. ¶ 59.

**Cape Air Buys Shoreline's Assets and then Shutters the Company**

97. While the original version of the Cape Air-Shoreline transaction was envisioned as a $5 million merger, Cape Air subsequently decided that it preferred an asset sale. Ex. 13 at 56:4-64:2 12 (Migliore Dep. Tr.).

98. In November 2018, Shoreline began working on a revised version of the transaction with Cape Air that would address the increased tax liabilities from an asset sale.Ex. 23 (HAS0002306).

99. In December 2018, Shoreline and Cape Air agreed to an asset purchase deal where Shoreline received over $6,370,000 — a substantial increase over the $5,000,000 that Cape Air had originally offered. Ex. 13 at 82:20-88:14 (Migliore Dep Tr.); Ex. 24 (HAS0002267 to HAS0002268).

100. Shoreline's corporate representative testified that increased purchase price was to make up for loss of the purported tax benefits of the ESOP. Ex. 3 at 336:10-15 (Collingwood Dep. Tr.) ("Q: One of the reasons that Cape Air paid more money is because you were going to lose the tax benefits of the ESOP? A: I believe, and I'm not positive about this, that it also provided tax advantages to Cape Air."); Ex. 13 at 82:20-88:14 (Migliore Dep. Tr.).

101. The increased purchase price also made up for tax losses to Mr. Kelly and Ms. Collingwood. Ex. 3 at 336: 6-15 (Collingwood Dept. Tr.) ("Q: Do you know if the changed version of the transaction made up for any tax losses to you and Mr. Kelly or to Shoreline? A: Yes, it did.")

102. A portion of the $6.37 million was paid directly to Mr. Kelly and Ms. Collingwood as part of the transaction. Ex. 24 (HAS0002267 to HAS0002268).

103. After the asset purchase, Shoreline existed as a corporate entity operated by Cape Air. Ex. 13 at 97:20-98:18 (Migliore Dep. Tr.).

15

104. Cape Air's corporate representative testified that Shoreline's performance in the years before the asset purchase transaction "was about the same" as its performance after the transaction closed in December 2018. Ex. 13 at 97:20-101:17 (Migliore Dep. Tr.).

105. Cape Air's corporate representative explicitly testified that Shoreline "was not profitable." Ex. 13 at 97:20-101:17 (Migliore Dep. Tr.).

106. Cape Air eventually decided to shut down Shoreline, in 2020, because it did not receive approval for a seaplane route between Boston and New York. Ex. 13 at 98:22-101:17 (Migliore Dep Tr.); Ex. 8 at 20-21 (Shoreline's Response to RFA No. 36 and 37).

### RYAN PILLA'S STATEMENT OF UNDISPUTED FACTS

**Mr. Pilla's Professional Background**

1. Mr. Pilla has worked as a mechanic for luxury foreign and domestic cars since the early 1990s. Ex. 25 at 8:24-10:21 (Pilla Dep. Tr.).

2. Mr. Pilla operates a successful automotive repair business named "The Car Doctor," which has been based out of the Hamptons since the late 1990s. Ex. 25 at 8:24-10:21 (Pilla Dep. Tr.).

**Mr. Pilla's Relationship with Ms. Herbst**

3. Mr. Pilla is Ms. Herbst's boyfriend and they have been dating for approximately six years. Pilla Decl. ¶ 1.

4. Mr. Pilla does not have any interest, ownership or otherwise, in Ms. Herbst's business ventures, including SAS and SAFE. Ex. 25 at 15:25-19:6 (Pilla Dep. Tr.) ("Q: Have you ever had a business relationship with Ms. Herbst? A: No. Q: Do you have any involvement in SAFE [or SAS]? A: No, besides being Cindy's . . . boyfriend, that's it.")

