UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

SHORELINE AVIATION, INC.

    Plaintiff,

  v.

SOUND AIRCRAFT FLIGHT ENTERPRISE, INC. et. al.

    Defendants.

-----------------------------------------------------------------X

Case No. 2:20-cv-02161-JMA-SIL

**DECLARATION OF CYNTHIA L. HERBST**

**CYNTHIA L. HERBST**, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. I am a defendant in this action. The foregoing Declaration is based on my personal knowledge. I am submitting this declaration in connection with defendants Sound Aircraft Flight Enterprise, Inc., Cynthia L. Herbst, and Ryan A. Pilla (the "Herbst Defendants") motion for summary judgment.

2. I have been booking passengers for chartered airplane, seaplane, and helicopter flights since the 1980s.

3. I first worked with East Hampton Aire as a customer service employee who handled passenger bookings at the East Hampton Airport from 1984 to 1987.

4. In 1990, after working for a software developer for a short period of time, I started working as an employee for Sound Aircraft Services ("SAS"), a company that was wholly owned by my former husband, Steven Tuma.

5. Initially, SAS leased ramp and tie-down spaces, which are parking spaces for aircraft,

and it also sold aviation fuel at Easton Hampton airport.

6. In late 1992, SAS started to offer booking services for chartered airplane, seaplane, and helicopter flights, and I served as the company's booking agent.

7. SAS booked flights on behalf of many operators.

8. Through my efforts, SAS began developing a customer base for booking passengers on flights.

9. During this time, I formed another company, Sound Aircraft Flight Enterprises ("SAFE"), which I wholly owned.

10. SAFE primarily provided pilot training, aerial sightseeing, and chartered flights.

11. In 1993, while working at the East Hampton airport, I randomly met and chatted with John Kelly, the principal of Shoreline Aviation ("Shoreline"). During our discussion, we decided that a working relationship between SAS and Shoreline would be mutually beneficial.

12. SAS provided services to Shoreline, such as fueling and airplane servicing.

13. Mr. Kelly and I eventually agreed to a non-exclusive business arrangement whereby, in exchange for commissions, SAS would book passengers for seaplanes and chartered planes departing from or flying to East Hampton, New York.

14. We agreed to a 10 percent commission for each passenger that SAS booked, which was the only formal condition of our arrangement.

15. We did not agree to a contract that formalized the terms, length, or other conditions of our arrangement, and there was an understanding that either party was free to cease working with the other party at any time.

16. We did not agree that Shoreline would own the rights to the data for any customers that SAS booked or I booked on SAS's behalf.

17. We did not agree that all the customers booked by SAS would be deemed Shoreline's customers.

18. We did not agree that either SAS or I would serve as Shoreline's exclusive agent.

19. During the course of SAS's, SAFE's, and Shoreline's business relationship, Shoreline did not ever seek to access customer data held by SAS, SAFE, or me.

20. During the course of SAS's, SAFE's, and Shoreline's business relationship, Shoreline did not ever inquire into how SAS, SAFE, or I collected, stored, or safeguarded any customer data.

21. During the course of SAS's, SAFE's, and Shoreline's business relationship, Shoreline did not ever claim it owned any customer data held by SAS, SAFE, or me.

22. For approximately twenty-four years, SAS and Shoreline continued their non-exclusive arrangement without any party attempting to establish formal terms, a duration, or claim ownership rights over customer lists.

23. At all times during this period, I was an employee of SAS.

24. SAS's employees and I booked customers for Shoreline flights, as well as flights on Liberty Helicopters, Associated Aircraft Group, and Action Airlines, and others.

25. We would check-in customers on flights, respond to customer inquiries, and handle administrative matters. We worked in SAS's offices, used SAS's computers, and were paid by SAS.

26. My salary was independent of any commissions received by SAS.

27. Shoreline, pursuant to the agreed upon commission, would pay SAS for the bookings.

28. Originally, SAS used a Shoreline credit card reader to process payments, and Shoreline then paid SAS its earned commissions.

29. After Shoreline filed for bankruptcy protection in the early 2000s, however, SAS began collecting payments and remitting the money to Shoreline to avoid payment delays.

30. Since SAS did not have the proper Federal Aviation Administration certificate that would permit it to collect and remit passenger taxes, SAFE would run the credit cards and remit the money to SAS.

