# EXHIBIT 1

Page 1

1

2     UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK

3     --------------------------------------X

4     SHORELINE AVIATION, INC.,

5                         Plaintiff,

6
                  -against-                Case No.

7                                          2:20-cv02161
                                           JMA-SIL

8
      CYNTHIA L. HERBST, SOUND AIRCRAFT

9     FLIGHT ENTERPRISES, INC., RYAN A.
      PILLA, BLADE URBAN AIR MOBILITY,

10    INC., a/k/a FLY BLADE, INC., MELISSA
      TOMKIEL, and ROBERT S. WIESENTHAL,

11
                         Defendants.

12
      --------------------------------------X

13

14
                        March 30, 2022

15                      10:20 a.m.

16                      Virtual Zoom

17

18

19           DEPOSITION of CYNTHIA L. HERBST, a

20    Defendant herein, taken by the Plaintiff,

21    pursuant to Rule 30(B)(6) of the Federal Rules

22    of Civil Procedure, and Notice, held at the

23    above-mentioned time and place, before Susan

24    Crane, a Notary Public of the State of New York.

25

```
                                          Page 10
 1                      C. Herbst
 2      knowledgeable about these topics?
 3           A      I am.
 4           Q      Can you briefly describe your
 5      educational background?
 6           A      My education?  Well, obviously
 7      elementary school.  High school; I graduated
 8      from Mercy High School.  I attended Suffolk
 9      Community College but did not complete college.
10      I went to a trade school in Florida with
11      relation to travel.
12           Q      What year was that, that you
13      completed your studies at the trade school in
14      Florida?
15           A      1982.
16           Q      Can you briefly describe your
17      employment history from 1982 through 1994?
18           A      1982, gosh, graduated high school.
19      I was employed by the Long Island Fishermen or
20      East End Litho which is a small company in Sag
21      Harbor that was a printing facility for the Long
22      Island Fishermen magazine.  I was in the
23      subscription department there.
24                  I was briefly living in Colorado
25      in late 1982 to 1983 or '83 to '84.  I worked at
```

```
                                      Page 11

 1                      C. Herbst
 2      a couple of different places out in Colorado.
 3      In 1984 I returned back to New York and I worked
 4      at the company called East Hampton Air that was
 5      at East Hampton Airport.
 6                     After that I briefly worked for a
 7      software developer part-time in a computer store
 8      in Southampton doing CAD work.  After that --
 9      actually I worked '84 to '87 at the East Hampton
10      Airport for East Hampton Air.  I worked in '87
11      to around '90 for the computer store and
12      computer software developer, and I was back at
13      East Hampton Airport in 1990 after forming the
14      corporation Sound Aircraft Services.  From '90
15      on I have been at the airport.
16           Q     You formed Sound Aircraft Services
17      with your ex-husband Mr. Tuma?
18           A     Yes.
19           Q     I'm going to try to minimize the
20      personal questions that I ask you, but as I'm
21      sure you are aware, there is some aspect with
22      your divorce from Mr. Tuma that has become an
23      issue in this case.  Have you ever been married
24      to anyone other than Mr. Tuma?
25           A     No.
```

```
                                            Page 12
 1                      C. Herbst
 2          Q       When did you get married to
 3     Mr. Tuma?
 4          A       1997.
 5          Q       Did there come a time that you
 6     were separated but not divorced?
 7          A       Yes.
 8          Q       When was that?
 9          A       2016.
10          Q       You are now divorced from
11     Mr. Tuma?
12          A       I am.
13          Q       When was that divorce finalized?
14          A       April 2017.  I want to say
15     April 27, 2017, and then I guess the judge
16     formalized it in July.
17          Q       Of 2017?
18          A       Yes.
19          Q       Would you refer to that as a
20     divorce agreement with Mr. Tuma?
21          A       Yes, a stipulation of settlement I
22     think it's referred to.
23          Q       That was from July or August of
24     2017; is that correct?
25          A       April.  We signed April 27, 2017,
```

```
                                          Page 13
 1                    C. Herbst
 2      and the judge formalized it in July.  I don't
 3      know the date, July 2017.
 4           Q      Thank you.  I'm going to ask you
 5      about litigation history.  I understand you have
 6      had some litigation with Mr. Tuma?
 7           A      Yes.
 8           Q      Is that ongoing?
 9           A      Yes.
10           Q      How many lawsuits are pending
11      right now?
12           A      I believe three.
13           Q      Are those all in Suffolk County
14      Supreme Court?
15           A      I believe two -- it's really hard.
16      Two I believe, and the other one is in
17      Riverhead, I believe.  I'm sorry, is Suffolk
18      County Supreme Court the Islip location?
19           Q      I don't want to answer your
20      questions.  It is not a trick question.  I will
21      represent to you that Suffolk County Supreme
22      Court is located in both Central Islip and
23      Riverhead if that helps.  Are you the plaintiff
24      in those lawsuits?
25           A      In one I am.  The other two I'm
```

```
                                          Page 14
  1                       C. Herbst
  2     not.
  3            Q       Without revealing any
  4     communications with counsel, is Mr. Foster
  5     representing you in all three of those lawsuits?
  6            A       Yes, he is.
  7            Q       Again without revealing any
  8     communications you may have had with him, does
  9     Mr. Foster continue to represent you in this
 10     present case that we are here for today?
 11            A       No, he really does not.  Reid
 12     does.
 13            Q       Is it fair to say Mr. Foster
 14     represented you in the present lawsuit and there
 15     came a time when you changed to Mr. Skibell?
 16            A       Yes, that's correct.
 17            Q       When you referred to Sound before,
 18     that is Sound Aircraft Services, Inc.?
 19            A       I'm sorry, I don't remember what
 20     my reference was.  Are you talking employment?
 21            Q       Yes.
 22            A       Yes, Sound Aircraft Services, Inc.
 23            Q       That was set up in 1990?
 24            A       Yes.
 25            Q       You owned that together with
```

```
                                      Page 15
 1                     C. Herbst

 2    Mr. Tuma?

 3            A       He was a hundred percent owner of

 4    that.

 5            Q       Am I correct that there were

 6    actually three separate entities?

 7            A       There are three separate entities,

 8    yes.

 9            Q       One is Sound Aircraft Services,

10    Inc., sometimes referred to as SAS; is that

11    correct?

12            A       Correct.

13            Q       And the second one is SAFE?

14            A       Correct.

15            Q       And the third one is an auto

16    group; is that right?

17            A       SAS Auto Group, yes.

18            Q       All three of those were set up in

19    1990?

20            A       No.

21            Q       When was SAS set up?

22            A       SAS, Sound Aircraft Services was

23    set up in 1990.  Sound Aircraft Flight

24    Enterprises was set up in 1992, and SAS Auto

25    Group I believe was set up in 2016.  It could be
```

```
                                           Page 16
 1                        C. Herbst
 2      2015 for SAS Auto Group.  I'm sorry, I don't
 3      have that exact date.
 4           Q       With all questions it's just to
 5      the best of your recollection.  When SAS was set
 6      up in 1990, initially Mr. Tuma was the one
 7      hundred percent owner?
 8           A       Yes.
 9           Q       How about SAFE?
10           A       One hundred percent owner.
11           Q       What about SAS Auto Group?
12           A       I'm one hundred percent owner.
13           Q       Are you familiar with the term
14      respecting corporate formality?
15           A       No.
16           Q       Are you familiar with the idea
17      that if you have a corporation, there are
18      certain things you might be required to do in
19      terms of keeping separate bank accounts or
20      operating them distinctly as separate entities
21      from the individual who may own them?  Are you
22      familiar generally with that concept?
23           A       Generally I think I understand.
24           Q       Do you have an understanding as to
25      whether that has occurred with those three
```

```
                                                    Page 17
 1                          C. Herbst
 2      entities that you described?
 3              A       Yes, I believe all three are
 4      operated in that fashion.
 5              Q       Do they each have their own bank
 6      account?
 7                              MR. KRIEGSMAN:  Reid, if
 8                      you want to make an objection,
 9                      make sure it is on the record.
10                              MR. SKIBELL:  It was vague
11                      in terms of time period.
12                              MR. KRIEGSMAN:  I'm glad I
13                      heard it, that was a good
14                      objection.  I will withdraw that
15                      and rephrase it.
16              Q       Let me back up.  When SAS and SAFE
17      were first set up, did you have any involvement
18      in setting them up?
19              A       I did.
20              Q       What was your involvement?
21              A       I got the attorney and I gave the
22      information to the attorney of what we were
23      doing, and she formed the whatever paperwork
