# EXHIBIT 2

Page 1

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF NEW YORK

3    _____

4    SHORELINE AVIATION, INC.,

5          Plaintiff,

6       v.                              Index No.

7    CYNTHIA L. HERBST, SOUND AIRCRAFT    2:20-cv-

8    FLIGHT ENTERPRISES, INC., RYAN A.    02161-JMA-SIL

9    PILLA, BLADE URBAN AIR MOBILITY,

10   INC. A/K/A FLY BLADE, INC.,

11   MELISSA TOMKIEL, AND ROBERT S.

12   WIESENTHAL,

13          Defendants.

14   _____

15          VIDEOCONFERENCE DEPOSITION OF

16              ANDREA COLLINGWOOD

17   DATE:          Tuesday, March 29, 2022

18   TIME:          9:12 a.m.

19   LOCATION:      Remote Proceeding

20                  New York, NY 10001

21   REPORTED BY:   Beth Fontane-Howard Notary Public

22   JOB NO.:       5129185

23

24

25

```
                                            Page 28

 1                    A. COLLINGWOOD

 2        might refer to it as SAS.  If I do so, I'm

 3        going to be referring to Sound Aircraft

 4        Services.  Is that clear?

 5              A    Yes.

 6              Q    Now, are you familiar with Sound

 7        Aircraft Flight Enterprises?

 8              A    Yes.

 9              Q    Now, during today's deposition I

10        may refer to it as SAFE.  It that clear?

11              A    Yes.

12              Q    Now, did SAS perform any

13        services for Shoreline Aviation?

14              A    Yes.

15              Q    And can you tell me when SAS

16        started performing services for Shoreline

17        Aviation?

18              A    Probably around the time that

19        John started the company, which was 1980.

20        I'm not sure when -- when Steve started

21        operating the FBO at East Hampton.

22              Q    And by Steve, you're referring

23        to Steven [ph] Tuma?

24              A    That's correct.

25              Q    Now, what type of services did
```

```
 1                      A. COLLINGWOOD

 2        SAS do for Shoreline Aviation?

 3                  MR. KRIEGSMAN:  Reid, I'm sorry.

 4             That one got a little garbled again.

 5             Do you want to do that one again,

 6             please?

 7             Q    What services did SAS perform

 8        for Shoreline Aviation?

 9             A    They did fueling, they helped

10        unload the passengers, they parked the

11        airplanes.  Basic

12        fixed-base-operation-type things.

13             Q    -- SAS perform any functions

14        with Shoreline related to ticketing

15        services?

16                  THE REPORTER:  What -- what kind

17             of services?  Ticketing, did you say?

18                  MR. SKIBELL:  Ticketing

19             services.

20                  THE WITNESS:  I'm sorry.  Did

21             SAS do any ticketing services?

22        BY MR. SKIBELL:

23             Q    Yes.

24             A    Well, Cindy did.

25             Q    And Cindy is who?  Is --
```

```
                                              Page 30

 1                     A. COLLINGWOOD

 2        A     Cindy -- Cindy Herbst.

 3        Q     And was she an employee?  Was

 4     she an employee of SAS?

 5        A     Yes.

 6        Q     And what did Ms. Herbst do as an

 7     employee of SAS for Shoreline?

 8        A     Well, she -- she did our

 9     reservations, bookings, she checked

10     passengers in, she -- she took their

11     credit card information, she maintained a

12     database for us.  She was our

13     representative for our seaplane flights

14     between East Hampton and New York City.

15        Q     All right.  Now, when did

16     Ms. Herbst on behalf of SAS start

17     performing those services?

18        A     Well, the agreement with

19     Ms. Herbst started in 1994.  And --

20        Q     Ms. Herbst on behalf of SAS

21     started performing services in 1994?

22        A     Well, it was interchangeable.

23     She -- sometimes it was SAFE, Sound

24     Aircraft Flight, Inc. [sic], and sometimes

25     it was SAS.  But it was always
```

```
                                        Page 31

 1                    A. COLLINGWOOD

 2        Cindy Herbst.

 3             Q    And let's start with the SAS.

 4        When did Ms. Herbst on behalf of SAS start

 5        performing services for Shoreline?

 6             A    Well, as SAS or whatever she was

 7        calling herself, it was 1994.

 8             Q    When in 1994?

 9             A    I'm not exactly sure.

10             Q    Can you tell us approximately

11        when in 1994?

12             A    I would assume it was a --

13        probably at the start of the summer

14        season.

15             Q    And when is the start of the

16        summer season?

17             A    I -- around May, roughly May.

18             Q    And you say "assume."  Do you

19        have any specific knowledge that

20        Ms. Herbst on behalf of SAS started

21        performing services in May of 1994?

22             A    My husband told me about it.

23             Q    And what did your husband tell

24        you?

25             A    He told me that Cindy was
```

```
                                          Page 32

 1                      A.  COLLINGWOOD

 2        overwhelmed by the amount of flights and

 3        people coming in and out and processing

 4        them, and that -- that, you know, she felt

 5        it was beyond what she expected to be

 6        doing.  And they sat down and they worked

 7        out an arrangement together.

 8             Q    And when did you have this

 9        discussion with Mr. Kelly?

10             A    Probably later that day.

11             Q    And do you know what day that

12        was?

13             A    No.  We've already established

14        that.

15             Q    And you said she was

16        overwhelmed.  Does that mean that

17        Ms. Herbst was performing services for

18        Shoreline before this conversation?

19             A    Yes.

20             Q    Do you know when she started

21        performing services before this

22        conversation?

23             A    I don't know when she started at

24        Sound, and I don't know when she started

25        helping out with the customers.
```

```
                                        Page 33

 1                    A. COLLINGWOOD
 2         Q    And this conversation you had
 3    with Mr. Kelly; did he say anything else
 4    in the conversation?
 5         A    Not that I recall.
 6         Q    -- have any other conversations
 7    with Mr. Kelly about services that
 8    Ms. Herbst was performing for Shoreline on
 9    behalf of SAS?
10              MR. KRIEGSMAN:  Objection to
11         form.
12         A    John and I had many
13    conversations about Cindy over the years.
14         Q    -- recall any conversations
15    about performing services for Shoreline
16    Aviation?
17         A    Yes.
18         Q    And what do you recall
19    discussing with Mr. Kelly?
20         A    We talked about him setting up
21    the arrangement with her:  the booking
22    arrangement where she would help us with
23    our customers in exchange for commissions.
24         Q    Now, you said that Ms. Herbst
25    also performed services for Shoreline on
```

```
                                              Page 34

 1                    A. COLLINGWOOD
 2        behalf of other companies.  Is that right?
 3             A    They were all her companies.
 4             Q    And what were the other two
 5        companies?
 6             A    There was SAFE and there was
 7        Sound Aircraft Flight, Inc.
 8             Q    All right.  To your knowledge do
 9        you know when Ms. Herbst started
10        performing services for Shoreline on
11        behalf of SAFE?
12             A    I don't -- I don't know.  I
13        don't know when it changed or it was -- it
14        seemed interchangeable.  Whether it was
15        Sound or SAFE or Sound Aircraft Flight,
16        Inc., it -- it was all interchangeable.
17             Q    In your view, it was all
18        interchangeable, the companies that
19        Ms. Herbst was working for?
20             A    They were her companies.
21             Q    Do you know if Ms. Herbst owned
22        SAS?
23             A    I'm sorry?
24             Q    Do you know if Ms. Herbst was an
25        owner of SAS?
```

```
                                           Page 35

 1                     A. COLLINGWOOD

 2          A     We had thought so, but it turns

 3      out she was not.

 4          Q     So Ms. Herbst was not an owner

 5      of SAS, right?

 6          A     We found out, yes, afterwards.

 7      Yes.

 8          Q     When did you find that out,

 9      Ms. Collingwood?

10          A     After she stole our customers

11      and took them to BLADE, we found out from

12      her ex-husband that she was not an owner

13      of Sound Aircraft Services.

14          Q     And was there a conversation

15      with Mr. Tuma that you're referring to?

16          A     Yes.

17          Q     And when did that conversation

18      take place?

19          A     In the summer of 2018.

20          Q     And who was present for this

21      conversation?

22          A     My husband and me and Steve.

23          Q     And what was discussed?

24          A     We told him that we had offered

25      to -- to buy out Cindy's portion of the
```

```
                                          Page 42

 1                    A. COLLINGWOOD

 2          A     I have not --

 3                    THE REPORTER:  You're -- you're

 4          breaking up.  You're freezing and

 5          you're breaking up.  The connection

 6          is not good.  I didn't get that

 7          answer, please.

 8                    MR. SKIBELL:  All right.  Why

 9          don't we go off the record for a

10          minute, and see if we can address any

11          connection issues?

12                    THE REPORTER:  Okay.  We are off

13          the record at 9:51 a.m.

14               (Off the record.)

15                    THE REPORTER:  Okay.  We are

16          back on the record at 9:53 a.m.

17                    MR. SKIBELL:  Beth, could you

18          read back the last question, please?

19                    THE REPORTER:  Okay.  One

20          moment, please.

21               (The reporter played back the

22               record as requested.)

23                    THE REPORTER:  Okay.  Go ahead.

24          Thank you.

25     //
```

```
                                        Page 43

 1                   A. COLLINGWOOD

 2        BY MR. SKIBELL:

 3            Q    So Ms. Collingwood, when we went

 4        off the record, we were discussing certain

 5        customer data.  So my question is have you

 6        ever viewed -- and by you I mean Shoreline

 7        ever viewed the customer data held on

 8        Ms. Herbst's computer system?

 9            A    I can only speak for myself, and

10        I have not.

11            Q    To your knowledge has anyone at

12        Shoreline Aviation reviewed the customer

13        information on Ms. Herbst's computer

14        system?

15            A    I really don't know.

16            Q    And by this I mean Shoreline.

17        Does Shoreline know which database

18        Ms. Herbst stores the information in?

19            A    She created the database, I

20        believe, with a friend of hers.

21            Q    Do you know which database she

22        uses to store this information?

23                 MR. KRIEGSMAN:  Objection to

24            form.

25            A    I really don't know.
```

```
                                              Page 44

 1                         A. COLLINGWOOD

 2          Q     Do you know if the database is

 3    password protected?

 4          A     I would certainly assume so.

 5          Q     Do you know one way or the other

 6    if the database is password protected?

 7          A     I do not know for sure.

 8          Q     Do you know who has access to

 9    the database of customer information held

10    by Ms. Herbst?

11                MR. KRIEGSMAN:  Objection to

12          form.

13          A     I would assume that Cindy Herbst

14    has it.

15          Q     Besides Ms. Herbst, do you know

16    if anyone else has access to that customer

17    database?

18                MR. KRIEGSMAN:  Objection to

19          form.

20          A     At -- at this time, I don't

21    know.

22          Q     Do you know who Ms. Herbst

23    shared the customer information with?

24          A     Perhaps Maureen Quigley.  She

25    may have -- she may have at one time
```

```
                                              Page 45

 1                    A. COLLINGWOOD

 2      shared it with my husband.  We know for

 3      sure she shared it with BLADE.

 4           Q    Do you know if she ever shared

 5      it with Mr. Kelly?

 6           A    I can't answer that.  I don't

 7      know.

 8           Q    So you don't know anyone

 9      specifically that Ms. Herbst shared the

10      customer data information with.  Is that

11      right?

12           A    Other than --

13                MR. KRIEGSMAN:  Well, you --

14           hold on.  Did the reporter get that

15           question?  Because it sounded a

16           little garbled to us.

17                THE REPORTER:  Yes.  Yes.

18                MR. KRIEGSMAN:  Okay.  Do you

19           mind -- I apologize.  Do you mind

20           reading that back?  I just want to

21           make sure we got it right.

22                (The reporter read back the

23                record as requested.)

24                THE WITNESS:  She shared it with

25           BLADE.  She sold it to BLADE.
```

```
                                              Page 46

 1                    A. COLLINGWOOD

 2        BY MR. SKIBELL:

 3             Q    -- exception of BLADE, can you

 4        tell us anyone that Ms. Herbst shared the

 5        customer information with?

 6             A    I really can't answer that.  I

 7        don't know.

 8             Q    Do you know how the customer

 9        information was generated by Ms. Herbst?

10             A    How the customer information was

11        generated?  By that do you mean how did

12        she gather the data?

13             Q    Yes.

14             A    Okay.  So she took phone calls

15        from our advertising and she put them into

16        her database, and she made reservations

17        from people using that database.

18             Q    So your testimony is that

19        Ms. Herbst's database was created only by

20        people that called into your advertising?

21        Is that your testimony?

22                  MR. KRIEGSMAN:  Objection,

23             misstates prior testimony.

24             A    No.  I'm -- I'm sure there were

25        other -- there were other people in her
```

```
                                                Page 47
 1                           A. COLLINGWOOD
 2        database other than Shoreline's customers.
 3              Q    Now, do you know of any persons
 4        that are in Ms. Herbst's database that
 5        responded to one of Shoreline's
 6        advertisements?
 7                    MR. KRIEGSMAN:  Objection to
 8              form.
 9              A    Any one person?  I'm sure there
10        were many.
11              Q    Can you identify any persons
12        that responded to Shoreline advertisements
13        and thus their customer information is in
14        Ms. Herbst's database?
15              A    Not that I know of specifically.
16              Q    Are you aware that Ms. Herbst
17        booked flights for Action Airlines?
18              A    Yes.
19              Q    Are you aware that Ms. Herbst
20        also booked flights for Liberty
21        Helicopters?
22              A    Yes, I was aware of that.
23              Q    And in connection with booking
24        flights for Action Airlines and Liberty
25        Helicopters, Ms. Herbst would've acquired
```

```
                                    Page 48

 1                    A. COLLINGWOOD

 2      customer information related to those two,

 3      correct?

 4           A    That -- virtual connectivity

 5      interruption --

 6                THE REPORTER:  You're not -- I'm

 7           sorry.  Your answer didn't come in.

 8           Your answer did not come in.

 9                THE WITNESS:  Okay.  To the best

10           of my knowledge, she --

11                MR. KRIEGSMAN:  We're answering,

12           and it sounds like you're not hearing

13           us.

14                THE REPORTER:  No, not hearing

15           you.  Please repeat the answer.

16                THE WITNESS:  Okay.  As far as I

17           know, she kept reservations for

18           Liberty Helicopter [sic] and for

19           Action Airlines.

20      BY MR. SKIBELL:

21           Q    And in connection with that, she

22      would've acquired customer information

23      related to flights for Action Airlines and

24      Liberty Helicopters, correct?

25                A    Presumably yes.  That's why we
```

```
                                              Page 49

 1                    A. COLLINGWOOD

 2      offered to buy the reservation system.

 3           Q    Now, are you familiar with a

 4      company called Cape Air?

 5                THE REPORTER:  Could -- what --

 6           could you spell that for me, please?

 7                MR. SKIBELL:  C-A-P-E.

 8                THE REPORTER:  Cape Air, okay.

 9                THE WITNESS:  Yes.

10      BY MR. SKIBELL:

11           Q    And what does Cape Air do?

12           A    Cape Air does scheduled flights

13      between many places around the United

14      States using Cessna 401 aircraft.

15           Q    -- a time when Shoreline began

16      discussing a business transaction with

17      Cape Airlines [sic]?

18           A    Yes.

19           Q    -- those discussion begin?

20           A    I'm really not sure

21      specifically.

22           Q    There come a time when Shoreline

23      signed a nondisclosure agreement with Cape

24      Airlines?

25                A    I believe so.
```

```
                                              Page 50

 1                    A. COLLINGWOOD

 2         Q     Did that take place in November

 3    of 2017?

 4         A     I really don't remember.

 5         Q     Do you know if it was before the

 6    end of the year in 2018?  I mean before

 7    the end of the year -- I'm sorry.  Before

 8    the end of the year in 2017.

 9         A     That may be the case.  I really

10    don't know.

11         Q     Now, did there come a time when

12    Shoreline entered into a letter of intent

13    with Cape Airlines?

14         A     I assume so, yes.

15         Q     And that was in approximately

16    March of 2018?

17         A     It could've been.

18         Q     I'm going to enter in what will

19    be Exhibit 2.

20              THE REPORTER:  May I get the

21         spelling of Quigley, Maureen Quigley?

22              MR. SKIBELL:  Q-U-I-G-L-E-Y.

23              THE REPORTER:  Thank you.

24    BY MR. SKIBELL:

25         Q     Ms. Collingwood, you've been
```

```
                                              Page 51

 1                        A. COLLINGWOOD

 2         handed a document that's been marked

 3         Exhibit 2, and you'll see this is a letter

 4         from Hyannis Air Service.  Do you see that

 5         at top?

 6              A    Yes, there is no date on it.

 7                   MR. KRIEGSMAN:  And Reid, I'm

 8              just going to -- you haven't shared

 9              any exhibits with us, and that's your

10              right.  But if you want to do it this

11              way, I'll just ask that you show her

12              the whole document before you ask her

13              a question about it.

14                   MR. SKIBELL:  I'm happy to send

15              you, Alex, separately some of the

16              exhibits.

17                   MR. KRIEGSMAN:  Okay.

18                   MR. SKIBELL:  But I think

19              this -- I'm just trying to make

20              things go more quickly for everyone,

21              Alex, okay?

22                   MR. KRIEGSMAN:  Yeah, me, too.

23                   MR. SKIBELL:  So I'll move on

24              now --

25                   MR. KRIEGSMAN:  I'd like to do
```

```
                                              Page 67

 1                   A.  COLLINGWOOD

 2              MR.  KRIEGSMAN:  Tell him.

 3        A     Oh, following the three-year

 4     employment, you will be engaged as a

 5     consultant.  Now I see, okay.  So that was

 6     initially the -- the discussion.

 7        Q     Is one of the reasons the

 8     transaction attracted to Shoreline because

 9     it would allow you and your husband to

10     transition out of the company?

11        A     Well --

12              MR.  KRIEGSMAN:  Objection, asked

13           and answered.  Go ahead and answer as

14           best as you can.

15        A     We were -- we were planning to

16     be there for a couple more years.

17        Q     And at the time the transaction

18     was being discussed, had your husband

19     unfortunately been already diagnosed with

20     cancer?

21        A     My husband was diagnosed on

22     March 15, 2018.

23        Q     Well, Ms. Collingwood, I'm going

24     to ask about another part of this

25     transaction.  If you look at one section
```

```
                                              Page 68

 1                    A. COLLINGWOOD

 2        that has little "g", do you see?  And it's

 3        marked due diligence review.  Do you see?

 4             A    Yes.

 5             Q    Ms. Collingwood?

 6             A    Yeah.  Yes.

 7             Q    Do you have an understanding of

 8        what due diligence means in this type of

 9        transaction?

10             A    Yes, I believe I do.

11             Q    All right.  And did Shoreline

12        cooperate with Cape Air in the conduct of

13        due diligence?

14             A    Yes.

15             Q    And you'll see in section little

16        "g" there, there's a reference to

17        Shoreline -- or Cape Air and its desire to

18        "examine the contracts and other legal

19        documents affecting the Company."  Do you

20        see that?

21             A    I see that, yes.

22             Q    Did Shoreline provide to Cape

23        Air, at some point, contracts and other

24        legal documents affecting the company?

25             A    I really don't know.
```

