# EXHIBIT 3

Page 268

1

2    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK

3    --------------------------------------X

4    SHORELINE AVIATION, INC.,

5                          Plaintiff,

6

             -against-                    Case No.

7                                         2:20-cv02161

                                          JMA-SIL

8

     CYNTHIA L. HERBST, SOUND AIRCRAFT

9    FLIGHT ENTERPRISES, INC., RYAN A.
     PILLA, BLADE URBAN AIR MOBILITY,

10   INC., a/k/a FLY BLADE, INC., MELISSA
     TOMKIEL, and ROBERT S. WIESENTHAL,

11

                         Defendants.

12

     --------------------------------------X

13

14

                         March 30, 2022

15                       8:30 a.m.

16                       Virtual Zoom

17

18

19           CONTINUED DEPOSITION of SHORELINE

20   AVIATION, INC., the Plaintiff herein, by ANDREA

21   COLLINGWOOD, taken by the Defendants, pursuant

22   to Rule 30(B)(6) of the Federal Rules of Civil

23   Procedure, and Notice, held at the

24   above-mentioned time and place, before Susan

25   Crane, a Notary Public of the State of New York.

```
 1                    A. Collingwood
 2    to pay commission from flights to Ms. Herbst,
 3    correct?
 4         A      That's correct, we had to pay
 5    employees instead.
 6         Q      You allege that Ms. Herbst is
 7    responsible for you needing to hire persons?
 8         A      Yes.
 9         Q      Can you tell us why Ms. Herbst is
10    responsible for you hiring persons?
11         A      Because she didn't fulfill her
12    contractual obligations to us.
13         Q      She was required to --
14         A      She took the commissions and she
15    did not book the flights or the passengers.  She
16    instead lied to them and diverted the customers
17    to Blade.
18         Q      I'm asking about the allegation
19    that you had to hire staff.  Can you tell us
20    what you did that required you to hire staff?
21         A      Well, they had to answer the
22    phone.  They had to book the flights, create the
23    manifests.  We hired I think there were four
24    different people, one of whom was to work on the
25    dock, something we hadn't had to do before, just
```

Page 299

```
 1                    A. Collingwood
 2   to prevent Blade from trying to solicit our
 3   customers.  In the document it says that there's
 4   $238,000 to replace the staff.
 5        Q      Would she be obligated to work for
 6   Shoreline forever?
 7        A      We had an indefinite agreement.
 8   Cindy never notified us that she wasn't going to
 9   fulfill her obligations to us.  She took the
10   commission money.
11        Q      I'm not asking about the
12   commission money for the flights she booked.
13   I'm trying to understand the obligation to
14   replace staff.  Was Ms. Herbst obligated to work
15   for Shoreline forever?
16        A      Well, she had to give us
17   reasonable notice if she wasn't going to, and
18   she never did that.
19        Q      What is reasonable notice?  How
20   long is that?
21        A      Well, I would assume it would be
22   at least a month or more.
23        Q      What is that assumption based on?
24        A      Just business.
25        Q      Did you ever discuss with
```

```
                                        Page 300
 1                    A. Collingwood
 2    Ms. Herbst what you considered to be reasonable
 3    notice?
 4         A     I did not.  I don't know what she
 5    discussed with my husband.
 6         Q     If Ms. Herbst had told you on
 7    April 1, 2018, that she no longer wanted to work
 8    with you, wouldn't you need to have to hire
 9    people to replace Ms. Herbst?
10         A     If she had informed us --
11                    MR. KRIEGSMAN:  Objection;
12                    calls for speculation.  Go ahead
13                    and answer.
14         A     If she had notified us that she
15    wasn't going to fulfill the terms of her job, we
16    would have had to find a replacement.
17         Q     Ms. Herbst wasn't responsible for
18    the replacement of your staff?
19         A     She is responsible for having not
20    notified us when she took our customer list and
21    sold it to our competitor.
22         Q     If she had given you notice
23    earlier, you would have needed to hire the same
24    people, correct?
25                    MR. KRIEGSMAN:  Objection;
```

```
                                              Page 301

 1                    A. Collingwood

 2                    calls for speculation.

 3          A      If she had given us notice?  Is

 4    that what you are asking me?

 5          Q      Yes, Ms. Collingwood.

 6          A      If she had given us notice, then

 7    we would have had to replace her.

 8          Q      Going back to 121, am I correct

 9    that in 2019 Shoreline started working together

10    with Cape Air?

11          A      Yes, that's correct.

12          Q      And started using the TakeFlite

13    system to book customers; is that correct?

14          A      We started to use the Cape flights

15    right after Cindy left us.  That was the summer

16    of 2018.

17          Q      Do you know if any of the decrease

18    in revenue between 2017 and 2019 was caused by

19    customers who decided they didn't want to fly

20    with Cape Air?

21          A      Well, we were still offering

22    Shoreline Aviation and the same staff was in

23    place.

24          Q      Do you know if there were

25    customers that no longer decided to fly with
```

```
                                         Page 302
 1                        A. Collingwood
 2   Shoreline and was then working with Cape Air?
 3           A       No.
 4           Q       Do you know if any customers
 5   didn't want to book with Shoreline because they
 6   didn't like the TakeFlite system?
 7           A       I don't think that had any impact
 8   on the customers.
 9           Q       Are you familiar with the concept
10   of loads?
11           A       Loads?
12           Q       Isn't that the amount of flights
13   that are available?
14           A       Yes.
15           Q       When you have less loads or less
16   flights available, you can fly less people,
17   correct?
18           A       Actually, what happened was when
19   Cindy took our customers over to Blade, we ended
20   up flying fewer people on flights just to keep
21   those passengers, just to keep the customers
22   with us.  Our minimum had always been four
23   people and we ended up flying with one or two
24   passengers because we had to now compete with
25   Blade and with Cape.
```

