# EXHIBIT 13

Page 1

1

2      UNITED STATES DISTRICT COURT
       EASTERN DISTRICT OF NEW YORK

3      -----------------------------------------X
       SHORELINE AVIATION, INC.,

4
                                   PLAINTIFF,

5

6          -against-           Case No.:
                               2:20-cv-02161

7                              JMA-SIL

8

       CYNTHIA L. HERBST, SOUND AIRCRAFT

9      FLIGHT ENTERPRISES, INC., RYAN A. PILLA,
       BLADE URBAN AIR MOBILITY, INC. a/k/a

10     FLY BLADE, INC., MELISSA TOMKIEL and
       ROBERT S. WIESENTHAL,

11
                                   DEFENDANTS.

12     -----------------------------------------X

13                   DATE: March 14, 2022

14                   TIME: 10:00 A.M

15

16

17            DEPOSITION of MIKE MIGLIORE,

18     CAPE AIR, taken by the respective parties,

19     pursuant to a Court Order and to the

20     Federal Rules of Civil Procedure, held via

21     Veritext Virtual Services, before Edith

22     Tirado-Plaza, a Notary Public of the State

23     of New York.

24

25

```
                                              Page 7

 1                       M. MIGLIORE
 2     you not to I'm going to ask you to respond
 3     to the question notwithstanding any
 4     objection; is that clear?
 5          A.    Yes.
 6          Q.    What did you do to prepare
 7     yourself to testify here today?
 8               MR. MAGUSON:   I'm going to
 9          instruct the witness not to divulge
10           any communication with counsel.
11           Other than what you may answer.
12          A.    I spoke with our counsel.
13          Q.    How many times did you speak
14     with your counsel?
15          A.    Several times.
16          Q.    Did you re view any documents
17     in connection with today's deposition?
18          A.    Yes, I did.
19          Q.    Did any documents refresh your
20     recollection as to the events that took
21     place?
22          A.    Yes, they did.
23          Q.    Can you tell me which documents
24     those were?
25          A.    You'll have to show me.  There
```

```
                                            Page 8
 1                  M. MIGLIORE
 2     are several documents that were reviewed.
 3          Q.    You also said that you are
 4     testifying in a capacity of behalf of a
 5     third-party in this case.  Do you
 6     understand that?
 7          A.    Yes, I do.
 8          Q.    I'm going to offer that party
 9     as Cape Air; is that clear?
10          A.    Yes.
11          Q.    Cape Air it also goes by other
12     name; correct?
13          A.    Yes.
14          Q.    What's the other name?
15          A.    Hyannis Air Surface Inc.
16          Q.    So we're on the same page when
17     I refer to Cape Air I'm also referring to
18     Hyannis?
19          A.    Yes.
20          Q.    You are currently employed by
21     Cape Air?
22          A.    Yes.
23          Q.    What role do you have at Cape
24     Air?
25          A.    I'm the chief financial officer
```

Page 9

                        M. MIGLIORE
1
2    of Cape Air.
3         Q.    How long have you worked for
4    Cape Air?
5         A.    11 plus years.
6         Q.    What role have you had over the
7    course of your 11 plus years you've been at
8    Cape Air?
9         A.    I've always been the chief
10   financial officer.
11        Q.    Can you tell us generally the
12   business of Cape Air?
13        A.    We are a commercial line.  135
14   scheduled service.  We fly to 40 different
15   destinations in the US and in the
16   Caribbean.
17        Q.    I'm going ask you some
18   questions today about a transaction between
19   the plaintiff Shoreline Aviation and Cape
20   Air.  Now, did you have any involvement in
21   that transaction?
22        A.    Yes, I did.
23        Q.    Can you generally describe what
24   type of role you played in the transaction?
25                   MR. MAGNUSON:  Objection to

```
                                        Page 10
 1                 M. MIGLIORE
 2         form.
 3              MR. KRIEGSMAN:   Objection to
 4         form.
 5         A.    I was involved with analyzing
 6    the business of Shoreline and along with
 7    the CEO and president at the time in the
 8    doing the due diligence on the business and
 9    putting together the offer and also working
10    with our attorneys to put together the
11    documents.
12         Q.    Who else, to your knowledge,
13    was involved in the transaction on Cape Air
14    side?
15         A.    The CEO Dan Wolf and Linda
16    Markham the president (phonetic).
17         Q.    What roles did they play in the
18    transaction?
19         A.    Very similar roles.  The three
20    of us would go down to Shoreline and
21    discuss that with both the owners of
22    Shoreline and Shoreline would come here to
23    discuss the transaction, the three of us
24    would meet with them.
25         Q.    To your knowledge, who
```

```
                                      Page 11
 1                    M. MIGLIORE
 2      participated on the Shoreline part of the
 3      transaction?
 4           A.     It was John Kelly and Andrea.
 5           Q.     Is that Andrea Collingwood?
 6           A.     Yes, sorry, yes.
 7           Q.     Was John Kelly the former
 8      principal of Shoreline Aviation?
 9           A.     Yes, he was.
10           Q.     He's now deceased; is that
11      correct?
12           A.     That is correct.
13           Q.     Do you know what role Miss
14      Collingwood had at Shoreline?
15           A.     From what I recall she was the
16      VP of marketing.
17           Q.     She was also Mr. Kelly's wife;
18      is that right?
19           A.     That is correct.
20           Q.     They were the two shareholders
21      of Shoreline; is that right?
22           A.     That is correct.
23           Q.     Now, you mentioned meetings
24      with Shoreline leading up to the
25      transaction.  Do you recall approximately
```

```
                                        Page 12
 1                    M. MIGLIORE
 2      how many meetings there were?
 3            A.     Numerous.   I couldn't even
 4      guess.
 5            Q.     Do you recall when discussions
 6      began between Shoreline and Cape Air about
 7      a potential transaction?
 8            A.     Discussions began in the fall
 9      of 2017.
10            Q.     Did you speak directly with
11      anyone at Shoreline about the transaction?
12            A.     Yes.
13            Q.     Who did you speak with?
14            A.     It would be both John and
15      Andrea.
16            Q.     Is that during the meetings or
17      also separate conversations?
18            A.     It would have been both during
19      the meetings, separate conversations and
20      through correspondence over e-mail.
21            Q.     Putting aside the meetings that
22      we talked about a minute ago, do you have
23      any idea how many conversations you had
24      with Shoreline about the transaction?
25            A.     Once again numerous
```

Page 23

1                      M. MIGLIORE

2          screen so you can look at the exhibit

3          with me.  I've also provided a copy

4          of the exhibits to your attorneys so

5          they have a copy as well.

