# EXHIBIT 25

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X
SHORELINE AVIATION, INC.,

                          Plaintiff,


          -against-                    Case No.
                                       2:20-cv02161
                                       JMA-SIL


CYNTHIA L. HERBST, SOUND AIRCRAFT
FLIGHT ENTERPRISES, INC., RYAN A.
PILLA, BLADE URBAN AIR MOBILITY,
INC., a/k/a FLY BLADE, INC., MELISSA
TOMKIEL, and ROBERT S. WIESENTHAL,

                          Defendants.

-------------------------------------X


                          June 8, 2022
                          10:03 a.m.
                          Virtual Zoom



          DEPOSITION of RYAN A. PILLA, a
Defendant herein, taken by the Plaintiff,
pursuant to Rule 30(B)(6) of the Federal Rules
of Civil Procedure, and Notice, held at the
above-mentioned time and place, before Susan
Crane, a Notary Public of the State of New York.

```
                                               Page 7
 1                    R. Pilla
 2    today's deposition?
 3         A       I read over the Interrogatories
 4    and the Complaint.  That was it.
 5         Q       I'm not interested in knowing
 6    about the substance of any communications you
 7    may have had with Mr. Skibell, but without
 8    revealing that, did you speak to anyone else
 9    about today's deposition?
10         A       No.
11         Q       Did you speak to Ms. Herbst about
12    today's deposition?
13         A       Yes.  The only two people I have
14    spoken to is Mr. Skibell and Cindy.  That's it.
15         Q       When did you speak to Ms. Herbst?
16         A       I live with Ms. Herbst.  She is my
17    significant other.
18         Q       When did you speak to her about
19    today's deposition?
20         A       I saw her this morning.  I saw her
21    last night.  Like I said, I see her every day.
22         Q       I'm only asking you now about the
23    deposition.  What did you and Ms. Herbst discuss
24    about today's deposition?
25         A       Not too much of anything.  I mean
```

```
                                         Page 8

 1                      R. Pilla

 2    again, I read over the Interrogatories and I

 3    read over the Complaint.

 4         Q      Do you know that she previously

 5    had her deposition taken in this case?

 6         A      Yes, I do.

 7         Q      Were you present for that?

 8         A      No, I was not.

 9         Q      Have you seen a recording of that?

10         A      No, I have not.

11         Q      Have you read a transcript of it?

12         A      No, I have not.

13         Q      Did you know that Andrea

14    Collingwood had her deposition taken in this

15    case?

16         A      Yes, I do.

17         Q      Were you present for that?

18         A      No, I was not.

19         Q      Have you seen a recording or read

20    a transcript of that deposition?

21         A      I have not.

22         Q      Can you briefly describe your

23    educational background?

24         A      Sure.  I graduated cum laude from

25    Rollins College in Winter Park, Florida.  I was
```

```
                                          Page 9
 1                     R. Pilla
 2   a business major.
 3         Q      What year did you graduate?
 4         A      '94.
 5         Q      Any further education or
 6   certificates or training beyond your college
 7   education?
 8         A      Well, I have ASC certifications.
 9   I'm a mechanic.  I'm a -- antique car, classic
10   car, BMW Porsche, Mercedes.  I have world
11   records.  I have quite a resume in the
12   mechanical field.
13         Q      Just briefly what is your
14   educational component of that, if any?  Do you
15   have any certificates or training that you
16   completed in that field?
17         A      I own a business called The Car
18   Doctor and everyone calls me the doctor so I
19   consider myself the doctor of cars.
20         Q      Can you describe for us briefly
21   what that business is and what it does?
22         A      It's a repair business.  We do
23   antique car work, classic car work, high
24   performance work.  Like I said, my expertise is
25   in full foreign and domestic BMWs, Porsche,
```

```
                                        Page 10
 1                        R. Pilla
 2    Mercedes, Ferraris, Bentleys.  I'm the doctor,
 3    mad scientist of cars.
 4            Q       When did you start that business?
 5            A       During college.  I have been doing
 6    it ever since.
 7            Q       Did you start it in Florida?
 8            A       I started it -- actually my father
 9    was very involved in the automotive business so
10    I was -- whatever I could work on -- he built
11    cars -- at the time to make money, I would.
12    Wherever I was at the present time, but I have
13    been working on cars since I was five years
14    old.
15            Q       When did you start The Car Doctor?
16            A       The Car Doctor out here in the
17    Hamptons was started, I don't know the exact
18    business certificate date, but sometime in the
19    late '90s.  I think probably certificatewise
20    and, you know, it was probably in the early
21    2000s.
22            Q       Where is that business located?
23            A       In Water Mill.
24            Q       Any other locations other than
25    Water Mill?
```

```
                                              Page 11

 1                      R. Pilla

 2         A       No.

 3         Q       Has it ever been located in any

 4   other places other than Water Mill?

 5         A         It was located in Amagansett at

