**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

SHORELINE AVIATION, INC.,

                      Plaintiff,

    -against-

CYNTHIA L. HERBST, SOUND AIRCRAFT
FLIGHT ENTERPRISES, INC., and RYAN A.
PILLA,

                    Defendants.

Case No. 2:20-cv-02161-JMA-SIL

ORAL ARGUMENT REQUESTED

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS CROSS
MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Alex Kriegsman
Kriegsman PC
279 Main Street
Sag Harbor, NY 11963
(631) 899-4826 Tel.
(631) 919-5182 Fax
alex@kriegsmanpc.com

*Attorneys for Plaintiff*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .............................................................................................. iii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 2

ARGUMENT ...................................................................................................................... 4

    I.     Shoreline is entitled to summary judgment on its breach of
         contract claim because there is no genuine dispute that a valid
         contract existed and Herbst/SAFE breached it by failing to provide
         booking services ............................................................................................. 4

         A.  A valid contract for booking services existed between the parties ............. 4

              1.   The parties performed under the Contract for 24 years ....................... 5

              2.   Defendants admitted the existence and validity of
                  the Contract ....................................................................................... 5

              3.   Both Herbst and SAFE were bound by the Contract ........................... 9

              4.   Shoreline's operating agreement with East Hampton
                  did not govern the terms of the Contract ............................................ 10

              5.   Shoreline informed Cape Air of its agreement with
                  Herbst/SAFE .................................................................................... 12

          B.  Herbst/SAFE breached the Contract by failing to provide
             booking services and stalling reservations to divert passengers
             to Blade carriers ...................................................................................... 12

          C.  Shoreline fully performed under the Contract by paying
             Herbst/SAFE for their booking services ................................................. 15

          D.  Shoreline suffered resulting damages in the amount
             of $1,675,758.50 ..................................................................................... 15

    II.    Shoreline is entitled to summary judgment on its tortious
         interference and unfair competition claims based on
         Herbst/SAFE's abuse of their access to Shoreline's
         customer list and false statements to divert customers to Blade ..................... 18

i

      A.  Shoreline has established its tortious interference claim ...........................18

      B.  Shoreline has established its unfair competition claim.............................21

III.    The Court should grant summary judgment for Shoreline on its breach of fiduciary duty claim because there is no genuine dispute that Herbst/SAFE owed Shoreline a fiduciary duty and engaged in misconduct.........................................................................22

      A.  As Shoreline's exclusive booking agent acting on Shoreline's behalf, Herbst/SAFE owed Shoreline a fiduciary duty.............................23

      B.  Herbst/SAFE engaged in misconduct that constituted breach of fiduciary duty .........................................................................25

      C.  Shoreline suffered damages as a direct result of Herbst/SAFE's breach of fiduciary duty..............................................................................27

IV.    Defendants are not entitled to summary judgment dismissal of the remaining claims.........................................................................................28

      A.  Factual issues remain as to whether the customer list constituted a trade secret.........................................................................28

      B.  The Operating Agreement does not preclude the promissory estoppel and unjust enrichment claims .......................................................31

      C.  Herbst and Pilla are not entitled to summary judgment dismissal because they are individually liable ...........................................31

CONCLUSION....................................................................................................................34

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                      **Page(s)**

*839 Cliffside Ave. LLC v. Deutsche Bank Nat'l Tr. Co.*,
    2018 WL 4608198 (E.D.N.Y. Sept. 25, 2018) ...........................................................31

*ABKCO Music, Inc. v. Harrisongs Music, Ltd.*,
    722 F.2d 988 (2d Cir. 1983)......................................................................... 24

*In re A.N. Frieda Diamonds, Inc.*,
    633 B.R. 190 (S.D.N.Y. 2021)......................................................................32

*Atla-Medine v. Crompton Corp.*,
    2001 WL 1382592 (S.D.N.Y. Nov. 7, 2001) ........................................... 8

*Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*,
    1 F. Supp. 3d 224 (S.D.N.Y. 2014) ...............................................................30

*Broker Genius, Inc. v. Zalta*,
    280 F. Supp. 3d 495 (S.D.N.Y. 2017) ..........................................................30

*Cambridge Valley Machining, Inc. v. Hudson MFG LLC*,
    470 F. Supp. 3d 230 (N.D.N.Y. 2020)..........................................................31

*Carvel Corp. v. Noonan*,
    3 N.Y.3d 182 (2004) ........................................................................... 18 n.8

*Conahan v. MedQuest Ltd.*,
    2022 WL 16748585 (S.D.N.Y. Nov. 7, 2022) ..........................................16-17, 25-26

*Cont'l Indus. Group, Inc. v. Altunkilic*,
    788 Fed. Appx. 37 (2d Cir. 2019) ................................................................24

*Eun Suk Cho v. Byung Ki Koo*,
    164 A.D.3d 1306 (2d Dep't 2018) .............................................................. 4

*Geneva Labs. Ltd. v. Nike W. African Imp. & Exp., Inc.*,
    2022 WL 673257 (E.D.N.Y. Mar. 7, 2022)..............................................7, 9

*Impax Media, Inc. v. Ne. Adver. Corp.*,
    No. 17 Civ. 8272, 2018 WL 3962841 (S.D.N.Y. Aug. 17, 2018) ............................. 20

*Integra FX3X Fund, L.P. v. Deutsche Bank, AG*,
    2016 WL 1169514 (S.D.N.Y. 2016)............................................................. 12

*Jeffreys v. City of New York*,
    426 F.3d 549 (2d Cir. 2005)..................................................................8

*Kurtzman v. Bergstol*,
    40 A.D.3d 588 (2d Dep't 2007) .........................................................22

*Lexington Prods. Ltd. v. B.D. Commc'ns, Inc.*,
    677 F.2d 251 (2d Cir. 1982).............................................................17

*LoPresti v. Terwilliger*,
    126 F.3d 34 (2d Cir. 1997)................................................................28

*Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Servs.*,
    388 F. Supp. 2d 292 (S.D.N.Y. 2005) ..............................................25

*M.S.S. Constr. Corp. v. Century Sur. Co.*,
    2015 WL 6516861 (S.D.N.Y. Oct. 28, 2015) ...........................................10

*Muhlstock v. Cole*,
    245 A.D.2d 55 (1st Dep't 1997) ...........................................................7

*N. Atl. Instruments, Inc. v. Haber*,
    188 F.3d 38 (2d Cir. 1999) ...............................................................28

*Ne. Gen. Corp. v. Wellington Adver., Inc.*,
    82 N.Y.2d 158 (1993) .....................................................................25

*Purgess v. Sharrock*,
    33 F.3d 134 (2d Cir. 1994)..........................................................18, 32

*Reynolds v. Lifewatch, Inc.*,
    136 F. Supp. 3d 503 (S.D.N.Y. 2015) ...........................................32-33

*Ridinger v. Dow Jones & Co.*,
    651 F.3d 309 (2d Cir. 2011).................................................................8

*Roy Exp. Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys.*,
    672 F.2d 1095 (2d Cir. 1982) ......................................................21-22, 32

*Samba Enters., LLC v. iMesh, Inc.*,
    2009 WL 705537 (S.D.N.Y. Mar. 19, 2009), *aff'd sub nom.*
    *Samba Enters., Ltd. v. iMesh, Inc.*, 390 Fed. Appx. 55 (2d Cir. 2010)............ 23, 26-28

*Sengillo v. Valeo Elec. Sys., Inc.*,
    328 Fed. Appx. 39 (2d Cir. 2009) ...........................................................12

iv

*Speedfit LLC v. Chapco Inc.*,
    2016 WL 5793738 (E.D.N.Y. June 29, 2016) ...........................................................10

*Staudinger+Franke GMBH v. Casey*,
    2015 WL 3561409 (S.D.N.Y. June 8, 2015) ............................................................25

*Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Group, Inc.*,
    2016 WL 5338550 (S.D.N.Y. Sept. 23, 2016)............................................................32

*Town & Country Linen Corp. v. Ingenious Designs LLC*,
    556 F. Supp. 3d 222 (S.D.N.Y. 2021) .......................................................29

*Veleron Holding, B.V. v. Morgan Stanley*,
    117 F. Supp. 3d 404 (S.D.N.Y. 2015) .......................................................23

*Winston v. Mediafare Entm't Corp.*,
    777 F.2d 78 (2d Cir. 1985)..........................................................................4-5

*World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*,
    530 F. Supp. 2d 486 (S.D.N.Y. 2007) ....................................................... 25

Plaintiff Shoreline Aviation, Inc. ("Shoreline") submits this memorandum of law in support of its motion for summary judgment in its favor on Counts I, IV, VIII, and IX against Defendants Cynthia Herbst ("Herbst") and Sound Aircraft Flight Enterprises, Inc. ("SAFE") and in opposition to the motion for summary judgment filed by Herbst, SAFE, and Ryan Pilla ("Pilla") (collectively, "Defendants").

