**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK**

– – – – – – – – – – – – – – – – – – – – – – – – – – X

SHORELINE AVIATION, INC.,   :   Case No. 2:20-cv-02161-JMA-SIL

      *Plaintiff,*   :

       v.     :

CYNTHIA L. HERBST, SOUND AIRCRAFT :
FLIGHT ENTERPRISES, INC., RYAN A.  :
PILLA,

      *Defendants.*  :

– – – – – – – – – – – – – – – – – – – – – – – – – –X

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
<u>PLAINTIFF'S MOTION SUMMARY JUDGMENT</u>**

GLENN AGRE BERGMAN & FUENTES LLP

Reid Skibell, Esq.
Jewel K. Tewiah, Esq.
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
Tel: (212) 970-1600

*Attorneys for Defendants*

## TABLE OF CONTENTS

**Page(s)**

TABLE OF CONTENTS................................................................................................... i

TABLE OF AUTHORITIES ......................................................................................ii-v

PRELIMINARY STATEMENT ..................................................................................... 1

ARGUMENT ................................................................................................................... 3

   I.   THE CONTRACT CLAIMS ................................................................................. 3

      A.  Shoreline's Oral Contract Claims Are Barred by the
Operating Agreement's Merger Clause. ....................................................... 3

      B.  The Admissible Evidence Proves Shoreline and SAS
Agreed to an Informal Booking Arrangement. ............................................. 7

          1. There Was No Agreement on Booking Exclusivity. ................................ 9

          2. There Was No Agreement on Ownership of Customer Data. ................ 10

          3. There Was No Agreement SAS Would Serve as a "Booking Agent". ................ 12

      C.  Even if There Was an Enforceable Oral Contract,
Neither SAFE Nor Ms. Herbst Were Parties to It....................................... 13

   II.  THE "BOOKING AGENT" CLAIMS ................................................................ 15

      A.  The "Booking Agent" Claims are Based on a Mistake of Law. ................... 15

      B.  There Are No Protectable Trade Secrets. ................................................... 17

   III. THE TORTIOUS INTERFERENCE AND UNFAIR COMPETITION CLAIMS.......... 18

   IV. LACK OF DAMAGES AND CAUSATION ...................................................... 20

   V.  THE PURPORTED BASES FOR INDIVIDUAL LIABILITY............................. 23

CONCLUSION...................................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*24/7 Records, Inc. v. Sony Music Entm't, Inc.*,
  566 F.Supp.2d 305 (S.D.N.Y.2008) ...................................................................... 21

*Am. Bldg. Maint. Co. of New York v. Acme Prop. Servs., Inc.*,
  515 F. Supp. 2d 298 (N.D.N.Y. 2007)................................................................... 19

*Am. Fed. Grp., Ltd. v. Rothenberg*,
  136 F.3d 897 (2d Cir. 1998) ................................................................................. 22

*Am. Fuel Corp. v. Utah Energy Dev. Co.*,
  122 F.3d 130 (2d Cir. 1997) ................................................................................. 25

*Blanton v. Educ. Affiliates, Inc.*,
  2022 WL 1505124 (2d Cir. May 12, 2022).......................................................... 17

*BLD Prods., LLC v. Viacom, Inc.*,
  2011 WL 1327340 (S.D.N.Y. Mar. 31, 2011)........................................................ 3

*Bloor v. Falstaff Brewing Corp.*,
  454 F.Supp. 258 (S.D.N.Y.1978) ........................................................................... 8

*Campbell v. Rite Aid Corp.*,
  2020 WL 6370244 (E.D.N.Y. June 18, 2020)........................................................ 9

*Chase Manhattan Bank, N.A. v. Keystone Distrib. Inc.*,
  873 F. Supp. 808 (S.D.N.Y. 1994) ....................................................................... 17

*CIT Bank, N.A. v. Escobar*,
  2017 WL 3614456 (E.D.N.Y. June 16, 2017)...................................................... 12

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*,
  650 F. Supp. 2d 314 (S.D.N.Y. 2009) .................................................................. 22

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*,
  976 F.3d 239 (2d Cir. 2020) ................................................................................. 22

*Conahan v. MedQuest Ltd.*,
  2022 WL 16748585 (S.D.N.Y. Nov. 7, 2022)...................................................... 20

*Dallas Aerospace, Inc. v. CIS Air Corp.*,
  352 F.3d 775 (2d Cir. 2003) ................................................................................. 10

*Design Strategy, Inc. v. Davis*,
    469 F.3d 284 (2d Cir. 2006) ............................................................... 21

*eCommission Sols., LLC v. CTS Holdings Inc.*,
    860 F. App'x 758 (2d Cir. 2019) ...................................................... 20

*eCommission Sols., LLC v. CTS Holdings, Inc.*,
    2018 WL 2078816 (S.D.N.Y. May 1, 2018) .................................... 17

*Fed. Ins. Co. v. CAC of NY, Inc.*,
    2015 WL 5190774 (E.D.N.Y. Aug. 17, 2015) ................................... 5

*Geneva Lab'ys Ltd. v. Nike W. Afr. Imp. & Exp., Inc.*,
    2022 WL 673257 (E.D.N.Y. Mar. 7, 2022)........................................ 8

*Gould Paper Corp. v. Madisen Corp.*,
    614 F. Supp. 2d 485 (S.D.N.Y. 2009) .............................................. 21

*Grant v. Citibank (S. Dakota), N.A.*,
    2010 WL 5187754 (S.D.N.Y. Dec. 6, 2010) .................................... 18

*Hatteras Enters., Inc. v. Forsythe Cosm. Grp., Ltd.*,
    2022 WL 3682270 (E.D.N.Y. Aug. 25, 2022) ................................... 3

*Henley v. City of Buffalo*,
    2023 WL 2975560 (W.D.N.Y. Mar. 27, 2023) ................................ 11

*Holzer v. Kaplan*,
    1991 WL 230623 (S.D.N.Y. Oct. 28, 1991)....................................... 7

*In re Roman Cath. Diocese of Rockville Ctr., N.Y.*,
    651 B.R. 399 (Bankr. S.D.N.Y. 2023)............................................. 15

*In re Ryan*,
    2022 WL 4486736 (Bankr. E.D.N.Y. Sept. 27, 2022) .................... 14

*Integra FX3X Fund, L.P. v. Deutsche Bank, AG*,
    2016 WL 1169514 (S.D.N.Y. Mar. 22, 2016).................................... 4

*Johnson & Johnson Consumer Cos., Inc. v. Aini*,
    2009 WL 6055841 (E.D.N.Y. Dec. 1, 2009)..................................... 14

*Julie Wang v. New York-New Jersey Section of the Ninety-Nines Inc.*,
    2018 WL 3432744 (S.D.N.Y. June 4, 2018) .................................... 14

*Kenford Co. Inc. v. Cnty of Erie*,
    67 N.Y.2d 257 (1986)......................................................................................... 22

*Klosin v. E.I. Du Pont De Nemours & Co.*,
    2023 WL 1097859 (W.D.N.Y. Jan. 30, 2023) ..................................................... 9

*Lightbox Ventures, LLC v. 3rd Home Ltd.*,
    2017 WL 5312187 (S.D.N.Y. Nov. 13, 2017)...................................................... 22

*Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Servs.*,
    388 F. Supp. 2d 292 (S.D.N.Y. 2005) ............................................................... 16

*M.S.S. Const. Corp. v. Century Sur. Co.*,
    2015 WL 6516861 (S.D.N.Y. Oct. 28, 2015)..................................................... 13

*Metro. Pilots Ass'n, L.L.C v. Schlosberg*,
    151 F. Supp. 2d 511 (D.N.J. 2001).................................................................... 6

