UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK**

------------------------------------- X

| | | |
|---|---|---|
| SHORELINE AVIATION, INC., | : | Case No. 2:20-cv-02161-JMA-SIL |
| *Plaintiff*, | : | |
| v. | : | |
| CYNTHIA L. HERBST, SOUND AIRCRAFT FLIGHT ENTERPRISES, INC., RYAN A. PILLA, | : | |
| | : | |
| *Defendants*. | : | |

------------------------------------- X

## SUPPLEMENTAL DECLARATION OF CYNTHIA L. HERBST

**CYNTHIA L. HERBST**, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. I am a defendant in this action. The foregoing Declaration is based on my personal knowledge. I am submitting this declaration in connection with defendants Sound Aircraft Flight Enterprise, Inc., Cynthia L. Herbst, and Ryan A. Pilla (the "Herbst Defendants") motion for summary judgment.

2. During the time that Sound Aircraft Services ("SAS") and then Sound Aircraft Flight Enterprises ("SAFE") had a booking arrangement Shoreline Aviation ("Shoreline"), I understood that pursuant to FAA regulations, including 14 CFR Part 135, Shoreline was required to maintain control over flight operations, and communications regarding flight operations. When I was asked about this at my deposition, I relayed the same information.

3. SAS and SAFE, however, maintained control over communications with passengers, on

other topics. For example, the two entities regularly dictated the content of communications to their customers regarding the availability and purchase of seats on Shoreline's flights. Likewise, SAS and SAFE dictated the contents of communications regarding the availability and purchase of seats on other operators such as Action Airlines and Liberty Helicopters.

4. SAS and SAFE also maintained control over the cancellation policy for their customers that booked seats on Shoreline's flights. The two entities implemented a cancellation policy where customers had to pay a fee if they cancelled their reservation for a flight forty-eight hours before its scheduled time departure time. Shoreline did not object to the implementation of this cancellation fee.

5. In January 2018, John Kelly of Shoreline informed SAFE that it was implementing a new reservation system that would have allowed it to process bookings without SAFE. In response, I told him that SAFE was revamping its reservations system. Mr. Kelly, however, told me that he intended to use Shoreline's new reservation system. This concerned me that Shoreline no longer wanted to work with SAFE.

6. Nevertheless, SAFE still sold tickets for Shoreline in January – March 2018. Shoreline had received all of the money related to the sold tickets.

7. In March and April 2018, SAFE was in limbo. Around this time, SAFE was engaged in discussions with Blade Air Mobility, Inc. ("Blade") regarding a potential partnership, but I did not want that partnership to detrimentally impact the booking arrangement between Shoreline and SAFE, so John Kelly was invited to attend a meeting with Blade in April 2018. Shortly after the meeting, Mr. Kelly told me that he had no interest in working with Blade, and offered to purchase SAFE and its assets instead.

8. I was concerned that if I did not accept Mr. Kelly's offer, he would have terminated the

booking arrangement between SAFE and Shoreline. Additionally, Mr. Kelly did not clarify if Shoreline still desired to utilize SAFE's booking services or if it would rely on its new reservation system. At the same time, I was weighing the possibility of working with Blade as I already discussed with Mr. Kelly.

9. SAFE did not book passengers on Shoreline's flights at this time because it desired to receive clarity from Shoreline regarding the booking arrangement.

10. On May 6, 2018, Shoreline unilaterally terminated its arrangement with SAFE by emailing the passengers for whom it had contact information and informing them that Shoreline was no longer working with SAFE. The communication also informed the passengers that they could book flights with Shoreline via Shoreline's website, email account, and toll free 800 number.

11. SAFE subsequently entered into a deal with Blade and executed a memorandum of understanding the next day.

12. I learned in connection with this litigation that Mr. Kelly executed into a binding letter of intent to merge Shoreline with Hyannis Air Service, Inc., d/b/a as "Cape Air" in March 2018. Mr. Kelly did not reveal this to me at the time. If there was an exclusive arrangement between Shoreline and SAFE, as Shoreline alleges, Mr. Kelly should have informed SAFE of the letter of intent because Cape Air would have been in control of Shoreline and all of its airplanes. I believe that Mr. Kelly's failure to inform me about the letter of intent is inconsistent with the claims in this case.

13. I understand that Shoreline has produced a picture in discovery that supposedly shows a SAFE employee working with Blade on or about May 4, 2018. I am unsure why the individual in the picture is near Blade's counter at the East Hampton airport, but I did not authorize that individual or any other person to work with Blade on that date.

14. In fact, SAFE did not provide or assist Blade with booking services until after the memorandum of understanding was executed on May 7, 2018.

*I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my personal knowledge.*

Dated: October 27, 2023

By: *Cynthia L. Herbst* /s/ Cynthia L. Herbst
Cynthia L. Herbst