# EXHIBIT 31

Page 1

1               UNITED STATES DISTRICT COURT

2               EASTERN DISTRICT OF NEW YORK

3       _____

4       SHORELINE AVIATION, INC.,

5               Plaintiff,

6           v.                          Index No.

7       CYNTHIA L. HERBST, SOUND AIRCRAFT      2:20-cv-

8       FLIGHT ENTERPRISES, INC., RYAN A.      02161-JMA-SIL

9       PILLA, BLADE URBAN AIR MOBILITY,

10      INC. A/K/A FLY BLADE, INC.,

11      MELISSA TOMKIEL, AND ROBERT S.

12      WIESENTHAL,

13              Defendants.

14      _____

15              VIDEOCONFERENCE DEPOSITION OF

16                  ANDREA COLLINGWOOD

17      DATE:           Tuesday, March 29, 2022

18      TIME:           9:12 a.m.

19      LOCATION:       Remote Proceeding

20                      New York, NY 10001

21      REPORTED BY:  Beth Fontane-Howard Notary Public

22      JOB NO.:        5129185

23

24

25

```
 1                    A. COLLINGWOOD
 2      Aircraft Flight Enterprises?
 3           A    Yes.
 4           Q    When did that happen?
 5           A    I'm really not sure.
 6           Q    Now, some of this -- is it right
 7      that one of the services Ms. Herbst
 8      performed was booking in customers?  Is
 9      that right?
10           A    That's correct --
11           Q    And --
12           A    She was our agent.
13           Q    She would do that on her
14      computer system?
15           A    Yes.
16           Q    And then she would give you a
17      flight manifest showing the customers?
18           A    That's correct.
19           Q    And what kind of information
20      would be on the flight manifest?
21           A    Usually the passenger's name,
22      the customer's name, and -- and their
23      weight.
24           Q    There would be no contact
25      information for the customers on the
```

```
                                             Page 41
 1                         A. COLLINGWOOD
 2       flight manifest, right?
 3            A     There was not.
 4            Q     And so the only one person that
 5       would have the contact information when
 6       customers were booked in was Ms. Herbst,
 7       right?
 8            A     We had our own customer list as
 9       well.
10            Q     But when the customers were
11       booked in by Ms. Herbst, the information
12       was added to her database, correct?
13                  MR. KRIEGSMAN:  Objection to
14             form.  Go ahead and answer if you
15             can.
16            A     I believe so.  She had -- she
17       maintained a database of all of our
18       customers.
19            Q     And that database that
20       Ms. Herbst maintained, that was on
21       Ms. Herbst's computer system, right?
22            A     That's correct as far as I know.
23            Q     Have you ever seen that
24       information on Ms. Herbst's computer
25       system?
```

```
                                              Page 42
 1                      A. COLLINGWOOD
 2          A    I have not --
 3                  THE REPORTER:  You're -- you're
 4          breaking up.  You're freezing and
 5          you're breaking up.  The connection
 6          is not good.  I didn't get that
 7          answer, please.
 8                  MR. SKIBELL:  All right.  Why
 9          don't we go off the record for a
10          minute, and see if we can address any
11          connection issues?
12                  THE REPORTER:  Okay.  We are off
13          the record at 9:51 a.m.
14                  (Off the record.)
15                  THE REPORTER:  Okay.  We are
16          back on the record at 9:53 a.m.
17                  MR. SKIBELL:  Beth, could you
18          read back the last question, please?
19                  THE REPORTER:  Okay.  One
20          moment, please.
21                  (The reporter played back the
22                  record as requested.)
23                  THE REPORTER:  Okay.  Go ahead.
24          Thank you.
25     //
```

A.  COLLINGWOOD

1

2    first name, the last name is Alli.  Or it

3    could be inverted.

4          A     Yeah.

5                Q     So for that person --

6          THE  REPORTER:  Wait, could --

7          Q     You don't have the ad --

8                THE  REPORTER:  Would you just --

9          would you just spell that name,

10         please?

11               MR.  SKIBELL:  All right.  It

12         looks like the first name at least is

13         listed here is W-A-H-E-E-D.  And on

14         this chart it lists the third person

15         as A-L-I [sic].

16   BY MR.  SKIBELL:

17         Q     And my question is, so for this

18   individual you have neither an address, a

19   phone number, or an email.

