# EXHIBIT 32

Page 1

```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------X
SHORELINE AVIATION, INC.,

                    Plaintiff,

        -against-                    Case No.
                                     2:20-cv02161
                                     JMA-SIL

CYNTHIA L. HERBST, SOUND AIRCRAFT
FLIGHT ENTERPRISES, INC., RYAN A.
PILLA, BLADE URBAN AIR MOBILITY,
INC., a/k/a FLY BLADE, INC., MELISSA
TOMKIEL, and ROBERT S. WIESENTHAL,

                    Defendants.
-----------------------------------------X


                    March 30, 2022
                    10:20 a.m.
                    Virtual Zoom


        DEPOSITION of CYNTHIA L. HERBST, a
Defendant herein, taken by the Plaintiff,
pursuant to Rule 30(B)(6) of the Federal Rules
of Civil Procedure, and Notice, held at the
above-mentioned time and place, before Susan
Crane, a Notary Public of the State of New York.
```

Page 72

1         C. Herbst
2     Q    I don't want you to guess.
3     A    I apologize.
4     Q    I'm asking if you ever made that
5   statement?
6     A    I don't recall ever making that
7   statement. I apologize, I don't recall.
8     Q    Were you acting on their behalf at
9   the East Hampton Airport?
10            MR. SKIBELL: Objection;
11         calls for a legal conclusion.
12    A    Only in the capacity for which I
13  worked with them.
14    Q    What does that mean?
15    A    If I was checking in a flight that
16  I had booked, then yes, I was doing my job of
17  facilitating the charter, the flight.
18    Q    And in that capacity you were
19  acting on their behalf?
20    A    I would say so.
21    Q    Talking about seaplane commuter
22  flights, Shoreline maintains control over the
23  flight operations, correct?
24    A    That is correct.
25    Q    Shoreline maintains control over

Page 73

1  C. Herbst
2  communications with the passengers on the
3  seaplane commuter flights, correct?
4      A    Depends on what the communications
5  were.
6      Q    When written communications went
7  out to the passengers who flew on Shoreline's
8  seaplane commuter flights, who decided what the
9  communication was?  Was it you or was it
10 Shoreline?
11          MR. SKIBELL:  Objection.
12     A    There's all kind of different
13 communications.  There could be a communication
14 for cancelling a flight due to weather that has
15 to be communicated to the passengers.  If that
16 was a flight that I had booked or a charter that
17 I had booked, I would be responsible to
18 communicate that to the passengers.
19          I would get that information from
20 Shoreline's flight operations dispatch office.
21 A different kind of communication, maybe a
22 passenger briefing before boarding a flight or
23 after boarding a flight, that would be a
24 Shoreline communication to the passenger.
25     Q    What other kind of communications

