# EXHIBIT 33

Page 1

1
2   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
3   ----------------------------------------X
    SHORELINE AVIATION, INC.,
4
                                PLAINTIFF,
5
6          -against-           Case No.:
                               2:20-cv-02161-JMA-SIL
7
8   CYNTHIA L. HERBST, SOUND AIRCRAFT FLIGHT
    ENTERPRISES, INC., RYAN A. PILLA, BLADE
9   URBAN AIR MOBILITY, INC. a/k/a FLY BLADE,
    INC., MELISSA TOMKIEL and ROBERT S.
10  WIESENTHAL,
11                              DEFENDANTS.
    ----------------------------------------X
12
13                DATE: July 21, 2022
14                TIME: 10:04 A.M.
15
16
17          REMOTE DEPOSITION of a Non-Party
18  Witness, CAMILLE R. MURPHY, taken by the
19  respective parties, pursuant to a Subpoena
20  and to the Federal Rules of Civil
21  Procedure, held at the above date and time,
22  before Susan Insinga, a Notary Public of
23  the State of New York.
24
25

```
 1                     C. MURPHY
 2   you signed, just to be clear.
 3         A.    Okay.
 4         Q.    So I'm going to ask you about
 5   paragraph 18.  Take a moment to review it,
 6   and you'll see it covers two pages, so if
 7   you need me to move it, I can.
 8         A.    Okay, you can slide it down a
 9   little bit.
10         Q.    Yeah.
11         A.    Okay.
12         Q.    So you'll see here, you
13   indicate that Shoreline's revenues from
14   charter and rental income, you set forth
15   for two years here; is that right?
16         A.    That's correct.
17         Q.    And those are the years ending
18   September 30, 2016 and the year ending
19   September 30, 2017; is that right?
20         A.    That's correct.
21         Q.    And can I ask why you only set
22   forth the revenue for those years?
23         A.    I don't recall.
24         Q.    Now, I assume you're aware that
25   profits are usually defined as revenue
```

Page 39

1                    C. MURPHY
2   minus costs?
3            MR. KRIEGSMAN:  Objection.
4        Q.    Is that accurate, Ms. Murphy?
5        A.    Yes.
6        Q.    And you didn't include any
7   profit numbers for these two years; is that
8   right?
9        A.    That's correct.
10       Q.    And you could have included
11  profit numbers for these two years, right?
12       A.    Well --
13            MR. KRIEGSMAN:  Objection.
14       A.    -- except that you have the
15  financial statements, which I did provide,
16  which do address profit.
17       Q.    Can you tell us, though, why in
18  the declaration, itself, you didn't address
19  the issue of profits?
20       A.    No, I can't.
21       Q.    Is that because someone else
22  other than you drafted this affidavit
23  originally?
24            MR. VLAHADAMIS:  Objection to
25       form.

```
 1                    C. MURPHY
 2              You can go ahead and answer,
 3          Camille.
 4        A.    Someone other than me drafted
 5    the -- drafted the affidavit, yes.
 6        Q.    But I'm trying to ask on the
 7    issue of profits, did you make a decision
 8    whether to include -- not include profits
 9    for the years ending September 3rd of 2016
10    and September 30, 2017?
11        A.    I did include --
12              MR. KRIEGSMAN:  Objection.
13          Asked and answered.
14        Q.    You include those in the
15    attached financial statements; is that
16    right?
17        A.    That's correct.
18        Q.    But not in the text of the
19    affidavit itself; is that right?
20        A.    Yeah, that's correct.
21        Q.    Now, you say charter and rental
22    income for the year September 30, 2016.
23              That's an aggregate number of
24    charter income for Shoreline Aviation?
25        A.    Yes.
```

1                    C. MURPHY
2        Q.    Do you know how much came from
3    charters versus other types of income?
4        A.    No, I do not, not off the top
5    of my head.  But those are numbers I could
6    provide, because I do have records about
7    that.
8        Q.    Is that in the financial
9    statements or is that in other records that
10   you have?
11       A.    It would be in the profit and
12   loss statements, the detailed profit and
13   loss statements.
14       Q.    And?
15       A.    But I have it.
16       Q.    And do you compile those on a
17   yearly basis for Shoreline aviation?
18       A.    We compile that information --
19             MR. KRIEGSMAN:  Objection to
20        form.
21       A.    -- on fiscal year basis.
22       Q.    So that would mean on an annual
23   basis ending September 30th of the year?
24       A.    Yes.
25       Q.    And does that profit and loss

```
 1                    C. MURPHY
 2        A.    Ms. Murphy, when we went off
 3   the record, we were talking about the
 4   affidavit that you signed in this case.  So
 5   I have a few more questions about the
 6   supporting materials, so I'm going to pull
 7   exhibit number --
 8              MR. KRIEGSMAN:  I'm sorry to
 9         interrupt, Reid.  I just want to make
10         sure everything is clear.
11              Did you say at some point off
12         the record?
13        Q.    When we went off the record,
14   before the break that we just had, we were
15   talking about this particular -- we were
16   talking about your affidavit, correct,
17   Ms. Murphy?
18              MR. KRIEGSMAN:  Thanks for
19         clarifying that, Reid.  I just wanted
20         to make sure I didn't miss anything.
21        Q.    So Ms. Murphy, I'm actually
22   asking a question to you and I understand
23   I've been confusing.
24              So when we went off the record,
25   we were discussing your affidavit, right?
```

```
1                     C. MURPHY
2        A.     I believe that's correct.
3        Q.     And I'm now going to ask you
4   about some of the supporting materials that
5   are enclosed with the affidavit, okay?
6        A.     Okay.
7        Q.     And so you'll see we have up
8   here on the screen a page that says CM
9   1168.
10             If you look at the top, you'll
11  see that it's a statement of revenue,
12  expenses and retained earnings, income tax
13  basis, for the years ended September 30,
14  2017 and 2016.
15             Do you see that Ms. Murphy?
16       A.     I see that.
17       Q.     And you'll see at the top, it
18  says, Revenues, and the first line is
19  Charter and Rental Income.
20             Do you see that?
21       A.     I see that.
22       Q.     And the two numbers to the side
23  for 2017 and 2016, those are the numbers
24  you include in your affidavit, correct?
25       A.     I believe that's true, yes.
```

