**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------X

SHORELINE AVIATION, INC.,

                Plaintiff,

    v.

CYNTHIA L. HERBST, SOUND AIRCRAFT,
FLIGHT ENTERPRISES, INC., RYAN A. PILLA

                Defendants.

-------------------------------------------------------------------X

:
:
:
:
:
:
:
:
:
:
:
:

Case No. 2:20-cv-02161-NJC-SIL

Judge Nusrat Jahan Choudhury


**DEFENDANTS' OBJECTION TO JUDGE LOCKE'S**
**REPORT AND RECOMMENDATION REGARDING SUMMARY JUDGMENT**


GLENN AGRE BERGMAN & FUENTES LLP

L. Reid Skibell (rskibell@glennagre.com)
Jewel K. Tewiah (jtewiah@glennagre.com)
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
Tel: (212) 970-1600

*Attorneys for Defendants*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ......................................................................................... 1

RELEVANT BACKGROUND .......................................................................................... 3

STANDARD OF REVIEW ............................................................................................... 4

OBJECTION AND ARGUMENT ..................................................................................... 5

   I.   SUMMARY JUDGMENT SHOULD BE GRANTED DISMISSING SHORELINE'S BREACH OF CONTRACT CLAIM ........................................................................... 5

       A.  The Parties' Written Contract Extinguished the Oral Contract ............................ 5

       B.  SAFE Never Agreed to Assume SAS's Obligations to Shoreline ........................ 7

   II.  SUMMARY JUDGMENT SHOULD BE GRANTED DISMISSING SHORELINE'S MISAPPROPRIATION CLAIMS ................................................................................ 9

  III.  SUMMARY JUDGMENT SHOULD BE GRANTED DISMISSING SHORELINE'S CLAIMS FOR BREACH OF FIDUCIARY DUTY/VIOLATION OF FAITHLESS SERVANT DOCTRINE ........................................................................................... 13

  IV.  SUMMARY JUDGMENT SHOULD BE GRANTED DISMISSING SHORELINE'S TORTIOUS INTERFERENCE CLAIM ....................................................................... 15

   V.  SUMMARY JUDMENT SHOULD BE GRANTED AS TO LOST PROFITS ............. 17

       A.  Shoreline Should be Precluded from Seeking Lost Profits.................................. 18

       B.  Shoreline's Calculation of Lost Profits Is Entirely Speculative .......................... 22

CONCLUSION.............................................................................................................. 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*24/7 Records, Inc. v. Sony Music Entm't, Inc.*,
566 F.Supp.2d 305 (S.D.N.Y.2008) ............................................................. 19

*Abuelhija v. Chappelle*,
2009 WL 1883787 (S.D.N.Y. June 29, 2009) ................................................. 7

*Allan Dampf, P.C. v. Bloom*,
127 A.D.2d 719 (App. Div. 1987) ................................................................ 22

*Ashland Mgmt. Inc. v. Janien*,
82 N.Y.2d 395 (1993) ................................................................................. 24

*Atias v. Sedrish*,
133 F. App'x 759 (2d Cir. 2005) ................................................................. 23

*Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co.*,
1 F. Supp. 3d 224 (S.D.N.Y. 2014) ....................................................... 10, 11

*Blanton v. Educ. Affiliates, Inc.*,
2022 WL 1505124 (2d Cir. May 12, 2022) .................................................. 14

*Broker Genius, Inc. v. Zalta*,
280 F. Supp. 3d 495 (S.D.N.Y. 2017) ......................................................... 11

*Christiana Bank & Tr. Co. v. Dalton*,
2009 WL 4016507 (E.D.N.Y. Nov. 17, 2009) .............................................. 12

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*,
650 F. Supp. 2d 314 (S.D.N.Y. 2009) ......................................................... 24

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*,
976 F.3d 239 (2d Cir. 2020) ....................................................................... 24

*Design Strategy, Inc. v. Davis*,
469 F.3d 284 (2d Cir. 2006) ..................................................... 19, 20, 21, 23

*Gleason Works v. Oerlikon Geartec, AG*,
141 F. Supp. 2d 334 (W.D.N.Y. 2001) ....................................................... 16

*Gould Paper Corp. v. Madisen Corp.*,
614 F. Supp. 2d 485 (S.D.N.Y. 2009) ......................................................... 18

*In re Roman Cath. Diocese of Rockville Ctr., New York,*
   651 B.R. 399 (Bankr. S.D.N.Y. 2023) ................................................................ 14

*In Touch Concepts, Inc. v. Cellco P'ship,*
   949 F. Supp. 2d 447 (S.D.N.Y. 2013) ................................................................ 16

*Insulet Corp. v. EOFlow, Co.,*
   104 F. 4th 873 (Fed. Cir. 2024) ........................................................................ 12

*Integra FX3X Fund, L.P. v. Deutsche Bank, AG,*
   2016 WL 1169514 (S.D.N.Y. Mar. 22, 2016) ...................................................... 7

*Kodak Graphic Commc'ns Canada Co. v. E.I. Du Pont de Nemours & Co.,*
   2013 WL 5739041 (W.D.N.Y. Oct. 22, 2013) .................................................... 21

*Learning Annex Holdings, LLC v. Gittelman,*
   48 A.D.3d 211 (App. Div. 2008) ...................................................................... 16

*Lehman v. Dow Jones & Co.,*
   783 F.2d 285 (2d Cir. 1986) ............................................................................ 10

*Lightbox Ventures, LLC v. 3rd Home Ltd.,*
   2017 WL 5312187 (S.D.N.Y. Nov. 13, 2017) .................................................... 24

*M.J. & K. Co., Inc. v. Matthew Bender and Co., Inc.,*
   220 A.D.2d 488 (App. Div. 1995) .................................................................... 16

*Murray v. Town of Stratford,*
   2014 WL 3700982 (D. Conn. July 25, 2014) .................................................... 22

*MVP Health Plan, Inc. v. OptumInsight, Inc.,*
   765 F. App'x 615 (2d Cir. 2019) ...................................................................... 24

*N. Shipping Funds I, L.L.C. v. Icon Cap. Corp.,*
   998 F. Supp. 2d 301 (S.D.N.Y. 2014) .............................................................. 18

*Nadel v. Play-By-Play Toys & Novelties, Inc.,*
   208 F.3d 368 (2d Cir. 2000) ...................................................................... 16, 17

*New York Racing Ass'n, Inc. v. Meganews, Inc.,*
   2000 WL 307378 (E.D.N.Y. Mar. 21, 2000) .................................................... 14

*Pike Co., Inc. v. Universal Concrete Prod., Inc.,*
   2022 WL 2301780 (W.D.N.Y. June 27, 2022) .................................................. 21

*Pittsfield Dev., LLC v. City of Chicago,*
   2021 WL 8314423 (N.D. Ill. Nov. 15, 2021) .............................................. 20, 21

*Process Am., Inc. v. Cynergy Holdings, LLC*,
   839 F.3d 125 (2d Cir. 2016) ................................................................... 24

*Reed Const. Data., Inc. v. McGraw–Hill Cos., Inc.*,
   2013 WL 1608489 (S.D.N.Y. Apr. 15, 2013) ........................................ 19

*Ritani, LLC v. Aghjayan*,
   970 F. Supp. 2d 232 (S.D.N.Y. 2013) ................................................... 24

