**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Shoreline Aviation, Inc.,<br><br>                            Plaintiff,<br><br>          -v-<br><br>Sound Aircraft Flight Enterprises, Inc., Ryan A. Pilla, and Cynthia Herbst,<br><br>                            Defendants. | 2:20-cv-2161<br>(NJC) (SIL) |

## MEMORANDUM AND ORDER

NUSRAT J. CHOUDHURY, United States District Judge:

      This action concerns claims by Plaintiff Shoreline Aviation, Inc. ("Shoreline") against Defendants Sound Aircraft Flight Enterprises, Inc. ("SAFE"), Cynthia Herbst ("Herbst"), and Ryan A. Pilla ("Pilla") (collectively, "Defendants") arising out of business relationships between the parties concerning the booking of passengers on Shoreline's seaplanes departing from, or flying to, the East Hampton Airport.

      The Amended Complaint brings the following claims: (1) breach of contract against Herbst and SAFE; (2) promissory estoppel against Herbst and SAFE; (3) unjust enrichment against Herbst and SAFE; (4) breach of fiduciary duty against Herbst and SAFE; (5) violation of the faithless servant doctrine against Herbst and SAFE; (6) misappropriation against all Defendants; (7) violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1831, et seq. against all Defendants; (8) unfair competition against all Defendants; (9) tortious interference

with prospective business relations against all Defendants; and (10) constructive trust against Herbst.[1] (Am. Compl. at 26–48, ECF No. 33.)

Before this Court is a Report and Recommendation (the "R&R") issued on August 12, 2024 by Magistrate Judge Steven I. Locke to address Defendants' fully-briefed Motion for Summary Judgment on all ten of Shoreline's claims and motion to preclude Shoreline from seeking loss profits damages, as well as Shoreline's fully-briefed Motion for Partial Summary Judgment on the breach of contract, breach of fiduciary duty, unfair competition, and tortious interference with business relations claims. (Defs.' Mot. Summ. J. ("Defs.' Mot."), ECF No. 153; Pl.'s Cross Mot. Partial Summ. J. ("Pl.'s Mot."), ECF No. 154.)

Judge Locke recommends the following rulings: (1) denial of the parties' cross-Motions on Shoreline's breach of contract claim against SAFE and breach of fiduciary duty, tortious interference, and unfair competition claims against Herbst and SAFE; (2) denial of Defendants' Motion as to Shoreline's faithless servant doctrine, DTSA, and misappropriation claims against Herbst and SAFE; and (3) grant of Defendants' Motion as to: (a) Shoreline's promissory estoppel and unjust enrichment claims against Herbst and SAFE; (b) Shoreline's breach of contract claim against Herbst; (c) Shoreline's constructive trust claims against Herbst; and (5) Shoreline's claims for common law trade secret misappropriation, violation of the DTSA, unfair competition, and tortious interference claims against Ryan Pilla. (R&R at 38–39, 41–42, 44.) Judge Locke also recommends denial of Defendants' preclusion motion without prejudice and

---

[1] The Amended Complaint also pleaded claims against Blade Urban Air Mobility, Inc. a/k/a Fly Blade, Inc., Melissa Tomkiei, and Rob Wiesenthal ("Blade Defendants"). (*See* Am. Compl. at 1.) The claims against the Blade Defendants were dismissed with prejudice following a joint stipulation between Shoreline and the Blade Defendants. (*See* ECF Nos. 105–06.)

with leave to renew as a motion in limine at the appropriate time to be scheduled by this Court. (*Id.* at 44.)

A copy of the R&R was provided to all counsel and parties. (*See* Elec. Order, Aug. 12, 2024.) The R&R instructed that any objections to the R&R must be submitted in writing to the Clerk of Court within fourteen (14) days, i.e., by August 26, 2024. (*Id.*) I granted Defendants' consent motion for an extension of time to file objections to the R&R, extending the deadline for objections to September 17, 2024. (Elec. Order, Aug. 20, 2024; *see also* Defs.' Mot. Exten. Time, ECF No. 158.)

On September 17, 2024, Defendants and Shoreline each filed objections to the R&R. (Defs.' Objs., ECF No. 159; Pl.'s Objs., ECF No. 160.) On October 1, 2024, Defendants and Shoreline each filed Responses to their adversaries' respective objections. (Defs.' Resp. Opp'n Pl.'s Objs. ("Defs.' Objs. Resp."), ECF No. 161; Pl.'s Resp. Opp'n Defs.' Objs. ("Pl.'s Objs. Resp."), ECF No. 162.)

For the reasons set forth below, I adopt the thorough and well-reasoned R&R with the following modification: I grant summary judgment to Defendants on the breach of contract claim premised on the theory that SAFE failed to provide reasonable notice of termination of its agreement with Shoreline.

## BACKGROUND

I assume familiarity with the facts of the case, and adopt the summary of the relevant factual allegations and record evidence included in the R&R. (*See* R&R at 1–15.) Stated briefly, Shoreline was a seaplane operator that offered commuter and charter flights between East Hampton, New York and Manhattan, New York from 1980 to 2020. (Defs.' Rule 56.1 Counterstatement of Facts ("Defs.' Counterstatement") ¶ 1, ECF No. 155-1; Pl.'s Rule 56.1

Counterstatement of Facts ("Pl.'s Counterstatement") ¶ 106, ECF No. 154-3.) Beginning in 1990, Herbst was employed by Sound Aircraft Services ("SAS"), a company owned by her then husband, Steven Tuma ("Tuma"). (*See* Pl.'s Counterstatement ¶ 2.) SAS leased ramp and tie-down spaces for airplanes and sold aviation fuel at the East Hampton Airport. (*Id.* ¶ 3.) In 1993, Herbst and John Kelly ("Kelly"), the principal for Shoreline, orally agreed that SAS would book passengers on Shoreline's seaplane and charter flights between East Hampton and Manhattan for a 10 percent commission. (*Id.* ¶¶ 15–17.) As part of the business relationship between Shoreline and SAS, SAS would mail letters to Shoreline customers offering coupon books of discounted flight tickets on Shoreline's seaplane flights. (*Id.* ¶¶ 22, 38.) These letters would be sent twice a year, in December and March. (Defs.' Counterstatement ¶ 5.) As part of its provision of booking services to Shoreline, SAS had a list of Shoreline customers. (Pl.'s Counterstatement ¶ 45.)

On May 15, 1994, SAS, Shoreline, and the Town of East Hampton entered into an operating agreement (the "1994 Operating Agreement"), which set out the terms of Shoreline's operations at the East Hampton Airport. (Pl. Counterstatement ¶¶ 25–27; 1994 Operating Agreement, ECF No. 153-12.) On May 26, 1995, SAS, Shoreline, and the Town of East Hampton executed a substantively similar second operating agreement (the "1995 Operating Agreement"). (1995 Operating Agreement, ECF No. 154-25.) On July 16, 1996, Shoreline and SAS executed a supplemental operating agreement (the "1996 Supplemental Operating Agreement") related to Shoreline operations at a former air hangar industrial site at the East Hampton Airport. (1996 Suppl. Operating Agreement, ECF No. 153-14.)

SAS continued to book passengers for Shoreline until April 2017, when Herbst and Tuma signed a Stipulation of Settlement ("Divorce Settlement") finalizing their divorce proceedings.

4

(Divorce Settlement at 47–53, ECF No. 154-153.) Under the Divorce Settlement, SAFE, a company owned solely by Herbst, took over SAS's booking services business. (*Id.* at 49–51.)

From January to May 2018, Herbst and SAFE negotiated a deal to sell a customer list and to enter into an employment agreement with Blade Urban Air Mobility, Inc. a/k/a Fly Blade, Inc. ("Blade"). (Defs.' Counterstatement, ¶¶ 17, 68.) Kelly and Shoreline were involved in some of these negotiations until April 11, 2018, when Kelly informed Herbst that Shoreline no longer sought to participate in the negotiations. (Pl.'s Counterstatement, ¶ 73.) Pilla, Herbst's boyfriend, was, at a minimum, involved with coordinating the scheduling of negotiation meetings. (Response to Ryan Pilla's Statement of Undisputed Facts ("Pl.'s Pilla Counterstatement"), ¶¶ 7–8.)

