# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

SHORELINE AVIATION, INC.,

            Plaintiff,

      - against -

CYNTHIA L. HERBST, SOUND AIRCRAFT
FLIGHT ENTERPRISES, INC. and RYAN A.
PILLA,

          Defendants.

Case No. 2:20-cv-02161-NJC-SIL

## PLAINTIFF'S PRE-TRIAL MEMORANDUM

Alex Kriegsman
Kriegsman PC
279 Main Street
Sag Harbor, NY 11963
(631) 899-4826
alex@kriegsmanpc.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ……………………………………...……………… iii

PRELIMINARY STATEMENT …………………………………………………... 1

PROCEDURAL HISTORY ……………………………………………………… 2

STATEMENT OF FACTS ……………………………………………………… 4

ARGUMENT …………………………………………………………...…… 6

    I.     Shoreline will establish its breach of contract
claim through proof that SAFE failed to
provide booking services for Shoreline in 2018 ………………………… 6

        A.  SAFE was obligated to mail out coupon
book letters, and the parties agreed on
exclusivity as to seaplane commuter flights ………………………… 6

        B.  SAFE breached the Contract by failing to
provide booking services ………………………………………….. 10

        C.  Shoreline fully performed under the Contract ……………….…... 13

        D.  Shoreline suffered resulting damages
in the amount of $1,675,758.50 …………………………………… 13

    II.    Shoreline will establish its breach of fiduciary
duty and faithless servant claims through proof
that Defendants owed a fiduciary duty to
Shoreline and breached that duty when they
diverted passengers to Shoreline's competitor …………………….... 14

        A.  As Shoreline's exclusive booking agent
acting on Shoreline's behalf, Defendants
owed Shoreline a fiduciary duty …………………………………… 15

        B.  Defendants were faithless in the
performance of their services and engaged
in misconduct that constituted breach of
fiduciary duty …………………………………………………… 17

        C.  Shoreline suffered damages as a direct

i

result of Defendants' breach of fiduciary duty ……………………….. 19

III.    Shoreline will establish its tortious interference claim through proof that Defendants diverted Shoreline customers to Blade based on false statements ……………… 20

IV.    Shoreline will establish its unfair competition, misappropriation, and DTSA claims through proof that Defendants abused their access to Shoreline's customer list to sabotage Shoreline's business …………………………………………………………..... 23

CONCLUSION ……………………………………………………………… 27

## **TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page(s)**

*ABKCO Music, Inc. v. Harrisongs Music, Ltd.*,
    722 F.2d 988 (2d Cir. 1983) …………………………………………………… 16

*Belluomo v. Tiger Schulmann's Mixed Martial Arts*,
    No. CV 14-4402, 2015 WL 5838732 (E.D.N.Y. Oct. 7, 2015) ………………… 7

*Catalyst Advisors, LP v. Catalyst Advisors Investors Global Inc.*,
    No. 21 Civ. 4855, 2024 WL 522751 (S.D.N.Y. Feb. 9, 2024) ………………… 24

*CDC Newburgh Inc. v. STM Bags, LLC*,
    692 F. Supp. 3d 205 (S.D.N.Y. 2023) ………………………………………… 23

*Conahan v. MedQuest Ltd.*,
    No. 20-cv-1325, 2022 WL 16748585 (S.D.N.Y. Nov. 7, 2022) ……………….. 17

*Cont'l Indus. Group, Inc. v. Altunkilic*,
    788 Fed. Appx. 37 (2d Cir. 2019) ……………………………………………… 16

*Ebel v. G / O Media, Inc.*,
    No. 20 Civ. 7483, 2021 WL 2037867 (S.D.N.Y. May 21, 2021) ……………… 15

*Eun Suk Cho v. Byung Ki Koo*,
    164 A.D.3d 1306 (2d Dep't 2018) ………………………………………….... 6

*Greenberg v. Falco Constr. Corp.*,
    29 Misc. 3d 1202(A) (Sup. Ct., Kings County 2010) ………………………….. 14

*Gulf Ins. Co. v. Transatlantic Reinsurance Co.*,
    69 A.D.3d 71 (1st Dep't 2009) ……………………………………………….. 8

*Hudson Techs., Inc. v. RGAS, LLC*,
    No. 21-CV-297, 2024 WL 552442 (S.D.N.Y. Feb. 12, 2024) …………………... 7

*IME Watchdog, Inc. v. Gelardi*,
    732 F. Supp.3d 224 (E.D.N.Y. 2024) ……………………………………… 24, 26

*Impax Media, Inc. v. Ne. Adver. Corp.*,
    No. 17 Civ. 8272, 2018 WL 3962841 (S.D.N.Y. Aug. 17, 2018) ……………... 22

*Kirch v. Liberty Media Corp.*,
    449 F.3d 388 (2d Cir. 2006) ………………………………………………… 20

iii

*Kohler v. Errico*,
    No. 3:09cv7290, 2015 WL 13879860 (S.D.N.Y. Mar. 11, 2015) ................... 7

*LoPresti v. Terwilliger*,
    126 F.3d 34 (2d Cir. 1997) ....................................................... 19-20

*N. Atl. Instruments, Inc. v. Haber*,
    188 F.3d 38 (2d Cir. 1999) ........................................................ 25

*Roy Exp. Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys.*,
    672 F.2d 1095 (2d Cir. 1982) ................................................... 23-24

*Salonclick LLC v. SuperEgo Mgmt. LLC*,
    No. 16 Civ. 2555, 2017 WL 1906865 (S.D.N.Y. May 8, 2017) ................... 18

*Samba Enters., LLC v. iMesh, Inc.*,
    No. 06 Civ. 7660, 2009 WL 705537 (S.D.N.Y. Mar. 19, 2009),
    *aff'd sub nom. Samba Enters., Ltd. v. iMesh, Inc.*,
    390 Fed. Appx. 55 (2d Cir. 2010) ....................................... 15-16, 18-19

*Schroeder v. Pinterest Inc.*,
    133 A.D.3d 12 (1st Dep't 2015) .................................................. 27

*Sheehy v. New Century Mortg. Corp.*,
    690 F. Supp. 2d 51 (E.D.N.Y. 2010) ............................................ 14

*Town & Country Linen Corp. v. Ingenious Designs LLC*,
    556 F. Supp. 3d 222 (S.D.N.Y. 2021) ........................................... 26

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
    487 F.3d 89 (2d Cir. 2007) ...................................................... 6

*Two Rivers Entities, LLC v. Sandoval*,
    192 A.D.3d 528 (1st Dep't 2021) ............................................... 15

*Unicorn Crowdfunding Inc. v. New Street Enter., Inc.*,
    No. 18 Civ. 10110, 2019 WL 2450911 (S.D.N.Y. June 12, 2019) ................. 8

*Veleron Holding, B.V. v. Morgan Stanley*,
    117 F. Supp. 3d 404 (S.D.N.Y. 2015) ...................................... 15-16, 18

**Statute**                                                                 **Page(s)**

18 U.S.C. § 1839(5)(B)(ii)(II) .................................................. 27

Plaintiff Shoreline Aviation, Inc. ("Shoreline") submits this pre-trial memorandum of law under Rule 7.2.2 of this Court's Individual Rules for Civil and Criminal Cases.