5. Mr. Pilla had absolutely no control or involvement in SAFE's operations or business plans during the period at issue. Ex. 25 at 59:5-10 (Pilla Dep. Tr.) ("Q: When you say you were not involved in any of the business that happened here, you are referring to what's alleged in the lawsuit? A: The everyday business that went on, correct. I had nothing to do with Cindy['s] and SAFE's business.")

6. Mr. Pilla only occasionally provided advice and guidance to Ms. Herbst regarding the operations of SAFE as moral support for his significant other. Ex. 25 at 26:2-21 (Pilla Dep. Tr.).

**Mr. Pilla's Limited Role in the Underlying Events**

7. During the time Ms. Herbst was negotiating the transaction between SAFE and Blade, Mr. Pilla corresponded with John Kelly of Shoreline on a handful of occasions. Ex. 25 at 33:20-35:6 (Pilla Dep. Tr.).

8. Ms. Herbst was dealing with medical and personal issues, so, for example, Mr. Pilla texted Mr. Kelly to coordinate the scheduling of the meeting with Blade. Ex. 25 at 33:20-35:6 (Pilla Dep. Tr.).

9. Mr. Pilla did not have a personal relationship with Mr. Kelly, and he had learned about Mr. Kelly via Ms. Herbst. Ex. 25 at 57:6-9 (Pilla Dep. Tr.).

10. Mr. Pilla did not have any relationships or contracts with Shoreline either. Pilla Decl. ¶ 7.

11. Mr. Pilla has never agreed to keep information confidential on Shoreline's behalf. *Id.*

12. Mr. Pilla did not ever access or transfer to any party, any of Shoreline's or SAFE's intellectual property, customer information, or other proprietary business information. *Id.* at ¶ 3.

17

13. Mr. Pilla has never negotiated with Shoreline or Blade on SAFE or any other entity's behalf. Ex. 25 at 34:7-12 (Pilla Dep. Tr.) ("Q: Did you ever negotiate with Shoreline? A: No, never negotiated with Shoreline."); *Id.* at 38:21-41:9 ("Q: Through your personal relationship with Cindy you became aware of negotiations between Cindy, Shoreline, and Blade. A: Yes. Did you participate in the negotiations? A: I did not participate in the negotiations.").

14. When Ms. Herbst executed a business deal with Blade Air Mobility, Inc. ("Blade"), Blade mistakenly copied Mr. Pilla on correspondence and had mistakenly listed him as a principal of SAFE on certain documents. Pilla Decl. ¶ 8.

15. Blade had also asked Mr. Pilla to sign a non-compete because of its mistaken belief that Mr. Pilla was a principal of SAFE. Ex. 26 (Blade 0006363); Pilla Decl. ¶ 8.

16. Mr. Pilla did not sign the non-compete or any other agreement with Blade because he has no interest or involvement with Ms. Herbst's business ventures. Pilla Decl. ¶ 9.

17. Mr. Pilla did not receive any consideration from Ms. Herbst's deal with Blade. *Id*. at 10.

| | |
|---|---|
| Dated: New York, New York<br>June 16, 2023 | GLENN AGRE BERGMAN &<br>FUENTES LLP<br><br>By:   */s/ Lindsey (Reid) Skibell*<br>Lindsey Reid Skibell<br>Jewel K. Tewiah<br>1185 Avenue of the Americas<br>New York, New York 10036<br>rskibell@glennagre.com<br>jtewiah@glennagre.com<br>(212) 970-1610<br><br>*Attorneys for Cynthia L. Herbst, Sound Aircraft Flight Enterprises, Inc., and Ryan A. Pilla* |

18

## PROOF OF SERVICE

  I hereby certify that a true and correct copy of the foregoing document was served via email, on June 16, 2023, upon counsel for Shoreline Aviation:

**Alex Kriegsman**
Kriegsman PC
279 Main Street
Sag Harbor, NY 11963
KriegsmanPC.com


             _/s/ Lindsey (Reid) Skibell_
             L. Reid Skibell