31. SAFE earned nothing for processing these payments on SAS's behalf.

32. With respect to customers, SAS collected customer information on its own and maintained that information on its computer systems, and SAS used that data to communicate with its customers.

33. Unfortunately, during this period, my marriage with Mr. Tuma deteriorated with us separating in 2016 and fully divorcing in 2017.

34. As a part of the divorce, Mr. Tuma and I entered into a formal agreement and stipulated that SAS would remain Mr. Tuma's company, while SAFE would remain my company.

35. We agreed that the companies would not compete with each other, and agreed that SAS would provide fueling to aircraft, aircraft storage, and other related services while SAFE would provide booking services for aircraft flights.

36. Shoreline, via Mr. Kelly, was informed about the divorce agreement, and did not object to SAFE providing the booking services that SAS previously provided.

37. Although Mr. Kelly eventually objected to the inconvenience of having to work with both SAS and SAFE, he did not claim that SAS had breached a contract or an assignment was required.

38. In July 2017, Mr. Kelly decided to take advantage of me while I was dealing with my divorce, and unilaterally proposed a new fee structure that paid SAFE less than SAS for the bookings.

39. SAFE was forced to accept the new fee structure because Mr. Kelly was withholding money that Shoreline owed SAFE for customers that it had already booked.

40. Additionally, similar to the informal arrangement with SAS, Shoreline and SAFE did not execute any contract that formalized the terms, length, or conditions of their arrangement, and were free to change the terms and cease working with each other at any time.

41. I was unaware that beginning in fall 2017, Shoreline and Mr. Kelly were seeking buyers and were negotiating with Hyannis Air Service, Inc., d/b/a as "Cape Air."

42. In early 2018, Blade Air Mobility, Inc. ("Blade") had reached out to SAFE to discuss a potential business partnership.

43. Blade is the creator of a smartphone application that people can use to find seats on flights, including flights to the Hamptons.

44. During the early discussions with Blade, I informed Blade that SAFE desired for Shoreline to be involved in any potential transaction.

45. Blade's representative agreed, and subsequently on April 6, 2018, I attend a meeting with Blade's representatives, Mr. Kelly, and a few other participants.

46. I did not know that Mr. Kelly was prohibited from negotiating with other entities on Shoreline's behalf by a March 2018 letter of intent.

47. Mr. Kelly eventually conveyed to me that he had no interest in working with Blade.

48. On May 6, 2018, Shoreline unilaterally terminated its arrangement with SAFE by emailing the customers for whom it had contact information and informing them that Shoreline was no longer working with SAFE. The communication also informed the customers that they could book flights with Shoreline via Shoreline's website, email account, and toll free 800 number.

49. Shoreline did not provide any notice to SAFE before terminating the arrangement.

50. Shoreline and SAFE have not worked together since Shoreline's unilateral and unexpected termination of the booking arrangement.

51. After Shoreline's termination of the booking arrangement, I decided I had no choice but to partner with Blade.

52. In the afternoon of May 7, 2018, I executed a Memorandum of Terms, which was a precursor to Blade and SAFE negotiating a definitive agreement.

53. Later that evening, I emailed SAFE's customers and informed them that Shoreline no longer wanted to work with SAFE.

54. SAFE and Blade ultimately entered a deal that entailed SAFE selling its customer list to Blade and SAFE agreeing to book passengers using Blade's platform for $175,000.

55. I also agreed to serve as a consultant to Blade for $5,000 a month.

56. Blade's and SAFE's deal was finalized on approximately May 17, 2018.

57. During the summer of 2018, I discovered that Mr. Tuma had violated the terms of our divorce agreement by entering into an improper business relationship with Shoreline and Mr. Kelly. I had discovered, among others things, that Shoreline was using SAS's kiosk at the East Hampton airport to check in customers for flights, contravening the divorce agreement.

58. After conferring with legal counsel, I decided to sue Shoreline, Mr. Kelly, SAS, and Mr. Tuma, seeking damages for breach of contract and tortious interference with contract.

59. Shoreline and Mr. Kelly were eventually dismissed from the lawsuit in 2020, and I am still seeking relief from SAS and Mr. Tuma.

*I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my personal knowledge.*

Dated: June 16, 2023

                                                         **Cynthia L. Herbst**
By: *[signature]*
Cynthia L. Herbst