24      attorneys do to form the corporation.
25              Q       What generally did SAS do?
```

```
                                        Page 18
 1                      C. Herbst
 2           A      When SAS was formed in 1990, it
 3      was strictly an aircraft maintenance facility.
 4           Q      What does that generally entail?
 5           A      Performing maintenance services on
 6      aircraft whether it be annual inspections,
 7      repairs, tire changes, maintenance as if you
 8      would take your car to the maintenance facility.
 9           Q      Ms. Herbst, I may use the term SAS
10      to refer to Sound Aircraft Services, Inc.; is
11      that okay?
12           A      Understood.
13           Q      That is how it was often referred
14      to; is that fair to say?
15           A      Yes.
16           Q      You just described what SAS did
17      when it was set up in 1990.  Did there come a
18      time when that changed, where SAS began doing
19      other things or stopped doing certain things?
20           A      Yes.
21           Q      When was that?
22           A      That was in about 1992.  We leased
23      some more ramp space and began renting tie-down
24      space -- parking spaces to aircraft.  In 1992 we
25      also began selling aviation fuel at the airport
```

```
                                          Page 19

 1                      C. Herbst
 2      for piston aircraft and jet fuel for turbine and
 3      jet aircraft.
 4            Q      How long did that continue for?
 5            A      Well, to present; tie-downs and
 6      fuel sales are still ongoing.  Aircraft
 7      maintenance closed in 2004.
 8            Q      What about SAFE, what did SAFE do
 9      when it was formed in 1992?
10            A      In 1992 SAFE primarily did
11      aircraft flight instruction, pilot training,
12      aerial sightseeing.
13            Q      Did there come a time when that
14      changed or expanded?
15            A      Yes, in 1998 we became a Part 135
16      FAA certified charter operator.
17            Q      Did there come a time around 1994
18      when SAFE began providing booking services?
19            A      It was earlier than that.  It was
20      actually Sound Aircraft Services primarily, and
21      it was I want to say in late '92 that I started
22      working with Action Airlines on brokering
23      charters.  And in 1993 I was brokering also with
24      Action Airlines and I believe we did some work
25      for Shoreline Aviation in '93, a very little
```

```
                                              Page 20

 1                     C. Herbst

 2     bit.

 3          Q      How would you describe the work

 4     that you were doing with Action Air beginning in

 5     '92?

 6          A      I was booking charters for them.

 7     Private aircraft charters.  You know, a client

 8     would call me ask to go from point A to point B

 9     and I would hire Action Airlines to operate that

10     flight or perform that flight.

11          Q      When you started working with

12     Shoreline in 1993, what were you doing with

13     them?

14          A      Shoreline was providing lifts for

15     the LaGuardia runs that we were doing with

16     Action Airlines.  It was flights between East

17     Hampton and LaGuardia.

18          Q      In the 1992-1993 time frame were

19     you doing most of that work for SAFE?

20          A      Yes, it was just me.

21          Q      Did SAFE have a separate bank

22     account from SAS?

23          A      It did.

24          Q      Did you take steps to ensure, for

25     example, that money that was due to SAS went
```

```
                                              Page 21
 1                          C. Herbst
 2      into the SAS bank account as opposed to the SAFE
 3      bank account?
 4              A       SAS was paid directly, yes.
 5              Q       You kept a separate bank account
 6      for SAS and SAFE?
 7              A       Yes.
 8              Q       If money was due to SAS, it went
 9      into the SAS bank account not the SAFE bank
10      account?
11              A       That's correct.
12              Q       And the reverse is true, monies
13      due to SAFE went into the SAFE bank account?
14              A       Yes.
15              Q       SAFE expenses were paid from the
16      SAFE account?
17              A       Yes.
18              Q       And SAS expenses were paid from
19      the SAS account?
20              A       Yes.
21              Q       You never used those accounts
22      interchangeably?
23              A       I'm not sure I would understand
24      how I would do that.
25              Q       Did you ever use the SAFE checking
```

```
                                        Page 22
 1                      C. Herbst
 2      account to pay for an SAS expense?
 3              A       No.
 4              Q       Did you ever use the SAS account
 5      to pay --
 6              A       I'm sorry.  No, I do not believe I
 7      have ever done that.
 8              Q       Did you ever use a personal
 9      account to pay a SAFE or SAS expense?
10              A       No.
11              Q       Did you ever take any funds that
12      were due to SAS or SAFE and deposit them into a
13      personal account?
14              A       I'm sorry, did you say did I ever
15      take corporate funds from SAFE and SAS and
16      deposit funds due to the corporation and deposit
17      them into my personal account?
18              Q       Yes, that's what I'm asking.
19              A       I never did that.
20              Q       If I use the term respecting
21      corporate formalities to describe what we just
22      discussed with regard to separate bank accounts,
23      would that term now make sense to you?
24              A       Yes.
25              Q       Is it fair to say in 1992 and 1993
```

```
                                              Page 23
 1                     C. Herbst
 2     you respected corporate formalities with regard
 3     to SAFE and SAS?
 4          A     Yes.
 5          Q     And did you continue to do that
 6     for the entire time you were involved with SAS?
 7          A     Yes.
 8          Q     And did you continue to also
 9     respect corporate formalities with regard to
10     SAFE?
11          A     Yes.
12          Q     Did you ever say you used those
13     corporate entities interchangeably?
14          A     I don't know that I understand
15     exactly what you mean by that.
16          Q     Do you understand what
17     interchangeably means?
18          A     When you are referring to it as
19     interchangeably with the corporations, I'm not
20     sure I do.
21          Q     You understood what it meant to
22     not respect corporate formalities, correct?
23          A     If you are telling me that
24     corporate formalities are a corporation is
25     responsible for their particular expenses and
```

```
                                      Page 24
 1                    C. Herbst
 2     those expenses are paid for by that corporate
 3     entity, then --
 4          Q      Okay.
 5          A      -- I get that.  Those expenses --
 6     and that's how it was.  If I had a payment due
 7     from Flight Enterprises for whatever that
 8     expense was, it came from Flight Enterprises, it
 9     did not come from Sound Aircraft.
10          Q      If it did come from Sound
11     Aircraft, for example, that would have been
12     using entities interchangeably; does that make
13     sense to you?
14                      MR. KRIEGSMAN:  We don't
15                 hear you, Reid.
16                      MR. SKIBELL:  We will
17                 change computers and log in to see
18                 if that helps you.
19                      (Recess was taken)
20                      MR. SKIBELL:  I'm going to
21                 object to that.  It calls for
22                 speculation and a legal
23                 conclusion.
24                      MR. KRIEGSMAN:  Thank you.
25          Q      Ms. Herbst, you identified three
```

```
                                               Page 25

1                        C. Herbst

2      entities; SAS, SAFE, and SAS Auto Group.  Was

3      there ever a fourth Sound entity?

4              A       No.

5              Q       Your testimony is that as long as

6      you were involved with those entities you

7      respected corporate formalities?

8              A       Yes.

9              Q       Are you familiar with Shoreline

10     Aviation, the plaintiff in this case?

11             A       I am.

12             Q       How did you come to meet Shoreline

13     Aviation?

14             A       I met John Kelly I believe like in

15     I'm going to say 1993.  It's almost 40 years now

16     so it's hard to say a specific date.  I met him

17     very informally in the terminal building.  I

18     believe I was introduced to him by the airport

19     manager at the time.

20                     John Kelly had just come in on a

21     flight on a seaplane, a Caravan, the bigger

22     seaplanes.  And I met him I asked him if he

23     wanted to work with Action with regard to

24     LaGuardia we were doing.  He knew the owner of

25     Action, they were very friendly.
```

Page 26

C. Herbst

1

2          I also asked if he would be

3   interested in using his seaplanes for a similar

4   run where I would book the passengers and he

5   would provide the aircraft.  For my LaGuardia

6   clients I could offer a seaplane run, and he

7   seemed affirmative that that would be something

8   that we could explore.

9          Q     At the time that you met him,

10  which sounds like to the best of your memory was

11  1993, do you know if he was already in the

12  seaplane business?

13         A     Yes.  As far as I knew he was in

14  the seaplane business, yes.

15         Q     Was that Shoreline operating

16  flights between Manhattan and the Hamptons?

17         A     I don't know what the extent they

18  operated at that time.  I knew he had the

19  particular aircraft he was in was owned by Harry

20  Maclow so I knew he did private services for

21  different clients of his own.