Page 69

1            A. COLLINGWOOD

2        Q    Did Shoreline cooperate with

3    Cape Air in the conduct of due diligence

4    in connection with the transaction?

5        A    Yes.  As far as I know, John --

6    John did that.

7        Q    To Shoreline's knowledge, did it

8    provide any documents between SAFE and

9    Shoreline to Cape Air in connection with

10   due diligence?

11       A    No.  But I do know that it was

12   discussed.

13       Q    Did Shoreline provide any

14   documents between Ms. Herbst and Shoreline

15   to Cape Air?

16       A    Not that I'm aware of.

17       Q    Now, you said a moment ago that

18   "it was discussed."  What did you mean by

19   "it" --

20       A    Well, we discussed with them the

21   East Hampton to New York City portion of

22   the business.  Cape Air was not really

23   interested in that other than as

24   something -- a function of our company.

25   They were -- their whole focus was to do

```
                                            Page 70

 1                    A. COLLINGWOOD

 2      Boston to New York City by seaplane.

 3           Q     And so you generally discussed

 4      with Cape Air the routes you had between

 5      New York City and The Hamptons.  Is that

 6      correct?

 7           A     We did discuss it, yes.

 8           Q     And did you discuss or tell Cape

 9      Air ever that there was a contract between

10      Shoreline and SAFE?

11           A     They were aware of our

12      relationship with Cindy.

13           Q     So they were aware generally

14      that you had a relationship with

15      Ms. Herbst.  Is that correct?

16           A     They were -- they were aware

17      that we had a broker agent in East

18      Hampton, yes.

19           Q     Okay.  Now, am I correct that

20      Cape Air had its own booking and

21      reservations department?

22           A     They do have their own.  We

23      didn't use theirs, though.

24           Q     And so what's being discussed in

25      this transaction is a merger, correct?
```

```
                                        Page 78

 1                      A. COLLINGWOOD

 2          A      Okay.

 3          Q      Ms. Collingwood, are you

 4      familiar with this document?

 5                      MR. KRIEGSMAN:   I'm just going

 6              to ask her to just take a moment to

 7              read it first.  We have it here.

 8          A      Yes, I am familiar with this

 9      document.

10          Q      And was this document sent on or

11      around May 6, 2018?

12          A      Actually, it was sent on May

13      7th.  It was written, I believe, on May

14      6th.  It was sent on Monday, the 7th.

15          Q      And you'll see at the top

16      right-hand corner --

17          A      Yes.

18          Q      It says the words sent 5/6/2018.

19          A      Yeah.

20          Q      Over there do you see that?

21          A      Yes.  It's my handwriting.

22          Q      So you wrote here on or about

23      5/6/2018 sent 5/6/2018?

24          A      Right.  John sent it to me on

25      the 6th and --
```

Page 79

                              A. COLLINGWOOD

1

2          Q     And you wrote the word "sent. "

3     Did you mean that you had sent this --

4     this was to be sent out to customers on

5     May 6th?

6          A     It was sent out to customers the

7     following day.  He sent it to me, and I

8     got it prepared to go out as a Constant

9     Contact file.

10         Q     So Ms. Collingwood, if I

11    understand, you're the one that wrote

12    there sent 5/6/2018.  Is that correct?

13         A     That's my handwriting.

14         Q     So John Kelly did not write sent

15    5/6/2018, right?

16         A     No, he did not.  I -- I wrote

17    that.

18         Q     And you're -- are the person

19    that helped send this out to customers,

20    correct?

21         A     That is correct.

22         Q     So do you know how this was sent

23    to customers?