Page 303

1              A. Collingwood
2       Q       My question is about loads.  Do
3   you know how Shoreline's load in 2017 compared
4   to 2018?
5       A       No, I don't know.
6       Q       Do you know how Shoreline's load
7   in 2017 compared to 2019?
8       A       No, that's not something that I
9   would have focused on.  My husband might have
10  known, but I don't.
11      Q       It could be one of the reasons for
12  fewer customer revenues because you were
13  offering fewer flights, right?
14                  MR. KRIEGSMAN:  Objection;
15                  calls for speculation.
16      A       I can't answer that.
17      Q       Because you don't know the amount
18  of loads?
19      A       I don't.  I don't know and I'm not
20  going to speculate.
21      Q       Am I correct that flying an
22  aircraft is expensive for things like jet fuel;
23  is that right?
24      A       Yes, that's right.
25      Q       If you are flying less flights,

1                    A. Collingwood

2     your costs typically go down as well, right?

3          A      Not if you are flying less

4     customers because you don't have them anymore.

5          Q      Do you know if you were flying

6     less flights in 2017 as compared to 2018?

7          A      I don't think there was a great

8     difference in the number of flights because we

9     were trying to retain people in 2018.

10         Q      But you don't have any numbers one

11    way or the other compared to whether you were

12    flying less flights in 2017 compared to 2018?

13         A      I don't know, Mr. Skibell.

14         Q      How about 2019, do you know if you

15    were flying less flights in 2019 as compared to

16    2017?

17         A      I don't know.  As I said, I wasn't

18    paying as much attention in 2019.

19         Q      It's possible that even though

20    revenue went down, costs could have also gone

21    down, right?

22                    MR. KRIEGSMAN:  Objection;

23                    calls for speculation.