6               (Whereupon, a document entitled

7          NDA was marked as Exhibit 1 for

8          identification as of this date by the

9          Reporter.)

10              MR. KRIEGSMAN:  You didn't give

11         me one.  Was that intentional?

12              MR. SKIBELL:   You can see as I

13         enter it.  You'll have it the same as

14         everyone else.  If you want I will

15         separately e-mail you the exhibits so

16         you have a copy.

17              MR. KRIEGSMAN:   That would be

18         great, thank you.

19       Q.    You'll see this is a document

20      that was produced in this litigation by

21      Shoreline to us and you'll see it bears a

22      bates stamp number of SAI005163.  I'll show

23      you it goes down to SAI005170.  I'm only

24      going to ask you about the top of the

25      document.  You'll see it's a November 8,

```
                                          Page 24

 1                    M. MIGLIORE
 2     2017 e-mail from you to John Kelly.  Does
 3     this refresh your recollection that the NDA
 4     was entered into on or around November of
 5     2017?
 6          A.    Yes, it does.
 7          Q.    I'm going to stop sharing.
 8                Now, when the parties entered
 9     into a nondisclosure agreement, did
10     Shoreline provide information to Cape Air
11     about its operations?
12          A.    Yes, they did.
13          Q.    How was that information
14     provided to Cape Air?
15          A.    Typically it was through
16     e-mail.
17          Q.    Did you request particular
18     information from Shoreline?
19          A.    Yes, we provided a whole due
20     diligence list.
21          Q.    Was that that due diligence
22     list after the NDA was entered into?
23          A.    Yes.
24          Q.    Do you recall asking for copies
25     of contracts from Shoreline in connection
```

```
                                              Page 25
 1                      M. MIGLIORE
 2     with the due diligence?
 3          A.    I have not reviewed that due
 4     diligence list we provided but typically we
 5     would ask for contracts, yes.
 6          Q.    Do you know if you ever
 7     received a copy of a contract between Sound
 8     and Shoreline?
 9          A.    I do not recall.
10          Q.    Do you recall what type of
11     other information you received from
12     Shoreline at this time?
13          A.    Could you please restate that?
14          Q.    Do you recall what other
15     information you received from Shoreline at
16     this time?  To be clear I'm asking you
17     about the time after the NDA had been
18     signed but before any other contract terms
19     had been agreed to?
20                MR. KRIEGSMAN:   Objection to
21            form.
22          A.    We received multiple documents
23     throughout the years so are you asking for
24     a specific time period?
25          Q.    Yes, I'm asking after the NDA
```

Page 26

                        M. MIGLIORE

1
2    was signed but before any sort of letter of
3    intent or any agreements were entered into.
4    That's the period of time I'm asking you
5    about.
6         A.    Reid, I don't recall.
7         Q.    Now, after the parties entered
8    into a nondisclosure agreement but before
9    any contract was entered into, was there
10   discussion of what a merger would look like
11   between Shoreline and Cape Air?
12        A.    Yes, there were initial
13   discussions once we signed an NDA.
14        Q.    What was discussed?
15        A.    The initial discussion was that
16   the owners of Shoreline wanted to do a ESOP
17   prior to a transaction between Shoreline
18   and Cape Air and then Cape Air would
19   purchase Shoreline, the business of
20   Shoreline.
21        Q.    What's an ESOP?  What is that
22   exactly?
23        A.    I'm sorry, can you restate?
24             MR. KRIEGSMAN:   Objection to
25        form.

```
                                          Page 27
 1                    M. MIGLIORE
 2        Q.    You referred to an ESOP, can
 3   you tell me what that is?
 4             MR. KRIEGSMAN:   Objection.
 5        A.    It's an employee stock
 6   ownership plan.
 7        Q.    At this time did Cape Air have
 8   a plain for integrating Shoreline into its
 9   business?
10        A.    No.
11        Q.    At this time did Cape Air have
12   its own booking services?
13        A.    Yes.
14        Q.    And did Cape Air have a website
15   for booking flights?
16        A.    Yes.
17        Q.    Did Cape Air have booking
18   agents?
19        A.    Can you clarify?
20        Q.    Did Cape Air have individuals
21   that worked as booking agents to book
22   flights for customers?
23             MR. KRIEGSMAN:   Objection to
24        form.
25        A.    I don't understand just because
```

```
                                             Page 28

 1                    M. MIGLIORE

 2      of how our business works.  We don't call

 3      them booking agents.  I just want to make

 4      sure I understand your question.

 5           Q.    How does Cape Air's at this

 6      time booking services operate?

 7                 MR. KRIEGSMAN:    Objection.

 8           A.    Like any normal airline that

 9      you book on.  So, we have a reservations

10      department, you can book on our website,

11      you can call our reservation agents and

12      book tickets.  You can also call a travel

13      agent and book through them on us.

14           Q.    At this time did you also have

15      customer service agents?

16           A.    Yes, customer service agents

17      and reservation agents are one the and same

18      here.

19           Q.    If there had been a merger

20      would Cape have had any need for Shoreline

21      to have an independent booking agent?

22                 MR. KRIEGSMAN:    Objection to

23           form.

24           A.    After the merger was the

25      question?
```

```
                                        Page 31
 1                    M. MIGLIORE
 2              MR. KRIEGSMAN:   Objection to
 3         form.  I think that first part of the
 4         question might have been missed.
 5         Q.    Did you understand the
 6    question?
 7              MR. KRIEGSMAN:   The same thing
 8         happened again where we're missing
 9         you in the beginning.
10              MR. SKIBELL:   Let's take a
11         break and I will call Veritext and
12         see if there's a way to address this
13         issue.  I think we should take a
14         15-minute break if that's okay.
15              (Whereupon, a brief a 15-minute
16         break was taken.)
17         Q.    When we were going off the
18    record we were talking about how Shoreline
19    might be integrated into Cape Air.  Do you
20    recall that?
21         A.    I do.
22         Q.    Now, did you have any
23    discussions with Shoreline about what it
24    was planning to do post merger?
25         A.    Yes, we had lots of
```

```
                                         Page 32
 1                    M. MIGLIORE
 2     discussions.
 3           Q.    Was there any discussion about
 4     whether or not they would terminate any
 5     sort of booking arrangement they had with
 6     Sound Aircraft?
 7           A.    Are you asking if they were
 8     going to terminate --
 9                 MR. KRIEGSMAN:   Note my
10            objection for the record.
11           A.    Were you asking if they were
12     going to terminate the contract with Sound?
13           Q.    I'm asking if they were going
14     to terminate any kind of business
15     relationship with Sound following the
16     merger with Cape Air.
17           A.    I don't recall any specifics.
18           Q.    Do you recall generally what
19     Shoreline was planning to do with its
20     booking services post merger?
21                 MR. KRIEGSMAN:   Objection to
22            form.
23           A.    I don't recall.
24           Q.    Did there come a time when the
25     parties entered into a letter of intent?
```

```
                                            Page 33
 1                    M. MIGLIORE
 2          A.     Yes, there was.
 3          Q.     Do you recall approximately
 4     when that was?
 5          A.     Yes, it was March of 2018.
 6          Q.     Were there economic terms set
 7     forth in the letter of intent?
 8          A.     Yes, there were.
 9          Q.     Was it planned to be an
10     approximately a five million dollar
11     acquisition by Cape Air?
12          A.     That was a part of the letter
13     of intent, yes.
14          Q.     Do you recall how the economic
15     terms of the transaction were arrived?
16               MR. KRIEGSMAN:  Objection to
17          form.
18          A.     Yes.
19          Q.     Can you explain to us how the
20     economic terms of the transaction as set
21     forth in the letter of intent were arrived?
22               MR. KRIEGSMAN:   Objection.
23          A.     Yes, there was a meeting in New
24     Haven at Shoreline's business where Cape
25     Air and Shoreline sat down and discussed
```