 6   the time.  At the time The Car Doctor existed in

 7   the Hamptons half of it was in Amagansett and

 8   half of it was in Water Mill.

 9         Q       Was it in Amagansett first?

10         A       Yes.

11         Q       Approximately if you recall, when

12   did you move it to Water Mill?

13         A       I don't totally recall that.

14   Maybe -- I'm not sure, 2007 or 2008.  Somewhere

15   around there.  I'm not really sure.

16         Q       Are you the sole owner of The Car

17   Doctor?

18         A       I am.

19         Q       Have you always been?

20         A       I am, yes.  I have.

21         Q       You don't have any partners or

22   owners of the The Car Doctor at present?

23         A       No.

24         Q       And never have there been before?

25         A       No.
```

```
                                          Page 14

 1                      R. Pilla
 2          A        Oh, boy, what was his name?  You
 3   would know him better than me.  He was a good
 4   client of yours.  He had a gray truck that we
 5   did for him.  I'm not really sure what his name
 6   was.  I'm not sure what it was.
 7          Q        Was that Michael Gaynor?
 8          A        Yes.
 9          Q        Did Michael Gaynor file a lawsuit
10   against The Car Doctor?
11          A        I don't know if it was a lawsuit.
12   I know there was paperwork saying he wasn't
13   happy with this, that or the other thing, and he
14   didn't want to pay the amount that was owed.
15   Then you and I believe the attorney at the time
16   was -- you can help me out with that too.
17          Q        Brian Doyle?
18          A        Brian Doyle.  Then we came to an
19   agreement and he paid half of what was owed and
20   it was settled.
21          Q        Other than Mr. Gaynor, are you
22   aware of anyone else filing a lawsuit --
23          A        No.
24          Q        -- in court against The Car
25   Doctor?
```

```
                                              Page 15

 1                          R. Pilla

 2          A        No, not that I know of.

 3          Q        Has The Car Doctor filed a lawsuit

 4    towards any other person or entity?

 5          A        Not that I recall.

 6          Q        I think you testified earlier that

 7    this is the first time that you have ever had

 8    your deposition taken?

 9          A        I believe so, yes.

10          Q        Have you ever given any testimony

11    at any sort of proceeding where you were being

12    questioned with a court reporter?

13          A        Not that I recall.

14          Q        What is your relationship with

15    Ms. Herbst?

16          A        She is my girlfriend, my

17    significant other, the current love of my life.

18    This is the last one.  I finally found it.

19          Q        How long has Ms. Herbst been your

20    girlfriend?

21          A        Approximately 10 years.

22          Q        Do you also have a business

23    relationship with Ms. Herbst?

24          A        No, I don't.

25          Q        Have you ever had a business
```

```
                                          Page 16

 1                     R. Pilla

 2    relationship with Ms. Herbst?

 3         A      No.

 4         Q      Do you own any other businesses

 5    other than The Car Doctor?

 6         A      No, I don't.

 7         Q      In the past have you owned any

 8    businesses other than The Car Doctor?

 9         A      No, I haven't.

10         Q      Any ownership interest in

11    businesses other than The Car Doctor?

12         A      All in The Car Doctor.  It's been

13    my only business, my pride and joy from day one.

14    I started it from nothing and made quite a

15    success out of it from who we are from a Car

16    Doctor standpoint.

17         Q      Great.  Does Ms. Herbst have any

18    involvement with The Car Doctor?

19         A      No.

20         Q      Has she ever had any involvement

21    with The Car Doctor?

22         A      No.

23         Q      Does she have an ownership

24    interest in The Car Doctor?

25         A      No.
```

```
                                       Page 17

 1                         R. Pilla
 2         Q       Has Ms. Herbst ever had an
 3    ownership interest in The Car Doctor?
 4         A       Never.
 5         Q       What does Ms. Herbst do for a
 6    living right now?
 7                         THE WITNESS:  My screen
 8                   just went blank.  Can you repeat
 9                   the question?
10                         MR. KRIEGSMAN:  The Zoom
11                   format is unusual so let us know
12                   at any time it changes.
13         Q       What does Ms. Herbst do for a
14    living right now?
15         A       She sells aviation charters.
16                         MR. SKIBELL:  I believe
17                   your Outlook is open, Alex.
18         Q       You said Ms. Herbst sells aviation
19    charters; does she do that through an entity?
20                         MR. SKIBELL:  Objection.
21                   You can answer.
22         A       She does that through her business
23    at SAFE.
24         Q       Is Ms. Herbst the owner of SAFE?
25         A       Yes, she is.
```

```
                                           Page 18

 1                        R. Pilla
 2          Q       Sole owner?
 3          A       As far as I know, yes.
 4          Q       As far as you know, how long has
 5   she been the owner of SAFE?
 6          A       I wouldn't know that.  As long as
 7   I have known her.
 8          Q       Are you familiar with Sound