## PRELIMINARY STATEMENT

For 24 years, Herbst acted as Shoreline's exclusive booking agent under an oral agreement, maintaining a customer list and communicating with Shoreline passengers on Shoreline's behalf. Despite the parties' performance of the agreement, and Herbst/SAFE's multiple admissions that such an agreement existed, Herbst/SAFE now attempt to disavow it and claim that they owed no fiduciary duty to Shoreline. They do so in the face of overwhelming evidence to the contrary.[1]

Because there is no genuine dispute that a valid and binding contract existed between Herbst/SAFE and Shoreline and that they breached the Contract by, among other things, failing to book reservations for Shoreline and terminating the Contract without reasonable notice, resulting in damages, Shoreline is entitled to summary judgment on its breach of contract claim. And because the evidence shows that Herbst/SAFE refused to book seats for Shoreline based on false premises, actively concealed their actions from Shoreline, exploited their access to Shoreline's customers to improperly divert their business to Blade Urban Air Mobility, Inc. ("Blade"), and sold the customer list that they held in trust for Shoreline to Blade, Shoreline is

---

[1] Tellingly, 24 of the 123 paragraphs in Defendants' Rule 56.1 Statement (nearly 20%) rely solely on conclusory statements in Herbst's and Pilla's declarations submitted with their summary judgment papers rather than on any other evidence in the record.

entitled to summary judgment on its breach of fiduciary duty, tortious interference with

prospective business relations, and unfair competition claims.

Finally, Defendants are not entitled to summary judgment dismissal of the individual

defendants or of the remaining claims, including misappropriation and Defend Trade Secrets Act

("DTSA") violation, because triable issues of fact exist as to whether Shoreline's customer list

constituted a trade secret, Pilla actively participated in the sale of Shoreline's customer list, and

Herbst failed to observe corporate formalities with Sound Aircraft Services, Inc. ("SAS") and

SAFE. This Court should therefore award summary judgment in Shoreline's favor on Counts I,

IV, VIII, and IX and deny Defendants' summary judgment motion in its entirety.

## STATEMENT OF FACTS

Shoreline is an aviation company that offered seaplane services from 1980 until 2020.

(Pl.'s Rule 56.1 Statement ("Pl.'s 56.1") ¶ 1.) Shoreline ran commuter and charter flights in the

Northeast, including flights in and out of East Hampton Airport in New York. (SAI007971-73

(Pl.'s Ex. 56)[2] ¶ 4.) Over its 40 years of business, Shoreline painstakingly developed a reputation

for an impeccable safety record, superior customer service, consistent on-time arrivals, and the

most well-maintained aircraft in the industry. (Pl.'s 56.1 ¶ 2.)

In 1993, Shoreline and Herbst entered into an agreement under which Herbst would be

Shoreline's exclusive booking agent for seaplane commuter flights between East Hampton and

Manhattan in exchange for a 10% commission (the "Contract"). (Id. ¶ 3.) At that time, Herbst ran

her booking services through SAS, a company owned by her then-husband Steven Tuma

("Tuma"). (Id.) But Herbst used the bank account of SAFE, an affiliated entity she owned, to

---

[2] "Pl.'s Ex." refers to the exhibits attached to the Declaration of Alex Kriegsman, dated August
11, 2023, in Support of Plaintiff Shoreline Aviation's Cross Motion for Partial Summary
Judgment and Opposition to Defendants' Motion for Summary Judgment.

remit customer payments to Shoreline. (Pl.'s Rule 56.1 Counterstatement ("Pl.'s Counterstatement") ¶¶ 9, 42-43.) When the couple divorced in 2017, Herbst transitioned her booking operations entirely to SAFE. (Pl.'s 56.1 ¶ 9.)

As Shoreline's exclusive booking agent, Herbst/SAS/SAFE handled Shoreline's reservation requests, payment processing, customer communications, correspondence, flight manifests, and passenger check-in procedures at East Hampton Airport. (*Id.* ¶ 4.) Shoreline's advertising included Herbst/SAS/SAFE's phone number for all reservations on Shoreline's seaplane commuter flights. (*Id.* ¶ 11.) Herbst's duties for Shoreline included mailing out a letter to Shoreline customers in December and March of each year, asking them to buy books of ten tickets to receive a 10% discount for purchasing ahead of season. (*Id.* ¶ 5.) As Shoreline's flights filled up early, customers generally booked their seats for the summer season beginning in March and April. (*Id.* ¶ 12.)

The parties performed under the Contract without incident for 24 years, between 1993 and 2017. (*Id.* ¶ 10.) But after Herbst's divorce, SAFE's customer service began to deteriorate. (*Id.* ¶¶ 23, 25-26.) Between January and May 2018, unbeknownst to Shoreline, Herbst and Pilla were engaged in negotiations with Blade, a Shoreline competitor that operates a mobile application that arranges helicopter and seaplane flights. (*Id.* ¶ 17.) Those negotiations concerned a potential sale of a customer list and an employment or consulting agreement. (*Id.*)

While those negotiations were ongoing in April and May 2018, Herbst instructed SAFE employees to stall customers who asked to book Shoreline flights by falsely stating that the summer schedule was not ready or that the employee was not authorized to book seats. (*Id.* ¶¶ 25-28.) In early May 2018, without notifying Shoreline, Herbst/SAFE unilaterally ended their relationship with Shoreline and agreed to work with Blade. (*Id.* ¶¶ 30-32.) Herbst/SAFE also

3

sold to Blade Shoreline's customer list that Herbst maintained for Shoreline. (*Id.* ¶¶ 32-33.) As a result, Shoreline had to scramble to set up its own reservation system and hire and train new dispatchers to book its flights for the fast-approaching summer season. (*Id.* ¶ 49.)

Herbst/SAFE then launched a campaign to divert Shoreline's customers to Blade, misrepresenting that it was Shoreline that had decided to terminate the Contract without notice. (*Id.* ¶¶ 35, 37.) Herbst advised the customers to seek a refund from Shoreline for their pre-paid tickets knowing full well that Shoreline had a no-refund policy for such tickets, a policy that she herself had implemented and insisted on before 2018. (*Id.* ¶ 38.) As a result of Herbst's active poaching efforts, many of Shoreline's long-time customers booked with Blade's air carriers instead, resulting in substantial lost profits for Shoreline. (*Id.* ¶¶ 40-41.) Shoreline respectfully refers this Court to Plaintiff's 56.1 and Plaintiff's Counterstatement for a complete recitation of the material facts.

## ARGUMENT

I.  **Shoreline is entitled to summary judgment on its breach of contract claim because there is no genuine dispute that a valid contract existed and Herbst/SAFE breached it by failing to provide booking services.**

To establish a breach of contract claim under New York law, a plaintiff must demonstrate (1) the existence of a contract, (2) plaintiff's performance under the contract, (3) defendant's breach of the contract, and (4) damages. *Eun Suk Cho v. Byung Ki Koo*, 164 A.D.3d 1306, 1307 (2d Dep't 2018). There is no genuine dispute that Shoreline has established each element.

### A.  A valid contract for booking services existed between the parties.

When determining whether an oral contract existed, this Circuit considers "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the

4

alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1985).

The evidence establishes that a valid oral contract for booking services existed between Shoreline and Herbst/SAFE. (Pl.'s 56.1 ¶ 3.) In 1993, Shoreline and Herbst/SAS/SAFE entered into the Contract, under which Herbst/SAS/SAFE would be Shoreline's exclusive booking agent for seaplane commuter flights between East Hampton Airport and Manhattan in return for a 10% commission. The parties agreed that SAFE would assume SAS's contractual duties in 2017. Neither party expressly reserved the right not to be bound prior to execution of a document, and all material terms of the Contract were agreed upon. And agreements to book flights in exchange for a commission are not so complex that they are usually committed to in writing.

## 1.   The parties performed under the Contract for 24 years.

The parties' intent to be bound was evidenced by their course of performance over 24 years. (*Id.* ¶ 10.) As Shoreline's booking agent, Herbst/SAS/SAFE handled Shoreline's reservation requests, payment processing, customer communications, and passenger check-ins at East Hampton Airport. (*Id.* ¶ 4.) Each week, Herbst/SAS/SAFE provided a report detailing sales, expenses, and fees. (*Id.* ¶ 10.) Herbst/SAS/SAFE would then send Shoreline a check for the total sales minus fuel fees and commission. (*Id.*)

## 2.   Defendants admitted the existence and validity of the Contract.

While Defendants now attempt to dispute the Contract's existence, Herbst/SAFE repeatedly acknowledged the essential terms and validity of the Contract both in this action and in prior actions. (Answer to Am. Compl. ("Answer") (Pl.'s Ex. 140) ¶¶ 5, 10, 15, 29 (admitting that Herbst and SAFE provided booking services for Shoreline's seaplane commuter flights in

return for a 10% commission from 1994 through April 2018).) In her deposition, Herbst admitted that an oral contract existed between Shoreline and Herbst/SAS:

> Q.    I'm going to turn to Paragraph 17 of the Amended Complaint. 'In 1994, Shoreline Aviation entered into an oral agreement with SAS and Herbst (the contract) pursuant to which Herbst would provide booking services exclusively for Shoreline Aviation's flights to and from the East Hampton Airport in return for commissions.' Did I read that correctly?
>
> A.    You did.
>
> Q.    Is that a true statement?
>
> A.    I wasn't working with them exclusively.
>
> Q.    The question is, is Paragraph 17 a true statement?
>
> A.    Yes, generally true.