*Muhlstock v. Cole*,
    245 A.D.2d 55 (1st Dep't 1997) ....................................................................... 8

*New York Racing Ass'n, Inc. v. Meganews, Inc.*,
    2000 WL 307378 (E.D.N.Y. Mar. 21, 2000)...................................................... 17

*OOO Garant-S v. Empire United Lines Co.*,
    2013 WL 1338822 (E.D.N.Y. Mar. 29, 2013)..................................................... 14

*Protic v. Dengler*,
    46 F. Supp. 2d 277 (S.D.N.Y. 1999) ................................................................ 19

*Roberts v. Edith Roman Holdings, Inc.*,
    2011 WL 2078223 (S.D.N.Y. May 19, 2011) .................................................... 6

*Roy Exp. Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc.*,
    672 F.2d 1095 (2d Cir. 1982) ........................................................................... 24

*Safeco Ins. Co. of Am. v. M.E.S., Inc.*,
    2010 WL 11627203 (E.D.N.Y. May 19, 2010) (dismissing ............................... 3

*Samba Enters., LLC v. iMesh, Inc.*,
    2009 WL 705537 (S.D.N.Y. Mar. 19, 2009)...................................................... 16

*Sengillo v. Valeo Elec. Sys., Inc.*,
    536 F. Supp. 2d 310 (W.D.N.Y. 2008) ............................................................. 4

*Speedfit LLC v. Chapco Inc.*,
  2016 WL 5793738 (E.D.N.Y. June 29, 2016) ................................................ 13

*Sporre S.A. de C.V. v. Int'l Paper Co.*,
  1999 WL 1277243 (S.D.N.Y. Dec. 30, 1999) ................................................ 13

*Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.*,
  2016 WL 5338550 (S.D.N.Y. Sept. 23, 2016) ............................................... 24

*Sly Mag., LLC v. Weider Publications L.L.C.*,
  346 F. App'x 721, 723 (2d Cir. 2009) ........................................................... 19

*TechnoMarine SA v. Jacob Time, Inc.*,
  2013 WL 5231471 (S.D.N.Y. July 16, 2013) ................................................ 12

*Telecom Int'l Am., Ltd. v. AT & T Corp.*,
  280 F.3d 175 (2d Cir. 2001) ......................................................................... 17

*Thayer v. Dial Indus. Sales, Inc.*,
  85 F. Supp. 2d 263 (S.D.N.Y. 2000) ............................................................... 6

*Town & Country Linen Corp. v. Ingenious Designs LLC*,
  556 F. Supp. 3d 222 (S.D.N.Y. 2021) ............................................................. 9

*Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.*,
  213 F.3d 627 (2d Cir. 2000) ......................................................................... 20

*Veleron Holding, B.V. v. Morgan Stanley*,
  117 F. Supp. 3d 404 (S.D.N.Y. 2015) ..................................................... 15, 16

*Vitro S.A.B. de C.V. v. Aurelius Cap. Mgmt., L.P.*,
  99 A.D.3d 564 (1st Dep't 2012) .................................................................... 19

*Wistron Neweb Corp. v. Genesis Networks Telecom Servs., LLC*,
  2023 WL 4493542 (S.D.N.Y. July 12, 2023) ........................................... 13, 14

*Wolf Concept S.A.R.L. v. Eber Bros. Wine & Liquor Corp.*,
  736 F. Supp. 2d 661 (W.D.N.Y. 2010) ........................................................... 8

**Rules**

Fed. R. Civ. P. 56(c)(4) .................................................................................... 9

Defendants Sound Aircraft Flight Enterprises, Inc. ("SAFE"), Cynthia Herbst, and Ryan Pilla submit this memorandum of law in further support of their motion for summary judgment and in opposition to the motion for partial summary judgment filed by Plaintiff Shoreline Aviation, Inc. ("Shoreline").

## PRELIMINARY STATEMENT

Shoreline's opposition ("Opp'n") has no answer to the core flaw in its case: the majority of Shoreline's allegations are unsupported by a whit of admissible evidence. An illustrative example concerns the alleged oral contract at the center of this dispute. Shoreline's 30(b) witness, Andrea Collingwood, testified that Shoreline lacks any knowledge as to whether Ms. Collingswood's husband, John Kelly, agreed with Ms. Herbst that (1) Shoreline and Sound Aircraft Services, Inc. ("SAS") had an exclusive booking relationship; and (2) Shoreline owned any customer data held by SAS. Ms. Herbst similarly testified that she did not discuss either issue with Mr. Kelly. And their testimony makes sense because the parties continued to work together until 2018, and if a contract had been reached covering those issues there should be extensive documentary proof of it.

Despite this unequivocal testimony from the parties' 30(b)(6) witnesses—which Shoreline does not even address—Shoreline continues to maintain that an oral contract was agreed to that prohibited SAS (and later SAFE) from booking passengers with other seaplane operators and that granted Shoreline ownership rights in the customer data that SAS/SAFE developed and held on their computer systems. It does so even in the face of a written contract signed by Shoreline and SAS, and that contains a merger clause, which would nullify any preexisting oral contract, and an explicit prohibition against exclusivity.

So, what does Shoreline rely upon for support? Nothing admissible. Shoreline cites self-serving hearsay taken from a couple of emails Mr. Kelly sent in 2018 after the relationship between the parties had soured, and conclusory snippets from affidavits signed by persons lacking any personal knowledge of what was agreed between Mr. Kelly and Ms. Herbst. It also claims that Ms. Herbst "admitted" the oral contract was exclusive when all she testified to was that SAS and SAFE consistently used Shoreline when booking seaplane flights prior to Shoreline terminating their informal arrangement. Plainly, there is a difference between parties choosing to work together because it is mutually beneficial and agreeing to be contractually bound to one another.

Another example involves damages. Since this case was filed in 2020, Shoreline has pursued the same categories of damages, including tax losses related to an Employee Stock Ownership Plan ("ESOP"), the costs of hiring two employees to handle bookings, and lost revenue (not profits) for 2018. In its opposition, Shoreline *abandoned* its original theories and *pivoted* to seeking over $1.6 million in lost profits for 2018 even though Shoreline has never amended its interrogatory responses, initial disclosures, or complaint to include lost profits, and thus no discovery has been taken on Shorelines purported expenses.[1] Moreover, Shoreline does not identify a single booking that Defendants' alleged misconduct caused it to lose. As a result, it cannot demonstrate an entitlement to damages, much less satisfy New York's demanding reasonable certainty standard for proving lost profits.

---

[1] Shoreline's belated attempt to shift its theory of damages to lost profits is particularly inexcusable because it has long known of Defendants' position that loss of revenue is not a cognizable harm. On April 14, 2022, Defendants sought the Court's leave to move for summary judgment, and identified as one of its bases the fact that Shoreline was pursuing loss of revenue, not lost profits, and the former is not recoverable. Dkt. No. 107 at 3. Shoreline responded by representing to the Court that Defendants' letter was "deliberately misleading and their motion is certain to fail." Dkt. No. 108 at 1. Shoreline also implied that at the appropriate time it would proffer a damages expert. *Id.* at 2. Subsequently, Defendants' request was denied.

This case is ripe for summary judgment because there is nothing for a jury to decide. Defendants respectfully submit that summary judgment should be entered dismissing all of Shoreline's claims.