20         A     Yeah.  Although I know we have

21   his email somewhere.

22               MR.  KRIEGSMAN:  Just answer his

23         question.

24         A     Okay.  I'm sorry.  What was the

25   question?

```
 1                    A. COLLINGWOOD
 2        Q    So for this person, you have no
 3   contact information.  Is that right?
 4        A    Mm-mm.
 5        Q    You need to answer "yes" or
 6   "no."
 7        A    We -- we do, it's just not here.
 8        Q    But this is supposed to be the
 9   customer contact list?
10             MR. KRIEGSMAN:  Objection, form.
11        A    For the most part it is, yes.
12        Q    And do you have any
13   understanding -- you'll see there's 2017,
14   2016, 2015, and 2014 on the right side.
15        A    Yes.
16        Q    Do you have an understanding of
17   what those refer to?
18        A    Yes.  These are -- these are the
19   coupon customers.  So Waheed Alli lives in
20   London part of the time, I believe, and --
21   and then he comes to Long Island in the
22   summer.
23        Q    And I'm asking --
24        A    Which -- have an address for
25   him.
```

1              A. COLLINGWOOD

2        Q    And I'm asking do you have an

3   understanding of what 2017, 2016, 2015,

4   and 2014 mean over there?

5        A    Right.  These are the coupon

6   customers.  The commuter coupon customers.

7        Q    Does that mean that Mr. Alli

8   only purchased a coupon book in 2017?

9        A    It's possible  he might have

10  been out of the country for the other

11  three years.

12       Q    But what is -- there's nothing

13  listed under the earlier years, correct?

14       A    No.

15       Q    All right.

16       A    I --

17       Q    And --

18       A    I'm -- I really can't speculate.

19       Q    So you don't know what

20  information is set forth in the right

21  column or right side of this document.  Is

22  that right?

23       A    I'm sorry.  Say that again.

24       Q    You don't know the purpose of

25  the columns that have dates in them.  Is

```
                                              Page 220
 1                    A. COLLINGWOOD
 2        that right?
 3            A     These are -- these are the
 4        commuter customers for those years.
 5            Q     But do you know why certain
 6        persons have years written down and other
 7        persons don't?
 8            A     I don't know.  I can only -- I
 9        could only guess.
10            Q     Now, if we look to the end of
11        this you'll see it says in red last
12        updated 5/3/17.
13            A     Mm-mm.
14            Q     And you see below it says last
15        updated 5/24/2017.  And does that mean the
16        last time this document was updated was in
17        2017?
18            A     I really don't know.
19            Q     Do you know why it wasn't
20        updated after 2017?
21            A     I don't know.
22            Q     Do you know if this document was
23        used for anything in the normal course of
24        Shoreline's business?
25            A     I don't know that either.
```

Page 221

1                    A. COLLINGWOOD

2          Q    I'm going to go to the next,

3     what appears to be, type of document

4     included in here.  You'll see it starts on

5     Bates number SAI003167, and you'll see it

6     goes to SAI003173.  Now, Ms. Collingwood,

7     do you know what this document is?

8          A    A customer list.

9          Q    All right.  Well, do you know

10    how it was generated?

11         A    I -- I don't know.

12         Q    Do you know --

13         A    I don't --

14         Q    When it was -- I'm sorry?

15         A    I -- I don't know if it was from

16    accounting or from dispatch.  I have no --

17         Q    Do you know when it was created?

18         A    It doesn't say.

19         Q    Do you know when it was last

20    updated?

21         A    I don't know that either.

22         Q    Now, on the left side you'll see

23    there's an ID number.  Do you have an

24    understanding of what that means?