1  C. Herbst
2  went out to passengers?
3          A     Are you speaking verbal, written
4  communications?
5          Q     Written communications.
6          A     It could be e-mails to passengers
7  with regard to booking reservations or
8  cancelling reservations, which if it was the
9  flight I was working, then it would be my
10 responsibility.  There was telephone
11 communications that I would be responsible for
12 if they are setting up information for, you
13 know, season information, then it would be a
14 collaboration depending on what the information
15 we would have to determine was.
16         Q     I'm just talking about written
17 communication.  I'm not talking about who was
18 delivering them, I'm talking about who was
19 determining what the substance of the
20 communication is.
21         A     If it is an e-mail with regards to
22 booking a reservation or cancelling a
23 reservation on a flight that I was responsible
24 for, then it would be me.
25         Q     I'm not asking you who sends it,

```
                                                         Page 75
1                       C. Herbst
2     I'm asking you who decides what the substance of
3     the communications would be?
4           A      I would be deciding in the
5     scenario that was talking about somebody
6     communicated via e-mail to book a reservation.
7     I or a customer service representative in my
8     employ would be responsible for the contents of
9     the communication.
10          Q      Not Shoreline?
11          A      If a client is booking a
12    reservation through e-mail?
13          Q      If a written communication went
14    out to passengers on a seaplane commuter flight.
15    I'm not talking about who sent it, I'm talking
16    about the substance of it.  Shoreline maintains
17    what the substance of that communication was,
18    correct?
19                      MR. SKIBELL:  Objection;
20              asked and answered.  Form.  You
21              can answer again.
22          A      Are you referring to a particular
23    communication that I can refer to?
24          Q      No, I'm talking about written
25    communications generally.  Shoreline determined
```

```
                                              Page 76
 1                    C. Herbst
 2   what the substance of those communications were?
 3              MR. SKIBELL:  Objection.
 4        Q     If a communication was going out
 5   to seaplane commuter flight passengers, even if
 6   you sent the communication, Shoreline was the
 7   one to determine what the substance of the
 8   communication was, correct?
 9              MR. SKIBELL:  Objection;
10              asked and answered.  Misstates her
11              testimony.  You can answer again.
12        A     No, I don't believe so.  There
13   would be different scenarios in which Shoreline
14   would need to tell me what the communication
15   was.
16        Q     Were there any scenarios where
17   Shoreline did maintain control of the substance
18   of the communications?
19        A     If the substance of the
20   communications had to do with cancelling a
21   flight due to weather or any other reason,
22   Shoreline would communicate that to me and I
23   would communicate that to the passengers.
24   Cancellations or anything that disrupts the
25   flight operation at a particular time, cancelled
```

Page 77

1  C. Herbst
2  or delayed, Shoreline would communicate that
3  information to me and I would communicate it to
4  the passengers.
5      Q    Okay.  Let's take that example.
6  What ultimately got communicated to the
7  passengers in that instance that you just
8  described, Shoreline determined what the
9  communication was?
10     A    If it had to do with the operation
11 of the flight, Shoreline would communicate that
12 information to me, yes.
13     Q    Are there any other instances
14 where there were written communications that
15 went to passengers where Shoreline didn't have
16 control over the communication and you had
17 control?
18     A    There were letters that went out
19 every year, they would have limited input on
20 those.
21     Q    What letters?
22     A    You know, the letters for let's
23 say, the sale of the coupon books.  Those
24 communications I would --
25     Q    I'm not --

```
                                                    Page 78
 1                       C. Herbst
 2                   MR. SKIBELL:  Let her
 3           answer.
 4      Q    Go ahead.
 5      A    For the information that would go
 6  out if people wanted to prepurchase tickets, I
 7  would be responsible for those communications.
 8  I would refer to John Kelly if there was
 9  anything that he wanted to input, and we would
10  work on it collaboratively.  Shoreline didn't
11  have control.
12      Q    Written communications went out to
13  passengers regarding the sale of coupon books,
14  correct?
15      A    Yes.
16      Q    And Shoreline maintained control
17  over those communications, correct?
18                   MR. SKIBELL:  Objection.
19      A    No, that is not correct.
20      Q    You had the control?
21      A    Yes.
22      Q    You didn't run things by Shoreline
23  first before sending them out?
24      A    Sure I would ask for input,
25  absolutely.  That is not control, that is input.
```

Page 128

1  C. Herbst
2  did not necessarily tell me where they are
3  coming from; if they saw an ad, I'm calling
4  about the ad or I'm calling you about the
5  flight.
6  Q  As we sit here today, do you have
7  any doubt as to whether there were some people
8  who became passengers on seaplane commuter
9  flights as a result of Shoreline advertising?
10  MR. SKIBELL:  Objection.
11  A  I believe there were people that
12  called as a result of the ads, yes.
13  Q  If Shoreline ran the ads and flew
14  on a Shoreline seaplane commuter flight after
15  Shoreline directed them to call you, you would
16  still consider that person your customer as
17  opposed to Shoreline's customer?
18  A  I would.  Can I give you an
19  example of why?
20  Q  Sure.
21  A  I had many passengers, a handful
22  of passengers I can remember offhand that were
23  my clients for years and years, and I would book
24  them on charter seaplanes and what have you.
25  Those passengers came to me and said, I'm