Page 51

C. MURPHY

1

2      Q.     And below that, there's a

3  section that says Cost of Goods Sold.

4              Can you tell us what that

5  relates to?

6      A.     Sure.  Those would be all of

7  the direct operating expenses of charter

8  and rental income.

9      Q.     If I understand correctly,

10  these are sort of aggregates and there are

11  more detailed profit and loss statements

12  that would break those out; is that right?

13      A.     I believe so, yes.

14      Q.     And now do you know which, if

15  any, of those costs of goods sold would be

16  impacted by the number of flights that

17  Shoreline Aviation flew in a given year?

18      A.     I think they all would be.

19      Q.     So if, for example, if

20  Shoreline flew less flights in a particular

21  year, it's parts and materials would likely

22  go down; is that correct?

23      A.     Not necessarily, no.

24      Q.     Could they have gone down?

25      A.     Could they have gone down, yes,

Page 52

1                        C. MURPHY
2     but it's not likely that they did.
3          Q.     All right.  Now, salary and
4     wages, could those go down if Shoreline
5     Aviation flies less flights in a particular
6     year, to your knowledge?
7          A.     Not necessarily, no.
8          Q.     Now, do you know if tie down
9     and hangar fees could go down if Shoreline
10    flies less flights in a particular year?
11         A.     I would think that's probably
12    true, but again, not necessarily correlated
13    to any kind of a reduction in revenue.
14         Q.     You would need to look at more
15    detailed information to see if tie down and
16    hangar fees actually went down as a result
17    of flying fewer flights; is that correct?
18         A.     That would be correct.
19         Q.     Now, dockage and marina, could
20    dockage and marina come down if Shoreline
21    flies less flights in a particular year?
22         A.     Possible, but again, not
23    directly correlated to the revenue.
24         Q.     You would need -- I'm not
25    asking revenue; I'm asking about operating

```
                                    Page 53

 1                 C. MURPHY

 2    expenses, Ms. Murphy?

 3         A.    Right.   Right.   I understand

 4    that.

 5         Q.    So you would need to look at

 6    more detailed information to see if dockage

 7    and marina went down as a result of fewer

 8    flights, correct?

 9         A.    Correct.

10         Q.    Now, aircraft supplies, that

11    could have gone down if Shoreline flies

12    fewer flights in a particular year,

13    correct?

14         A.    Could have, but not necessarily

15    that it did.

16         Q.    Now, for salary and wages, does

17    that include pilot wages?

18         A.    Yes, I believe it does.

19         Q.    And if Shoreline flies fewer

20    flights in a given year, the amount it pays

21    its pilots could go down, correct?

22         A.    Well, again, Reid I just want

23    to be clear about how I answer this.

24              Not necessarily, because you

25    may have -- you may find yourself in a
```

Page 54

                                C. MURPHY

1
2   situation where you have to find, scramble,
3   engage other pilots to cover routes that
4   have either -- have been affected by some
5   change in the amount of business.
6              So I'm just very cautious about
7   saying that those expenses could have gone
8   down.
9              Could they have?  Yes, they
10  could have.  Does that mean that they did?
11  It does not mean that at all.
12     Q.    Understood.  We'd require more
13  detailed analysis; is that right?
14     A.    That's correct.
15     Q.    So did we cover aircraft
16  supplies, Miss Murphy?  I don't recall.
17     A.    You asked me about it, yes.
18     Q.    So pilot training, do you know
19  if that could go down if you flew less
20  flights in a given year?
21     A.    Well, just look at -- look at
22  what we're doing.
23              I mean, that went up, right?
24  Supplies went up.  Dockage and marina went
25  up.  All of these went up except for

Page 55

                        C. MURPHY

1

2    salaries and wages; yet, we had a decrease

3    in revenue.

4              So I'm just trying to be sure

5    that you're clear that even though you

6    might have a decrease in income, it does

7    not necessarily mean that all the costs

8    will go down.

9        Q.    Right.  You have to do a

10   detailed analysis to see if that's the

11   case; is that right?

12             MR. VLAHADAMIS:  Asked and

13        answered.  Objection.

14       A.    That's right.

15       Q.    And you weren't asked to do

16   that in drafting your affidavit; is that

17   correct?

18       A.    That's correct.

19       Q.    I should say you were not asked

20   to do that in signing your affidavit; is

21   that correct?

22             MR. KRIEGSMAN:  Objection.

23             MR. VLAHADAMIS:  You can answer

24        it, Camille.