*Ruckelshaus v. Monsanto Co.*,
   467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) ......................... 10

*Saniteq, LLC v. GE Infrastructure Sensing, Inc.*,
   2018 WL 4357475 (E.D.N.Y. Sept. 13, 2018) ........................................ 5

*Sengillo v. Valeo Elec. Sys., Inc.*,
   328 F. App'x 39 (2d Cir. 2009) ............................................................... 7

*Silicon Knights, Inc. v. Epic Games, Inc.*,
   2012 WL 1596722 (E.D.N.C. May 7, 2012) .................................... 19, 20

*Spotnana, Inc. v. Am. Talent Agency, Inc.*,
   2010 WL 3341837 (S.D.N.Y. Aug. 17, 2010) ................................. 20, 21

*Structured Cap. Sols., LLC v. Commerzbank AG*,
   177 F. Supp. 3d 816 (S.D.N.Y. 2016) ................................................... 10

*Telecom Int'l Am., Ltd. v. AT & T Corp.*,
   280 F.3d 175 (2d Cir. 2001) ................................................................. 13

*Town & Country Linen Corp. v. Ingenious Designs LLC*,
   556 F. Supp. 3d 222 (S.D.N.Y. 2021) ................................................... 12

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
   487 F.3d 89 (2d Cir. 2007) ................................................................... 23

*Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*,
   736 F. Supp. 1281 (S.D.N.Y. 1990) ........................................................ 8

*Wang v. Chen*,
   1992 WL 7840 (S.D.N.Y. Jan. 10, 1992) ............................................. 8, 9

*Waterville Inv., Inc. v. Homeland Sec. Network (NV Corp.*,
   2010 WL 2695287 (E.D.N.Y. July 2, 2010) ......................................... 10

*Wistron Neweb Corp. v. Genesis Networks Telecom Servs., LLC*,
   2023 WL 4493542 (S.D.N.Y. July 12, 2023).................................................................. 9

*Wong v. Michael Kennedy, P.C.*,
   853 F. Supp. 73 (E.D.N.Y. 1994)............................................................................ 8

*Yahaya v. Hua*,
   1989 WL 214481 (S.D.N.Y. Nov.28, 1989)................................................................. 9

**Statutes**

28 U.S.C. § 636(b)(1) ....................................................................................... 5

**Rules**

Fed R. Civ. P. 26 .................................................................................. 18, 19, 20

Fed. R. Civ. P. 72 (b)(2)................................................................................... 5

Defendants Sound Aircraft Flight Enterprises, Inc. ("SAFE"), Cynthia Herbst, and Ryan Pilla (collectively the "Herbst Defendants") hereby object to certain portions of the August 12, 2024 Report and Recommendation of Magistrate Judge Steven I. Locke (Dkt. No. 157, the "R&R") for the reasons set forth below.

## **PRELIMINARY STATEMENT**

While the R&R correctly denied Shoreline's arguments for summary judgment, it declined to decide certain legal issues that should be resolved at this stage of the case, and it misinterpreted key pieces of evidence. The Herbst Defendants respectfully submit that the parts of the R&R denying summary judgment for them should not be adopted, and summary judgment should instead be granted dismissing Shoreline's remaining claims.

This case revolves around an alleged oral contract from 1993, whereby a third-party, Sound Aircraft Services ("SAS") and Plaintiff Shoreline Aviation, Inc. ("Shoreline") either agreed to an informal commission based sales arrangement, as the Herbst Defendants claim, or to an exclusive contract that allegedly transformed SAS (and later SAFE) into Shoreline's fiduciary, as Shoreline claims. The R&R correctly found that no admissible evidence exists demonstrating that this alleged oral contract required either party to provide notice before terminating it. The R&R erred, however, in two critical respects.

*First*, the R&R erred in finding that there was a disputed issue of fact as to whether the oral contract required SAS/SAFE to exclusively book Shoreline seaplane flights. Following the formation of the alleged oral contract, Shoreline, SAS, and the Town of East Hampton entered into a series of written Operating Agreements, the first of which has a prohibition against exclusivity and a broad merger clause. Those Agreements cover, among other things, SAS's provision of "flight reservation services" to Shoreline—the very subject of the alleged oral contract. Thus, as a matter of law the Operating Agreements extinguished the oral contract.

*Second*, the R&R erred in concluding that an oral contract exists between Shoreline and SAFE. In 2017, SAFE took over booking seaplane for Shoreline. But the only obligation that the parties discussed at the time was the commission structure. Pursuant to New York law on novation, that means SAS's other alleged obligations to Shoreline did not transfer to SAFE.

Equally unavailing are Shoreline's claims grounded in alleged misappropriation, including its common law misappropriation, unfair competition, Defend Trade Secrets Act, and breach of fiduciary duty causes of action (the "Misappropriation Claims"). They fail for the most basic of reasons: Shoreline did nothing to protect the data it claims was misappropriated. For more than twenty-five years, SAS and SAFE collected data for the customers they booked for Shoreline and others, and over that lengthy period Shoreline never claimed the data belonged to it. Shoreline concocted for the purposes of this litigation a contention that SAS/SAFE's data is its property. But the law does not grant trade secret protection to information that a plaintiff openly shared without any safeguards, much less to information created and held by another party.

The Herbst Defendants are also entitled to summary judgment on Shoreline's belated attempt to recover lost profits. During discovery, Shoreline consistently asserted it was seeking lost revenue, a position it did not alter even after the Herbst Defendants pointed out that lost revenue is not cognizable as damages. Shoreline only pivoted to seeking lost profits in opposing summary judgment. At that time, Shoreline submitted a rudimentary calculation of lost profits that charged the Herbst Defendants with being responsible for its entire decline in profitability. Rule 37 and the case law interpreting it are clear that the proper remedy for this type of delay in updating damages is exclusion. And even if (contrary to fact) a lesser sanction was warranted, Shoreline cannot recover lost profits given that its calculation is entirely speculative.

For the reasons set forth below, Shoreline's other claims are belied by the evidentiary record. Accordingly, summary judgment should be granted in the Herbst Defendants' favor.

## RELEVANT BACKGROUND

On December 18, 2023, the parties each moved for summary judgment pursuant to the Court's scheduling orders. Dkt. Nos. 147-156.[1] The Herbst Defendants moved for summary judgment on all of Shoreline's causes of action. Dkt. Nos. 153 and 155. Shoreline sought summary judgment on a subset of its claims. Dkt. Nos. 154 and 156.

On August 12, 2024, the R&R was issued, granting and denying in part the Herbst Defendant's motion, while denying Shoreline's motion in its entirety. Dkt. No. 157. The R&R dismissed Shoreline's causes of actions for promissory estoppel, constructive trust, unjust enrichment, and piercing the corporate veil. *Id.* at 17-19, 28-30, 43-44. The R&R also dismissed Shoreline's breach of contract claim against defendant Cynthia Herbst and all of Shoreline's causes of action against defendant Ryan Pilla. *Id.* at 2, 27. The R&R denied summary judgment for the remaining causes of action.