In May 2018, Shoreline sent a letter to its customers informing them that they would be able to book flights directly with Shoreline. (Pl.'s Counterstatement, ¶ 83.) Herbst then sent an email to the customer list SAFE maintained informing them that Shoreline and SAFE were no longer working together. (*Id.* ¶ 89.) SAFE and Blade entered into an asset purchase agreement under which Blade paid SAFE $175,000 for a customer list held by SAFE. (Defs.' Counterstatement ¶ 32.) The customer list SAFE sold to Blade included information about customers Herbst and SAFE had booked on Shoreline's seaplane commuter flights. (*Id.* ¶ 33.)

Shoreline commenced this action on May 13, 2020, alleging several claims against Defendants. (Compl., ECF No. 1.) Shoreline filed an Amended Complaint on April 1, 2021. (Am. Compl.) On December 19, 2022, Magistrate Judge Locke certified that discovery is complete. (Elec. Order, Dec. 19, 2022.)

On December 18, 2023, Defendants filed a Motion for Summary Judgment on all of Shoreline's claims. (Defs.' Mot.; Defs.' Mem. Supp. Defs.' Mot. ("Defs.' Mot. Mem."), ECF

No. 153-1.) On the same day, Shoreline filed a Cross-Motion for Partial Summary Judgment seeking summary judgment on its breach of contract, breach of fiduciary duty, unfair competition, and tortious interference with prospective business relations claims. (Pl.'s Mot.; Pl.'s Mem. Supp. Pl.'s Cross Mot. Partial Summ. J. ("Pl.'s Mot. Mem."), ECF No. 154-1.) Defendants and Shoreline filed Responses to each other's respective motions. (Defs.' Mem. Supp. Mot. Summ. J. Opp'n Pl.'s Mot. Summ. J. ("Defs.' Mot. Resp."), ECF No. 155; Pl.'s Mem. Further Supp. Cross Mot. Summ. J. ("Pl.'s Mot. Resp."), ECF No. 156.) Defendants' Response includes a request that the Court preclude Shoreline from seeking lost profits damages at trial. (Defs.' Mot. Resp. at 21.)

Judge Joan M. Azrack, to whom this case was assigned before the case was transferred to my docket, referred the cross-Motions to Judge Locke for a report and recommendation. (Elec. Order Dec. 18, 2023.) On August 12, 2024, Judge Locke issued the R&R. (R&R.)

## LEGAL STANDARDS

### I.    Report and Recommendation

In reviewing a report and recommendation concerning a motion for summary judgment, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). A district court "must determine de novo any part of the magistrate judge's disposition that has been properly objected to" and may "accept, reject, or modify the recommended disposition." Fed. R. Civ. P. 72(b)(3); *see also United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997); *Miller v. Brightstar Asia, Ltd.*, 43 F.4th 112, 120 (2d Cir. 2022). The district court may adopt those portions of the recommended ruling to which no timely objections have been made, provided no

clear error is apparent from the face of the record. 28 U.S.C. § 636(b)(1)(C); *see also Larocco v. Jackson*, No. 10-cv-1651, 2010 WL 5068006, at *2 (E.D.N.Y. Dec. 6, 2010).

## II.    Summary Judgment

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Kemp v. Regeneron Pharmaceuticals, Inc.*, 117 F.4th 63, 68 (2d Cir. 2024). The moving party bears the burden of demonstrating the absence of a material question of fact. *Balderramo v. Go N.Y. Tours Inc.*, 668 F. Supp. 3d 207, 219 (S.D.N.Y. 2023) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Cunningham v. Cornell Univ.*, 86 F.4th 961, 980 (2d Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of "material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 248).

In order to defeat summary judgment, the non-moving party must set forth sufficient facts showing that there is a genuine dispute for trial. *See* Fed. R. Civ. P. 56(c). The non-moving party "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Daly v. Westchester Cnty. Bd. of Legislators*, No. 23-cv-1220, 2024 WL 3264125, at *2 (2d Cir. July 2, 2024). "Mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010). A court considering whether summary judgment is appropriate "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Cunningham*, 86 F.4th at 980; *see also Woods v. Centro of Oneida, Inc.*, 103 F.4th 933, 939 (2d

Cir. 2024) ("We may find for the movant defendant only if we conclude that on the record presented, considered in the light most favorable to the non-movant, no reasonable jury could find in movant's favor."). If "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment must be denied. *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir. 1983).

Where more than one party moves for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *BWP Media USA Inc. v. Polyvore, Inc.*, 922 F.3d 42, 47 (2d Cir. 2019). Therefore, when evaluating Defendants' Motion for Summary Judgment, I draw all reasonable inferences against Defendants; when considering Shoreline's Cross-Motion for Partial Summary Judgment, I draw all reasonable inferences against Shoreline.

## DISCUSSION

### I. Unopposed Recommendations

I have reviewed the unopposed portions of the R&R, and, finding no clear error, I adopt those recommendations pursuant to 28 U.S.C. § 636(b)(1). First, I adopt the recommendation to reject Shoreline's request to impute liability under the oral contract between Shoreline and SAS onto Herbst and SAFE by piercing the corporate veil of SAS or finding that Herbst and SAFE were alter egos of SAS. (R&R at 17–19.) Second, because I decline to pierce the corporate veil to hold Herbst liable for any breach of contract by SAS, I also adopt the recommendation to grant Defendants' Motion for Summary Judgment as to Shoreline's breach of contract claim against Herbst. (*Id.* at 23.) Third, I adopt the recommendation to grant Defendants' Motion for Summary Judgment as to Shoreline's promissory estoppel and unjust enrichment claims against SAFE and Herbst on the basis that Shoreline formed a contract with SAS and, subsequently

8

SAFE, that governs the subject matter of Shoreline's promissory estoppel and unjust enrichment claims. (*Id.* at 29–30.) Fourth, I adopt the recommendation to grant summary judgment for Defendants on Shoreline's constructive trust claim against Herbst because Shoreline abandoned this claim by failing to address it in its opposition to Defendants' Motion for Summary Judgment and its submissions in support of its own Motion for Partial Summary Judgment. (*Id.* at 43–44.) Fifth, I adopt the recommendation to grant summary judgment for Defendants on Shoreline's claims against Ryan Pilla for trade secret misappropriation, unfair competition, and tortious interference under New York common law and violation of the DTSA. (*Id.* at 38–39, 41–42.)

## II.    The Breach of Contract Claim Against SAFE

Both parties object to Judge Locke's recommended denial of the parties' cross-Motions for Summary Judgment on Shoreline's breach of contract claim against SAFE under the theories that SAFE breached contract provisions requiring it to send letters advertising coupon books and to exclusively book seaplane flights for Shoreline. (Defs.' Objs. at 5–9; Pl.'s Objs. at 2–6.) Shoreline also objects to the R&R's finding that no admissible evidence in the record supports its theory that SAFE breached a contract provision requiring it to provide reasonable notice of termination. (Pl.'s Objs. at 6–7.)

I adopt Judge Locke's recommendations with one modification. I deny summary judgment to either party on the breach of contract claim premised on the theories that SAFE failed to send letters advertising coupon books and to exclusively book seaplane flights for Shoreline. Contrary to Judge Locke's recommendation, however, I grant summary judgment to Defendants on the breach of contract claim premised on the theory that SAFE failed to provide reasonable notice of termination of its agreement with Shoreline due to Shoreline's failure to point to admissible evidence that the parties' contract included a requirement to provide such reasonable notice.

### A.  The Parties' Objections

Defendants object to the R&R, arguing that it (1) "erred in finding that there was a disputed issue of fact as to whether the oral contract required SAS/SAFE to exclusively book Shoreline seaplane flights" and (2) "erred in concluding that an oral contract exists between Shoreline and SAFE." (Defs.' Objs. at 5–9.) Defendants argue that the written 1994 Operating Agreement between Shoreline, the Town of East Hampton, and SAS explicitly contains prohibitions against exclusivity, that it superseded the prior alleged oral contract through "a broad merger clause," and that it was reaffirmed by a subsequent 1995 Operating Agreement and 1996 Supplemental Operating Agreement. (*Id.* at 5–6; *see also* 1994 Operating Agreement at SAI000369 ¶ 18; 1995 Operating Agreement at SAI000402 ¶ 18; 1996 Suppl. Operating Agreement at SAI000406.) The 1996 Supplemental Operating Agreement is only between SAS and Shoreline and does not include the Town of East Hampton as a party. (Defs.' Mot. Mem. at 5; 1996 Suppl. Operating Agreement at SAI000409; SAI000411) Further, Defendants argue that there was no novation of any obligations under the purported oral Shoreline-SAS contract, meaning SAFE never assumed any obligations to Shoreline following SAFE's takeover of booking passengers for Shoreline in 2017. (Defs.' Objs. at 8.) Instead, Defendants argue that the only obligation to which SAFE agreed was that Shoreline would pay SAFE a commission for booking passengers on Shoreline's seaplane flights. (*Id.* at 9.)