## PRELIMINARY STATEMENT

This case seeks to recover the damages suffered by an aviation company, Shoreline, when its exclusive booking agent for seaplane commuter flights, Defendant Sound Aircraft Flight Enterprises, Inc. ("SAFE") negotiated with Shoreline's competitor, Blade Urban Air Mobility, Inc. ("Blade"), to sell Shoreline's customer list, stopped booking for Shoreline in March 2018, the beginning of the busy summer season, and went to work for Blade. Prior to March 2018, for 24 years, SAFE's predecessor, SAFE, and its sole shareholder, Defendant Cynthia Herbst ("Herbst"), maintained a customer list, booked seaplane commuter flights, and communicated with Shoreline passengers on Shoreline's behalf under an oral agreement formed in 1993 (the "Contract").

This Court found that a valid and binding contract existed between SAFE and Shoreline, and ample evidence will establish that SAFE breached the Contract by, among other things, failing to book reservations for Shoreline and failing to mail out letters to Shoreline customers offering discount coupons in 2018. Shoreline is therefore entitled to judgment in its favor on its breach of contract claim against SAFE.

Shoreline will also offer testimony and documentary evidence demonstrating that SAFE and Herbst (together, "Defendants") refused to book seats for Shoreline based on false premises, actively concealed their actions from Shoreline, exploited their access to Shoreline's customers to divert their business to Blade, and sold Blade the customer list that SAFE held in trust for Shoreline. Thus, it is entitled to judgment in its favor on its

1

breach of fiduciary duty, faithless servant, tortious interference with prospective business relations, and unfair competition claims against Defendants.

Finally, Shoreline will show that its customer list constituted a trade secret and Defendants misappropriated that trade secret. Accordingly, Shoreline is entitled to judgment in its favor on its misappropriation and Defend Trade Secrets Act ("DTSA") claims against Defendants.

## PROCEDURAL HISTORY

Shoreline filed its original complaint on May 13, 2020. Shoreline filed the now operative Amended Complaint ("Complaint") on April 1, 2021 asserting claims for breach of contract against Herbst and SAFE (Count I); promissory estoppel against Defendants (Count II); unjust enrichment against Defendants (Count III); breach of fiduciary duty against Defendants (Count IV); violation of the faithless servant doctrine against Defendants (Count V); misappropriation against Defendants, Ryan Pilla ("Pilla"), Blade, Melissa Tomkiel ("Tomkiel"), and Robert Wiesenthal ("Wiesenthal") (Count VI); violation of the DTSA, 18 U.S.C. § 1832 *et seq.*, against Defendants, Pilla, Blade, Tomkiel, and Wiesenthal (Count VII); unfair competition against Defendants, Pilla, Blade, Tomkiel, and Wiesenthal (Count VIII); tortious interference with prospective business relations against Defendants, Pilla, Blade, Tomkiel, and Wiesenthal (Count IX); constructive trust against Herbst, Tomkiel, Wiesenthal, and Blade (Count X); tortious interference with contract against Blade, Tomkiel, and Wiesenthal (Count XI); and aiding and abetting breach of fiduciary duty against Blade, Tomkiel, and Wiesenthal (Count XII). On July 16, 2021, Defendants and Pilla answered the Complaint. In March 2022,

Shoreline settled with Blade, Tomkiel, and Wiesenthal, and they were dismissed from the case.

Defendants and Pilla filed a motion for summary judgment dismissal of all claims and a motion to preclude Shoreline from seeking lost profits damages on December 18, 2023, and Shoreline cross-moved for summary judgment on its breach of contract, breach of fiduciary duty, unfair competition, and tortious interference claims. On August 12, 2024, Magistrate Judge Steven I. Locke issued a Report and Recommendation ("R&R") recommending that District Judge Nusrat J. Choudhury deny (1) the parties' cross-motions as to Shoreline's breach of contract claim against SAFE and breach of fiduciary duty, tortious interference, and unfair competition claims against Defendants; and (2) Defendants' motion as to the faithless servant doctrine, DTSA, and misappropriation claims against Defendants; and grant Defendants and Pilla's motion as to (1) the promissory estoppel and unjust enrichment claims; (2) breach of contract claim against Herbst; (3) constructive trust claims; and (4) all claims against Pilla. Judge Locke also recommended denial of Defendants' preclusion motion without prejudice and with leave to renew as a motion in limine. All parties filed objections to the R&R.

On May 30, 2025, this Court adopted the R&R with a modification granting summary judgment to Defendants on the breach of contract claim premised on the theory that SAFE failed to provide reasonable notice of termination of the Contract. (the "SJ Order"). As a result, the remaining claims for trial are the (1) breach of contract against SAFE; (2) breach of fiduciary duty against Defendants; (3) violation of the faithless servant doctrine against Defendants; (4) misappropriation against Defendants; (5)

3

violation of the DTSA against Defendants; (6) unfair competition against Defendants; and (7) tortious interference with prospective business relations against Defendants.

## STATEMENT OF FACTS

Shoreline is an aviation company that offered seaplane flights from 1980 until 2020. Shoreline ran commuter and charter flights in the Northeast, including flights in an out of East Hampton Airport in New York. At trial, Shoreline will introduce evidence, including testimony from its employees Andrea Collingwood ("Collingwood"), Joan Gitlin, and Eric Weaver that, over its 40 years of business, Shoreline painstakingly developed a reputation for an impeccable safety record, superior customer service, consistent on-time arrivals, and the most well-maintained aircraft in the industry.