22         Q     So there came a time when you

23  worked with Shoreline on seaplane commuter

24  flights between Manhattan and East Hampton; is

25  that correct?

Page 27

1                    C. Herbst

2          A      Yes.   I worked with him on private

3     charters, too.   We did a lot of private charter

4     work.   He had smaller seaplanes as well.   We

5     brokered for a lot of smaller trips on smaller

6     aircraft.   There was only one large aircraft at

7     the time.   I don't recall what the availability

8     was on that at the time, but that's how we

9     started out.   We did use smaller airplanes too,

10    for 23rd Street runs as shared charters, not

11    private charters.

12         Q      To your knowledge, he was

13    operating some of those seaplane flights when

14    you began working with him?

15         A      Yes, to my knowledge he was.   Yes.

16         Q      Would some of those have included

17    flights between Manhattan and East Hampton?

18         A      I would be assuming so.   Honestly,

19    that would be my guess.   He chartered airplanes

20    that could be coming and going from anywhere.

21         Q      I don't want you to assume.

22                    MR. KRIEGSMAN:   Reid, I'm

23                    going to show her the Amended

24                    Complaint next.

25         Q      I'm going to show you a document

                                                        Page 28

1                          C. Herbst

2        the Amended Complaint in this case.  It's

3        Defendant's Exhibit A for today's deposition.

4                          (Defendant's Exhibit A,

5                          Amended Complaint, was marked for

6                          identification.)

7              Q     I'm going to ask you a question

8        about a specific part of the document but your

9        attorney has the whole document.  With the Zoom

10       format you can only see what I have up on the

11       screen.  I will make sure your attorney has the

12       whole document.  If at any time you want to see

13       another page, just indicate that.

14                          MR. SKIBELL:  I don't

15                          believe you mailed us an exhibit.

16                          If you want to do what you are

17                          saying you want to do, you need to

18                          e-mail me the exhibits.

19                          MR. KRIEGSMAN:  I am going

20                          to do that.  I told you before I

21                          want to show her this and one or

22                          two documents that you introduced,

23                          and then I'm going to send you

24                          everything in order.  I will make

25                          sure that any document I'm asking

```
                                        Page 29

 1                      C. Herbst
 2              her about you have up on the
 3              screen.
 4      Q       Are you generally familiar with
 5  the Amended Complaint in this case, Ms. Herbst?
 6      A       I am, yes.
 7      Q       I'm going to turn to Paragraph 17
 8  of the Amended Complaint.  "In 1994, Shoreline
 9  Aviation entered into an oral agreement with SAS
10  and Herbst (the contract) pursuant to which
11  Herbst would provide booking services
12  exclusively for Shoreline Aviation's flights to
13  and from the East Hampton Airport in return for
14  commissions."  Did I read that correctly?
15      A       You did.
16      Q       Is that a true statement?
17      A       I wasn't working with them
18  exclusively.
19      Q       The question is, is Paragraph 17 a
20  true statement?
21      A       Yes, generally true.
22      Q       You began working with them in
23  1994?
24      A       I believe I did some work for them
25  in 1993 as well.
```

```
                                        Page 30
 1                     C. Herbst
 2         Q      You booked their flights, correct?
 3         A      I booked my clients on their
 4    aircraft, correct.
 5         Q      You provided booking services to
 6    Shoreline; is that fair to say?
 7         A      Yes.  I was the charter broker and
 8    the shared charter broker, so yes.
 9         Q      And in exchange you were paid a
10    commission?
11         A      Yes.
12         Q      The agreed upon commission was 10
13    percent?
14         A      Correct.
15         Q      You worked pretty hard?
16         A      I worked very hard.
17         Q      I have read a lot of documents in
18    this case and it looks to me like you were
19    working very hard.  You didn't just work hard,
20    you also incurred expenses to provide the
21    booking services, correct?
22         A      Yes, correct.
23         Q      You had overhead?
24         A      Yes.
25         Q      You had a staff?
```

```
                                          Page 31
 1                          C. Herbst
 2            A       Yes.
 3            Q       At least some of the intention of
 4      that staff was to provide these booking
 5      services?
 6            A       Yes.
 7            Q       You weren't doing these things for
 8      free, correct?
 9            A       I wasn't doing them for free.
10            Q       You expected to be paid?
11            A       I expected to be paid and I also
12      paid.  I paid operators and operators paid me,
13      the business arrangement.
14            Q       What is meant by that is sometimes
15      the payments from the customers would go to
16      Shoreline and they would cut you a check, and
17      sometimes the payments went to you and you would
18      cut Shoreline a check, correct?
19            A       Yes, that's correct depending on
20      what the sale was.
21            Q       The agreement was you provided the
22      booking services in exchange for a 10 percent
23      commission, correct?
24                         MR. SKIBELL:  Objection.
25                         You can answer.
```

```
                                        Page 32

                                C. Herbst

 1

 2        A       My commission was 10 percent of

 3     the trip, the fare, the charter.  It was 10

 4     percent.

 5           Q       You agreed that that was the

 6     correct number?  You didn't think it was

 7     supposed to be 12 or 8 percent?

 8                       MR. SKIBELL:  Objection.

 9                       Are you talking to a particular

10                       time?  It's vague.

11                       MR. KRIEGSMAN:  Just for

12                       the record, buddy, let her answer.

13                       MR. SKIBELL:  I'm letting

14                       her answer.  I'm trying to make

15                       sure it is clear in terms of time

16                       frame.  I want the record to be

17                       clear.

18                       MR. KRIEGSMAN:  I don't

19                       need you to ask me any questions.

20                       If you have an objection, please

21                       state it succinctly pursuant to

22                       the federal rules of civil

23                       procedure.

24        Q       Do you need me to read that

25     question again?
```

Page 33

                              C. Herbst

1

2          A        Please.

3          Q        Did you agree that 10 percent was

4     the correct commission?

5                              MR. SKIBELL:  Objection.

6          Q        Don't look at your attorney, I'm

7     asking you.

8                              MR. SKIBELL:  You are

9                       allowed to answer if you

10                      understand.  If you want

11                      clarification, you are allowed to

12                      ask for clarification.

13         A        Can you clarify, please?

14         Q        You were paid a 10 percent

15    commission in exchange for the booking services

16    that you provided; is that true?

17         A        Are you in a particular year?

18         Q        How about 1994; is it true?

19         A        1994, yes.

20         Q        Was it true in 1995?

21         A        Yes.  To the best of my knowledge,

22    yes.  This was a long time and -- yes, to the

23    best of my knowledge 10 percent.

24         Q        You testified that you were here

25    on behalf of SAFE, correct?

Page 34

                         C. Herbst
1
2        A       I'm here on behalf of SAFE, yes.
3        Q       In a capacity and you got a notice
4    that you are the most knowledgeable person about
5    these topics, correct?
6        A       That's correct.
7        Q       You are prepared to testify on
8    behalf of SAFE on those identified topics,
9    correct?
10       A       Yes.
11       Q       That 10 percent continued through
12   at least 2017; isn't that true?
13       A       I can't say that for sure.  Things
14   changed and fares increased and the way things
15   were done, you know, there could have been -- it
16   could have been more than 10 percent but
17   generally speaking yes, 10 percent was the magic
18   number.
19       Q       That was pursuant to a contract
20   between you and John Kelly, correct?
21                       MR. SKIBELL:  Objection.
22       A       We did not have a contract.  We
23   had an arrangement.  We had a business
24   arrangement.
25                       MR. SKIBELL:  Give me a

Page 37

C. Herbst

1                        C. Herbst

2          A      No, I'm not working with Shoreline

3      now.

4          Q      There came a time when what you

5      described as your arrangement with Shoreline

6      came to an end, correct?

7          A      Yes.

8          Q      How did it end?

9          A      How it ended was John Kelly after

10     discussions and many different conversations

11     that were had sent out an e-mail to clients

12     basically terminating me, letting the clients

13     know he would no longer be working with me.

14         Q      John Kelly terminated the

15     arrangement?

16         A      Yes.  He sent out an e-mail on

17     May 6 informing clients that he was -- they were

18     no longer going to use me for bookings.

19         Q      That is May 6, 2018?

20         A      Yes, May 6, 2018.

21                    MR. KRIEGSMAN:  Next I'm

22                    going to show her what you marked

23                    yesterday as Exhibit 4, Reid.