24         A     It was sent through Constant

25    Contact.

```
                                      Page 80

 1                   A. COLLINGWOOD

 2        Q    Can you tell us what Constant

 3   Contact is?

 4        A    Well, you -- you send letters to

 5   your customers using a database, and it

 6   goes out to all of them.  And if there are

 7   responses, it sends it back to you.

 8        Q    And so just did this go through

 9   email to customers?

10        A    Yes, it did.

11        Q    And it was sent through a

12   database held at Constant Contact.  Is

13   that correct?

14        A    I'm sorry.  Could you ask that

15   again?

16        Q    Sure.  It was sent to a list of

17   persons that were in a database hosted by

18   Constant Contact?

19        A    That's correct.

20        Q    And how long had Shoreline been

21   using Constant Contact for before this was

22   sent?

23        A    I really don't remember.

24        Q    -- know if it had been using it

25   in 2017?
```

```
                                    Page 81

 1                  A. COLLINGWOOD
 2          A     I -- I don't remember,
 3     Mr. Skibell.  I don't know.
 4          Q     Do you know how long Shoreline
 5     used Constant Contact for?
 6          A     A couple of years.
 7          Q     And so does Shoreline still have
 8     access to the Constant Contact database?
 9          A     No, we do not.
10          Q     And why not?
11          A     Because the company is no longer
12     operating.
13          Q     And when did Shoreline stop
14     using Constant Contact?
15          A     I'm not -- I'm not really sure.
16          Q     And do you know what happened to
17     the information that was held in Constant
18     Contact?
19          A     No, I don't know.
20          Q     Did Shoreline ever print it out?
21          A     Did Shoreline ever print out,
22     what, the files from Constant Contact?  Is
23     that what you're asking?
24          Q     Yes.
25          A     I don't know.
```

```
                                              Page 82

 1                     A. COLLINGWOOD

 2          Q    What did Shoreline use Constant

 3    Contact for?

 4          A    To get in touch with our

 5    customer base.

 6          Q    And how was information

 7    collected to be input into Constant

 8    Contact?

 9               MR. KRIEGSMAN:  Objection to

10          form.

11          A    We had a list of customers that

12    we used.

13          Q    So you had a list of customers

14    that was outside of Constant Contact that

15    someone added into Constant Contact?

16          A    That's correct.  I believe

17    that's how it worked.

18          Q    And when did Shoreline load this

19    list of customers into Constant Contact?

20          A    I really don't remember.

21          Q    Were you in charge of marketing

22    at the time that this information was

23    added into Constant Contact?

24          A    Yes, I was.

25          Q    So would it been during the
```

```
                                            Page 83

 1                    A. COLLINGWOOD

 2      period of time when you were officially

 3      working for Shoreline Aviation?

 4           A     That's correct.

 5           Q     So it would've been after 2016

 6      this information was added into Constant

 7      Contact?

 8           A     Yes.

 9           Q     But you don't know when it was

10      added into Constant Contact?

11           A     I don't remember.

12           Q     And you don't know what happened

13      to the information that was in Constant

14      Contact?

15           A     Well, we no longer have an

16      account with them.

17           Q     Do you know when Shoreline

18      stopped using Constant Contact?

19           A     I don't know.  Sometime in 2019

20      I would imagine.

21           Q     And is that just because you

22      didn't want to pay for Constant Contact

23      anymore?

24                 MR. KRIEGSMAN:  Objection to

25           form.
```

Page 84

                              A. COLLINGWOOD

1

2          Q     Well, I'll rephrase the

3     question.  Why did Shoreline stop using

4     Constant Contact?

5          A     Well, we were not going to be

6     functioning after a certain period so

7     there was no need to continue the account.

8          Q     Shoreline was still functioning

9     in 2019, correct?

10         A     Yes.  Yes, we --

11         Q     And --

12         A     In partnership with Cape Air.

13         Q     In partnership with Cape Air.

14    And Shoreline stopped using Constant

15    Contact at some point in 2019?

16         A     I believe so, yes.

17         Q     So do you know why Shoreline

18    stopped using Constant Contact?

19              MR. KRIEGSMAN:  Object, asked

20         and answered.

21         A     There was no longer any -- any

22    reason to use it.

23         Q     And why was there no longer any

24    reason to use it?

25         A     Well, the company closed on

```
                                     Page 85

 1                   A. COLLINGWOOD

 2      April 1st of 2020.

 3           Q    And Shoreline stopped using

 4      Constant Contact in 2019, right?

 5           A    Possibly in the fall of 2019.

 6           Q    And do you have any

 7      understanding as to why Shoreline stopped

 8      using Constant Contact?

 9               MR. KRIEGSMAN:  Objection, asked

10           and answered.

11           A    There was no reason for it.

12           Q    Do you know how much Constant

13      Contact cost on a monthly basis?

14           A    I don't remember.  I believe we

15      paid it on an annual basis.

16           Q    Do you know how much Constant

17      Contact cost on an annual basis?

18           A    I don't know.

19           Q    Is it more than $100?

20           A    I would imagine.

21           Q    Do you have any understanding as

22      to how much it is?

23           A    I don't remember, Mr. Skibell.

24           Q    Now, do you know how many times

25      Shoreline sent out customer communications
```

```
                                              Page 86

 1                        A. COLLINGWOOD

 2        using Constant Contact?

 3            A     Probably under ten.

 4            Q     Now, you testified a few minutes

 5        ago that at some point information was

 6        uploaded to Constant Contact.  Do you

 7        recall that, Ms. Collingwood?

 8            A     Yes.

 9            Q     Now, can you tell us what

10        information was uploaded to Constant

11        Contact?

12            A     Our customer list.

13            Q     And -- format was that customer

14        list in?

15            A     I really don't know.

16            Q     Do you know how many names were

17        on the customer list that uploaded to

18        Constant Contact?

19            A     Possibly over a thousand.

20            Q     Do you know specifically how

21        many names were on the list that was

22        uploaded to Constant Contact?

23            A     No.  No, sir.  It was a few

24        years ago.  I don't -- I don't remember.

25            Q     Do you know if there were
```

```
                                           Page 87
 1                    A. COLLINGWOOD
 2       addresses that were uploaded to Constant
 3       Contact?
 4           A    I believe they were email
 5       addresses.
 6           Q    Okay.  Now, the list that was
 7       uploaded to Constant Contact, was that a
 8       specific database?
 9           A    It was our own database.
10           Q    And did that database have a
11       name?
12           A    Shoreline customers, I would
13       imagine.
14           Q    And was there a particular
15       program that Shoreline saved that
16       information in?
17           A    I'm going to make an assumption
18       that it was Excel.
19           Q    Do you know one way or the other
20       what database was used to keep the list of
21       Shoreline customers?
22           A    No, I don't know.
23           Q    And you were marketing director
24       at the time this list was uploaded,
25       correct?
```

```
                                              Page 88

 1                         A. COLLINGWOOD

 2            A     Yes.  Although I don't believe I

 3       did it.

 4            Q     Do you know who did do it?

 5            A     One of our staff who was a

 6       little more tech savvy that I am.

 7            Q     And this Excel file that you

 8       believe was uploaded, have you seen that

 9       file?

10            A     Have I seen it?  Yes.

11            Q     Yes.

12            A     Yes.

13            Q     And was it produced in this

14       case, Ms. Collingwood?

15            A     Yes, it was.

16            Q     Do you know how the information

17       was collected that was saved to this Excel

18       file?

19            A     Some of it was collected over

20       the years.

21            Q     Do you know how it was

22       collected?

23            A     Some of it was collected through

24       the -- through the checks that we received

25       from commuter customers, and some of it
```

```
                                        Page 89
 1                      A. COLLINGWOOD
 2      probably came from the Friends of East
 3      Hampton Airport [sic].
 4           Q     What is the Friends of East
 5      Hampton Airport?
 6           A     It's an organization of people
 7      who wanted to see the airport maintained
 8      as it is.
 9           Q     And is the names of the person
10      that are part of Friends of East Hampton
11      Airport, is that publicly available
12      information?
13           A     I would imagine it is.
14           Q     Was there a person at Shoreline
15      that was in charge of collecting or
16      managing this customer information?
17           A     At one time.  She left.
18           Q     And who was that person?
19           A     Her named was Martha.
20           Q     Do you know Martha's last name?
21           A     Fernald [ph].
22                 THE REPORTER:  Could you spell
23           that, please?
24      BY MR. SKIBELL:
25           Q     And can you spell it?
```

```
                                               Page 90

  1                         A. COLLINGWOOD

  2          A     Yes.  F-E-R-N-A-L-D.

  3          Q     And how long did Martha Fernald

  4     work at Shoreline?

  5          A     Probably under two years, and

  6     then she moved.

  7          Q     And what years did she work at

  8     Shoreline?

  9          A     I think 2016/2017 maybe.  I'm --

 10     I'm really not positive.

 11          Q     Absent Ms. Fernwall [sic] over

 12     this two-year of time, was anyone at

 13     Shoreline in charge of collecting or

 14     managing customer information?

 15          A     Yes, our dispatch department.

 16          Q     Shoreline had a dispatch

 17     department?

 18          A     I'm sorry?

 19          Q     Shoreline had a dispatch

 20     department?

 21          A     Yes, we did.

 22          Q     And who was part of the dispatch

 23     department?

 24          A     Joan Gitlin was the manager of

 25     the department.
```

```
                                              Page 91

 1                    A. COLLINGWOOD

 2              THE REPORTER:  Could you spell

 3         Gittin or Gitlin, please?

 4              THE WITNESS:  Sure.  It's

 5         G-I-T-L-I-N.

 6    BY MR. SKIBELL:

 7         Q    And who else was part of the

 8    dispatch department?

 9         A    Well, at one time it was only

10    Joan.  And then after Cindy betrayed us,

11    we had to hire more people.  We hired

12    three people in May of 2018 to take over

13    the East Hampton/New York City customers.

14         Q    So what responsibilities, if

15    any, did Ms. Gitlin have for managing or

16    collecting customer information?

17         A    She arranged charter flights and

18    management client flights.

19         Q    Can you tell us what management

20    clients are?

21         A    Management clients were our

22    customers who owned their own airplanes

23    and we took care of their airplanes and

24    provided their flight services.  We also

25    used those airplanes to offset the cost of
```

```
                                        Page 92

1                     A. COLLINGWOOD

2       ownership for them.  We used them as in

3       commuter flights and in charter flights.

4            Q    Now, to your knowledge, did

5       Ms. Gitlin have any specific duties or --

6       related to the Excel spreadsheet you

7       testified about a moment ago?

8            A    I don't know.  She probably had

9       her own database.

10           Q    Her own database of management

11      clients and charter clients?

12           A    Right, that's correct.

13           Q    And was that information

14      uploaded to Constant Contact?  Do you

15      know?

16           A    I really don't know.  We

17      wouldn't have sent the same kind of

18      mailing to the management clients that we

19      would have sent to commuter customers.

20           Q    Do you specifically know if

21      Ms. Gitlin had a list of management

22      clients and charter clients?

23           A    Well, I know she had a list.  I

24      don't know what form it was in.

25           Q    Do you know what information was
```

Page 93

1              A. COLLINGWOOD

2      held on the list?

3           A    It would've been phone numbers,

4      personal assistant information, addresses.

5           Q    Excel spreadsheet that we were

6      talking about that was uploaded to

7      Constant Contact, after it was uploaded to

8      Constant Contact, do you know what

9      happened to that Excel spreadsheet?

10          A    It was probably maintained in

11     the accounting department.  It was

12     password protected so it wasn't common

13     knowledge.  I think it --

14          Q    Do you know what happened -- oh,

15     I'm sorry I interrupted you.  I apologize,

16     Ms. Collingwood.

17          A    I was just going to say that

18     probably my husband and I had access to it

19     as well as our accounting person.