24         A      I really can't answer that.

25                    MR. SKIBELL:  Let's go to

```
                                              Page 305

 1                    A. Collingwood

 2                    another document.  Let's take a

 3                    quick break.  I want to make sure

 4                    when Cindy arrives she knows where

 5                    to go.

 6                         (Recess was taken)

 7         Q      Ms. Collingwood, I have a few more

 8    questions about the document we were just

 9    looking at.  I want to make sure I have this.

10                         MR. KRIEGSMAN:  The Amended

11                    Complaint?

12                         MR. SKIBELL:  Yes.

13         Q      Ms. Collingwood, look at 122.  You

14    will see that it indicates what Shoreline's

15    damages are in this case.  Do you see that?

16         A      Yes.

17         Q      Do you see there is a number there

18    of 1.35 million.  That is for lost revenue from

19    both commuter and charter flights; is that

20    correct?

21         A      We know now that it's a different

22    number.  That's what we put in this document.

23         Q      Well, tell me how the original

24    number was reached and tell me what the current

25    number is.
```

```
                                              Page 306

 1                    A. Collingwood

 2        A      I don't know what the current

 3   number is, we are still working on that.  But it

 4   was the loss of revenue from commuter flights as

 5   well as charter flights that Sound would book

 6   with us.  That was her job with us and she was

 7   no longer fulfilling that.

 8        Q      I want to start with the

 9   1.35 million.  How was that number reached?

10        A      I don't --

11                    MR. KRIEGSMAN:  Just answer

12              the question.

13        A      It's based on the numbers from the

14   previous year so the loss of revenue between

15   2017 and 2018.

16        Q      My question is, what documents did

17   you look to to create the 1.35 million?

18        A      Accounting figures.

19        Q      Were those accounting figures all

20   commuter and charter flights, or do they include

21   just commuter and charter flights between New

22   York and East Hampton Airport?

23        A      This number is based entirely on

24   what Cindy did as our broker.  This is what she

25   booked as our broker.
```

```
                                                          Page 307

 1                       A. Collingwood

 2            Q        She didn't book flights in 2018,

 3     correct?

 4            A        I'm sorry, I didn't hear that.

 5            Q        Ms. Herbst didn't book flights in

 6     2018, right?

 7            A        That is correct; she did not.

 8            Q        I'm asking about the lost revenue

 9     from commuter and charter flights.  Is that

10     based on a particular number in your accounting

11     documents that breaks out revenue from flights

12     in and out of East Hampton Airport?

13            A        Yes, it is on the P&L statements,

14     for example.

15            Q        There's specific ones that

16     indicate the amount of revenue from East Hampton

17     Airport?

18            A        Yes, it's called commuter revenue.

19            Q        Is that commuter revenue just for

20     East Hampton or does it also cover Florida or

21     Bahamas or the Virgin Islands?

22            A        No, it is actually Sound.

23            Q        That's how you got the number

24     1.35; is that correct?

25            A        Yes, that's correct.
```

```
                                              Page 308

 1                       A. Collingwood

 2           Q       And so am I correct that profits

 3      are normally revenue minus costs, right?

 4           A       Usually.

 5           Q       In this case is Shoreline seeking

 6      profits, lost profits?

 7           A       We are seeking loss of revenue.

 8           Q       So you are not seeking lost

 9      profits at all?

10                       MR. KRIEGSMAN:   Objection;

11                       it calls for a legal conclusion.

12                       Answer the question as best as you

13                       can.

14           A       It consists of 1.35 million from

15      lost revenue from both commuter and charter

16      flights.

17           Q       As you sit here today do you know

18      if Shoreline lost any profits from the alleged

19      conduct of Ms. Herbst and the other defendants?

20           A       Yes, absolutely.

21           Q       Do you know how much lost profits

22      it had?

23           A       Not specifically.

24           Q       Can you identify any lost profits

25      that it had?
```

```
                                          Page 330

 1                       A. Collingwood

 2    version of 5 million dollars?

 3           A      I'm really not sure.

 4           Q      Were you aware that on or about

 5    December 5 Mr. Kelly made a proposal to Cape Air

 6    for a transaction that was a little over 6.3

 7    million dollars?

 8           A      I wish I could say I remember, but

 9    I really don't.

10           Q      Do you remember that the final

11    version of the transaction was approximately 6.3

12    million dollars?

13           A      That sounds about right.

14           Q      The amount of money that was paid

15    by Cape Air went up from 5 million to

16    approximately 6.3 million?

17           A      I can see there were different

18    proposals.  I also know that the company was

19    evaluated for the ESOP at 6 million.

20           Q      What do you mean evaluated for the

21    ESOP?

22           A      We were working on an ESOP

23    program.  John started working on that I think

24    in 2016.  And you go to an audit process; you