Page 34

```
 1                    M. MIGLIORE
 2      the economic terms of the deal.
 3            Q.    Who was present for this
 4      meeting?
 5            A.    Myself, Dan Wolf our CEO, Linda
 6      Markham our president, John Kelly and
 7      Andrea.
 8            Q.    Do you recall if anyone took
 9      notes at the meeting?
10            A.    Yes.
11            Q.    Who took notes at the meeting
12      to your recollection?
13            A.    From my recollection there was
14      someone if the Cape Air side that was
15      jotting notes down and also someone from
16      Shoreline that was jotting notes down.
17            Q.    Do you know if those notes are
18      still available somewhere?
19            A.    I do not recall.
20            Q.    In that meeting how did the
21      parties arrive at the economic terms of the
22      deal?
23            A.    I can tell you how Cape Air
24      arrived at agreeing to that.
25            Q.    How did Cape Air arrive at
```

```
                                          Page 38

 1                       M. MIGLIORE
 2         Q.     The three million dollars would
 3    have been paid to Shoreline the entity?
 4         A.     Yes.
 5         Q.     And one of the debts that would
 6    have been assumed the ESOP?
 7         A.     That was a consideration at the
 8    time.  It was also another debt that they
 9    -- further down in the document that it
10    talks about.
11         Q.     Is that other debt the loans
12    from the aircraft?
13         A.     Yes.
14         Q.     Was that approximately 1.4
15    million was due on loans from the aircraft?
16         A.     Yes, that is correct.
17         Q.     So, as part the of the deal
18    what Cape Air have been assuming the
19    liability for the loans in the aircraft?
20         A.     Yes.
21         Q.     If we put those together the
22    consideration for the deal would have been
23    approximately 6.4 million?
24         A.     That is correct.
25         Q.     Do you see where it says C?
```

```
                                                    Page 39

  1                         M. MIGLIORE

  2           A.      Yes.

  3           Q.      And you see there's a reference

  4    to the ESOP not exceeding 1.5 million?

  5           A.      Yes.

  6           Q.      Do you have an understanding as

  7    to why the parties agreed to the ESOP could

  8    not exceed 1.5 million?

  9                   MR. KRIEGSMAN:    Objection to

 10            form.

 11           A.      I do not recall.

 12           Q.      If you look at E there's a

 13    reference to employment contracts.  Do you

 14    see that?

 15           A.      I do.

 16           Q.      And you'll see there's a

 17    reference to a salary for Mr. Kelly.  Do

 18    you see that?

 19           A.      Yes, I did.

 20           Q.      Also there's a reference to a

 21    salary for Miss Collingwood?

 22           A.      Yes.

 23           Q.      As written here it says TBD.

 24    Does that mean to be determined?

 25           A.      Yes, it does.
```

```
                                    Page 40
 1              M. MIGLIORE
 2        Q.    At this time did Cape Air have
 3    have a general understanding of what it was
 4    going to pay for Mr. Kelly for his
 5    employment?
 6        A.    I think, yes, in general, but
 7    it wasn't specifically kind of discussed
 8    but we knew what John was making at -- John
 9    and Andrea were making at Shoreline.
10        Q.    What were you generally
11    planning to pay Mr. Kelly and Miss
12    Collingwood in connection with their
13    employment agreements?
14        A.    I don't recall specifically but
15    if you look at the final agreement it was
16    in the general range of what we ended up
17    agreeing to with John and Andrea.
18        Q.    So, what was contemplated here
19    was similar to what was put forth in the
20    final deal documents in terms of their
21    compensation?
22        A.    That is correct.
23        Q.    So, that would have been an
24    additional consideration to Mr. Kelly and
25    Miss Collingwood in connection with the
```

```
                                    Page 41
 1                    M. MIGLIORE
 2   transaction?
 3              MR. KRIEGSMAN:   Objection to
 4       form.
 5       A.    Yes, it was always a part of
 6   the deal.
 7       Q.    Do you see there's a reference
 8   to a noncompetition agreement.
 9       A.    Yes.
10       Q.    You see in the second sentence
11   there it says agreement to be conditioned
12   upon and subject to buyer's performance
13   under deferred consideration payment
14   obligation and employment agreement.
15              Was it Cape Air's understanding
16   that the two million dollars would be
17   contingent upon Mr. Kelly and Miss
18   Collingwood agreeing to a noncompete?
19              MR KRIEGSMAN:   Objection to
20       form.
21       A.    That is correct.
22       Q.    If you H is third-party consent
23   and approvals.  At this time did Cape Air
24   have an understanding of who needed to
25   consent or approve to the transaction?
```

```
                                          Page 42

 1                        M. MIGLIORE

 2         A.     I'm reading it.  Hang on.

 3                I don't recall.

 4         Q.     You see G, it says due

 5    diligence review. Does this set forth the

 6    information that Cape Air was requesting in

 7    connection with its due diligence on its

 8    transaction?

 9         A.     Yes, that was the general due

10    diligence list and then we gave a very

11    specific due diligence list we requested

12    after this.

13         Q.     You see there's a reference to

14    contracts in due diligence.  Was one of the

15    things that was requested by Cape Air the

16    contracts of the company?

17         A.     Yes.

18         Q.     I'm going to pull this document

19    down and I'm going to go to another

20    document.

21                MR. SKIBELL:  This will be

22           Exhibit Number 3.

23                (Whereupon, an e-mail from Paul

24           Eckland was marked as Exhibit 3 for

25           identification as of this date by the
```