 9   Aircraft Services?
10          A       Yes.
11          Q       What is your understanding of what
12   Sound Aircraft Services is?
13          A       All I know is when I met Cindy,
14   she was the brain child behind everything.  And
15   there was I believe two parts of the business,
16   one was charters and one was fuel.  I think
17   Sound Aircraft Services was the fuel and ground
18   services and then SAFE was the charter component
19   of her company.
20          Q       Do you have any ownership interest
21   in SAFE?
22          A       No.
23          Q       Do you have any involvement in
24   SAFE?
25          A       No, besides being Cindy's
```

```
                                               Page 19
 1                        R. Pilla
 2   girlfriend -- boyfriend, that's it.
 3        Q      Have you ever had an ownership
 4   interest in SAFE?
 5        A      No.
 6        Q      Have you ever had any involvement
 7   in SAFE?
 8        A      No.
 9        Q      Did you ever have any ownership
10   interest in Sound Aircraft Services or any other
11   entity that Ms. Herbst was involved in?
12        A      Never.
13        Q      Did you ever have any involvement
14   in Sound Aircraft Services or any other business
15   entity that Ms. Herbst was involved in?
16        A      No.
17        Q      I think you testified earlier you
18   understand we are here today in connection with
19   a lawsuit?
20        A      Yes.
21        Q      What is your understanding of what
22   this lawsuit is about?
23                        MR. SKIBELL:  Objection to
24                   form.  You can answer if you
25                   understand the question.
```

```
                                         Page 20

                            R. Pilla

 1

 2        A       What do I -- repeat it again,

 3   Mr. Kriegsman.

 4        Q       Sure.  What is your understanding

 5   of what this lawsuit is about?

 6        A       This lawsuit as far as I know

 7   is -- again, I hope I'm not speaking out of turn

 8   -- very frivolous in my opinion.  With that

 9   said, this was about someone stating that

10   Cindy's customers were someone else's, which

11   they are not.

12        Q       What do you mean by that, "Cindy's

13   customers"?

14                     MR. SKIBELL:  Objection.

15                     You can answer if you understand

16                     the question.

17                     MR. KRIEGSMAN:  Just to be

18                     clear, Mr. Pilla, I'm going to ask

19                     you some questions and Mr. Skibell

20                     may interpose objections.  Unless

21                     he instructs you not to answer,

22                     you just answer the question.

23                     MR. SKIBELL:  I instruct

24                     you not to answer about any

25                     communications you have had with
```

```
                                        Page 25

  1                        R. Pilla

  2     multiple friends and acquaintances at the

  3     airport so this is something that I just

  4     observed.  Obviously everyone observed it.

  5     Everyone knows Cindy.  Cindy was the East

  6     Hampton Airport.  Cindy has been there forever.

  7     She started everything.

  8           Q      You came to learn that by being a

  9     pilot and customer and passenger at the East

 10     Hampton Airport; is that fair to say?

 11           A      Yes.  She actually -- before we

 12     became in a relationship she actually way back

 13     in the day used to charter -- I used to charter

 14     planes from her.  At that point I basically

 15     said, Well, why don't I learn how to fly.  Then

 16     I became I'm part of East Hampton Airport and a

 17     person around the airport.

 18           Q      Any other ways that you came to

 19     learn about SAFE or Cindy's business or

 20     operations at the East Hampton Airport?

 21           A      No.

 22           Q      I understand that you, Ryan Pilla,

 23     are named personally as a defendant in this

 24     case?

 25           A      Yes.
```

```
                                              Page 26

 1                      R. Pilla
 2        Q        What is your understanding of what
 3   the claims are against you?
 4        A        I don't have too much
 5   understanding.  Like I said, I think this is a
 6   frivolous component of that.  Conversations with
 7   my girlfriend facilitate that I did something
 8   wrong.  Again, that's just a simple conversation
 9   and advice that she asked me for, and I don't
10   know why someone that brought coffee to the
11   table is part of this case.
12        Q        Did you do anything else other
13   than bring coffee to the table?
14        A        I had simple conversations with
15   her and giving her advice that she asked for.
16   The reason being is because I have done other
17   deals like this so I tried to help her in any
18   way, shape or form that I could so she wasn't
19   taken advantage of.  If I had any advice for her
20   being she is my significant other, just as you
21   would, I gave it to her.
22                      MR. KRIEGSMAN:  I'm going
23                      to mark as Exhibit A the Amended
24                      Complaint in this case.
25                      (Plaintiff's Exhibit A,
```

```
                                                    Page 27

 1                          R. Pilla

 2                          Amended Complaint, was marked for

 3                          identification, as of this date.)

 4          Q        Mr. Pilla, I'm showing you a