(Herbst Dep. 29:7-21, Mar. 30, 2022 ("Herbst Dep.") (Defs.' Ex. 1.)[3]

And notwithstanding Defendants' about-face position taken for the first time in this litigation that the Contract was not exclusive, Herbst admitted later in her testimony that, with regard to the booking of seaplane commuter flights, the relationship between Shoreline and Herbst/SAFE was an exclusive one:

> Q.    [A]re you aware of any instance between 1995 and 2017 when Shoreline ever used any other booking agent to book one of their seaplane commuter flights between Manhattan and East Hampton?
>
> A.    No.
>
> Q.    Did you book passengers on seaplane commuter flights between Manhattan and East Hampton for an operator other than Shoreline prior to April of 2018?
>
> A.    I did not.

---

[3] "Defs.' Ex." refers to the exhibits attached to the Declaration of Reid Skibell, dated June 16, 2023, in Support of the Herbst Defendants' Motion for Summary Judgment.

(Herbst Dep. 65:11-23 (Pl.'s Ex. 137).)

Other examples of admission abound. In a 2018 complaint filed by Herbst and SAFE, they acknowledged the existence of the exclusive booking agreement they had with Shoreline. (Verified Compl. ¶¶ 14-15, *Herbst et al. v. Tuma et al.*, Index No. 616650/2018 (Sup. Ct., Suffolk County 2018) ("*Herbst v. Tuma* compl.") (Pl.'s Ex. 142) (until May 2018, [SAFE] utilized Shoreline as "its operator of flight services"); *id.* ¶ 54 (Shoreline "operated their business exclusively with" Herbst from May 2017 to May 2018.)

In communications with John Kelly ("Kelly"), Shoreline's president, throughout the contractual period, Herbst often referred to the exclusive nature of the agreement between SAFE and Shoreline. For example, in a 2010 e-mail to Kelly regarding a new seaplane company, Herbst writes, "I'm a little concerned that someone may be gearing up to compete with us." (SAI002664 (Pl.'s Ex. 24.) In a 2011 e-mail, in reference to another aviation company, Herbst writes to Kelly, "I don't want to feed anyone but us!!!" (SAI002720 (Pl.'s Ex. 25).)

These documents establish a meeting of the minds on the material terms of the agreement, including exclusivity for seaplane commuter flights. So long as the parties agreed on the essential terms of the contract, a lack of precision on peripheral matters does not negate the existence of a valid contract. *See Geneva Labs. Ltd. v. Nike W. African Imp. & Exp., Inc.*, 2022 WL 673257, at *5 (E.D.N.Y. Mar. 7, 2022) ("The offer, acceptance, and manifestation of intent do not need to extend to every potential contract term – only the material terms."); *Muhlstock v. Cole*, 245 A.D.2d 55, 58 (1st Dep't 1997) (parties' oral contract supported by record and the "fact that the duration of this arrangement was unspecified does not necessarily make the agreement too indefinite to enforce"). Defendants attempt to muddy the waters by referring to other carriers for which Herbst/SAS/SAFE booked charter and helicopter flights. (*See* Defs.'

Mem. of Law in Supp. of their Mot. for Summ. J. ("Defs.' Br.") at 5.) But Shoreline has never argued that the exclusivity of the Contract extended to such flights. Instead, Shoreline has consistently limited the exclusive nature of the relationship to bookings for seaplane commuter flights. (*See* Pl.'s 56.1 ¶¶ 3, 15.)

Defendants also misstate the facts by claiming that Shoreline did not assert that it had a contract with Herbst/SAFE during Kelly's lifetime and that no evidence of the contract exists by pointing to the lack of "an off-hand reference to a contract in an email." (Defs.' Br. at 1-2.) In fact, when Kelly referred to the Contract as "our longstanding exclusive agreement" in an email to Herbst on April 23, 2018, Herbst did not object to this characterization. She cannot now create a material issue of fact by asking this Court to ignore this clear statement of the contract's exclusivity. (SAFE00000124-25 (Pl.'s Ex. 61).) *See Atla-Medine v. Crompton Corp.*, 2001 WL 1382592, at *5 (S.D.N.Y. Nov. 7, 2001) (party bound by date limitation set forth in letter memorializing oral agreement where party failed to object).

Given the documentary evidence establishing the course of conduct between the parties and Herbst/SAFE's repeated admissions of the Contract's existence, Herbst's testimony that the parties' "business arrangement" was not a contract and was not exclusive is entitled to no weight. (*See, e.g.*, Herbst Dep. 29:17-18, 34:22-24 (Defs.' Ex. 1).) A party's unsubstantiated testimony that is directly contradicted by the objective record fails to create a genuine issue of fact for trial. *See Ridinger v. Dow Jones & Co.*, 651 F.3d 309, 317 (2d Cir. 2011) (conclusory statements without evidence insufficient to defeat summary judgment); *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) ("nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful").[4] This Court should also disregard Defendants'

---

[4] Internal quotation marks have been omitted from quotations from court opinions throughout

8

repeated arguments that no contract existed because Kelly referred to the relationship at one point as a "booking arrangement." (*See* Defs.' Br. at 3-4, 15.) To form a valid contract under New York law, there must be (1) an offer, (2) acceptance, (3) consideration, (4) mutual assent, and (5) mutual intent to be bound. *Geneva*, 2022 WL 673257, at *5. Shoreline has established that all five elements are present here. What the parties choose to call the agreement is not dispositive of whether an agreement is valid and binding.

### 3. Both Herbst and SAFE were bound by the Contract.

Defendants' argument that Herbst's agreement to serve as booking agent did not continue in 2017 is flatly contradicted by the evidence. Defendants falsely claim that there was no "assignment of the contract when SAFE started booking flights instead of SAS." (Defs.' Br. at 2.) There is no genuine dispute that Herbst worked with Shoreline in the same capacity after 2017 through SAFE as she did prior to that year through SAS, as Herbst and SAFE admitted in their answer and interrogatory responses. (*See* Pl.'s Counterstatement ¶ 57.) Moreover, SAFE was actively involved in processing payments to Shoreline even before 2017. (*Id.* ¶ 43.) Given these repeated admissions that SAFE took over the booking services portion of the contract between Shoreline and Herbst/SAS in what amounted to a novation, and SAFE's involvement in the provision of booking services prior to 2017, Defendants' argument that SAFE was not bound by the Contract is both puzzling and disingenuous.[5]

As a result, Defendants' argument that Herbst and SAFE cannot be liable for breach of contract because they were allegedly non-signatories to the Contract is untenable. Although, for

---

this brief.

[5] Taken to its logical conclusion, Defendants' argument that SAFE was under no obligation to provide booking services to Shoreline would mean that the customer list to which Herbst/SAFE lay claim would actually belong to SAS, not SAFE.

purposes of this litigation, Defendants argue that Herbst was not a signatory to the Contract, she herself stated in her verified complaint in *Herbst v. Tuma* that Shoreline "operated their business exclusively with Plaintiff, CYNTHIA HERBST, from May 2017 to May 2018." (*Herbst v. Tuma* complaint (Pl.'s Ex. 142) ¶ 54.)

But even if this Court were to find that Herbst or SAFE was not a party to the Contract individually, they may still be liable as the alter egos of SAS. And the fact that SAFE was regularly making payments to Shoreline on behalf of SAS prior to 2017 shows that SAFE was in privity of contract with SAS, assumed obligations under the Contract, and was ultimately assigned the Contract. *See Speedfit LLC v. Chapco Inc.*, 2016 WL 5793738, at *6 (E.D.N.Y. June 29, 2016) (non-party bound by contract if assigned to non-party or signatory was alter ego of non-party); *M.S.S. Constr. Corp. v. Century Sur. Co.*, 2015 WL 6516861, at *9 (S.D.N.Y. Oct. 28, 2015) (non-signatory may be held liable for breach of contract where (1) non-signatory is signatory's alter ego, (2) non-signatory manifests an intent to be bound by the contract, or (3) actions show they are in privity of contract or assumed obligations under the contract).