## ARGUMENT

### I. THE CONTRACT CLAIMS

Shoreline's legal claims are predicated on the existence of the putative oral contract. The reason for this is that Shoreline's contention that it owned SAFE's customer data or that it had a protectable interest in the underlying customers are based on the oral contract and Ms. Herbst's supposed agreement to be Shoreline's "booking agent." Because the oral contract was supplanted by two written contracts—the first of which contains a merger clause—Shoreline's claims fail as a matter of law. Further, Shoreline fails to cite any admissible evidence to substantiate its allegations concerning the existence and features of the supposed contract. There is none. Mr. Kelly and Ms. Herbst agreed to an informal commissions-for-bookings arrangement that was mutually convenient and beneficial for over two decades until both sides decided to go in different directions.

### A. Shoreline's Oral Contract Claims Are Barred by the Operating Agreement's Merger Clause.

Shoreline's breach of contract and related quasi-contract claims must be dismissed because any contract was supplanted by an Operating Agreement containing a merger clause and a prohibition against exclusivity. Critically, the merger clause rendered the preexisting oral contract—to the extent it ever existed—a *nullity* since its terms would have been integrated into the Operating Agreement.[2] Herbst Defendants Moving Br. ("Mem") at 18. While Shoreline

---

[2] *See also Hatteras Enters., Inc. v. Forsythe Cosm. Grp., Ltd.*, 2022 WL 3682270, at *7 (E.D.N.Y. Aug. 25, 2022) (dismissing breach of contract claim based when subsequent contract

responds with bald assertions about the Operating Agreement's purpose and other immaterial arguments, those do not render the merger clause any less binding under New York law.

*First*, Shoreline's claim that Defendants' legal authorities are distinguishable (citing no authorities of its own) is erroneous. Each case involved a standard merger clause reflecting that it was the "complete agreement" between the parties. The clauses in those cases are substantivity identical to the one found in the Operating Agreement. Compare Ex. 7 at SAI000369 (the Operating Agreement was the "complete understanding of the parties" and may only be modified by written agreement) with *Sengillo v. Valeo Elec. Sys., Inc.*, 536 F. Supp. 2d 310, 313 (W.D.N.Y. 2008) (contract was the "entire agreement between the parties" and could only be modified by written agreement); *Integra FX3X Fund, L.P. v. Deutsche Bank, AG*, 2016 WL 1169514, at *3 (S.D.N.Y. Mar. 22, 2016) (contract was the "the entire agreement and understanding of the parties with respect to its subject matter"). [3]

*Second*, while Shoreline contends that the Operating Agreement covers a different subject matter than the putative oral contract, the evidence shows the *opposite*. The cover letter from the Town of East Hampton enclosing the Operating Agreement specifically instructed Shoreline that "your company will engage the services of [SAS] to supervise, facilitate, and control Shoreline's activities on the ground . . . . [SAS] is a party to this Agreement, ***eliminating the need for a***

---

contained a merger clause); *BLD Prods., LLC v. Viacom, Inc.*, 2011 WL 1327340, at *13 (S.D.N.Y. Mar. 31, 2011) (collecting authorities, and finding a merger clause requires "dismissal of any claim founded on the earlier alleged oral agreement between the parties"), *vacated on other grounds sub nom.*, *BLD Prods., LLC v. Remote Prods., Inc.*, 509 F. App'x 81 (2d Cir. 2013); *Safeco Ins. Co. of Am. v. M.E.S., Inc.*, 2010 WL 11627203, at *8 (E.D.N.Y. May 19, 2010) (dismissing claim).
[3] "Ex." refers to the exhibits attached to the declaration of Reid Skibell in support of the Herbst Defendants' Motion for Summary Judgment. "Pl. Ex." refers to the exhibits relied upon by Shoreline in their summary judgment papers.

*separate agreement between your company and [SAS].*"[4] (Pl. Ex. 19 at SAI000340) (emphasis added). Accordingly, Shoreline understood when it negotiated the Operating Agreement that this would be the lone contract between it and SAS, including with respect to booking and ticketing services.

Consistent with that fact, the Operating Agreement states that it governs all of Shoreline's operations at East Hampton Airport, including SAS's provision to Shoreline of booking, ticketing, check-in, luggage handling, and related customer services.  (Ex. 7 (¶1)). Those are the very same services that Shoreline claims are covered by the purported oral contract, which, according to Shoreline, applied to "flights to and from the East Hampton Airport through SAS/SAFE." (Ex. 5 (Response to Interrogatory No. 1) at 4; *see also* Mem. at 15. Thus, the Operating Agreement and the oral contract overlap, which Shoreline's contentions do not change. *See, e.g.*, *Fed. Ins. Co. v. CAC of NY, Inc.*, 2015 WL 5190774, at *2 (E.D.N.Y. Aug. 17, 2015)  (Locke, J.) (rejecting "bald assertion" that was at odds with the contractual terms).

Further, Shoreline does not identify any substantive differences between the scope of the Operating Agreement and that of the putative oral contract.[5] That is unsurprising. Shoreline's corporate representative *conceded* that the Operating Agreement covers the same subject matter as the putative oral contract. (Ex. 2 at 160:11-161:20) ("Q: Are those the services that you testified earlier Ms. Herbst was providing to Shoreline? A:Yes.  It's a little -- a little more vague, but yes."). While Ms. Collingwood testified there were minor differences between the two contracts, those

---

[4] Shoreline cites this document in its 56.1 Statement, thereby acknowledging it is admissible as evidence.

[5] Although Shoreline contends the Operating Agreement does not cover pricing, the Agreement obligates SAS to charge Shoreline "fair, reasonable and non-discriminatory prices." (Ex. 7 (3)(D)). And the lack of a commission schedule does not render the Operating Agreement or its merger clause any less enforceable. As Shoreline itself notes, a contract is enforceable where there is a meeting of the mind on the material terms. Opp'n at 7.

differences concern features of the putative oral contract that are the basis for Shoreline's legal claims here. (*Id.* at 162:3-15) (stating that the Operating Agreement does not cover "the fiduciary responsibilities"). However, that is also the point: even if Shoreline and SAS/SAFE had agreed to an oral contract containing those features—which never happened—the parties subsequently agreed to omit them and any reference to the oral contract in the Operating Agreement. That decision means the Operating Agreement controls, and Shoreline does not contend that the Operating Agreement was ever breached.

*Third*, it is immaterial whether the subject of the contracts are different given the breadth of the merger clause. Shoreline concedes that it and SAS were parties both to any alleged oral contract, as it had to acknowledge since Ms. Herbst was employed by SAS and only booked flights through SAS prior to 2017. Opp'n at 2, 9 (claiming that there was "what amounted to a novation" between SAS and SAFE in 2017)). The Operating Agreement's merger clause also indicates that it is the complete agreement between the parties. "New York law gives full effect to merger clauses." *Roberts v. Edith Roman Holdings, Inc.*, 2011 WL 2078223, at *3 (S.D.N.Y. May 19, 2011). Where, as here, "the parties to a contract enter into a new agreement that expressly supersedes the previous agreement, the previous agreement is *extinguished*." *Id.* (emphasis added); *see also Thayer v. Dial Indus. Sales, Inc.*, 85 F. Supp. 2d 263, 269 (S.D.N.Y. 2000) (merger clause bars consideration of any earlier agreements between the parties); *Metro. Pilots Ass'n, L.L.C v. Schlosberg*, 151 F. Supp. 2d 511, 525 (D.N.J. 2001) (applying New York law, and holding "when a contract has a merger clause, stating that the agreement between the parties is the final agreement, the prior contract is unenforceable"). In other words, Shoreline and SAS specifically agreed that the Operating Agreement would supplant any previous agreements between them, which would include the oral contract.

6

*Fourth*, Shoreline argues that Operating Agreement's exclusivity prohibition should be disregarded because this provision supposedly relates to a statute concerning an airline's exclusive use of an airport. Shoreline's argument misses the mark. The parties to the Operating Agreement were sophisticated and represented by counsel; if they had intended to limit the scope of the Operating Agreement's exclusivity provision in the way Shoreline claims they would have done so at the time. Shoreline's unilateral attempt to rewrite the wording of the exclusivity provision is too late by decades.