25         A    I don't -- again, I don't know

```
                                        Page 222
 1                    A. COLLINGWOOD
 2        if it came from accounting or from
 3        dispatch or one of the computer programs.
 4        I really don't know.
 5             Q    So the second column you'll see
 6        is called type.  And you'll see certain
 7        persons are listed as customers and
 8        certain persons are listed as agents.  Do
 9        you have an understanding of what's the
10        difference between the two?
11             A    Well, this, the one that I'm
12        looking at right now, says Norcross/Morris
13        [ph], and he was one of the management
14        clients.
15             Q    I'm not sure -- all right.  So
16        you're indicating one of the persons
17        listed as agent was a management client?
18             A    Yeah, right.  Right, and I'm --
19        and I'm looking at the other ones, and it
20        says the same thing.
21             Q    And so do you -- you are --
22             A    It could be that whatever system
23        created it didn't have a designation for
24        management client.
25             Q    Now, if you look on the first
```

```
                                      Page 223

 1                    A. COLLINGWOOD

 2        page of this document that ends in 3167,

 3        you'll see that there is a agent that is

 4        called Beach Amphibian.

 5             A    Yes.

 6             Q    Do you have an understanding who

 7        Beach Amphibian is?

 8             A    Yes, he's one of the management

 9        clients.

10             Q    All right.  So is it that all

11        the persons listed with agent are

12        management clients?

13             A    Yes.  Bel Air, for instance,

14        Andre Balazs, those are management

15        clients.

16             Q    And so for certain persons

17        listed on here, there's no address

18        information.  Is that right?

19             A    Yes.  But it's -- you know, like

20        Andre Balazs, who is a management client,

21        we would've had all of his information in

22        dispatch.

23             Q    But in this particular document,

24        many of the persons listed as customers,

25        there's no address, right?
```

Page 224

                    A. COLLINGWOOD

1

2          A     Yeah.  And some of them are

3     charter customers as well.

4          Q     And that's not broken out here

5     whether or not they're commuter or charter

6     customers?

7          A     No.

8          Q     All right.  You'll see to the

9     right of email, there's a column.  Do you

10    have an understanding of what that refers

11    to?

12         A     The -- the one that says zero?

13         Q     Yes.

14         A     Okay.  It says commission, zero.

15         Q     Do you know what that means?

16         A     It means that they were not

17    Sound customers.

18         Q     So if, for example, there is no

19    listing there, it means that they are a

20    Sound customer?

21         A     I'm -- I don't know.  I really

22    don't know.  This could've been created,

23    I -- I -- after that.  I don't know.

24         Q     Do you know if this document was

25    ever used in the normal course of

```
                                              Page 225
 1                    A. COLLINGWOOD

 2      Shoreline's business?

 3           A    I don't know.  I don't know.

 4           Q    All right.  If you look at the

 5      next column over, it says office.  Do you

 6      have an understanding of what office

 7      refers to?

 8           A    Where do you see that?

 9           Q    I'm looking on the first of

10      these pages that ends in 3167 is where I'm

11      at.  And if you look at the top -- and if

12      you look on the screen you can see it.

13           A    Uh-huh.

14           Q    Oh, I went too fast.

15           A    Okay.  I see it.

16           Q    It says office.  Do you have an

17      understanding what office refers to there?

18           A    No, I don't know.

19           Q    And to the right of that,

20      there's something that says comment.  Do

21      you know what that refers to?

22           A    I'm sorry.  It says what?

23           Q    Comment.  Comment.

24           A    Oh.

25           Q    Do you know what that refers to?
```

```
                                          Page 226

 1                   A. COLLINGWOOD

 2          A     No, I don't.

 3          Q     How about the next column over

 4     says frequent.  Do you know what that

 5     means?

 6          A     No, I don't.

 7          Q     All right.  And the next one

 8     over is P-status.  Do you know what that

 9     means?

10          A     No.

11          Q     And one more over says factored.

12     Do you know what factored means?

13          A     I have no idea.

14          Q     How about separate invoice?

15          A     No.  I think this is from a

16     program I never worked in.

17          Q     And you don't know if this was

18     ever used in the normal course of

19     Shoreline's business I take it?

20          A     I don't know.

21          Q     But if it was used for

22     marketing, you would've known, correct?

23          A     Yes, I would.

24          Q     All right.  If we now go down,

25     you'll see there's another document that
```

```
 1                    A. COLLINGWOOD
 2       don't believe so.
 3            Q    She didn't steal anything off of
 4       Shoreline's computers, right?
 5            A    No.  Just most of our business.
 6            Q    You claim she misappropriated
 7       things that were on her own computer,
 8       right?
 9            A    Yes.  But the information was
10       common if that makes sense.
11            Q    Now, you testified earlier about
12       Friends of East Hampton Airport.  Do you
13       recall that?
14            A    Yes.
15            Q    Now, that was publicly available
16       information, right?
17            A    As far as I know.
18            Q    And do you claim that Ms. Herbst
19       misappropriated any information that was
20       publicly available through the Friends of
21       East Hampton Airport?
22            A    I don't know.
23            Q    Now, but you do claim that the
24       information on Ms. Herbst's computer
25       systems was owned by Shoreline, right?
```

```
 1                    A. COLLINGWOOD

 2           A    That's correct.

 3           Q    Now, am I also correct that in

 4     April 2018 Shoreline offered to buy

 5     certain assets of SAFE?

 6           A    That's correct.

 7           Q    And include among the things

 8     they had offered to buy was the customer

 9     information on Ms. Herbst's computer

10     systems?

11           A    That's correct.

12           Q    So Shoreline was offering to buy

13     in April 2018 information that it claims

14     in this case it owns?

15           A    As well as other operators.

16     We --

17           Q    But --

18           A    Had offered to buy her

19     reservation system.

20           Q    But Shoreline claims in this

21     case it owns information that it offered

22     to buy in April of 2018, correct?

23           A    Right.

24           Q    Oh.

25           A    And at that point, Cindy was
```