Page 129

1 C. Herbst
2 interested in buying a seaplane. Okay, here's
3 John Kelly's number, talk to him about it.
4 The passenger would go and on some
5 occasions buy a seaplane. Shoreline would
6 operate the seaplane and that passenger no
7 longer booked with me because they had their own
8 airport and Shoreline operated it.
9 Is that passenger considered my
10 customer or is that passenger considered
11 Shoreline's customer? In this world of aviation
12 things happen. Whether a passenger calls me
13 with regard to an advertisement placed by
14 Shoreline, whether an advertisement placed by
15 me, or whether they talked to somebody else at
16 the airport or however they got the information,
17 the point is Shoreline shared passengers with
18 me, referred passengers to me, and I referred
19 clients to Shoreline that ended up to be big
20 clients for Shoreline.
21 One passenger not only bought a
22 seaplane but bought a jet. This is the working
23 relationship that we had. Those things
24 happened.
25      Q      All passengers that booked with

|   | Page 130 |
|---|---|
| 1 | C. Herbst |
| 2 | SAFE for seaplane commuter flights between |
| 3 | Manhattan and East Hampton between 1994 and 2018 |
| 4 | flew with Shoreline, correct? |
| 5 | A     Seaplanes, yes.  They were the |
| 6 | only operator I used for those flights. |
| 7 | Q     You didn't have your own planes? |
| 8 | A     I had my own planes but not |
| 9 | seaplanes.  May I also point out that in the |
| 10 | early days Shoreline -- |
| 11 | Q     All right, go ahead. |
| 12 | A     I just want to point out that in |
| 13 | the early days they were the only ones that had |
| 14 | seaplanes.  They were the only seaplane |
| 15 | operator, but they also had land planes that I |
| 16 | booked.  They didn't only have seaplanes. |
| 17 |           MR. SKIBELL:  Can we just |
| 18 |           take a few minutes for a bathroom |
| 19 |           break? |
| 20 |           MR. KRIEGSMAN:  Sure, you |
| 21 |           know, the longer we go today the |
| 22 |           less chance we will finish today. |
| 23 |           MR. SKIBELL:  Five minutes |
| 24 |           shouldn't matter.  Maybe we can |
| 25 |           get to the docs. |

Page 131

1  C. Herbst
2  MR. KRIEGSMAN:  When we
3  finish the questions, we will get
4  to the docs.  We will be back on
5  in five.
6  (Recess was taken)
7  MR. KRIEGSMAN:  Back on the
8  record?
9  Q   Ms. Herbst, I'm going to ask you
10 some questions about your divorce agreement with
11 Mr. Tuma and how that impacted this case.  I
12 believe you testified earlier that your divorce
13 was finalized in 2017; is that correct?
14     A   That is correct.
15     Q   Did the divorce agreement provide
16 what was to happen with regard to those three
17 entities; Sound, SAFE, and the auto group
18 entity?
19     A   What would happen to them?
20     Q   Yes.
21     A   I will state it the best that I
22 can.  Sound Aircraft Services was going to
23 remain with Steven Tuma.  I would have -- I
24 would not be able to compete with him with
25 regards to fueling aircraft, tying down aircraft

Page 176

1      C. Herbst
2  Shoreline Aviation in 201?
3      A    Absolutely not.
4      Q    During the course of your
5  arrangement with Shoreline Aviation, did you
6  take any action to harm them?
7      A    I did not, Mr. Kriegsman.  I never
8  booked another seaplane operator in my duration
9  of working with Shoreline Aviation.  Never once
10 did I do that.  I was super loyal.  I cannot say
11 that in reverse.
12     Q    How about the $65,000 in advance
13 commissions that you were paid --
14     A    $65,000 --
15              MR. SKIBELL:  Let him ask
16              the question.
17     Q    For the 2018 season was it fair
18 for you to keep those commissions?
19     A    Absolutely, yes.
20     Q    How many of those passengers did
21 you book on seaplane commuter flights?
22     A    The commission was based on the
23 fact that I sold the tickets, not that I booked
24 them.  Passengers buy coupon books year after
25 year.  I didn't necessarily book them.  They