25       A.    I don't understand your

```
 1                     C. MURPHY
 2   question, Reid.
 3        Q.    I was trying to be clear,
 4   because you did not draft the affidavit,
 5   correct; someone else did and you signed
 6   it, right?
 7             MR. VLAHADAMIS:  Objection.
 8        A.    You already know that.
 9        Q.    All right.  Understood.  I'm
10   just trying to be clear in my questions,
11   Ms. Murphy.
12        A.    Okay.
13        Q.    So if we look at where it says,
14   in parentheses, Loss, Income From
15   Operations, am I understanding correctly
16   that is net income or loss?
17        A.    It's net income from
18   operations.  Net income or loss from
19   operations.
20             Then there are other items that
21   also affect the income or loss for the
22   company for the year which are stated below
23   that number.
24        Q.    All right.  And below that
25   number, there's also -- it says, Loss
```

Page 57

```
 1                   C. MURPHY
 2   before income taxes.
 3             That's the loss to the company
 4   before calculation of income taxes?
 5        A.    That's correct.
 6        Q.    And then there's -- below that,
 7   there's a statement of income tax expenses?
 8        A.    Correct.
 9        Q.    And so -- and below that is the
10   net loss for the year?
11        A.    Correct.
12        Q.    So if we look at 2017,
13   Shoreline had a net loss of $338,331; is
14   that right?
15        A.    That's correct.
16        Q.    And the net loss for the year
17   2016 was $32,072?
18        A.    Correct.
19        Q.    So now I'm going to go to the
20   year ending September 30, 2018 and you'll
21   see we're going to -- I'm going to direct
22   to you page CM 1184.
23             If you look at the top, you'll
24   see this is a statement of revenues,
25   expenses and retained earnings, income tax
```

```
 1                    C. MURPHY
 2    basis for the years ended September 30,
 3    2018 and 2017.
 4             Do you see that Ms. Murphy?
 5        A.    I see that.
 6        Q.    And under revenues, you'll see
 7    there's charter and rental income for 2018
 8    and 2017?
 9        A.    I see that.
10        Q.    And you'll see there's two
11    numbers there, and those are the numbers
12    that we were discussing earlier in your --
13    in the text of your affidavit; is that
14    correct?
15        A.    Yes, correct.
16        Q.    And this is where you get that
17    there is a decline in revenue from the year
18    ending September 30, 2017, the year ending
19    September 30, 2018, correct?
20        A.    Correct.
21        Q.    And if we look down at cost of
22    goods sold, there was a reduction in costs
23    from -- there was a reduction in costs from
24    the year 2017 to the year 2018?
25        A.    Yes, there was.
```

```
                                           Page 59

 1                    C. MURPHY
 2        Q.     And if you look down at income,
 3   loss before income taxes, you'll see in
 4   2018, there was a gain of $360,391 -- let
 5   me back up.  $360, 391, right.
 6        A.     Say that again?
 7        Q.     $360,391, correct?
 8        A.     Correct.
 9        Q.     And the year before that we
10   looked at, there was a loss of over
11   $300,000, correct?
12        A.     Correct.
13        Q.     And if you look after
14   application of taxes, you'll see there's a
15   gain of over $350,000 the year ending 2018,
16   correct?
17        A.     Correct.
18        Q.     And that's as compared to a
19   loss of over three $330,000 the year
20   before?
21        A.     Correct.
22        Q.     So even though revenue fell in
23   2018, 2018 was the more profitable year for
24   Shoreline, correct?
25        A.     Correct.
```

```
 1                    C. MURPHY
 2        Q.     Now, I want to go back up to
 3   another part of your declaration.  If you
 4   look at paragraph 6, there is a discussion
 5   of a transaction with Cape Air.
 6               Do you see that?
 7        A.     Yes, I do.
 8        Q.     And you're familiar with the
 9   transaction discussed there; is that
10   correct?
11        A.     Correct.
12        Q.     And it's written here,
13   Initially the parties contemplated a stock
14   sale whereby Cape Air would purchase
15   Shoreline's stock and merge Shoreline's
16   ESOP into the ESOP Cape Air had in place.
17               Now, what is -- the sentence
18   there, what is that based on?
19        A.     What is that -- I'm sorry, I
20   don't understand.
21        Q.     Sure.  The sentence written
22   there, do you know what the basis is for
23   that statement?
24        A.     Of course.  Of course, I do.
25   Those are the facts as they were unfolding
```

```
1                    C. MURPHY
2        A.    That's correct.
3        Q.    And do you know, did John Kelly
4   and Andrea Collingwood work for that money?
5   Did they do work for Cape Air after the
6   transaction closed?
7        A.    Well, I know that Andrea did.
8   I don't recall the timing of John's illness
9   as to how long he worked for the company.
10       Q.    Okay.  Thank you.
11             And then, finally, I thought I
12  heard it before.  Were you involved in all
13  aspects and negotiations of the Cape Air
14  transaction?
15       A.    No, not at all.
16       Q.    Okay.  There was an attorney
17  named Jim Nugent who was representing
18  Shoreline in connection with the
19  transaction?
20       A.    That's correct.
21       Q.    And an attorney named Richard
22  Glassman who was focusing on the ESOP plan
23  both before and after the transaction was
24  contemplated?
25       A.    Yes, that's correct.
```

Page 165

                         C. MURPHY

1

2    Q.    Okay.

3          MR. KRIEGSMAN:  No further

4    questions.

5          MR. SKIBELL:  All right.  I'm

6    going to have a short redirect.  Just

7    give me a couple minutes to double

8    check and then I will have a few

9    additional questions.

10         MR. KRIEGSMAN:  Okay, great.

11    So what do you want, another five

12    minutes, Reid?