Specifically, the R&R found that Shoreline formed an enforceable oral contract with SAS, which was later transferred to SAFE. *Id.* at 23-24. The R&R held that there was a genuine issue of material fact regarding the terms of the oral contract and whether SAS and SAFE breached the terms by not mailing out letters advertising coupon books. *Id.* at 25. The R&R, however, held that Shoreline did not provide any admissible evidence for its theory that the purported oral contract contained a provision requiring reasonable notice of termination. *Id.*

---

[1] The Herbst Defendants incorporate by reference the papers and related exhibits that they filed with the Court in support of their motion for summary judgment. "SOMF" refers to the Statement of Material Facts submitted by the Herbst Defendants in connection with their summary judgment motion. "Dkt. No." refers to all other summary judgment papers as filed on the docket and all emphasis has been added unless otherwise noted. The Herbst Defendants will submit to chambers courtesy copies of their summary judgment papers along with a courtesy copy of their objection to the R&R.

In addition, the R&R held that Shoreline held that there was a genuine issue of material fact regarding whether SAS and SAFE were required to book seaplane routes exclusively for Shoreline. *Id.* at 26. The R&R also held that there was a genuine issue of material regarding Shoreline's damages for commissions paid to SAFE for tickets purchased because it was unclear if SAFE "earned" the commissions. *Id.* at 26-27.

With respect to Shoreline's breach of fiduciary duty cause of action, the R&R held that a genuine issue of material fact exists regarding whether a fiduciary relationship existed between Shoreline and Herbst/SAFE. *Id.* at 31-32. The R&R further held that a genuine issue of material fact exists regarding whether Herbst/SAFE breached its fiduciary duty by selling a customer list to Blade Urban Air Mobility, Inc. a/k/a Fly Blade, Inc. ("Blade") that Shoreline alleges is its trade secret. *Id.* at 34-35.

As for Shoreline's misappropriation, violation of the Defend Trade Secrets Act, and unfair competition causes of action, the R&R held that genuine issues of material fact exists regarding: (1) whether the customer list that SAFE sold to Blade constitutes a trade secret; and (2) whether Herbst/SAFE had impermissibly used the customer list when SAFE partnered with Blade. *Id.* at 36-40. The R&R held for Shoreline's tortious interference with prospective business relations claim there is conflicting evidence regarding whether Herbst/SAFE tortiously interfered with Shoreline's relationships by directing unidentified customers to book flights with Blade after the termination of the parties' alleged oral contract. *Id.* at 41-43.

Lastly, the R&R denied without prejudice the Herbst Defendants' request to preclude Shoreline from pursuing lost profits as damages because the issue is typically addressed in a motion *in limine*. R&R at 19-21.

## **STANDARD OF REVIEW**

Any party may serve and file with the district court judge, written objections to a report

and recommendation of a magistrate judge on a dispositive matter. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). When reviewing a party's objection to a magistrate's report and recommendation, the district judge must conduct a "*de novo*" review of the report, the related motion papers, and the relevant record. *See* Fed. R. Civ. P. 72(b)(2); *Saniteq, LLC v. GE Infrastructure Sensing, Inc.*, 2018 WL 4357475, at *2-3 (E.D.N.Y. Sept. 13, 2018) (sustaining objection to summary judgment report and recommendation).

If upon *de novo* review, the district judge finds that the magistrate issued an erroneous ruling, the district judge may "reject, or modify any of the magistrate judge's findings or recommendations." *Saniteq, LLC*, 2018 WL 4357475, at *2. Here, the Court should decline to adopt portions of the R&R discussed below, because they are either inconsistent with settled law or based on an erroneous interpretation of certain critical facts. Accordingly, the Herbst Defendants respectfully request that the Court grant their motion for summary judgment in full.

## OBJECTION AND ARGUMENT

I.  **SUMMARY JUDGMENT SHOULD BE GRANTED DISMISSING SHORELINE'S BREACH OF CONTRACT CLAIM**

### A.  The Parties' Written Contract Extinguished the Oral Contract

It is undisputed that Shoreline, SAS, and the Town of East Hampton entered into an operating agreement in May 1994 (the "Operating Agreement") subsequent to the alleged 1993 oral contract, and that the Operating Agreement required SAS to provide a host of services to Shoreline, including "***ticketing, check-in***, baggage handling, and ***related customer services***." SOMF ¶ 25-27; R&R at 27; Dkt. No. 153-12. It is equally undisputed that the 1994 Operating Agreement contained a broad merger clause and a prohibition against exclusivity, and that its terms were reaffirmed in two other written contracts, the 1995 and 1996 Operating Agreements. Dkt. No. 153-12 p.2 ¶ 1; R&R at 27. The 1996 Operating Agreement specifically states that "[SAS]

shall continue to offer *flight reservations services* and ground handling . . . in accordance with the operating agreement in place between the parties." Dkt. No. 153-14 ¶ II.B.

Where the R&R erred in analyzing the written contract was by straining to find nuance where none exists. Specifically, the R&R reasoned that the Operating Agreement was intended to cover services at East Hampton Airport, while the oral contract was intended to apply to services that took place outside of the Airport. However, it would make no sense for sophisticated parties to enter into a written Operating Agreement, include a broad merger clause, and intentionally carve out a preexisting oral contract without adding any explicit language to that effect. Indeed, the R&R's conclusion is belied by the letter the Town of East Hampton sent to Shoreline enclosing the Operating Agreement, which shows that the Operating Agreement was intended to be the lone contract between Shoreline and SAS. Dkt. No. 154-24 at SAI000340) ("[SAS] is a party to this Agreement, *eliminating the need for a separate agreement between your company and [SAS]*.").

Moreover, the language that the R&R relied upon does not support its conclusion. The R&R cited to the fact that the Operating Agreement states that it "sets forth the standards and conditions for the safe and orderly conduct of [Shoreline's] air carrier operations to and from the Airport," which the R&R contrasted with "Herbst's, SAS's or SAFE's booking activities prior to a passenger's arrival at the Airport." R&R at 28. However, if the parties had intended to draw this type of distinction, they would have done using explicit language. For example, the parties could have limited the Operating Agreement to services SAS performed for Shoreline "at the Airport," as opposed to using the broader "to and from the Airport," or excluded booking activities from the Agreement's scope, as opposed to broadly including "related customer services."

To the extent there was any uncertainty as to what the parties intended, it was removed by the 1996 Operating Agreement. That Agreement specifically indicates that the Operating Agreements cover the "flight reservation services" SAS was providing to Shoreline. There is no

other way to interpret the phrase "flight reservation services" other than it being synonymous with the "booking activities" that Shoreline claims is the subject of the oral contract. The Court should apply the plain and ordinary meaning of that phrase and find that the Operating Agreements overlap with the putative oral contract.

The case law referenced by the R&R also demonstrates why its conclusion is misguided. It relies upon *Abuelhija v. Chappelle,* 2009 WL 1883787, at *6 (S.D.N.Y. June 29, 2009), for the proposition that a merger clause will not supplant a pre-existing contract where the contracts cover different subject matters. However, *Abuelhija* concerned two written contracts; it makes sense in that situation to find that a merger clause will not automatically extinguish the earlier contract. But where, as here, parties have a pre-existing oral contract and enter into a written agreement with a merger clause, the written contract extinguishes the oral contract. *See Sengillo v. Valeo Elec. Sys., Inc.,* 328 F. App'x 39, 42 (2d Cir. 2009) ("any claim based on an alleged oral contract . . . is barred by the merger clauses contained in the [written agreement]"); *Integra FX3X Fund, L.P. v. Deutsche Bank, AG,* 2016 WL 1169514, at *3 (S.D.N.Y. Mar. 22, 2016) (merger clause "requires dismissal of any claim founded on [an] earlier alleged oral agreement between the parties").