Shoreline replies to Defendants' objections, arguing (1) that the Operating Agreements with the Town of East Hampton did not supersede the purported oral contract with regard to booking passengers and (2) that a novation did occur, resulting in SAFE assuming SAS's obligations under the oral contract. (Pl.'s Objs. Resp. at 2–7.)

Shoreline independently objects to the R&R's denial of summary judgment on its breach of contract claim against SAFE on the grounds that SAFE was required to book passengers on Shoreline's flights, mail coupon book letters, and provide Shoreline reasonable notice of termination. (Pl.'s Objs. at 2–7.)

Defendants reply to Shoreline's objections, arguing that the R&R was correct (1) in finding that there was no admissible evidence supporting Shoreline's theory that the purported oral contract required reasonable notice of termination, and (2) in recommending denial of summary judgment to Shoreline on its breach of contract claim under the theories that SAFE failed to book Shoreline passengers and failed to mail out coupon book letters in 2018. (Defs.' Objs. Resp. at 4–11.)

### B.  An Oral Contract Existed Between Shoreline and SAS

In the Second Circuit, "[t]o determine whether an oral agreement is binding, [courts] look to four factors: "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." *Patel v. Long Island Univ.*, No. 23-cv-7381, 2024 WL 4763927, at *1 (2d Cir. Nov. 13, 2024) (quoting *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1985)). "No single factor is decisive." *Id.* (quoting *Ciaramella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320, 323 (2d Cir. 1997)).

Here, the four factors, weighed together, lead to the conclusion that undisputed facts establish an oral contract between Shoreline and SAS concerning customer services related to the booking of Shoreline's seaplane flights into and out of the East Hampton Airport, but the precise

scope of the oral agreement between Shoreline and SAS remains in dispute. The first factor weighs in favor of finding an oral contract because the undisputed record does not show that either Shoreline or SAS indicated an express reservation of the right not to be bound by an agreement in the absence of a writing. To the contrary, the undisputed facts show that both Shoreline and SAS performed for 24 years under an oral contract that at a minimum concerned SAS's booking of passengers on Shoreline's seaplane flights into and out of the East Hampton Airport in exchange for a commission. (*Id.* ¶ 15, 35.) As to the second factor, the parties agree that SAS booked passengers on Shoreline's flights in and out of East Hampton between 1993 and 2017 in exchange for a 10 percent commission, performing their obligations under the purported oral contract. (Pl.'s Counterstatement ¶¶ 12–16, 83.) Furthermore, the parties agree that from the beginning of the Shoreline-SAS agreement through 2017, SAS sent out mailers each December and March to Shoreline's past customers. (*Id.* ¶ 22; Defs.' Counterstatement ¶¶ 5.) For the third factor, at a minimum, the parties agree that Shoreline and SAS had an agreement for SAS to receive a commission for each passenger it booked on a Shoreline flight, even if the full contours of the agreement are not clear. (Defs.' 56.1 ¶¶ 15–16; Pl.'s 56.1 ¶ 3.) Thus, it is unclear if all the terms of the alleged contract were agreed upon. For the fourth factor, the record does not address whether this sort of contract between a booking agent and seaplane operator would typically be committed to writing. Therefore, all four factors together indicate that a binding oral contract was formed between Shoreline and SAS.

### C. The Written Operating Agreements Did Not Supersede the Oral Contract between Shoreline and SAS

Both in their motion papers and their objections to the R&R, Defendants argue that the written 1994 Operating Agreement between Shoreline, SAS, and the Town of East Hampton supersedes the oral contract between Shoreline and SAS because: (1) the 1994 Operating

12

Agreement features a merger clause, which provides that the written agreement is the final and complete agreement between the parties; (2) the subsequent 1995 Operating Agreement and 1996 Supplemental Operating Agreement reaffirm the 1994 Operating Agreement; and (3) the Operating Agreements covered the subject matter addressed by the oral contract—specifically booking or ticketing services. (Defs.' Mot. Mem. at 4, 18–19; Defs.' Objs. at 5–7; *see also* 1994 Operating Agreement at SAI000361, 1995 Operating Agreement at SAI000394, 1996 Suppl. Operating Agreement at SAI000406–07.) The 1994 and 1995 Operating Agreements state, "This Agreement contains the complete understanding of the parties and may be modified only by written endorsement pursuant to a resolution of the Town Board." (1994 Operating Agreement at SAI000369, 1995 Operating Agreement at SAI000402.) The 1996 Supplemental Operating Agreement did not contain a similar merger clause, but instead states "S[AS] shall continue to offer flight reservation services and ground handling at the Site and at the Airport Terminal Building in accordance with its current operating agreement in place between the parties." (Defs.' Mot. Mem. at 5; 1996 Suppl. Operating Agreement at SAI000409.) The "Site" in question is a former air hangar industrial site at the East Hampton Airport. (1996 Suppl. Operating Agreement at SAI000406)

"The Second Circuit interprets general merger clauses . . . to supersede previous agreements between the parties 'only to the extent that [the agreements] conflict.'" *Crye Precision LLC v. Bennettsville Printing*, No. 15-cv-221, 2019 WL 6388636, at *6 (E.D.N.Y. Aug. 13, 2019), *report and recommendation adopted*, No. 15-cv-221, 2019 WL 4463298 (E.D.N.Y. Sept. 18, 2019) (citing *Bank Julius Baer & Co., Ltd. v. Waxfield Ltd.*, 424 F.3d 278, 283 (2d Cir. 2005), *abrogated on other grounds by Holick v. Cellular Sales of New York, LLC*, 802 F.3d 391 (2d Cir. 2015)). "[A] merger clause acts only to require full application of the parol

evidence rule to the writing in question." *Bank Julius Baer & Co., Ltd.*, 424 F.3d. at 283. As such, if there is a "variance in the terms . . . [of] agreements, the earlier terms survive to the extent that they remain uncontradicted by the terms of the subsequent agreement." *Crye Precision LLC*, 2019 WL 6388636 at *6 (citing *Pereira v. Cogan*, 267 B.R. 500, 515 (S.D.N.Y. 2001). "To determine the effect of a merger clause, New York courts decide as a matter of law whether the parties intended the specific provisions at issue to cover the same subject matter; if the parties did not so intend, the agreements do not conflict." *Id.* (citing *Pereira*, 267 B.R. at 515).

The express purpose of the 1994 and 1995 Operating Agreements was "to set forth the standards and conditions for the safe and orderly conduct of [Shoreline]'s air carrier operations to and from the" East Hampton Airport, and "to formally establish procedures to be followed to insure the safe, orderly and compatible conduct of [Shoreline]'s operation, including *the ground operation services* to be provided by S[AS], one of the Airport's fixed based operators." (1994 Operating Agreement at SAI000360 (emphasis added); 1995 Operating Agreement at SAI000393 (emphasis added).) The 1994 and 1995 Operating Agreements mention SAS sparingly, only doing so in reference to services SAS would provide Shoreline at the East Hampton Airport. (1994 Operating Agreement at SAI000361; 1995 Operating Agreement at SAI000343.) The 1994 and 1995 Operating Agreements do not set forth a single obligation on the part of either Shoreline or the Town of East Hampton to SAS, such as the amount of payment for SAS's ticketing or other ground services. The portion of the 1994 Operating Agreement from which Defendants quote in their Objections to the R&R states that SAS is responsible for "ticketing, check-in, baggage handling, and related customer services." (Defs.' Objs. at 5 (quoting 1994 Operating Agreement at SAI000361); *see also* Defs.' Mot. Mem. at 4 (citing the

same provision).) The quoted language, however, selectively omits the beginning of the cited

paragraph, which states in full:

> [Shoreline] shall engage the services of [SAS], one of the Airport's fixed based
> operators to supervise, facilitate and control *its activities on the ground*. The
> Town, [Shoreline] and [SAS] agree that [SAS]'s responsibilities under this
> Agreement shall include, but not be limited to the following: directing aircraft
> into parking position on the ramp; ensuring that adequate clearance is maintained
> from any obstacles; providing a fixed parking space approved by the Airport
> Manager on the ramp and ensuring that the same is [] suitably designated and
> available for all arriving flights; providing passenger escort to and from [] the
> aircraft and terminal gate for all flights; fueling of aircraft; and the provision of
> ticketing, check-in, baggage handling, and related customer services.