In 1993, Shoreline entered into an agreement with Sound Aircraft Services, Inc. ("SAS") under which it would be Shoreline's exclusive booking agent for seaplane commuter flights between East Hampton and Manhattan in exchange for a 10 percent commission. SAS was a company owned by Herbst's then-husband Steven Tuma ("Tuma"), but Herbst acted as its General Manager and took primary responsibility for providing booking services for Shoreline. When the couple divorced in 2017, Herbst transitioned her booking operations entirely to SAFE.

As Shoreline's exclusive booking agent, SAS and later SAFE handled Shoreline's reservation requests, payment processing, customer communications, correspondence, flight manifests, and passenger check-in procedures at East Hampton Airport. Shoreline's advertising included SAS/SAFE's phone number for all reservations on Shoreline's seaplane commuter flights. SAFE's duties for Shoreline included mailing out a letter to Shoreline customers in December and March of each year, asking them to buy books of

4

ten tickets to receive a 10% discount for purchasing ahead of season. As Shoreline's flights filled up early, customers generally booked their seats for the summer season beginning in March and April.

The parties performed under the Contract without incident for 24 years, between 1993 and 2017. But after Herbst's divorce, SAFE's customer service began to deteriorate. Between January and May 2018, unbeknownst to Shoreline, Herbst and SAFE were negotiating with Blade, a Shoreline competitor, to sell Shoreline's customer list and enter into a consulting agreement.

Undisputed evidence in the form of testimony from former SAFE employees Eduardo Fernandes ("Fernandes") and Maureen Quigley ("Quigley") and text exchanges will show that, while those negotiations were ongoing in April and May 2018, Herbst instructed Fernandes and Quigley to stall customers who asked to book Shoreline flights by falsely stating that the summer schedule was not ready or that the employee was not authorized to book seats. In early May 2018, without notifying Shoreline, SAFE unilaterally ended its relationship with Shoreline and agreed to work with Blade. SAFE also sold to Blade for $175,000 Shoreline's customer list that SAFE maintained for Shoreline.

Defendants then launched a campaign to divert Shoreline's customers to Blade, misrepresenting to them that it was Shoreline that had decided to terminate the Contract without notice. Herbst advised the customers to seek a refund from Shoreline for their pre-paid tickets, knowing full well that Shoreline had a no-refund policy for such tickets, a policy that she herself had implemented and insisted on before 2018. As a result of Defendants' active poaching efforts, many of Shoreline's long-time customers booked

with Blade's air carriers instead, resulting in substantial lost profits for Shoreline in 2018 and beyond.

## ARGUMENT

### I.    Shoreline will establish its breach of contract claim through proof that SAFE failed to provide booking services for Shoreline in 2018.

The evidence at trial will show that SAFE breached the Contract by failing to provide booking services to Shoreline in 2018. To establish a prima facie case of breach of contract, a plaintiff must demonstrate (1) the existence of a contract, (2) plaintiff's performance under the contract, (3) defendant's breach of the contract, and (4) resulting damages. *Eun Suk Cho v. Byung Ki Koo*, 164 A.D.3d 1306, 1307 (2d Dep't 2018). This Court has determined that a valid and binding contract existed between the parties "concerning customer services related to the booking of Shoreline's seaplane flights into and out of the East Hampton Airport." (SJ Order at 11-12, 16-18, 22.) The Court determined that whether the booking relationship was exclusive and whether mailing out coupon book letters was required by the Contract was to be determined by the trier of fact. (*Id.* at 22-25.) At trial, Shoreline will establish that the Contract included mailing out coupon book letters, that the parties agreed that the booking relationship would be exclusive as to seaplane commuter flights, and each of the remaining elements.

### A. SAFE was obligated to mail out coupon book letters, and the parties agreed on exclusivity as to seaplane commuter flights.

The obligation to send out coupon book letters and exclusivity were both parts of the Contract. The best evidence of what parties agreed to in an oral contract is their course of conduct. *See Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 97 (2d Cir. 2007) ("[T]he existence of a contract may be established through the

conduct of the parties recognizing the contract.")[1]; *Belluomo v. Tiger Schulmann's Mixed Martial Arts*, No. CV 14-4402, 2015 WL 5838732, at *4 (E.D.N.Y. Oct. 7, 2015) ("In view of the fact that the agreement was oral, the terms thereof can be discerned only by reference to the parties' performance and particular documents, generated over the course of the parties' fifteen year relationship, evidencing that performance."); *Kohler v. Errico*, No. 3:09cv7290, 2015 WL 13879860, at *3 (S.D.N.Y. Mar. 11, 2015) ("Evidence of a prior course of dealing can establish a party's awareness of and consent to intended contractual terms."). As this Court noted, the parties' "substantial partial performance on the contract weighs strongly in favor of contract formation." (SJ Order at 19 (quoting *Hudson Techs., Inc. v. RGAS, LLC*, No. 21-CV-297, 2024 WL 552442, at *5 (S.D.N.Y. Feb. 12, 2024).)

The evidence at trial will show that Defendants were obligated under the Contract to mail out coupon book letters as part of their booking services, which included reservation requests, payment processing, customer communications, correspondence, flight manifests, and passenger check-in procedures at East Hampton Airport. (SAI003256-58; Decl. of Herbst (ECF No. 153-3) ¶ 25.) This Court noted that "the parties agree that from the beginning of the Shoreline-SAS agreement through 2017, SAS sent out mailers each December and March to Shoreline's past customers." (SJ Order at 12, 23.) The Court also found that this undisputed fact "demonstrates a course of performance supporting the notion that the mailings were required by the contract." (*Id.* at 24.) Echoing this principle with respect to the existence of the booking agreement,

---

[1] Internal quotation marks haven been omitted from quotations from court opinions throughout this brief.

7

Judge Locke stated that "the parties' repeated performance evidences their understanding that a contract had been formed." (*See* R&R at 24.) And with respect to the requirement to mail out coupon book letters, Judge Locke noted that the "parties' course of performance under the contract is considered to be the most persuasive evidence of the agreed intention of the parties." (*Id.* at 25-26 (citing *Gulf Ins. Co. v. Transatlantic Reinsurance Co.*, 69 A.D.3d 71, 85 (1st Dep't 2009)).