24         Q      Are you able to see that

25     Ms. Herbst?

```
                                          Page 38

 1                         C. Herbst

 2            A      Yes.

 3                        MR. SKIBELL:  If you want

 4                 to look at the rest of the

 5                 document, you certainly can.

 6            Q      In the top right there is a

 7     handwritten note that says "sent "5/6/18"; am I

 8     reading that correctly?

 9            A      Yes.

10            Q      Do you recognize this document?

11            A      Yes.

12            Q      Is this what you were just

13     referring to when you said that Mr. Kelly

14     terminated the relationship on May 6, 2018?

15            A      There's another document in this

16     case somewhere that he says he would no longer

17     be using my services.

18            Q      Let's take a look at this document

19     first.  On the top right there is a handwritten

20     note that says 5/6/2018.

21            A      Yes.

22            Q      This is coming from Shoreline

23     Aviation's Seaplane Services.  Did I read that

24     correctly?

25            A      Yes.
```

```
                                        Page 39

 1                       C. Herbst

 2           Q        "Dear Shoreline Aviation customer"

 3      -- bearing Bates stamp beginning with SAI 47 --

 4      "beginning May 1, 2018, our seaplane commuter

 5      and charter customers will be able to book

 6      directly with Shoreline Aviation using our

 7      Website, e-mail, or toll free 800 number."  Did

 8      I read that correctly?

 9           A        You did.

10           Q        I'm going to show you Exhibit 6.

11      This is also Exhibit O to the Amended Complaint.

12      Are you able to see the screen, Ms. Herbst?

13           A        Yes.

14           Q        This appears to be an e-mail, if

15      we look at the top, from you dated May 7, 2018.

16           A        Yes.

17           Q        At 7:05 p.m.  Did I read that

18      correctly?

19           A        You did.

20           Q        "To reservations department.

21      Subject:  Message to our valued clients.  As you

22      know, you purchased a ticket book for summer

23      2018."  Did I read that correctly?

24           A        You did.

25           Q        "Unfortunately, it appears that
```

Page 40

1                         C. Herbst

2          Shoreline Aviation no longer wishes to work with

3          Sound Aircraft Flight Enterprises without notice

4          to us."  Did I read that correctly?

5                    A      Yes.

6                    Q      "Many of you have been our

7          longstanding customers for more than 20 years.

8          We truly appreciate and value the relationship

9          we have built together and we would like to

10         continue this relationship regardless of

11         Shoreline's unexpected decision."  Did I read

12         that correctly?

13                   A      Yes.

14                   Q      Just to go to the background,

15         let's talk about some of the background.  Let's

16         go back to the background of your relationship

17         with Shoreline and the arrangement.  Part of

18         that arrangement involves seaplane commuter

19         flights, correct?

20                   A      Yes.

21                   Q      And these were regularly scheduled

22         flights during the summer months between

23         Manhattan and East Hampton, correct?

24                   A      That's correct.

25                   Q      You were booking passengers on

```
                                    Page 41
 1                    C. Herbst

 2        Shoreline flights and you were being paid a

 3        10 percent commission, correct?

 4              A      Correct.

 5              Q      You testified that that was an

 6        arrangement between you and Shoreline, correct?

 7              A      That's correct.

 8              Q      You testified that John Kelly

 9        terminated that arrangement, correct?

10              A      Correct.

11              Q      So looking at this May 7, 2018,

12        e-mail, Exhibit O to the Amended Complaint, you

13        sent this after you believed Mr. Kelly

14        terminated the relationship?

15              A      Yes.

16              Q      You are saying he did that without

17        notice to you?

18              A      Yes, I'm saying that e-mail went

19        out from John Kelly to clients without my

20        knowledge.

21              Q      You go on to say that Shoreline's

22        decision was unexpected.

23              A      Yes.

24              Q      Those are true statements?

25              A      I believe them to be true
```

```
                                      Page 42
 1                    C. Herbst
 2      statements, yes.
 3           Q      Mr. Kelly terminated the
 4      relationship without notice to you?
 5           A      That's correct.
 6           Q      When he did, it was unexpected?
 7           A      Correct.
 8           Q      And he did it on May 6, 2018?
 9           A      Yes.
10                     MR. SKIBELL:  Can we take a
11                     break.  Also maybe we can fix the
12                     technology.
13                     MR. KRIEGSMAN:  Okay, in a
14                     few more minutes.
15           Q      Before he terminated it, the
16      arrangement was in place?
17           A      Yes.
18                     MR. KRIEGSMAN:  This is
19                     what you sent us last night, the
20                     interrogatory responses.  We are
21                     going to call this Plaintiff's
22                     Exhibit D-2, defendant's and Sound
23                     Aircraft Flight Enterprises
24                     Amended Responses and Objections
25                     to Plaintiff's First Set of
```

```
                                            Page 43

 1                      C. Herbst

 2                  Interrogatories.

 3                          (Plaintiff's Exhibit D-2,

 4                  Defendant's Amended Responses and

 5                  Objections to Plaintiff's First

 6                  Set of Interrogatories, was marked

 7                  for identification.)

 8          Q       Are you able to see that on the

 9   screen?

10          A       Yes.

11          Q       Are you familiar with this

12   document, Ms. Herbst?

13          A       I am.

14          Q       That is your signature on the

15   verification page executed March 28, 2022?

16          A       Yes.

17          Q       On Page 4 I'm going to read to you

18   Interrogatory Number 3.  "Describe in detail

19   your duties and obligations in providing booking

20   services for Shoreline Aviation and how you

21   performed those duties and obligations."  Did I

22   read that correctly?

23          A       You did.

24          Q       And then it says the response, and

25   do you see in the first sentence there are some
```

```
                                              Page 53

                              C. Herbst

 1

 2         Q        Fair to say the seaplane commuter

 3    flights were regularly scheduled trips during

 4    the summer months between Manhattan and East

 5    Hampton?

 6         A        Yes.

 7         Q        Where you could purchase a seat on

 8    one of those regularly scheduled Shoreline

 9    flights?

10         A        They were shared charter flights.

11    They were operated by Shoreline.

12         Q        There was a regular schedule?

13         A        Yes.

14         Q        And so if you wanted to go from

15    Manhattan to East Hampton on a seaplane commuter

16    flight, you would have to go on one of the

17    regularly scheduled flights?

18         A        Yes, you would choose what time

19    you would like to depart.

20         Q        As opposed to a charter flight

21    where you could go when you wanted as a

22    passenger and where you wanted?

23         A        Correct.

24         Q        You booked passengers on Shoreline

25    seaplane commuter flights?
```

Page 54

C. Herbst

1

2        A      I booked passengers on those
3     shared charter flights, yes.  I sold seats, yes.
4        Q      When you say shared charter
5     flights, is that the same thing as a seaplane
6     commuter flight?
7        A      Yes.
8        Q      If I use the term "seaplane
9     commuter flight," do you understand what I'm
10    talking about?
11       A      Yes.
12       Q      And you booked passengers on
13    seaplane commuter flights?
14       A      I did.
15       Q      Shoreline commuter flights?
16       A      Those commuter flights were
17    operated by Shoreline Aviation.  It was
18    Shoreline Aviation aircraft on those flights,
19    yes.
20       Q      You booked passengers on those
21    flights for more than 20 years?
22       A      Yes.
23       Q      And you were paid 10 percent
24    commission for that work?
25       A      Yes.

```
                                            Page 55

 1                        C. Herbst

 2         Q       You also booked passengers on

 3    Shoreline charter flights, correct?

 4         A       Correct.

 5         Q       You were paid commission for that

 6    work as well?

 7         A       Correct.

 8         Q       The coupon book mailer was where

 9    passengers who were going to fly on the seaplane

10    commuter flights had the option of purchasing

11    books of tickets in advance for which they would

12    get a discount on the fare; is that correct?

13         A       That's correct.

14         Q       And they would purchase the coupon

15    book typically beginning in the fall of the

16    prior year and they would use them the following

17    summer?

18         A       We did not typically sell them in

19    the fall.  It was only in the later years that

20    we started to send out those offers in the fall.

21         Q       When you say the later years, when

22    was that?

23         A       I would say May 2010, 2011, 2012

24    to 2017.

25         Q       Beginning in 2010, 2011 or 2012
```

Page 56

1                    C. Herbst

2      there were coupon book mailers that would go out

3      to these customers giving them an opportunity to

4      purchase coupon books, correct?

5          A      Yes.  The mailer went out to my

6      clients that would give them an opportunity to

7      prepurchase flights for the following season.