20          Q    All right.  Do you know if it

21     was ever used for anything again after the

22     information was uploaded to Constant

23     Contact?

24          A    We might have done a mailing, a

25     direct mailing.  I'm not sure.

```
                                            Page 94

 1                    A. COLLINGWOOD
 2          Q    Do you know if you did a direct
 3     mailing before the list was uploaded to
 4     Constant Contact?
 5          A    I don't recall.
 6          Q    Were mailings normally done by
 7     Ms. Herbst?
 8          A    Yes, they were for commuter
 9     customers.  For our commuter customers,
10     they were done by Ms. Herbst.
11          Q    Do you have any recollection of
12     Shoreline ever sending a mailer to its
13     commuter clients?
14          A    I think once Shoreline did, and
15     it was because Maureen Quigley asked us
16     to.  It had to do with a price increase,
17     and they wanted the letter to come
18     directly from John.
19          Q    Do you recall when that was?
20          A    I'm sorry.  Not off the top of
21     my head.
22          Q    All right.  So you said the
23     information was password protected.  Is
24     that right?
25          A    That's correct.
```

```
                                        Page 95
 1                  A. COLLINGWOOD
 2         Q     And you had access.  You had the
 3    password.  Is that correct?
 4         A     Yes, I did.
 5         Q     And was the password ever
 6    changed?
 7         A     I don't know.  I don't think so.
 8         Q     And did you use that information
 9    for any purpose, that Excel spreadsheet?
10               MR. KRIEGSMAN:  Objection to
11          form.
12         A     Other than to get in touch with
13    customers, no, I -- I really don't know.
14    I don't think so.
15         Q     So if a customer had a problem
16    you would access the Excel spreadsheet so
17    you could contact them or their assistant.
18    Is that what you used it for?
19         A     Well, most of that kind of
20    communication was done over the phone or
21    by email.
22         Q     Well, I'm trying to understand
23    in what circumstances you would access the
24    Excel spreadsheet of customer information.
25    Can you tell us?
```

```
                                            Page 96

   1                        A. COLLINGWOOD

   2           A     Well, an example would be the

   3     constant -- Constant Contact mailing.

   4     Other than that, it was just -- you know,

   5     just to have it.  And so --

   6           Q     So no one used the information?

   7           A     I'm sorry?

   8           Q     No one at Shoreline used the

   9     information for any purpose?

  10           A     Other than the mailings, the

  11     Constant Contact mailings, I -- I really

  12     can't recall.

  13           Q     And before this exhibit that

  14     we're looking at, were there any Constant

  15     Contact communications that went out by

  16     Shoreline?

  17           A     I don't -- I don't recall.  You

  18     asked me this before.

  19           Q     Do you know when you signed up

  20     for Constant Contact?

  21           A     I really don't know.

  22           Q     Now, if you look at this

  23     communication, you see the first sentence

  24     it says that "Beginning May 1st 2018, our

  25     seaplane commuter and charter customers
```

```
                                          Page 97

 1                   A. COLLINGWOOD

 2      will be able to book directly with

 3      Shoreline Aviation, using our website,

 4      email, or toll free 800 number."  Do you

 5      see that Ms. Herbst?  I mean, excuse me,

 6      I'm sorry, Ms. Collingwood.

 7           Q    I see that.  But the letter went

 8      out on May 7th.

 9           Q    So my question is before this

10      letter went out, customers could not book

11      directly with Shoreline Aviation?

12           A    No, we had a -- a broker who was

13      doing that.  That was Cindy's position

14      with us.

15           Q    And did there come a time when

16      Shoreline began a project to develop its

17      own platform for booking?

18           A    We -- we used a program, it was

19      called TakeFlight.  And we had started

20      talking to them early in 2018.

21           Q    And what did you discuss with

22      TakeFlight?

23           A    The program had many functions.

24      It could do scheduling, it could track

25      maintenance, it could -- it could
```

```
                                              Page 98

 1                    A. COLLINGWOOD
 2        provide -- you could put in information
 3        about pilot logs, it did a lot of things.
 4        It also had a platform for customers.
 5        John had discussed with Cindy creating a
 6        portal so that she could access it and put
 7        in the information so that we would get
 8        manifests in a timely fashion.
 9             Q    And did there come a time when
10        Shoreline entered into a contract with
11        TakeFlight?
12             A    I'm really not sure.  I assume
13        there was a contract.  There was probably
14        some sort of monthly fee or something for
15        its usage, and I believe that we paid
16        something to have it uploaded initially.
17        It was a platform that was used in other
18        seaplane companies, which is why we chose
19        to use it.
20             Q    And with respect to the booking
21        functionality through TakeFlight, did
22        Shoreline start working on a project to
23        implement that?
24             A    For -- for booking reservations?
25             Q    Yes.
```

```
                                      Page 99

  1                     A. COLLINGWOOD

  2          A    Is that what you're asking?

  3     Yes.  The plan was to have -- have that so

  4     that Cindy could use that and upload all

  5     her information into the system, and then

  6     we would know how many people had booked

  7     flights, and we could plan accordingly

  8     with the aircraft and our staff.

  9          Q    And that would also give you

 10     access to the customer information,

 11     correct?

 12          A    I would imagine yes.

 13          Q    Previously when Ms. Herbst was

 14     booking directly, she would be the only

 15     one with access to the customer

 16     information, correct?

 17          A    She -- yes.  She took all of the

 18     data from the customers, but they were our

 19     customers.

 20          Q    I'm going to enter in another

 21     exhibit right now.

 22          A    Is this Number 4?  Five?

 23          Q    Exhibit Number 4, that is

 24     correct.

 25     //
```

```
                                                    Page 100

 1                    A. COLLINGWOOD

 2                    (Exhibit 4 was marked for

 3                    identification.)

 4                    MR. KRIEGSMAN:  So sorry, Reid.

 5              This is exhibit 4 and it's labeled as

 6              5 in what you sent us?

 7                    MR. SKIBELL:  Yes.

 8                    MR. KRIEGSMAN:  Thank you.

 9         BY MR. SKIBELL:

10              Q     So this is an email,

11         Ms. Collingwood, and you'll see it bears

12         the Bates number SAI007421, SAI007422.

13         And if you look at the first email, you'll

14         see it's an email from John Kelly to

15         Cindy Herbst.  Do you see that?

16              A     Yes.

17              Q     And Mr. Kelly is informing

18         Ms. Herbst about the purchase of the

19         program that we were just discussing,

20         correct?

21              A     Yes.

22              Q     And you'll see Ms. Herbst

23         responds to this email.

24              A     Right.  Right.

25              Q     And she indicates that she is in
```

```
                                        Page 101
                           A. COLLINGWOOD
 1
 2     the process of developing a new customer
 3     reservation program as well.  Do you see
 4     that?
 5            A     Yes.
 6            Q     -- this email exchange,
 7     Shoreline continue to develop booking
 8     platform through TakeFlight?
 9            A     That was not our major reason
10     for -- for doing that program, but yes.
11     And one of the reasons that John was doing
12     it was to help Cindy out.
13            Q     And Ms. Herbst is informing you
14     here she wants to use her own program,
15     correct?
16            A     That's what she stated here,
17     yes.
18            Q     So but Shoreline continued to
19     develop its own booking system after
20     receiving this email from Ms. Herbst,
21     correct?
22            A     We didn't really get it up and
23     running or functional until after Cindy
24     had sold our customer list to BLADE.  It
25     was not the --
```

```
                                              Page 102
 1                    A. COLLINGWOOD
 2          Q     But you can --
 3          A     It was not the major focus for
 4     us.  Our -- you know, the TakeFlight
 5     program was not -- this was not the major
 6     function for which we bought this program.
 7          Q     But after February 1, 2018,
 8     Shoreline continued to develop the
 9     TakeFlight program to allow it to book
10     customers directly, right?
11          A     We were not working on that
12     segment of the program at that time.
13          Q     You were not working on the
14     segment of the program at all after
15     February 1, 2018?
16          A     On the booking segment.
17          Q     Well, when did you start working
18     on the booking segment of the TakeFlight
19     program?
20          A     When it became imperative when
21     our customer list was sold to BLADE.
22          Q     And when did that take place,
23     Ms. Collingwood?
24          A     May -- May 1st.  I'm --
25          Q     The 1st is when you believe a
```

Page 103

```
 1                    A. COLLINGWOOD
 2      customer list was sold to BLADE?
 3           A     I'm not really sure.
 4           Q     Oh, you testified about a
 5      customer list that was sold to BLADE,
 6      right, Ms. Collingwood?
 7           A     I'm sorry.
 8           Q     I'm at --
 9           A     Say that --
10           Q     All right.  Ms. Collingwood, I'm
11      going to ask you some questions about the
12      customer list that you just testified was
13      sold to BLADE, okay?
14           A     Yes.
15           Q     Now, you don't know specifically
16      when this customer list was sold.  Is that
17      right?
18           A     It's in the documents.
19           Q     Do you know?
20           A     Well, it was before we started
21      the booking program.  I don't know.  It's
22      in the documents.  She was -- she was
23      working with BLADE for quite some time.
24           Q     Like you were working with Cape
25      Air, right, Ms. Collingwood?
```

```
                                                Page 104

 1                  A. COLLINGWOOD
 2                  MR. KRIEGSMAN:  Objection.
 3           Q     -- Cape Air since March, right?
 4                  MR. KRIEGSMAN:  Objection,
 5           misstates prior testimony.
 6           Q     Ms. Collingwood, when you say
 7      that this customer list was sold, what
 8      list are you referring to?
 9           A     I'm referring to the Shoreline
10      commuter list that Cindy sold to BLADE.
11           Q     Are you referring to information
12      that was on Ms. Herbst's own computer
13      system?  Is that right?
14           A     Yes.  Yes, that is correct.
15      She --
16           Q     And --
17           A     Was our agent.
18           Q     And it's your testimony that
19      Shoreline owned all the customer data on
20      Ms. Herbst's computer system?  Is that
21      your testimony?
22           A     That is correct.
23           Q     And can you tell us why
24      Shoreline owned all the customer data on
25      Ms. Herbst's --
```

Page 105

1                    A. COLLINGWOOD

2          A     Well, we owned only the commuter

3     information on Ms. Herbst's computer, and

4     that was the arrangement, the exclusive

5     booking arrangement, that she had with my

6     husband over 24 years.

7          Q     So I want to understand,

8     Ms. Collingwood.  So when you say the

9     commuter data, what data are you referring

10    to?

11         A     All of the customer information.

12         Q     So any customer information that

13    Ms. Herbst had on her own computer system

14    you believe belonged to Shoreline?

15         A     That is correct.

16         Q     And can you tell us what gave

17    Shoreline the rights to all of the

18    customer data?

19         A     She was our agent.  That was the

20    arrangement.  She was our agent.

21         Q     So when you say "agent," you

22    mean she booked flights.  Is that right?

23         A     That's correct.  She couldn't do

24    the flights.  We did the flights.  She

25    worked for us.  We did not work for her.

A. COLLINGWOOD

1

2      Q    Do you have a contract with her?

3      A    We had an oral contract with

4  her --

5      Q    Did you have a --

6      A    Dated back -- 1994.

7      Q    Is that the what -- and how do

8  you know that, Ms. Collingwood?

9      A    Because my husband and I

10  discussed it.

11      Q    Is that the conversation you

12  referred to earlier where --

13      A    That --

14      Q    Your husband told you that

15  Ms. Herbst was overwhelmed?

16      A    I'm --

17      Q    Is that what you're referring

18  to?

19      A    Yeah -- yes.  Yes, that's

20  correct.

21      Q    Absent that conversation, do you

22  have any information suggesting there was

23  a contract between Ms. Herbst and

24  Shoreline?

25      A    Well, I watched it -- the -- I

```
 1                    A. COLLINGWOOD
 2        watched them perform the -- you know,
 3        the -- for 20 years.  You know, we have
 4        twenty -- over 20 years' worth of
 5        documentation.
 6             Q    -- she booked flights.  Is that
 7        correct?
 8             A    I'm sorry.  You -- I -- I missed
 9        the --
10             Q    You watched Ms. Herbst and her
11        companies book flights for Shoreline,
12        correct?
13             A    Yes.
14             Q    And did your husband tell you in
15        that conversation that you're referring to
16        that Ms. Herbst had agreed that Shoreline
17        owned all the customer data?
18             A    That was the arrangement.  She
19        worked for us.  She performed that service
20        for us.
21             Q    -- Ms. Herbst agree with you
22        husband in the conversation you're
23        referring to that Shoreline owned all of
24        the customer data?
25             A    To the best of my knowledge,
```

Page 108

```
 1              A. COLLINGWOOD
 2      yes.
 3           Q    You -- told you that Ms. Herbst
 4      and him discussed the customer contact
 5      data?  Is that your testimony?
 6           A    That's -- yes, that's what I
 7      believe.
 8           Q    I'm not asking your belief.  I'm
 9      asking what he told you.  So
10      Ms. Collingwood, please tell us what
11      Mr. Kelly told you in 1994 about any
12      agreement with Ms. Herbst about the
13      customer contact data.
14                MR. KRIEGSMAN:  Reid, I know
15           you're excited.  You don't need to
16           raise your voice, though, okay?
17           A    I'm -- I'm sorry.
18           Q    All right.
19           A    What we talked about was the
20      arrangement that he had come to with
21      Cindy, and she was going to represent
22      Shoreline at East Hampton for us.  The
23      customers were Shoreline customers.  They
24      were Shoreline customers before Cindy
25      started her business.  Cindy could not
```

Page 109

```
 1                  A. COLLINGWOOD
 2      perform those flights; we did that.
 3           Q     Could you perform the booking
 4      without Ms. Herbst?
 5           A     Could we have done it without
 6      her?  Yes.
 7           Q     Could she have booked on other
 8      flights without you?  Correct?
 9           A     At the time there were no other
10      seaplane operators.
11           Q     Ms. Collingwood, in the
12      conversation that you had with John Kelly
13      in 1994, did he mention anything about
14      treatment of customer data?
15           A     I'm not sure that we had a
16      discussion about that specifically.
17      I'm -- I can't recall.  It was a long time
18      ago.
19           Q     Now, I want to go back to the
20      document we were looking at a moment ago,
21      Ms. Herbst -- I mean Ms. Collingwood.
22                 MR. KRIEGSMAN:  You're going
23           back to that email, Reid?
24                 MR. SKIBELL:  Yes.
25                 MR. KRIEGSMAN:  Okay.
```

```
                                              Page 110

 1                        A. COLLINGWOOD

 2        BY MR. SKIBELL:

 3              Q    So Ms. Collingwood, you'll see

 4        in the second paragraph there's a

 5        discussion of checking in  --

 6                    MR. KRIEGSMAN:  Sorry, Reid.  So

 7              it's not the email?  It's the

 8              document before that?

 9                    MR. SKIBELL:  It's the one on

10              the screen, Alex.  If you'll look on

11              the screen, you'll see the document.

12                    MR. KRIEGSMAN:  Right.  All

13              right.  I just asked you if it was

14              the email, and you said yes, and so

15              that's why I pulled it up.  I'm

16              trying to help you out, buddy.  All

17              right.  Here we go.

18                    MR. SKIBELL:  I'm good, Alex.

19              Worry about Alex.  It's a lot to

20              worry about.

21                    MR. KRIEGSMAN:  I was worrying

22              about you not being able to open the

23              document, my friend.  So that's --

24                    MR. SKIBELL:  Oh, well, thanks.

25              All right.
```

Page 111

1                          A. COLLINGWOOD

2           BY MR. SKIBELL:

3                Q    So Ms. Collingwood, if you'll

4           look at the exhibit on the screen, this is

5           the customer contact that you testified

6           went out on May 7, 2018.