25    know, it was very long and involved and I
```

```
                                        Page 331

 1                    A. Collingwood
 2    believe that it came out to 6 million that was
 3    the valuation of the company.
 4          Q       I'm just asking about what Cape
 5    Air paid.  Cape Air paid approximately 6.37
 6    million dollars, correct?
 7          A       I'm not sure.  I'm not sure.
 8          Q       But you are aware that the final
 9    price went up more than a million dollars paid
10    by Cape Air, correct?
11          A       I'm wondering if the 5 million is
12    excluding the nondisclosure amount.  I don't see
13    that listed here.
14          Q       What is the nondisclosure amount
15    you are referring to, Ms. Collingwood?
16          A       My husband and I were both paid
17    for a nondisclosure agreement.
18          Q       If you look at --
19          A       It's a noncompete agreement, not a
20    nondisclosure.
21          Q       If you look at this, you will
22    see --
23          A       I'm just seeing that here.
24          Q       -- that you were paid 2 million
25    dollars not to compete.  Is that what you were
```

```
                                        Page 332

 1                    A. Collingwood

 2    paid?

 3          A      I think ultimately it was 1.5.

 4          Q      Do you know if that was computed

 5    into the final price paid by Cape Air to

 6    Shoreline?

 7          A      I don't know.  In addition to that

 8    we were -- we stayed on with Cape Air.  Oh, here

 9    it is, I see.

10          Q      Let me ask you a different

11    question.  If you look back on this page, do you

12    recall that under the original version of the

13    transaction Shoreline would have paid

14    approximately 27 percent in corporate taxes?

15          A      I don't know.

16          Q      Would there be documents at

17    Shoreline that it did related to the different

18    versions of the transaction and the amount that

19    was received by the owners?

20          A      I think you probably got those.

21    You probably got that information.

22          Q      Ms. Collingwood, I'm going to tell

23    you the only documents we got on this topic was

24    produced by Cape Air, not Shoreline.

25                 My question is, to your knowledge,
```

```
                                           Page 333

 1                         A. Collingwood

 2      do those documents exist for Shoreline?

 3              A       We gave you everything that we

 4      had.  If there are things missing, it's probably

 5      because the e-mails were terminated.

 6              Q       Ms. Collingwood, what do you mean

 7      by the e-mails were terminated?

 8              A       Cape Air terminated our accounts

 9      so there may have been documents that you have,

10      that we may have had an in e-mail form, but once

11      Cape Air terminated them -- for instance, when

12      my husband died, his e-mail account was

13      terminated.  When I was finished at Cape Air,

14      when they terminated me, they terminated my

15      e-mail.  I would no longer have had access to

16      those.

17              Q       Well, the documents we are looking

18      at are before the transaction between Cape Air

19      and Shoreline, correct?

20              A       I'm not sure.

21              Q       The analysis leading up to the

22      final version of the transaction was before the

23      transaction closed, right?

24              A       I believe I have given you

25      everything that we had.
```

```
                                                  Page 334

 1                          A. Collingwood

 2              Q       My question is, wouldn't these

 3      documents have been on an e-mail account for

 4      Shoreline, not Cape Air?

 5              A       Not that I found then.  I don't

 6      know why you would have been given something

 7      that I didn't have.  We provided everything that

 8      we had.

 9              Q       I'm going to go back to this

10      document, an e-mail from John Kelly from

11      Shoreline Aviation on or about November 26,

12      2018, to Mike Migliore.

13              A       Right.

14              Q       So the e-mail account at

15      shorelineaviation.com; is that one that would

16      have been terminated by Cape Air?

17              A       No.

18              Q       So this document would have been

19      sent from an account that was not terminated by

20      Cape Air?

21              A       That's correct.  I don't know why

22      you don't have it.

23              Q       To your knowledge, there were

24      financial analyses done by Shoreline in

25      connection with the changed version of the
```

```
                                              Page 335
1                        A. Collingwood

2      transaction?

3              A      I don't know that.

4              Q      Do you know if Shoreline lost any

5      money from the original version of the

6      transaction to the revised version of the

7      transaction?

8              A      I'm sorry, lost any money from the

9      original transaction?

10             Q      I'm asking about your damages in

11     this case, Ms. Collingwood.  My question is,

12     there was an original version of the transaction

13     which is what we looked at in the letter of

14     intent, correct?

15             A      Yes.

16             Q      There's a later version of the

17     transaction that took place after the lawsuit we

18     were discussing was filed?

19             A      Right.  Initially it was a stock

20     purchase and it led to an asset purchase.  Is

21     that what you are referring to?

22             Q      Yes.  Did Shoreline lose any money

23     as a result of the change in the structure of

24     the transaction?