Page 45

                      M. MIGLIORE
1
2    response from Mr. Glassman.  You're copied
3    on this response; correct?
4         A.    Yes.
5         Q.    You'll see Mr. Eckland
6    indicates in the first sentence that
7    there's one way that the structure -- that
8    the transaction could be structured; is
9    that right?
10        A.    Yes.
11        Q.    He runs through seven steps of
12   how the transaction would be structured; is
13   that right?
14        A.    Yes, it is.
15        Q.    If you look at the paragraph
16   after the seven steps he indicates there's
17   other ways of structuring the transaction;
18   is that correct?
19        A.    That is correct.
20        Q.    At this time I'm asking for
21   Cape Air's perspective that had parties
22   agreed on a form of a transaction involving
23   ESOP?
24        A.    No, not at all.
25        Q.    You see there's a reference to

```
                                    Page 46
 1                  M. MIGLIORE
 2     section 1042 and the tax benefits for the
 3     Kellys.  Do you see that?
 4          A.    Can you point out the
 5     specifically where you're referring to?
 6          Q.    I'll read it.
 7          A.    I see it.
 8          Q.    Was this Cape Air's
 9     understanding that the ESOP was primarily
10     to further the tax benefits for Mr. Kelly
11     and Miss Collingwood?
12          A.    Creation.
13               MR. KRIEGSMAN:  Objection to
14          form.
15          A.    I think that was a significant
16     reason for the transaction being structured
17     this way.
18          Q.    You see there's a reference to
19     the next sentence Mr. Glassman writes
20     importantly please understand I do not know
21     what final outcome is acceptable to the
22     Kellys /EUS with respect to their continued
23     holdings and/or note from Hyannis.  Do you
24     see that?
25          A.    I do.
```

Page 47

```
 1                    M. MIGLIORE
 2        Q.    Do you have any understanding
 3   of what Mr. Glassman is referring to talks
 4   about holding shares and/or a note?
 5        A.    I don't recall.
 6        Q.    Do you know if there was ever a
 7   resolution reached as to whether or not Mr.
 8   Kelly and Miss Collingwood would hold
 9   shares in Cape Air following a transaction
10   involving the ESOP?
11             MR. KRIEGSMAN:  Objection to
12        form.
13        A.    I don't recall that being one
14   of the structures.
15        Q.    Do you recall Mr. Kelly and
16   Miss Collingwood ever agreeing to hold a
17   note from Cape Air in connection with an
18   ESOP version of the transaction?
19        A.    I don't recall.  There were
20   many conversations in regards to different
21   structures.  That specific one I do not
22   recall.
23        Q.    I'm going to go up to an e-mail
24   from Mr. Eckland.  Do you see that?
25        A.    Yes.
```

```
                                            Page 55

 1                    M. MIGLIORE

 2          Reporter.)

 3          Q.    This is an exhibit that was

 4    produced by Shoreline in the case.  It

 5    bears the bates stamp SAI007548 to 550.  To

 6    be clear you're not on this e-mail.  So,

 7    I'm going to ask you about some statements

 8    made by John Kelly in this e-mail; okay?

 9          A.    Okay.

10          Q.    You'll see in this e-mail it

11    was sent on or around October 15, 2018 so

12    this was after the e-mail we looked at a

13    moment ago; is that correct?

14          A.    Yes, it is.

15          Q.    He indicates that the lawsuit

16    filed by Sound Aircraft Light Enterprises

17    is creating some complications; is that

18    right?

19          A.    That's what it states there.

20          Q.    In addition to the lawsuit

21    filed by Sound referenced there, am I

22    correct hat parties had not agreed on a

23    structure of the ESOP version of the

24    transaction?

25          A.    At this time?
```

```
                                          Page 56

 1                      M. MIGLIORE

 2          Q.     Yes.

 3          A.     Yes.

 4          Q.     Beyond the lawsuit there were

 5     other issues associated with an ESOP

 6     version of the transaction; is that right?

 7          A.     Yes.

 8          Q.     Did Cape Air have a preference

 9     for a different version of the transaction

10     at this time?

11                 MR. KRIEGSMAN:    Objection to

12           form.

13          A.     Yes, at this time we really

14     wanted to move forward with an asset

15     purchase.

16          Q.     Can you tell us what reasons

17     Cape Air wanted to move forward in the

18     asset purchase?

19          A.     There were several reasons.

20     One is as you stated the lawsuits

21     complicated the deal.  They were not moving

22     forward with the ESOP for various reasons

23     and we liked the idea of having an ESOP

24     because we were also an ESOP company and

25     also for lack of a better word the
```

```
                                        Page 57

 1                    M. MIGLIORE

 2    negotiations were dragging on for quite

 3    some time now.  We wanted to close to move

 4    on with our business plan.

 5         Q.    Were there reasons that Cape

 6    Air preferred an asset purchase that went

 7    beyond the lawsuit filed by Sound?

 8         A.    Yes.

 9         Q.    One of those reasons was that

10    there was no agreement between the parties

11    on how an ESOP version of the transaction

12    would be structured?

13         A.    That's correct.

14         Q.    So, the asset purchase of this

15    transaction was going to be easier to Cape

16    Air's perspective?

17              MR. KRIEGSMAN:   Objection to

18         form.

19         A.    Yes.

20         Q.    If there had been no lawsuit

21    filed by Sound Aircraft would Cape Air at

22    this time still preferred a non merger

23    version of the transaction?

24              MR. KRIEGSMAN:   Objection.

25         Calls for speculation.
```

```
                                              Page 58

 1                      M. MIGLIORE

 2          A.     Are you asking if we would have

 3      preferred an asset deal anyway if the

 4      litigation wasn't there?

 5          Q.     Yes.

 6          A.     Yes, it's always easier to do

 7      an asset purchase rather than a stock

 8      purchase of a company.

 9          Q.     If you look at the second

10      paragraph do you see he writes while Cape

11      Air is still willing to do the ESOP stock

12      purchase transaction they're worried about

13      the timing. At this time was Cape Air still

14      willing to do an ESOP purchase of the

15      transaction?

16          A.     Yes.

17          Q.     There's a reference to timing.

18      Did Cape Air have a timing concern at this

19      time?

20          A.     Yes, the timing issue was that

21      this was dragging on for months now,

22      possibly going on a year from initial

23      discussions.  We really needed to get the

24      Boston New York up and running.

25          Q.     Would Cape Air have waited to
```

```
                                        Page 59
 1                    M. MIGLIORE
 2     do an ESOP version of the transaction if
 3     they had been asked to wait?
 4                    MR. KRIEGSMAN:   Objection.
 5          A.    That was never discussed but I
 6     don't believe so.
 7          Q.    Did Shoreline also have a, to
 8     you knowledge a concern about the delay at
 9     this time?
10                    MR. KRIEGSMAN:   Objection.
11          A.    I wouldn't have knowledge of
12     that specifically from John or Andrea.
13          Q.    Did Mr. Kelly or Miss
14     Collingwood express they had concerns about
15     the delay at this time?
16          A.    Yes, I think it was frustrating
17     everybody that that was going on as long as
18     it did because we had both parties that
19     were willing to do a deal.
20          Q.    And you see in the last
21     paragraph you see that Mr. Kelly writes
22     that -- I think he's referring to Cape Air,
23     that they're willing to adjust the purchase
24     terms to ease some of that burden?  Do you
25     see that?
```

```
                                         Page 60
 1                    M. MIGLIORE
 2        A.    The last sentence where it says
 3   this is less attractive?
 4        Q.    Yes.
 5        A.    I see that.  What was the
 6   question?
 7        Q.    I was just pointing you to
 8   that.
 9             At this time had there been
10   discussions between Cape Air and Shoreline
11   about changes to the financial terms of the
12   transaction?
13             MR. KRIEGSMAN:  Objection to
14        form.
15        A.    Yes, there were -- to be clear
16   there were changes in the financial
17   structure throughout the discussions.
18        Q.    At this time was Cape Air
19   willing to increase the purchase price to
20   offset the loss of the tax advantages on
21   the ESOP?
22        A.    Cape Air was willing to pay --
23             MR. KRIEGSMAN:  Note objection
24        to the form.
25        A.    Cape air was willing to pay a
```

```
                                              Page 61
 1                    M. MIGLIORE
 2      certain amount for the business whether it
 3      was an asset sale or whether it was a stock
 4      sale.  We talked about and we know what
 5      John and Andrea wanted to accomplish from
 6      this.  So, we adjusted accordingly.
 7           Q.    When you say adjusted
 8      accordingly, does that mean you increased
 9      what Cape Air was willing to offer to
10      offset the loss of the tax advantages from
11      the ESOP?
12           A.    Cape Air didn't specifically --
13      wasn't specifically concerned about their
14      tax advantages or tax losses.  If you look
15      at the original MOU or LOI in March it
16      wasn't materially different in our eyes
17      than the final agreement.
18           Q.    But was Cape Air willing to pay
19      more to deal with any issues the Kellys
20      that with their taxes?
21                MR. KRIEGSMAN:   Objection.
22           A.    The deal structure changed so
23      we were back in negotiations and to get to
24      the final terms Cape Air wasn't necessarily
25      concerned with their tax advantages but ig
```

```
                                         Page 62
 1                     M. MIGLIORE

 2      was during negotiations that we agreed to

 3      the final financial terms of the agreement.

 4                 MR. SKIBELL:   Let's take a

 5            five-minute break.

 6                 (Whereupon, a brief break was

 7            taken.)

 8                 MR. SKIBELL:  I'm going to mark

 9            this as Exhibit Number 6.

10                 (Whereupon, an e-mail was

11            marked as Exhibit 6 for

12            identification as of this date by the

13            Reporter.)

14            Q.    Do you see the bottom of this

15      e-mail?  This is a document you'll see that

16      was produced by Cape Air in this case.

17      It's an e-mail from you to Mr. Magnuson and

18      others.  Do you see that, Mr. Migliore?

19            A.    I do.

20            Q.    Did you see the subject is

21      Shoreline evaluation documentation?  Do you

22      see that?

23            A.    I do.

24            Q.    A moment ago you were

25      testifying about how there were discussions
```