 5     document that has been marked as Exhibit A for

 6     this deposition.  This is the Amended Complaint

 7     in this action that was filed on April 1, 2021.

 8     I'm going to scroll through that slowly.  Please

 9     let me know if you want me to speed up, slow

10     down or go back.

11                          MR. SKIBELL:  Do you want

12                          to get some context as to what you

13                          are asking about?  You are

14                          scrolling too fast.

15          Q        Is it too fast, Mr. Pilla?

16                          MR. SKIBELL:  If you want

17                          him to read the entire thing, you

18                          need to go slow.  Is that what you

19                          want, Alex?

20                          MR. KRIEGSMAN:  Reid, when

21                          I'm interested in your advice, I

22                          will let you know about it.

23                          MR. SKIBELL:  You can't

24                          scroll through like you are doing,

25                          Alex, and ask my client questions.
```

```
                                            Page 32

 1                      R. Pilla
 2          A       I don't know much about it.
 3          Q       Did you have any involvement in
 4   this relationship other than bringing coffee to
 5   the table and giving advice?
 6          A       No, I didn't.
 7          Q       Did you have any relationship with
 8   Shoreline?
 9          A       Never.
10          Q       Any involvement with Shoreline at
11   all?
12          A       Never.
13          Q       Other than bringing coffee to the
14   table and providing advice, did you ever have
15   any contact or communications or negotiations
16   with Shoreline?
17          A       Mr. Kriegsman, if you want to ask
18   a direct question, I can answer you.  It seems
19   you are being very vague in the way of asking me
20   a question.  I read the Complaint.  I read the
21   Interrogatories.  I read the information that
22   has been produced.  If you want to ask me a
23   question about it, feel free to ask and I will
24   answer it for you.
25                      MR. KRIEGSMAN:  Susan, can
```

```
                                              Page 33

 1                          R. Pilla

 2                   you read back the last question,

 3                   please.

 4                          (The requested portion of

 5                   the record was read by the Court

 6                   Reporter.)

 7                          MR. SKIBELL:  Objection,

 8                   vague.  You can answer if you

 9                   understand the question.

10         Q         Did you understand the question,

11    Mr. Pilla?

12         A         No, I don't understand the

13    question.  If you want to rephrase it, I can try

14    to answer it for you.

15         Q         Sure.  Let's try to break it up.

16    You testified earlier that you brought coffee to

17    the table and provided advice to Ms. Herbst,

18    correct?

19         A         Correct.

20         Q         Did you ever have any contact with

21    Shoreline Aviation?

22                          MR. SKIBELL:  Objection.

23         A         The only contact I have had with

24    Shoreline Aviation, and that is a broad

25    statement, was simply I have had from time to
```

```
                                              Page 34
 1                        R. Pilla
 2    time communications with John Kelly which was
 3    presented in your evidence.  That's what I'm
 4    referring to.
 5            Q       Any other contact with Shoreline?
 6            A       No.
 7            Q       Did you ever negotiate with
 8    Shoreline?
 9            A       (Nodding)
10            Q       You are shaking your head.  You
11    have to give an answer.
12            A       No, never negotiated with
13    Shoreline.
14            Q       You mentioned from time to time
15    you had communications with John Kelly; what
16    were those?
17            A       They were during the time that
18    they were trying to join forces with Blade.
19    Cindy was at the time having some surgical
20    procedures and having some medical procedures
21    and also taking her daughter to colleges and
22    stuff, so from time to time she was unavailable.
23                    So there was some small text
24    messages back and forth between John Kelly and
25    myself trying to set up a meeting so everyone
```

```
                                              Page 35
 1                       R. Pilla
 2    could join forces instead of compete against
 3    each other.  Because in my opinion, my advice at
 4    the time was that why not join forces and work
 5    together instead of competing against each
 6    other.
 7         Q      When you say everyone, who do you
 8    mean by that?
 9         A      Blade, Rob Wiesenthal, Melissa
10    Tomkiel, and Cindy, SAFE.
11         Q      When you use the phrase
12    "everyone," does that include Shoreline in that?
13         A      Yes, Shoreline, John Kelly.
14         Q      When you said everyone should join
15    forces, you meant Blade, Wiesenthal, Tomkiel on
16    the one hand, Cindy, SAFE, and Sound on the
17    other hand, and Shoreline John Kelly; is that
18    who you are referring to?
19         A      Yes.
20         Q      Anyone else or any other entity?
21         A      No.
22         Q      What did you mean when you said
23    "join forces"?
24         A      Again, you know, they all did
25    separate things within their company, so at that
```