### 4. Shoreline's operating agreement with East Hampton did not govern the terms of the Contract.

This Court may easily dispose of Defendants' misleading argument that a provision in Shoreline's 1994 operating agreement with the Town of East Hampton (the "Operating Agreement") confirms that Shoreline did not have an exclusive agreement with Herbst/SAFE. That provision must be construed in the context of the entire agreement. The Operating Agreement's purpose is to "set forth the standards and conditions" for Shoreline's operations at the East Hampton Airport. (SAI000358-71 (Defs.' Ex. 7) at SAI000360.) Defendants do not dispute the nature and purpose of the Operating Agreement. (Defs.' Rule 56.1 Statement ¶ 27; Defs.' Br. at 4.) Paragraph 16(B) merely provides that Shoreline does not have an exclusive right

10

to operate at the airport to comply with 49 U.S.C. § 47107(a)(4), which provides, in relevant part, that "a person providing, or intending to provide, aeronautical services to the public will not be given an exclusive right to use the airport." Paragraph 16(B) therefore has nothing whatsoever to do with the booking agreement between Shoreline and Herbst/SAFE. (*See* Defs.' Ex. 7 at SAI000368.) Defendants' insistence that Paragraph 16(B) somehow negates the exclusive nature of the Contract is nothing but a strained grasping at straws.

For the same reason, Defendants' attempt to characterize the Operating Agreement, which makes one general and passing reference to SAS's booking services for Shoreline, as somehow supplanting the Contract fails. (*See* Defs.' Br. at 2; Defs.' Ex. 7 ¶ 3(B)(1).) Even a cursory reading of the Operating Agreement makes clear that it is primarily an agreement between Shoreline and the Town, with SAS included as an ancillary party to clarify its role as the fixed base operator.[6] Defendants heavily rely on the Operating Agreement's integration clause (*see* Defs.' Br. at 18-19), but that provision is limited to the subject of that agreement, which is Shoreline's operations at the East Hampton Airport. Also, the clause provides that the Operating Agreement "may be modified only by written endorsement pursuant to a resolution of the Town Board," which makes no sense if applied to the booking agreement between Shoreline and Herbst/SAS/SAFE. (*See* Defs. Ex. 7 ¶ 18.) The fact that the subject of the Operating Agreement was <u>not</u> the booking services of Herbst/SAS/SAFE is further confirmed by the lack of any essential terms with regard to those services, including the commission amount agreed to

---

[6] The fact that Shoreline admitted that the Operating Agreement referred to SAS's provision of ticketing services does not support the argument that the Operating Agreement constituted the parties' agreement as to those services. (*See* Defs.' Br. at 19.) Defendants neglect to mention that Shoreline denied that the Operating Agreement contained the complete understanding of Shoreline and SAS. (*See* Pl.'s Resps. & Objections to Defs.' Reqs. for Admis. No. 12 (Defs.' Ex. 8).)

11

between the parties. (*See* Collingwood Dep., Mar. 29, 2022 ("Collingwood Dep.") 160:16–162:8 (Defs.' Ex. 2) (the Operating Agreement did not lay out the specific terms of the booking agreement between Shoreline and SAS).)[7] Accordingly, the cases cited by Defendants for this argument are inapposite because, in each case, the subject of the written agreement and its merger clause specifically covered the subject of the oral agreement. *See Sengillo v. Valeo Elec. Sys., Inc.*, 328 Fed. Appx. 39, 41-42 (2d Cir. 2009); *Integra FX3X Fund, L.P. v. Deutsche Bank, AG*, 2016 WL 1169514, at *3 (S.D.N.Y. 2016).

### 5.   Shoreline informed Cape Air of its agreement with Herbst/SAFE.

Finally, Defendants' statement that "Shoreline did not provide Cape Air with any information indicating that it had a contract with either SAS or SAFE" is contradicted by the record. (*See* Defs.' Br. at 7.) Andrea Collingwood, Shoreline's vice president, testified that, in connection with Cape Air's due diligence, Shoreline discussed with Cape Air the "East Hampton to New York City portion" of Shoreline's business and the fact that Herbst served as Shoreline's booking agent in East Hampton. (Collingwood Dep. 69:2–70:18 (Defs.' Ex. 2).) Indeed, Cape Air was well aware of the agreement between Shoreline and Herbst/SAFE given that their suit against Shoreline was the primary reason Cape Air pursued an asset sale rather than a stock sale. (Pl.'s Counterstatement ¶ 97.)

### B.   Herbst/SAFE breached the Contract by failing to provide booking services and stalling reservations to divert passengers to Blade carriers.

The evidence establishes that Herbst/SAFE breached the Contract by failing to mail out letters to Shoreline customers in March or April 2018 offering discount coupons, failing to book

---

[7] Similarly, the July 16, 1996 agreement between SAS and Shoreline did not concern the booking services provided by Herbst/SAS/SAFE and, in any case, never came to fruition because its condition precedent was not met. (*See* SAI000406-11 (Defs.' Ex. 9); SAI000439-51 (Pl.'s Ex. 21).)

reservations for Shoreline's seaplane commuter flights beginning in April 2018, and terminating the Contract without reasonable notice. (Pl.'s 56.1 ¶¶ 23-30.)

Against overwhelming evidence that Herbst/SAFE unilaterally terminated the Contract without prior notice to Shoreline, Defendants persist in pushing the false narrative that it was Shoreline that decided to stop working with SAFE. (*See* Defs.' Br. at 2, 9.) But the indisputable evidence shows otherwise, confirming that Herbst actively sought to sabotage Shoreline's business and siphon its customers to Blade by instructing SAFE employees Eduardo Fernandes ("Fernandes") and Maureen Quigley ("Quigley") in March, April, and May 2018 to stall customers seeking to book Shoreline seats based on a false premise that the summer schedule was not ready and that Fernandes was not authorized to book reservations. (Pl.'s 56.1 ¶¶ 25-28.) Herbst was intentionally vague and evasive when responding to Quigley's questions about the reasons for the stalling. On March 22, 2018, Quigley asked Herbst, "Wondering what I am telling people about reservations. … What am I saying to people who know the routine? Have the emails from days ago been answered?" (SAFE00003338-39 (Pl.'s Ex. 74).) Herbst responded, "Please don't mention coupon books." (*Id.*) Quigley responded, "Are we not offering another cp book? Why can't I mention them?" Herbst responded, "We just have to be non committal [sic] right now. Trying to figure out shorelines [sic] intentions with us." (*Id.*)

E-mails show Herbst/SAFE repeatedly stringing customers along and delaying reservations in March, April, and early May 2018 until SAFE's deal with Blade was finalized. (Pl.'s 56.1 ¶ 26; BLADE 0001945-46 (Pl.'s Ex. 101) (Herbst tells Blade "we need to have [the agreement] finalized before hitting the 'send' button on the mailer.").) In her declaration, long-time Shoreline customer Mildred Glimcher details how SAFE did not book her reservations until early May 2018 when Herbst encouraged her to book flights with Blade instead. (SAI007971-73

(Pl.'s Ex. 56) ¶¶ 9-13.) She stated, "It appears that Ms. Herbst was purposely refusing to book my summer flights with Shoreline, so that she could induce me to fly with Blade instead." (*Id.* ¶ 15.)

    As another example, Jane Neale reached out to SAFE on April 9, 2018 requesting the flight schedule. (SAFE00002182-86 (Pl.'s Ex. 67).) SAFE responded, "We are still in the process of [s]cheduling flights for the summer of 2018[.]" (*Id.*) Ms. Neale followed up again on April 23, asking if the schedule had been finalized. (*Id.*) Herbst responded, "We are working on the details and should have the information out in a week." (*Id.*) Ms. Neale wrote again on May 1, asking "Is there any further news on the below? … Would be really grateful if you could come back to me." (*Id.*) SAFE responded, "The mailer has not gone out yet as we are having new software written and is it [sic] taken longer than expected …." (*Id.*) On May 7, Ms. Neale wrote Herbst, in relevant part, "I received an email today from Shoreline Aviation about booking summer flight from NY to EH – is Shoreline Aviation you? If not when is your reservation email coming out?" (*Id.*) Herbst responded on May 7: "Our email is going our [sic] tomorrow. Thank You for checking in." (*Id.*) Notwithstanding Ms. Neale's confusion about SAFE's relationship with Shoreline, Herbst made no effort to clarify. (*Id.*) As yet another example, Kevin Oram, a Shoreline customer, reached out to a SAS employee in frustration, stating, "Mike I've been calling for over a month, every week SAFE has been saying one more week until the schedule comes out, so I call the next week and still nothing. You usually take reservations by late April." (SAI000143-45 (Pl.'s Ex. 9).)

    In fact, the summer schedule was generally the same every year, and it was Herbst/SAFE's practice to begin booking Shoreline customers on summer commuter flights in March or April each year. (*See* SAFE00002441 (Pl.'s Ex. 69) (in a December 29, 2017 e-mail,

Quigley writes to a customer, "We will contact you in March regarding making reservations for the upcoming season."); Pl.'s 56.1 ¶¶ 12, 27.) And Fernandes was SAFE's customer service representative whose main role was to book reservations. (Defs.' Resp. to Interrog. No. 4 (Pl.'s Ex. 141) (admitting that Fernandes was a "customer service representative[] who booked reservations"); Herbst Dep. 193:4-10 (Pl.'s Ex. 137) (Fernandes's role with SAFE was "customer service," which involved "booking any sort of requests that came in."); SAI003234-37 (Pl.'s Ex. 32) ¶¶ 5, 15.)