**B.    The Admissible Evidence Proves Shoreline and SAS Agreed to an Informal Booking Arrangement.**

Shoreline spills considerable ink arguing about two unremarkable, undisputed points: (1) Mr. Kelly, on behalf of Shoreline, and Ms. Herbst, on behalf of SAS, agreed to a commission-bases sales arrangement, and (2) neither SAS nor SAFE booked any flights with other seaplane operators while they were working with Shoreline. It then launches into a discussion of SAFE's purported duties to Shoreline, thereby *skipping* the crucial step of bringing forth evidence to show that Mr. Kelly and Ms. Herbst *agreed* to any obligations or duties beyond the payment of commissions in exchange for booking passengers (*i.e.*, booking exclusivity, treatment of customer data, and principle-agent relationship).

The only evidence that Shoreline cites concerning what was actually discussed during the purported contract formation is Ms. Herbst's testimony in which she stated that she and Mr. Kelly agreed to a commission-based sales arrangement. Opp'n at 6. That type of loose arrangement, without any other elucidated obligations, is not a contract. *See Holzer v. Kaplan*, 1991 WL 230623, at *2 (S.D.N.Y. Oct. 28, 1991) ("A court cannot decree performance of an agreement unless it can discern with particularity what the terms of the agreement are."). If it were, there would be endless lawsuits involving the termination of informal business affiliations or relations. While Shoreline

cites cases that supposedly stand for the opposite proposition, they actually support Defendants' position. In those matters, unlike here, the parties had negotiated the complete terms of the contract at issue except for duration.[6]

Nevertheless, even if the parties' commission-based sales arrangement could be construed as a contract, it still lacked the features that Shoreline claims were breached. As set forth below, the record demonstrates Mr. Kelly and Ms. Herbst never discussed booking exclusivity, ownership of customer data, or a principle-agent relationship. And while Shoreline argues at length that SAFE delayed booking unspecified potential customers in March and April for summer flights, it fails to articulate why that would be a breach of the putative oral agreement.[7] Shoreline has never alleged that Mr. Kelly and Ms. Herbst agreed to a best-efforts requirement. Indeed, such a provision would only have been binding if the two of them had agreed to "some definite, measurable standard and a clear set of guidelines against which to measure the defendant's efforts." *Wolf Concept S.A.R.L. v. Eber Bros. Wine & Liquor Corp.*, 736 F. Supp. 2d 661, 672 (W.D.N.Y. 2010) (citing *Bloor v. Falstaff Brewing Corp.,* 454 F.Supp. 258, 266–267 (S.D.N.Y.1978), *aff'd,* 601 F.2d 609 (2d Cir.1979)). Nothing like that was negotiated here.

---

[6] *See Geneva Lab'ys Ltd. v. Nike W. Afr. Imp. & Exp., Inc.*, 2022 WL 673257, at *5 (E.D.N.Y. Mar. 7, 2022) (complete terms of an orally agreed settlement agreement set forth in multiple written drafts); *Muhlstock v. Cole*, 245 A.D.2d 55, 58 (1st Dep't 1997) (terms of contract fully specified except duration).

[7] Shoreline employs a variety of overstuffed language to describe Ms. Herbst's conduct during these two months. In fact, Ms. Herbst was weighing her options because Mr. Kelly had made an offer to buy SAFE, and she was increasingly concerned that if she did not take the offer or do a deal with Blade, Mr. Kelly was going to cut her out by having Shoreline itself book the flights. Supplemental Declaration of Cynthia L. Herbst, dated October 27, 2023 ("Supp. Herbst Decl.) ¶¶ 5-8. Ms. Herbst's fears were prescient, as the evidence produced in this case demonstrates that Mr. Kelly had already executed a binding Letter of Intent to merge Shoreline into Cape Air for more than $5 million. (Ex. 16 at (1)(a)).

### 1.  There Was No Agreement on Booking Exclusivity.

Ms. Herbst testified that that she did not discuss booking exclusivity with Mr. Kelly, and her testimony is supported by Ms. Collingwood's testimony. The latter *conceded* that Shoreline has no knowledge as to whether there was an agreement on booking exclusivity. (Ex. 2 at 150:4-151:21) ("Q: To your knowledge did [Mr. Kelly and Ms. Herbst] discuss one way or the other whether Ms. Herbst could book flights for other seaplane operators? A: I really don't know the answer to that."). Shoreline is bound by Ms. Collingwood's testimony, which should end any debate on this point. *See Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 261 (S.D.N.Y. 2021) (explaining that "[i]t would defeat the entire purpose of Rule 30(b)(6) if a party's representative could admit to a fact during a deposition only to have that party contradict the fact later, and after its adversary's opportunity to challenge it pretrial had expired"); *Klosin v. E.I. Du Pont De Nemours & Co.*, 2023 WL 1097859, at *4 (W.D.N.Y. Jan. 30, 2023) ("30(b)(6) testimony binds the corporation").

Tellingly, the only reference to booking exclusivity that Shoreline was able to locate in the voluminous discovery produced in this case is an email Mr. Kelly sent Ms. Herbst offering to buy SAFE, in which he asserts, without explanation, the existence of a prior "exclusive agreement" to book passengers. Opp'n at 8 (citing to Pl's. Ex. 61). Not only is that statement inadmissible hearsay, but it is contradicted by multiple communications authored by Mr. Kelly where, unlike in this document, he was not posturing. Mem. at 14-15. It has no evidentiary weight. Fed. R. Civ. P. 56(c)(4); *see, e.g.*, *Campbell v. Rite Aid Corp.*, 2020 WL 6370244, at *6 (E.D.N.Y. June 18, 2020) (Locke, J.) (explaining that "inadmissible hearsay . . . cannot be considered on summary judgment").

This piece of hearsay is also at odds with Mr. Kelly's conduct. In March 2018, Mr. Kelly executed a binding Letter of Intent to merge his business into Cape Air. Nevertheless, Mr. Kelly concealed this Letter of Intent from SAFE. Mem. at 7. Plainly, if Shoreline and SAS/SAFE had an exclusive contract such that Shoreline was obligated to offer SAS/SAFE any seaplanes operating out of East Hampton Airport for bookings, Mr. Kelly would have been obligated to inform SAS/SAFE that Shoreline would shortly *cease to exist* as a legal entity and Cape Air would *own* its seaplanes. Shoreline's failure to inform SAFE of its impending sale underscores the meritless nature of Shoreline's exclusivity argument. *See Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 784 (2d Cir. 2003) (affirming grant of summary judgment where a party's course of conduct was inconsistent with the oral modification of a contract).

As for Shoreline's argument that Ms. Herbst admitted there was an exclusive booking relationship between Shoreline and SAS, the testimony it relies upon shows that SAS/SAFE chose to book passengers on Shoreline seaplanes. Ms. Herbst did *not* testify that SAS/SAFE were obligated by a contract to do so. Opp'n at 6. Likewise, the complaint it references from Ms. Herbst's dispute with her ex-husband alleges that Shoreline (not SAFE) exclusively used SAFE to book passengers, which, once again, does not show that SAFE owed any duties to Shoreline. *See id.* Although SAFE generally liked working with Shoreline, and Shoreline had the capacity to fulfill SAFE's booking requirements, that does not imply SAFE was obligated to do so.