1                     A.  COLLINGWOOD

2          clearly holding our information hostage.

3              Q    All right.  Now let's go to an

4          exhibit here.  I believe this will be our

5          Exhibit 12, and --

6                    THE REPORTER:  Okay.  Excuse me.

7              I don't mean to interrupt.  I have to

8              confess to you that I have 101 fever.

9              I don't know --

10                   MR. SKIBELL:  Oh, my goodness,

11             I'm so sorry.

12                   THE REPORTER:  This morning

13             apparently.  Is this going to be much

14             longer?  I'm so sorry to interrupt.

15             But if it's going to be like a few

16             more hours, maybe I can --

17                   MR. SKIBELL:  Yeah, it's going

18             to be another --

19                   MR. KRIEGSMAN:  That could

20             take --

21                   MR. SKIBELL:  Well, let's take a

22             five-minute break then --

23                   THE REPORTER:  We are off the

24             record at 2:43 p.m.

25                   (Off the record.)

```
                                          Page 238

 1                    A. COLLINGWOOD
 2             THE REPORTER:  Okay.  We are
 3        back on the record at 2:59 p.m.
 4             MR. SKIBELL:  All right.
 5    BY MR. SKIBELL:
 6        Q    So I'm handing you a document
 7    which will be Exhibit 12 which starts at
 8    SAI000040, it continues to SAI000043.  And
 9    first I'm going to ask you about the
10    document on the top, which is two pages
11    long.
12             (Exhibit 12 was marked for
13             identification.)
14             MR. KRIEGSMAN:  Okay.  And I'm
15        just showing her that same document
16        that you emailed to us.  So Reid,
17        just to make sure we're on the same
18        one:  this is four pages beginning
19        with SAI40 --
20             MR. SKIBELL:  Yes.
21             MR. KRIEGSMAN:  And continues
22        into SAI43?
23             MR. SKIBELL:  Yes.
24             MR. KRIEGSMAN:  Okay.  So scroll
25        through it, and then listen for his
```