13         MR. SKIBELL:  Yeah, that would

14    be fine.  Thanks.

15         (Whereupon, a brief recess was

16    taken.)

17  CONTINUED EXAMINATION BY

18  MR. SKIBELL:

19    Q.    Ms. Murphy, I'm entering an

20  exhibit.  You can correct me if I'm wrong,

21  but I believe this is what Mr. Kriegsman

22  called Exhibit A.

23    A.    I don't know.  I didn't keep

24  track of what he called them.  I'm sorry.

25    Q.    All right.  So if you look at

```
                                    Page 166
 1                  C. MURPHY
 2   the --
 3             MR. KRIEGSMAN:  And, I'm sorry,
 4        Reid, are you entering this as an
 5        exhibit?
 6             MR. SKIBELL:  Well, I believe
 7        you already entered it as an exhibit,
 8        unless I'm wrong.
 9             MR. KRIEGSMAN:  That's why I'm
10        asking.  Yeah.
11        Q.    So you'll see the document
12   we're looking at here bears the Bates stamp
13   SAI 007979, okay?
14             If you look at the end, it is
15   SAI 007983.
16             Now, I take it this was not a
17   document that you produced in response to
18   your subpoena; is that correct?
19        A.    That's correct.
20        Q.    Now, if you look on the left
21   side of the document, you see it says, 3:26
22   p.m., 2/24/2022.
23             Do you see that?
24        A.    I do see that.
25        Q.    Do you have any understanding
```

```
                                          Page 167

 1                      C. MURPHY

 2    as to why it has that time and date?

 3         A.    That's how QuickBooks works.

 4    It always times -- it usually, depending on

 5    how you set it up when you first start the

 6    company, in QuickBooks, it date stamps and

 7    time stamps the running of the report.

 8         Q.    All right.  So did you pull up

 9    this document on 3:26 p.m. on February 24,

10    2022?

11         A.    I don't believe I did,

12    actually.

13         Q.    Do you know who did?

14         A.    No, I don't.

15         Q.    Do you know if the numbers here

16    are final numbers?

17         A.    Well, I did look when Alex put

18    it up, and it does agree, in essence, with

19    the tax returns that were filed, so I was

20    pretty comfortable that it was complete.

21         Q.    Now, which tax returns are you

22    referring to?

23         A.    The ones we looked at earlier

24    for the fiscal year ending September 30th

25    of 2018, and I think in the package you
```

                        C. MURPHY
1
2    have the one for September of 2017 as well.
3          Q.    Those were the financial
4    statements we looked at earlier; is that
5    what you're referring to?
6          A.    Well, I was referring to the
7    tax returns, but they all have the same
8    numbers, so it's interchangeable.
9          Q.    So -- but did you do anything
10   to determine whether the information set
11   forth in Exhibit A is a final statement of
12   either revenue or expenses?
13         A.    Yeah, that's what I just said;
14   I looked at the tax returns and determined
15   that we got some good numbers here.
16         Q.    All right.  So let's look at
17   what Alex reviewed as charter income.
18               Do you see that --
19         A.    Yes.
20         Q.    -- in the middle of the page?
21               And you'll see that there is a
22   total for total charter revenue set forth
23   there.  Can you tell us what you did, if
24   anything, to confirm that number as a final
25   number?

                          C. MURPHY
1
2        A.     What I testified to is that
3    remember my tax returns and financial
4    statements really just report total income,
5    so since total income agreed with the tax
6    returns and the financial statements, okay,
7    and these reports were probably -- they
8    were prepared by Dee, so, no, I mean, I
9    didn't -- I didn't reconcile every single
10   number on this report, no, I did not.
11       Q.     So you said prepared by Dee.
12       A.     Well, I take that back.  She
13   doesn't still work there, so I don't know
14   who printed the reports for you.
15       Q.     All right.  And I take it you
16   don't know how this report was created?
17       A.     I do know how it was created.
18              You go into QuickBooks and you
19   ask for a profit and loss, you say what
20   time period you want and you print it.
21       Q.     But you don't know how this
22   specific report was created by the unknown
23   person who created it in February of 2022,
24   do you?
25              MR. VLAHADAMIS:  Objection to

Page 170

1                      C. MURPHY

2         form.

3              MR. KRIEGSMAN:  Objection.

4              MR. VLAHADAMIS:  You can

5         answer, Camille.

6              THE WITNESS:  I don't know how

7         to answer it.

8         A.    I know that, you know,

9    QuickBooks takes all of the transactions

10   that happen on a bank statement and they're

11   reconciled and put into QuickBooks, so I do

12   know how it works.