Consequently, the R&R should have found that the purported oral contract was extinguished by the Operating Agreements. The purported oral contract and the Operating Agreements both concern SAS booking flights for Shoreline but had materially different terms regarding exclusivity. Because Shoreline does not claim the Operating Agreements were breached, its contract claim must be dismissed.

### B. SAFE Never Agreed to Assume SAS's Obligations to Shoreline

The basic facts related to the purported oral contract are evident and uncontested. The oral contract was discussed during a conversation between John Kelly, the principal of Shoreline who

is now deceased, and Herbst, who was booking flights for SAS, an entity owned by her then husband. *See* R&R at 23-24. SAFE was not a party to that contract.

In 2017, following Herbst's divorce, SAFE began booking flights for Shoreline. In connection with that development, it is undisputed that Kelly and Herbst never discussed, much less agreed that SAFE would assume the array of obligations Shoreline claims are part of the oral contract. All that was discussed in 2018 was the commission structure that Shoreline would use to compensate SAFE. R&R at 8; SOMF ¶¶ 49-57.

According to the R&R, a legal transfer of obligations from SAS to SAFE took place, which is referred to as a novation, because the "[t]he record establishes that after SAFE took over booking for Shoreline, SAFE continued to book passengers and charge Shoreline commissions." *Id*. at 24. In other words, the R&R assumed that a transfer of SAS's alleged obligations to Shoreline could occur without any specific agreement by SAFE to take on those obligations. That assumption was error because it is inconsistent with New York's "stringent standard for novation." *Wang v. Chen*, 1992 WL 7840, at *6 (S.D.N.Y. Jan. 10, 1992).

A novation is the substitution of a new obligation for an old one, with the intent of extinguishing the old one, often involving the substitution of a third party for one of the original parties to the contract. *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 736 F. Supp. 1281, 1284 (S.D.N.Y. 1990), *aff'd*, 925 F.2d 566 (2d Cir. 1991). The "elements of a novation are: (1) a previously valid obligation; (2) an agreement of all parties to the new contract; (3) extinguishment of the old contract; and (4) a valid new contract supported by consideration." *Wong v. Michael Kennedy, P.C.*, 853 F. Supp. 73, 81 (E.D.N.Y. 1994). In addition to those elements, a "clear and definite intention" to novate is required to effectuate a valid novation. *Trans-Orient Marine Corp.*, 736 F. Supp. at 1283 (quoting Corbin on Contracts: "[n]o one will be held to have surrendered or modified any of his contract rights unless he is shown to have assented thereto in a

manner that satisfies the requirements of a valid contract"); *see also Yahaya v. Hua,* 87 Civ. 7309, 1989 WL 214481 at *4 (S.D.N.Y. Nov.28, 1989) (requiring a "clear and definite intention").

While a novation can be implied from the parties' conduct, there is a particularly "high hurdle" for demonstrating an implied novation, which requires the existence of facts showing an "unequivocal intention" to effectuate a novation. *Wistron Neweb Corp. v. Genesis Networks Telecom Servs., LLC*, 2023 WL 4493542, at *16-18 (S.D.N.Y. July 12, 2023).

Shoreline does not argue that there was an express novation whereby SAFE expressly agreed with Shoreline to assume SAS's contractual and fiduciary obligations to Shoreline. Rather, Shoreline claims there was an implied novation. Dkt. No. 154-1 at 9. But the evidentiary record does not support that contention. SAFE's conduct does not demonstrate that it intended to accept SAS's obligations to Shoreline that are the basis for the legal claims at issue. Although SAFE agreed to book SAS's customers on Shoreline's seaplanes in exchange for commissions, that conduct, at best, demonstrates the parties' consent to a straightforward booking-for-commissions agreement. It does not show an "unequivocal intention" to assume exclusivity, fiduciary, or agency to Shoreline, which is what would be required for a novation of those duties. *See, e.g.*, *Wistron*, 2023 WL 4493542, at *19 (on summary judgment, rejecting argument there was an implied novation); *Wang v. Chen*, 1992 WL 7840, at *6 (rejecting argument that an implied novation had occurred where the conduct was "also consistent" with a lack of novation).

Because the factual predicates for an implied novation are not present in the evidentiary record, the breach of contract claim against SAFE should be dismissed.

## II.    SUMMARY JUDGMENT SHOULD BE GRANTED DISMISSING SHORELINE'S MISAPPROPRIATION CLAIMS

The R&R held that there was genuine issue of fact regarding whether Herbst/SAFE misappropriated a trade secret (confidential customer data) supposedly belonging to Shoreline.

R&R at 30-41. That conclusion appears to have been based on a misunderstanding of Shoreline's novel theory of misappropriation. What Shoreline claims was misappropriated is data that SAS/SAFE created and held, and which related to all of SAS/SAFE's clients, including those who flew on helicopters or fixed wing airplanes. By contrast, the evidence that the R&R found creates a disputed issue of fact is customer information that Shoreline sporadically collected on its own. Dkt. No. 154-63 (spreadsheet Shoreline produced). It is immaterial whether Shoreline protected its own customer data. The Misappropriation Claims should be dismissed because SAS/SAFE's customer data does not qualify as Shoreline's trade secret.

The law is settled with respect to the legal requirements for the existence of a trade secret, which is an element of the Misappropriation Claims. In New York, courts use a multi-factor test to determine if information constitutes a trade secret. *Waterville Inv., Inc. v. Homeland Sec. Network (NV Corp.)*, 2010 WL 2695287, at *3 (E.D.N.Y. July 2, 2010). The most important consideration, however, is "whether the information was secret." *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 298 (2d Cir. 1986). A plaintiff must demonstrate that it took "substantial measures to protect the secret nature of its information." *Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 267 (S.D.N.Y. 2014), *aff'd* 610 F. App'x 69 (2d Cir. 2015). "[W]here there is no genuine dispute that the party claiming misappropriation 'disclose[d] [its] trade secret to others who are under no obligation to protect the confidentiality of the information . . . [its] property right is extinguished" and summary judgment is warranted.'" *Structured Cap. Sols., LLC v. Commerzbank AG*, 177 F. Supp. 3d 816, 835 (S.D.N.Y. 2016) (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984)).

Here, the lack of any genuine trade secret is even clearer than in a situation where a party claiming misappropriation disclosed the information without protection because Shoreline never possessed the purported trade secrets in the first place. The only information Shoreline has

identified as trade secrets is data created and held by SAS and SAFE. Dkt. No. 153-7 at 230:6-19 (misappropriated information was "[Ms. Herbst's] list"). It was also a stranger to this data. The evidentiary records shows that Shoreline never sought access to this data. SOMF ¶ 22.[2] Shoreline also failed to inquire into how SAS or SAFE collected, stored, or safeguarded this customer data. [3] *Id*. ¶ 23. And it neglected to put into place an agreement with SAS or SAFE that would require the customer information to be protected in some manner. *Id*. ¶¶ 17-20. Shoreline cannot claim that it owns SAS/SAFE's data in such circumstances.[4]

Beyond Shoreline's dearth of knowledge as to how the claimed trade secrets were collected and protected, Shoreline's conduct demonstrates that it has no rights to SAS/SAFE's customer data. Shoreline's corporate witness admitted that Mr. Kelly and Ms. Herbst did not discuss ownership of customer data when the putative oral contract was formed. Dkt. No. 153-7 at 149:8-14 ("Q: So if I understand correctly, when Ms. Herbst and Mr. Kelly had a conversation about

---

[2] On this point, Shoreline's corporate representative testified as follows: "Q: My questions is have you ever viewed – and by you I mean Shoreline ever viewed the customer data held on Ms. Herbst's computer system? A: I can only speak for myself, and I have not. Q: To your knowledge has anyone at Shoreline Aviation reviewed the customer information on Ms. Herbst's computer system? A: I really don't know." Dkt. No. 153-7 at 43:3-15.