(*Id.* at SAI000361 (emphasis added); *see also* 1995 Operating Agreement at SAI000394

(including the identical paragraph).)

Likewise, in citing the 1996 Supplemental Operating Agreement, Defendants selectively

omit pertinent text in the agreement that makes clear it solely concerns Shoreline's operations at

the East Hampton Airport. The provision in its entirety states: "[SAS] shall continue to offer

flight reservation services and ground handling *at the Site and at the Airport Terminal Building*

in accordance with its current operating agreement in place between the parties." (1996 Suppl.

Operating Agreement at SAI000406 (emphasis added).)[2]

The R&R correctly found that the 1994 and 1995 Operating Agreements between

Shoreline, SAS, and the Town of East Hampton concerned Shoreline's operations at the East

Hampton Airport—not SAS's booking of passengers on Shoreline's seaplanes prior to the

---

[2]  In their briefing in support of their summary judgment motion, Defendants misleadingly
provide only the following text from   this provision: "[SAS] shall continue to offer flight
reservations services . . . in accordance with its current operating agreement in place between the
parties." (Def's Mot. Mem. at 19 (quoting Defs.' 56.1 ¶ 33).)

passengers' arrival at the East Hampton Airport—and that the 1996 Operating Agreement between Shoreline and SAS reaffirms the 1995 Operating Agreement. (R&R at 27–28.)

The Operating Agreements do not cover the same subject matter as the oral contract, nor do they indicate intent by Shoreline or SAS to alter the oral contract. Therefore, the Operating Agreements and the oral contract do not conflict. *See Crye Precision LLC*, 2019 WL 6388636 at *6 (citing *Pereira v. Cogan*, 267 B.R. at 515). Since they do not conflict with the oral contract, the Operating Agreements do not supersede the oral contract between Shoreline and SAS. *See id.* (citing *Bank Julius Baer & Co., Ltd.*, 424 F.3d at 283).

### D.  SAFE is Bound by the Terms of the Oral Contract

The R&R concluded that "there is no genuine issue of material fact as to whether Shoreline and SAS, and subsequently Shoreline and SAFE, entered into the [oral] Contract, by which SAS/SAFE booked passengers on Shoreline flights in exchange for commissions." (R&R at 25.) Defendants object on the grounds that the R&R did not analyze whether an implied novation occurred under New York law transferring SAS's obligations to SAFE in 2017, and that no novation occurred. (Defs.' Objs. at 8–9.) Instead, Defendants argue that the only obligations to which SAFE agreed was the commission structure Shoreline used to compensate SAFE for bookings starting in 2017. (*Id.* at 8.) Shoreline opposes this objection by asserting that there was an express novation between Shoreline, SAFE, Herbst,[3] and SAS, which resulted in SAFE taking on SAS's booking services obligations, and, in the alternative, that "the parties' course of dealings" following Herbst and Tuma's divorce give "ample evidence of an implied novation." (Pl.'s Objs. Resp. at 6–7.)

---

[3]  Herbst, in her individual compacity, was not a party to the oral contract between SAS and Shoreline, as the Court finds Herbst was not an alter ego of SAS. *See supra* Discussion § I.

A novation is the substitution of a new obligation for an old one, with the intent of extinguishing the old one, often involving the substitution of a third party for one of the original parties to the contract. *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 736 F. Supp. 1281, 1284 (S.D.N.Y. 1990), *aff'd*, 925 F.2d 566 (2d Cir. 1991). The "elements of a novation are: (1) a previously valid obligation; (2) an agreement of all parties to the new contract; (3) extinguishment of the old contract; and (4) a valid new contract supported by consideration." *Wong v. Michael Kennedy, P.C.*, 853 F. Supp. 73, 81 (E.D.N.Y. 1994); *see also Lipsett v. Banco Popular North America*, No. 22-cv-3901, 2022 WL 17547444, at *11 n.5 (S.D.N.Y. Dec. 9, 2022).

The first element—a previously valid obligation—is satisfied here because the undisputed record demonstrates that, at a minimum, an oral contract existed between Shoreline and SAS under which SAS would book passengers on Shoreline's seaplanes in and out of the East Hampton Airport for a commission. *See supra* Discussion § I.II.B.

The remaining three elements are likewise satisfied by Shoreline, SAFE, and SAS's conduct. In April 2017, Herbst and Tuma, the principal of SAS, signed the Divorce Settlement resolving their divorce proceedings. (Divorce Settlement at 47.) The Divorce Settlement gave Herbst sole ownership of SAFE and Tuma sole ownership over SAS. (*Id.* at 46–47.) SAFE was granted exclusive control of SAS's booking services business going forward. (*Id.* at 47–48.) The Divorce Settlement also contained a non-compete provision restricting SAS from engaging in such business for 5 years, which extinguished SAS's obligations under the oral contract and assigned them to SAFE. (*Id.*) SAFE understood the Divorce Settlement to grant it exclusive control of the pre-divorce booking services business because SAFE and Herbst filed a suit in the Supreme Court of the State of New York, County of Suffolk against Tuma, SAS, Kelly,

17

Shoreline, and a former SAFE employee, to, among other things, enforce the non-compete provision of the Divorce Settlement. (ECF No. 154-151 at 7.) The complaint in that matter alleges that Tuma and SAS violated the non-compete provision by entering into a 2018 agreement with Kelly and Shoreline to engage in "the sale of charter flights." (*Id.*) The Divorce Settlement's noncompete provision provides evidence of SAFE's understanding that SAFE had taken over SAS's booking services business including its obligations to Shoreline, and that SAS would no longer provide such services. (Divorce Settlement at 47–48.) The parties further agree that Kelly sent a letter to Herbst on July 25, 2017 proposing a new commission structure for SAFE and Shoreline, following the divorce proceedings and division of the formerly intertwined SAS and SAFE. (Pl.'s Counterstatement ¶ 53; July 25, 2017 Kelly Letter, ECF No. 153-9.) Herbst, on behalf of SAFE, accepted. (Pl.'s Counterstatement ¶ 56; Herbst Dep. 48:3–49:2, ECF No. 154-146.)

The second element of novation, that all parties consent to the new contract, is satisfied by the Divorce Settlement and the acceptance of the new commission structure by SAFE. The Divorce Settlement and SAFE and Herbst's state court complaint show that the parties and SAS extinguished SAS's obligations under the oral contract, satisfying the third element of novation. Finally, the accepted new commission structure in July 2017 is a new contract for booking services between SAFE and Shoreline supported by consideration, in this case commissions on future bookings. There is sufficient record evidence to support a finding of novation. The R&R correctly found that SAFE had taken on SAS's obligations under the oral contract to book passengers on Shoreline's flights in exchange for a commission. (R&R at 24–25.)

18

### E.  The Terms of the Oral Contract

As to the terms of an oral contract, "[a] factual question arises when the parties' intent cannot be conclusively determined as a matter of law from the terms of the agreement itself." *Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*, 578 F. Supp. 3d 467, 487 (S.D.N.Y. 2022) (citing *Mallad Constr. Corp. v. County Fed. Sav. & Loan Ass'n*, 344 N.Y.S.2d 925, 930 (1973)). "Evidence of a prior course of dealing can establish a party's awareness of and consent to intended contractual terms," *Kohler v. Errico*, No. 09-cv-7290, 2015 WL 13879860, at *3 (S.D.N.Y. Mar. 11, 2015) (citing *Will Luck Co., Inc. v. F.C. Gerlach & Co., Inc.*, 421 F. Supp. 2d 533, 540 (E.D.N.Y. 2005)), and "the 'parties' substantial partial performance on the contract weighs strongly in favor of contract formation.'" *Hudson Techs., Inc. v. RGAS, LLC*, No. 21-cv-297, 2024 WL 552442, at *5 (S.D.N.Y. Feb. 12, 2024) (quoting *NYKCool A.B. v. Pac. Fruit, Inc.*, 507 F. App'x 83, 86 (2d Cir. 2013)).