The parties' course of performance over 24 years evidence their understanding that SAFE's duties for Shoreline included mailing out a letter to Shoreline customers in December and March of each year, asking them to buy books of ten tickets to receive a 10% discount for purchasing ahead of season. (SAI000034-50; SAI007270; SAFE00000124-25; SAFE00003370; SAFE00003475.) As Shoreline's flights filled up early, customers generally booked their seats for the summer season beginning in March and April. Thus, mailing out the coupon book letters was part and parcel of the booking services SAFE provided for Shoreline. *See Unicorn Crowdfunding Inc. v. New Street Enter., Inc.*, No. 18 Civ. 10110, 2019 WL 2450911, at *4 (S.D.N.Y. June 12, 2019) (rejecting counterclaim defendant's argument that counterclaim plaintiff did not "identify the 'specific terms of performance that were required'" where the pleading "plausibly alleges an overall course of dealings sufficient to evince the terms on which the parties agreed"). Indeed, when a customer sought to book flights, Herbst responded, "The mailer has not gone out yet as we are having new software written and is it [sic] taken longer than expected …." (SAFE00002182-86.) The evidence establishes that SAFE viewed sending out the coupon book letter or the "mailer" as the first step in taking reservation

requests. (*See* BLADE 0001945-46 (Herbst tells Blade "we need to have [the agreement] finalized before hitting the 'send' button on the mailer.")

Moreover, documents evidencing the parties' performance demonstrate that the Contract was exclusive. Prior to this action, Herbst never disputed that the booking relationship between Shoreline and SAFE was exclusive with regard to the booking of seaplane commuter flights. Between 1993 and May 2018, Shoreline's advertisements, including its website, publications, travel guides, and signage, contained SAS/SAFE's phone number for all reservations on Shoreline's seaplane commuter flights. (SAI006864; SAI007746-54 at SAI007754; Compl. Ex. C.) It would have made no business sense to advertise the phone number for SAS and SAFE for all of Shoreline's seaplane bookings if the parties did not have an exclusive agreement. Herbst admitted in her deposition that the booking relationship between Shoreline and SAFE was an exclusive one:

> Q.    [A]re you aware of any instance between 1995 and 2017 when Shoreline ever used any other booking agent to book one of their seaplane commuter flights between Manhattan and East Hampton?
>
> A.    No.
>
> Q.    Did you book passengers on seaplane commuter flights between Manhattan and East Hampton for an operator other than Shoreline prior to April of 2018?
>
> A.    I did not.

(Herbst Dep. 65:11-23.)

Other examples of admissions abound. In a 2018 complaint filed by Defendants, they acknowledged the existence of the exclusive booking agreement they had with Shoreline. (Compl. ¶¶ 14-15, *Herbst et al. v. Tuma et al.*, Index No. 616650/2018 (Sup.

9

Ct., Suffolk County 2018) (until May 2018, [SAFE] utilized Shoreline as "its operator of flight servies"); *id.* ¶ 54 (Shoreline "operated their business exclusively with" Herbst from May 2017 to May 2018).)

In communications with John Kelly ("Kelly"), Shoreline's president until his death in 2019, throughout the contractual period, Herbst often referred to the exclusive nature of the agreement between SAFE and Shoreline. For example, in a 2010 email to Kelly regarding a new seaplane company, Herbst wrote, "I'm a little concerned that someone may be gearing up to compete with us." (SAI002664.) In a 2011 email, in reference to another aviation company, Herbst wrote to Kelly, "I don't want to feed anyone but us!!!" (SAI002720.) These contemporaneous emails establish that the parties had agreed to an exclusive booking agency; the emails simply would not make sense otherwise.

### B. SAFE breached the Contract by failing to provide booking services.

The evidence will establish that SAFE breached the Contract by failing to mail out letters to Shoreline customers in March 2018 offering discount coupons and failing to book reservations for Shoreline's seaplane commuter flights beginning in March 2018. Herbst actively sought to sabotage Shoreline's business and siphon its customers to Blade by instructing SAFE employees Fernandes and Quigley to stall customers seeking to book Shoreline seats based on a false premise that the summer schedule was not ready and that Fernades was not authorized to book reservations. In fact, however, the summer schedule was generally the same every year, and it was SAFE's practice to begin booking Shoreline customers on summer commuter flights in March or April each year. (SAFE00002441.) And Fernandes was SAFE's customer service representative whose

main role was to book reservations. (Defs.' Resp. to Interrog. No. 4; Herbst Dep. 193:4-

10; SAI003234-37.)

Indeed, SAFE openly admitted that it deliberately did not provide booking

services for Shoreline in April and May 2018. (Supplemental Decl. of Herbst (ECF No.

155-2) ¶ 9 (admitting that "SAFE did not book passengers on Shoreline's flights" in

March and April 2018); Defs.' Resp. to Pl.'s Statement of Undisputed Material Facts in

Supp. of Pl.'s Mot. for Summ. J. ¶¶ 23 ("Defendants do not dispute that Herbst did not

mail out letters concerning Shoreline's coupon books" in March or April 2018), 26

(failing to dispute that "[b]eginning in or around March 2018, Herbst and SAFE stalled

customers seeking to book seats on Shoreline flights, failed to book reservations for

Shoreline flights, reliably answer phone calls from customers, and accurately inform

them as to the availability of seats on Shoreline flights").)

Herbst was intentionally vague and evasive when responding to Quigley's

questions about the reasons for the stalling. On March 22, 2018, Quigley asked Herbst,

"Wondering what I am telling people about reservations. … What am I saying to people

who know the routine? Have the emails from days ago been answered?"

(SAFE00003338-39.) Herbst responded, "Please don't mention coupon books." (*Id.*)

Quigley responded, "Are we not offering another cp book? Why can't I mention them?"

Herbst responded, "We just have to be non committal [sic] right now. Trying to figure

out shorelines [sic] intentions with us." (*Id.*)

Emails show Defendants repeatedly stringing customers along and delaying

reservations in March, April, and early May 2018 until SAFE's deal with Blade was

finalized. (BLADE 0001945-46 (Herbst tells Blade "we need to have [the agreement]

11

finalized before hitting the 'send' button on the mailer.").) One customer, Jane Neale, reached out to SAFE on April 9, 2018 requesting Shoreline's flight schedule. (SAFE00002182-86.) Herbst responded, "We are working on the details and should have the information out in a week." (*Id.*) Ms. Neale wrote again on May 1, asking "Is there any further news on the below? … Would be really grateful if you could come [sic] back to me." (*Id.*) SAFE responded, "The mailer has not gone out yet as we are having new software written and is it [sic] taken longer than expected …." (*Id.*) On May 7, Ms. Neale wrote Herbst, in relevant part, "I received an email today from Shoreline Aviation about booking summer flight from NY to EH – is Shoreline Aviation you? If not, when is your reservation email coming out?" (*Id.*) Ms. Neale's confusion about SAFE's relationship with Shoreline was evident, but Herbst made no effort to clarify. (*Id.*)

As another example, on May 6, 2018, Kevin Oram, a Shoreline customer, reached out to a SAS employee in frustration, stating, "Mike I've been calling for over a month, every week SAFE has been saying one more week until the schedule comes out, so I call the next week and still nothing. You usually take reservations by late April." (SAI000143-45.) Finally, long-time Shoreline customer Mildred Glimcher has affirmed that SAFE purposely refused to book her summer flights with Shoreline until early May 2018 when Herbst encouraged her to book flights with Blade instead.