8          Q      A mailer would go out again in

9      March or April, correct?

10         A      Yes.  There were no set dates, no

11     specific date when it would go out but yes, in

12     the spring we would send it out.  March or

13     April, yes.

14         Q      Springtime, approximately March or

15     April; is that fair to say?

16         A      That's fair, yes.

17         Q      The flights were only operating in

18     the summer months, correct?

19         A      Correct.

20         Q      If you purchased a coupon book,

21     you would have to get a reservation on one of

22     the regularly scheduled commuter flight?

23         A      The purchase of the coupon book

24     wasn't in conjunction with the reservation.

25     When you made your reservation or you wanted to

```
                                          Page 57

                              C. Herbst

 1

 2      fly, that would be your form of payment.  We

 3      would deduct it from your commuter pass.

 4            Q      Right; or you could just purchase

 5      a seat, correct?

 6            A      Or you could purchase a seat.

 7      That would be at retail price.

 8            Q      And so if they purchased the

 9      coupon book, they would purchase that from

10      Shoreline and give Shoreline the money for the

11      coupon book, and then Shoreline would turn

12      around and give you the 10 percent commission,

13      correct?

14                        MR. SKIBELL:  Objection;

15                   vague as to time period.

16            A      When they purchased the coupon

17      book, they purchased it through us, through our

18      mailing, in response to our mailing.  We would

19      collect the payment for it, and that would only

20      be in a check form.

21                   John Kelly did not want to take

22      credit cards for coupon books because the credit

23      cards take three percent of the sale and it was

24      already a discounted fare.  We would send out

25      the mailers to see if anybody was interested and
```

```
                                              Page 58
 1                       C. Herbst

 2     people would respond to us.  They would send the

 3     checks to us.  We would do all of the paperwork

 4     on that and submit to Shoreline those payments.

 5           Q     Coupon books weren't purchased

 6     directly from Shoreline?

 7                       MR. SKIBELL:  Objection;

 8                       asked and answered.

 9           A     No.

10           Q     When they purchased seats without

11     a coupon, they purchased directly from SAFE?

12           A     Again, there has to be a time

13     period.  It was Sound Aircraft Services for most

14     of the time.  It was only 2017 that it was SAFE

15     so, yes.  They were either purchasing it from

16     Sound Aircraft Services or Sound Aircraft Flight

17     Enterprises.

18           Q     Give me the time frame when it was

19     Sound and when it was SAFE.

20           A     It was sound from the beginning,

21     since '93 or '94 until 2016, the end of 2016.

22     Then in 2017 began SAFE.

23           Q     But SAFE already existed going

24     back to '94?

25           A     '92, yes.
```

Page 59

1                          C. Herbst

2          Q        Why did that change?  Was that

3     part of your divorce agreement with Mr. Tuma?

4          A        That's correct.

5          Q        Just going back to the seaplane

6     commuter flights, they operated during the

7     summer, correct?

8          A        Correct.

9          Q        There was a schedule?

10         A        Correct.

11         Q        If you wanted to travel on one of

12    the flights, you needed a ticket and a

13    reservation, correct?

14         A        That's correct.

15         Q        They bought seats from you, the

16    passengers?

17         A        Yes.

18         Q        What was the guaranteed seating

19    form?

20         A        The guaranteed seating form was

21    developed over the years.  It is basically the

22    rules if you will, of what was required to

23    identify or what the restrictions were, what the

24    cancellation policy was, what the luggage

25    restrictions were.  And then it would include

```
                                          Page 121

 1                        C. Herbst

 2      book mailer as well, correct?

 3           A      Yes.

 4           Q      Every year --

 5           A      Yes.

 6           Q      -- until the arrangement was

 7      terminated?

 8           A      Yes.

 9           Q      Did you do any advertising?

10           A      I did.

11           Q      Did you advertise for commuter

12      seaplane commuter flights?

13           A      I did.

14           Q      Did you advertise for Shoreline

15      charter flights?

16           A      I advertised for -- I honestly

17      don't remember what the advertisement was.  It

18      was for seaplanes, helicopters, land planes, jet

19      aircraft.  The advertisement included all.

20           Q      Did the advertisement mention

21      Shoreline by name?

22           A      I don't recall.

23           Q      What was the form of the

24      advertising that you did?

25           A      My advertising was mostly or
```

Page 122

1                     C. Herbst

2     mainly Yellow Book and Peconic Book, the phone

3     books when they were popular.  They would be

4     free and they would end up on everybody's

5     doorstep.  The renters that came out had all of

6     that.

7                     I also did some -- I may have done

8     some advertisement in the East Hampton Star.

9     That would be early on.  There was a point in

10    time when the phone books were no longer popular

11    anymore and people were doing more online.  We

12    were sold out anyway, so advertisements was

13    really added onto the waitlist and nothing more

14    because we were at capacity.

15           Q      Did you do any online advertising?

16           A      No.  Just Website, that's all.

17           Q      You mentioned the phone book; did

18    the advertisements in the phone book mention

19    Shoreline by name?

20           A      I don't recall if they mentioned

21    Shoreline Aviation by name.

22           Q      What about the advertisements in

23    the East Hampton Star, did they mention

24    Shoreline by name?

25           A      Again, I cannot tell you.  I do

```
                                            Page 123
 1                    C. Herbst

 2     not recall.

 3          Q      What about the advertisements on

 4     your Website, did those mention Shoreline by

 5     name?

 6          A      I don't believe it mentioned

 7     Shoreline Aviation by name.  I believe it

 8     mentioned seaplane service.  I'm sorry, I don't

 9     recall.

10          Q      I don't want to press your memory

11     but you are here as a witness on behalf of SAFE,

12     correct?

13          A      I'm a witness on behalf of SAFE

14     but don't forget, it is 20 plus years of this

15     with Sound Aircraft Services.  I acted as an

16     employee of Sound Aircraft Services up until the

17     transition to SAFE.

18          Q      You testified earlier that you

19     were prepared to testify about the items

20     identified in that notice, correct?

21          A      Yes.

22          Q      Are you having any general trouble

23     with your memory today?

24                    MR. SKIBELL:  No, she is

25                    not, Alex.
```

```
                                          Page 124
 1                      C. Herbst

 2                         MR. KRIEGSMAN:  Reid, don't

 3               answer for the witness today.

 4          A      I don't believe I'm having -- I

 5      mean you are talking about really a long, long

 6      time ago.  It is very difficult to remember

 7      everything.

 8          Q      Did you prepare for today's

 9      deposition?

10          A      Yes.

11          Q      And you reviewed documents?

12          A      I prepared to the best of my

13      ability.

14          Q      You reviewed the Complaint in this

15      action?

16          A      I did.

17          Q      You reviewed the Answer that you

18      filed?

19          A      My Answer with regard to

20      advertising or in general?

21          Q      You looked at the Answer before

22      you testified; you knew that that was filed on

23      your behalf?

24          A      Yes.

25          Q      Did you review that to prepare for
```