7                A    Yes.

8                Q    And if you look at the second

9           sentence, it indicates that check-in will

10          be at the Sound Aircraft Services booth.

11          Do you see that?

12               A    Yes.

13               Q    And where were check-ins before?

14               A    With SAFE.

15               Q    And when did you first begin

16          discussing with Sound Aircraft Services

17          that they would be checking in customers?

18               A    Sound did not book in our

19          customers.  We had -- we had to send

20          employees over to East Hampton to do it

21          because Cindy was no longer working for

22          us.

23               Q    When you said "booking" did you

24          mean checking in?  Virtual connectivity

25          interruption.  This email is communicating

```
                                   Page 112

 1                    A. COLLINGWOOD

 2       to customers that check-in will now be

 3       done at the Sound Aircraft Services booth,

 4       right?

 5                   MR. KRIEGSMAN:  Reid, I think

 6              you got garbled on that.  And I don't

 7              think that was on our end, because I

 8              think the court reporter was

 9              struggling to hear that, too.

10              Q    This customer communication

11       indicates that check-in will now be, going

12       forward, will be done at the Sound

13       Aircraft Services booth, correct?

14              A    It doesn't saying "going

15       forward."  Check-in will be shore -- Sound

16       Aircraft Services booth, okay.  Yes,

17       that's what it says.

18              Q    So and before this, SAFE was

19       checking in customers.  Is that right?

20              A    Well, yes.  But Sound and SAFE

21       had separated the year before.  But we had

22       checked in with Cindy and since she was

23       then working for BLADE, we needed to go

24       somewhere.

25              Q    You say Cindy was working with
```

```
                                           Page 113
 1                  A.  COLLINGWOOD
 2       BLADE --
 3            A    Yes.
 4                 MR. KRIEGSMAN:  I lost you
 5            again, Reid.  I'm reading your lips.
 6            I think you said how do you know
 7            that, but we couldn't hear it.
 8                 MR. SKIBELL:  Court Reporter, am
 9            I coming through?
10                 THE REPORTER:  Now -- now you're
11            not coming through.
12                 MR. SKIBELL:  All right.  Well,
13            then, you know what?  Why don't we
14            take a two-minute break and I will
15            log out and log back in and see if
16            that addresses any situations?
17                 THE REPORTER:  Thank you.
18                 MR. KRIEGSMAN:  Great.
19                 THE REPORTER:  We are off the
20            record at 11:33.
21                 (Off the record.)
22                 THE REPORTER:  We are back on
23            the record at 11:35 a.m.
24       BY MR. SKIBELL:
25            Q    Let's go back to the document
```

```
                                          Page 121

 1                      A. COLLINGWOOD

 2        not able to book their flights.

 3             Q    Now, by sending this

 4        communication were you basically

 5        communicating to customers that Shoreline

 6        was no longer working with SAFE?

 7             A    No.  No, we --

 8             Q    But you're telling customers --

 9             A    John --

10             Q    That it -- I'm sorry,

11        Ms. Collingwood --

12             A    I'm sorry?

13             Q    Go ahead, Ms. Collingwood.  I'm

14        sorry.

15             A    I -- you know, John held out

16        hope until the very end that -- that he

17        was going to be able to work it out with

18        Cindy.  We were trying to make her life a

19        little bit easier.  That was part of the

20        reason for the portal.  Cindy --

21             Q    Was your --

22             A    Had complained that she was

23        working too hard, and she clearly wanted

24        to, you know, have an easier life.  And

25        John had worked with her for 24 years,
```

Page 122

1               A. COLLINGWOOD
2       they had a great working relationship, and
3       I -- I think that he just expected her to
4       come around, you know, that she would
5       continue to work for us as our agent.  She
6       had always done that, they'd always gotten
7       along well, so you know.  Our customers
8       were calling and asking why they couldn't
9       book their flights.
10          Q    And did you discuss this
11      customer communication with Ms. Herbst
12      before it was sent?
13          A    We tried.  We tried to
14      communicate with her.
15          Q    Did you discuss this specific
16      communication with Ms. Herbst before it
17      was sent?
18          A    Oh, this one.  This one that you
19      have on the screen?
20          Q    Yes.
21          A    No, we did not.  It was clear at
22      that point that Cindy was done with us.
23          Q    And this was communicating to
24      customers that Shoreline was done with
25      SAFE, correct?

Page 123

1                    A. COLLINGWOOD

2          A    We didn't really have a choice

3      at the time.

4          Q    And this communication was

5      communicating to customers that Shoreline

6      was done with SAFE, right?

7               MR. KRIEGSMAN:  Objection to

8          form.

9          A    It doesn't actually say that.  I

10     think that John, when he wrote this

11     letter, went out of his way not to say

12     anything bad about Cindy.  And do you

13     see --

14         Q    -- indicates that check-ins will

15     not be at Sound Aircraft Services, right?

16         A    That's --

17              MR. KRIEGSMAN:  Reid, we had

18          that thing again, correct me if I'm

19          wrong, Madam Court Reporter, where

20          we're missing a little bit of the

21          start of the question.

22              THE REPORTER:  Thank you.

23              Just repeat it, please.

24     BY MR. SKIBELL:

25         Q    This communication indicated

Page 124

1                    A. COLLINGWOOD

2      that check-ins will now be at Sound

3      Aircraft Services booth, correct?

4           A     That is correct.

5           Q     And customers will now book

6      directly on Shoreline Aviation, correct?

7           A     Yes.  That's what it said --

8           Q     And so this communication was

9      informing customers that Shoreline was no

10     longer working with SAFE, right?

11          A     I think he avoided saying that.

12     But that's -- you know, I think he avoided

13     saying that.

14          Q     But customers would've

15     understood that's what he was saying in

16     this communication, right?

17          A     I'm not quite sure what his

18     intent was.

19          Q     But they would've known to come

20     directly to Shoreline going forward,

21     right?

22          A     Right.  Because clearly they

23     could not go to Sound.

24          Q     And that's why you sent it, to

25     make sure they came directly to Shoreline,

Page 148

1                    A. COLLINGWOOD

2        documentation that the arrangement was in

3        place.

4            Q    And your testimony, if I

5        understand, was that this was an

6        arrangement between Ms. Herbst and

7        Shoreline, right?

8            A    That is correct.

9            Q    Now, does Shoreline claim in

10       this case that it was an exclusive

11       arrangement?

12           A    It was.

13           Q    And what does Shoreline claim

14       Ms. Herbst could not do?

15           A    That's a good question.  Well,

16       she couldn't give our information to our

17       competitor.

18           Q    And you're claiming that the

19       oral contract covered treatment of data?

20           A    Yes.

21           Q    Is that your testimony?

22           A    Yes.

23           Q    And but that was not discussed

24       between Ms. Herbst and your husband,

25       right?

Page 149

A. COLLINGWOOD

1
2          A     Well, I believe that they worked

3      on the data that needed to be gathered.

4      Cindy designed -- this is my recollection.

5      That she had designed the program with

6      John's help that they then used for their

7      customer database.

8          Q     I'm asking about the

9      conversation they had, Ms. Collingwood.

10     So if I understand correctly, when

11     Ms. Herbst and Mr. Kelly had a

12     conversation about working together, they

13     didn't discuss customer data, right?

14         A     No, not that I'm aware of.

15         Q     Okay.  And did they discuss

16     whether or not Ms. Herbst could book

17     flights for other operators?

18         A     I -- yes.  She was already doing

19     that with Sound -- with -- not with Sound,

20     with Action Air [sic].

21         Q     So it was agreed between

22     Ms. Herbst and your husband that

23     Ms. Herbst could continue to book flights

24     for other operators.  Is that right?

25         A     Not seaplane operators.  Other

```
                                                      Page 150

 1                       A. COLLINGWOOD

 2        operators, fine, but not seaplane

 3        operators.

 4             Q    There were no other seaplane

 5        operators operating at the time, correct,

 6        Ms. Collingwood?

 7             A    I don't think so.  I don't think

 8        there was.  No, not --

 9             Q    So --

10             A    Not until fall -- Fly The Whale

11        started operating.  Until --

12             Q    And when did that start

13        operating --

14             A    There was -- there was one

15        before that, V1.

16                  THE REPORTER:  I'm sorry.  I'm

17             sorry.  You're saying not until what

18             started operating?

19                  THE WITNESS:  Fly The Whale.

20                  THE REPORTER:  Okay.

21                  THE WITNESS:  I know it's a

22             silly name.

23                  THE REPORTER:  Okay.

24                  THE WITNESS:  And prior to that,

25             I think V1 was operating an airplane.
```

Page 151

1              A. COLLINGWOOD

2         BY MR. SKIBELL:

3              Q    But in 1994, there were no other

4         seaplane operators, right?

5              A    I don't believe there were.

6         I'm -- I'm not positive about that, but I

7         don't believe there were.

8              Q    So I assume that there was no

9         discussion between Mr. Kelly and

10        Ms. Herbst about whether or not Ms. Herbst

11        could book for other seaplane operators?

12             A    Well, ultimately there were more

13        seaplane operators, and -- you know, and

14        the agreement was an exclusive agreement.

15             Q    I'm asking now what was

16        discussed in 1994.  To your knowledge did

17        they discuss one way or the other whether

18        Ms. Herbst could book flights for other

19        seaplane operators?

20             A    I really don't know the answer

21        to that.

22             Q    All right.  Did they discuss how

23        long this arrangement would be for?