25             A      We lost the tax advantages of the
```

```
                                            Page 336
 1                    A. Collingwood
 2   ESOP program that we had been working on.
 3          Q      Were those tax advantages to
 4   Shoreline or to you and Mr. Kelly?
 5          A      I believe it was both.
 6          Q      Do you know if the changed version
 7   of the transaction made up for any tax losses to
 8   you and Mr. Kelly or to Shoreline?
 9          A      Yes, it did.
10          Q      One of the reasons that Cape Air
11   paid more money is because you were going to
12   lose the tax benefits of the ESOP, right?
13          A      I believe, and I'm not positive
14   about this, that it also provided tax advantages
15   to Cape Air.
16          Q      One of the reasons Cape Air wanted
17   to move forward with the transaction was to make
18   up for the loss of the tax benefits of the ESOP,
19   right?
20          A      I believe they made an adjustment
21   based on that, but it didn't compensate for what
22   we lost having to give up the ESOP.
23          Q      How much did you lose having to
24   give up the ESOP relative to the increased money
25   paid by Cape Air?
```

```
                                          Page 337
  1                     A. Collingwood
  2        A      I was told by the attorney and I
  3   believe by our CPA that we would have had tax
  4   advantages over a ten-year period in the amount
  5   of over 3 million dollars.
  6        Q      Was there anything stopping
  7   Shoreline from setting up an ESOP after the
  8   transaction took place with Cape Air?
  9        A      The stop of the ESOP was Cindy's
 10   lawsuit.
 11        Q      Did Cape Air also have an ESOP?
 12        A      Yes, they did.
 13        Q      Did you participate in the Cape
 14   Air ESOP after the transaction?
 15        A      Not willingly, but yes.
 16        Q      Why do you say "not willingly"?
 17        A      They just set me up for it.
 18        Q      Did you receive tax benefits from
 19   that?
 20        A      Not that I'm aware of.  It was --
 21   we are not talking thousands of dollars here.
 22        Q      Do you know if there was any final
 23   analysis of any tax losses to Shoreline from the
 24   original version of the transaction to the
 25   changed version of the transaction?
```

```
                                             Page 339
 1                    A. Collingwood

 2     message.  Is this between Steven Pilla and John

 3     Kelly?

 4            A       It appears to be.

 5            Q       Do you have an understanding of

 6     what this conversation is about here?

 7            A       Steve is telling John that Cindy

 8     is videotaping our staff, and that he wants to

 9     make sure we are not booking flights because it

10     has something to do with their divorce.

11            Q       He says he doesn't want -- I

12     believe he means caught, but it is spelled

13     cough.  It is caught.  He says he doesn't want

14     any people caught on video doing so; is that

15     right?

16            A       Yes.  We were told earlier in the

17     season that we could not sell computer or

18     charter seats or flights because of their

19     divorce agreement.

20            Q       When were you told that?

21            A       Earlier in the season.  I think

22     after the first day that we were behind Steve's

23     counter.  We were told we could not do that

24     anymore and that we could not book any flights.

25            Q       Were you told that before you
```

```
                                        Page 340
 1                     A. Collingwood
 2      started behind Mr. Tuma's counter?
 3           A      Not that I'm aware of.
 4           Q      Did Mr. Tuma communicate to you at
 5      or around that time about the stipulation in the
 6      divorce decree?
 7           A      He had a conversation with my
 8      husband about it.
 9           Q      After that conversation Shoreline
10      instructed people not to be caught on video?
11           A      No.  No.  We told them not to book
12      flights, not to not be caught on video.
13           Q      You told people that they could
14      call the office, Shoreline's office?
15           A      That's correct.
16           Q      Do you know if persons
17      communicated to passengers that they should call
18      the office to book flights?
19           A      It may have been.  I wasn't there.
20           Q      This direction was to people that
21      were checking in customers at SAFE's spot in the
22      East Hampton Airport?
23           A      Can you repeat that?
24           Q      Yes.  Shoreline's instruction to
25      only check people in and to tell people to call
```

                                                    Page 341

1                        A. Collingwood

2     the office for booking, that was instructed to

3     people that were at the SAFE spot in the East

4     Hampton terminal?

5              A        They were on the other side of

6     the counter, but our staff would tell people --

7     they would either take their name and say,

8     We will call you at the office or ask them to

9     call the office directly to book their

10    flights.

11             Q        What do you mean by "other side of

12    the counter"?  I want to make sure I understand

13    that.

14             A        I'm sorry?

15             Q        What did you mean by "other side

16    of the counter"?

17             A        Well, initially the first time we

18    were over there we were behind Steve's counter,

19    and then we were told that we could not do that

20    and so we were outside of the counter.

21             Q        For how long were you outside of

22    the counter?

23             A        I believe the summer.

24             Q        If I understand correctly,

25    Shoreline instructed its employees that were