Page 63

```
 1                    M. MIGLIORE
 2    on the change version of the appeal.
 3         A.    Yes.
 4         Q.    The attachments to this are
 5    they financial information relating to
 6    chage structure of the deal?
 7              MR. KRIEGSMAN:   Objection to
 8         form.
 9         A.    I think so.  I would have to
10    see the actual document.
11         Q.    There's also a reference to a
12    meeting on 11-29, do you see that?
13         A.    Yes.
14         Q.    Was there a meeting on or
15    around November 29th between the parties to
16    discuss the terms of an asset purchase?
17         A.    Yes.
18         Q.    And at that meeting was a final
19    version of the deal agreed to between the
20    parties?
21         A.    If it wasn't on that date it
22    was very close to that date.  I don't know
23    if it was specifically that date, but
24    they're very close because we went ahead
25    and did the actual purchase agreement
```

```
                                              Page 64
 1                      M. MIGLIORE
 2      shortly after that.
 3           Q.    Before the parties met on
 4      November 29, did John Kelly make a proposal
 5      to Cape Air about a new version of the
 6      transaction?
 7           A.    I don't recall specifically.
 8      There were lots of discussion and lots of
 9      different spread sheets going back and
10      forth.  If you were to show me maybe it
11      would --
12           Q.    Let's see if this refreshes
13      your recollection.
14                 MR. SKIBELL:  I'm going to
15            enter in what will be Exhibit 7.
16                 (Whereupon, an e-mail dated
17            October 26, 2018 was marked as
18            Exhibit 7 for identification as of
19            this date by the Reporter.)
20           Q.    It's eight on the list of
21      exhibits I provided.  This is an e-mail
22      from Kelly to you dated October 26, 2018.
23                 MR. KRIEGSMAN:  You're marking
24            this as Exhibit 7 to the deposition?
25                 MR. SKIBELL:   Right.
```

```
                                      Page 65
 1               M. MIGLIORE
 2        Q.    You see it has an attachment.
 3    Do you see that?
 4        A.    Nothing is showing.
 5        Q.    I have to separate the
 6    attachment.  I want to be clear what I'm
 7    doing.  Let me now enter the attachment to
 8    this particular e-mail so you have an it.
 9               You see saw the e-mail?
10        A.    This is the first time I'm
11    seeing that.  This is the first time that
12    you're showing it to me.
13        Q.    This will be marked as Exhibit
14    7.  Is this an e-mail from John Kelly to
15    you on or about November 26, 2018?
16        A.    Yes.
17        Q.    You see it has an attachment to
18    this.  Do you see that?
19        A.    I do.
20        Q.    I'm going to pull this down and
21    separately enter and provide you with the
22    attachment.  It is an Excel file so that's
23    why I need to do it separately.  This is
24    part of Exhibit 7.
25               Does this refresh your
```

```
                                          Page 81
 1                    M. MIGLIORE
 2      the assets this was based on information
 3      provided to you by Shoreline; is that
 4      correct?
 5           A.    Yes, it's information received
 6      during the due diligence throughout the
 7      process.
 8           Q.    Did Shoreline ever provide you
 9      estimated value on a customer list?
10           A.    Not that I recall.
11                MR. SKIBELL:   We're going to
12             the next exhibit.  It should be
13             Exhibit 9.
14                   (Whereupon, an e-mail from Mr.
15             Kelly was marked as Exhibit 9 for
16             identification as of this date by the
17             Reporter.)
18                MR. KRIEGSMAN:   What you
19             pre-marked as 10 is going to be 9
20             now?
21                MR. SKIBELL:   Yes.
22           Q.    You'll see this is a document
23      that bears the bates stamp HAS0002267 and
24      this is an e-mail from Mr. Kelly to Mr.
25      Wolf, Miss Markham and to you; correct?
```

```
                                          Page 82

 1                        M. MIGLIORE
 2         A.     Yes, correct.
 3         Q.     Is he responding to 6.3 million
 4    dollar proposal?
 5         A.     Yes.
 6         Q.     He's making a suggestion -- a
 7    change to the employment terms for Miss
 8    Collingwood and himself?
 9         A.     Yes.
10         Q.     You will see an attachment here
11    labelled response to Cape Air offer.  Do
12    you see that?
13         A.     Yes.
14         Q.     I'm going to show you that
15    document now which is part of this
16    document.  You'll see if you look at the
17    top of this document there's a purchase
18    price.  Do you see that?
19         A.     I do.
20         Q.     I'm going to go back to the
21    Exhibit 9.  Is this a document you received
22    from Mr. Kelly?
23         A.     Yes, it is.
24         Q.     Does this have a slightly hire
25    purchase price for the transaction?
```

```
                                          Page 83

 1                    M. MIGLIORE

 2        A.    Yes, slightly higher than 6.3.

 3        Q.    That's based on changes to the

 4   employment contract; is that correct?

 5              MR. KRIEGSMAN:   Objection to

 6          form.

 7        A.    I don't think it was

 8   specifically just for the employment

 9   contracts.

10        Q.    It's a counter that's

11   approximately almost $75,000 higher; is

12   that right?

13        A.    Correct.

14        Q.    And did Cape Air accept that

15   offer?

16        A.    It looks to be the final

17   document.  I'm trying to recall the cash

18   payment at closing at 4.3.  It looks to be

19   extremely close to the final documents.

20   There was a couple of moving parts but I

21   think it is the final deal structure, yes.

22        Q.    I'm going to take this document

23   down.

24              MR. SKIBELL:  I'm going to

25          enter one more document here.  I'm
```