Page 36

                           R. Pilla

1    point in time, it was -- East Hampton Airport is

2    a small airport, and you guys should all work

3    together instead of compete against each other.

4          Q       This is happening in the 2018 time

5    frame?

6          A       I'm not very good with dates,

7    Mr. Kriegsman, but yes.  Again, this is my

8    opinion in the way that it seemed as though

9    everyone could work better together instead of

10   against each other.  That was my opinion.

11         Q       How did you think at that time the

12   parties were working against each other?

13                 MR. SKIBELL:  Objection.

14         A       I don't understand the question.

15   They all brought something to the table; you

16   know, you should all work together.  I wasn't

17   involved in any of that.  I just knew that from

18   a business component when there's a big gorilla

19   in the room and smaller little ones, maybe it is

20   easier for everyone to join each other and

21   become one.

22         Q       Who was the gorilla in the room?

23         A       I don't know.  I'm just saying if

24   there was.  I'm simply saying why work against

```
                                              Page 37
 1                      R. Pilla
 2   each other, you can all work together.  Again
 3   it's a small airport.  There's only one --
 4        Q      I'm sorry, I didn't mean to
 5   interrupt you.
 6        A      It is a very small community, the
 7   aviation community at East Hampton Airport.
 8        Q      When you use the phrase "gorilla
 9   in the room," were you referring to Blade?
10        A      I was referring to whoever was the
11   powerful one there, they should all join
12   together with whoever it was.
13        Q      Okay, but I'm asking --
14        A      Cindy has been there the longest.
15   She has been there over 35 years.
16        Q      Were you referring to Cindy as the
17   gorilla in the room?
18                      MR. SKIBELL:  Objection.
19        A      No, I wasn't referring to anyone
20   as the gorilla.
21        Q      Amongst those parties that you
22   identified; Blade, Cindy, SAFE, Shoreline, John
23   Kelly, if one of those would be the gorilla in
24   the room, who would that be?
25                      MR. SKIBELL:  Objection;
```

```
                                          Page 38
 1                      R. Pilla
 2              asked and answered.  You can
 3              answer it again.
 4       A      Everyone did something different.
 5   There were helicopters, there's seaplanes,
 6   there's Cindy's charter planes.  Everyone did
 7   something, again so -- I don't know who was more
 8   powerful than the other.
 9       Q      When you used the phrase "gorilla
10   in the room," you weren't referring to Blade?
11       A      What's that?
12                  MR. SKIBELL:  Objection;
13              asked and answered.
14       Q      Did you think there was a time
15   where Blade or Cindy or Shoreline were working
16   against each other?
17       A      No, I just think they had their
18   own separate entity, whatever they did.  There
19   was no reason for them to compete against each
20   other is what I was saying.
21       Q      To your knowledge, were there
22   negotiations by and amongst Blade and Shoreline
23   and Cindy?
24       A      Ask the question again.
25       Q      Were you aware of negotiations to
```

```
                                         Page 39
 1                    R. Pilla
 2   work together between Blade, the Blade parties,
 3   Cindy, SAFE, and Shoreline?
 4         A      Yes, I was aware of it.  I was not
 5   part of the negotiations, I was aware of it.
 6         Q      How did you come to be aware of
 7   it?
 8         A      Through conversations with Cindy.
 9         Q      Any conversations with Shoreline?
10         A      No.  Like I already stated, I had
11   minimum conversations with John Kelly trying to
12   just set up a meeting for everyone to meet and
13   discuss this.
14         Q      Through your personal relationship
15   with Cindy you became aware of negotiations
16   between Cindy, Shoreline, and Blade?
17         A      Yes.