As had been the practice in prior years, in January, February, and March of 2018, Shoreline paid Herbst her 10% commission in advance for customer booking and handling for the upcoming 2018 summer season in the amount of $65,522. (Pl.'s 56.1 ¶ 20.) Because Herbst stopped booking seats for Shoreline in April 2018 and never earned those commissions, Shoreline asked that she refund the pre-paid and unearned commissions, but she never did. (*Id.* ¶¶ 21-22.)

### C. Shoreline fully performed under the Contract by paying Herbst/SAFE for their booking services.

There is no dispute that Shoreline performed under the Contract by paying Herbst and SAFE their commissions when due. Between 2002 and 2017, Shoreline paid Herbst and SAFE commissions for commuter flights sold in the total amount of $2,900,890. (*Id.* ¶ 14.) Herbst and SAFE admitted that Shoreline paid them those commissions. (SAI000266 (Pl.'s Ex. 16); Answer (Pl.'s Ex. 140) ¶ 19.)

### D. Shoreline suffered resulting damages in the amount of $1,675,758.50.

As a result of Herbst/SAFE's breaches, Shoreline suffered damages in the amount of $1,675,758.50. (Pl.'s 56.1 ¶ 49.) These damages consist of $1,610,236.50 in lost profits in 2018 when customers flew with Blade instead and the $65,522 in unearned commissions paid to

15

Herbst/SAFE. (*Id.*) Defendants falsely claim that Shoreline has "not identified any customers it would have booked on flights absent the Herbst Defendant's [sic] alleged tortious conduct." (Defs.' Br. at 26.) But the Amended Complaint specifically lists 34 customers who were diverted to Blade in 2018 (Am. Compl. (Pl.'s Ex. 148) ¶ 107), and documents produced by both the parties and non-party Blade confirm that over 160 long-time Shoreline customers did indeed switch to Blade as a result of Herbst/SAFE's misconduct. (Pl.'s 56.1 ¶¶ 40-41.) A commission report for sales booked by SAFE for Blade between May 7, 2018 through September 30, 2018 shows that at least 160 Shoreline customers booked with Blade for the 2018 summer season. (*Compare* SAFE00000434-70 (Pl.'s Ex. 62) *with* SAI003162-3233 (Defs.' Ex. 12) *and* SAI007775-76 (Pl.'s Ex. 54); List of 160 Customers (Pl.'s Ex. 146).) There can be no genuine dispute that Shoreline lost customers to Blade as a direct result of Herbst/SAFE's breach of contract.

Equally meritless is Defendants' claim that Shoreline "lacks any cognizable damages" because it alleged lost revenue, not lost profits. In fact, the evidence shows that the revenues attributable to seaplane commuter flights decreased by $839,848.51 in 2018, and the expenses attributable to those flights increased by $770,387.99. (Pl.'s 56.1 ¶¶ 47-48.) There is no question that Shoreline's profits attributable to seaplane commuter flights substantially decreased in 2018 as a result of Defendants' actions. Accordingly, Defendants' claim that Shoreline did not suffer any damages is false, and Shoreline is entitled to damages in the amount of $1,675,758.50. (*Id.* ¶ 49.)

In any case, a plaintiff need not pin down the exact amount of damages at this stage of the proceedings. *Conahan v. MedQuest Ltd.*, 2022 WL 16748585, at *5 n.6 (S.D.N.Y. Nov. 7, 2022) (plaintiffs need not prove the exact amount of damages for purposes of summary

16

judgment). "When it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be any good reason for refusing, on account of such uncertainty, any damages whatever for the breach." *See Lexington Prods. Ltd. v. B.D. Commc'ns, Inc.*, 677 F.2d 251, 253 (2d Cir. 1982). Defendants' argument that it is "too late for Shoreline now to claim it is pursuing lost profits" is meritless as a matter of law.

Defendants' remaining arguments concerning damages are either irrelevant, misleading, and/or incorrect. The testimony of Cape Air's representative concerning Shoreline's profitability was in reference to Shoreline's financial data in the aggregate, not specifically to the profitability of Shoreline's seaplane commuter flights between East Hampton and Manhattan, which is the subject of this action. (*See* Migliore Dep. 98:4–101:3, Mar. 14, 2022 (Defs.' Ex. 13).) As to the relevant segment of Shoreline's business, the evidence is clear – Shoreline's revenues attributable to seaplane commuter flights decreased by $839,848.51 in 2018, and the expenses attributable to those flights increased by $770,387.99 as a result of Defendants' breaches. (Pl.'s 56.1 ¶¶ 47-48.) And, as Defendants acknowledge, Shoreline does not seek damages in connection with its closure, so the reasons for such closure have no bearing on Shoreline's damages claims. (*See* Defs.' Br. 27-28.)

Equally misleading and inaccurate are Defendants' arguments concerning the $65,522 in unearned commissions, claiming that because Shoreline received the amount paid by the customers, Herbst/SAFE were entitled to their 10% commission. (*See id.* at 28-29.) That argument is based on a mistaken understanding that all that was left to do for Herbst/SAFE was to check those passengers into their flights. (*See id.* at 29.) But the coupon books that were sold did not have flight reservations associated with them. Shoreline's payment of commission to Herbst/SAFE was for the booking of reservations, which Herbst/SAFE failed to do for a single

17

customer in 2018. (Collingwood Dep. 257:24–260:2 (Pl.'s Ex. 138).) There is no question that Herbst/SAFE failed to earn those commissions because they deliberately refused to book coupon book customers on Shoreline flights in March, April, and May 2018. (*See, e.g.*, SAI007664-87 (Pl.'s Ex. 52) ¶ 30 ("She did not respond to customer inquiries, failed to return phone calls, neglected to send out the March mailer, and stopped booking customers altogether.").) As a result, Shoreline was forced to scramble and hire dispatch coordinators and customer service representatives to do the job that Shoreline had already paid Defendants to do. Shoreline has established, as a matter of law, each element of its breach of contract claim against Herbst and SAFE, and this Court should enter summary judgment in Shoreline's favor on Count I.

## II. Shoreline is entitled to summary judgment on its tortious interference and unfair competition claims based on Herbst/SAFE's abuse of their access to Shoreline's customer list and false statements to divert customers to Blade.

### A. Shoreline has established its tortious interference claim.

Shoreline is also entitled to summary judgment on its tortious interference with prospective business relations claim. The elements of this claim are (1) plaintiff's business relations with a third party; (2) defendant's interference with those relations; (3) defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship. *Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir. 1994).[8]

Here, the evidence eliminates any material fact issues concerning the tortious interference claim. As Shoreline's exclusive booking agent for 24 years, Herbst/SAFE knew of Shoreline's

---

[8] Thus, Shoreline need only establish that Defendants' actions were dishonest, unfair, or improper; they were not required to show that the means were criminal or fraudulent. (*See* Defs.' Br. at 25.) Even if a defendant was motivated by economic self-interest, New York courts have held that the use of "wrongful means" can support a claim for tortious interference with prospective business relations, and "wrongful means" include "misrepresentation." *See Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 191-92 (2004). But even if Shoreline were required to show fraud, it has amply done so, as discussed in this section.

long-standing business relationships with its customers. And the evidence is replete with Herbst/SAFE's intentional interference with those relationships using improper means. (Pl.'s 56.1 ¶¶ 31-40.) Two former SAFE employees confirmed in affidavits that Herbst directed them to stall customers who sought to book Shoreline flights based on a false premise, intending to divert them to Blade once her agreement with Blade was finalized. (*See* Affidavit of former SAFE employee Eduardo M. Fernandes (Pl.'s Ex. 32) at ¶¶ 6-26 (stating that Herbst instructed him to stall Shoreline customers with false statements and conceal his actions from Shoreline so that Herbst could divert these customers to Blade); SAI003238-55 (Pl.'s Ex. 33) (text messages between Herbst and Fernandes showing the instructions to lie and conceal).) Defendants acknowledge the authenticity of these text messages. (Defs.' Herbst and SAFE Resps. & Objections to Pl.'s First Set of Req. for Adm. (Pl.'s Ex. 147) at ¶19.)[9] (*See also* Affidavit of former SAFE employee Maureen Quigley (Defs.' Ex. 11) at ¶¶ 9-19 (describing how, over Quigley's objections, Herbst directed her to stall, refuse to book Shoreline customers, provide false explanations for the refusals, and conceal her actions from Shoreline while Herbst's negotiations proceeded with Blade).) Herbst also went out of her way to mislead Shoreline customers about the nature of her relationship with Shoreline and to improperly encourage customers to seek a refund from Shoreline for their pre-paid tickets. Herbst/SAFE abused their access to Shoreline's customer list and sold it to Blade, Shoreline's competitor, with an intent to harm Shoreline's business.

---

[9] Defendants were apparently unable to bring themselves to type the word "admit."  But pursuant to F. R. Civ. Pr. 36(3), "A matter is admitted unless [] the party to whom the request is directed serves on the requesting party a written answer or objection…" Herbst/SAFE's failure to respond to ¶19 is therefore an admission.