## 2. There Was No Agreement on Ownership of Customer Data.

With respect to the issue of customer data, Shoreline's 30(b)(6) witness admitted that Mr. Kelly and Ms. Herbst did not discuss ownership of customer data. (Ex. 2 at 149:8-14) ("Q: I'm asking about the conversation they had, Ms. Collingwood. So if I understand correctly, when Ms. Herbst and Mr. Kelly had a conversation about working together, they didn't discuss customer

data, right? A: No, not that I'm aware of."). Ms. Herbst's testimony on this point was the same. Mem. at 14. Shoreline tacitly concedes this point by failing to address their corporate witness's admission. *See Henley v. City of Buffalo*, 2023 WL 2975560, at *1 (W.D.N.Y. Mar. 27, 2023) ("By failing to respond to defendants' arguments, plaintiff concedes their validity.")

Shoreline's claim to own SAFE's customer data is further belied Mr. Kelly's attempt to purchase that very same data in 2018. In response, Shoreline claims Mr. Kelly was only attempting to purchase a subset of data relating to SAFE customers who flew on fixed wing and helicopter flights, not seaplane flights. Opp'n at 30. But that is inaccurate; the evidence shows Mr. Kelly attempted to purchase *all of SAFE's customer data.* [8] (Ex. 10 at SAI000042); (Ex. 2 at 242: 17-19) ("Q. So Mr. Kelly is offering to purchase SAFE's customer data, right? A: Yes, all of it."). According to Ms. Collingwood, Mr. Kelly wanted the contact information for persons who had previously flown on Shoreline flights because SAFE was supposedly "holding our customer list hostage." *Id.* at 245:10-18; *see also* Ex. 31 at 236:12-237:2. But she also acknowledged that Shoreline never asked for SAFE to return its purported customer data, which cannot be reconciled with Shoreline's ownership claim. Ex. 2 at 245:19-246:13.

Shoreline attempts to confuse the issue by referencing notes taken by a pilot regarding a discussion he had with Mr. Kelly. Opp'n at 30. This does not move the needle. The pilot's stated belief—without any explanation as to why—that Shoreline owns the underlying customer relationships reflected in SAFE's customer database does not make it true. Nor does it show what was agreed between Mr. Kelly and Ms. Herbst back in 1994.

---

[8] While Shoreline cites testimony from Ms. Collingwood in which she volunteered in response to an unrelated question that Mr. Kelly was supposedly interested in purchasing non-Shoreline customer data, it is not credible in light of her other testimony.

**3.   There Was No Agreement SAS Would Serve as a "Booking Agent".**

With respect to Ms. Herbst supposedly agreeing that SAS would serve as Shoreline's "booking agent," Shoreline fails to identify any relevant evidence. Shoreline relies on (i) conclusory statements made in two affidavits from persons who lack personal knowledge of what would have been agreed between Mr. Kelly and Ms. Herbst, and (ii) hearsay statements made by Mr. Kelly in two emails decades after the purported oral contract was reached and that were intended to cast blame on SAFE for the deterioration of the parties' working arrangement. Opp'n at 2.[9] Even if these documents contained probative facts—which they do not—they would still provide no basis for avoiding summary judgment because the documents are inadmissible as evidence. *See TechnoMarine SA v. Jacob Time, Inc.*, 2013 WL 5231471, at *6-7 (S.D.N.Y. July 16, 2013) (granting summary judgment where "plaintiff offered no documentary evidence beyond [witness's] conclusory statement"). As this Court has explained, "[a]ffidavits submitted in opposition to summary judgment must be based on personal knowledge, must set forth facts such facts as would be admissible in evidence, and must show that the affiant is competent to testify to the matters stated therein." *CIT Bank, N.A. v. Escobar*, 2017 WL 3614456, at *6 (E.D.N.Y. June 16, 2017) (Locke, J.) (citation omitted).

---

[9] Shoreline cites as support the authorities contained in third fact listed in its 56.1 statement. Most of these citations are either irrelevant to the issue of whether there was an agreement SAS would serve as a "booking agent" to Shoreline, or contradict Shoreline's position (*i.e.*, the Operating Agreement). The only ones that are even potentially supportive is an affidavit by a former SAFE employee who only started working there in 2017 (Pl. Ex. 32 at 1, ¶1), an affidavit from a person who flew on Shoreline and hired it to operate her airplane (Pl. Ex. 56 at 1, ¶4), an email Mr. Kelly sent Ms. Herbst on April 23, 2018, attempting to convince her to sell SAFE (Pl. Ex. 61 at SAFE00000124), and an email Mr. Kelly sent his customer list on May 14, 2018, stating why SAFE was supposedly at fault for Shoreline's decision to cease working with SAFE (Pl. Ex. 4).

In short, the admissible evidence shows and is fully consistent with the existence of an informal booking arrangement between Shoreline and SAS/SAFE. Remarks by Mr. Kelly in self-interested communications provide no basis for Shoreline to avoid summary judgment, particularly given the admissions by its corporate representative and Mr. Kelly in other documents.

### C.   Even if There Was an Enforceable Oral Contract, Neither SAFE Nor Ms. Herbst Were Parties to It.

As noted above, Shoreline has acknowledged that neither SAFE nor Ms. Herbst were parties to the purported oral contract when it was supposedly negotiated in 1994. And as the case law demonstrates, as non-signatories they would not be bound by its terms. Mem. at 16-17; *see also Speedfit LLC v. Chapco Inc.*, 2016 WL 5793738, at *6 (E.D.N.Y. June 29, 2016) (Locke, J.) (relied on by Shoreline and finding that principles and a subsidiary were not bound by a contract signed by the corporation).[10] Shoreline's novel legal arguments to the contrary do not withstand scrutiny.

Shoreline asserts there was "what amounted to a novation" between SAS and SAFE/Ms. Herbst in 2017 because SAFE began booking customers on Shoreline's seaplanes. Opp'n at 10. However, this argument cannot be reconciled with New York law on novation. There is a "high hurdle" for demonstrating an implied novation, which requires the existence of facts showing an "unequivocal intention" to effectuate a novation. *Wistron Neweb Corp. v. Genesis Networks Telecom Servs., LLC*, 2023 WL 4493542, at *16-18 (S.D.N.Y. July 12, 2023) (citing *Sporre S.A. de C.V. v. Int'l Paper Co.*, 1999 WL 1277243, at *4 (S.D.N.Y. Dec. 30, 1999)).

---

[10] The other case relied on by Shoreline concerns a matter where the plaintiff barely survived a motion to dismiss based on the allegation that individual non-signatories agreed to be bound by a contract. *See M.S.S. Const. Corp. v. Century Sur. Co.*, 2015 WL 6516861, at *10 (S.D.N.Y. Oct. 28, 2015). Here, there is no evidence that SAFE or Ms. Herbst agreed to be so bound; Ms. Herbst was merely an employee of SAS and received no compensation related to SAS's informal arrangement with Shoreline. Mem. at 17-18.

Shoreline does not clear that hurdle. Neither SAFE nor Ms. Herbst agreed to accept SAS's purported obligations to Shoreline that are the basis for the legal claims here. Rather, the evidentiary record shows that SAFE agreed to book SAS's customers on Shoreline's seaplanes in exchange for commissions which, at most generous, represents a *partial novation* of SAS's obligations to Shoreline. Because SAFE did not consent to assume booking exclusivity, fiduciary, or customer data obligations to Shoreline, there is no basis for implying a novation of any such duties. *See, e.g.*, *Winstron*, 2023 WL 4493542, at *19 (on summary judgment, rejecting argument there was an implied novation).