Page 275

```
 1                     A. Collingwood
 2    specifically.  They purchased coupon books, ten
 3    coupon books so I assume each of them flew
 4    approximately ten times throughout the course of
 5    the summer.
 6             Q     Do you know how these persons came
 7    to book on Blade?
 8             A     Yes.  Cindy took the customer list
 9    and sold it to Blade, and then she lied to these
10    customers about the relationship between
11    Shoreline and her and Blade.
12             Q     Ms. Collingwood, what is that
13    based on?
14             A     Based on Blade documents.
15             Q     Do you know if these persons
16    booked on Blade before 2018?
17             A     I would assume so just because if
18    they couldn't get on a Shoreline flight, they
19    may have taken Blade.  They were our customers
20    for years and bought coupons from us for a
21    number of years.
22             Q     So if they booked on Blade before
23    2018, Blade would have their customer
24    information, correct?
25             A     It's possible.
```

```
                                            Page 276

 1                        A. Collingwood

 2          Q       It's my understanding that Blade

 3     advertises heavily in the New York and Hamptons

 4     area, correct?

 5          A       Yes, that's correct.

 6          Q       And many people try out Blade's

 7     application, right?

 8          A       Yes.

 9          Q       And Blade offered a lot of

10     amenities that Shoreline didn't offer, right?

11                        MR. KRIEGSMAN:  Objection.

12          A       Like?  I'm not sure what you mean

13     by that.

14          Q       All right.  You are aware that if

15     Blade were to cancel a flight, it would arrange

16     for a Porsche to take someone from New York to

17     the Hamptons, correct?

18          A       Yes.

19          Q       You didn't offer that service I

20     take it?

21          A       No, we didn't.  We offer an

22     aircraft and mechanics and staff.  And Blade is

23     an app, so they had all sorts of money to spend

24     on Porsches and we did not.

25          Q       And Blade also offered a lounge,
```

```
                                              Page 277

 1                    A. Collingwood

 2   right?

 3         A       Yes.

 4         Q       Where was that lounge located?

 5         A       It was located at the 23rd Street

 6   Seaport.

 7         Q       I take it you do not offer a

 8   lounge?

 9         A       We did for a period of time.

10         Q       When did you stop offering a

11   lounge?

12         A       When the company stopped

13   operating.

14         Q       Between 2018 and 2019, did you

15   have a lounge at the 23rd Street Seaport in New

16   York City?

17         A       We did in 2019.  I don't remember

18   if we did in 2018.

19         Q       How did your lounge compare to the

20   Blade lounge?

21         A       We didn't serve cocktails to

22   people that were about to get on a seaplane.

23         Q       Blade served cocktails to people I

24   take it?

25         A       Yes.
```

```
                                              Page 278

 1                    A. Collingwood

 2         Q       Were there other amenities that

 3    Blade offered that you didn't offer?

 4         A       I'm not sure what amenities they

 5    offered.

 6         Q       Let's take John Berg.  This is the

 7    first person that you list here.  Now, if I

 8    understand your testimony, John Berg purchased a

 9    Blade coupon book; is that right?

10                         MR. KRIEGSMAN:  Objection;

11                    misstates prior testimony.

12         A       Yes, according to the documents

13    from Blade I believe he bought a ten-passenger

14    book.

15         Q       Do you know which documents you

16    are referring to?

17         A       There are a number of them.

18    Apparently they are created in their accounting

19    program.

20         Q       And so do you know why Mr. Berg

21    came to purchase a ten pack of tickets in 2018?

22         A       From Blade because Cindy, our

23    agent in the Hamptons, sold our customer list to

24    Blade.  They were all targeted to purchase their

25    coupon books from Blade.  We know that because
```

1               A. Collingwood

2       Q       Did you reach out to any person

3   that you thought was diverted and ask why they

4   stopped booking with Shoreline?

5       A       No, we knew why.

6       Q       If I understand correctly, at this

7   time in 2018 your husband passed away, correct?

8       A       My husband passed away in 2019.

9       Q       I apologize.  Do you know if these

10  persons decided to stop booking with Shoreline

11  because your husband was no longer with the

12  company?

13      A       No, my husband was still with the

14  company.

15      Q       How about in 2019, you allege

16  persons stopped booking flights with Shoreline

17  in 2019, correct?

18      A       No, in 2018.  We are talking about

19  2018.

20      Q       I'm going to direct you to

21  Paragraphs 112 and 119.  I'm going to ask you a

22  few questions about these.  Ms. Collingwood, I

23  want to first direct you to Paragraph 114.  Can

24  you explain what is alleged there?

25      A       This is about the tactics that

Page 289

1                    A. Collingwood

2    Blade used to prevent our customers from having

3    access to the aircraft in a timely fashion and a

4    whole bunch of other issues that came up.

5            Q      Can you summarize what Blade did

6    to sabotage Shoreline's business?

7            A      Well, they blocked our signage.

8    On a couple of occasions they diverted one of

9    our passengers to a Blade flight.  Their pilots

10   were sitting -- their aircraft was sitting on

11   the dock for periods of time so that our

12   passengers couldn't load or disembark.  There

13   were many things that they did to make life

14   difficult.