13        Q.    So, Ms. Murphy, do you have

14   within your files your calculations of

15   profit and loss from October 2016 through

16   September of 2017?

17        A.    Of course, I do.  You've got

18   the financial statements and the tax

19   returns that I sent you or --

20        Q.    You didn't sent us --

21        A.    -- included in my affidavit.

22   Sorry.

23        Q.    Ms. Murphy, you did not produce

24   detailed profit and loss statements in

25   response to the subpoena, did you?

```
                                          Page 171
 1                    C. MURPHY
 2       A.    You need to define for me
 3   detailed, because the financial statements
 4   that were provided are what I would call
 5   detailed, so are you referring to something
 6   else?
 7       Q.    All right.  So the document
 8   we're looking at here, there is a version
 9   in your files of a profit and loss
10   statement of October 2016 through
11   September 2017, correct?
12       A.    Yes.
13       Q.    And you did not produce that in
14   connection with the subpoena, correct?
15       A.    Wait a minute now.  Hold on a
16   second.  I think -- no, I did not put it in
17   the affidavit.  I'm not sure that it was
18   asked for in my subpoena, the detailed
19   underlying work papers, so I don't know how
20   to answer that, Reid.
21       Q.    So you didn't produce it, did
22   you?
23            MR. VLAHADAMIS:  Asked and
24        answered.  Objection.
25       A.    I'm not answering that.
```

```
                                            Page 172
 1                    C. MURPHY
 2        Q.    So did you check the document
 3   we're looking at, Exhibit A, versus the
 4   documents that you have for Shoreline for
 5   this period of time?
 6             MR. KRIEGSMAN:  Objection.
 7        Asked and answered.
 8        A.    Their totality, yes.
 9        Q.    Did you check the specific
10   numbers that we're looking at here versus
11   the version of this that appears in your
12   own files?
13             MR. KRIEGSMAN:  Objection.
14        Asked and answered.
15             MR. VLAHADAMIS:  Go ahead.
16             You can answer, Camille.
17        A.    Are you asking me, Reid, line
18   by line?
19        Q.    I'm asking you, this particular
20   document, did you look at the version of
21   this document in your files and compare the
22   two documents?
23             MR. KRIEGSMAN:  Objection.
24        Asked and answered.
25             MR. VLAHADAMIS:  Note my
```

Page 173

1                     C. MURPHY

2          objection to form.

3                  What document are you comparing

4          it to?

5      Q.    Ms. Murphy, there is a version

6  of the profit and loss statement of

7  October 2016 through September 2017 in your

8  files, correct?

9                  MR. KRIEGSMAN:  Let the record

10         reflect that Mr. Skibell is raising

11         his voice at the witness.

12                 MR. SKIBELL:  That's is

13         inaccurate, and I don't appreciate

14         your gamesmanship, Alex.  Please stop

15         it.

16                 MR. KRIEGSMAN:  Continues to

17         raise voice.

18     Q.    Ms. Murphy, there is a version

19 of the profit and loss statement between

20 October 2016 and September 2017 for

21 Shoreline in your files, correct?

22     A.    Correct.

23     Q.    And we have in front of us a

24 version of a profit and loss statement of

25 October 2016 through September 2017 that

Page 174

                        C. MURPHY

1

2   was not produced by you, correct?

3        A.    I can't say that.

4              I'm not sure if didn't --

5   listen, that's February of 2022; it's July.

6   I can't tell you if I printed this or not.

7   I really don't know.

8        Q.    Ms. Murphy --

9              MR. VLAHADAMIS:  I'm going to

10        object, because you're misstating her

11        prior testimony, Reid.

12       Q.    Ms. Murphy, you'll see on the

13  right-hand corner there's a Bates stamp?

14             Do you see it starts SAI?

15       A.    Yes, I do.

16       Q.    And that indicates that it's a

17  document that was produced by Shoreline

18  Aviation, correct?

19             MR. VLAHADAMIS:  Objection.

20       A.    I don't know.

21             MR. VLAHADAMIS:  She doesn't

22        know that information.

23       Q.    It does not bear the Bates

24  stamp CM that shows documents that were

25  produced by you, correct?

Page 175

                              C. MURPHY

1

2                MR. KRIEGSMAN:  Objection.

3                MR. VLAHADAMIS:  You can answer

4        the question, if you know, Camille.

5        A.    I don't know.

6        Q.    All right.  So, Ms. Murphy, I'm

7    asking a simple question here.

8                So what we're looking at is

9    Exhibit A, and my question is, did you

10   compare Exhibit A to the profit and loss

11   October 2016 through September 2017 that

12   you have for Shoreline in your files?

13       A.    I compared Exhibit A while we

14   were talking to the tax return and the

15   financial statements that we prepared for

16   this time period, and they agree.

17       Q.    But not the line by line items

18   we see here as compared to the version of

19   the profit and loss statement in your file,

20   correct?

21               MR. KRIEGSMAN:  Objection.

22               MR. VLAHADAMIS:  Objection.

23               You can answer, Camille.

24       A.    Line by line to my work papers

25   in my files?  The answer to that is no.

                              C. MURPHY

1

2        Q.     All right.  So if you go down,

3    where it says Charter Revenue in the middle

4    of the page, do you have an understanding

5    of what charter revenue refers to there?

6        A.     Of course, yes, I do.

7        Q.     And can you tell us what

8    charter revenue refers to there?

9        A.     Chartering of airplanes to go

10   from point A to point B.

11       Q.     And do you recall -- do you

12   have an understanding one way or the other

13   as to whether charter revenue is limited to

14   flights in and out of East Hampton Airport?

15       A.     No.

16       Q.     You don't know one way or the

17   other?

18       A.     I know it's not just limited.

19              I know the Sound commuter fees

20   are from New -- to the Hamptons, but in

21   terms of the others, I'm fairly certain

22   they go in and out of other places.

23       Q.     Okay.  So you'll see that

24   there's something called Cancellation Fees.