[3] Shoreline's corporate representative lacked any knowledge as to how SAS/SAFE held the information that Shoreline claims is its trade secret. *See* Dkt. No. 153-7 at 43:21-25 ("Q: Do you know which database [Ms. Herbst] uses to store this information? . . . . A: I really don't know."); *id.* at 44:2-8 ("Q: Do you know if the database is password protected? . . . . A: I do not know for sure."); *id.* at 44:15-21 ("Q: Besides Ms. Herbst, do you know if anyone else has access to that customer database? . . . A: At -- at this time, I don't know.").

[4] *See Big Vision Priv.*, 1 F. Supp. 3d at 267 (holding that plaintiff failed to identify trade secret because information belonged to another company and information belonged to another company and "there was virtually no contemporaneous documentary or testimonial evidence . . . indicating that [plaintiff] took any steps to ensure the confidentiality of the information . . ."); *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 522 (S.D.N.Y. 2017) (holding that plaintiff failed to protect purported trade secret it disclosed to customers without protection of a confidentiality agreement).

working together, they didn't discuss customer data, right? A: No, not that I'm aware of."). Indeed, Shoreline has not identified a single written communication between Shoreline and SAS/SAFE in which Shoreline discusses the data it claims was misappropriated with one exception. In 2018, Kelly attempted to buy SAFE's customer data, which further belies Shoreline's claim to own the data. Dkt. No. 153-15 at SAI000041; Dkt. No. 153-6 at 177:20- 178:24; Dkt. No. 153-7 at 68:7-69:13. People do not typically attempt to purchase property they genuinely own.

In response to the voluminous evidence demonstrating that Shoreline had no legal interest in SAS/SAFE's customer data, the R&R pointed to two pieces of evidence—neither of which concerns the customer data that was allegedly misappropriated. The R&R cited the affidavit of Joan Gitlin, a flight dispatcher and Shoreline employee, who stated in conclusory fashion "that access to Shoreline's customer base was restricted and password-protected." R&R at 34, and that Herbst and SAFE were given access to "Shoreline's customer information, proprietary pricing information, and confidential business practices . . . ." R&R at 37-38. However, even if Shoreline had password protection on its own computer system, that has no bearing on whether Shoreline can claims SAS/SAFE's customer data is a protectable trade secret. *See Insulet Corp. v. EOFlow, Co.*, 104 F. 4th 873, 881 (Fed. Cir. 2024) (the DTSA requires a showing of reasonable measures "to protect [the] specific information alleged to be trade secret"); *see also Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 266 (S.D.N.Y. 2021) (granting summary judgment where plaintiff had "not proffered evidence from which a reasonable jury could find that they took appropriate steps to protect its alleged [trade secrets]").[5]

---

[5] The affidavit is also unsupported by any facts beyond those assertions, including an explanation as to how a flight dispatcher would have relevant knowledge of how Shoreline protects its customer information. It provides no basis to avoid summary judgment. *See Christiana Bank & Tr. Co. v. Dalton*, 2009 WL 4016507, at *4 (E.D.N.Y. Nov. 17, 2009) ("[S]elf-serving, factually unsupported affidavits . . . generally fail to raise triable issues of fact).

The R&R also relied upon is an email where the content differs from what it claims. In the email, Herbst states that the "passenger manifest" for a particular flight "is not public," and it would violate "aviation regulations as well as privacy laws" for Herbst to provide the manifest to anyone other than Shoreline, as the operator of the flight, the FAA, or the TSA. *See* Dkt. No. 154-54. Whether a particular flight manifest is protected by federal regulations plainly has nothing to do with SAS/SAFE's customer data.[6] However, the R&R credited this email as indicating Herbst told someone "that Shoreline's customer information was 'not public' and that Herbst and SAS took 'very seriously' the confidentiality of Shoreline's customer list." R&R at 38. A review of the email will show that the R&R's description is simply inaccurate.

In sum, because Shoreline cannot claim that the SAS/SAFE customer data qualifies as ***its trade secrets***, the Misappropriation Claims should be dismissed. *See Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 198 (2d Cir. 2001) (explaining that "absent some appropriation of an idea or knowledge in which [plaintiff] had a property interest or a contractual arrangement creating such an interest, we see no . . . impropriety here").

## III.    SUMMARY JUDGMENT SHOULD BE GRANTED DISMISSING SHORELINE'S CLAIMS FOR BREACH OF FIDUCIARY DUTY/VIOLATION OF FAITHLESS SERVANT DOCTRINE

Although the R&R held that disputed issues of fact existed regarding Shoreline's breach of fiduciary duty and faithless servant claims, that finding was predicated on the existence of a relationship of trust that went beyond a booking for commissions agreement between Shoreline and SAFE. For the reasons discussed above in the breach of contract section and in the R&R's veil

---

[6] Although the R&R further noted that Shoreline paid some amount of money in advertising, *see* R&R at 38, it does not explain what that has to do with Shoreline's failure to protect, monitor, or view the SAS/SAFE customer data, all of which are required for Shoreline to show that the customer is its trade secret.

piercing analysis, the evidentiary record demonstrates that neither Herbst nor SAFE agreed to assume any responsibilities that went beyond an arm's length business relationship.

Under New York law, "control alone is insufficient to establish the existence of an agency relationship"; rather, there must also be "mutual consent" that the agent is acting for the principle's benefit. *In re Roman Cath. Diocese of Rockville Ctr., New York*, 651 B.R. 399, 428 (Bankr. S.D.N.Y. 2023) (citation omitted). Here, there was no such consent because (1) it is undisputed that the only obligations Shoreline and SAFE discussed when SAFE starting booking flights was the form of a commission structure (SOMF ¶¶ 49-57), and thus no valid novation took place which would have transferred fiduciary or agency-like duties to SAFE; and (2) the Operating Agreement supplanted the alleged oral contract, and it contains no agreement to assume duties beyond standard contractual ones. Shoreline has conceded as much with respect to the Operating Agreement. Dkt. No. 153-7 at 162:9- 15 ("Q: So [the Operating Agreement] does not set forth that Ms. Herbst or SAS have any fiduciary obligations to Shoreline, correct? A: I'm not a lawyer, but I would say that's – that's the case.").