#### 1.  Reasonable Notice of Termination Was Not Required Under the Oral Contract

The R&R found that Shoreline has failed to offer admissible evidence to support its assertion that the oral contract between Shoreline and SAS, and thus the contract between Shoreline and SAFE formed by novation, required the parties to provide reasonable notice of termination. (R&R at 25.) Shoreline objects to this finding on three grounds: (1) Defendants purportedly conceded that the oral contract between Shoreline and SAFE could be terminated on reasonable notice; (2) Shoreline offered admissible evidence to support its assertion; and (3) under New York law, if parties do not agree to the time and manner of termination, reasonable notice is implied. (Pl.'s Objs. at 7.)

Regarding Shoreline's first argument, Defendants assert in response to Shoreline's objections that the portion of Defendants' reply brief cited by Shoreline as Defendants'

purported concession regarding the existence of a requirement to provide reasonable notice of termination is actually a discussion of Shoreline's damages calculation and does not concede that the oral Shoreline-SAS contract or the Shoreline-SAFE contract included a reasonable notice of termination requirement. (Defs.' Objs. Resp. at 5.) Instead, in that portion of their reply brief, Defendants argue that under Shoreline's own interpretation of the oral contract as requiring reasonable notice of termination, any harm to Shoreline "from the breach must flow from the lack of [reasonable] notice." (Defs.' Mot. Resp. at 22–23.) Defendants do not concede that reasonable notice of termination was a term of the oral contract between Shoreline and SAFE; rather, Defendants simply make an argument about the proper calculation of damages in the event Shoreline prevails on a breach of contract theory premised on SAFE's failure to provide reasonable notice that it was terminating its oral contract with Shoreline.

    With respect to Shoreline's second argument in support of its position that SAFE was obliged to provide reasonable notice before terminating its agreement with Shoreline, Shoreline contends that it offered admissible evidence in the form of communications from Kelly, Shoreline's principal, to Herbst, in which Kelly referred to a notice requirement and to which Herbst did not contemporaneously object. (Pl.'s Objs. at 7.) These email communications took place in April and May 2018, after SAFE allegedly stopped booking passengers on Shoreline's flights and failed to mail coupon book letters to Shoreline customers. (Skibell Decl. Ex. 10 at SAI000049, ECF. No. 153-15; Kriegsman Decl. Ex. 61 at SAFE00000124, ECF No. 154-70.)[4]

---

[4]  Neither email is discussed or cited in Shoreline's moving or reply brief in support of its Motion for Summary Judgment, but the emails are cited in Shoreline's Rule 56.1 Statement to support Shoreline's assertion that "either party could terminate the oral [c]ontract with reasonable notice to the other party." (Pl.'s 56.1 ¶ 8.)

Even assuming that these emails are admissible at trial, they do not conclusively establish that the oral contract between Shoreline and SAS, formed 24 years earlier, had a term requiring reasonable notice of termination, which was in turn transferred to SAFE via novation when SAFE took over SAS's obligations under the oral contract in 2017. In the first email cited, Kelly writes to Herbst, "It became clear that with no prior notification to us, you had decided to unilaterally end our agreement." (Skibell Decl. Ex. 10 at SAI000049.) Nowhere in this statement or elsewhere in the email does Kelly state that reasonable notification of termination was required by the oral contract. In the second email, Kelly writes to Herbst, "If you are not going to book our passengers, please send me formal notification of that fact. . . ." (Kriegsman Decl. Ex. 61 at SAFE00000124.) Again, Kelly did not state, and the email as a whole does not establish, that reasonable notification of termination was required by the original oral contract between Shoreline and SAS. In this second email, Kelly appears to request formal notification of termination but does not assert that such notification is explicitly required under the contract terms. Accordingly, I agree with the R&R's conclusion that Shoreline "has come forth with no admissible evidence supporting its contention that the [oral] [c]ontract contained a provision requiring reasonable notice of termination." (R&R at 25.)

Third, Shoreline also argues that New York law will imply a reasonable notice term when the parties to a contract have not agreed upon a manner of termination. (Pl.'s Objs. at 7.) This is a new argument raised for the first time in Shoreline's objections to the R&R; Shoreline did not make this argument in support of its Motion for Partial Summary Judgment or in opposition to Defendants' Motion for Summary Judgment. District courts "will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been

raised before the magistrate but were not." *Fossil Group, Inc. v. Angel Seller LLC*, 627 F.Supp.3d 180, 186–87 (E.D.N.Y. 2022). Accordingly, I reject Shoreline's belated argument.

Therefore, I adopt the R&R's finding that Shoreline has failed to provide sufficient evidence that the oral contract between Shoreline and SAS, and therefore the contract between Shoreline and SAFE formed through novation, required the parties to provide reasonable notice of termination. (R&R at 22.)

### 2. The Oral Contract Obligated SAS/SAFE to Book Passengers on Shoreline's Flights, But Whether the Booking Relationship Was Exclusive is in Dispute

I agree with the R&R's finding that Shoreline has offered sufficient evidence to show that under its oral contract with SAS, the latter agreed to book passengers on Shoreline's seaplanes in exchange for a 10 percent commission. (Pl.'s Counterstatement ¶ 15–16.) Neither Shoreline nor Defendants contest that this commission-based booking arrangement existed from 1993 through 2017. (*Id.* at 12–16.) The parties, however, dispute whether the booking agreement required SAS, and later SAFE, to book passengers *exclusively* for Shoreline. (*Id.*) In other words, while it is undisputed that the Shoreline/SAS contract permitted SAS to receive a commission for booking Shoreline's seaplane flights, the parties dispute whether this oral contract required SAS to do this work exclusively for Shoreline. Additionally, the parties dispute whether the contract between Shoreline and SAFE formed through novation required the latter to exclusively book seaplane flights for Shoreline. The parties have not identified any evidence in the record that would resolve these issues as a matter of law. Both parties cite to Herbst's deposition, in which she testified that she was not working with Shoreline exclusively, but also testified that she had "never booked another seaplane operator in [her] duration of working with Shoreline Aviation." (Herbst. Dep. 29:16–18, 176:4–11, ECF No. 153-6.)

Shoreline objects to the R&R's finding that the record gives rise to a genuine dispute over whether SAFE was required to exclusively book passengers for Shoreline on the grounds that the R&R relied on insufficient evidence put forth by Defendants, including "Herbst's conclusory, one-sentence denial in her deposition that she was not working with Shoreline exclusively." (Pl.'s Objs. at 8.) Defendants argue on reply that nothing in the evidentiary record shows that SAS/SAFE agreed to exclusively book Shoreline seaplane flights, and that Shoreline's corporate representative, Andrea Collingwood, was unable to answer the question of whether Kelly and Herbst had discussed exclusivity when they created the oral contract. (Collingwood Dep. 150:4-151:21, ECF. No. 153-7)

Taken together, the lack of undisputed evidence in the record indicating that exclusivity was a requirement of the oral contract between Shoreline and SAS and the undisputed evidence showing that Herbst, whether working for SAS or SAFE, never booked seaplane passengers traveling into or out of the East Hampton Airport on any seaplane operator other than Shoreline creates a genuine dispute of material fact as to whether SAFE was required to exclusively book passengers on Shoreline's seaplanes in 2018. Accordingly, whether SAFE's failure to book passengers on Shoreline's flights in 2018 constituted a breach of the contract between Shoreline and SAFE formed through novation is an issue for the jury to decide.