In addition to refusing to mail out the coupon book letters and book reservations at all in 2018, much less exclusively for Shoreline, SAFE breached the Contract by failing to reliably answer phone calls from customers and accurately inform customers as to the availability of seats on Shoreline's flights. (SAI007664-87 ¶ 30 (SAFE "did not

12

respond to customer inquiries, failed to return phone calls, neglected to send out the March mailer, and stopped booking customers altogether.").)

There is no question that SAFE breached the Contract by failing to book passengers on Shoreline's flights in 2018 even if the jury finds that the failure to mail out coupon book letters and to book seaplane commuter flights exclusively for Shoreline did not by themselves constitute a breach.

**C. Shoreline fully performed under the Contract.**

There is no dispute that Shoreline performed its obligations under the Contract by paying SAFE the 10% commission when due. Between 2002 and 2017, Shoreline paid SAS and SAFE commissions for commuter flights sold in the total amount of $2,900,890. (SAI000264; SAI000266; SAI000305-06; SAI000313-23; SAI000560-002525; Answer ¶ 19.) SAFE admitted that Shoreline paid them those commissions. (SAI000266; Answer ¶ 19.)

**D. Shoreline suffered resulting damages in the amount of $1,675,758.50.**

As a result of SAFE's breaches, Shoreline suffered $1,610,236.50 in lost profits. Moreover, as had been the practice in prior years, in January, February, and March of 2018, Shoreline paid SAFE its 10% commission in advance for customer booking and handling for the upcoming 2018 summer season in the amount of $65,522. (SAI000313-23.) Because SAFE stopped booking seats for Shoreline in March 2018 and never earned those commissions, Shoreline asked that SAFE refund the pre-paid and unearned commissions on April 23, 2018 and May 14, 2018, but it never did. (SAI000049-51; SAI006816; SAFE00000124-25; Pl.'s Resp. to Interrog. No. 7.)

13

Documents produced by both parties and nonparty Blade confirm that long-time Shoreline customers switched to Blade in 2018 as a result of SAFE's breaches and misconduct. A commission report for sales booked by SAFE for Blade between May 7, 2018 through September 30, 2018 shows that at least 160 Shoreline customers booked with Blade for the 2018 summer season. (*Compare* SAFE00000434-70 *with* SAI003162-3233 *and* SAI007775-76; List of 160 Customers (ECF No. 154-155).)

The evidence will show that SAFE breached the Contract, resulting in $1,675,758.50 in damages to Shoreline, and the jury should enter judgment in Shoreline's favor on Count I.

**II.    Shoreline will establish its breach of fiduciary duty and faithless servant claims through proof that Defendants owed a fiduciary duty to Shoreline and breached that duty when they diverted passengers to Shoreline's competitor.**

The evidence will show that Defendants breached their fiduciary duty to Shoreline and violated the faithless servant doctrine when they diverted Shoreline's customers to Blade, misappropriated Shoreline's proprietary information, refused to book seats for Shoreline passengers based on false premises, and secretly worked with Blade while purporting to act as Shoreline's exclusive booking agent. To establish a breach of fiduciary duty under New York law, a plaintiff must show (1) the existence of a fiduciary relationship between plaintiff and defendant, (2) defendant breached that duty, and (3) damages as a result of the breach. *Sheehy v. New Century Mortg. Corp.*, 690 F. Supp. 2d 51, 62 (E.D.N.Y. 2010). A plaintiff may recover punitive damages for a breach of fiduciary duty where the breach demonstrates a high degree of moral culpability or a wanton or reckless disregard for the rights of the plaintiff. *Greenberg v. Falco Constr. Corp.*, 29 Misc. 3d 1202(A), at *4 (Sup. Ct., Kings County 2010). Under New York's

14

faithless servant doctrine, "an agent is required to be loyal to his employer and is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties." *Ebel v. G / O Media, Inc.*, No. 20 Civ. 7483, 2021 WL 2037867, at *5 (S.D.N.Y. May 21, 2021). An "employee or agent who is faithless in the performance of his or her duties is not entitled to recover either salary or commission." *Two Rivers Entities, LLC v. Sandoval*, 192 A.D.3d 528, 529 (1st Dep't 2021).

### A. As Shoreline's exclusive booking agent acting on Shoreline's behalf, Defendants owed Shoreline a fiduciary duty.

By virtue of Defendants' role as Shoreline's exclusive booking agent for seaplane commuter flights, acting as Shoreline's representative at East Hampton Airport, Defendants owed Shoreline a fiduciary duty. *See Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 453 (S.D.N.Y. 2015) ("an exclusive agency gives rise to a fiduciary duty between principal and agent under New York law"). Agency is a "fiduciary relationship which results from the manifestation of consent of one person to allow another to act on his or her behalf and subject to his or her control, and consent by the other so to act." *Samba Enters., LLC v. iMesh, Inc.*, No. 06 Civ. 7660, 2009 WL 705537, at *7 (S.D.N.Y. Mar. 19, 2009), *aff'd sub nom. Samba Enters., Ltd. v. iMesh, Inc.*, 390 Fed. Appx. 55 (2d Cir. 2010).

Here, Herbst herself admitted that she was Shoreline's representative at East Hampton Airport and that she was acting on Shoreline's behalf. (Herbst Dep. 71:17–72:20; Minutes of Stipulation 63:16-20, *Tuma v. Tuma*, Index No. 019777/2014 (Sup. Ct., Suffolk County 2019) ("Shoreline had no independent retail presence in the terminal.

15

I [Herbst] was their presence in the terminal. Flight Enterprises."); Answer ¶ 15 (Defendants admit that they "served as Shoreline Aviation's broker").)

And there is no dispute that Shoreline consistently referred to Defendants as Shoreline's booking agent to third parties and directed all booking inquiries to Defendants. (*See, e.g.*, SAI002881; SAI002911.) Such circumstances could lead to only one conclusion – that Defendants acted on Shoreline's behalf as Shoreline's agents. *See Samba*, 2009 WL 705537, at *8 (granting defendant summary judgment on its breach of fiduciary duty counterclaim based in part on the fact that the "overall purpose" of the parties' agreement was to engage plaintiff to act on defendant's behalf).