                              C. Herbst
1    SAFE for seaplane commuter flights between
2    Manhattan and East Hampton between 1994 and 2018
3    flew with Shoreline, correct?
4
5            A       Seaplanes, yes.  They were the
6    only operator I used for those flights.
7            Q       You didn't have your own planes?
8            A       I had my own planes but not
9    seaplanes.  May I also point out that in the
10   early days Shoreline --
11           Q       All right, go ahead.
12           A       I just want to point out that in
13   the early days they were the only ones that had
14   seaplanes.  They were the only seaplane
15   operator, but they also had land planes that I
16   booked.  They didn't only have seaplanes.
17                          MR. SKIBELL:  Can we just
18                          take a few minutes for a bathroom
19                          break?
20                          MR. KRIEGSMAN:  Sure, you
21                          know, the longer we go today the
22                          less chance we will finish today.
23                          MR. SKIBELL:  Five minutes
24                          shouldn't matter.  Maybe we can
25                          get to the docs.

```
                                            Page 131

 1                    C. Herbst

 2                    MR. KRIEGSMAN:  When we

 3              finish the questions, we will get

 4              to the docs.  We will be back on

 5              in five.

 6                    (Recess was taken)

 7                    MR. KRIEGSMAN:  Back on the

 8              record?

 9        Q      Ms. Herbst, I'm going to ask you

10    some questions about your divorce agreement with

11    Mr. Tuma and how that impacted this case.  I

12    believe you testified earlier that your divorce

13    was finalized in 2017; is that correct?

14        A      That is correct.

15        Q      Did the divorce agreement provide

16    what was to happen with regard to those three

17    entities; Sound, SAFE, and the auto group

18    entity?

19        A      What would happen to them?

20        Q      Yes.

21        A      I will state it the best that I

22    can.  Sound Aircraft Services was going to

23    remain with Steven Tuma.  I would have -- I

24    would not be able to compete with him with

25    regards to fueling aircraft, tying down aircraft
```

```
                                          Page 132
                           C. Herbst
 1

 2     or hangar storage or anything related to those

 3     services.  He would not be able to do any

 4     aircraft charters, any aircraft flight

 5     instruction or sightseeing or car rentals with

 6     the exception of Enterprise car rental which he

 7     already had a lease arrangement with the FBO.

 8          Q     What about booking services?

 9          A     Yes, that is aircraft charters.

10     He was not able to do aircraft -- book a

11     charter, he couldn't facilitate a charter.  He

12     couldn't operate a flight school, pilot flight

13     instruction, aerial sightseeing, car rental with

14     the exception of Enterprise or the list related

15     to those services.

16          Q     You testified earlier that these

17     three entities existed going back to the 1990s,

18     correct?

19          A     Two did; Sound Aircraft Services

20     in 1990, Sound Aircraft Flight Enterprises in

21     1992.  And SAS Auto Group I believe was 2016,

22     possibly 2015 but I believe it was 2016.

23          Q     After the divorce SAFE became your

24     entity, not Mr. Tuma's?

25          A     It was always just my entity.
```

```
                                            Page 133

  1                        C. Herbst

  2         Q     I apologize.  I thought you

  3    testified earlier that when it was started, it

  4    was owned a hundred percent by Mr. Tuma.

  5         A     Sound Aircraft Services one

  6    hundred percent Mr. Tuma, the corporation in

  7    inception.  Sound Aircraft Flight Enterprises

  8    one hundred percent Cynthia Herbst from 1992

  9    inception.  SAS Auto Group was one hundred

 10    percent Cynthia Herbst from inception.

 11         Q     This 2017 divorce agreement being

 12    finalized, how did that impact your arrangement

 13    with Shoreline?

 14         A     Well, the impact was more of an

 15    employee situation.  I had to find and train new

 16    employees.  The impact also was -- I didn't know

 17    it at the time -- would be that the FBO was

 18    going to now charge Shoreline Aviation for ramp

 19    fees.  And once again, I didn't know it at the

 20    time that John Kelly would want to reclaim those

 21    from me.

 22         Q     Anything else?

 23         A     That's it.  The large part was the

 24    employees, I had to hire and train new

 25    employees.
```

Page 134

                             C. Herbst

1

2          Q      What about Maureen Quigley, she

3     was already an employee of yours?

4          A      She was an employee of Sound

5     Aircraft Services, she became an employee of

6     Sound Aircraft Flight Enterprises.

7          Q      So as far as the arrangement with

8     Shoreline and the services, the booking services

9     that SAFE provided, Maureen had already been

10    doing those things prior to 2017, correct?

11         A      Correct.  So it was Sound Aircraft

12    Services, correct.

13         Q      She continued to do the same thing

14    but more under the SAFE umbrella?

15         A      She was now under the SAFE

16    umbrella and the SAFE payroll.

17         Q      After the divorce was finalized,

18    was anything communicated by SAFE or SAS to

19    Shoreline?

20         A      I can't speak for SAS because I

21    don't know what my ex-husband would have

22    communicated.  Prior to my divorce being settled

23    I had more than one conversation with John Kelly

24    with regards to there was a divorce and how that

25    looked like it was going to play out with regard

```
                                        Page 135
 1                      C. Herbst
 2     to bookings and what would happen, you know,
 3     employees and that sort of thing.
 4          Q     What did you tell Mr. Kelly?  Did
 5     you tell him you would continue to provide the
 6     same services?
 7                      MR. SKIBELL:  Objection to
 8                 form.
 9          A     Yes.  We would continue to provide
10     the booking services, and Maureen was going to
11     come over to Flight Enterprises; she was on the
12     Flight Enterprises payroll.  We would change
13     counters, a few little details that I went over
14     with him.
15                 I also made it clear to him that
16     the FBO would not be able to perform charter
17     services or anything that would compete with
18     charter services with Flight Enterprises.  That
19     was strictly spelled out in the divorce
20     agreement, and I let him know that before it was
21     finalized and then when it was finalized, that
22     that was the case.
23          Q     As far as the arrangement between
24     you and Shoreline, you made clear to Kelly that
25     you would continue to provide the same booking
```

```
                                       Page 136
 1                    C. Herbst
 2     services and you were going to continue to
 3     receive that same 10 percent commission,
 4     correct?
 5          A      Correct.  Yes, he made it very
 6     clear that he had no interest in doing his own
 7     reservations.
 8          Q      Anything else that was discussed
 9     with Mr. Kelly at that time?
10          A      I believe that covers it.
11          Q      Any other conversations or
12     communications that you had with Mr. Kelly in
13     connection with the finalization of your divorce
14     agreement and the Sound/SAFE split or how that
15     might impact Shoreline or your arrangement with
16     Shoreline?
17          A      I think that covers it.
18          Q      We talked before about Blade.
19          A      Yes.
20          Q      Did there come a time when you
21     began discussions with Blade about doing
22     business with them?
23          A      Yes.
24          Q      When was that?
25          A      Early 2018.
```