24             A    There was no limitation to their

25        agreement.

```
                                      Page 152

1                    A. COLLINGWOOD
2          Q    So there was no specific
3     discussion of time period?
4          A    No.  It would -- it went on for
5     24 years.  It could've gone on -- it could
6     still be going on if Cindy hadn't sold our
7     information to BLADE.
8          Q    So but just to be clear, during
9     that 1994 discussion there was no
10    discussion of a length of time for the
11    arrangement.  Is that right?
12         A    It was an indefinite period.
13    There was no -- there was no end to it.
14    It wasn't -- you know, it wasn't a
15    five-year contract or a ten-year contract.
16    It was an ongoing contract.
17         Q    To your knowledge did they
18    discuss how either side could cancel the
19    contract?
20         A    I think the understanding was
21    that they could -- that they could cancel
22    with reasonable notice.
23         Q    All right.  Now, in 1994 did
24    your husband and Ms. Herbst, to your
25    knowledge, discuss how either side could
```

```
                                        Page 153

 1                 A. COLLINGWOOD

 2     cancel the contract?

 3          A    I -- I just answered that.

 4               MR. KRIEGSMAN:  Yeah.  Object as

 5          asked and answered.

 6          Q    So your testimony is that

 7     mister --

 8          A    That it was an indefinite

 9     contract, yes.

10          Q    I'm asking something different,

11     Ms. Collingwood.  So my question was in

12     1994 during this conversation that took

13     place, did Mr. Kelly and Ms. Herbst

14     discuss that either side could cancel the

15     contract?

16          A    Yes.

17          Q    And what did they specifically

18     discuss in terms of how the contract could

19     be canceled?

20          A    Well, they'd -- they'd have to

21     give reasonable notice.

22          Q    Either side could give

23     reasonable notice?

24          A    That is correct.

25          Q    And so you recall that your
```

Page 154

```
1                    A. COLLINGWOOD
2          husband told you I spoke with Cindy and we
3          agreed either side would have to give
4          reasonable notice?  Is that your
5          testimony?
6              A    I'm not quite sure how the --
7          how that conversation went, but that was
8          the general idea.
9              Q    So you don't know what was
10         discussed between Mr. Kelly and Ms. Herbst
11         about any notice --
12             A    I -- I only know --
13                  MR. KRIEGSMAN:  Objection.
14             A    I only know what my husband told
15         me.  I mean, it -- it was a -- initially
16         that first year, it was, you know, a trial
17         period.  Cindy, you know, felt that she
18         was -- ah, never mind -- she was working
19         too hard and not getting compensated for
20         it.  So the terms of the agreement were
21         that she would provide our booking
22         services in exchange for commission, and
23         that oral contract lasted for 24 years.
24             Q    And I understand what took place
25         afterwards.  I'm asking about the original
```

Page 155

A. COLLINGWOOD

1                   A. COLLINGWOOD

2     conversation.

3         A    Okay.

4         Q    And my question is did they

5     discuss at all how the contract could be

6     canceled to your knowledge?

7         A    With reasonable notice.

8         Q    And how do you know that

9     Ms. Kelly -- I mean Mr. Kelly and

10    Ms. Herbst discussed the contract could

11    only be canceled on reasonable notice?

12          MR. KRIEGSMAN:  Objection, asked

13       and answered.  Go ahead and answer if

14       you can.

15         A    I -- I just -- I -- all I have

16    is my husband's -- my conversation with my

17    husband at the time.

18         Q    And he said Cindy and I

19    discussed specifically the cancelation of

20    this arrangement?  Is that your testimony?

21          MR. KRIEGSMAN:  Objection, asked

22       and answered several times.

23         Q    Is that your testimony,

24    Ms. Collingwood?

25         A    I discussed with my husband the

Page 156

```
 1              A. COLLINGWOOD
 2       terms of the contract meaning she would
 3       provide booking services in exchange for
 4       commission.  If it didn't work out,
 5       there -- there would be reasonable notice
 6       and they'd both move on.
 7            Q    And did he tell you what they
 8       discussed in terms of what would be a
 9       reasonable notice period?
10                 MR. KRIEGSMAN:  Objection, asked
11            and answered.
12            A    I don't know.  I don't know if
13       they discussed a -- a -- what was a
14       reasonable period of time.
15            Q    Now let's go to a document.
16       Okay.  Ms. Herbst [sic], you've been
17       handed a document that was enclosed with
18       the complaint in this case.  You'll see at
19       top it's called Operating Agreement East
20       Hampton Town Airport.  Are you familiar
21       with this document?
22            A    Yes, I've seen it.
23            Q    And do you have an understanding
24       of what an operating agreement is?
25            A    I am not a lawyer, but I assume
```

Page 157

1              A. COLLINGWOOD

2        that it's, you know, working things out

3        with the town between the town airport,

4        Sound, and Shoreline.

5            Q    And so Shoreline was a party to

6        this operating agreement?

7            A    Yes.

8            Q    And Sound Aircraft Services was

9        also a party to this agreement.  Is that

10       right?

11           A    According to this document, yes.

12           Q    And the Town of East Hampton was

13       also a party to this agreement.  Is that

14       right?

15           A    Yes.

16           Q    And do you know -- you'll see it

17       has an effective date there.  Do you see

18       the effective date at the end of the first

19       paragraph?

20           A    May 1994.  The 15th of May.

21           Q    And you testified earlier about

22       a discussion that Mr. Kelly and Ms. Herbst

23       had about a booking arrangement.

24           A    Yes.

25           Q    My question:  was that

```
                                              Page 158

 1                    A. COLLINGWOOD

 2      conversation before or after this

 3      contract?

 4           A    You know, I would think it would

 5      be about the same time because that's

 6      about the time of year that the commuter

 7      business would start.  But I would -- I

 8      would say that they probably had this

 9      arrangement before right -- maybe right

10      before this.  We usually started flights

11      around May 1st.

12           Q    I see.  So you assume that that

13      conversation between Ms. Herbst and

14      Mr. Kelly happened around the time of the

15      contract.  But you don't know specifically

16      which happened first?

17           A    I -- I don't know specifically.

18      You're right it's an assumption.

19           Q    Now, if you look on number 2,

20      you see there's a term of agreement, and

21      you see it's for a -- the agreement had a

22      term of one year.  Do you know if this

23      agreement was extended?

24           A    I can't recall.

25           Q    Do you recall that the complaint
```

Page 159

```
 1              A. COLLINGWOOD
 2     in this case alleges that the agreement
 3     was extended?
 4          A    Oh, I'm sorry.   I -- that's not
 5     something that's coming to mind.
 6          Q    Okay.  Now, if you'll look at
 7     section -- oh, Ms. Collingwood, have you
 8     reviewed this document before?
 9          A    Yes, I have.
10          Q    All right.  Am I correct that
11     section 3 discusses the parties' rights
12     and obligations?
13          A    Well, I'm not a lawyer, but I --
14     it looks like that's the case.
15               MR. KRIEGSMAN:  If you want to
16          see the --
17               THE WITNESS:  Yeah, I do.  Could
18          I?  Thank you.
19               MR. KRIEGSMAN:  I'm just showing
20          her that paragraph 3.
21               THE WITNESS:  Okay.  What was
22          your question?
23     BY MR. SKIBELL:
24          Q    And my question was, to your
25     knowledge does this section 3 cover the
```

```
 1              A. COLLINGWOOD
 2     parties' obligations to one another?
 3         A    I don't know, but it appears to.
 4         Q    And --
 5         A    This is --
 6         Q    Oh, go ahead.  I'm sorry.
 7         A    I'm -- I'm sorry.  It's -- it's
 8     addressing the relationship between the
 9     two companies and what their functions
10     are.
11         Q    And if you look at B(1), you'll
12     see it discussed the services that Sound
13     was going to provide to Shoreline.
14         A    Mm-mm.
15         Q    Do you see that?
16         A    Yes.  Down at the bottom it
17     says, "fueling of aircraft," "the
18     provision of ticketing, check-in, baggage
19     handling, and related customer services."
20     So it's -- is that what you're asking
21     about?
22         Q    Yes.  Are those the services
23     that you testified earlier Ms. Herbst was
24     providing to Shoreline?
25         A    Yes.  It's a little -- a little
```

```
                                    Page 161

 1                    A. COLLINGWOOD

 2      more vague, but yes.

 3           Q    So this agreement covers the

 4      services that Ms. Herbst was providing to

 5      Shoreline on behalf of SAS?  Is that --

 6           A    Some of them.  Yeah.  They're

 7      not all included here, but some of them,

 8      yes.

 9           Q    But it covers she was providing

10      ticketing services, right?

11           A    Yes.

12           Q    And she was providing check-in

13      services, right?

14           A    Yes.

15           Q    And those were responsibilities

16      she was doing at the time on behalf of

17      SAS, right?

18           A    Well, yeah.  There was -- there

19      was -- there were more things included,

20      but yes.

21           Q    There were additional details

22      that were included, but they would

23      generally fall under what's in B(1),

24      correct?

25           A    Well, that's -- that's not
```

```
                                    Page 162
 1                    A. COLLINGWOOD
 2        really clearly spelled out here.
 3             Q    What services was she providing
 4        that is not spelled out in B(1)?
 5             A    The creation of the manifests,
 6        the credit card information, the fiduciary
 7        responsibilities.  I mean, I don't think
 8        check-in spells all that out.
 9             Q    So this contract does not set
10        forth that Ms. Herbst or SAS have any
11        fiduciary obligations to Shoreline,
12        correct?
13             A    I'm not a lawyer, but I would
14        say that's -- that's the case.  It's
15        pretty vague.
16             Q    Now, if Shoreline wanted
17        Ms. Herbst to have fiduciary duties to it,
18        it could have included that in this
19        contract, right?
20             A    I don't know.
21             Q    Was there any reason that
22        Shoreline could not have included in this
23        contract that SAS had fiduciary duties to
24        it?
25             A    I don't know.
```

Page 163

1                    A. COLLINGWOOD

2          Q    All right.  I'm going to ask

3     about another provision of this contract.

4     Sorry it takes me one second to get here.

5     Now, you see there's a section there

6     that's called reserved rights.  Do you see

7     that, Ms. Collingwood?

8          A    Understood -- give me a minute

9     and I'll read it.

10         Q    Here, I'll make it easier to

11    read.

12         A    It's not really --

13              MR. KRIEGSMAN:  Well, let him

14         ask you a question.

15         A    Okay.  What's the question?

16         Q    My first question was this

17    section covers certain reserved rights the

18    parties kept for one another, correct?

19         A    I'm not sure.  I'm not a lawyer,

20    and I'm not sure what the intent of this

21    is.

22         Q    If you look at 6(B) [sic], it

23    reads it's "clearly understood and agreed

24    that nothing in this Agreement shall be

25    construed to grant or authorize the

Page 176

                              A. COLLINGWOOD

1

2       right?

3           A     That's what it's called, an

4       operating agreement.

5           Q     And the document we looked at

6       earlier was a 1994 document that was also

7       labeled an operating agreement, right?

8           A     Right.  But this has a

9       different -- this is different.

10          Q     And this is two years after the

11      earlier contract was entered into, right?

12          A     Yes.

13          Q     And this is after Ms. Herbst and

14      Mr. Kelly had their conversation about

15      working together in an arrangement, right?

16          A     Yes.

17          Q     And if you look down to section

18      2, it says aircraft management and

19      charter.  Do you see that?

20          A     Yes.

21          Q     And if look at II(b) it reads

22      "Sound shall continue to offer flight

23      reservation services and ground handling

24      at the Site and at the Airport Terminal

25      Building in accordance with its current

Page 177

                    A. COLLINGWOOD

1       operating agreement in place between the

2       parties."  Now, that's referring back to

3       the earlier operating agreement we looked

4       at, right?

5            A    I think this document is

6       different.

7            Q    In II(B) when it refers to

8       "current operating agreement in place

9       between the parties," is that referring

10      back to the document we looked at a moment

11      ago?

12           A    I don't -- I don't know.  I

13      think --

14           Q    To your knowledge -- oh, I'm

15      sorry.  Ms. Collingwood, go ahead.

16           A    Well, you're reading it

17      correctly, but I'm -- I'm not sure that

18      it's the same as the previous one.

19           Q    To your knowledge, did Shoreline

20      and Sound Aircraft enter into any other

21      operating agreements?