Page 84

1              M. MIGLIORE

2       going to share my screen.  This was a

3       document that was produced to us

4       without an attachment.  I'm going to

5       direct you to the third tab.

6            (Whereupon, a spread sheet was

7       marked as Exhibit 10 for

8       identification as of this date by the

9       Reporter.)

10       Q.    Or the second tab.  You'll see

11   this is similar to a document we looked at

12   earlier but it adds a new proposal under

13   column K.  Do you see that?

14       A.    Yes.

15       Q.    Is this something that you

16   wrote?

17       A.    It's something I prepared,

18   yeah.

19       Q.    Is this an evaluation of Mr.

20   Kelly's counter proposal?

21       A.    Yes, it is.

22       Q.    If you look at E that's the

23   original agreement?

24       A.    That is correct.

25       Q.    Under that version of the

```
                                    Page 85
 1                    M. MIGLIORE
 2      original agreement Cape Air is paying
 3      roughly $600,000 more than it values the
 4      assets of the company?
 5          A.    That is correct.
 6          Q.    Under Mr. Kelly's revised
 7      proposal Cape Air is paying a little over
 8      1.1 million over the value of the assets of
 9      the company; is that correct?
10          A.    Yes, that's correct.
11          Q.    It's paying approximately
12      $500,000 more in its estimation for this
13      transaction?
14          A.    Yes.
15          Q.    Was that to address the tax
16      issues that we had discussed earlier about
17      not using the ESOP?
18          A.    It wasn't specifically to
19      address the tax issues.  We were willing to
20      pay a certain amount that was in
21      negotiations to get to a price where we
22      were willing to pay.  In John's point of
23      view maybe it was to address that, but we
24      were willing to pay a certain amount for
25      the business.
```

Page 86

1                    M. MIGLIORE

2          Q.    In column E you see the

3     purchase price was five million dollars; is

4     that correct?

5          A.    Yes.

6          Q.    The purchase price in column K

7     is a little over 6.3 million dollars; is

8     that correct?

9          A.    That's correct.

10         Q.    So, you're paying roughly

11    1.3 million dollars more than under the

12    original agreement; right?

13         A.    Yes.

14         Q.    Would that extra money on the

15    purchase price be there to address in part

16    Mr. Kelly's tax concerns?

17              MR. KRIEGSMAN:    Objection to

18          form.

19         A.    I know one of their concerns

20    was the taxes.  I don't specifically know.

21    We didn't specifically increase that to say

22    we're going to take care of John's tax

23    issues.

24         Q.    In the negotiations related to

25    the higher purchase price of more than

```
                                    Page 87
 1                    M. MIGLIORE
 2    6.3 million dollars, did Mr. Kelly use his
 3    tax issues as a justification for a higher
 4    purchase price?
 5                MR. KRIEGSMAN:   Objection to
 6          form.
 7         A.    Yes, I think it was a
 8    negotiating point from his perspective.
 9         Q.    Did he also claim there were
10    tax benefits to Cape Air of doing a
11    transaction as an asset purchase instead of
12    a stock purchase?
13         A.    Yes.
14         Q.    Was that one of the reasons
15    that Cape Air was willing to pay almost
16    more than 1.3 million dollars more than
17    under the original merger scenario?
18                R. KRIEGSMAN:   Objection to
19          form.
20         A.    There were several reasons we
21    paid more.  One of those were taking into
22    the tax consideration of the assets we were
23    purchasing.
24         Q.    What were the other reasons
25    that Cape Air was willing to pay more for
```

Page 88

1                        M. MIGLIORE

2     an asset purchase rather than the original

3     merger?