18         Q      Did you participate in the
19   negotiations?
20         A      I did not participate in any
21   negotiations.
22         Q      You never negotiated with
23   Shoreline on Cindy's behalf?
24         A      No.
25         Q      You never negotiated with Blade on
```

```
                                        Page 40
 1                    R. Pilla
 2   Cindy's behalf?
 3        A        I simply had a conversation.  I
 4   had spoken to John Kelly via text like I said to
 5   you.  And from time to time being that I was
 6   around the airport, I would have small talk with
 7   Rob Wiesenthal, both of them, just trying to get
 8   Cindy and Rob Wiesenthal to speak about this to
 9   try to better Cindy's life as -- like I stated
10   already, I'm trying to get her to work less.
11        Q        What was the nature of the small
12   talk?
13        A        Oh, nothing.  It was just a
14   conversation that Rob Wiesenthal needed to get
15   in touch with Cindy to know the ins and outs of
16   her business which I don't know.
17        Q        You suggested to Rob Wiesenthal
18   that he get in touch with Cindy to learn the ins
19   and outs of her business?
20        A        No, that's not what I said.  I
21   said Rob Wiesenthal asked from time to time, "Is
22   Cindy around?  Can you get Cindy in touch with
23   me," for conversation between Rob Wiesenthal and
24   Cindy, not between Rob Wiesenthal and me.
25        Q        Any other involvement?
```

```
                                        Page 41
 1                       R. Pilla
 2         A       No other involvement.
 3         Q       No other involvement in
 4  negotiations between Cindy on one hand and Blade
 5  on the other hand?
 6         A       No, besides the conversations
 7  between Cindy and I, and advice that she would
 8  ask me being that I was her boyfriend.  That's
 9  it.
10         Q       Did you ever try to get Shoreline
11  thrown out of the East Hampton Airport?
12         A       Never.
13         Q       Do you know who Jim Brundidge is?
14         A       Yes.
15         Q       Who is he?
16         A       The manager at the East Hampton
17  Airport.
18         Q       Did you ever film Shoreline
19  passengers?
20         A       No.  I took pictures -- and that's
21  very misleading in the way the Complaint was
22  written.  And those pictures that were taken of
23  Shoreline had nothing to do with this case
24  whatsoever.  This was simply -- those pictures
25  were for a breach that was happening by Cindy's
```

```
                                              Page 42
  1                         R.  Pilla
  2     ex-husband when he was facilitating charters
  3     behind the counter in the terminal.
  4          Q      Just to be clear, you never took
  5     any videos but you did take some pictures?
  6          A      I took some pictures and it wasn't
  7     of Shoreline's -- it wasn't of passengers.  It
  8     wasn't any of that.  It was simply of the
  9     ex-husband that was facilitating -- that's why
 10     when you read this Complaint, it is very
 11     misleading.
 12                 That was simply pictures that were
 13     taken of the ex-husband facilitating charters
 14     behind the East Hampton terminal counter which
 15     he was not allowed to do.  It was a breach of
 16     Cindy's and her ex-husband's marital
 17     stipulation.
 18                      MR. SKIBELL:  I would like
 19                 to take a break before you ask
 20                 your next question.
 21          Q      So you didn't take any video,
 22     correct?
 23          A      No.  I took pictures.
 24                      MR. KRIEGSMAN:  Let's take
 25                 that break.  How much time would
```

Page 56

1                        R. Pilla

2    World.

3          Q     Can you list the five businesses

4    that you were referring to?

5          A        It wasn't five.  It was four that

6    I just mentioned and that was The Car Doctor,

7    Car Doctor, Car Doctor World, Car Doctor Motor

8    Sports.

9          Q     Car Doctor, The Car Doctor, Car

10   Doctor World, and Car Doctor Motor Sports?

11         A     Correct.

12         Q     You said five, but it's four; is

13   that fair to say?