Herbst/SAFE also worked with Blade to target Shoreline customers, falsely representing to them that it was Shoreline that had unilaterally terminated the Contract without notice, taking advantage of customer confusion about the relationship between SAFE and Shoreline, and exploiting Herbst's inside knowledge of Shoreline's customers and practices to persuade those passengers to fly with Blade instead. (Pl.'s 56.1 ¶ 35.) After Kelly sent an e-mail to Shoreline customers explaining the actual reason for the dissolution of the Contract, Glimcher wrote to Kelly, "I knew there had to be a longer story than the one Cindy was telling me when she called me." (SAI000183 (Pl.'s Ex. 14).) In a series of May 2018 e-mails between Herbst and Blade, Herbst reveals Shoreline's business practices and discusses strategies to keep a customer from "[going] back to Shoreline." (BLADE 0005774-77 (Pl.'s Ex. 125).) Herbst informs Blade that the customer is balking at Blade's higher prices, stating, "I'm trying hard to save her as I'm not sure she gets that she can go back to Shoreline." (*Id.*) Blade responds, "We won't be able to compete with Shoreline on those prices to MTP but I will see if there is a discount I can offer. I am sure we can put something together to secure them as customers." (*Id.*)

In another e-mail, a Blade employee asks Herbst to review a draft of an email to send to Shoreline customers, stating, "Additionally, we plan to tweak this email slightly to target those who ended up flying with Shoreline last summer because they purchased their books before our deal. We would like to hear your thoughts on how to most effectively target them." (BLADE 0000884-85 (Pl.'s Ex. 95).) Fraudulent behavior, a breach of fiduciary duty, and the use of a company's confidential information to compete with the company is more than sufficient to establish wrongful means. *See Impax Media, Inc. v. Ne. Adver. Corp.*, 2018 WL 3962841, at *9 (S.D.N.Y. Aug. 17, 2018).

20

Herbst/SAFE understood that their cooperation and agreements with Blade made Herbst/SAFE vulnerable to legal action by Shoreline. During negotiations with Blade, Herbst asked Blade to add provisions to the agreements for "legal backing to SAFE/Cindy against any legal action brought against either or both as a result of this transaction and all SAFE/BLADE operations at HTO" because "the exposure that this will create all at once could negatively impact the future of SAFE …." (BLADE0001945-46 (Pl.'s Ex. 101).)

Finally, Herbst/SAFE's stalling and deceptive tactics worked, and many Shoreline passengers ended up flying with Blade carriers instead. (Pl.'s 56.1 ¶¶ 40-41; BLADE 0000377-89 (Pl.'s Ex. 87); SAI003234-37 (Pl.'s Ex. 32) ¶ 22 (Herbst informed SAFE employees that "she was going to work for Blade and that Shoreline customers would subsequently be booked on Blade flights.").) It is simply disingenuous for Defendants to argue that Shoreline has not identified diverted customers or that Defendants' tortious conduct had nothing to do with the fact that over 160 customers who flew with Shoreline year after year prior to 2018 abruptly changed course and flew with Blade instead as soon as Herbst/SAFE joined forces with Blade and actively sought to poach those customers. (*See* Pl.'s 56.1 ¶¶ 40-41.) Shoreline suffered damages in the amount of $1,610,236.50 in lost profits in 2018 when its customers were wrongfully diverted to Blade. (*Id.* ¶¶ 47-49.)

**B.  Shoreline has established its unfair competition claim.**

These same facts demonstrate Herbst/SAFE's unfair competition in abusing their access to Shoreline customers to sabotage Shoreline's business and divert them to a competitor. New York's common law of unfair competition is a "broad and flexible doctrine" that encompasses "any form of commercial immorality." *See Roy Exp. Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys.*, 672 F.2d 1095, 1105 (2d Cir. 1982). "An unfair competition claim

21

involving misappropriation usually concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property ...." *Id.*

Herbst/SAFE unquestionably misappropriated Shoreline's customer list for their own commercial advantage and did so in bad faith, misrepresenting the facts to the customers, hiding their actions from Shoreline, and taking advantage of customer confusion to divert sales to Blade. Given these undisputed facts, Defendants' argument that there was no evidence of bad faith is based on nothing but wishful thinking. And Defendants misleadingly argue that SAFE's communications with customers after termination of the Contract were "entirely proper." (*See* Defs.' Br. at 26.) Shoreline's unfair competition claim is based not on the mere fact that Herbst communicated with the customers but on the fact that she made false statements to them about Shoreline and SAFE's relationship to Shoreline as well as lied to them about the reasons she could not book them on Shoreline flights in March, April, and May of 2018 and sought to divert them to Blade by taking advantage of customer confusion. This Court should therefore grant summary judgment for Shoreline on its tortious interference (Count IX) and unfair competition (Count VIII) claims against Herbst and SAFE.[10]

### III. The Court should grant summary judgment for Shoreline on its breach of fiduciary duty claim because there is no genuine dispute that Herbst/SAFE owed Shoreline a fiduciary duty and engaged in misconduct.

In addition, Shoreline has established its entitlement to summary judgment of its breach of fiduciary duty claim. To establish a breach of fiduciary duty, a plaintiff must show (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the misconduct. *Kurtzman v. Bergstol*, 40 A.D.3d 588, 590 (2d Dep't 2007).

---

[10] Shoreline does not seek summary judgment on its tortious interference claim based on Herbst/SAFE's filing of *Herbst v. Tuma* and, as a result, Defendants' arguments concerning their right to file suit are irrelevant. (*See* Defs.' Br. at 25.)

### A. As Shoreline's exclusive booking agent acting on Shoreline's behalf, Herbst/SAFE owed Shoreline a fiduciary duty.

By virtue of Herbst/SAFE's role as Shoreline's exclusive booking agent for seaplane commuter flights, acting as Shoreline's representative at East Hampton Airport, Herbst/SAFE owed Shoreline a fiduciary duty. *See Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 453 (S.D.N.Y. 2015) ("an exclusive agency gives rise to a fiduciary duty between principal and agent under New York law"). Agency is a "fiduciary relationship which results from the manifestation of consent of one person to allow another to act on his or her behalf and subject to his or her control, and consent by the other so to act." *Samba Enters., LLC v. iMesh, Inc.*, 2009 WL 705537, at *7 (S.D.N.Y. Mar. 19, 2009), *aff'd sub nom. Samba Enters., Ltd. v. iMesh, Inc.*, 390 Fed. Appx. 55 (2d Cir. 2010).

Here, Herbst herself admitted that she was Shoreline's representative at East Hampton Airport and that she was acting on Shoreline's behalf. (Herbst Dep. 71:17–72:20 (Pl.'s Ex. 137); Minutes of Stipulation (Pl.'s Ex. 145) 63:16-20, *Tuma v. Tuma*, Index No. 019777/2014 (Sup. Ct., Suffolk County 2019).) There is no dispute that Shoreline consistently referred to Herbst/SAFE as Shoreline's booking agent to third parties and directed all booking inquiries to Herbst/SAFE. (*See, e.g.*, SAI002881 (Pl.'s Ex. 27); SAI002911 (Pl.'s Ex. 28).) Under these circumstances, no reasonable jury could conclude that Herbst/SAFE was not Shoreline's agent acting on Shoreline's behalf. *See Samba*, 2009 WL 705537, at *8 (granting defendant summary judgment on its breach of fiduciary duty counterclaim based in part on the fact that the "overall purpose" of the parties' agreement was to engage plaintiff to act on defendant's behalf).

Furthermore, a fiduciary duty exists when the principal retains a degree of control over the agent. *Veleron*, 117 F. Supp. 3d at 453; *Samba*, 2009 WL 705537, at *7. Here, Shoreline maintained control over flight operations, ticket prices, and communications Herbst/SAFE sent

23

to Shoreline's passengers concerning Shoreline's policies and flight operations. (Pl.'s 56.1 ¶ 16.)

E-mails exchanged between SAFE and Shoreline in 2010 and 2012 confirm that Shoreline

dictated the contents of the mailers sent to customers offering coupon books, including

information on schedule, pricing, and operations. (*See* SAI002748 (Pl.'s Ex. 26); SAI007270

(Pl.'s Ex. 46).)

There is no genuine dispute that Herbst and SAFE maintained a list of Shoreline

customers for the benefit of Shoreline. (SAI007746-54 (Pl.'s Ex. 53) ¶¶ 12-13.)  An agent with

access to the company's confidential information owes the company a fiduciary duty to protect

that information and not use it in competition with the company. *See Cont'l Indus. Group, Inc. v.*

*Altunkilic*, 788 Fed. Appx. 37, 41 (2d Cir. 2019); *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*,

722 F.2d 988, 994 (2d Cir. 1983). Defendants' argument that Shoreline could not have owned

the customer data because it did not ask to access the data or inquire about its storage misses the

point and simply ignores Shoreline's actions that are consistent with its ownership of the

customer list. Because the parties agreed that Herbst/SAFE would maintain the list for Shoreline

and handle all communications on Shoreline's behalf, Shoreline's access to its customers was

necessarily through Herbst/SAS/SAFE. (*See* Pl.'s Counterstatement ¶ 22.) Moreover, multiple

documents confirm that not only did Shoreline instruct Herbst not to disclose Shoreline's

confidential information to third parties, Shoreline had confirmation of Herbst's understanding of

and cooperation with these confidentiality requirements. (*See id.* ¶ 23.)