Shoreline also posits that Ms. Herbst and SAFE can be held liable for SAS's contractual obligations as its purported alter-ego. Not so. To make that argument, Shoreline would have needed to implead SAS as a party, which it has not done and should not be permitted to do at this late juncture. *See In re Ryan*, 2022 WL 4486736, at *7 (Bankr. E.D.N.Y. Sept. 27, 2022) (under New York law, entity for which defendants are an alleged alter-ego is a necessary party); *Julie Wang v. New York-New Jersey Section of the Ninety-Nines Inc.*, 2018 WL 3432744, at *4 (S.D.N.Y. June 4, 2018) (recommending dismissal for failure to include entity for which defendant was the alleged alter-ego).

Moreover, the evidence does not support piercing the corporate veil of SAS. SAFE only processed payments for SAS for a period because it had the proper FAA accreditation. Mem. at 5. Cooperation among affiliated small businesses is commonplace and does not support alter ego liability. *See OOO Garant-S v. Empire United Lines Co.*, 2013 WL 1338822, at *6 (E.D.N.Y. Mar. 29, 2013) (explaining that small business are held to a higher standard with respect to alter ego liability). Any other purported misconduct by SAS's owner, Steven Tuma, also cannot be imputed to SAFE (a separate company owned by Ms. Herbst) or Ms. Herbst (an employee and Mr. Tuma's

ex-wife). *See Johnson & Johnson Consumer Companies, Inc. v. Aini*, 2009 WL 6055841, at *7 (E.D.N.Y. Dec. 1, 2009) (explaining that to pierce the corporate veil "courts require a nexus between the failure to maintain separate corporate formalities and the wrong suffered by the plaintiff").

## II.   THE "BOOKING AGENT" CLAIMS

### A.   The "Booking Agent" Claims are Based on a Mistake of Law.

At bottom, Shoreline's argument is that it owns SAFE's passenger relationships and passenger data because Shoreline referred to SAS or SAFE as a "booking agent" on a few occasions over the years they worked together, which is supposedly reflective of a fiduciary relationship. But this theory is foreclosed by New York law. Mem. at 20-22. As one of the cases Shoreline relies upon succinctly put it: "One does not become an 'agent' under New York law simply because that term is used in the title of a contract." *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 451 (S.D.N.Y. 2015).

While Shoreline denies it is "simply relying on a mere label or the fact that Herbst/SAFE received commissions" for its claim that they owed Shoreline fiduciary duties (Opp'n at 25), that is precisely what it is doing. Shoreline attempts to distinguish the abundance of legal authorities cited by Defendants demonstrating that the title of "booking agent" is meaningless and does not make one a fiduciary, by claiming that they do not involve situations where the alleged principle exerted control over the "booking agent". But its argument is *circular*. Although Shoreline claims it controlled SAS/SAFE, this contention is based on the fact that Mr. Kelly referred to SAS/SAFE as a "booking agent" or "broker" in certain emails. *Id.* at 23 (citing Pls. Ex. 27 and 28). To put it another way, a label  is the foundation for Shoreline's argument that it had the power to control SAS/SAFE.

In any event, Shoreline is wrong on both the law and the facts. Under New York law, "control alone is insufficient to establish the existence of an agency relationship"; rather, there must also be "mutual consent" that the agent is acting for the principle's benefit. *In re Roman Cath. Diocese of Rockville Ctr., New York*, 651 B.R. 399, 428 (Bankr. S.D.N.Y. 2023) (citation omitted). Even the authorities relied on by Shoreline demonstrate that an agreement—*i.e.*, a contract or the equivalent of one through conduct—is essential to the creation of an agency relationship. *See Samba Enters., LLC v. iMesh, Inc.*, 2009 WL 705537, at *7 (S.D.N.Y. Mar. 19, 2009) (finding an agency relationship where "both parties manifested their intent to have Samba act on iMesh's behalf" in a contract), *aff'd sub nom. Samba Enters., Ltd. v. iMesh, Inc.*, 390 F. App'x 55 (2d Cir. 2010); *Veleron*, 117 F. Supp. 3d at 451 (S.D.N.Y. 2015) (analyzing whether a party agreed to serve as an agent "under the Agency Disposal Agreement"); *Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Servs.*, 388 F. Supp. 2d 292, 305 (S.D.N.Y. 2005) (defendant agreed to represent plaintiff as the "sole intermediary" in the purchase of certain bonds).

Here, the required consent was lacking because everyone involved understood that Shoreline and SAS/SAFE had an arm's length booking arrangement. The Operating Agreement shows that SAS was performing a defined set of services for Shoreline, which did not involve any fiduciary duties. Mem. at 21. Mr. Kelly and Ms. Collingwood, Shoreline's corporate representative, both described the relationship between Shoreline and SAS/SAFE as a booking arrangement involving an exchange of services for commissions. (Ex. 6 at SAI000255) (characterizing the relationship with SAFE as "merely a booking arrangement"); (Ex. 2 at 31:3-33:23) ("[Mr. Kelly and Ms. Collingwood] talked about him setting up the arrangement with [Ms. Herbst]: the booking arrangement where she would help us with our customers in exchange for commissions."). And Ms. Herbst testified, including in the excerpts cited by Shoreline, that she

16

booked her customers on a variety of carriers (Pl. Ex. 137 at 60:12-61:12), and the only tasks SAS/SAFE performed on Shoreline's behalf was "checking in" customers for their flights at the gate. (Pl. Ex. 137 at 71:17-72:20). It is a gross distortion of this testimony to claim, as Shoreline does, that Ms. Herbst admitted she was functioning as a principal's agent.

The only control that Shoreline exercised with respect to SAS/SAFE related to the content of customer communications relating flight operations, which reflected FAA mandates. Supp. Herbst Decl. ¶ 2. That modicum of control does not demonstrate Shoreline was SAS/SAFE's agent because the relationship was at its core a commercial one between sophisticated parties. Dismissal is thus appropriate. *See, e.g.*, *New York Racing Ass'n, Inc. v. Meganews, Inc.*, 2000 WL 307378, at *6 (E.D.N.Y. Mar. 21, 2000) (dismissing breach of fiduciary duty claim on summary judgment); *Chase Manhattan Bank, N.A. v. Keystone Distrib. Inc.*, 873 F. Supp. 808, 816 (S.D.N.Y. 1994); *see also Blanton v. Educ. Affiliates, Inc.*, 2022 WL 1505124, at *5 (2d Cir. May 12, 2022) (upholding grant of summary judgment on breach of fiduciary duty claim where relationship was commercial in nature irrespective of the "longevity of that working relationship").

### B.  There Are No Protectable Trade Secrets.

The evidentiary record conclusively demonstrates that Mr. Kelly and Ms. Herbst never agreed Shoreline would own the customer data that SAS, and later SAFE, developed and held on their computer systems. Shoreline's corporate representative admitted as much, and Shoreline has done nothing to rebut her testimony. Mem 23-24. That fact alone is fatal to Shoreline's misappropriation, DTSA, and unfair competition claims. *See Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 198 (2d Cir. 2001) (explaining that "absent some appropriation of an idea or knowledge in which [plaintiff] had a property interest or a contractual arrangement creating such an interest, we see no . . . impropriety here"); *eCommission Sols., LLC v. CTS Holdings, Inc.*, 2018 WL 2078816, at *6 (S.D.N.Y. May 1, 2018) (rejecting argument defendant stole data "which was

17

readily shared while [defendant] and [plaintiff] worked together"), *aff'd*, 860 F. App'x 758 (2d Cir. 2019).

But even putting that issue to the side, Shoreline' claims would still fail because the evidence proves that Shoreline took no steps to safeguard the data held on SAFE's computer systems. Shoreline's corporate representative testified that Shoreline never once sought access to the data, inquired into how the data was kept, or asked about how the data was safeguarded.[11] Shoreline tries to excuse its apparent neglect by claiming that it was relying on SAS/SAFE to hold the data on its behalf. That makes no sense.[12] If Shoreline believed it owned the data and the data was valuable, it logically would have taken steps to protect or access the data over the more the two decades it worked with SAS/SAFE. Instead, it tracked customer data on its own in fits and starts, and later tried to purchase SAFE's customer data. Mem. at 6-7.