15               They also plastered all of their

16   advertising all over the dock, which is a public

17   facility and was not supposed to have any

18   advertising on it.  I'm not sure how that

19   happened, but anyway, they did a lot of things

20   to sabotage our operation.

21           Q      Did that start in 2018?

22           A      Yes.

23           Q      Did it hurt Shoreline's business

24   in 2019?

25           A      Yes.

1                    A. Collingwood

2          Q      Could it have been responsible for

3    those 34 persons deciding to book with Blade

4    instead of Shoreline?

5          A      No, that was long before this

6    stuff started.  Not long before, but maybe a

7    month or two.

8          Q      A month or two before, I see.

9    Now, with respect to this conduct by Blade, you

10   allege that Ms. Herbst was involved in efforts,

11   for example, to block Shoreline Aviation's

12   advertising?

13         A      No, but Cindy did other things

14   that hurt.  For instance, having -- they started

15   to book their flights for earlier than 8:00 in

16   the morning.  Historically none of the flights

17   were supposed to arrive in the City before

18   8:00 a.m.  That was to respect the local

19   residents.  You know, these were policies that

20   Cindy knew that she shared with Blade.

21         Q      Ms. Collingwood, I'm asking about

22   the efforts you described by Blade to sabotage

23   Shoreline Aviation's business.  I'm trying to

24   understand.  You allege that Ms. Herbst was

25   involved in these efforts by Blade to sabotage

```
                                              Page 307

 1                       A. Collingwood

 2           Q        She didn't book flights in 2018,

 3    correct?

 4           A        I'm sorry, I didn't hear that.

 5           Q        Ms. Herbst didn't book flights in

 6    2018, right?

 7           A        That is correct; she did not.

 8           Q        I'm asking about the lost revenue

 9    from commuter and charter flights.  Is that

10    based on a particular number in your accounting

11    documents that breaks out revenue from flights

12    in and out of East Hampton Airport?

13           A        Yes, it is on the P&L statements,

14    for example.

15           Q        There's specific ones that

16    indicate the amount of revenue from East Hampton

17    Airport?

18           A        Yes, it's called commuter revenue.

19           Q        Is that commuter revenue just for

20    East Hampton or does it also cover Florida or

21    Bahamas or the Virgin Islands?

22           A        No, it is actually Sound.

23           Q        That's how you got the number

24    1.35; is that correct?

25           A        Yes, that's correct.
```

Page 308

```
 1                      A. Collingwood
 2         Q      And so am I correct that profits
 3    are normally revenue minus costs, right?
 4         A      Usually.
 5         Q      In this case is Shoreline seeking
 6    profits, lost profits?
 7         A      We are seeking loss of revenue.
 8         Q      So you are not seeking lost
 9    profits at all?
10                      MR. KRIEGSMAN:  Objection;
11                 it calls for a legal conclusion.
12                 Answer the question as best as you
13                 can.
14         A      It consists of 1.35 million from
15    lost revenue from both commuter and charter
16    flights.
17         Q      As you sit here today do you know
18    if Shoreline lost any profits from the alleged
19    conduct of Ms. Herbst and the other defendants?
20         A      Yes, absolutely.
21         Q      Do you know how much lost profits
22    it had?
23         A      Not specifically.
24         Q      Can you identify any lost profits
25    that it had?
```

Page 309

```
 1                        A. Collingwood
 2          A       It's in the documents, but I don't
 3     know off the top of my head, no.
 4          Q       Let's look at another document.  I
 5     believe this should be Number 15.  Are you
 6     familiar with an affidavit in this case provided
 7     by Camille Murphy?
 8                        MR. KRIEGSMAN:  I'm going
 9                    to ask you to hold on so I can
10                    pull this up as well.
11          Q       Ms. Collingwood, are you familiar
12     with the affidavit of Camille Murphy?
13          A       I have seen it.
14          Q       Do you know who Ms. Murphy is?
15          A       Yes.
16          Q       Can you tell us who she is?
17          A       She was our CPA for over 35 years.
18          Q       To your knowledge, did someone ask
19     her to submit this affidavit?
20                        MR. KRIEGSMAN:  I'm going
21                    to instruct the witness not reveal
22                    to any communications you may have
23                    had with counsel.  Without doing
24                    that, answer as best as you can.
25          A       I'm sorry, I forgot what the
```