25              Do you have an understanding of

```
                                          Page 177
 1                    C. MURPHY
 2   what that refers to?
 3         A.     Yes.
 4         Q.     And can you tell us what that
 5   refers to?
 6         A.     If you book a flight and then
 7   you cancel it within a certain time period,
 8   you have to pay a fee.
 9         Q.     And those fees -- do you know
10   if they were just on flights that were
11   booked by of SAFE?
12                MR. KRIEGSMAN:  Objection to
13          form.
14         A.     No, I don't know.
15         Q.     All right.  So if you look,
16   there's a column below that says Charter
17   Fees.
18                Do you have an understanding of
19   what charter fees refers to there?
20         A.     I just answered that.  It's
21   fees -- it's flights from point A to point
22   B that are not in the Sound -- that are not
23   the ones from -- into the Hamptons.
24         A.     I see.
25         Q.     So those -- where it says
```

```
                                          Page 178

 1                      C. MURPHY
 2   Charter Fees there are different from the
 3   Sound Commuter Fees that are at the bottom
 4   of Charter Revenue; is that correct?
 5         A.    I believe so, yes.
 6         Q.    And you see there's also a
 7   reference to Charter Fees Brokers.
 8               Do you see that?
 9         A.    I see that.
10         Q.    And that refers to fees paid to
11   brokers other than SAFE; is that correct?
12               MR. KRIEGSMAN:  Objection.
13         A.    I would have no way of knowing
14   that.
15         Q.    So you don't know one way or
16   the other whether that was paid to SAFE or
17   not; is that correct?
18         A.    That's a correct statement.
19         Q.    All right.  Now, I believe you
20   also testified about expenses that
21   Mr. Kriegsman asked you about, and I want
22   to ask you about expenses and whether or
23   not those are related to -- what those
24   relate to.
25               So if you look on the page now,
```

Page 179

                    C. MURPHY
1
2    it's page 2 of this document.  It bears the
3    Bates stamp SAI 007980, and you'll see
4    Charter Expenses.
5              Now, and there's a number of
6    those broken out there and add up to almost
7    $1.4 million.
8              Do you see that?
9        A.    I do see that.
10       Q.    Do you know if those expenses
11   set forth there are limited to flights that
12   were booked by SAFE?
13             MR. KRIEGSMAN:  Objection.
14       A.    I don't think it's -- I don't
15   know.  I do not know.
16       Q.    Do you have an understanding as
17   to whether or not these expenses also
18   relate to flights that were booked by other
19   persons other than SAFE?
20       A.    I do not know.
21       Q.    Now, if you look below, you'll
22   see there's a section that's called
23   Maintenance.  Do you see that?
24       A.    Yes, I do.
25       Q.    It's broken out into Total

```
                                                  Page 180
 1                      C. MURPHY
 2   Maintenance.
 3              Do you have an understanding as
 4   to whether -- am I correct those are all
 5   expenses?
 6       A.    Those are all expenses, I
 7   believe, that's correct.
 8       Q.    And do you have an
 9   understanding as to whether or not those
10   were expenses that were allocated to
11   flights that were booked by SAFE?
12              MR. KRIEGSMAN:  Objection.
13       A.    No, I don't know.
14       Q.    All right.  So if you look
15   below there's a number of other expenses.
16              You see there's -- below that,
17   you see there's Payroll Expenses?
18              Do you see those?
19       A.    Yes, I do.
20       Q.    You see there's Housing
21   Expenses?
22              Do you see those?
23       A.    Yes, I do.
24       Q.    There's Pilot Expense
25   Transportation.
```

1               C. MURPHY

2          Do you see those?

3     A.    Yes.

4     Q.    And there's Other

5  Transportation Expenses listed here; is

6  that correct?

7     A.    Correct.

8     Q.    And do you have an

9  understanding as to whether these expenses

10  were limited to flights that were booked by

11  SAFE?

12    A.    I do not.

13    Q.    All right.  Now, Mr. Kriegsman

14  also asked you, if I recall, about a number

15  of other expenses.  Let's go to the next

16  page.  I believe it's SAI 007981, okay.

17          And you'll see in the middle of

18  the page, there's Charitable Donations,

19  Consulting Fees, Depreciation Expenses.

20          Do you see that section?

21    A.    Yes, I do.

22    Q.    Do you have an understanding as

23  to whether those are related to or those

24  are limited to flights that were booked by

25  SAFE?

```
                                    Page 182
 1                  C. MURPHY
 2      A.    No, I do not.
 3      Q.    Do you have an understanding as
 4  to whether those were limited to charter
 5  flights?
 6            MR. KRIEGSMAN:  Objection.
 7      A.    No, I do not.
 8      Q.    Now, you'll see below that, you
 9  see there's Insurance Expenses?
10            Do you have an understanding as
11  to whether those were limited to flights
12  that were booked by SAFE?
13      A.    No, I do not.
14      Q.    How about you'll see there's
15  Launch Expenses.
16            Do you see those?
17      A.    I do.
18      Q.    Do you have an understanding as
19  to whether those were limited to flights
20  that were booked by SAFE?
21      A.    I do not.
22      Q.    Do you have an understanding as
23  to whether those were limited to charter
24  flights?
25      A.    No, I do not.
```

```
                                    Page 183
 1                    C. MURPHY
 2        Q.    All right.  Now let's go to the
 3   next page.  You'll see there's the lease of
 4   an Audi.
 5              Do you have understanding as to
 6   whether that was related to -- merely to
 7   flights that were booked by SAFE?
 8        A.    Is that the $3,000 that you're
 9   referring to?
10        Q.    Yup.
11        A.    $3,019 -- $3,000, no, I do not,
12   no.
13        Q.    All right.  Well, look at all
14   of the other expenses that are set forth
15   here.
16              You'll see there's -- if you
17   look, there's Lease, there's Licenses,
18   there's Miscellaneous Office Expenses,
19   there's Payroll.
20              Now, can you tell us whether
21   any -- to your knowledge, whether any of
22   those expenses were limited to flights that
23   were booked by SAFE?
24        A.    No, I cannot.
25        Q.    All right.  Now let's look at
```