The R&R does not identify a single piece of evidence that suggests SAFE possessed any other duties beyond booking flights between 2017, when it first started working with Shoreline, and 2018, when the parties' relationship terminated. In fact, Shoreline's principal noted in describing the relationship when it ended, "[t]his was merely a booking arrangement . . . ." Dkt. No. 153-11 at SAI0000255. Because the evidence shows there was no consent to the formation of a fiduciary or agency relationship, the breach of fiduciary duty and faithless servant claims should be dismissed.[7]

---

[7] *See, e.g.*, *Blanton v. Educ. Affiliates, Inc.*, 2022 WL 1505124, at *5 (2d Cir. May 12, 2022) (upholding grant of summary judgment where relationship was commercial in nature irrespective of the "longevity of that working relationship"); *New York Racing Ass'n, Inc. v. Meganews, Inc.*,

## IV.    SUMMARY JUDGMENT SHOULD BE GRANTED DISMISSING SHORELINE'S TORTIOUS INTERFERENCE CLAIM

Shoreline has two theories of tortious interference, one of which should be dismissed because Shoreline abandoned it, and the other which should be dismissed because Shoreline is unable to proffer evidence of causation.

Originally, Shoreline alleged that the filing of a lawsuit by Herbst was a form of tortious interference, which supposedly caused it millions in damages because it was unable to take advantage of an Employee Stock Ownership Plan ("ESOP"). In their moving papers, the Herbst Defendants explained that Herbst filed the lawsuit in question based on the advice of her attorney at the time (Dkt. No. 153-1 at 25), and that a lawsuit brought in good faith does not constitute tortious conduct because the commencement of litigation is a protected activity under the *Noerr-Pennington* doctrine and New York law. Dkt. No. 153-1 at 25 (collecting authorities). Shoreline neglected to respond beyond indicating in a footnote that it was abandoning the claim. (Dkt. No. 154-1 at 22, n. 10.)

While the R&R dismissed Shoreline's constructive trust claim on abandonment grounds, the R&R did not do the same for the tortious interference claim related to the ESOP. *See* R&R at 44 (summary judgment was "appropriate" because "Plaintiff has abandoned this claim"). That was error because Shoreline equally abandoned its ESOP theory of tortious interference.

Shoreline's other theory of tortious interference is that it owns the relationships with the customers that SAFE booked, and thus SAFE purportedly tortiously interfered with those relationships by providing its own customer information to Blade.  Even putting aside the fact that Shoreline has no protectable interest in customer data owned by SAFE, as explained above, this

---

2000 WL 307378, at *6 (E.D.N.Y. Mar. 21, 2000) (dismissing breach of fiduciary duty claim where defendant had "contractual status as a service providing agent").

theory still fails. The R&R overlooked the fact that a tortious interference claim should be dismissed where, as here, a plaintiff is unable to proffer evidence of causation.

"In essence, a claim for tortious interference with prospective business relations lies when 'the third party would have entered into or extended a contractual relationship with plaintiff **but for** the intentional and wrongful acts of the defendant.'" *Gleason Works v. Oerlikon Geartec, AG*, 141 F. Supp. 2d 334, 342 (W.D.N.Y. 2001) ( quoting *M.J. & K. Co., Inc. v. Matthew Bender and Co., Inc.*, 220 A.D.2d 488, 490 (App. Div. 1995)). Consistent with that purpose, a plaintiff is required to prove the existence of "***specific business relationships*** that [the plaintiff] would have obtained **but for** defendants' interference." *In Touch Concepts, Inc. v. Cellco P'ship*, 949 F. Supp. 2d 447, 478 (S.D.N.Y. 2013), *aff'd*, 788 F.3d 98 (2d Cir. 2015).

Further, at the summary judgment stage a plaintiff must offer more than "suspicions" that defendant's conduct injured a business relationship. *See Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000). The failure to link any alleged misconduct to a lost business relationship with admissible evidence will support dismissal of a tortious interference claim. *See e.g.*, *Gleason Works*, 141 F. Supp. 2d at 342 (dismissing claim where plaintiff "never links any particular damages" to defendant); *Learning Annex Holdings, LLC v. Gittelman*, 48 A.D.3d 211, 211 (App. Div. 2008) ("plaintiff has failed to identify any specific customers it would have obtained but for defendant's actions").

The only evidence that Shoreline has attempted to proffer is a list of 160 persons who it claims flew on Blade (based on Blade flight manifests) and at one time previously supposedly flew on a Shoreline flight. But Shoreline has no information establishing why those people decided to fly with Blade; it is merely assuming causation. Dkt. No. 153-7 at 285:16-20 ("Q: You are assuming that because these persons stopped booking with you, that they did it because of actions by Ms. Herbst, correct? A: That is correct."); *see also id.*, 279:8-280:9; 283:8-11; 292:19-25. In so

16

doing, Shoreline disregards the myriad alternative reasons why such customers may have chosen to fly with Blade instead of Shoreline, including: (1) the novelty and convenience of Blade's smartphone app, which Shoreline lacked (Dkt. No. 155-6 at 276:6-8); (2) Blade's heavy advertising (*id.* at 276:2-5); (3) Blade's customer amenities, such as arranging for a Porsche to drive customers who missed a flight due to weather and its cocktail lounge (*id.* at 276:22-24 ("Blade is an app, so they had all sorts of money to spend on Porsches and we did not"); 277:4-25 ("We didn't serve cocktails to people that were about to get on a seaplane")); and (4) Shoreline's own allegations of "sabotage" by Blade (*id.* at 289: 5-25).

The R&R stated that an issue of fact exists because there is evidence suggesting that the SAFE Defendants delayed booking Shoreline flights in April and May 2018, and that in May 2018 Herbst discussed strategies to encourage customers to fly with Blade. R&R at 42-43. That was an error because no evidence exists linking that purported misconduct with a lost business relationship; essentially, the R&R read out the causation requirement. Because that conclusion is at odds with binding precedent, the tortious interference claim should be dismissed. *See Nadel*, 208 F.3d 368 ("suspicions . . . cannot suffice to support a claim for tortious interference").

## V.    SUMMARY JUDMENT SHOULD BE GRANTED AS TO LOST PROFITS

In their moving papers, the Herbst Defendants detailed the flaws with the three categories of damages that Shoreline had previously identified, including a claim its lost revenue for 2018. Dkt. No. 153-1 at 27-30. Shoreline failed to address those flaws in its opposition papers beyond attempting to pivot to a lost profits category of damages. Dkt. No. 155 at 20-23. Accordingly, the R&R properly recognized that Shoreline has abandoned its alleged damages theories other than (1) lost profits and (2) $65,522 in supposedly unearned commissions. R&R at 14.

The time has come for summary judgment on the first of the two remaining categories of damages. The issue is ripe for decision because Shoreline has failed to explain why it waited ***more***

*than three years* after it commenced this action (Dkt. No. 1), and ***eight months*** after it certified

that discovery was complete (Dkt. No. 143), to assert for the very first time that it is entitled to lost

profits.[8] Consistent with Shoreline's Hail Mary attempt to shift from lost revenue to lost profits as

a category of damages, it has provided no methodological basis for its calculation of lost profits.

As explained below, that provides an independent reason for dismissal.

### A.  Shoreline Should be Precluded from Seeking Lost Profits

While the R&R noted that the issue of whether evidence should be excluded is typically

decided in a motion *in limine* (R&R, 21), there is no prohibition on it being decided as part of a

motion for summary judgment. In fact, courts have specifically rejected attempts by plaintiffs to

avoid summary judgment by advancing new damages theories that were not disclosed prior to the

close of discovery. *See, e.g.*, *N. Shipping Funds I, L.L.C. v. Icon Cap. Corp.*, 998 F. Supp. 2d 301,

337 (S.D.N.Y. 2014) (dismissing claim on summary judgment because "it is too late for [Plaintiff]

to seek damages based on theories or calculations that have not previously been raised and were

not subject to discovery"); *Gould Paper Corp. v. Madisen Corp.*, 614 F. Supp. 2d 485, 490

(S.D.N.Y. 2009) (limiting plaintiff to nominal damages). The same outcome is appropriate here.