### 3.  Whether Mailing of Coupon Book Letters was Required by the Oral Contract is in Dispute

Shoreline contends that the oral Shoreline-SAS contract required SAS to mail coupon book letters to Shoreline's customers. The parties agree that SAS or SAFE mailed coupon book letters to Shoreline's customers in December and March of each year through 2017 and that SAFE did not do so in the spring of 2018. (*See* Defs.' Counterstatement ¶¶ 5, 23.) But the parties dispute whether SAS was *required* to mail the coupon book letters under its oral contract with

23

Shoreline, and whether SAFE assumed this obligation. Shoreline argues that SAS's consistent performance of this mailing in December and March of each year following the commencement of the Shoreline/SAS agreement in 1993 through April 2017 establishes that SAS, and later SAFE, was required to perform this service. (Pl.'s Mot. Mem. at 3; Defs.' Counterstatement ¶ 5; Divorce Settlement at 47, 53.) Defendants contend that there is "no document or testimony in the record establishing [that] SAFE has a contractual obligation to mail out letters on Shoreline's behalf." (Defs.' Counterstatement ¶ 23.) The R&R found that there is a genuine issue of material fact as to whether SAFE was required to perform this service. (R&R at 25.)

In its objections to the R&R, Shoreline argues that "mail[ing] out letters advertising coupon books" was a "part of those booking services[] SAFE was required to handle," and that SAFE's failure to do so in 2018 violated its obligation under the oral contract to book passengers on Shoreline's flights. (Pl.'s Objs. at 3.) Shoreline previously argued in its summary judgment briefing, however, "that Herbst/SAFE breached the Contract by failing to mail out letters to Shoreline customers in March or April 2018 offering discount coupons," which constituted an independent basis for breach of contract, separate from "failing to book reservations for Shoreline's seaplane commuter flights beginning in April 2018, and terminating the Contract without reasonable notice." (Pl.'s Mot. Mem. at 12–13). In their opposition to Shoreline's objections, Defendants argue that SAS "sent out [coupon] mailers at certain times because that would help it to generate commissions. But that does not mean that SAS understood it was obligated to send out such mailers." (Defs.' Objs. Resp. at 9.)

The undisputed fact that SAS and SAFE mailed coupon book letters to Shoreline customers each December and March through 2017 demonstrates a course of performance supporting the notion that the mailings were required by the contract. *See Gulf Ins. Co. v.*

*Transatlantic Reinsurance Co.*, 886 N.Y.S.2d 133, 143 (N.Y. App. Div. 2009). I agree with the R&R's finding that the record gives rise to genuine questions of material fact as to whether SAFE breached an oral contract requirement to send the mailings. (R&R at 25.)

### III. Breach of Fiduciary Duty and Violation of Faithless Servant Doctrine Claims

The R&R recommends that I deny the parties' cross-Motions for Summary Judgment on Shoreline's breach of fiduciary duty claim and deny Defendants' Motion for Summary Judgment on Shoreline's claim under the faithless servant doctrine. (R&R at 36.) I agree.

The parties dispute whether Herbst and SAFE had a fiduciary duty to Shoreline. (Pl.'s Mot. Mem. at 22; Defs.' Mot. Mem. at 20–23.) Based on Judge Locke's review of the evidence, the R&R found "that there is a genuine issue of material fact as to whether a fiduciary relationship existed" between Shoreline and either Herbst or SAFE. (R&R at 33.) The R&R also determined that if a jury were to find that a fiduciary duty existed, sufficient facts in the record exist for a "reasonable jury to find that SAFE breached its fiduciary duty," and "because the parties agree that Herbst was a party to the Blade asset purchase agreement, she may be held individually liable for her participation in such a breach." (R&R at 34–35 (citing *Weinreb v. 37 Apartments Corp.*, 943 N.Y.S.2d 519, 522 (NY. App. Div. 2012).) Specifically, Shoreline contends that Herbst and SAFE breached their fiduciary duty by "(1) stalling customers who sought to purchase Shoreline seats in March through May 2018; (2) using Shoreline's proprietary information to compete with Plaintiff; and (3) selling Plaintiff's customer list to Blade." (*Id.* at 34.) Finally, the R&R found that the three categories of damages Shoreline seeks—"lost profits, disgorgement of funds Blade paid to Herbst and SAFE, and unearned commissions"—each satisfy the damages element of a breach of fiduciary duty claim. (*Id.* at 35–36.)

Defendants object to the R&R's recommendations to deny summary judgment to either party on Shoreline's breach of fiduciary duty claim and to deny Defendants summary judgment on Shoreline's violation of the faithless servant doctrine claim, arguing that there was not "mutual consent" for SAFE and Herbst to serve as agents for the principal, Shoreline. (Defs.' Objs. at 14 (citing *In re Roman Cath. Diocese of Rockville Ctr.*, New York, 651 B.R. 399, 428 (S.D.N.Y. 2023).) Defendants support this position by raising the same lack of novation and merger clause arguments made with respect to Shoreline's breach of contract claims. *See supra* Discussion §§ I.II.C–D. Shoreline responds to Defendants' lack of mutual consent argument by citing to evidence in the record showing that SAFE and Herbst consented to act as Shoreline's agents with regard to booking services, including Herbst's testimony in deposition and during her divorce proceedings. (Pl.'s Objs. Resp. at 12.) During her deposition, Herbst testified that she was working on Shoreline's behalf at the East Hampton Airport with respect to passengers she booked on Shoreline's flights. (Herbst Dep. 71:17–72-20, ECF No. 154-146.) During her divorce proceedings, Herbst testified that, in 2017, "Shoreline had no independent retail presence in the [Airport] terminal" and that she, as SAFE, "was their presence in the terminal." (Minutes of Stipulation, *Tuma v. Tuma*, Index No. 019777/2014 (N.Y. Sup. Ct. July 25, 2019)), 63:16–20, ECF No. 154-154.) This evidence gives rise to a genuine question of material fact as to whether either Herbst or SAFE served as a fiduciary to Shoreline. The R&R correctly denied Defendants' summary judgment motion on Shoreline's breach of fiduciary duty claims against SAFE and Herbst due to the existence of such questions of fact.

Shoreline objects to the recommendation to deny its own Cross-Motion for Partial Summary Judgment on its breach of fiduciary duty claim on the basis that the R&R should have found that the oral contract between Shoreline and SAFE required the latter to book passengers

exclusively for Shoreline and that this requirement in turn imposed a fiduciary duty upon SAFE. (Pl.'s Objs. at 8–9.) In that motion, Shoreline made the same arguments to support its request for summary judgment on its breach of contract and breach of fiduciary duty claims. (*See* Pl.'s Mot. Mem. at 6–8.) For the reasons stated above, these arguments fail to establish as a matter of law that the contract between Shoreline and SAFE formed through novation required SAFE, and thus Herbst, to book seaplane passengers exclusively on Shoreline's flights. *See supra* Discussion § II.E.2. Shoreline has therefore failed to establish that, based on the undisputed facts, SAFE and Herbst had a fiduciary duty to Shoreline as its booking agents.

Accordingly, I adopt the R&R's recommendation to deny the parties' cross-Motions for Summary Judgment on Shoreline's breach of fiduciary duty claims and to deny Defendants' Motion for Summary Judgment on Shoreline's claim under the faithless servant doctrine. (R&R at 36.)

## IV.    Trade Secret Misappropriation, DTSA, and Unfair Competition Claims

The R&R recommends that I deny Defendants' Motion for Summary Judgment on Shoreline's trade secret misappropriation and DTSA claims with respect to both SAFE and Herbst. (R&R at 39.) It also recommends that I deny the parties' cross-Motions for Summary Judgment on Shoreline's unfair competition claims with respect to both SAFE and Herbst. (R&R at 40.) I agree with both recommendations.

### A.  Defendants' Objections[5]

Defendants combine their objections to the R&R's findings on Shoreline's misappropriation, DTSA, and unfair competition claims. (Defs.' Objs. at 2, 4, 9–13.) Defendants object to the R&R's finding that "there was [a] genuine issue of fact regarding whether

---

[5]  Shoreline did not object to the R&R's recommendation that I deny Shoreline's Cross-Motion for Partial Summary Judgment on its unfair competition claims against SAFE and Herbst. (*See generally* Pl.'s Objs.)

Herbst/SAFE misappropriated a trade secret (confidential customer data) supposedly belonging to Shoreline." (Defs.' Objs. at 9–10.) Defendants argue that the data at issue was data that "SAS/SAFE created and held, and which related to all of SAS/SAFE's clients, including those who flew on helicopters or fixed wing airplanes." (*Id.* at 10.) Defendants argue that since the customer data was not Shoreline's trade secret, the R&R should have granted Defendants summary judgment on Shoreline's trade secret misappropriation, DTSA, and unfair competition claims. (*Id.* at 13.) Shoreline replies that Defendants' arguments are the same ones raised in their motion papers and that the R&R's findings on this issue are not entitled to de novo review, just clear error review. (Pl.'s Objs. Resp. at 17–18.)