Furthermore, a fiduciary duty exists when the principal retains a degree of control over the agent. *Veleron*, 117 F. Supp. 3d at 453; *Samba*, 2009 WL 705537, at *7. Here, Shoreline maintained control over flight operations, ticket prices, and communications Defendants sent to Shoreline's passengers concerning Shoreline's policies and flight operations. (SAI002748; SAI007244; SAI007270; Herbst Dep. 59:18–61:16, 72:21–73:24, 76:16–77:12, 79:2-10.) Emails exchanged between SAFE and Shoreline in 2010 and 2012 confirm that Shoreline dictated the contents of the mailers sent to customers offering coupon books, including information on schedule, pricing, and operations. (*See* SAI002748; SAI007270.)

In addition, an agent with access to the company's confidential information owes the company a fiduciary duty to protect that information and not use it in competition with the company. *See Cont'l Indus. Group, Inc. v. Altunkilic*, 788 Fed. Appx. 37, 41 (2d Cir. 2019); *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 994 (2d Cir. 1983). Here, Defendants maintained a list of Shoreline customers for the benefit of

16

Shoreline. (SAI007746-54 ¶¶ 12-13.) Because the parties agreed that Defendants would handle all communications on Shoreline's behalf, Shoreline's access to its customers was necessarily through SAFE. (SAI002748; SAI007244; Herbst Dep. 73:6-20, 76:16–77:12; Collingwood Dep. 40:16-23, 182:12–183:4.) Multiple documents and testimony will confirm that not only did Shoreline instruct Herbst not to disclose Shoreline's confidential information to third parties, Shoreline had confirmation of Herbst's understanding of and cooperation with these confidentiality requirements prior to her breach. (SAI007248; SAI007664-87 ¶ 22; Collingwood Dep. 209:5–210:4.)

Given the exclusive nature of the relationship, the fact that Defendants acted on Shoreline's behalf in selling tickets and communicating with passengers, the level of control Shoreline had over Defendants' customer communications, and the fact that Defendants had access to Shoreline's confidential data, ample evidence exists to establish a fiduciary relationship here.

### B. Defendants were faithless in the performance of their services and engaged in misconduct that constituted breach of fiduciary duty.

The evidence at trial will establish that Defendants engaged in misconduct and failed to exercise "utmost faith and loyalty in the performance" of their duties. *See Conahan v. MedQuest Ltd.*, No. 20-cv-1325, 2022 WL 16748585, at *5 (S.D.N.Y. Nov. 7, 2022). Indeed, the R&R, adopted by this Court, concluded that, should a fiduciary relationship be found, Shoreline had established both a breach of fiduciary duty and damages. (R&R at 34-36.) First, while they were acting as Shoreline's exclusive booking agent, they disclosed Shoreline's confidential business information to Blade, Shoreline's competitor, refused to book seats for Shoreline based on false premises, and actively sought to conceal these actions from Shoreline. (*See, e.g.*, BLADE 0000721; BLADE

17

0001229-30; BLADE 0001987-88; SAI003234-37; SAI003238-55; SAI003256-58.)

Regarding flight reservations, Herbst sent an email to Quigley stating, in relevant part,

"Please ask me questions first before calling anyone at [S]horeline." (SAFE00003347.)

Even before their agreements with Blade were finalized, Defendants were working with

Blade to draft emails to Shoreline customers in late April and early May 2018 and

working behind the Blade counter at East Hampton Airport as early as May 4, 2018.

(BLADE 0001960; BLADE 0002037-38; SAI002619.)

Second, documents show that Defendants exploited their access to Shoreline's

customers to divert their business to Blade, making false representations to Shoreline

customers, taking advantage of customer confusion, and suggesting that they seek a

refund for their pre-paid tickets from Shoreline. As one customer noted in an email to

Shoreline, SAFE's "initial communication the other day was incredibly misleading if not

underhanded, encouraging customers as it did, to seek a refund from you guys."

(SAI000169.) Third, Defendants sold to Blade the customer list that they held in trust for

Shoreline's benefit. Through each of these actions, Defendants breached their duties to

Shoreline as a matter of law. *See Salonclick LLC v. SuperEgo Mgmt. LLC*, No. 16 Civ.

2555, 2017 WL 1906865, at *4 (S.D.N.Y. May 8, 2017) (an agent breaches its fiduciary

duty when it uses "confidential knowledge acquired in [its agency] in competition with

[its] principal"); *Samba*, 2009 WL 705537, at *9 (agent liable for breach of fiduciary duty

where agent had a conflict of interest with principal and failed to disclose conflict).

Defendants failed to exercise utmost faith and loyalty in the performance of their duties.

*See Veleron*, 117 F. Supp. at 454 (fiduciary duty violated where agent acts adversely to

employer).

18

Although Defendants claim that the customers on the list were SAFE's, Defendants do not dispute the fact that (1) Shoreline referred all commuter customers to SAFE for reservations, including in all of their advertisements; (2) all of the commuter customers were Shoreline passengers, and (3) some of the customers on the list were Shoreline customers before SAS or SAFE existed. In fact, because of the exclusive relationship between SAFE and Shoreline, there is a complete overlap between Shoreline's seaplane commuter passengers and the list of seaplane commuters maintained by Defendants. (*See* SAI007746-54; *compare* SAI003162-3233 and SAI007775-76 *with* SAFE00002440 and native file attachment.) There is no question that the customer list Defendants sold to Blade constituted Shoreline's customer list. (*See* BLADE 0003220-22; BLADE 0005772-73.)

### C. Shoreline suffered damages as a direct result of Defendants' breach of fiduciary duty.

Finally, Shoreline will show that it suffered damages as a direct result of Defendants' misconduct in the form of lost profits, and Shoreline is also entitled to recover the $65,522 in unearned commissions, the $175,000 Defendants received from sale of the customer list, the $188,562 in commissions from Blade for the 2018 summer season, and the $20,000 SAFE received from Blade for "Check-In Services for the period starting May 15, 2018 and ending September 15, 2018." (SAFE00000434-70; BLADE 0008161-72 at 0008163, 0008169.) *See Samba*, 2009 WL 705537, at *9 (agent who breaches fiduciary duty not entitled to receive any compensation and must disgorge all wrongful benefits obtained by its disloyalty).