Page 137

1                          C. Herbst
2          Q        What was the nature of those
3    discussions?
4          A        They were interested in if there
5    was any possibility that we could work together.
6    And I thought that, you know, at the time
7    perhaps yes, that might be a great idea for us
8    to all be able to work together.  That would
9    include John Kelly, so I asked that John Kelly
10   be part of the conversation of how we might be
11   able to come up with an agreement that we all
12   work together.
13         Q        You were saying something else?
14         A        I said an agreement that would
15   benefit everyone.
16         Q        Who made the first contact with
17   Blade?  Did they reach out to you or did you
18   reach out to them?
19         A        They reached out to me.
20         Q        Who was that?
21         A        I want to say it was Rob
22   Wiesenthal.
23         Q        Did he reach out to you by phone
24   or e-mail, talk to you in person?
25         A        He was in the East Hampton

```
                                              Page 138
 1                       C. Herbst
 2     terminal a lot so I believe our first
 3     conversation was in the terminal.
 4          Q       That would have been early 2018?
 5          A       Early 2018 in person.
 6          Q       January?
 7          A       Or February.  I don't recall the
 8     specific date.
 9          Q       What did he say?
10          A       It would be really great if we
11     could join forces.
12          Q       When you say "we," who is the we
13     there?
14          A       Well, for me the "we" was me,
15     Shoreline, SAFE -- me as SAFE, Shoreline as the
16     lift, and Blade.
17          Q       In that first discussion when
18     Mr. Wiesenthal approached you, did he bring up
19     Shoreline?
20          A       I think I brought up Shoreline.
21          Q       What did you say?
22          A       That I wanted John Kelly to be
23     part of the conversation.
24          Q       What was Mr. Wiesenthal's
25     response?
```

```
                                            Page 139

 1                       C. Herbst

 2          A       He had no problem with it.

 3          Q       For the record, who is Ryan Pilla?

 4          A       Ryan Pilla is my boyfriend.

 5          Q       Did he have a role at SAFE?

 6          A       No.

 7          Q       Never worked there?

 8          A       No.

 9          Q       As far as your arrangement with

10     Shoreline Aviation, was he involved in that at

11     all?

12          A       No.

13          Q       Was he involved in the discussions

14     with Blade?

15          A       Yes.

16          Q       At what point did he become

17     involved?

18          A       He was involved in discussions

19     with regard to me.  He was my boyfriend and I,

20     you know, wanted his advice, his opinion.  He

21     was and he is a businessman, operates many

22     businesses, and the conversation really started

23     with me.

24          Q       Meaning between you and Mr. Pilla?

25          A       Yes.
```

```
                                        Page 140

 1                      C. Herbst

 2          Q      Did there come a time when

 3     Mr. Pilla was communicating directly with Blade?

 4          A      I don't believe without me.  It

 5     was always sort of I'm communicating with him

 6     and he was communicating with me and Blade.  He

 7     could have had conversations without me I

 8     presume, but I was aware of everything so

 9     nothing behind closed doors.

10          Q      I'm not asking about with you or

11     without you.  I'm just asking did there come a

12     time when Mr. Pilla was communicating directly

13     with Blade?

14          A      I believe there was a time, yes.

15          Q      When was that?

16          A      Probably during discussions on

17     different options or, you know, different

18     scenarios that would come into play.

19          Q      Was that also in January or

20     February?

21          A      Probably more end of February,

22     March.

23          Q      You have the first conversation

24     with Mr. Wiesenthal in the East Hampton Airport

25     and you brought up Shoreline and John Kelly.
```

```
                                              Page 141

 1                         C. Herbst

 2     What was Mr. Wiesenthal's reaction?

 3          A      I don't think he had a reaction

 4     because Shoreline had seaplanes.  They had a lot

 5     of lifts; it would benefit Blade to be working

 6     with Shoreline and with SAFE for the client, for

 7     the passenger portion of it.  I brought the

 8     passenger portion of it, Shoreline would bring

 9     the lift, and Blade had the app.

10          Q      That is your first conversation

11     with Mr. Wiesenthal in the airport.  What

12     happened next?

13          A      We tried and got a meeting

14     together with all of the operators or all the

15     players; me, Shoreline, and Blade, and we had

16     the meeting in April where the idea was

17     presented and went from there.  Discussions went

18     from there.  There were different scenarios, you

19     know.

20          Q      Where did that meeting take place

21     in April?

22          A      The Westhampton Airport.

23          Q      Who was present for that meeting?

24          A      Rob Wiesenthal, Melissa Tomkiel of

25     Blade, John Kelly and Eric Weaver of Shoreline,
```

```
                                        Page 142
 1                    C. Herbst
 2      and me for SAFE and Ryan Pilla.
 3           Q      What was discussed at that
 4      meeting?
 5           A      There were different scenarios
 6      discussed; how Shoreline could provide the lifts
 7      for Blade which would -- you know, Blade
 8      wouldn't have to go out to other seaplane
 9      operators for their lifts for their passengers.
10                  John had a lot of aircrafts and
11      could provide a lot of lifts.  Logistically it
12      would be easier for Blade to use one operator
13      than several different operators.  That was part
14      of the conversation.
15                  Part of the conversation was that
16      SAFE could provide the bookings through the
17      Blade app for her clients which would have
18      streamlined so much for me.  Obviously, the
19      benefit for Blade would be they would have, you
20      know, both SAFE and Shoreline working together.
21      We would all be working as one.  It just seemed
22      like such a logical thing to do instead of
23      competing with each other which is always
24      difficult.
25           Q      Prior to that meeting had you been
```

```
                                          Page 143
 1                    C. Herbst
 2      competing with Shoreline?
 3             A      No.
 4             Q      You first meet Mr. Wiesenthal in
 5      the East Hampton Airport in January or February;
 6      he approaches you?
 7             A      Yes.
 8             Q      And then as far as the discussions
 9      with Blade, the next thing that happened is the
10      April meeting at the Westhampton Airport,
11      correct?
12             A      Yes.
13             Q      Mr. Kelly was present at the April
14      meeting?
15             A      Yes.
16             Q      How did he know about it?  Did you
17      tell him about it?
18             A      I don't know if I told him about
19      it or Ryan told him about it or both.
20             Q      Before that April meeting at
21      Westhampton Airport, as far as you know, any
22      direct communication between Shoreline and
23      Blade?
24             A      I don't know of any.  I'm not
25      aware of any.
```

```
                                           Page 153
 1                    C. Herbst
 2      and I was traveling a lot during that time.
 3              Q      You told him over the phone that
 4      you wanted to meet with he and Blade at the
 5      Westhampton Airport to talk about working
 6      together as a team?
 7              A      Yes.
 8              Q      You didn't provide any more detail
 9      as to what you meant by that?
10              A      No, I don't think detail was
11      necessary.  Again, it was pretty obvious what
12      role we would play.
13              Q      What was Mr. Kelly's response?
14              A      He would.  He would have the
15      meeting.  He would attend.
16              Q      Did he ask you any details about
17      what you had in mind or what Blade had in mind?
18              A      No.
19              Q      As far as you know, when Mr. Kelly
20      walked into the meeting with Blade at the
21      Westhampton Airport, all he knows is there's a
22      possibility of these three entities working
23      together as a team?
24              A      Yes.
25              Q      You are not aware of Mr. Kelly
```

```
                                      Page 154
 1                      C. Herbst
 2      being provided any further details?
 3            A      I'm not aware.
 4            Q      You are not aware of him asking
 5      for any further details?
 6            A      I'm not aware.
 7            Q      You said that meeting was April 6?
 8            A      Yes, the 6th.
 9            Q      What happened at the April 6
10      meeting?
11            A      We all show up.  Blade sort of,
12      you know, spells out what the they are looking
13      to do, how we can all work together; what my
14      role would be, what John's role would be, and
15      what their role would be.
16                   They spoke specifically on what
17      they would pay Shoreline for the lift of the
18      aircraft, and my role would be, you know, using
19      their platform to book my clients.  Their role
20      would be -- I'm sorry, I would get paid by
21      Blade, and Shoreline would get their payments
22      directly from Blade for their lifts.
23            Q      Let's talk about who is there in
24      the April 6 meeting.  You are there?
25            A      Yes.
```

1                    C. Herbst

2          Q       Mr. Pilla is there with you?

3          A       Yes.

4          Q       John Kelly is there?

5          A       Yes.

6          Q       Eric Weaver is there?

7          A       Yes.

8          Q       Rob Wiesenthal?

9          A       Yes.

10         Q       Melissa Tomkiel?

11         A       Yes.

12         Q       Who is Melissa Tomkiel for the

13    record?

14         A       I don't know her -- I think she is

15    the president of Blade now.  I don't know what

16    her specific title was.  If she was legal

17    counsel, I'm not sure what her title was.

18         Q       But as of April of 2018 she worked

19    for Blade?

20         A       Yes.

21         Q       And she was at that meeting on

22    behalf of Blade?