22           A    I really don't know.

23           Q    To your knowledge has Shoreline

24      produced any other operating agreements

Page 178

```
1                      A. COLLINGWOOD
2       between the parties?
3            A    Is there one from --
4                 MR. KRIEGSMAN:  Answer his --
5            A    I don't know.  I don't -- I
6       don't know.
7            Q    Okay.  And do you know if this
8       agreement was extended?
9            A    You mean with the town?
10           Q    You'll see this agreement is
11      between Shoreline and Sound.  Do you see
12      that at the top?
13           A    All right.  Yes.  Yup.  Yup,
14      that's different.  Okay.
15           Q    Do you know if this agreement
16      was ever extended between the two parties?
17           A    I don't know.
18           Q    Do you know if there are any
19      other contracts between Shoreline and
20      Sound Aircraft?
21           A    I don't know.  Not that I'm
22      aware of.
23           Q    I'm going to take this down.
24      Now, Shoreline has a claim for promissory
25      estoppel in this case.  Is that right?
```

```
                              A. COLLINGWOOD
 1
 2         A    I'm sorry?
 3         Q    Does Shoreline have a claim for
 4    promissory estoppel in this case?
 5              THE WITNESS:  Is that one of the
 6         charges?
 7              MR. KRIEGSMAN:  Just answer it
 8         to the best of your knowledge what
 9         he's asking you.
10         A    I -- I don't know.  Could you
11    explain?
12         Q    Well, I'm just asking about
13    Shoreline's cause of an action in this
14    case.  Do you know if there's a claim for
15    promissory estoppel?
16         A    I don't know.
17         Q    Do you know if Shoreline claims
18    that one of the defendants made a promise
19    to it?
20         A    Yes.
21         Q    And which defendant does
22    Shoreline claim made a promise to it?
23         A    Cindy Herbst.
24         Q    And what did Ms. Herbst promise?
25         A    That she would provide booking
```

Page 205

```
 1              A. COLLINGWOOD
 2        and answer if you can.
 3        A    I -- I don't know who the --
 4   when those conversations took place.  I
 5   assume that John and Cindy had made those
 6   issues clear.  Sorry, I don't mean to say
 7   assume.  But -- but it was understood.  It
 8   was always understood.
 9        Q    Do you know if there were any
10   specific discussions between Mr. Kelly and
11   Ms. Herbst where Mr. Kelly indicated that
12   Shoreline owned the SAFE customer data?
13        A    That would've come up in their
14   first conversation.
15        Q    And do you know if they
16   discussed during that first conversation
17   who owned the customer data?
18        A    Cindy was working for Shoreline.
19        Q    Do you know if they discussed
20   during that 1994 conversation that
21   Shoreline owned all the information on
22   Ms. Herbst's computer systems?
23        A    Well, it's clearly not all the
24   information because she had other people
25   she represented, all right?  Is that
```

Page 206

```
 1              A. COLLINGWOOD
 2    understood?
 3         Q    I'm just asking what was
 4    discussed in 1994, Ms. Collingwood, to be
 5    clear.  So my question is in 1994 was
 6    there a discussion where about whether or
 7    not Shoreline owned any information on
 8    Ms. Herbst's computers systems?
 9         A    Well, when they had the
10    discussion, I don't know that she had a
11    computer system.
12         Q    So I take it the answer is there
13    were none?
14              MR. KRIEGSMAN:  Objection.
15         A    No, that's not what I said.  It
16    was understood that she was working for
17    Shoreline --
18         Q    Who's --
19         A    But I don't know that she had a
20    computer at the time or whether she had
21    the system set up or not.
22         Q    I understand, Ms. Collingwood,
23    you believe she was working for Shoreline.
24    My question is actually a little
25    different.  My question is did Mr. Kelly
```

```
 1                    A. COLLINGWOOD
 2      and Ms. Herbst discuss during that 1994
 3      discussion treatment of customer data?
 4      Was that a topic that was discussed?
 5                    MR. KRIEGSMAN:  Objection to
 6           form.
 7           A     Everything she did related to
 8      Shoreline's commuter flights was for us,
 9      and that was understood between the two of
10      them.
11           Q     But you don't know one way or
12      the other of whether or not ownership of
13      customer data was discussed.  Is that
14      right?
15           A     I was not there, Mr. Skibell.  I
16      was not there.
17           Q     Okay.  Now, you recall in the
18      complaint there's a reference to an
19      employee handbook?
20           A     Yes.
21           Q     And this employee handbook was
22      from 2000.  Is that right?
23           A     I think I wrote it in '99 and
24      yes, we gave it to people in -- just
25      before 2000.
```

```
                                           Page 208

 1                      A. COLLINGWOOD

 2           Q    Was it ever updated after 2000?

 3           A    Yes, it was.

 4           Q    And when was it updated?

 5           A    Probably when I went back to

 6      work for the company in 2016 or '17.

 7           Q    Now --

 8           A    We needed to update it.

 9           Q    So there are -- how many times

10      was it updated, then, after 2000?

11           A    It probably wasn't until I came

12      back to work for the company full time.

13           Q    And after you came back, was it

14      updated once or more than once?

15           A    I want to say twice.

16           Q    And Ms. Herbst was never an

17      employee of Shoreline, correct?

18           A    No, but we did give her an

19      employee handbook.

20           Q    And when did you give it to her?

21           A    At a Christmas party.

22           Q    That was a Christmas gift?

23           A    Not exactly.

24           Q    What year was that?

25           A    I believe it was Christmas 1999.
```

Page 209

A. COLLINGWOOD

1

2    Well, it would've been December 1999.

3         Q    And what'd you tell her, if

4    anything, about it, the handbook?

5         A    I think there may have been -- I

6    think the reason that we wanted her to

7    have it was there were things that were

8    spelled out in there about privacy,

9    confidentiality, things like that.  But

10   Cindy was our representative in East

11   Hampton, and frequently our pilots and

12   other staff might've been coming and going

13   in East Hampton so we wanted her to be

14   familiar with -- you know, with how our

15   staff should behave and things like that.

16   So -- so that's why John asked me to give

17   it to her.

18        Q    And do you recall what you said

19   to Ms. Herbst when you gave it to her?

20        A    I think I explained that to her

21   at the time.

22        Q    And do you recall specifically

23   what you said about why you were giving it

24   to her?

25        A    Well, I expected her to, you

```
                                        Page 210

 1              A. COLLINGWOOD

 2       know, read through it and understand that,

 3       you know, everything that was spelled in

 4       it -- spelled out in it applied to her.

 5       But you know, one of the other reasons, of

 6       course, was that she could let us know if

 7       anybody stepped out of line.

 8            Q    And but she wasn't an employee

 9       at that time, right?

10            A    She was never an employee.  She

11       was -- she was --

12            Q    Did you --

13            A    Booking agent.

14            Q    And that document has a

15       signature page, right?

16            A    You know, I don't know that that

17       one did.  The later ones did.

18            Q    Do you know if she ever

19       signed -- or was she ever provided another

20       employee handbook?

21            A    No, she was not.

22            Q    And here, I'm going to --

23            A    I didn't really think Cindy

24       needed to be updated on media or sexual

25       harassment.
```

Page 211

1                       A. COLLINGWOOD

2          Q    Is that most of what the

3     employee handbook covered?

4          A    No.  No, that's what the

5     revisions were about.  'Cause media didn't

6     exist as -- you know, as we know it in

7     1999.

8          Q    And is this the copy of the

9     employee handbook that's you were

10    referring to?

11              MR. KRIEGSMAN:  Reid, do you

12         mind just quickly scrolling through

13         it?

14              MR. SKIBELL:  If it helps, I'll

15         represent this is the one enclosed

16         with the complaint.

17              MR. KRIEGSMAN:  Okay.  Thanks.

18              THE WITNESS:  Yes, that appears

19         to be it.

20    BY MR. SKIBELL:

21         Q    All right.

22         A    Actually, no.  No, no, no.  This

23    is the later one.  This is the later one.

24         Q    I see.  And how do you know

25    that?  Can you -- I'm sorry.  I'm moving

Page 212

```
1                    A. COLLINGWOOD
2        too quickly.  But how can you tell us
3        that?
4             A    I think that I saw media and
5        sexual harassment.  I think that was
6        perhaps the one that was provided to Cape
7        Air.
8             Q    I see.  So this does not appear
9        to be the one that you recall giving to
10       Ms. Herbst in 1999?
11            A    Can I look at the table of
12       contents?
13                 MR. KRIEGSMAN:  Yeah --
14            Q    Here it is.
15                 MR. KRIEGSMAN:  I'm just showing
16            the witness the same document, Reid,
17            on my computer so she can scroll.
18            A    Good grief, this is long.  Yes,
19       I think this is the newer one.
20            Q    Okay.  So this would not have
21       been a document provided to Ms. Herbst.
22       Is that right?
23            A    No, it was -- it was in a little
24       blue book.  This one is a different --
25       was -- had a different format.
```

```
 1                    A. COLLINGWOOD
 2        Q    I'm going to ask you a quick
 3   question about this.  Now, if you'll look
 4   at this section here, it relates to
 5   confidentiality of customers and client
 6   matters.  Do you see that?
 7        A    Yes.
 8        Q    And you see there's a reference
 9   here to nondisclosure agreements.  Do you
10   see that?
11        A    Yes.
12        Q    Did Shoreline ever ask
13   Ms. Herbst to execute a nondisclosure
14   agreement?
15        A    Not that I'm aware of.  That had
16   probably more to do with some of the
17   people that -- whose planes we managed.
18        Q    Oh, that section of the handbook
19   related generally to people's whose planes
20   you managed who might be celebrities or
21   something of that nature?
22        A    Yeah, I think that's possible.
23        Q    I'm going to move to another
24   document.  Now, this was provided to us in
25   one big dump, I will say.  And it starts
```

Page 214

 1              A. COLLINGWOOD

 2     at SAI003161, and you'll see it goes all

 3     the way down to SAI003233.

 4              MR. KRIEGSMAN:  Okay.  We're

 5         looking at that same document on my

 6         screen.

 7         A    Okay.

 8         Q    Ms. Collingwood, do you need a

 9     moment to look at the document?

10              MR. KRIEGSMAN:  Why don't we put

11         it over here so you can see it.

12              THE WITNESS:  Okay.  All right.

13              So it's a bunch of customer --

14              MR. KRIEGSMAN:  Yeah, just read

15         it and listen to the question.

16              THE WITNESS:  Okay.  Okay.  All

17         right.

18              Go ahead.  Tell me what's your

19         question.

20     BY MR. SKIBELL:

21         Q    All right.  Well, I'm going to

22     turn to the first page.  Do you have an

23     understanding of what's here on the first

24     page?

25         A    These are customers' names from

Page 229

1              A. COLLINGWOOD

2       Cindy.  So all of these people who booked

3       through Sound were listed this way and

4       were referred to as Sound customers

5       because it meant that she was going to get

6       a commission for these people.  Does that

7       make sense to you?

8           Q    Well, I'm just the

9       question-asker so it doesn't need to.  But

10      I understand the answer.

11          A    I don't get to ask questions?

12          Q    Not right now.  So but these

13      persons, at least in the software that you

14      were using at the time, were identified as

15      Sound customers.  Is that right?

16          A    That is correct.

17          Q    All right.  Now, you testified

18      earlier about the information that was

19      uploaded to Constant Contact.  Is it any

20      of the documents that we've just looked

21      at?

22          A    It could've been -- I didn't set

23      it up, but it could've been the first one

24      we were going over.

25          Q    Well, just let me pull it back

Page 230

```
 1                    A. COLLINGWOOD
 2        up to make sure that we're on the same
 3        page.  Hold on one sec.  So is that the
 4        document here --
 5             A    Yes, it could be that.
 6             Q    Okay.  In this case when you're
 7        referring to documents that were protected
 8        or that contains your confidential
 9        information, is there any other customer
10        list that we haven't looked at that was
11        on -- and let me be clear, that was on
12        Shoreline's computer systems?
13             A    Cindy's list.
14             Q    Absent what's on Ms. Herbst's
15        computer system is there any information
16        that you claim was misappropriated?
17             A    Other than Cindy's?
18             Q    Yes.
19             A    Not that I'm aware of.
20             Q    So hold on one second.  So let's
21        go back to a different document.  I'm
22        going back to the -- if you go down -- so
23        this is count 6.  And if I understand
24        correctly, the information that was
25        disclosed there is what I've called the
```

```
                                          Page 231
 1                  A. COLLINGWOOD
 2        SAFE customer data, the information on
 3        Ms. Herbst's computer system.  Is that
 4        right?
 5              A    Was that a question?
 6                  MR. KRIEGSMAN:  Yeah.  If that
 7              was a question, I object to form.
 8              Q    All right.  The information that
 9        you are claiming was improperly disclosed
10        by Ms. Herbst and SAFE, that's the
11        information I've referred to as the SAFE
12        customer data, the information on
13        Ms. Herbst's computer system.
14                  MR. KRIEGSMAN:  Objection to
15              form.
16              A    I'm not sure what you're asking
17        me.  Are you saying that --
18                  MR. KRIEGSMAN:  Just let him
19              rephrase it.
20              A    Okay.  Can you rephrase it for
21        me?
22              Q    All right.  So the in -- in
23        paragraph 182, Shoreline claims
24        that Herbst and SAFE used and disclosed
25        trade secrets.  Do you see that?
```

Page 241

                    A. COLLINGWOOD

1       customers.  Do you see that?