4          A.    Cape Air really wanted to get

5     this deal done in a timely manner.  The

6     negotiations were going for some time.  We

7     were moving forward with our business and

8     we really wanted to close on that so from

9     our perspective it wasn't material so in

10    order to get the deal done we went ahead

11    and agreed to this amount.

12         Q.    To get the deal done in a

13    timely manner you were willing to pay more?

14         A.    Sure.

15              MR. SKIBELL:  We're going to

16          enter another exhibit.  This is

17          Exhibit 11.

18              (Whereupon, a nonbinding term

19          sheet was marked as Exhibit 11 for

20          identification as of this date by the

21          Reporter.)

22         Q.    It's a document that bears the

23    bates stamp HAS0002250 to HAS0002253.    Is

24    this the nonbinding term sheet that was

25    entered into the parties following

1                    M. MIGLIORE

2    negotiations that we were looking at?

3          A.    Yes, it is.

4          Q.    Does it reflect a little

5    6.3 million dollar transaction?

6          A.    Yes, it does.

7          Q.    And you see under one C there's

8    an indication of consideration.  The

9    consideration is allocated to different

10   assets.  Do you have an understanding as to

11   why that is?

12         A.    Why the consideration was

13   breaking out A, B, C or D?

14         Q.    Yes.

15         A.    Yes, for both tax purpose for

16   us and them we had to identify what the

17   purchase price went towards.

18         Q.    Did any of the purchase price

19   go towards a customer list?

20         A.    No, they did not.

21         Q.    You see under E it says

22   employment agreements?  We were discussing

23   earlier the salaries for Mr. Kelly and Miss

24   Collingwood.  So, under the term sheet they

25   were to get approximately $100,000 each

```
                                            Page 90

 1                    M. MIGLIORE
 2    year?
 3         A.    That is correct.
 4         Q.    That was was originally
 5    envisioned at the letter of intent we were
 6    looking the earlier?
 7         A.    The one back in March?
 8         Q.    Yes.
 9         A.    Yes, it was in the ballpark.
10         Q.    If you look on F it refers to
11    noncompetition agreement.  Do you see that?
12         A.    Yes.
13         Q.    They were to get approximately
14    1.5 million dollars for the noncompete; is
15    that right?
16         A.    That is correct.
17         Q.    Was that part of the
18    consideration for the transaction?
19         A.    Yes, it was.
20         Q.    And that was paid directly to
21    Mr. Kelly and Miss Collingwood?
22         A.    Yes.
23         Q.    Do you know if all of the money
24    due under their contracts was paid to them?
25                    MR. KRIEGSMAN:   Objection to
```

```
                                          Page 91

 1                    M. MIGLIORE

 2         form.

 3         A.    Yes, it was.

 4              MR. SKIBELL:   Let's take a

 5         five-minute break and I'll organize

 6         the last questions and then Alex can

 7         question.   Does that work?

 8              (Whereupon, a brief break was

 9         taken.)

10              MR. SKIBELL:  I'm going to

11         enter Exhibit 12.

12              (Whereupon, a due diligence

13         list was marked as Exhibit 12 for

14         identification as of this date by the

15         Reporter.)

16         Q.    You'll see this is a document

17    that was produced by Shoreline in this

18    case.  It bears the bates stamp SAI004784

19    to SAI004788.  So, I'm going to direct your

20    attention to the fourth page that talks

21    about a Shoreline due diligence list.

22              Mr. Migliore, you testified

23    earlier about a due diligence list that

24    Cape Air sent to Shoreline.  Do you recall

25    that?
```

```
                                        Page 92
 1                     M. MIGLIORE
 2          A.     I do.
 3          Q.     Does this appear to be the due
 4     diligence list that Cape Air sent to
 5     Shoreline?
 6          A.     Yes, it does.
 7          Q.     This was the information that
 8     Cape Air was using to value the company?
 9          A.     That is correct.
10          Q.     So, if you look down you'll see
11     there's a column that's labelled under
12     intellectual property.  Do you see that?
13          A.     I do.
14          Q.     Under that column Cape Air did
15     not request information on a customer list;
16     is that correct?
17          A.     That is correct.
18          Q.     Is there anywhere in this due
19     diligence list that Cape Air requested
20     information about a customer list?
21          A.     Can I get a minute to go
22     through it?
23          Q.     Sure.
24               MR. KRIEGSMAN:   How is this
25          marked in what you sent over to me?
```

```
                                              Page 93
  1              M. MIGLIORE
  2              MR. SKIBELL:   This is in the
  3         information I sent to you.  I believe
  4         it's labeled as 13.
  5         A.    That is correct I don't see
  6    anything in here that references a customer
  7    list.
  8         Q.    Is this list based off of
  9    information that you were provided by John
 10    Kelly as to the assets of the company?
 11         A.    Can you restate that?
 12         Q.    Is this due diligence list
 13    based in part on information John Kelly
 14    provided you about what assets Shoreline
 15    had?
 16         A.    We created this due diligence
 17    list to give to Shoreline so they can
 18    provide us with this information.  I'm not
 19    sure that question you asked is the way I
 20    answered it.  They didn't provide us
 21    anything.  We provided the due diligence
 22    list.  They provided us the information in
 23    the due diligence list.
 24         Q.    This list is based on the
 25    information you believe was important to
```

```
                                         Page 94
 1                        M. MIGLIORE
 2     value Shoreline's business?
 3                  MR. KRIEGSMAN:   Objection.
 4          A.    That is correct.
 5          Q.    Cape Air did not request a
 6     customer list in connection with valuing
 7     Shoreline's business; is that right?
 8          A.    Yes, that is correct.
 9          Q.    You will see there's a section
10     called material contracts.  Do you see
11     that?
12          A.    I do.
13          Q.    Under this column is it correct
14     that Cape Air was requesting all material
15     contracts between Shoreline and any other
16     party?
17          A.    Yes, that is correct.
18          Q.    Am I correct that Cape Air
19     never received any information suggesting
20     there was a contract between Sound Aircraft
21     and Shoreline?
22                  MR. KRIEGSMAN:   Objection to
23           form.
24          A.    I don't specifically recall all
25     the information we received under the
```

```
                                           Page 95

 1                    M. MIGLIORE

 2     material contracts due diligence list.

 3          Q.    Do you recall receiving any

 4     information suggesting or indicating that

 5     there was a contract between Shoreline and

 6     Sound?

 7          A.    Yeah, I do not recall that.

 8          Q.    I'm going to pull this down.  I

 9     want to go to the period after the

10     transaction closed.  Do you recall when it

11     closed approximately?

12          A.    The 29th or 30th of December.

13          Q.    Am I correct that John Kelly

14     died in July of the following year?

15          A.    That is correct.

16          Q.    In connection with this

17     transaction did he ever tell you he had

18     cancer?

19          A.    Yes, we were aware during the

20     process that he had cancer.

21          Q.    When in the process did he

22     inform you that he had cancer?

23          A.    I would say the fall.

24          Q.    So, was that before the final

25     terms of the deal were reached?
```

```
                                            Page 96
 1                    M. MIGLIORE
 2          A.    Yes, it was the fall of 2018.
 3     The final deal was late -- the LOI was
 4     December five, 2018.
 5          Q.    Did his untimely passing did
 6     that affect Shoreline's business?
 7          A.    I assume it did.  It clearly
 8     affected our business.
 9          Q.    How did it affect your
10     business?
11          A.    Well, one of the reasons we
12     were buying Shoreline was for John's
13     knowledge of the sea plane business and
14     clearly having an employment agreement we
15     wanted him to literally run that sea plane
16     business, the maintenance program, just to
17     oversee he it completely.  He had much more
18     experience than anybody at Cape Air had
19     here.
20          Q.    Are you aware of how
21     Shoreline's business performed after the
22     asset purchase?
23               MR. KRIEGSMAN:   Objection.
24          A.    I'm not sure how to answer that
25     because there really wasn't a Shoreline
```