14         A     Yes.

15         Q     You refer to them as subsidiary

16   companies; are those separate legal entities?

17         A     Car Doctor Motor Sports is and The

18   Car Doctor.

19         Q     Have any of those entities been

20   part of lawsuits?

21                    MR. SKIBELL:  Objection;

22               asked and answered.

23         A     Not that I recall.  No, they

24   haven't.  Not that I recall, no.

25         Q     You end this text message by

```
                                        Page 57
 1                     R. Pilla
 2   saying, "I'm doing the best I can my friend."
 3   What did you mean by that?
 4        A      It's the way I talk to people, my
 5   friend, whatever.  It could be anything.
 6        Q      Was John Kelly a friend of yours?
 7        A      No.
 8        Q      How did you know him?
 9        A      Just through Cindy.
10        Q      Did you have any animosity towards
11   him?
12        A      Nope.
13        Q      Did you feel that he had wronged
14   you in any way?
15        A      No.
16        Q      In April of 2018 did you know that
17   he was sick?
18        A      Yeah.  I don't know the dates but
19   I heard that he was sick.  I don't know the
20   dates.  I knew that he was obviously.
21        Q      Obviously what?
22        A      I don't know the dates.  I don't
23   know what he was sick with or anything to do
24   with that as far as what --
25        Q      What was obvious to you?
```

Page 58

1                    R. Pilla

2        A       I'm sorry?

3        Q       What was obvious to you?

4        A       I didn't know the dates.  I don't

5   know the dates of when he was sick.

6        Q       But you used the word obvious.

7   I'm trying to understand what you meant.  What

8   was obvious to you?

9        A       I didn't mean anything by it.

10       Q       Was it obvious to you that John

11   Kelly was dying of cancer?

12       A       No.  I didn't know the date is

13   what I was referring to.  I don't know the date

14   of when he was sick or anything to do with that.

15       Q       I'm not asking you about the date.

16   You testified that you heard that he was sick,

17   correct?

18       A       Yes.

19       Q       As we sit here today, you know

20   John Kelly eventually died of cancer, correct?

21       A       Yes, I do.

22       Q       Before he died there came a time

23   that you heard that he was sick, correct?

24       A       Right.  I don't recall who I heard

25   it from.  I probably heard it from Cindy but I

```
                                        Page 59

                         R.  Pilla
 1
 2    don't know what the time frame was.  I was not
 3    involved in any of the business that happened
 4    here so I don't know.
 5          Q      When you say you were not involved
 6    in any of the business that happened here, you
 7    are referring to what's alleged in the lawsuit?
 8          A      The everyday business that went
 9    on, correct.  I had nothing to do with Cindy and
10    SAFE's business.
11          Q      Did there come a time where you
12    saw John Kelly and it appeared that he was sick?
13          A      No.
14                      MR. KRIEGSMAN:  Let's just
15                      take a short break here.  Ten
16                      minutes if that's okay with you.
17                      Let's go on a 10-minute break.
18                         (Recess was taken)
19                      MR. KRIEGSMAN:  Back on the
20                      record.
21          Q      Mr. Pilla, are you ready?
22          A      Yes.
23          Q      Mr. Skibell is your attorney in
24    this lawsuit?
25          A      Yes.
```

```
                                    Page 60

 1                      R. Pilla

 2        Q      When the lawsuit was filed

 3   however, you were represented by a different

 4   attorney, correct?

 5        A      I don't know how to answer that

 6   honestly.  You can correct me because I don't

 7   think I was part of the case at that point in

 8   time.

 9        Q      Just to be clear, I don't want you

10   to reveal the substance of any communications

11   you may have had with Mr. Skibell or your

12   previous attorney, but I'm just going to share

13   the screen.

14                      MR. KRIEGSMAN:  I'm going

15                  to mark as Exhibit C to the

16                  deposition a June 26, 2020, letter

17                  to the Honorable John Azrack from

18                  Frederic C. Foster, PC.

19                      (Plaintiff's Exhibit C,

20                  June 26, 2020, letter from

21                  Frederic C. Foster, was marked for

22                  identification, as of this date.)

23        Q      Does that refresh your

24   recollection, Mr. Pilla, that before Mr. Skibell

25   you had a different attorney representing you in
```