Given the exclusive nature of the relationship, the fact that Defendants acted on

Shoreline's behalf in selling tickets and communicating with passengers, the level of control

Shoreline had over Defendants' customer communications, and the fact that Defendants had

access to Shoreline's confidential data, this case is distinguishable from the cases cited by

Defendants where such factors did not exist. *See, e.g.*, *Ne. Gen. Corp. v. Wellington Adver., Inc.*, 82 N.Y.2d 158, 160-61, 163 (1993) (non-exclusive finder with limited involvement in transaction and no power to bind principal); *Staudinger+Franke GMBH v. Casey*, 2015 WL 3561409, at *12 (S.D.N.Y. June 8, 2015) (no superior access to confidential information by agent or control by principal); *World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 504-05, 504 n.7 (S.D.N.Y. 2007) (finding that nonexclusive licensing agent who had no power to bind plaintiff and was not empowered to act on its behalf did not owe plaintiff a fiduciary duty and suggesting that a fiduciary relationship was born once the agent agreed to be plaintiff's exclusive licensing agent). Thus, contrary to Defendants' arguments, ample evidence exists to establish a fiduciary relationship, and Shoreline is not simply relying on a mere label or the fact that Herbst/SAFE received commissions.

Defendants rely on the purported lack of a valid agreement and that the Operating Agreement did not refer to a fiduciary relationship to assert that such a relationship could not have existed. (*See* Defs.' Br. at 21.) But that argument is based on a flawed premise, because a contract did exist, and in any case a breach of fiduciary duty claim does not depend on the existence of an agreement between the parties. *See Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Servs.*, 388 F. Supp. 2d 292, 305 (S.D.N.Y. 2005) (denying summary judgment dismissal of breach of fiduciary duty claim because it "is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary" and "the ongoing conduct between parties may give rise to a fiduciary relationship").

**B.  Herbst/SAFE engaged in misconduct that constituted breach of fiduciary duty.**

Shoreline has also established that Herbst/SAFE engaged in misconduct and failed to exercise "utmost faith and loyalty in the performance" of their duties. *See Conahan*, 2022 WL

16748585, at *5. First, while they were acting as Shoreline's exclusive booking agent, Herbst and SAFE disclosed Shoreline's confidential business information to Blade, Shoreline's competitor, refused to book seats for Shoreline based on false premises, and actively sought to conceal these actions from Shoreline. (Pl.'s 56.1 ¶¶ 17-18, 25-30.) Regarding flight reservations, Herbst sent an e-mail to Quigley stating, in relevant part, "Please ask me questions first before calling anyone at [S]horeline." (SAFE00003347 (Pl.'s Ex. 75).) Even before their agreements with Blade were finalized, Herbst was working with Blade to draft emails to Shoreline customers in late April and early May 2018 and working behind the Blade counter at East Hampton Airport as early as May 4, 2018. (BLADE 0001960 (Pl.'s Ex. 103); BLADE 0002037-38 (Pl.'s Ex. 107); SAI002619 (Pl.'s Ex. 23).)

Second, ample evidence exists to show that Herbst exploited her access to Shoreline's customers to improperly divert their business to Blade, making false representations to Shoreline customers and suggesting that they seek a refund for their pre-paid tickets from Shoreline. (Pl.'s 56.1 ¶¶ 38-39; SAI003234-37 (Pl.'s Ex. 32) ¶ 22.) As one customer noted in an e-mail to Shoreline, SAFE's "initial communication the other day was incredibly misleading if not underhanded, encouraging customers as it did, to seek a refund from you guys." (SAI000169 (Pl.'s Ex. 13).)

Third, Herbst sold to Blade the customer list that she held in trust for Shoreline's benefit. (Pl.'s 56.1 ¶ 32; SAI003256-58 ¶ 20 (Herbst asked Quigley to "email her the list of Shoreline commuter customers" on May 7, 2018).) In doing so, Herbst/SAFE breached their fiduciary duties to Shoreline as a matter of law. *See Samba*, 2009 WL 705537, at *9 (agent liable for breach of fiduciary duty where agent had a conflict of interest with principal and failed to disclose conflict).

26

Although Herbst/SAFE claim that the customers on the list were theirs, they do not dispute the fact that (1) Shoreline referred all commuter customers to SAFE for reservations, including in all of their advertisements, (2) all of the commuter customers were Shoreline passengers; and (3) some of the customers on the list were Shoreline customers before SAS or SAFE existed. In fact, because of the exclusive relationship between SAFE and Shoreline, there would be a complete overlap between Shoreline's seaplane commuter passengers and the list of seaplane commuters maintained by Herbst/SAFE. (*See* SAI007746-54 (Pl.'s Ex. 53) at 7753-54 ("we were sure that she held our entire list of customers because she and [SAFE] had been doing our booking for many years"); *compare* SAI003162-3233 (Defs.' Ex. 12) and SAI007775-76 (Pl.'s Ex. 54) *with* SAFE00002440 and native file attachment (Pl.'s Ex. 68).) There is no question that the customer list Herbst/SAFE sold to Blade constituted Shoreline's customer list. (*See* BLADE 0003220-22 (Pl.'s Ex. 112) (Herbst forwards Blade a list of customers who pre-purchased Shoreline coupon books in 2017 and 2018); BLADE 0005772-73 (Pl.'s Ex. 124) (internal Blade email with the subject line "Shoreline Flier List" and containing a list of Shoreline customers).) Given these undisputed facts, Shoreline has established that Herbst/SAFE breached their fiduciary duty to Shoreline when they sold the customer list to Blade.

### C.  Shoreline suffered damages as a direct result of Herbst/SAFE's breach of fiduciary duty.

Finally, Shoreline has shown that it has suffered damages as a direct result of Herbst/SAFE's misconduct in the form of lost profits, and Shoreline is also entitled to recover the unearned commissions paid to Herbst/SAFE and the amounts Herbst/SAFE received from the sale of the customer list and commissions from Blade for the 2018 summer season. (*See* Pl.'s 56.1 ¶¶ 20-22, 32, 42.) *See Samba*, 2009 WL 705537, at *9 (agent who breaches fiduciary duty

not entitled to receive any compensation and must disgorge all wrongful benefits obtained by its disloyalty).

Herbst may be held individually liable for SAFE's breach of fiduciary duty because she personally committed and participated in the misconduct. *See LoPresti v. Terwilliger*, 126 F.3d 34, 42 (2d Cir. 1997) ("a corporate officer who commits or participates in a tort, even if it is in the course of his duties on behalf of the corporation, may be held individually liable"). There is no question that Herbst personally participated and directed the tortious conduct, including misleading customers, selling Shoreline's customer list, and stalling customer requests to purchase Shoreline tickets based on false premises. Accordingly, this Court should grant summary judgment for Shoreline on Count IV for Herbst and SAFE's breaches of fiduciary duty.

## IV. Defendants are not entitled to summary judgment dismissal of the remaining claims.

### A. Factual issues remain as to whether the customer list constituted a trade secret.

Defendants' sole argument for dismissal of the misappropriation, DTSA, and unfair competition claims is that the customer list does not constitute a trade secret. But sufficient evidence exists to create a genuine dispute on this point. The Second Circuit has long recognized that a "customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret" so long as it is not "otherwise readily ascertainable." *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999). Here, Shoreline has established that its customer list was developed through 38 years of top-notch service and thousands of dollars in advertisements to identify individuals interested in seaplane services between New York City and East Hampton. Shoreline's customer list was not known outside of Shoreline's business and could not have been properly acquired without great difficulty by competitors. (SAI007664-87 (Pl.'s Ex. 52) ¶ 23.) Also, Shoreline took several measures to guard the secrecy of the list,

28

restricting access to its customer database and prohibiting disclosure by its employees and agents. (*Id.* ¶ 20.)

Defendants would have this Court believe that Shoreline has "essentially" done "*nothing*" to safeguard its customer information, but that assertion is belied by the facts. (*See* Defs.' Br. at 24.) From the beginning, Shoreline made clear to Herbst that she and her affiliated entities were obligated to guard the secrecy of Shoreline's customer information. (SAI007664-87 (Pl.'s Ex. 52) ¶ 22 (Affidavit of Joan Gitlin, Shoreline's Dispatch Manager, confirming that Herbst/SAS/SAFE "were instructed by Shoreline not to disclose Shoreline's confidential information, including its customer list, to anyone outside Shoreline, SAS, and SAFE"); Collingwood Dep. 209:5–210:4 (Defs.' Ex. 2) (Collingwood explained to Herbst that the confidentiality and privacy requirements relating to customer information in Shoreline's employee handbook applied to Herbst).) Herbst and SAFE were obligated to safeguard customer data, and the fact that Herbst was not a Shoreline employee is irrelevant. Moreover, the obligation to maintain the data's secrecy need not be in written form or through a formal confidentiality agreement for the data to qualify as a trade secret. *See Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 262 (S.D.N.Y. 2021).