## III.   THE TORTIOUS INTERFERENCE AND UNFAIR COMPETITION CLAIMS

Shoreline's tortious interference and unfair competition claims based on miscellaneous alleged misconduct fare no better than its claims related to SAFE's customer data and customer relationships. Shoreline has withdrawn its theory of liability based on SAFE's filing of a lawsuit

---

[11] (Ex. 2 at 43:3-15) ("Q: My questions is have you ever viewed – and by you I mean Shoreline ever viewed the customer data held on Ms. Herbst's computer system? A: I can only speak for myself, and I have not. Q: To your knowledge has anyone at Shoreline Aviation reviewed the customer information on Ms. Herbst's computer system? A: I really don't know."); *id.*, at 43:21-25 ("Q: Do you know which database [Ms. Herbst] uses to store this information? . . . . A: I really don't know."); *id.* at 44:2-8 ("Q: Do you know if the database is password protected? . . . . A: I do not know for sure."); *id.* at 44:15-21 ("Q: Besides Ms. Herbst, do you know if anyone else has access to that customer database? . . . A: At -- at this time, I don't know.").

[12] Shoreline also states that it verbally instructed SAS/SAFE to protect this customer data. Shoreline makes this point by citing to an affidavit made on "information and belief" by a former employee. Opp'n at 29 (citing to Pl. Ex. 52 (¶22)). However, "[s]tatements in an affidavit made on information and belief have no probative value and may not be considered in a motion for summary judgment." *Grant v. Citibank (S. Dakota), N.A.*, 2010 WL 5187754, at *2 (S.D.N.Y. Dec. 6, 2010).

(Opp'n at 22 n. 10), which leaves Shoreline's argument that SAFE misled unidentified customers so as to convince them to fly with Blade. That theory is meritless.

As Shoreline tacitly acknowledges, a tortious interference claim will not lie where, like here, a defendant is advancing a competing economic interest unless the plaintiff can demonstrate the use of fraudulent or criminal means. Similarly, an unfair competition requires a showing of bad faith. *See Sly Mag., LLC v. Weider Publications L.L.C.,* 346 F. App'x 721, 723 (2d Cir. 2009). The closest Shoreline can come to making a showing of fraud or bad faith is the assertion that SAFE misstated who decided to terminate the booking arrangement between SAFE and Shoreline. Not only were any such statements accurate because it was Shoreline who unilaterally declared it would no longer work with SAFE (Ex. 20 (SAI000033); (Ex. 8 at 22 (Shoreline's Response to RFA No. 39)), but SAFE was merely stating a non-actionable opinion. *See Protic v. Dengler*, 46 F. Supp. 2d 277, 279 (S.D.N.Y. 1999) (dismissing tortious interference claim based on opinion), *aff'd*, 205 F.3d 1324 (2d Cir. 1999); *Vitro S.A.B. de C.V. v. Aurelius Cap. Mgmt., L.P.*, 99 A.D.3d 564, 565 (1st Dep't 2012) (same). Shoreline told its side of the story in an email to customers and did so prior to any communications by SAFE. (Ex. 20 (SAI000033). There is nothing fraudulent or wrongful about SAFE stating its own view in response.

And even if the conduct was actionable, Shoreline cannot identify a single customer who was caused by the aforementioned statements to book a flight on Blade instead of Shoreline. While Shoreline may disagree with the requirements for a tortious interference claim, the law is clear that any lost business relationships must be specifically identified. Shoreline's "mere suspicions" that Defendants' conduct hurt its business is inadequate. *Am. Bldg. Maint. Co. of New York v. Acme Prop. Servs., Inc.*, 515 F. Supp. 2d 298, 316 (N.D.N.Y. 2007) (dismissing claim for failure to identify any lost business relationships).

## IV.    LACK OF DAMAGES AND CAUSATION

Notably, Shoreline has abandoned any claim to most of the alleged damages set forth in its complaint and discovery responses. Shoreline punted on the following categories of damages in its opposition brief:

- $518,425 in lost tax benefits from an Employee Stock Ownership Plan that it supposedly lost as a result of a lawsuits complaint filed by Ms. Herbst, which Shoreline *admits* it has abandoned as a theory of liability (Opp'n at 22 n. 10);

- $839,848.51 in lost revenue for 2018 allegedly resulting from harm to Shoreline business, which Shoreline has tacitly conceded it has no right to because lost revenue is not a cognizable form of damages (Mem. at 27); and

- $189,605.87 in costs of hiring replacement staff and amending Shoreline's advertising, which Defendants correctly argued Shoreline would have incurred even if SAFE had given reasonable notice before terminating the putative contract and Shoreline has also conceded (Mem. at 27).

Shoreline retreats to two categories of alleged damages that relate to its breach of contract claim. Opp'n at 15-18. Shoreline has not identified any damages for its other claims, though it seeks disgorgement on its breach of fiduciary duty claim, and it is impossible to ascertain what its damages would be on the other claims since Shoreline has failed to update its interrogatory responses and initial disclosures. Declaration of Reid Skibell, dated October 27, 2023, ("Supp. Skibell Decl.") ¶¶ 2-5. This fact independently supports dismissal of the claims.[13] *See, e.g.*, *eCommission Sols., LLC v. CTS Holdings Inc.*, 860 F. App'x 758, 760 (2d Cir. 2019) (upholding dismissal of unfair competition claim at summary judgment for failure to show damages "directly traceable to the acts of unfair competition"); *Valley Juice Ltd., Inc. v. Evian Waters of France*,

---

[13] *Conahan v. MedQuest Ltd.*, 2022 WL 16748585 (S.D.N.Y. Nov. 7, 2022), which involved a disloyal employee who wrote checks to herself and stole transit cards, is not to the contrary. In that case, the court denied summary judgment on the issue of damages because while the employer "may not have calculated the precise amount of [] damages," the existence of and general type of damages was evident. *Id.*, at *5 n. 6.

*Inc.*, 213 F.3d 627 (2d Cir. 2000) (upholding dismissal of tortious interference claim where the "evidence is insufficient to show what profits, if any, [plaintiff] would have gained had its contract with [defendant] continued").

*First*, Shoreline primarily asserts it is entitled to *lost profits* of over $1.6 million for 2018 (Opp'n at 15), even though its two complaints, two sets of interrogatory responses and initial disclosures all state Shoreline is only seeking *lost revenue* for 2018,[14] and its 30(b)(6) witness confirmed it is pursuing *lost revenue* in this action. (Ex. 31 at 308:2-16). Shoreline's pivot comes far too late. Not only does Shoreline fail to explain why it neglected to update its discovery responses and disclosures to change its theory of damages from lost revenue to lost profits (as required by Rule 26(e)), but it could not do so since even if it tried because Defendants have consistently argued that lost revenue is not recoverable as damages. Mem. at 27-28. Given Shoreline's unjustified delay in altering its damages theory and the prejudice that would flow from reopening discovery, preclusion under Rule 37(c) is appropriate. Shoreline should be limited to seeking nominal damages because it cannot "explain[] why it omitted 'lost profits' as a category of damages in its Initial Disclosure." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 297 (2d Cir. 2006); *see also Gould Paper Corp. v. Madisen Corp.*, 614 F. Supp. 2d 485, 490 (S.D.N.Y. 2009) (granting summary judgment on request for compensatory damages for failure to comply with discovery obligations); *24/7 Records, Inc. v. Sony Music Entm't, Inc.,* 566 F.Supp.2d 305, 318 (S.D.N.Y.2008) (theory of damages precluded by failure to make initial disclosure).