Page 184

1                    C. MURPHY
2  -- we also have Professional Fees.
3           Do you know whether those
4  professional fees were limited to flights
5  booked by SAFE?
6       A.    I do not know.
7       Q.    How about this?  Do you see
8  Seabird Yachts?
9           Do you have an understanding as
10  to whether those were limited to flights
11  booked by SAFE?
12       A.    I do not.
13       Q.    Now, do you recall earlier
14  Mr. Kriegsman asking you about advertising
15  expenses?
16       A.    Yes, I do.
17       Q.    Do you recall -- do you know
18  one way or the other whether those
19  advertising expenses were limited to
20  flights that were booked by SAFE?
21       A.    No; however, I did see quite an
22  increase from '17 to '18, and I think we
23  can draw the conclusion they needed to do a
24  lot more advertising after what happened
25  with SAFE.

Page 185

1                    C. MURPHY

2        Q.    Do you know if any of those

3   advertisements were set -- or used in the

4   Bahamas?

5        A.    Oh, I'm sure some of them were.

6        Q.    Do you know if they increased

7   the amount of advertising they did in the

8   Bahamas?

9        A.    No, I do not.

10        Q.    Do you know if they increased

11   the amount of advertising they did in

12   Florida?

13        A.    No, I do not.

14        Q.    So you really have no idea why

15   the advertising expenses would have

16   increased, do you?

17               MR. KRIEGSMAN:   Objection.

18        A.    Wow.

19        Q.    Ms. Murphy, are you going to

20   answer the question?

21        A.    Could you ask it again, please?

22        Q.    Ms. Murphy, do you know one way

23   or the other why the advertising expenses

24   for Shoreline increased in 2018 versus

25   2017?

```
                                          Page 186
 1                   C. MURPHY
 2        A.    Yes.  As stated earlier, they
 3   really had to market once the deal with --
 4   when this transaction, this situation,
 5   happened with SAFE.  They had do a
 6   tremendous amount of marketing to try to
 7   resolve what happened to the company.
 8        Q.    Were you aware, Ms. Murphy,
 9   that Shoreline was already facing
10   competition from Blade before there were
11   any changes in the relationship between
12   SAFE and Shoreline?
13        A.    I don't know anything about
14   those details, I'm sorry.
15        Q.    So you don't really know if the
16   increase in advertising in East Hampton
17   related to the fact that Blade also
18   increased its advertising?
19             MR. KRIEGSMAN:  Objection.
20        You're harassing the witness with
21        something totally outside of her
22        knowledge.  Let the record reflect
23        that.  Objection.
24             MR. SKIBELL:  I'm just asking
25        what you asked her about, Alex, so I
```

```
                                              Page 187
 1                    C. MURPHY
 2         disagree that it's outside of her
 3         knowledge.
 4         Q.     So let's -- I'm going to show
 5    you another document.
 6                You'll see what, I believe, is
 7    Exhibit B, that was shown to you earlier by
 8    Mr. Kriegsman.
 9         A.     Mm-hmm.
10         Q.     Do you recall you were asked a
11    number of questions about this document?
12                Do you recall that?
13         A.     Yes, I do.
14         Q.     Were you aware before today's
15    deposition that you were going to be asked
16    about Exhibit B?
17         A.     I wasn't officially made aware
18    of it, but I'm not -- I've been doing this
19    for a long time, Reid.  I know how to
20    prepare myself for things.
21         Q.     But did you have an
22    understanding whether or not specifically
23    you were going to be asked about Exhibit B
24    before today's deposition?
25                MR. VLAHADAMIS:  Again, I'm
```

```
                                    Page 188

 1              C. MURPHY
 2       going to instruct the witness to
 3       specifically not discuss any
 4       privileged communications with
 5       respect to what she was instructed to
 6       do or not do with respect to the
 7       deposition.
 8              You're getting there again,
 9       Reid.
10              MR. SKIBELL:  All right.  I'm
11       moving on to my next question,
12       because I believe the question has
13       already been answered.
14       Q.    So if you look in the middle of
15   the -- I'll go to the top of the page.
16              So if you look on the left
17   side, you'll see, like other documents we
18   were looking at, this document indicates
19   that it has February 24, 2022 on the left
20   side.  Is that accurate?
21       A.    That's what I see.
22       Q.    And it also says 3:25 p.m.
23              Do you see that?
24       A.    Yes, I do.
25       Q.    So I take it you were not the
```

```
                                              Page 189
 1                    C. MURPHY
 2   one that created this particular document;
 3   is that correct?
 4        A.     I testified earlier I don't
 5   know.
 6        Q.     Okay.  Now, if you look in the
 7   middle of the page, you'll see there's
 8   Charter Revenue.  And do you recall being
 9   asked questions about charter revenue?
10        A.     Yes.
11        Q.     And you'll see at the top,
12   there's -- we were -- there's cancellation
13   fees.
14                Do you know if those
15   cancellation fees are limited to flights
16   that were booked by SAFE?
17        A.     I do not.
18        Q.     Now, if you look at -- you see
19   there's Commuter Fees of a little over
20   $1 million?  Do you see that?
21        A.     Yes, I do.
22        Q.     And do you see there's Charter
23   Fees of almost $1 million?
24                Do you see that?
25        A.     I'm sorry, say that again?
```

```
                                    Page 190
 1                  C. MURPHY
 2        Q.    You'll see the second line,
 3   you'll see there's charter fees of almost
 4   $1 million.  Do you see that?
 5        A.    Charter -- yes, I do see that.
 6        Q.    Then there's Sound Commuter
 7   Fees of $767,000 or a little over that.
 8              Do you see that?
 9        A.    Yes, I do.
10        Q.    All right.  So and I'm going to
11   try to group this together, but you'll see
12   there's services there that are listed and
13   they add up to almost $2 million.
14        A.    Yes, I see that.
15        Q.    Is that income that was
16   received, or are those expenses, if you
17   know?
18        A.    I do know that's income.
19        Q.    You'll see below, you'll see
20   there's Cost of Goods Sold and you see
21   there's Aircraft Fuel Expense and Aircraft
22   Insurance.
23              Do you see that?
24        A.    Yes, I do.
25        Q.    Am I understanding that those
```