The Federal Rules of Civil Procedure are clear as to the obligations on a party with respect

to setting forth its calculation of damages and updating its calculation of damages; there is no

ambiguity. R&R at 20 (citing Fed R. Civ. P. 26(a) and 26(e)). It is indisputable that Shoreline

violated those Rules because it failed to identify lost profits as a category of damages until its

---

[8] While the R&R stated that "Plaintiff has not had an opportunity to respond" to the issue of why it delayed in identifying lost profits as a category of damages, *id.*, at 21, the fact is that Shoreline did have such an opportunity in its Reply Memorandum in Support of Its Cross Motion for Partial Summary Judgment. Nevertheless, Shoreline still could not explain why it delayed for years to seek lost profits. *See* Dkt. No. 156.

opposition to summary judgment.[9] *See Design Strategy, Inc. v. Davis*, 469 F.3d 284, 297 (2d Cir. 2006) (upholding decision to limit plaintiff to nominal damages where it could not "explain[] why it omitted 'lost profits' as a category of damages in its Initial Disclosure").

In two complaints, two sets of interrogatory responses and its initial disclosures Shoreline stated it is only pursuing "lost revenue" as damages,[10] and its 30(b)(6) witness confirmed it is "seeking loss of revenue" in this action. Dkt. No. 155-6 at 308:2-16. Shoreline also attempted to prove its entitlement to lost revenue by producing a declaration by its accountant summarizing its allegedly lost revenue.[11] Shoreline never altered its theory of damages even after the Herbst Defendants brought to its attention that lost revenue is not a cognizable harm. On April 14, 2022, the Herbst Defendants sought the Court's leave to move for summary judgment, and they identified as one of the bases the fact that Shoreline was pursuing loss of revenue, not lost profits, and the former is not recoverable as damages. Dkt. No. 107 at 3. Instead of providing a computation of lost profits and updating its discovery, Shoreline responded by representing that Defendants' letter was "deliberately misleading and their motion is certain to fail." Dkt. No. 108 at 1.

Rule 37(c)(1) provides that a failure to comply with Rule 26 requires preclusion of the evidence at issue "unless the failure was substantially justified or is harmless." *Id.* There is a four-part test for determining if evidence should be excluded: (1) the party's explanation for the failure

---

[9] *See also Reed Const. Data., Inc. v. McGraw–Hill Cos., Inc.*, 2013 WL 1608489, at *4 (S.D.N.Y. Apr. 15, 2013) (precluding plaintiff from seeking damages under belatedly disclosed damages theories); *Silicon Knights, Inc. v. Epic Games, Inc.*, 2012 WL 1596722, at *4 (E.D.N.C. May 7, 2012) (plaintiff limited to nominal damages for failure to provide computation of damages in its initial disclosures); *24/7 Records, Inc. v. Sony Music Entm't, Inc.,* 566 F.Supp.2d 305, 318 (S.D.N.Y.2008) (theory of damages precluded by failure to make initial disclosure).

[10] Dkt. Nos. 1 and 34 (Complaint and Amended Complaint); Dkt. Nos. 153-10; Dkt. No. 155-5 and 6 (Discovery Responses).

[11] Dkt. No. 154-64 at ¶¶ 17-20.

to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness [es]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance. *Design Strategy*, 469 F.3d at 297. All of those factors weigh in favor of preclusion on these facts.

*First*, Shoreline has not explained why it failed to identify lost profits as a category of damages earlier. Instead, Shoreline claims that the Herbst Defendants should have intuited it was seeking lost profits (not lost revenue) based on the testimony of Shoreline's accountant, who testified about Shoreline's expenses. Dkt. No. 156 at 10-15. That contention is easily disposed of. The deposition of Shoreline's accountant was permitted by court order to take place after the close of fact discovery, and she was briefly questioned about the authenticity of certain profit and loss statements by Shoreline's counsel during a friendly cross-examination. Dkt. No. 154-218 at 160-163. When subsequently questioned by counsel for the Herbst Defendants about the bases for the information in those statements, she professed ignorance. Dkt. No. 155-8 at 39:21-40:5, 50:3-59:25; 165:19-194:11. That limited testimony could not have put the Herbst Defendants on notice that Shoreline was shifting its entire damages theory after the close of fact discovery. That is particularly true since the Herbst Defendants had previously informed Shoreline that lost revenue is not a cognizable form of damages, and the latter had responded with invective. Dkt. No. 107 at 3; Dkt. No. 108 at 1.

In any event, parties who have been caught violating Rule 26 typically raise a form of Shoreline's argument. Courts consistently reject the argument because the existence of damages evidence is not substitute for a party's failure to comply with its discovery obligations.[12]

---

[12] *See, e.g.*, *Design Strategy*, 469 F.3d at 295 ("[B]y its very terms, Rule 26(a) requires . . . a 'computation,' supported by documents."); *Pittsfield Dev., LLC v. City of Chicago*, 2021 WL 8314423, at *10 (N.D. Ill. Nov. 15, 2021) (rejecting argument because "it was not the [defendant's] burden to pursue a damages computation via deposition testimony"); *Silicon Knights*, 2012 WL

*Second*, to the extent lost profits was important to Shoreline, it had ample time to fulfill its discovery obligations. Having chosen not to do so, Shoreline cannot complain that it would be harmed from the exclusion of lost profits as a category of damages. *See Pike Co., Inc. v. Universal Concrete Prod., Inc.*, 2022 WL 2301780, at *2 (W.D.N.Y. June 27, 2022) ("[new category of damages], could not have been *that important* if it was not until almost five years into the litigation that [plaintiff] identified the damages category for the first time"); *Spotnana,* 2010 WL 3341837, at *2 (S.D.N.Y. Aug. 17, 2010) (rejecting argument that plaintiff would be harmed by exclusion of damages evidence where it could not explain the delay).

*Third*, the prejudice to the Herbst Defendants "in having to defend against a category of damages that it was never able to explore in discovery is self-evident." *Pike Co.*, 2022 WL 2301780, at *2; *see also Design Strategy*, 469 F.3d 284 at 297 (prejudice from having to reopen discovery would be "severe"). As one court explained in similar circumstances:

> The Court finds that [plaintiff's] belated damages computation and failure to sufficiently identify the purportedly supporting documentation inflict undue prejudice and surprise upon [defendant]. [Defendant] has not had a fair opportunity to investigate and attempt to counter . . . Even if reopening discovery to allow the [defendant] to depose [plaintiff's expert]] regarding his damages calculations could enable the [defendant] to get to the bottom of [plaintiff's] belated damages computation, [defendant] would need to expend significant resources to defend against these computations, including seeking leave to reopen discovery.

*Pittsfield Dev.*, 2021 WL 8314423, at *7. If anything, the prejudice to the Herbst Defendants is even greater than in that case because they incurred significant expenses in countering damages theories that Shoreline later abandoned.