## B.  The Law

"Under New York law, '[a] plaintiff claiming misappropriation of a trade secret must prove that (1) it possessed a trade secret, and (2) the trade secret was used by defendant in breach of an agreement, confidence, or duty, or as a result of discovery by improper means.'" *Bullion Shark LLC v. Flip a Coin LLC*, No. 2:23-cv-6529, 2023 WL 8455669, at *7 (E.D.N.Y. Dec. 6, 2023) (citing *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 339 (E.D.N.Y. 2020)) (alterations in original). "A trade secret is any formula, pattern, device or compilation of information which is used in one's business, and which gives one an opportunity to obtain an advantage over competitors who do not know or use it." *Id.*; *accord Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009).

As to the first requirement of a misappropriation of a trade secret claim,

New York courts consider the following factors when determining whether certain information constitutes a trade secret: [i] the extent to which the information is known outside of the business; [ii] the extent to which it is known by employees and others involved in the business; [iii] the extent of measures taken by the business to guard the secrecy of the information; [iv] the value of the information to the business and its competitors; [v] the amount of effort or money

28

expended by the business in developing the information; and [vi] the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 267 (S.D.N.Y. 2014), *aff'd sub nom. Big Vision Priv. Ltd. v. E.I. du Pont de Nemours & Co.*, 610 F. App'x 69 (2d Cir. 2015) (citation omitted). "The most important factor is whether or not the information is in fact secret." *Id.* (citation omitted). "'The existence . . . of a trade secret usually is treated as a question of fact,' and properly the province of the jury." *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 384 (S.D.N.Y. 2023) (quoting *Chevron U.S.A., Inc. v. Roxen Serv., Inc.*, 813 F.2d 26, 29 (2d Cir. 1987)). Summary judgment may be appropriate, however, "where it is clear that the information at issue is not actually secret." *Id.* (citation omitted). The elements for liability under both a common law misappropriation claim and a federal DTSA claim "overlap almost entirely." *Catalyst Advisors, LP v. Catalyst Advisors Invs. Glob. Inc.*, No. 21-cv-4855, 2024 WL 522751, at *17 (S.D.N.Y. Feb. 9, 2024).

Under New York law, to succeed on a claim for unfair competition based on misappropriation, a plaintiff must show "that the defendant: (1) misappropriated the plaintiff's labors, skills, expenditures, or good will; and (2) displayed some element of bad faith in doing so." *CDC Newburgh Inc. v. STM Bags, LLC*, 692 F. Supp. 3d 205, 225 (S.D.N.Y. 2023) (quotation marks and citation omitted). While "a plaintiff need not establish misappropriation of a trade secret . . . to state a claim for unfair competition, it must establish that a defendant misappropriated or misused the plaintiff's property or the fruit of its labors and expenditures." *Big Vision Private Ltd.*, 610 Fed. Appx. at 71. "Where, as here, the unfair competition claim and a misappropriation claim arise from the same factual predicate, the two claims generally rise and fall together." *Recovery Racing III, LLC v. Brown*, No. 20-cv-4696, 2021 WL 9678666, at *6

29

(E.D.N.Y. Oct. 28, 2021) (citing *Faiveley Transp. USA Inc. v. Wabtec Corp.*, 758 F. Supp. 2d 211, 221 (S.D.N.Y. 2010)).

### C.  Application

For the first element of Shoreline's trade secret misappropriation and DTSA claims, the R&R finds that a reasonable jury could find the that the customer data SAFE sold to Blade was Shoreline's trade secret. (R&R at 37–38.) I agree.

Evidence in the record shows that Shoreline's customer data was not information known outside the business. Shoreline restricted access to its customer data, including through password protection. (Kriegsman Decl. Ex. 52, Gitlin Aff. ¶ 19, ECF No. 154-61.) The customer data was known by employees and others involved in Shoreline's business, but Shoreline's employees were instructed not to disclose the customer data to anyone outside the company. (*Id.*) Shoreline gave Herbst and SAFE "unfettered access" so they could "perform their role as Shoreline's booking agent," but instructed them "not to disclose" the customer data "to anyone outside of Shoreline, SAS, and SAFE." (*Id.* ¶ 22.) Shoreline took measures to guard the secrecy of the customer data both by password protecting it internally, and by instructing Herbst, SAS, and SAFE not to disclose the customer data. (*Id.* ¶¶ 19, 22.) The customer data was of significant value to the business and its competitors, as shown by the fact that SAFE eventually sold the customer data and data on other non-Shoreline customers to Blade for $175,000. (Herbst Dep. 187:2–13, ECF No. 153-6; *see also* Asset Purchase Agreement at art. 1.2, ECF No. 153-27.) The record shows that Shoreline spent money on advertising and marketing to build its customer list. (*See, e.g.*, ECF No. 154-145.) Shoreline also built long-term customer relationships through its services as demonstrated by the positive feedback of longtime customers in the record. (*See, e.g.*, ECF No. 154-10 at SAI000084; ECF No. 154-65 at 1, ECF No. 154-69 at SAI010514.) The

customer data took significant effort and money to develop over the course of 38 years and is not the sort of information that could be easily acquired or duplicated. (Gitlin Aff. ¶ 23.) Therefore, there is sufficient evidence that a reasonable jury could find that the customer data was a trade secret.

Defendants rely on cases that are distinguishable to argue that the customer data was not a trade secret under New York law or the DTSA. (*See* Defs.' Mot. Mem. at 24.) In both *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495 (S.D.N.Y. 2017), and *Big Vision Private Ltd.*, 1 F. Supp. 3d 224, the purported trade secrets were disclosed to third parties, none of whom were potentially acting as fiduciary agents of the plaintiff, as Shoreline alleges is the case here.

Defendants also rely on distinguishable cases to argue that there was no protectable trade secret or information to support the trade secret misappropriation, DTSA, or unfair competition claims because there was no formal agreement between Kelly and Herbst regarding ownership of the customer data. (Defs.' Mot. Resp. at 17–18.) Neither case on which Defendants rely for this assertion involved trade secret misappropriation or DTSA claims. In *Telecom International America Limited v. AT&T Corp.*, the plaintiff alleged a common law unfair competition claim for the alleged misappropriation of information gained from a failed joint venture between the plaintiff and the defendant. 280 F.3d 175, 197 (2d Cir. 2001). The Second Circuit affirmed the district court's dismissal of plaintiff's unfair competition claim on the grounds that there was no clear "idea or knowledge" that defendant could have misappropriated; instead, the allegedly misappropriated information was the knowledge and experience gained from the joint venture. *Id.* at 198. In *eCommission Solutions, LLC v. CTS Holdings, Inc.*, the plaintiff similarly brought an unfair competition claim stemming from the defendant's use of its knowledge of plaintiff's pricing information and customers that plaintiff had shared with defendant during the course of

their joint venture. No. 15-cv-2671, 2018 WL 2078816, at *5 (S.D.N.Y. May 1, 2018). The defendant in *eCommission Solutions* was not working as plaintiff's agent, nor did the plaintiff allege that the customer list was a trade secret. *Id.* Contrary to Defendants' argument, the lack of a formal agreement between Kelly and Herbst regarding ownership of the customer data is not fatal to Shoreline's misappropriation, DTSA, and unfair competition claims. (*See* Defs. Reply at 17–18.)

For the second element of Shoreline's trade secret misappropriation and DTSA claims, the R&R found that a reasonable jury could have found that SAFE's sale of the customer data to Blade could have breached SAFE and Herbst's fiduciary duty to Shoreline. (R&R at 38.) As discussed above, I agree with this conclusion. *See supra* Discussion § III. Accordingly, I deny summary judgment on Shoreline's misappropriation and DTSA claims against SAFE and Herbst.

With respect to Shoreline's unfair competition claim, Shoreline argues that SAFE and Herbst misappropriated Shoreline's customer data in bad faith in order to divert sales to Blade. (Pl.'s Mot. Mem at 22.) Like the trade secret misappropriation and DTSA claims, the unfair competition claim centers on the alleged misappropriation of customer data. As explained, the parties dispute ownership of the customer data. Accordingly, neither Shoreline nor Defendants merit summary judgment on the unfair competition claims because there is a genuine issue of material fact regarding the ownership of the customer data. *See Recovery Racing III, LLC*, 2021 WL 9678666, at *6 ("Where, as here, the unfair competition claim and a misappropriation claim arise from the same factual predicate, the two claims generally rise and fall together.") (citing *Faiveley Transp. USA Inc.*, 758 F. Supp. 2d at 221).