Herbst may be held individually liable for SAFE's breach of fiduciary duty because she personally committed and participated in the misconduct. *See LoPresti v.*

19

*Terwilliger*, 126 F.3d 34, 42 (2d Cir. 1997) ("a corporate officer who commits or participates in a tort, even if it is in the course of his duties on behalf of the corporation, may be held individually liable"). There is no question that Herbst personally participated and directed the tortious conduct, including misleading customers, selling Shoreline's customer list, and lying to customers about why SAFE could not book their Shoreline flights.

The evidence will show that Herbst and SAFE breached their fiduciary duty to Shoreline and violated the faithless servant doctrine, resulting in $1,675,758.50 in damages to Shoreline. Shoreline is also entitled to $383,562 in disgorgement of monies paid to Defendants during their period of disloyalty. The jury should enter judgment in Shoreline's favor on Counts IV and V.

III.    **Shoreline will establish its tortious interference claim through proof that Defendants diverted Shoreline customers to Blade based on false statements.**

The evidence will show that Defendants tortiously interfered with Shoreline's relationships with its customers. The elements of a tortious interference with prospective business relations claim under New York law are (1) plaintiff's business relationship with a third party; (2) defendant's knowledge of and intentional interference with the relationship; (3) defendant acted solely out of malice or used dishonest, unfair, or improper means; and (4) defendant's interference caused injury to the relationship. *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006). Here, as Shoreline's exclusive booking agent for 24 years, Herbst and SAFE knew of Shoreline's long-standing business relationship with its customers. Indeed, this Court adopted the R&R's finding that "[t]he parties do not dispute that Shoreline had a business relationship with its passengers … or

20

that Herbst and SAFE were aware of which customers they had booked on Shoreline's flights." (R&R at 42; SJ Order at 34.)

And the evidence is replete with Herbst and SAFE's intentional interference with those relationships using improper means. Two former SAFE employees confirmed in affidavits, with supporting text messages, that Herbst directed them to stall customers who sought to book Shoreline flights based on lies, intending to divert them to Blade once Defendants' agreement with Blade was finalized. (SAI003234-37 ¶¶ 6-26; SAI003238-55; SAI003256-58 ¶¶ 9-19.) Defendants acknowledged the authenticity of these text messages. (Defs.' Herbst and SAFE Resps. & Objections to Pl.'s First Set of Req. for Adm. ¶ 19.) Defendants concealed these deceptive tactics from Shoreline while their negotiations with Blade proceeded.

Defendants also made misleading remarks to Shoreline customers, deliberately took advantage of customer confusion about the nature of her relationship with Shoreline, and made no effort to clarify such confusion. They improperly encouraged customers to seek a refund from Shoreline for their pre-paid tickets, abused their access to Shoreline's customer list, and sold it to Blade with an intent to harm Shoreline's business.

Defendants also worked with Blade to target Shoreline customers, exploiting Herbst's inside knowledge of Shoreline's customers and business practices to persuade those passengers to fly with Blade instead. In a series of May 2018 emails between Herbst and Blade, Herbst reveals Shoreline's business practices and discusses strategies to keep a customer from "[going] back to Shoreline." (BLADE 0005774-77.) Herbst informs Blade that the customer is balking at Blade's higher prices, stating, "I'm trying hard to save her as I'm not sure she gets that she can go back to Shoreline." (*Id.*) Blade

21

responds, "We won't be able to compete with Shoreline on those prices to MTP but I will see if there is a discount I can offer. I am sure we can put something together to secure them as customers." (*Id.*)

In another email, a Blade employee asks Herbst to review a draft of an email to send to Shoreline customers, stating, "Additionally, we plan to tweak this email slightly to target those who ended up flying with Shoreline last summer because they purchased their books before our deal. We would like to hear your thoughts on how to most effectively target them." (BLADE 0000884-85.) Fraudulent behavior, a breach of fiduciary duty, and the use of a company's confidential information to compete with the company is more than sufficient to establish wrongful means. *See Impax Media, Inc. v. Ne. Adver. Corp.*, No. 17 Civ. 8272, 2018 WL 3962841, at *9 (S.D.N.Y. Aug. 17, 2018).

Defendants understood that their cooperation and agreements with Blade made Defendants vulnerable to legal action by Shoreline. During negotiations with Blade, Herbst asked Blade to add provisions to the agreements for "legal backing to SAFE/Cindy against any legal action brought against either or both as a result of this transaction and all SAFE/BLADE operations at HTO" because "the exposure that this will create all at once could negatively impact the future of SAFE …." (BLADE0001945-46.)

Defendants engaged in other interference to harm Shoreline's business relations with its customers, including attempting to block Shoreline's access to the terminal at East Hampton Airport by filing a frivolous lawsuit against Tuma, SAS, Kelly, Shoreline, and Fernandes in August 2018, which was dismissed as to Kelly, Shoreline, and

22

Fernandes on May 18, 2020. (*Herbst v. Tuma* complaint; 5/18/20 Farneti decision granting Shoreline's motion to dismiss in *Herbst v. Tuma*.)

Finally, Defendants' stalling and deceptive tactics worked, and many Shoreline passengers ended up flying with Blade carriers instead. (BLADE 0000377-89; SAI003234-37 ¶ 22 (Herbst informed SAFE employees that "she was going to work for Blade and that Shoreline customers would subsequently be booked on Blade flights.").) As soon as Defendants joined forced with Blade and actively sought to poach Shoreline's customers, over 160 customers who had flown with Shoreline year after year prior to 2018 abruptly changed course and flew with Blade instead. (List of 160 Customers.) Shoreline suffered damages in the amount of $1,610,236.50 in lost profits in 2018 when its customers were wrongfully diverted to Blade. Accordingly, the jury should enter judgment in Shoreline's favor on Count IX.