23         A       Yes.

24         Q       Was anyone else there?

25         A       I don't believe anybody else was

```
                                          Page 176
 1                       C. Herbst
 2        Shoreline Aviation in 201?
 3             A       Absolutely not.
 4             Q       During the course of your
 5        arrangement with Shoreline Aviation, did you
 6        take any action to harm them?
 7             A       I did not, Mr. Kriegsman.  I never
 8        booked another seaplane operator in my duration
 9        of working with Shoreline Aviation.  Never once
10        did I do that.  I was super loyal.  I cannot say
11        that in reverse.
12             Q       How about the $65,000 in advance
13        commissions that you were paid --
14             A       $65,000 --
15                         MR. SKIBELL:  Let him ask
16                     the question.
17             Q       For the 2018 season was it fair
18        for you to keep those commissions?
19             A       Absolutely, yes.
20             Q       How many of those passengers did
21        you book on seaplane commuter flights?
22             A       The commission was based on the
23        fact that I sold the tickets, not that I booked
24        them.  Passengers buy coupon books year after
25        year.  I didn't necessarily book them.  They
```

```
                                          Page 177

 1                      C. Herbst
 2      didn't have to book reservations.  It was for
 3      the sale of it.
 4              Q      The folks who bought the coupon
 5      books, how many of them did you book on a
 6      seaplane commuter flight in 2018?
 7              A      I never had the opportunity to
 8      book them.
 9              Q      In your dealings with Blade in
10      2018, did you do anything that was dishonest
11      towards Shoreline?
12              A      No.
13              Q      What happened next after the April
14      6 meeting?
15                          MR. SKIBELL:  We have been
16                          going for about an hour.  Is now a
17                          good time, Alex?
18                          MR. KRIEGSMAN:  Just answer
19                          the pending question.
20              A      After the April 6 meeting I had
21      offers from Shoreline to purchase, I had offers
22      from Blade to purchase.  There were a lot of,
23      you know, scenarios.  I had software program
24      that was really screwing me up with the delay of
25      that.  Those are the things that were happening
```

```
                                              Page 178
 1                         C. Herbst
 2       after the April 6 meeting.
 3                         MR. KRIEGSMAN:  Let's take
 4                    a 15-minute break and we will come
 5                    back.
 6                         (Recess was taken)
 7                         MR. KRIEGSMAN:  Back on the
 8                    record.  Can you read back the
 9                    last question and answer.
10                         (The requested portion of
11                    the record was read by the Court
12                    Reporter.)
13            Q       What was the offer from Shoreline?
14            A       I don't have it in front of me but
15       I believe it was $375,000 over the course of
16       three years with my sales commissions that I got
17       from selling coupons as the down payment.
18            Q       Anything else?
19            A       I think it mentioned maybe
20       purchasing assets or not necessarily the
21       personal items, but my client list would be part
22       of the deal, the files pertaining to that.
23       Employees may or may not come over.  Certain
24       things like that.
25            Q       When was that presented?
```

```
                                        Page 179

 1                    C. Herbst

 2          A       If I had it in front of me,

 3   April 13 maybe.  April 13.

 4          Q       So approximately April 13 of

 5   2018 --

 6          A       Yes.

 7          Q       -- John Kelly presents an offer to

 8   you to purchase your business; is that correct?

 9          A       Correct.

10          Q       How does he communicate that?  Is

11   that through e-mail?

12          A       Via e-mail.

13          Q       What was your response?

14          A       I was considering it, but it

15   really wasn't striking me as a fair offer

16   because my own money was the down payment.

17          Q       John Kelly presents you this offer

18   on about April 13, 2018, and you were then

19   considering it.  Did you tell Mr. Kelly that you

20   were considering it?

21          A       I think there was a date on the

22   bottom of the transmission that if he didn't

23   hear from me by a certain date, he was

24   withdrawing it.  I don't think there was any

25   communication from me to him.
```

```
                                              Page 180
 1                          C. Herbst
 2          Q       Okay, Mr. Kelly wound up making a
 3     second offer.  Do you remember that correctly
 4     that there were two e-mails from Mr. Kelly?
 5                          MR. SKIBELL:  Objection to
 6                   form.
 7          A       I don't remember a second e-mail.
 8          Q       As far as you know, the first time
 9     he presented an offer it had an ultimatum where
10     you had to respond?
11          A       Yes.
12          Q       You never responded to Mr. Kelly's
13     offer?
14          A       I did not respond before the
15     ultimatum passed.
16          Q       Did you ever respond at all?
17          A       I don't believe I did.
18          Q       Just so I get the timeline right,
19     you have been working with Mr. Kelly for over 20
20     years, correct?
21          A       Correct.
22          Q       Blade approaches you about the
23     three of you working together, Shoreline, you,
24     and Blade, correct?
25          A       Correct.
```

```
                                            Page 181

 1                       C. Herbst

 2                       MR. SKIBELL:  Objection.

 3          Q       That's the end of January of 2018?

 4          A       Somewhere in the beginning of the

 5     year, yes.

 6          Q       You are interested in that.  You

 7     testified how you thought that had potential for

 8     all three parties, correct?

 9          A       Yes.

10          Q       You have a meeting with all three

11     parties at the Westhampton Airport on April 6,

12     correct?

13          A       Correct.

14          Q       And then on April 13 John Kelly

15     makes an offer to you to purchase your business?

16          A       Correct.

17          Q       At this point in time you know

18     that John Kelly is not interested in the Blade

19     transaction, correct?

20          A       Correct.

21          Q       Instead he makes an offer to you

22     on approximately April 13?

23          A       Correct.

24          Q       And you never responded?

25          A       Correct.
```

```
                                        Page 182
 1                       C. Herbst
 2          Q       In that context you testified
 3     earlier you felt you dealt fairly with
 4     Mr. Kelly.  Is this fair when someone has been
 5     working with you for 20 years and they make you
 6     an offer to not even respond?
 7          A       I would say it depends on what the
 8     offer was.  That particular offer was not much
 9     of an offer.
10          Q       Was it insulting?
11          A       Yes.
12          Q       Why was it insulting?
13          A       Using my own money for the down
14     payment and then not going to pay for three
15     years out.
16          Q       But you didn't want to tell him
17     that?
18          A       I didn't feel the need to tell him
19     that.
20          Q       After Mr. Kelly made the offer to
21     you, I know you testified you didn't respond,
22     but did anyone else ever respond on your behalf?
23          A       I think there was some
24     transmissions between he and Ryan.  I don't know
25     that Ryan declined the offer or accepted the
```

```
                                              Page 183
 1                      C. Herbst
 2      offer.  That's not his place, but that's it.  I
 3      was visiting colleges with my daughter at the
 4      time so I was really tied up with a lot of
 5      different things going on, that being one of
 6      them.
 7           Q     After Mr. Kelly presents the offer
 8      to you, that was the time you were visiting
 9      colleges with your daughter and Mr. Pilla gets
10      back to Mr. Kelly on your behalf?
11                      MR. SKIBELL:  Objection;
12                 misstates testimony.
13           Q     Is that what happened?
14                      MR. SKIBELL:  Objection.
15           A     I do not know if Mr. Kelly went to
16      Ryan first or if Ryan went to Mr. Kelly.  I want
17      to say Mr. Kelly went to Ryan first.
18           Q     Was that because he hadn't heard a
19      response from you?
20           A     I would assume, yes.
21           Q     Did Mr. Kelly make efforts to
22      reach you by phone as well?
23           A     I don't know.
24           Q     You didn't feel that Mr. Kelly
25      deserved any response from you?
```

```
                                            Page 184
 1                      C. Herbst
 2                         MR. SKIBELL:  Objection;
 3                asked and answered.
 4          A       I don't believe so.
 5          Q       Did there come a time when you
 6      came to learn that Mr. Kelly was sick with
 7      cancer?
 8          A       I did not know that he was sick
 9      until just before he passed away.  I had no
10      idea.
11          Q       When was that?
12          A       April of 2019.
13          Q       Until April of 2019 you did not
14      know Mr. Kelly was sick?
15          A       I had no idea.
16          Q       What do you know about the
17      communications that Mr. Pilla had with Mr. Kelly
18      after he presented the offer to you on about
19      April 13?
20          A       I would say in the nutshell
21      because without looking at the exhibits, without
22      having it in front of me, the communication was
23      basically, you know, what do you want to do
24      about this, or could you come up higher; do you
25      want assets, what have you.  I don't know who
```

                              C. Herbst
1
2    said what without looking.  There was some other
3    conversations about the offer in that regard.
4         Q     Did Mr. Kelly express to Mr. Pilla
5    any frustration that he wasn't able to reach
6    you?
7         A     I think so.  At the time, you
8    know, I mentioned I was traveling to colleges,
9    but I was also sick so I was out for a bit sick.
10   I was out of my office from May 1 to May 7 as
11   well.  It was difficult in April; I was visiting
12   colleges, I was sick in April, and I was out for
13   a week in May.
14        Q     You not getting back to Mr. Kelly
15   after the offer was due in part to the fact that
16   you were traveling, visiting colleges, and sick?
17        A     Yes, there were a lot of things I
18   was thinking about.  I had Blade offers,
19   Shoreline offers, I had program delays.  There
20   was a lot going on at the time.  I was on my
21   schedule, no one else's schedule.
22        Q     Did you have enough time to
23   negotiate with Blade at that point in time?
24        A     There were back and forths with
25   Blade but nothing was solidified until weeks in

```
                                        Page 186
 1                       C. Herbst

 2      May.

 3              Q      What do you mean by back and

 4      forths with Blade?

 5              A      There were different scenarios.

 6      There were different options, offers.  Things

 7      changed rapidly.  You know, there was a point in

 8      time that Blade may not have been able to

 9      operate at the airport.  There were different

10      things going on so the offers, the scenarios to

11      buy changed.

12              Q      And that's all taking place, the

13      back and forths are happening during the month

14      of April of 2018?

15              A      April and May.  End of April,

16      beginning of May.

17              Q      What is going back and forth?  Was

18      it e-mail communications between you and Blade?

19              A      Yes.

20              Q      Were specific offers made to you

21      by Blade?

22              A      Yes.

23              Q      During the month of April?

24              A      I would have to look at the

25      e-mails to remind myself of the dates.
```

Page 187

1                        C. Herbst

2          Q       You ultimately entered into a deal
3     with Blade, correct?

4          A       Yes.

5          Q       When did you enter into that deal?

6          A       That deal was finalized on or
7     about May 14 or 15.

8          Q       What were the terms of that deal?

9          A       The terms I believe it was
10    $175,000 for the client list.  There was a
11    consulting piece of it that was $5,000 a month I
12    believe for four months, maybe five months, and
13    10 percent commissions on my sales.

14         Q       Would you use your computer system
15    or Blade's?

16         A       I would be using Blade's platform
17    for all of my reservations.

18         Q       That would include Blade putting
19    in all of what you described as your customer
20    information into Blade's platform?

21         A       Correct.

22         Q       You testified earlier that you had
23    some very serious concerns about putting your
24    information into a new Shoreline platform.  Did
25    you have similar concerns about putting that