2               THE REPORTER:  I'm sorry.  Oh,

3           Shoreline.  Shoreline.

4               THE WITNESS:  Yes.

5   BY MR. SKIBELL:

6       Q    So he was referring to the

7   relationship between the parties as an

8   arrangement, right?

9       A    Yes.

10      Q    Not a contract, right?

11      A    No.

12      Q    He calls it an arrangement,

13  right?

14      A    It was an oral contract.

15      Q    And your husband in this

16  document refers to it as an arrangement,

17  right?

18      A    Well, I think it was -- it was

19  both an arrangement and an oral contract.

20      Q    And he only called it an

21  arrangement here, right?

22      A    In this --

23      Q    Excuse me one sec, by the way --

24      A    Particular document, it appears

Page 242

1              A. COLLINGWOOD

2       that that's the case, yes.

3              Q    You'll see there's also an offer

4       to purchase in this document.

5              A    Yes.

6              Q    And you've testified this

7       earlier this is the offer to purchase the

8       assets of SAFE?

9              A    Right.

10             Q    And included in there, and

11      you'll see the sentence reads the purchase

12      will include all customer lists, contact

13      information --

14             A    Mm-mm.

15             Q    Do you see that?

16             A    Yes, I see it.

17             Q    So Mr. Kelly is offering to

18      purchase SAFE's customer data, right?

19             A    Yes, all of it.

20             Q    And he's offering to purchase,

21      thus, information you claim in this

22      lawsuit actually belongs to Shoreline,

23      right?

24             A    It does belong to Shoreline.

25             Q    And you'll see at the next

```
                                        Page 243
 1              A. COLLINGWOOD
 2      paragraph he writes you would agree not to
 3      release your customer lists to any other
 4      person or business entity.  Do you see
 5      that?
 6           A    Mm-mm.
 7           Q    So Mr. Kelly was once again
 8      referring to the information on SAFE's
 9      computer system as, quote, your customer
10      list, right?
11           A    Yes, but it would've included
12      all of the customers.
13           Q    And he's saying that all of the
14      customers belong to SAFE, right?
15           A    No, that's not what he's saying.
16           Q    He's saying you would agree not
17      to release your customer list, right?
18           A    Mm-mm.
19           Q    You have to answer "yes" or
20      "no."
21           A    That -- yes, that would be all
22      of her customers.
23           Q    Right.  Because they all belong
24      to her, correct?
25                MR. KRIEGSMAN:  Objection, asked
```

Page 244

```
 1              A. COLLINGWOOD
 2         and answered.
 3              THE WITNESS:  Yeah.
 4              MR. KRIEGSMAN:  But go ahead and
 5         answer.
 6    BY MR. SKIBELL:
 7         Q    So you only -- Shoreline only
 8    started referring to the SAFE customer
 9    data, the information on SAFE's computer
10    systems, as its in this lawsuit, right?
11              MR. KRIEGSMAN:  Objection.
12         A    I -- I don't -- I didn't -- I
13    didn't understand your question.  I'm
14    sorry.
15         Q    All right.  So the first time
16    that Shoreline claimed it owned the
17    information on SAFE's computer systems was
18    when the complaint in this lawsuit was
19    filed, right?
20         A    No.
21         Q    Is there any document you can
22    point to where Shoreline claims it owns
23    SAFE's customer list?
24         A    Well, there are discussions
25    about it in some of the email documents.
```

Page 245

1               A. COLLINGWOOD

2          Q    Can you tell us which email

3     documents?

4          A    No, not off the top of my head.

5          Q    But here you would agree

6     John Kelly is referring to this as the

7     Sound contact list, right?

8          A    Yes, but it's all of the Sound

9     customers, not just Shoreline's.

10          Q    And you would agree it would

11     make no sense for Shoreline to try to buy

12     something that it already owned, right?

13          A    Already owned.

14          Q    Ms. Collingwood --

15          A    What --

16          Q    I didn't get your answer.

17          A    As I said before, she was

18     holding our customer list hostage.

19          Q    Is there any document where you

20     ask for her to voluntarily provide the

21     customer list to you?

22          A    No.  But at that point she

23     wasn't communicating with us.

24          Q    You're making her an offer to

25     purchase her assets, right?

Page 246

                              A. COLLINGWOOD

1    A    Yes, in -- yes, and --

2    Q    So it --

3    A    Go ahead.

4    Q    If you thought the assets
5    belonged to Shoreline, why didn't you just
6    demand they're returned?

7         MR. KRIEGSMAN:  Answer the
8         question the best that you can.

9    A    Well, she wasn't communicating
10   with us.  There was -- you know, I mean,
11   how were we going to ask her if she wasn't
12   responding to us?

13   Q    Well, you reached out to her and
14   made an offer to purchase her customer
15   list, right?

16   A    To which -- to which she never
17   responded.

18   Q    And you never asked for her to
19   return a customer list that purportedly
20   belonged to you, right?

21        THE WITNESS:  Oh, I can't -- can
22        you --

23        MR. KRIEGSMAN:  Ask him to do
24        it.

1              A. COLLINGWOOD

2              THE WITNESS:  Can you scroll

3         down to the next to -- to the ones

4         from the -- the later ones with his

5         offer?

6    BY MR. SKIBELL:

7         Q    Ms. Collingwood, can you answer

8    my question and then you can look at

9    whatever you want?  But there's a question

10   pending --

11             MR. KRIEGSMAN:  Yeah, but I'm

12        going to object in that you asked her

13        to point to a document and she's

14        trying to do that.  And now --

15             MR. SKIBELL:  That's not what my

16        question was, Alex.

17             MR. KRIEGSMAN:  Why don't we

18        read it back?  Because that's what I

19        heard.

20             MR. SKIBELL:  That's totally

21        fine.  Beth, is it possible to have

22        it read back?

23             THE REPORTER:  Yeah, sure.

24             (The reporter played the record

25             as requested.)

```
                                            Page 248

 1                    A. COLLINGWOOD

 2               THE REPORTER:  Go ahead, please.

 3       BY MR. SKIBELL:

 4          Q    So Ms. Collingwood, I'll

 5       rephrase the question.  So you never

 6       reached out and asked Ms. Herbst to return

 7       a customer list that purportedly belonged

 8       to Shoreline, correct?

 9          A    Well, we -- we did.  John did

10       write to her after this initial

11       communication, and if you scroll down to

12       the next letter you'll -- you'll see that

13       where he talks to her about according to

14       our longstanding exclusive agreement, you

15       should be booking passengers, yet Eduardo

16       in your office says he has not been

17       authorized to do so.  If you are not going

18       to book our passengers, please send me

19       fort -- formal notification of that fact

20       and refund these commissions.  Your delay

21       in implementing the processes that have

22       been in place for more than 20 years have

23       caused irreparable harm to both our

24       companies.  Please review the attached

25       offer and give me your decision as to
```

Page 249

                                    A. COLLINGWOOD

1
2        whether or not you have any interest in
3        proceeding with this.  If I do not hear
4        from you by 5 p.m. on Wednesday, April
5        25th the other -- offer will be withdrawn
6        and we will take appropriate legal action
7        to protect our interests.  So he did, in
8        fact, ask her to do her job, to do what
9        she was obligated to do based on the
10       agreement.
11            Q    All right.  So Ms. Collingwood,
12       I'm not asking about booking customers or
13       flights.  My question is different.  At
14       this time Mr. Kelly offered to purchase
15       SAFE's customer list, right?
16            A    All of her lists, yes.
17            Q    And he never asked for her to
18       return a customer list that supposedly
19       belonged to Shoreline, correct?
20            A    No.  He asked her to do her job
21       or to give us notice that she wasn't going
22       to do her job.
23            Q    And he didn't ask for her to
24       return a customer list that supposedly
25       belonged to Shoreline, right?

Page 250

```
               A. COLLINGWOOD
 1
 2        A    No.  John was still holding out
 3    hope that Cindy was going to communicate
 4    with us and make a decision one way or
 5    another.
 6        Q    All right.  And did Shoreline --
 7    before the filing of this lawsuit can you
 8    point to any communication where it
 9    demanded the return of a customer list
10    held by SAFE?
11        A    Well, in this email.
12             MR. KRIEGSMAN:  Just let the
13             record reflect that the witness is
14             looking at the same document that was
15             just up on the screen, continue on to
16             SAI43.
17        Q    So --
18             MR. KRIEGSMAN:  Yes, that's --
19        Q    Ms. Herbst [sic], I've put the
20    exhibit back on the screen.  Can you
21    direct me to where in the exhibit
22    Mr. Kelly demands the return of a customer
23    list held in SAFE's possession?
24        A    Well, he didn't specifically.
25    But he asked her to honor the longstanding
```

1                  A. COLLINGWOOD

2       agreement, and again, we got no response

3       from her.

4            Q    All right.  I'm going to take

5       this down, and I'm going to pull up

6       another exhibit.  Hold on one second.  Oh,

7       you know what, I apologize.  That's the

8       wrong document.  Hold on one moment.  All

9       right.  I think this'll work now.  All

10      right.  It's not working.  Hold on one

11      moment.  There's one other thing I can do.

12      I apologize.  Now, Ms. Collingwood, this

13      document you'll see here bears the Bates

14      number SAI000102 to SAI000118.  And you'll

15      see at the top of this document it writes,

16      indicates text messages between Ryan Pilla

17      and John Kelly.

18           A    Mm-mm.

19                MR. KRIEGSMAN:  And sorry, Reid,

20           just for the record, what exhibit is

21           this?

22                MR. SKIBELL:  It's not one that

23           I previously sent to you, but I

24           assumed you were familiar with it.

25           But I can --

Page 257

```
 1              A. COLLINGWOOD
 2         Q    And the documents show that
 3    there was no signed contract until May
 4    18th, right?
 5         A    Right.  But they started
 6    negotiating in January.
 7         Q    And you were -- same time you
 8    were negotiating with Cape, right?
 9              MR. KRIEGSMAN:  Objection, asked
10         and answered.  Answer if you can.
11              Q    So in this --
12              THE WITNESS:  I'm not sure what
13         he --
14    BY MR. KRIEGSMAN:
15         Q    Text communications between
16    Mr. Kelly and Mr. Pilla, did Mr. Kelly
17    ever claim that SAFE's customer data
18    actually belongs to Shoreline?
19         A    Mr. Pilla should've known that
20    and so should Cindy, so.
21         Q    But Mr. Kelly never demanded the
22    return of Shoreline's purported
23    confidential information, did he?
24         A    No, he was asking her to
25    perform, you know, what she obligated to
```

                    A. COLLINGWOOD
1
2     do through the agreement, and we'd already
3     paid her commissions.  So far there was no
4     one booked, not a single customer for
5     Shoreline.
6          Q    So you paid her approximately
7     $65,000 in commissions, correct?
8          A    That is correct.
9          Q    And you received all the money
10    from the flights related to those
11    commissions, right?
12         A    Yes, we did.
13         Q    So you received over $650,000
14    that was originated by Ms. Herbst,
15    correct?
16              MR. KRIEGSMAN:  Objection.
17         A    Actually, that money came to us.
18         Q    Correct.  You received $650,000
19    where Ms. Herbst sold tickets for you,
20    right?
21         A    She -- she didn't sell the
22    tickets.  She -- she sold the coupon books
23    for the commuters, and the money came
24    directly to us.  They were our customers.
25         Q    And you received over $650,000,

Page 259

                        A. COLLINGWOOD

1

2      right?

3          A     That's correct.  And she got

4      her --

5          Q     And --

6          A     Ten percent commission.

7          Q     So she earned her commissions,

8      right?

9          A     No, she did not.  No, she did

10     not.

11         Q     You got all the money, didn't

12     you?

13         A     Did she book their trips?  Did

14     she put them on flights?  No, she didn't

15     earn her commission.

16         Q     Oh, she didn't book them on

17     flights.  Was that because you were

18     checking in customers at her ex-husband's

19     part of the terminal?  Is that --

20               MR. KRIEGSMAN:  Objection.

21         A     No.

22         Q     Did you ask her to put any of

23     those persons on an airplane?

24         A     That was -- that was what she

25     was obligated to do for us.  That was our