                                              Page 97

1                        M. MIGLIORE

2       business going forward.  When we -- we were

3       dealing with all the employees.  We were

4       dealing with all the customers going

5       forward so in all essence we were running

6       the Shoreline business with help from John

7       as an employee.

8            Q.    Relative to the pre-transaction

9       revenue generated by the business, did that

10      go down following the merger?

11           A.    Can you clarify?

12           Q.    So, before the merger you did

13      various financial projections from the

14      value of Shoreline's business?

15           A.    Before the closing of the deal?

16           Q.    Correct.  Before the closing of

17      the deal you did various financial analysis

18      of how Shoreline was doing; right?

19           A.    Correct.

20           Q.    You testified that after the

21      deal you were basically or Cape Air was

22      basically running the business; is that

23      right?

24           A.    That is correct.  If you were

25      to look at the contract it clearly says we

Page 98

1              M. MIGLIORE
2     were funding the business for two months
3     January and February.
4          Q.    How did the business perform
5     after the transaction relative to how it
6     performed before the transaction?
7          A.    Are you asking financially?
8          Q.    Yes.
9          A.    Financially it was about the
10    same.  It was, you know, typically losses
11    money in the first quarter and we knew it
12    was going to lose money in the first
13    quarter.
14         Q.    After those first two months,
15    were you still running the business, Cape
16    Air, or was Shoreline running itself?
17         A.    No, we were running the
18    business.
19         Q.    How did it continue to perform
20    after that initial period of time?
21         A.    Similar to previous years.
22         Q.    Now, you testified earlier
23    about the Boston to New York route and why
24    that was part of the thinking behind the
25    deal.  Do you recall that?

```
                                        Page 99
 1                    M. MIGLIORE
 2          A.    I do.
 3          Q.    Did that Boston to New York
 4    route come to fruition?
 5          A.    No, it never did.
 6          Q.    Did that impact the
 7    profitability of the sea plane business?
 8          A.    Yes, it did.
 9          Q.    Did COVID impact the
10    profitability of the sea plane business?
11          A.    No, we shut down the business
12    prior to COVID.  It was almost the same
13    exact time that we shut down the business.
14    I think we announced late February, early
15    March, to the employees that we were not
16    going forward with it.
17          Q.    Why did Cape Air shut down the
18    business?
19          A.    The main reason for buying
20    Shoreline and for doing the business plan
21    was the Boston to New York market.  There
22    were many approvals that we needed to get
23    in Boston Harbor and we were not able to
24    get those approvals and to run a viable
25    business.
```

Page 100

1                    M. MIGLIORE
2          Q.    But the business operations in
3    terms of volume or profitability or amount
4    of customers was the same after the
5    transaction as before the transaction?
6               MR. KRIEGSMAN:  Objection to
7           form.
8          A.    The amount of business that was
9    generated prior to the deal versus after
10   the deal you're asking?
11         Q.    Yes.
12         A.    Yeah, in 2019 I think we did
13   roughly the same amount of revenue as they
14   did in previous years from just the I'll
15   say Shoreline business.
16         Q.    Were the costs roughly the same
17   after the transaction as before the
18   transaction?
19         A.    I think they grew but they were
20   roughly about the same.
21         Q.    In terms of profitability the
22   business was roughly a profitable after the
23   transaction as before the transaction?
24               MR. KRIEGSMAN:  Objection to
25           form?

1                    M. MIGLIORE

2         A.    From the analysis we did the

3    business wasn't profitable.

4         Q.    Did that change from before the

5    transaction to after the transaction?

6         A.    No, it did not.

7         Q.    What happened to the assets

8    that Cape Air had?

9         A.    Over 2019 -- no, over 2020 it

10   was early once we decided we started to

11   sell the assets.

12        Q.    Who did you sell the assets to?

13        A.    There were probably various but

14   there was one company that bought the

15   inventory and the aircrafts.  If you say it

16   I'll remember it.  I forgot right now who

17   it was.

18        Q.    Was it Fly the Whale?

19        A.    Yes, thank you.

20        Q.    Did you offer to sell the

21   business back to Miss Collingwood?

22        A.    I don't recall.  I don't think

23   so.

24        Q.    Do you recall what you got on

25   the assets of Shoreline after you sold it

```
                                        Page 102
 1                    M. MIGLIORE
 2      to Fly the Whale?
 3           A.     How much we received?
 4           Q.     Yes.
 5           A.     Specifically, no.
 6           Q.     Do you recall did Cape Air lose
 7      money on the Shoreline transaction?
 8           A.     Yes.
 9           Q.     Do you know approximately how
10      much Cape Air lost in the Shoreline
11      transaction?
12           A.     A significant amount.
13           Q.     Can you give me an idea of what
14      a significant amount means?
15           A.     Several million dollars.
16           Q.     Is it more than two million
17      dollars?
18           A.     Yes.
19           Q.     Is it more than four million
20      dollars?
21           A.     I don't recall the specific
22      amount on that but it was greater than two.
23           Q.     Was it in your mind between two
24      and four million dollars?
25           A.     Yes.
```