Indeed, Herbst herself confirmed her duty to keep the customer information confidential in a 2011 email to a third party that was also sent to Shoreline, writing, "With regard to our passenger manifest; this information is not public. My releasing any portion of it to anyone other than Shoreline Aviation as the operator, FAA officials or the TSA would be a violation of aviation regulations as well as privacy laws. We take this very seriously for our passengers as well as the guests that you book with us."). (SAI007248 (Pl.'s Ex. 45).) Shoreline had every reason to believe that Herbst/SAFE took their obligation to safeguard customer data seriously.

29

The cases cited by Defendants in support of their argument are factually inapposite because, in each case, the plaintiff had itself disclosed the alleged trade secret to multiple third parties and/or published them in other ways without requiring confidentiality. *See Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 524 (S.D.N.Y. 2017) (software disclosed to every user without providing for confidentiality did not constitute trade secret); *Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 267 (S.D.N.Y. 2014) (formulation disclosed to 16 third parties and published in patent application without any steps to ensure confidentiality was not secret). In this case, the only party other than Shoreline that had access to the customer data was Herbst/SAS/SAFE, which had access because they were maintaining the list on Shoreline's behalf and were obligated to keep the information secret.

That Shoreline offered to purchase Herbst's contact list in March 2018 does not mean that Shoreline did not have rights to its own customer list. Herbst/SAFE separately owned contact information for non-Shoreline customers for whom Herbst booked seats for other operators. It was this list that Shoreline offered to purchase, not its own customer list that Herbst maintained on Shoreline's behalf. (*See* Collingwood Dep. 48:16–49:2 (Defs.' Ex. 2) (Shoreline's offer to purchase Herbst's customer lists concerned information related to charter and helicopter customers through Action Airlines and Liberty Helicopters).) Indeed, contemporaneous notes taken by Shoreline pilot Eric Weaver during an April 6, 2018 meeting confirm this understanding. (*See* SAI000037-39 (Pl.'s Ex. 1) at SAI000038 (discussing the overlap between Herbst/SAFE's customer list and Shoreline's customer list and stating, "[W]e were sure that she held our entire list of customers because she and [SAFE] had been doing our booking for many years.").)

30

**B.  The Operating Agreement does not preclude the promissory estoppel and unjust enrichment claims.**

Defendants are not entitled to dismissal of the promissory estoppel and unjust enrichment claims. Their principal argument for dismissal is that the Operating Agreement constitutes a written contract covering the subject matter of the oral agreement. (*See* Defs.' Br. at 12, 18-19.) But, for the reasons discussed in Section I.A.4 *supra*, that argument is meritless as a matter of law. The cases cited by Defendants are distinguishable because the written contracts there specifically covered the subject of the dispute. *See Cambridge Valley Machining, Inc. v. Hudson MFG LLC*, 470 F. Supp. 3d 230, 262 (N.D.N.Y. 2020) (dismissing promissory estoppel claim for damages flowing from product purchase because written contract related to such purchases existed); *839 Cliffside Ave. LLC v. Deutsche Bank Nat'l Tr. Co.*, 2018 WL 4608198, at *11 (E.D.N.Y. Sept. 25, 2018) (dismissing unjust enrichment counterclaim because mortgage terms governed the escrow payments at issue).

**C.  Herbst and Pilla are not entitled to summary judgment dismissal because they are individually liable.**

This Court may easily dispose of Defendants' arguments that the individual defendants have no liability. Defendants attempt to downplay Pilla's role in Herbst's business affairs, but the evidence clearly shows otherwise. Pilla played a central role in negotiations with Blade and Shoreline in 2018. He attended and actively participated in the April 6, 2018 meeting among representatives of Blade, SAFE, and Shoreline, often taking the lead in the discussion. (Pl.'s Rule 56.1 Counterstatement to Pilla's Statement ¶¶ 5, 13.) He acted on SAFE's behalf in communicating and negotiating with Shoreline. (*Id.* ¶¶ 5, 7.) He was copied on nearly every email between Blade and Herbst and actively participated in negotiations between SAFE and Blade. (*Id.* ¶¶ 5, 12-13.) Pilla is referenced by name three separate times in the Memorandum of

31

Terms between Blade and SAFE, and he received stand-by privileges on Blade flights under the Consulting Agreement between SAFE and Blade. (*Id.* ¶¶ 5, 14-15, 17.) There is no question that Pilla was an active participant in negotiations concerning the Asset Purchase Agreement entered into by SAFE and Blade, under which SAFE improperly transferred Shoreline's customer list to Blade. (*Id.* ¶ 12.)

Although Pilla argues that he cannot be liable because he did not have a formal business relationship with Shoreline or SAFE, the claims asserted against him for DTSA violation, unfair competition, and tortious interference with prospective business relations do not require the defendant to have such a relationship. *See Purgess*, 33 F.3d at 141 (for tortious interference claim, defendant's interference with plaintiff's business relations with a third party is the necessary showing); *Roy*, 672 F.2d at 1105 (unfair competition claim involves taking and use of plaintiff's property to compete against plaintiff's own use of same property); *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Group, Inc.*, 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016) (under DTSA, use or disclosure of trade secret derived from or through a person who owed a duty to maintain secrecy sufficient). The evidence amply supports triable issues as to Pilla's involvement in tortious acts against Shoreline.

As for Herbst, regardless of whether SAFE's corporate veil is pierced, an individual defendant who is the primary tortfeasor cannot hide behind a corporate entity to escape liability. *See In re A.N. Frieda Diamonds, Inc.*, 633 B.R. 190, 206 (S.D.N.Y. 2021) ("corporate owners and officers may be held personally liable for torts they commit, without regard to whether the corporate veil can be pierced"). The one case to which Defendants cite, *Reynolds v. Lifewatch, Inc.*, is distinguishable because there, the court found that mere awareness and control of a company's operations were insufficient for individual liability but specifically stated that

32

personal participation in the wrongful acts, as is the case here, makes the officer individually

liable. *See* 136 F. Supp. 3d 503, 526-27 (S.D.N.Y. 2015). Moreover, Defendants wrongly argue

that all the tort claims against Herbst are predicated on the existence of a fiduciary relationship.

(*See* Defs.' Br. at 31.) Neither the tortious interference nor the unfair competition claim requires

that the defendant owe a fiduciary duty to plaintiff, and Shoreline's allegations supporting these

claims are independent of the fiduciary duty claim.

      Finally, contrary to Defendants' claims, Shoreline has not "abandoned any attempt to

demonstrate a basis for veil-piercing." (*See* Defs.' Br. at 31.) In fact, ten pages of Herbst's

deposition transcript are devoted to a discussion of corporate formalities and the operation of the

three entities with which Herbst was affiliated. (*See* Herbst Dep. 15:5–25:8 (Defs.' Ex. 1).) And

Defendants' argument that the "evidence is overwhelming that SAFE, at all times, respected the

corporate form" plays fast and loose with documentary evidence that shows otherwise. (*See*

Defs.' Br. at 31.) Herbst failed to observe corporate formalities for SAS and SAFE by

commingling resources, funds, and employees and by commingling corporate funds with

personal funds. Herbst testified in *Tuma v. Tuma* that SAS, SAS Auto Group, Inc. and SAFE

were "run as one big operation," there were "criss-crosses" in payment of expenses, which were

"intermingled" among the three companies, "crossovers" in employees, and "intertwined

personnel, recordkeeping and storage, computer services, accounting services, telephone

numbers and services, utilities and supplies." (*Tuma v. Tuma* minutes 11:16–12:14, 16:7-9, 29:1-

6 (Pl.'s Ex. 145).) In addition, SAS paid personal estimated taxes for Herbst and Tuma

individually. (*Id.* 14:4-23.) What is more, reports from as early as 2004 labeled "Sound Aircraft

Services Weekly Recap Report" had corresponding checks to Shoreline from SAFE's bank

33

account. (*See, e.g.*, SAI000560-63 (Pl.'s Ex. 22).) There is more than enough evidence to create a genuine dispute on Shoreline's corporate veil piercing claim.

## CONCLUSION

For the foregoing reasons, this Court should grant summary judgment for Shoreline on Counts I, IV, VIII, and IX against Herbst and SAFE and deny Defendants' summary judgment motion in its entirety.

Dated:  Sag Harbor, New York
              August 11, 2023

<div style="margin-left:40%">

Respectfully submitted,

KRIEGSMAN PC

By:*/s/  Alex Kriegsman*
    Alex Kriegsman

279 Main Street
Sag Harbor, NY 11963
(631) 899-4826 Tel.
(631) 919-5182 Fax
alex@kriegsmanpc.com

*Attorneys for Plaintiff*

</div>

34