In any event, Shoreline's newly minted lost profits theory fares no better than its lost revenue theory. Under New York's seminal case on lost profits, a party seeking consequential damages for breach of contract, as here, "is required to demonstrate 'with certainty that such

---

[14] Dkt. Nos. 1 and 34; Exs. 5, 29, and 30.

damages have been caused by the breach,' and that the alleged loss is capable of proof with reasonable certainty." *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 322 (S.D.N.Y. 2009) (citing *Kenford Co. Inc. v. Cnty of Erie*, 67 N.Y.2d 257 (1986)), *aff'd*, 976 F.3d 239 (2d Cir. 2020). Where a plaintiff is unable to demonstrate lost profits with reasonable certainty, summary judgment is appropriate. *See, e.g.*, *Lightbox Ventures, LLC v. 3rd Home Ltd.*, 2017 WL 5312187, at *13 (S.D.N.Y. Nov. 13, 2017) (granting summary judgment). This demanding standard applies equally to Shoreline's breach of fiduciary duty claim. *See Am. Fed. Grp., Ltd. v. Rothenberg*, 136 F.3d 897, 907 (2d Cir. 1998).

Shoreline calculated its alleged lost profits by taking its 2017 profits and subtracting its 2018 profits, thereby assigning blame to Defendants for every customer who did not book and every cost it incurred. This ignores a host of alternative reasons for why a person who flew on a Shoreline seaplane to the Hamptons in 2017 might forego going to the Hamptons in 2018, might book on another airline or helicopter provider, or might drive to the Hamptons. The record shows that alternative causes abound even for the more limited issue of why potential customers might have chosen Blade over Shoreline: including: (1) the novelty and convenience of Blade's smartphone app, which Shoreline lacked (Ex. 31 at 276:6-8); (2) Blade's heavy advertising (*id.* at 276:2-5); (3) Blade's customer amenities, such as arranging for a Porsche to drive customers who missed a flight due to weather and its cocktail lounge (*id.* at 276:22-24 ("Blade is an app, so they had all sorts of money to spend on Porsches and we did not"); 277:4-25 ("We didn't serve cocktails to people that were about to get on a seaplane")); and (4) Shoreline's own allegations of "sabotage" by Blade (*id.* at 289: 5-25).

Further, Defendants overlook the fact that SAFE was entitled to cancel the purported oral contract on reasonable notice, and thus any harm from the breach must flow from the lack of notice.

Shoreline does not even attempt to explain how its lost profits allegedly due to SAFE's cancelation without reasonable notice can be separated from that which it would have suffered if notice had been given.

Since Shoreline was not seeking lost profits, there was no reason for the parties to pursue discovery on Shoreline's expenses, and the one witness who testified on this matter (who Shoreline questioned, without any indication it was going to change its damages theory) lacked knowledge about how the expenses were incurred. (Ex. 33 at 39:21-40:5, 50:3-59:25; 165:19-194:15). However, multiple reasons exist for any increased costs relative to 2017 that are unrelated to Defendants' alleged misconduct, including legal and accounting fees for the Cape Air transaction and the costs of Shoreline developing its own flight booking system. Additionally, Shoreline itself has stated that it incurred $189,605.87 in costs related to taking over flight bookings from SAFE, which it would have incurred anyway had SAFE terminated the alleged contract with notice. There is no connection between those costs and any actionable conduct.

*Second*, Shoreline is continuing to seek damages related to commissions that were paid to SAFE for coupon books it sold. Although Shoreline contends that these commissions were unearned, it disregards the fact that it received the full amount of compensation it was due for the coupon books. What it is complaining about is the fact that it had to book the customers on flights and check them in, but it does not attempt to assign a monetary value to those services. Nor could it since SAFE was entitled to cancel the alleged contract on reasonable notice, and if it had, Shoreline would have been performing those services anyway.

## V.    THE PURPORTED BASES FOR INDIVIDUAL LIABILITY

Although Shoreline focuses on the fact that Mr. Pilla assisted Ms. Herbst in the negotiations of the sale of her company, SAFE, to Blade, that is not the basis for its legal claims. The claims against Mr. Pilla are for direct liability, not aiding and abetting, and thus Shoreline must proffer

evidence to show that he either breached a duty owed to Shoreline or personally engaged in tortious conduct. Apparently recognizing Mr. Pilla owed no duties to Shoreline, it contends that he can still be liable for a DTSA violation, unfair competition or tortious interference. Opp'n at 23. Shoreline is mistaken.

Shoreline's DTSA and unfair competition claims fail because Mr. Pilla (1) never possessed, received, transferred, or accessed the customer data that are the alleged trade secrets; and (2) has no duty, confidential or otherwise, to Shoreline as he never had a relationship with the entity. Mem. at 30-31; *see also Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.,* 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016) (relied on by Shoreline and finding that a DTSA claim requires the trade secret to have been disclosed by one with duty to maintain secrecy or acquired by means other than "reverse engineering, independent derivation, or any other lawful means of acquisition"); *Roy Exp. Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc.,* 672 F.2d 1095, 1105 (2d Cir. 1982) (requiring a "taking and use" of plaintiff's property"). Likewise, Mr. Pilla cannot be liable for tortious interference because negotiating the sale of a business does not constitute interference with any of Shoreline's business relationships. If Blade or SAFE used customer data transferred as part of the sale in their business to harm business relationships that Shoreline could specifically identify, then its claims would be against them. Nor is there evidence that Mr. Pilla acted with the sole purpose of harming Shoreline or used dishonest, unfair, or improper means to do so.

With respect to Ms. Herbst, the doctrine that Shoreline relies upon is limited to willful, tortious misconduct by an officer or director. Like Mr. Pilla, she owed no individual duties to Shoreline, and thus Ms. Herbst could not have breached any fiduciary duties or duties to safeguard information. Although Shoreline states that Ms. Herbst could still be liable for tortious

interference or unfair competition, that would require Shoreline to demonstrate fraudulent or bad faith conduct by Ms. Herbst. As noted above, there is none because Ms. Herbst merely communicated to SAFE's customers her interpretation of why Shoreline had decided to cease working with SAFE.

Furthermore, Shoreline has failed to provide any evidence demonstrating that Ms. Herbst did not respect the corporate form in a manner that would render her individually liable. During all relevant times, she operated SAFE as a conventional business. Mem. at 31 n.9. The evidence Shoreline cites relates to Mr. Tuma's alleged misuse of the corporate form in connection with how he operated SAS and associated companies years before its legal claims allegedly arose.

Accordingly, Shoreline cannot show that she employed SAFE to commit a wrong or perpetuate a fraud. *See Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997) ("New York law requires the party seeking to pierce a corporate veil to make a two-part showing: (i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil.").

## **CONCLUSION**

For the foregoing reasons, the Herbst Defendants' respectfully submits the Court should

grant the Motion.

Dated: New York, New York
      October 27, 2023

GLENN AGRE BERGMAN & FUENTES LLP

By: */s/ Lindsey (Reid) Skibell*
Lindsey Reid Skibell, Esq.
Jewel K. Tewiah, Esq.
1185 Avenue of the Americas
New York, New York 10036
rskibell@glennagre.com
jtewiah@glennagre.com
(212) 970-1600

*Attorneys for Defendants*

26

## PROOF OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via email, on October 27, 2023, upon counsel for Shoreline Aviation:

**Alex Kriegsman**
Kriegsman PC
279 Main Street
Sag Harbor, NY 11963
KriegsmanPC.com

*/s/ Lindsey (Reid) Skibell*

L. Reid Skibell

27