1                    C. MURPHY

2    are expenses that were incurred in 2018?

3         A.     Correct.

4         Q.     And do you know if those two

5    expenses were limited to flights that were

6    booked by Sound?

7         A.     No, I do not.

8         Q.     All right.  If you go in the

9    middle of the next page, you'll see there

10   are Charter Expenses, and those were a

11   little over $1.2 million.

12              Do you see that?

13        A.     Yes, I do.

14        Q.     Do you know if those charter

15   expenses were limited to flights that were

16   booked by Sound?

17        A.     No, I do not.

18        Q.     All right.  And you see there's

19   Maintenance Expenses of over $350,000.

20              Do you see that?

21        A.     Yes, I do.

22        Q.     Do you know if those are

23   limited to flights that were booked by

24   Sound?

25        A.     No, I do not.

```
                                              Page 192
 1                      C. MURPHY
 2        Q.    Do you know if those were
 3   limited to charter flights?
 4        A.    No, I do not.
 5        Q.    All right.  Now you'll see
 6   there's Payroll Expenses, and then you see
 7   there's a number of pilot -- I mean Pilot
 8   Expenses on the next page.
 9              Do you see that?
10        A.    Yes, I do.
11        Q.    Do you know if any of those
12   expenses are specific either to charters or
13   to flights booked by SAFE?
14        A.    No, I do not.
15        Q.    Now, in the middle of the page,
16   you see there's advertising expenses?
17        A.    Yes, I do.
18        Q.    And you don't know whether
19   those advertising expenses are limited to
20   East Hampton airport, do you?
21        A.    No, I do not.
22        Q.    All right.  And on the last
23   page, you'll see under where it says Total
24   Loss, you see there's a number of
25   additional expenses.  They start with Lease
```

Page 193

1                    C. MURPHY
2   Audi, and they go through Payroll?  They
3   continue on the next page, through
4   Professional Fees, Repair, Seabird Yachts?
5              Do you see those?
6        A.    Hold on one second.  Can you
7   just go back up, Reid, for one second?
8        Q.    Of course.
9        A.    Little bit more.  Little bit
10  more.  So a little bit more.
11             Where was that Launch?  Hold
12  on.  Okay.
13             So Total Launch is the total of
14  the preceding section.  Stop right there.
15  Stop.  No.  No.  No.  Stop.  Go back down a
16  little bit.
17             Okay.  So the total launch
18  expenses were $30,000.  Then you're
19  starting with overhead expenses.
20             So the expenses below that you
21  are reading off are not launch expenses.  I
22  just wanted to make that clear.
23        Q.    I appreciate the clarification.
24  I didn't mean to suggest otherwise.
25             I'm asking about the expenses

```
                                    Page 194
 1                    C. MURPHY
 2    that start with Lease Audi and go all the
 3    way through Travel and Entertainment.
 4               Do you see those?
 5        A.    Yes, I do.
 6        Q.    And were those limited to
 7    charters?
 8        A.    I don't know.
 9        Q.    And do you know if those were
10    limited to flights booked by SAFE?
11        A.    I do not know that.
12        Q.    All right.
13               MR. SKIBELL:  Thank you,
14         Ms. Murphy.  I have no further
15         questions.
16               MR. KRIEGSMAN:  All right.
17         Just real fast, because I know Reid's
18         hungry.
19    CONTINUED EXAMINATION BY
20    MR. KRIEGSMAN:
21        Q.    Ms. Murphy, I'm just going to
22    show you again what was marked as Exhibit
23    B.
24               Do you see in the top left,
25    there is a date stamp of February 24, 2022?
```

```
 1                    C. MURPHY
 2      A.    Yes, I do.
 3      Q.    And a time of 3:25 p.m.?
 4      A.    Yes.
 5      Q.    Am I right that that comes from
 6 QuickBooks?
 7      A.    That's correct.
 8            MR. SKIBELL:  Objection.
 9      Q.    Does that refer to when this
10 document was created or just when it was
11 printed?
12            MR. SKIBELL:  Objection.
13      A.    Just when it was printed.
14      Q.    So if I printed the same
15 document now, it would say 2:11 p.m. on
16 July 21, 2022?
17      A.    Yes, it would.
18            MR. SKIBELL:  Note my
19        objection.
20            MR. KRIEGSMAN:  Okay.  Nothing
21        further.
22            MR. SKIBELL:  I have nothing
23        further.  Thank you, Ms. Murphy.
24            MR. KRIEGSMAN:  And did you
25        want to read and sign?  I have to get
```