---

1596722, at *5 ("making witnesses available is not a substitute for the computation and analysis that Rule 26(a)(1)(A)(iii) requires"); *Spotnana, Inc. v. Am. Talent Agency, Inc.*, 2010 WL 3341837, at *2 (S.D.N.Y. Aug. 17, 2010) (rejecting argument that production of documents satisfied plaintiff's disclosure obligations under Rule 26).

*Fourth*, it is far too late to reopen fact and expert discovery given that this case is more than four years old, and Shoreline has provided no justification for its delay. [13]

*Finally*, Shoreline should be required to pay the Herbst Defendants' legal fees in connection with seeking preclusion. This is a standard remedy in such circumstances. *See Murray v. Town of Stratford*, 2014 WL 3700982, at *12 (D. Conn. July 25, 2014) ("Even where preclusion is not ordered under Rule 37, it is generally appropriate, at a minimum, to require a party who has not complied with its discovery obligations to pay the reasonable fees and costs incurred by the moving party in seeking disclosure and/or in seeking discovery sanctions.") (citation omitted).

Shoreline had ample opportunities to pursue lost profits during discovery. Having failed to even raise lost profits as a category of damages until the middle of summary judgment briefing, it should not be permitted to use these newfound damages to avoid summary judgment.

## B. Shoreline's Calculation of Lost Profits Is Entirely Speculative

Even if Shoreline were permitted to belatedly pursue lost profits, the Herbst Defendants would still be entitled to summary judgment because its so-called calculation is pure speculation. Shoreline calculated lost profits by taking its 2017 profits and subtracting its 2018 profits, thereby assigning blame to Defendants for every customer who did not book and every additional cost that was incurred. Shoreline also claims it suffered the same lost profits for each of its claims even though they have different factual predicates and Shoreline can only recover lost profits that was

---

[13] *See Pike Co.*, 2022 WL 2301780, at *2 (excluding evidence where case was more than four years old); *Kodak Graphic Commc'ns Canada Co. v. E.I. Du Pont de Nemours & Co.*, 2013 WL 5739041, at *6 (W.D.N.Y. Oct. 22, 2013) ("reopening discovery for purposes of investigating these additional damages would result in further substantial delays in the resolution of this case and impose additional costs").

proximately caused by the particular misconduct.[14] In short, no discernible methodology or logic underlies Shoreline's calculation of lost profits.

The R&R erred by ignoring this critical issue altogether. As a matter of law, Shoreline's "'simple arithmetic' calculation is inadequate as a measure of damages" because it disregards an array of complicating issues that should be part of a damages analysis. *See Design Strategy*, 469 F.3d at 295; *see also Atias v. Sedrish*, 133 F. App'x 759, 760 (2d Cir. 2005) (upholding rejection of lost profits based on "suspect assumptions"). Specifically, it does not take into consideration *alternative reasons* for why a person who flew on a Shoreline seaplane to the Hamptons in 2017 might forego going to the Hamptons in 2018, might book on another airline or helicopter provider, or might drive to the Hamptons. As noted above, the record shows that alternative causes abound for the limited issue of why potential customers chose Blade over Shoreline.

Nor does Shoreline's "simple arithmetic" factor in *alternative reasons* for Shoreline's increased costs in 2018. For example, there is $189,605.87 in costs Shoreline incurred in taking over flight bookings from SAFE that were originally part of its alleged damages but it later abandoned. Dkt. No. 155 at 21-22. If an expert had correctly calculated lost profits here, as is typically done, that amount would have been excluded. But Shoreline did not even attempt to exclude costs that are unrelated to the claims still in the case.

In addressing the Herbest Defendants' argument that its damages are speculative, Shoreline declined to defend its methodology (or lack thereof) as being reasonably certain. Instead, Shoreline claimed that it had incurred general damages, as distinct from consequential damages, which it asserts are subject to a lower level of proof. Dkt. No. 156 at 11-15. Not so. As set forth in the

---

[14] For example, a plaintiff's lost profits damages for misappropriation and unfair competition are limited to customers who were "actually divert[ed]" by the defendant's alleged misconduct. *See Allan Dampf, P.C. v. Bloom*, 127 A.D.2d 719, 719 (App. Div. 1987).

authority relied on by Shoreline, "when the non-breaching party seeks only to recover money that the ***breaching party agreed to pay under the contract***, the damages sought are general damages." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007) (emphasis added). Shoreline is attempting to recover the funds that unidentified customers would have paid, not funds that the Herbst Defendants would have paid under the purported oral contract. That means Shoreline's alleged breach of contract damages are consequential, not general.[15]

A party seeking consequential damages "is required to demonstrate 'with certainty that such damages have been caused by the breach,' and that the alleged loss is capable of proof with reasonable certainty." *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 322 (S.D.N.Y. 2009). Where a plaintiff is unable to demonstrate lost profits with reasonable certainty, summary judgment is appropriate. *See, e.g.*, *Lightbox Ventures, LLC v. 3rd Home Ltd.*, 2017 WL 5312187, at *13 (S.D.N.Y. Nov. 13, 2017); *Ritani, LLC v. Aghjayan*, 970 F. Supp. 2d 232, 253 (S.D.N.Y. 2013) (lost profits for breach of fiduciary duty must be proven with "reasonable certainty").

Shoreline's "simple arithmetic" calculation of damages does not satisfy the reasonably certain test because it provides no methodological way to allocate lost profits that were caused by the alleged misconduct from other causes.[16] The Herbst Defendants are entitled to summary

---

[15] *See MVP Health Plan, Inc. v. OptumInsight, Inc.*, 765 F. App'x 615, 618 (2d Cir. 2019) ("[Plaintiff's] lost revenues are not general damages because the losses claimed do not flow naturally from [defendant's] breach, but, rather, flow from [plaintiff's] contracts with its insured members."); *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 322 (S.D.N.Y. 2009) (distinguishing *Tractebel* on the basis that the plaintiff "is seeking to recover lost profits from lost sales to third-parties that are not governed [by] the [contract]"), *aff'd*, 976 F.3d 239 (2d Cir. 2020).

[16] The decision relied upon by Shoreline is inapposite because in that case the plaintiff's damages was supported by an expert witness who calculated a baseline for customer attrition that he compared to the customer attrition following defendant's misconduct. *See Process Am., Inc. v.*

judgment on Shoreline's claims seeking lost profits because it has no right to damages that "rest[] on a host of speculative assumptions" about why its profits were lower in 2018 than in 2017. *See Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 405 (1993).

## **CONCLUSION**

For the foregoing reasons and those stated in the Herbst Defendants' summary judgment moving and reply briefs, the Herbst Defendants respectfully request that its objection to the R&R be sustained; and that the Court grant the Herbst Defendants' motion for summary judgment dismissing Shoreline's amended complaint in its entirety**.**

Dated: New York, New York
      September 17, 2024

GLENN AGRE BERGMAN & FUENTES LLP

By: */s/ Lindsey (Reid) Skibell*
Lindsey Reid Skibell, Esq.
Jewel K. Tewiah, Esq.
1185 Avenue of the Americas
New York, New York 10036
rskibell@glennagre.com
jtewiah@glennagre.com
(212) 970-1600

*Attorneys for Defendants*

---

*Cynergy Holdings, LLC*, 839 F.3d 125, 142 (2d Cir. 2016). Shoreline has neither offered expert evidence nor made an attempt to rule out alternative causes.