**V.      The Tortious Interference with Prospective Business Relations Claim**

The R&R recommends that I deny the parties' cross-Motions for Summary Judgment on Shoreline's tortious interference with prospective business relations claim with respect to both SAFE and Herbst. (R&R at 43.) I agree.

**A.  The Parties' Objections**

Defendants object to the R&R on the grounds that (1) it erred by not dismissing Shoreline's tortious interference claim related to the Employee Stock Ownership Plan ("ESOP") and that (2) it "read out the causation requirement" of a tortious interference claim thereby finding a material issue of fact where the was none. (Defs' Obj. R&R at 15–16.) Specifically, Defendants argue that Shoreline has failed to identify admissible evidence showing that Defendants' alleged interference was the but-for cause of specific customers leaving Shoreline to fly with Blade. (*Id.* at 16.) Shoreline responds that summary judgment is unwarranted on the tortious interference claim because Shoreline has offered sufficient evidence of intentional interference with its undisputed business relationship with passengers, including 160 former customers who were annual purchasers of Shoreline's coupon books since at least 2014 but switched to flying with Blade in 2018. (Pl.'s Objs. Resp. at 15.)

**B.  The Law**

"Under New York law, to state a claim for tortious interference with prospective economic advantage, the plaintiff must allege that (1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006) (quotation marks omitted). To meet the third element at the summary judgment stage, a plaintiff must establish that the defendant engaged in "a crime or

independent tort" conduct. *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 262 (2d Cir. 2015); *see also In Touch Concepts, Inc. v. Cellco Partnership*, 949 F. Supp. 2d 447, 477 (S.D.N.Y. 2013), *aff'd*, 788 F.3d 98 (2d Cir. 2015) (where a defendant acted in economic self-interest, and not with the sole purpose of inflicting intentional harm, the conduct at issue must be independently criminal or tortious).

### C. Application

The evidence Shoreline has offered is sufficient for a reasonable jury to find that Shoreline customers switched to Blade due to the alleged interference of SAFE and Herbst. However, the undisputed evidence is insufficient to establish that, as a matter of law, SAFE and Herbst engaged in tortious interference with Shoreline's business relationships.

As the R&R lays out, the parties do not dispute the first element of a tortious interference claim: Shoreline had a business relationship with its customers. (R&R at 42.)

As to the second element, while the parties agree that SAFE and Herbst were aware of the business relationship, the parties dispute whether SAFE and Herbst intentionally interfered with it. (*Id.*; Defs.' Counterstatement ¶ 33.) There is record evidence significant enough for a reasonable jury to find that SAFE and Herbst intentionally interfered to get Shoreline's customers to book with Blade in 2018. The R&R noted, for example, that two SAFE employees, Eduardo Fernandes and Maureen Quigley, testified that Herbst instructed them to lie to Shoreline customers and delay booking them on Shoreline flights. (R&R at 42; *see also* Kriegsman Decl. Ex. 32, Fernandes Aff. ¶¶ 6–25, ECF No. 154-41; Kriegsman Decl. Ex. 33, ECF No. 154-42 (text messages between Herbst and Fernandes instructing Fernandes on what to say to customers seeking to book a flight); Skibell Decl. Ex. 11, Quigley Aff. ¶¶ 14, 15, 18, ECF No. 153-16.)

For the third element, Shoreline must establish that, as a matter of law, Herbst or SAFE engaged in "criminal or independently tortious" conduct in order to be entitled to summary judgment. *In Touch Concepts, Inc.*, 949 F. Supp. 2d at 478. As noted above, Shoreline has not established any independently tortious conduct. Defendants have likewise failed to establish that SAFE and Herbst did not engage in independently tortious conduct.

As to the fourth element, damages, the parties agree that at least 160 customers who had flown with Shoreline in the past and purchased coupon books had instead booked with Blade in 2018. (Defs.' Counterstatement ¶ 41; List of 160 Customers, ECF. No. 154-155.) Shoreline has offered sufficient evidence for a reasonable jury to find that these customers switched from Shoreline to Blade due to alleged interference by SAFE and Herbst.

## VI.    Defendants' Request to Preclude Shoreline from Pursuing Lost Profits Damages

Defendants request that I preclude Shoreline from seeking lost profits damages at trial due to Shoreline's asserted failure to update its discovery responses and disclosures to change its damages theory from lost revenue to lost profits. (Defs.' Mot. Resp. at 21.) The R&R denied Defendants' request without prejudice and with leave to renew as a motion in limine. (R&R at 19.) The R&R reasoned that a motion in limine is the more appropriate vehicle to seek an order precluding Shoreline from pursuing lost profit damages at trial because Shoreline did not have an opportunity to respond to the request to preclude raised for the first time in Defendants' reply brief in support of Defendants' Motion for Summary Judgment and because the request seeks to limit the evidence Shoreline may introduce at trial. (R&R at 20–21.)

Shoreline and Defendants object to Judge Locke's decision not to issue a substantive recommendation concerning Defendants' request to preclude and ask this Court to determine whether Shoreline may pursue lost profits rather than lost revenue at trial. (Defs.' Objs. at 18;

35

Pl.'s Objs. at 10–12.) The parties dispute whether Shoreline disclosed its theory of damages based on lost profits prior to the close of discovery. (Defs.' Objs. at 18–22; Pl's Objs. Reply at 9.) Defendants argue that Shoreline failed to disclose its lost revenue theory of damages until its brief filed in opposition to Defendants' Motion for Summary Judgment and in support of its Motion for Partial Summary Judgment—long after discovery had closed. (Defs.' Objs. R&R at 18–19; *see also* Defs.' Mot. Resp. at 2, 21) Shoreline contends that, during their respective depositions, both Shoreline's corporate witness, under Federal Rule of Civil Procedure 30(b)(6), and its accountant disclosed sufficient information that Defendants should have realized that Shoreline was pursuing a theory of lost revenue damages in addition to a theory of lost profits damages. (Pl's Objs. Reply at 9–11.)

The cases Defendants cite in their objections to the R&R stand for the proposition that a federal district court *may* preclude a party at the summary judgment stage from advancing new damages theories that were not disclosed during discovery. (Def's Objs. at 18–19, 19 n.9.) None of these cases compel a federal district court to resolve such a question at the summary judgment stage.[6]

I see no reason to reject Judge Locke's recommendation to deny Defendants' motion to preclude without prejudice and with leave to renew as a motion in limine in accordance with the Court's forthcoming schedule for remaining pre-trial matters. Accordingly, I deny Defendants'

---

[6] *See N. Shipping Funds I, L.L.C. v. Icon Cap. Corp.*, 998 F. Supp. 2d 301, 337 (S.D.N.Y. 2014); *Gould Paper Corp. v. Madisen Corp.*, 614 F. Supp. 2d 485, 490 (S.D.N.Y. 2009); *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 297 (2d Cir. 2006); *Reed Const. Data., Inc. v. McGraw–Hill Cos., Inc.*, 2013 WL 1608489, at *4 (S.D.N.Y. Apr. 15, 2013); *Silicon Knights, Inc. v. Epic Games, Inc.*, 2012 WL 1596722, at *4 (E.D.N.C. May 7, 2012) *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 566 F.Supp.2d 305, 318 (S.D.N.Y.2008).

motion to preclude without prejudice with leave to renew it as a motion in limine in accordance with the pre-trial schedule that I will set in a forthcoming order.

## CONCLUSION

Having conducted a review of the motion papers and the applicable law and having reviewed de novo the portions of the R&R the parties objected to, I adopt the findings and recommendations contained in the well-reasoned and thorough R&R in their entirety with the following modification: I grant summary judgment to Defendants on Shoreline's breach of contract claim premised on the theory that SAFE failed to provide reasonable notice of termination.

Dated: Central Islip, New York
          May 30, 2025

_____*/s/ Nusrat J. Choudhury*_____
          NUSRAT J. CHOUDHURY
          United States District Judge