IV. **Shoreline will establish its unfair competition, misappropriation, and DTSA claims through proof that Defendants abused their access to Shoreline's customer list to sabotage Shoreline's business.**

These same facts demonstrate Defendants' unfair competition, misappropriation and violation of the DTSA in abusing their access to Shoreline customers to sabotage Shoreline's business and divert them to a competitor. The elements of an unfair competition claim under New York law are (1) misappropriation of plaintiff's labor, skills, expenditures, good will, or commercial advantage (including proprietary information or trade secrets) and (2) a display of some element of bad faith in doing so. *CDC Newburgh Inc. v. STM Bags, LLC*, 692 F. Supp. 3d 205, 226 (S.D.N.Y. 2023). New York's common law of unfair competition is a "broad and flexible doctrine" that encompasses "any form of commercial immorality." *Roy Exp. Co. Establishment of*

23

*Vaduz, Liechtenstein v. Columbia Broad. Sys.*, 672 F.2d 1095, 1105 (2d Cir. 1982). "An unfair competition claim involving misappropriation usually concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property ...." *Id.*

The elements of a misappropriation claim under New York law are (1) plaintiff possessed a trade secret and (2) defendant used that trade secret in breach of an agreement, confidence, or duty as a result of discovery by improper means. *IME Watchdog, Inc. v. Gelardi*, 732 F. Supp.3d 224, 238 (E.D.N.Y. 2024). The elements of a DTSA claim are (1) plaintiff possessed a trade secret; and (2) defendant's misappropriated the trade secret. *Catalyst Advisors, LP v. Catalyst Advisors Investors Global Inc.*, No. 21 Civ. 4855, 2024 WL 522751, at *17 (S.D.N.Y. Feb. 9, 2024). The elements of a misappropriation claim under New York law and a DTSA claim are "fundamentally the same." *IME*, 732 F. Supp.3d at 238.

The evidence will establish that Shoreline's customer list constituted a trade secret. In determining whether certain information constitutes a trade secret, New York courts consider the following factors: "(1) [t]he extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *IME*, 732 F.Supp.3d at 239. The Second Circuit has long recognized that a "customer list developed by a business through

24

substantial effort and kept in confidence may be treated as a trade secret" so long as it is not "otherwise readily ascertainable." *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999).

Here, Shoreline will show that its customer list was developed through 38 years of top-notch service and thousands of dollars in advertisements to identify individuals interested in seaplane services between New York City and East Hampton. (Compl. Ex. C.) The tailored nature of this customer list rendered it not readily ascertainable. As this Court noted, "Shoreline also built long-term customer relationships through its services as demonstrated by the positive feedback of longtime customers in the record." (SJ Order at 30.) The record will establish that the passengers on Shoreline flights booked through SAFE because they sought to use Shoreline's services, not the other way around. (*See, e.g.*, SAI007971-73 ¶¶ 4-5 (Shoreline customer flew consistently with Shoreline based on its "on-time service, well-maintained aircraft and friendly staff"); SAI010514-16 (Shoreline customer writes, "As much as I like dealing with the Sound booking people very much, the reason I [fly Shoreline] is the planes and the pilots which are all excellent.").) Shoreline's customer list was not known outside of Shoreline's business and could not have been properly acquired without great difficulty by competitors. (SAI007664-87 ¶ 23.) Also, Shoreline took several measures to guard the secrecy of the list, restricting access to its customer database and prohibiting disclosure by its employees and agents. (*Id.* ¶¶ 19-20.) Thus, Shoreline's customer data could not be easily acquired or duplicated. (*Id.* ¶ 23.)

Defendants were given access to Shoreline's customer information, proprietary pricing information, and confidential business practices solely because they were acting

25

as Shoreline's booking agent. (*Id.* ¶ 21.) From the beginning, Shoreline made clear to Herbst that she and her affiliated entities were obligated to guard the secrecy of Shoreline's customer information. (*Id.* ¶ 22; Collingwood Dep. 209:5–210:4.) The obligation to maintain the data's secrecy need not be in written form or through a formal confidentiality agreement for the data to qualify as a trade secret. *See Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 262 (S.D.N.Y. 2021).

Indeed, Herbst herself confirmed her duty to keep the customer information confidential in a 2011 email to a third party that was also sent to Shoreline, writing, "With regard to our passenger manifest; this information is not public. My releasing any portion of it to anyone other than Shoreline Aviation as the operator, FAA officials or the TSA would be a violation of aviation regulations as well as privacy laws. We take this very seriously for our passengers as well as the guests that you book with us."). (SAI007248.) And the fact that Herbst and SAFE eventually sold Shoreline's customer list for $175,000 evidences the significant value of that list to Shoreline's business and its competitors. (Herbst Dep. 187:2-13; BLADE 0008161-72 at BLADE 0008162.) *See IME*, 732 F.Supp.3d at 239 (plaintiff's customers lists constituted trade secrets where "customer information was clearly valuable to individuals outside the business, as evidenced by … [Defendant's] willingness to pay [plaintiff's president] for the information").

The evidence will show that Defendants unquestionably misappropriated Shoreline's customer list and other proprietary business information for their own commercial advantage. In February 2018, Herbst disclosed to Blade Shoreline's confidential financial data, including the number of customers who purchased commuter

seats, number of scheduled flights, and number of ticket books sold. (BLADE 0000721; BLADE 0001229-30; BLADE 0001987-88.) Defendants then sold Shoreline's customer list to Blade for $175,000 in May 2018. (BLADE 0008161-72 at BLADE 0008162.)

Defendants took these actions in bad faith using improper means, misrepresenting the facts to the customers, hiding their actions from Shoreline, and taking advantage of customer confusion to divert sales to Blade. Defendants made false statements to Shoreline's customers about Shoreline and SAFE's relationship to Shoreline and lied to them about the reasons SAFE could not book the passengers on Shoreline flights in March, April, and May of 2018. A breach of fiduciary duty satisfies the improper use of trade secret element of a misappropriation claim. *See Schroeder v. Pinterest Inc.*, 133 A.D.3d 12, 28 (1st Dep't 2015). And "misappropriation" under the DTSA is defined to include disclosure or use of a trade secret by a person who knew that the trade secret was "acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5)(B)(ii)(II). There is no question that Defendants misappropriated Shoreline's trade secret. The jury should enter judgment in Shoreline's favor on Counts VI, VII, and VIII.

## CONCLUSION

The evidence at trial will establish that SAFE breached its agreement with Shoreline and Defendants breached their fiduciary duty to Shoreline, interfered with Shoreline's business relationships, engaged in unfair competition, and misappropriated Shoreline's trade secret, in violation of the DTSA. Shoreline is therefore entitled to judgment in its favor on all its remaining claims and to the relief it requests in the Joint Pre-Trial Order.

27

Dated:  Sag Harbor, New York
   July 23, 2025

         Respectfully submitted,

         KRIEGSMAN PC

By:  */s/  Alex Kriegsman*
         Alex Kriegsman
         279 Main Street
         Sag Harbor, NY 11963
         (631) 899-4826 Tel.
         alex@kriegsmanpc.com

         *Attorneys for Plaintiff*