# EXHIBIT 7

**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK**

– – – – – – – – – – – – – – – – – – – – – – – – – – X

SHORELINE AVIATION, INC.,             :       Case No. 2:20-cv-02161-JMA-SIL

               *Plaintiff*,     :

            v.          :

CYNTHIA L. HERBST, SOUND AIRCRAFT  :
FLIGHT ENTERPRISES, INC., RYAN A.
PILLA,                        :

            *Defendants*.    :

– – – – – – – – – – – – – – – – – – – – – – – – – – X

**DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED
MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT**

GLENN AGRE BERGMAN & FUENTES LLP

Reid Skibell
Jewel K. Tewiah
1185 Avenue of the Americas, 22nd Fl
New York, New York 10036

*Attorneys for Defendants Cynthia L. Herbst,
Sound Aircraft Flight Enterprises, Inc., &
Ryan A. Pilla*

Pursuant to Federal Rule of Civil Procedure 56 (c) and Local Rule 56.1, and in connection with their opposition to the motion of plaintiff Shoreline Aviation, Inc., ("Plaintiff" or "Shoreline") for summary judgment, defendants Sound Aircraft Flight Enterprise, Inc., Cynthia L. Herbst, and Ryan A. Pilla (the "Defendants") respectfully submits the following response to Plaintiff's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1:

1.    Shoreline's seaplane commuter customers included longtime passengers that had been flying with Shoreline since 1980, when Shoreline first began offering seaplane services. SAI000183 (Pl.'s Ex. 14) 1; SAI006864 (Pl.'s Ex. 43); SAI007746-54 (Pl.'s Ex. 53) at SAI007752; SAI007971-73 (Pl.'s Ex. 56) ¶¶ 4-5; BLADE 0006144-47 (Pl.'s Ex. 130) at BLADE 0006144; Herbst Dep. 26:22– 27:20, Mar. 30, 2022 ("Herbst Dep.") (Defs.' Ex. 1).

- Defendants' Response: Defendants do not dispute that Shoreline first started offering seaplane services in 1980. To the extent that the proposed fact in paragraph 1 is intended to suggest that all of Shoreline's passengers were longtime and exclusive customers who did not fly with other operators, the record does not support such a claim. For example, Shoreline relies on email correspondence from 2018 between John Kelly and two former passengers that has no reference to exclusivity. See Pl.'s Exs. 14 and 43. Shoreline also cites two declarations where the declarants lack direct knowledge of its passengers since 1980 or whether those passengers flew with other operators. See Pl.'s Exs. 53, 56. Shoreline also cites Ms. Herbst's deposition testimony, in which she discusses meeting John Kelly in 1993. See Defs. Ex. 1 at 26:22– 27:20 (Herbst Dep. Tr.).[1] Ms. Herbst does not testify about how long Shoreline has been in business nor does she testify that it has customers who have flown with it since the 1980s. Id.

2.    For over 38 years, Shoreline cultivated and developed an extensive list of customers who returned as passengers on its seaplanes every summer because of Shoreline's service, aircraft, and staff. SAI003161-3233 (Defs.' Ex. 12); SAI007775-76 (Pl.'s Ex. 54); SAI007971-73 (Pl.'s Ex.

---

[1] Defs. Ex. refers to the exhibits enclosed with the declarations of Reid Skibell in support of Defendants' Motion for Summary Judgment and in opposition to Shoreline's Motion for Summary Judgment.

56) ¶¶ 4-5; SAI010514-16 (Pl.'s Ex. 60) at SAI010514; SAFE00002440 and native file attachment (Pl.'s Ex. 68); SAFE00002983 and native file attachment (Pl.'s Ex. 73).

- <u>Defendants' Response</u>: Disputed. The proposed fact in paragraph 2 is not sufficiently supported by the record. Shoreline relies on customers lists, which appear to be incomplete and do not indicate how, when, or why they were created. *See* Pl.'s Exs. 54, 68, 73; Defs. Ex. 31 at 218:8-225:3 (Shoreline acknowledging that it does not know how customer lists were created). These documents also do not show how often these persons booked flights, whether they booked with other operators, or why they booked flights.

The record establishes that Shoreline did not regularly collect or utilize customer data. Defs. Ex. 2 at 43:3-44:21, 98:20-99:19, 149: 10-14, 245:10-250:16; Defs. Ex. 31 at 41:3-22, 236:12-237:2. (Collingwood Dep. Tr.); Declaration of Cynthia Herbst, dated June 16, 2023 ("Herbst Declaration") ¶¶ 16, 32. For this reason, Shoreline sought to purchase SAFE's customer list in 2018. (Defs. Ex. 10 at SAI000041-42); (Defs. Ex. 2, at 242:3-24) ("Q. So Mr. Kelly is offering to purchase SAFE's customer data, right? A: Yes, all of it."). The record also shows that passengers did not fly with Shoreline because of its "service, aircraft, and staff", but because it was the only entity that offered seaplane flights at the East Hampton airport for most of the relevant period. Defs. Ex. 32 at 129:25-130:16 (Herbst Dep. Tr.); Defs. Ex. 2 at 150:4-151:7.

3.  In or about 1993, Shoreline entered into an agreement with Defendants Cynthia L. Herbst ("Herbst"), doing business as Sound Aircraft Services, Inc. ("SAS") and Sound Aircraft Flight Enterprises ("SAFE"), under which Herbst would be Shoreline's exclusive booking agent for seaplane commuter flights between East Hampton Airport and the 23rd Street Seaplane Base in Manhattan in exchange for a 10% commission (the "Contract"). SAI000340-55 (Pl.'s Ex. 19) at SAI000344; SAI000358-71 (Defs.' Ex. 7) at SAI000361; SAI000392-404 (Pl.'s Ex. 20) at SAI000394; SAI000406-11 (Defs.' Ex. 9) ¶ II(B); Answer to Am. Compl. ("Answer") (Pl.'s Ex. 140) ¶¶ 5, 10, 15, 19; Herbst and SAFE's Resps. & Objections to Pl.'s First Set of Interrogs. ("Defs.' Resp. to Interrog.") (Pl.'s Ex. 141) Nos. 2, 3; Pl.'s Am. Objections & Resps. to First Set of Interrogatories to Pl. by Defs. ("Pl.'s Resp. to Interrog.") (Defs.' Ex. 5) No. 1; Herbst Dep. 29:7–30:14 (Defs.' Ex. 1), 65:12-23 (Pl.'s Ex. 137); Collingwood Dep. 151:3–154:23, Mar. 29, 2022 ("Collingwood Dep.") (Defs.' Ex. 2); SAI000034-50 (Defs.' Ex. 10) at SAI000040; SAI000052 (Pl.'s Ex. 4); SAI002881 (Pl.'s Ex. 27); SAI003234-37 (Pl.'s Ex. 32) ¶ 4; SAI003256-

58 (Defs.' Ex. 11) ¶ 4; SAI003313-14 (Pl.'s Ex. 34) at SAI003314; SAI007971-73 (Pl.'s Ex. 56) ¶ 7; SAFE00000124-25 (Pl.'s Ex. 61); BLADE 0005640-43 (Pl.'s Ex. 122) at BLADE 0005642; BLADE 0008273 (Pl.'s Ex. 134).

- <u>Defendants' Response</u>:  Disputed.  Shoreline's corporate representative admits that Shoreline does not know how the arrangement between Shoreline and SAS came to be. Defs. Ex. 2 at 31:3-33:23 (Collingwood Dep. Tr.) ("[Mr. Kelly and Ms. Collingwood] talked about him setting up the arrangement with [Ms. Herbst]: the booking arrangement where she would help us with our customers in exchange for commissions"); *Id.* at 150:4-151:21 (Q:  I'm asking now what was discussed in 1994. To your knowledge did they discuss one way or the other whether Ms. Herbst could book flights for other seaplane operators? A:  I really don't know the answer to that.").

Nevertheless, the record establishes that SAS, which Ms. Herbst was an employee of, and Shoreline agreed to a non-exclusive business arrangement whereby, in exchange for commissions, SAS would book passengers for seaplanes and chartered planes departing from or flying to East Hampton, New York. *See* Defs. Ex. 1 at 19:17-34:24; 58:10-22 (Herbst Dep. Tr.); Herbst Declaration ¶ 6; Ex. 10 at SAI000040 (SAI000034 to SAI000050) (Shoreline: "For twenty-four years we have operated under an arrangement. . ."); Herbst Declaration ¶ 13-23; Defs. Ex. 6 at SAI000255 (SAI000254 to SAI000257) (Kelly referring to the relationship with SAFE as a "booking arrangement."); *see also* Plaintiff's Response to Defendants' Undisputed Fact No. 15 (admitting that Herbst and Kelly entered into an agreement where she, through SAS, would book passengers for Shoreline in exchange for commissions). Ms. Herbst started to handle bookings via SAFE in 2017, after her divorce from Steven Tuma, who was the owner of SAS. Defs. Ex. 1 at 131:15-132:15 (Herbst Dep. Tr.); Herbst Declaration ¶ 34. The parties did not execute any assignment concerning the assigning of SAS's purported contractual obligation or rights to SAFE.

3

Herbst Declaration ¶ 37. The record further confirms that Shoreline understood that it only had an arrangement with SAS/SAFE as it failed to disclose to Cape Air, a company that it started merger talks with in 2017, that it had any contract with Ms. Herbst/SAFE. Defs. Ex. 13 at 95:3-7 (Migliore Dep. Tr.); Defs. Ex. 2 at 68:7-69:16 (Collingwood Dep. Tr.).

Further, on May 15, 1994, SAS, Shoreline, and the town of East Hampton entered into an operating agreement (the "Operating Agreement"), which was intended "to formally establish procedures to be followed to insure the safe, orderly and compatible conduct of [Shoreline]'s operation, including the ground operation services to be provided by [SAS], one of the Airport's fixed base operators." Ex. 7 (SAI000358 to SAI000371); Ex. 8 at 9 (Shoreline's Response to RFA No. 8); The Operating Agreement stated that that "[i]t is clearly understood and agreed that nothing in this agreement shall be construed to grant or authorize the granting of an exclusive right to [Shoreline]." Ex. 7 at § 16 (B) (SAI000358 to SAI000371). The Operating Agreement also included an integration clause confirming that it reflected "the complete understanding of the parties" and could only be modified "by written endorsement pursuant to a resolution of the Town Board." Ex. 7 at § 18 (SAI000358 to SAI000371). On July 16, 1996, SAS and Shoreline executed a supplemental written operating agreement (the "Supplemental Operating Agreement"), which reaffirmed the duties and obligations between the parties. Ex. 9 (SAI000406 to SAI000411); Ex. 8 at 11 (Shoreline Response to RFA No. 13). The Supplemental Operating agreement was the last contract executed by Shoreline and SAS related to booking and ticketing services. Ex. 9 (SAI000406 to SAI000411); Ex. 2 at 177:20-178:22 (Collingwood Dep. Tr.).

Shoreline's proffered evidence fails to demonstrate an agreement between SAS and Shoreline that formalized the exclusivity, terms, length, or conditions of their arrangement. For example, Shoreline cites the Operating Agreement with East Hampton, which explicitly stated that

4

Shoreline had no exclusive rights. *See* Pl.'s Exs. 19, 20; Defs. Exs. 7, 9. Shoreline also relies on its own discovery responses, which are insufficient to establish an undisputed fact. *See* Defs. Ex. 5. Furthermore, Shoreline also cites Defendants' deposition testimony, answer to the complaint and discovery responses, in which Defendants repeatedly denied the existence of an enforceable agreement with Shoreline. *See* Pl.'s Ex. 140 at p. 1-2; Pl.'s Ex. 141 at Resp. to Int. Nos. 2 and 3; Defs. Ex. 1 at 26:22-34:24 (Herbst Dep. Tr.).

With respect to the issue of SAS serving as a "booking agent", Shoreline's evidence does not support this proposition. For example, as discussed already, the Operating Agreement contradicts any claim that SAS served as SAFE's exclusive booking agent. Additionally, the other exhibits are not helpful because they are: an affidavit by a former SAFE employee who only started working there in 2017 (Pl. Ex. 32), an affidavit from a person who flew on Shoreline and hired it to operate her airplane (Pl. Ex. 56), an email Mr. Kelly sent Ms. Herbst on April 23, 2018, attempting to convince her to sell SAFE (Pl. Ex. 61), and an email Mr. Kelly sent passengers on May 14, 2018, stating why SAFE was supposedly at fault for Shoreline's decision to cease working with SAFE (Pl. Ex. 4).

4.    As part of her duties as Shoreline's booking agent, Herbst/SAFE handled Shoreline's reservation requests, payment processing, customer communications, correspondence, flight manifests, and passenger check-in procedures at East Hampton Airport. SAI003256-58 (Defs.' Ex. 11) ¶ 5; Decl. of Cynthia L. Herbst ("Herbst Decl.") ¶ 25; Collingwood Dep. 30:6-14 (Defs. Ex. 2); Pl.'s Resp. to Interrog. (Defs.' Ex. 5) No. 1.

- Defendants' Response:  Disputed. The record does not support the assertion that SAFE contractually agreed to be a booking agent for Shoreline nor does it support the assertion that Ms. Herbst agreed to handle bookings in an individual capacity. *See* Defs. Resp. to Plaintiff's Proposed Undisputed Fact No. 3. Shoreline cites evidence that only establishes that at some point in time, SAS handled administrative tasks for Shoreline. *See* Defs. Ex. 11 ¶ 5; Herbst Decl. ¶ 25.

Additionally, Shoreline's citation to deposition testimony where the witness lacked any direct knowledge and its own interrogatory response is improper. *See* Defs. Exs. 2 and 5.

The record also establishes that the reservation requests were SAFE's and SAS's, not Shoreline's. *See* Defs. Resp. to Plaintiff's Proposed Undisputed Fact No. 2.

5.   Herbst/SAFE's administrative duties for Shoreline included mailing out a letter to Shoreline customers, once in December and again in March of each year, asking them to buy books of ten tickets to receive a 10% discount in December and a 5% discount in March for purchasing ahead of the summer season. SAFE00000124- 25 (Pl.'s Ex. 61); Pl.'s Resp. to Interrog. (Defs.' Ex. 5) No. 1.

- Defendants' Response:  Defendants do not dispute that SAS, and later SAFE, mailed letters regarding purchasing books of tickets that could be used to book  flights. Defendants dispute that Ms. Herbst/SAFE were contractually obligated to mail out letters on Shoreline's behalf. The record establishes that SAS and then SAFE completed certain administrative tasks for Shoreline in the hope of receiving commissions as a part of SAS/SAFE's and Shoreline's non-exclusive booking arrangement. *See* Herbst Declaration ¶ 24-25, 34; *see also* Defs. Resp. to Plaintiff's Proposed Undisputed Fact No. 3.

6.   Shoreline maintained control over flight operations, ticket prices, and communications Herbst/SAFE sent to Shoreline's passengers concerning Shoreline's policies and flight operations. SAI002748 (Pl.'s Ex. 26); SAI007244 (Pl.'s Ex. 44); SAI007270 (Pl.'s Ex. 46); Herbst Dep. 59:18–61:16, 72:21–73:24, 76:16–77:12 (Pl.'s Ex. 137).

- Defendants' Response:  Defendants dispute the proposed fact in paragraph 6 to the extent that it asserts that Ms. Herbst handled administrative tasks related to booking in an individual capacity. The record establishes that Ms. Herbst initially handled bookings and related administrative tasks as an employee of SAS, a company wholly owned by her ex-husband Steven Tuma. *See* Defs. Resp. to Plaintiff's Proposed Undisputed Fact No. 3. After her divorce from Mr. Tuma in 2017, Ms. Herbst started to handle bookings and related administrative tasks as an owner of SAFE. *Id*.

6

Defendants also do not dispute that Shoreline maintained control over ticket prices and flight operations and communications concerning flight operations as required by the FAA. Defendants dispute that Shoreline maintained control over all other communications. The record establishes that SAFE controlled the content of communications that it made to its customers, including those that it booked on Shoreline's flights. Defs. Ex. 32 at 72:25-78:25. (Herbst Dep. Tr.); *see also* Supp. Herbst Decl. ¶¶ 2-3.

7.    As Shoreline's booking agent, Herbst/SAFE knew of Shoreline's business relationships with its customers. SAI002881 (Pl.'s Ex. 27); SAI002911 (Pl.'s Ex. 28).

- Defendants' Response: Disputed. The cited evidence does not support the asserted fact

in paragraph 7. Shoreline cites, without context, an email correspondence from 2017 concerning seat availability. *See* Pl.'s Ex. 27. The second cite is another email correspondence from 2017 where Shoreline copied SAFE in response to an inquiry. *See* Pl.'s Ex. 28.  The emails do not detail or refer to any knowledge by Ms. Herbst/SAFE of "Shoreline's business relationships."

8.    Under the Contract, either party could terminate the Contract with reasonable notice to the other party. SAI000034-50 (Defs.' Ex. 10) at SAI000049; SAFE00000124-25 (Pl.'s Ex. 61) at SAFE00000124; Herbst Dep. 48:22–49:24 (Pl.'s Ex. 137); Collingwood Dep. 152:17-22 (Defs.' Ex. 2); Pl.'s Resp. to Interrog. (Defs.' Ex. 5) Nos. 2, 3.

- Defendants' Response: Disputed. Shoreline fails to provide any cite to the record, other

than its own discovery responses, that demonstrate the parties had a contract that included reasonable notice before termination as a term. Shoreline relies on Ms. Herbst's deposition testimony, which contradicts its assertion as she testified that the parties had an informal arrangement without "formality of cancellation." Pl.'s Ex. 137 at 49:4-15.

The record also establishes that Shoreline and Ms. Herbst/SAFE did not have any contract, but a non-exclusive booking arrangement.  *See* Resp. to Plaintiff's Proposed Undisputed Fact No. 3. Additionally, it is confirmed in the record that Shoreline terminated its arrangement with SAFE

without any notice. Defs. Ex. 1 at 42:3-17 (Herbst Dep. Tr.); Defs. Ex. 2 at 122:15-123:3 (Collingwood Dep. Tr.); Defs. Ex. 19 (SAI000047); Defs. Ex. 20 (SAI000033); Herbst Decl. ¶ 49.

9.    In April 2017, Herbst transitioned to SAFE full time. SAI000052 (Pl.'s Ex. 4); SAI003414 (Pl.'s Ex. 36); Answer (Pl.'s Ex. 140) ¶ 10; Defs.' Resp. to Interrog. (Pl.'s Ex. 141) No. 1.

- Defendants' Response: Undisputed.

10.    The Contract was evidenced by the parties' course of performance over 24 years. Each week, Herbst and SAFE would provide a recap report detailing sales, expenses, and fees. Herbst would then send Shoreline a check for the total sales minus fuel fees and her commission. SAI000560-002525 (Pl.'s Ex. 22); Answer (Pl.'s Ex. 140) ¶ 22. Each time a customer contacted Shoreline about purchasing tickets on its commuter flights, Shoreline directed the customer to contact Herbst/SAFE, Shoreline's booking agent. SAI002881 (Pl.'s Ex. 27); SAI002911 (Pl.'s Ex. 28).

- Defendants' Response: Disputed. The proposed fact that the party had a "course of performance" for 24 years is not sufficiently supported by the record. The record establishes that Shoreline and Ms. Herbst/SAFE did not have any contract, but a non-exclusive booking arrangement existed between Shoreline and SAS initially, and then Shoreline and SAFE. *See* Defs. Resp. to Plaintiff's Proposed Undisputed Fact Nos. 3 and 8.  Shoreline's proffered evidence only confirms that a booking arrangement existed between SAS/SAFE and Shoreline.

11.    Between 1993 and May 2018, most of Shoreline's advertisements, including its website, publications, travel guides, and signage, contained the contact information for Herbst/SAS/SAFE for booking purposes.  SAI006864 (Pl.'s Ex. 43); SAI007746-54 (Pl.'s Ex. 53) at SAI007754; Am. Compl. Ex. C (Pl.'s Ex. 136)

- Defendants' Response: Disputed. The proposed fact in paragraph 11 is not sufficiently supported by the record. Shoreline cites email correspondence and a declaration that does not contain or refer to its advertisements.  *See* Pl.'s Exs. 43 & 53. The only document that actually contains contact information, Pl.'s Ex. 136, only demonstrates that in 1994 and 2015, Shoreline's advertisements contained SAS's contact information, not Herbst's or SAFE's.

12.    Beginning in or around 2005, it was the general practice of Herbst/SAFE to begin booking Shoreline customers on summer commuter flights in March or April each year. SAI003256-58

8

(Defs.' Ex. 11) ¶ 8; SAI007971-73 (Pl.'s Ex. 56) ¶ 6; SAFE00002441 (Pl.'s Ex. 69); Herbst Dep. 193:16–195:6 (Pl.'s Ex. 137).

- <u>Defendants' Response</u>: Disputed. The proposed fact in paragraph 12 is not sufficiently supported by the record. The record establishes that Ms. Herbst did not handle bookings in an individual capacity and SAFE did not start handling bookings until 2017. *See* Defs. Resp. to Plaintiff's Proposed Undisputed Fact Nos. 3. Further, Ms. Herbst testified that "people called at all different times" with respect to bookings. Pl.'s Ex. 137 at 193:16-21.

13. Herbst and SAFE acknowledged the existence, essential terms, and the validity of the Contract. SAI002664 (Pl.'s Ex. 24); SAI002720 (Pl.'s Ex. 25); SAI007746-54 (Pl.'s Ex. 53) ¶ 9; Answer (Pl.'s Ex. 140) ¶¶ 5, 10, 15, 19; Herbst Dep. 29:7– 30:14 (Defs.' Ex. 1), 65:12-23 (Pl.'s Ex. 137); Verified Compl. ¶¶ 14-15, Herbst et al. v. Tuma et al., Index No. 616650/2018 (Sup. Ct., Suffolk County 2018) ("Herbst v. Tuma complaint") (Pl.'s Ex. 142).

- <u>Defendants' Response</u>: Disputed. The proposed fact asserted in paragraph 13 is not supported by the record. Shoreline relies on email correspondence between John Kelly and Ms. Herbst, in her capacity as an employee of SAS, which were general business emails concerning customers booking flights with SAS. *See* Pl.'s Exs. 24 and 25. Shoreline also cites a declaration containing inadmissible hearsay. *See* Pl.'s Ex. 53 ¶ 9. Shoreline also relies on complaint allegations where Ms. Herbst/SAFE only alleged that Shoreline was "utilized" as an operator of flight services; their allegations did not state that Ms. Herbst/SAFE acknowledged the existence of a contract with Shoreline. *See* Pl.'s Ex. 142 ¶¶ 14-15. Shoreline also cites Ms. Herbst/SAFE's Answer, where they stated that "Herbst and SAFE deny the allegations in paragraph 21 of the Amended Complaint, including the existence of a contract, except admit that Herbst and SAFE served as Shoreline Aviation's broker in a non-exclusive capacity, in return for a 10% commission on each commuter seat and charter flight booked." *See* Pl.'s Ex. 140 at ¶ 15.

The record establishes that Ms. Herbst/SAFE only acknowledged a non-exclusive booking arrangement between Shoreline and SAFE without any reference to a valid enforceable agreement. Defs. Ex. 1 at 19:17-34:24; 58:10-22 (Herbst Dep. Tr.); *see also* Pl.'s Ex. 140 at ¶ 15.

14.  Shoreline performed all of its obligations under the Contract by paying Herbst and SAFE their commissions when due. SAI000264 (Pl.'s Ex. 15); SAI000266 (Pl.'s Ex. 16); SAI000305-06 (Pl.'s Ex. 17); SAI000313-23 (Pl.'s Ex. 18); SAI000560- 002525 (Pl.'s Ex. 22); Answer (Pl's Ex. 140) ¶ 19.

- Defendants' Response: Defendants do not dispute that Shoreline paid SAFE

commissions pursuant to a non-exclusive booking arrangement. Defendants dispute that Shoreline

paid Ms. Herbst in an individual capacity and dispute that a contract existed between Shoreline

and Ms. Herbst/SAFE. The record establishes that Shoreline and Ms. Herbst/SAFE did not have

any contract, but a non-exclusive booking arrangement existed between Shoreline and SAFE

where Shoreline paid SAFE commissions for booking passengers on its flights. *See* Resp. to

Plaintiff's Proposed Undisputed Fact Nos. 3 and 13; *see also See* Pl.'s Ex. 18 (bank record

reflecting payments to SAFE); Pl.'s Ex. 140 at ¶ 15 ( "Herbst and SAFE deny the allegations in

paragraph 21 of the Amended Complaint, including the existence of a contract, except admit that

Herbst and SAFE served as Shoreline Aviation's broker in a non-exclusive capacity, in return for

a 10% commission on each commuter seat and charter flight booked.").

15.  Herbst/SAFE was Shoreline's exclusive booking agent for seaplane commuter flights between East Hampton Airport and the 23rd Street Seaplane Base in Manhattan. SAI000034-50 (Defs.' Ex. 10) at SAI000040; SAI000052 (Pl.'s Ex. 4); SAI002664 (Pl.'s Ex. 24); SAI002720 (Pl.'s Ex. 25); SAI002881 (Pl.'s Ex. 27); SAI002911 (Pl.'s Ex. 28); SAI007664-87 (Pl.'s Ex. 52) ¶¶ 8-9; Herbst Dep. 65:12-23, 71:17–72:20 (Pl.'s Ex. 137); Collingwood Dep. 105:2-6 (Defs.' Ex. 2); Herbst v. Tuma complaint (Pl.'s Ex. 142) ¶¶ 14-15; SAI003234-37 (Pl.'s Ex. 32) ¶ 4; Minutes of Stipulation 57:20-21, 63:16-20, Tuma v. Tuma, Index No. 019777/2014 (Sup. Ct., Suffolk County 2019) (Pl.'s Ex. 145).

- Defendants' Response: Disputed. The record does not sufficiently support the assertion

that Herbst/SAFE served as Shoreline's exclusive booking agent. There is not any document in the record reflecting an enforceable agreement Shoreline and Ms. Herbst/SAFE that formalized the terms, length, or exclusivity of their relationship. For example, Shoreline relies on email correspondence pertaining to customer inquiries in 2010, 2011, and 2017; the emails do not reference or discuss the nature of Shoreline and Ms. Herbst/SAFE's relationship. *See* Pl.'s Exs. 24, 25, 27, and 28. Shoreline also relies on correspondence from John Kelly, which involved posturing and is inadmissible as hearsay. *See* Defs. Ex. 10; Pl.'s Ex. 4. Additionally, the correspondence from John Kelly contradicts the proposed fact in paragraph 15, as Kelly states that it was SAS, not Ms. Herbst/SAFE, which has historically handled bookings for Shoreline. *See* Defs. Ex. 10 at SAI000034. Shoreline also cites a declaration and testimony of witnesses who do not have any direct knowledge of how Shoreline's and Herbst/SAFE's arrangement was established and its terms. *See* Pl.'s Ex. 52 (dispatcher affidavit); Defs. Ex. 2 at 150:4-151:21. Shoreline also cites Ms. Herbst's testimony, which is unavailing, as she has repeatedly disavowed any exclusive contract with Shoreline. Defs. Ex. 1 at 19:17-34:24 (Herbst Dep. Tr.).

The record establishes that Shoreline and Ms. Herbst/SAFE did not have any contract, but a non-exclusive booking arrangement existed between Shoreline and SAS initially, and then Shoreline and SAFE, where Shoreline paid commissions for non-exclusive booking services provided by SAS and SAFE. *See* Resp. to Plaintiff's Proposed Undisputed Fact Nos. 3, 8 and 13-14.

16. Herbst/SAFE's communications to Shoreline passengers concerning ticket prices, sales, cancellation, and other policies were made on behalf of Shoreline, and Shoreline maintained control over the content of those communications. SAI002748 (Pl.'s Ex. 26); SAI007244 (Pl.'s Ex. 44); SAI007270 (Pl.'s Ex. 46); Herbst Dep. 59:18–61:16, 72:21–73:24, 76:16–77:12, 79:2-10 (Pl.'s Ex. 137).

- <u>Defendants' Response</u>: Disputed. The record establishes that SAFE controlled the

11

content of communications that it made to passengers that it booked on Shoreline's flights. Defs. Ex. 32 at 72:25-78:25. (Herbst Dep. Tr.); *see also* Supp. Herbst Decl. ¶ 2-3.

17.  Beginning in January 2018 and continuing through May 2018, Herbst/SAFE and Pilla were in discussions and negotiations with Blade Urban Air Mobility, Inc. a/k/a Fly Blade, Inc. ("Blade") concerning a potential sale of a customer list and employment agreement. BLADE 0000520-21 (Pl.'s Ex. 90); BLADE 0000721 (Pl.'s Ex. 94); BLADE 0001229-30 (Pl.'s Ex. 97); BLADE 0001987-88 (Pl.'s Ex. 106); Herbst Dep. 189:24–192:6 (Pl.'s Ex. 137); Herbst Decl. ¶ 42.

- Defendants' Response: Disputed to the extent that the proposed fact in paragraph 17 asserts that Pilla had any official involvement in the negotiations concerning a transaction and/or partnership between Blade and Ms. Herbst/SAFE. The record demonstrates that Pilla was not a principal of SAFE nor did he benefit economically from any partnership with Blade. Defs. Ex. 25 at 59:5-10 (Pilla Dep. Tr.) ("Q: When you say you were not involved in any of the business that happened here, you are referring to what's alleged in the lawsuit? A: The everyday business that went on, correct.  I had nothing to do with Cindy['s] and SAFE's business."). Mr. Pilla only occasionally provided advice and guidance to Ms. Herbst regarding the operations of SAFE as moral support for his significant other. Defs. Ex. 25 at 26:2-21 (Pilla Dep. Tr.).

18.  Included in Defendants' discussions with Blade was Blade's January 2018 request for Shoreline's proprietary business information for 2017, including the number of customers who purchased commuter seats, number of scheduled flights, and number of ticket books sold. BLADE 0000721 (Pl.'s Ex. 94); BLADE 0001229- 30 (Pl.'s Ex. 97). Herbst responded in February 2018 with that information. BLADE 0001987-88 (Pl.'s Ex. 106).

- Defendants' Response: Disputed. The cited evidence does not support the proposed fact in paragraph 18. Shoreline cites email communications concerning due diligence by Blade concerning SAFE's operations, not requests for Shoreline's proprietary business information. *See* Pl.'s Ex. 94; Pl.'s Ex. 97; and Pl.'s Ex. 106. The documents cited by Shoreline do not mention Shoreline at all.  *Id.*

19. Blade competed with Shoreline in providing access to seaplane commuter flights between East Hampton Airport and Manhattan. BLADE 0005774-77 (Pl.'s Ex. 125) at BLADE 0005774; BLADE 0005894-96 (Pl.'s Ex. 126) at BLADE 0005894.

- <u>Defendants' Response</u>: Undisputed.

20. As had been the practice in prior years, in January, February, and March of 2018, Shoreline paid Herbst her 10% commission in advance for customer booking and handling for the upcoming 2018 summer season in the amount of $65,522. SAI000313-23 (Pl.'s Ex. 18).

- <u>Defendants' Response</u>: Disputed. The proposed fact that Shoreline had a practice of

paying Ms. Herbst in advance is not sufficiently supported by the record. Shoreline cites bank

records, which only indicate that checks were purportedly made out to SAFE, not Ms. Herbst. *See*

Pl.'s Ex. 18. Moreover, the majority of the checks were made in December 2017. *Id.* Further, the

record also establishes that Shoreline paid SAFE, the commission at issue and other commissions,

for tickets actually sold by SAFE. Thus, the payments to SAFE were not made in advance of

Shoreline receiving payment from passengers. Defs. Ex. 8 at 25 (Shoreline's Response to RFA

No. 46); Defs. Ex. 2 at 258:6-12 (Collingwood Dep. Tr.); Defs. Ex. 32 at 176:12-25.

21. Because Herbst stopped booking seats for Shoreline in April or May 2018 and never earned those commissions, Shoreline asked that she refund that amount on April 23, 2018 and May 14, 2018. SAI000049-51 (Pl.'s Ex. 3); SAI006816 (Pl.'s Ex. 42); SAFE00000124-25 (Pl.'s Ex. 61). SAI002748 (Pl.'s Ex. 26); SAI007244 (Pl.'s Ex. 44); SAI007270 (Pl.'s Ex. 46); Herbst Dep. 59:18–61:16, 72:21–73:24, 76:16–77:12 (Pl.'s Ex. 137).

- <u>Defendants' Response</u>: Disputed to the extent that the proposed fact in paragraph 21

asserts that Ms. Herbst, on behalf of SAFE, did not earn the referenced commissions. The record

demonstrates that Shoreline, in fact, did receive $655,220 from customers who purchased the

tickets at issue. Defs. Ex. 8 at 25 (Shoreline's Response to RFA No. 46); Defs. Ex. 2 at 258:6-12

(Collingwood Dep. Tr.); Defs. Ex. 32 at 176:12-25.

22. Herbst never returned the $65,522 in pre-paid and unearned commissions to Shoreline. Pl.'s Resp. to Interrog. (Defs.' Ex. 5) No. 7.

- <u>Defendants' Response</u>: Disputed to the extent that the proposed fact in paragraph 22

asserts that Ms. Herbst, on behalf of SAFE, did not earn the referenced commissions. The record demonstrates that Shoreline, in fact, did receive $655,220 from customers who purchased the tickets at issue. Defs. Ex. 8 at 25 (Shoreline's Response to RFA No. 46); Defs. Ex. 2 at 258:6-12 (Collingwood Dep. Tr.); Defs. Ex. 32 at 176:12-25.

23.  Herbst and SAFE failed to mail out letters to Shoreline customers in March or April 2018 offering discount coupons for the summer. SAI000034-50 (Defs.' Ex. 10) at SAI000040; SAI000052 (Pl.'s Ex. 4); SAI003487-89 (Pl.'s Ex. 37) at SAI003487; SAFE00000124-25 (Pl.'s Ex. 61) at SAI000124; SAFE00002182-86 (Pl.'s Ex. 67) at SAFE00002182; SAFE00003370-73 (Pl.'s Ex.77) at SAFE00003370; SAFE00003475 (Pl.'s Ex. 78); BLADE 0001945-46 (Pl.'s Ex. 101).

- Defendants' Response: Defendants do not dispute that Herbst did not mail out letters concerning Shoreline's coupon books. Defendants dispute that Ms. Herbst/SAFE were contractually obligated to do so.  There is no document or testimony in the record establishing that Herbst/SAFE had a contractual obligation to mail out letters on Shoreline's behalf. *See* Resp. to Plaintiff's Proposed Undisputed Fact Nos. 3, 8 and 13-14.  Further, the documents cited by Shoreline shows the persons at issue were ones that SAFE had previously handled bookings for, not Shoreline customers. *See* Resp. to Plaintiff's Proposed Undisputed Fact Nos. 2.

24.  Beginning in March 2018, Shoreline customers reached out to Herbst/SAFE in an effort to reserve commuter seats for the summer. SAI000168 (Pl.'s Ex. 12); SAFE00002173-76 (Pl.'s Ex. 66); SAFE00002441 (Pl.'s Ex. 69); SAFE00002530 (Pl.'s Ex. 71); SAFE00003347 (Pl.'s Ex. 75); SAFE00003368 (Pl.'s Ex. 76); SAFE00003370-73 (Pl.'s Ex. 77).

- Defendants' Response: Disputed. The record does not support the asserted fact that "Shoreline customers reached out to Herbst/SAFE in an effort to reserve commuter seats for the summer." Shoreline cites email correspondence pertaining to eight individuals who reached out to SAFE to inquire about reserving seats on seaplane flights; the individuals did not specify if they wished to fly on Shoreline's seaplanes. *See* Pl.'s Exs. 12, 66, 69, 71, 75, 76, 77.  Furthermore, the

record establishes that Herbst and SAFE were not contractually obligated to reserve seats on Shoreline's planes. *See* Resp. to Plaintiff's Proposed Undisputed Fact Nos. 3, 8, and 13-14.

25.  Beginning in March 2018, Herbst told SAFE employees Eduardo Fernandes ("Fernandes") and Maureen Quigley ("Quigley") to stall customers seeking to book Shoreline seats by telling them the summer schedule had not yet been finalized and that Fernandes did not handle reservations. SAI000143-45 (Pl.'s Ex. 9); SAI003234-37 (Pl.'s Ex. 32) ¶¶ 6-26; SAI003238-55 (Pl.'s Ex. 33); SAI003256-58 (Defs.' Ex. 11) ¶¶ 9-15, 18; SAI007971-73 (Pl.'s Ex. 56) ¶¶ 9-12; SAFE00003338-39 (Pl.'s Ex. 74).

- <u>Defendants' Response</u>: Disputed. The record does not support the proposed fact in

paragraph 25. As a threshold matter, Shoreline relies on documents containing inadmissible

hearsay to prove the truth of its asserted fact in paragraph 25. *See* Pl.'s Exs. 9, 32, 33, 56.

Defendants further disputed the proposed fact in paragraph 25 to the extent that it is intended to

suggest that SAFE had a contractual obligation to book passengers on Shoreline's flights. The

record establishes that the referenced customers were not Shoreline's and SAFE had no contractual

obligation to book customers for Shoreline's flights. *See* Resp. to Plaintiff's Proposed Undisputed

Fact Nos. 2-3 and 13-15.

26.  Beginning in or around March 2018, Herbst and SAFE stalled customers seeking to book seats on Shoreline flights, failed to book reservations for Shoreline flights, reliably answer phone calls from customers, and accurately inform them as to the availability of seats on Shoreline flights. SAI000037-39 (Pl.'s Ex. 1) at SAI000038; SAI000049-51 (Pl.'s Ex. 3); SAI000052 (Pl.'s Ex. 4); SAI000126-29 (Pl.'s Ex. 7) at SAI000128-29; SAI000149 (Pl.'s Ex. 10); SAI000168 (Pl.'s Ex. 12); SAI003234-37 (Pl.'s Ex. 32) ¶¶ 6-26; SAI003238-55 (Pl.'s Ex. 33); SAI 3256-58 (Defs.' Ex. 11) ¶¶ 9-15, 18; SAI003393 (Pl.'s Ex. 35); SAI003549 (Pl.'s Ex. 38); SAI005785 (Pl.'s Ex. 39); SAI006864 (Pl.'s Ex. 43); SAI007746-54 (Pl.'s Ex. 53) ¶¶ 16-19; SAI007971-73 (Pl.'s Ex. 56) ¶¶ 9-12; SAFE00000124-25 (Pl.'s Ex. 61) at SAFE00000124; SAFE00001267-69 (Pl.'s Ex. 64); SAFE00001672 (Pl.'s Ex. 65); SAFE00002173-76 (Pl.'s Ex. 66); SAFE00002182-86 (Pl.'s Ex. 67); SAFE00002511 (Pl.'s Ex. 70); SAFE00002530 (Pl.'s Ex. 71); SAFE00002533-35 (Pl.'s Ex. 72); SAFE00003368 (Pl.'s Ex. 76); SAFE00003370-73 (Pl.'s Ex. 77); SAFE00003475 (Pl.'s Ex. 78); SAFE00003478-79 (Pl.'s Ex. 79); SAFE00003510-12 (Pl.'s Ex. 80); SAFE00003691 (Pl.'s Ex. 81); BLADE 0000377-89 (Pl.'s Ex. 87) at BLADE 0000385-87; BLADE 0003310-17 (Pl.'s Ex. 113); Collingwood Dep. 122:7-9 (Pl.'s Ex. 138).

- <u>Defendants' Response</u>: Disputed to the extent that the proposed fact in paragraph 26 is

intended to suggest that Ms. Herbst/SAFE had a contractual obligation "to book seats on Shoreline flights, failed to book reservations for Shoreline flights, reliably answer phone calls from customers, and accurately inform them as to the availability of seats on Shoreline flights." There is no document or testimony in the record evidencing a contractual obligation that Ms. Herbst/SAFE had to complete the tasks listed in paragraph 26. *See* Defs. Resp. to Plaintiff's Proposed Undisputed Fact Nos. 3 and 13-15.

27.  Shoreline's schedule did not change from year to year. SAI003234-37 (Pl.'s Ex. 32) ¶¶ 6, 13; SAI007971-73 (Pl.'s Ex. 56) ¶ 10; Herbst Dep. 199:15-17 (Pl.'s Ex. 137).

- Defendants' Response: Undisputed, but irrelevant.

28.  Since May 2017, Fernandes served as SAFE's customer service representative who booked reservations. SAI003234-37 (Pl.'s Ex. 32) ¶¶ 3, 5, 15; Defs.' Resp. to Interrog. (Pl.'s Ex. 141) No. 4; Herbst Dep. 193:4-10 (Pl.'s Ex. 137).

- Defendants' Response: Undisputed.

29.  Herbst instructed Fernandes and Quigley to conceal their stalling of customers from Shoreline. SAI003234-37 (Pl.'s Ex. 32) ¶¶ 10, 14, 17, 22; SAI003238-55 (Pl.'s Ex. 33) at SAI003241; SAI003256-58 (Defs.' Ex. 11) ¶ 16; SAFE00003347 (Pl.'s Ex. 75).

- Defendants' Response: Disputed. Shoreline's cited evidence does not support the assertion that Ms. Herbst instructed Fernades or Quigley to conceal "stalling" as some of the exhibits fail to have any reference to those words or actions. *See* Pl.'s Ex. 75; and Defs' Ex. 11. Although the Fernades and Quigley affidavits allege that they were instructed by Herbst to conceal their activities, this is inadmissible hearsay. *See* Pl.'s Exs. 32 and 33.

30.  Herbst and SAFE unilaterally terminated the Contract without notice to Shoreline by (a) ceasing to make reservations for Shoreline customers on Shoreline commuter flights in March 2018; (b) failing to respond to calls, texts, or emails from Shoreline in late January 2018; (c) entering into a Memorandum of Terms with Blade dated May 4, 2018 contemplating the sale of the commuter customer list maintained by Herbst/SAFE and a consulting agreement; (d) working behind the Blade counter at East Hampton Airport as early as May 4, 2018; and (e) sending an email on May 7, 2018 to Shoreline's customers falsely stating that Shoreline had made the decision to discontinue the relationship. SAI000049-51 (Pl.'s Ex. 3) at SAI000049; SAI000157-59 (Pl.'s Ex. 11); SAI002619 (Pl.'s Ex. 23); SAI007664-87 (Pl.'s Ex. 52) ¶¶ 28-30, 35; SAI007971-73 (Pl.'s

Ex. 56) ¶¶ 9- 13; SAFE00000614-16 (Pl.'s Ex. 63); Answer (Pl.'s Ex. 140) ¶¶ 5, 63; BLADE 0000609-16 (Defs.' Ex. 21); Defs.' Resp. to Interrog. No. 7 (Pl.'s Ex. 141); Collingwood Dep. 119:11-16 (Pl.'s Ex. 138); Pl.'s Resp. to Interrog. (Defs.' Ex. 5) No. 1.

- **Defendants' Response**: Disputed. The proposed fact in paragraph 30 relates to a proffered legal conclusion, not a fact. It is also not sufficiently supported by the record. Shoreline fails to cite any document reflecting a contractual obligation on Ms. Herbst's and SAFE's part to complete tasks for Shoreline. The record establishes that Shoreline and Ms. Herbst/SAFE did not have a contract, but a non-exclusive booking arrangement existed between Shoreline and SAS initially, and then Shoreline and SAFE, where Shoreline paid commissions for non-exclusive booking services provided by SAS and SAFE. *See* Defs. Resp. to Plaintiff's Proposed Undisputed Fact Nos. 2-3, 8, and 13-15.

The record also establishes that the contents of Ms. Herbst's May 7, 2018 email was not false as Shoreline unilaterally terminated its arrangement with SAFE by emailing former passengers for whom it had contact information and informing them that Shoreline was no longer working with SAFE. Defs. Ex. 1 at 38:6-40-13 (Herbst Dep. Tr.); Defs. Ex. 19 (SAI00047); Defs. Ex. 20 (SAI000033); Defs. Ex. 8 at 22 (Shoreline's Response to RFA No. 39).

31.  On or about May 7, 2018, SAFE and Blade entered into a Memorandum of Terms to define the provisions of a purchase agreement for the sale of a customer list, consulting agreement, and a non-compete agreement. BLADE 0000609-16 (Defs.' Ex. 21).

- **Defendants' Response**: Undisputed.

32.  On or around May 17, 2018, Herbst and SAFE entered into an asset purchase agreement with Blade, pursuant to which Blade purchased a list of customers from SAFE (the "Customer List") for $175,000. BLADE 0000645-56 (Pl.'s Ex. 92); BLADE 0001972 (Pl.'s Ex. 104); Answer (Pl.'s Ex. 140) ¶ 56.

- **Defendants' Response**: Undisputed.

33. The Customer List contained information concerning the passengers for whom Herbst/SAFE booked seats on Shoreline's seaplane commuter flights. SAI003161-3233 (Defs.' Ex. 12); SAI003256-58 (Defs.' Ex. 11) ¶ 20; SAI007746-54 (Pl.'s Ex. 53) ¶¶ 12-13; SAI007746-

54 (Pl.'s Ex. 53) at SAI007753-54 ; SAI007775-76 (Pl.'s Ex. 54); SAFE00002440 and native file attachment (Pl.'s Ex. 68); SAFE00002983 and native file attachment (Pl.'s Ex. 73); BLADE 0000034-45 (Pl.'s Ex. 84); BLADE 0000394 and native file attachment (Pl.'s Ex. 88); BLADE 0001945-46 (Pl.'s Ex. 101); BLADE 0003220- 22 (Pl.'s Ex. 112); BLADE 0005772-73 (Pl.'s Ex. 124); BLADE 0005899-5901 (Pl.'s Ex. 127); BLADE 0008300-80 (Pl.'s Ex. 135).

- <u>Defendants' Response</u>: Disputed to the extent that the proposed fact in paragraph 33 is intended to assert that the customers on the purported list were exclusively Shoreline's. The cited evidence and the record establish that that the customers were actually customers that SAFE had a relationship with because it had book seats for them on various operators, including Shoreline. *See* Defs. Resp. to Plaintiff's Proposed Undisputed Fact No. 3; Defs. Ex. 2 at 43:3-44:21, 98:20-99:19, 149: 10-14; Defs. Ex. 31 at 41:3-22, 236:12-237:2. (Collingwood Dep. Tr.); Declaration of Cynthia Herbst, dated June 16, 2023 ("Herbst Declaration") ¶¶ 16, 32

34.  Herbst/SAFE waited until after their agreements with Blade were finalized in May 2018 to book seats on Blade air carriers for the customers who had reached out earlier for Shoreline seats. BLADE 0000377-89 (Pl.'s Ex. 87) at BLADE 0000383; BLADE 0008144-45 (Pl.'s Ex. 132).

- <u>Defendants' Response</u>: Disputed. The proposed fact in paragraph 34 is not sufficiently supported by the record. Shoreline cites an email where a customer does not specifically request to fly with Shoreline but asks for general seaplane availability. *See* Pl.'s Ex. 87. The other document cited by Shoreline is a draft mailer prepared by Herbst. *See* Pl.'s Ex. 132. It does not mention or refer to Shoreline's customers. *Id.*

The record demonstrates that, in May 2018, Blade and Ms. Herbst/SAFE agreed to a partnership, where Ms. Herbst served as a consultant for Blade and agreed to book all customers, not only those who had previously flown with Shoreline, using Blade's reservation platform. Defs. Ex. 1 at 187:2-21 (Herbst Dep. Tr.); Defs. Ex. 21 (BLADE 0000609 to BLADE 0000616); Defs. Ex. 22 (Blade 0008161 to Blade 0008172).

35.  Beginning in April 2018, Herbst and SAFE worked with Blade to target Shoreline customers in an effort to divert them to Blade. SAI000084-87 (Pl.'s Ex. 5); SAI000157-59 (Pl.'s

18

Ex. 11); SAI003234-37 (Pl.'s Ex. 32) ¶ 22; SAI006864 (Pl.'s Ex. 43); SAI007971-73 (Pl.'s Ex. 56) ¶¶ 13, 15; BLADE 0000884-85 (Pl.'s Ex. 95); BLADE 0000923 (Pl.'s Ex. 96); BLADE 0001301-03 (Pl.'s Ex. 98); BLADE 0001955-56 (Pl.'s Ex. 102); BLADE 0001960 (Pl.'s Ex. 103); BLADE 0001975 (Pl.'s Ex. 105); BLADE 0002037-38 (Pl.'s Ex. 107); BLADE 002793- 96 (Pl.'s Ex. 110); BLADE 0002802-05 (Pl.'s Ex. 111); BLADE 0004833-34 (Pl.'s Ex. 114); BLADE 0004840-49 (Pl.'s Ex. 115); BLADE 0004916-17 (Pl.'s Ex. 116); BLADE 0005640-43 (Pl.'s Ex. 122); BLADE 0005720-21 (Pl.'s Ex. 123); BLADE 0005774-77 (Pl.'s Ex. 125); BLADE 0005894-96 (Pl.'s Ex. 126); BLADE 0005899-5901 (Pl.'s Ex. 129); BLADE 0006127 (Pl.'s Ex. 129); BLADE 0008096-8100 (Pl.'s Ex. 131); BLADE 0008210 (Pl.'s Ex. 133); BLADE 008273 (Pl.'s Ex. 134); Answer (Pl.'s Ex. 140) ¶ 68; Herbst Dep. 210:6– 220:5 (Pl.'s Ex. 137).

- Defendants' Response: Disputed. The proposed fact in paragraph 35 is not sufficiently supported by the record. The documents cited by Shoreline only establish that SAFE and Blade contacted individuals that SAFE had handled bookings for, in the past, and informed them about Blade's services.

The record establishes that the referenced customers were not Shoreline's and SAFE had no contractual obligation to book customers for Shoreline's flights. *See* Resp. to Plaintiff's Proposed Undisputed Fact No. 2-3, 13-15, 33. After SAFE and Blade executed a contract formalizing a partnership between the companies, SAFE started to book customers using Blade's reservation platform. Defs. Ex. 1 at 187:2-21 (Herbst Dep. Tr.); Defs. Ex. 22 (Blade 0008161 to Blade 0008172).

36.  As early as May 4, 2018, SAFE employees were working behind the Blade counter at East Hampton Airport. SAI002619 (Pl.'s Ex. 23).

- Defendants' Response: Disputed. The cited evidence does not support the asserted fact as it is an unverified picture message with no context. The record establishes that SAFE did not authorize any of its employees to work with Blade until after the parties executed the memorandum of understanding on May 7, 2018. Ex. 21 (Blade 0000609 to Blade 0000616); Supp. Herbst Decl. ¶¶ 11-12.

37.  On May 7, 2018, Herbst sent an email to Shoreline customers stating that Shoreline had ceased working with SAFE. In this email, she stated, "Unfortunately, it appears that Shoreline

Aviation no longer wishes to work with Sound Aircraft Flight Enterprises. Without notice to us." SAI000157-59 (Pl.'s Ex. 11) at SAI000157.

- <u>Defendants' Response</u>: Defendants do not dispute that Ms. Herbst sent an email to her

customers on May 7, 2018, informing them that Shoreline unilaterally terminated their booking

arrangement. Defendants dispute that the customer were Shoreline's. The record establishes that

the customers were passengers that SAFE and/or SAS had handled bookings for in the past, not

exclusive Shoreline customers. Herbst Declaration ¶¶ 16, 32; *see also* Defs. Resp. to Plaintiff's

Proposed Undisputed Fact Nos. 3, 33.

38.  Herbst suggested to Shoreline customers that they seek a refund from Shoreline for their pre-paid tickets, even though it was Herbst/SAFE that had previously insisted on a no-refund policy for Shoreline customers. SAI000049-51 (Pl.'s Ex. 3) at SAI000050; SAI000157-59 (Pl.'s Ex. 11); SAI000169 (Pl.'s Ex. 13); Herbst Dep. 213:3-8 (Pl.'s Ex. 137); Pl.'s Resp. to Interrog. (Defs.' Ex. 5) No. 15.

- <u>Defendants' Response</u>: Disputed. Shoreline has already admitted that it maintained

control over its ticket prices, sales, and other policies, so Herbst/SAFE had no control over

Shoreline's refund policy. *See* Shoreline's Statement of Proposed Undisputed Facts ¶¶ 6 and 16.

Additionally, Shoreline cites only one document - Defs. Ex. 3 – that actually discusses it's

purported no-refund policy and that is insufficient to establish an undisputed fact as it is a self-

serving discovery response. Furthermore, the record establishes that the customers were

passengers that SAS and/or SAFE had handled bookings for, not exclusive Shoreline customers.

*See* Defs. Resp. to Plaintiff's Proposed Undisputed Fact Nos. 2-3 and 33.

39.  Herbst made misleading remarks to Shoreline customers, deliberately took advantage of customer confusion about the nature of her relationship with Shoreline, and made no effort to clarify such confusion. SAI000049-51 (Pl.'s Ex. 3); SAI000157-59 (Pl.'s Ex. 11) at SAI000157; SAI000169 (Pl.'s Ex. 13); SAI000183 (Pl.'s Ex. 14); SAFE00002182-86 (Pl.'s Ex. 67) at SAFE00002182; BLADE 0005774-77 (Pl.'s Ex. 125) at BLADE 0005774. SAI002748 (Pl.'s Ex. 26); SAI007244 (Pl.'s Ex. 44); SAI007270 (Pl.'s Ex. 46); Herbst Dep. 59:18–61:16, 72:21–73:24, 76:16–77:12 (Pl.'s Ex. 137).

- <u>Defendants' Response</u>: Disputed. The proposed fact in paragraph 39 is not sufficiently

supported by the record. As threshold matter, the documents contain opinions, which if they could be construed as facts would, be truthful. The record establishes that on May 6, 2018, Shoreline unilaterally terminated its arrangement with SAFE by emailing the customers for whom it had contact information and informing them that Shoreline was no longer working with SAFE: "Beginning May 1st 2018, our seaplane commuter and charter customers will be able to book directly with Shoreline Aviation, using our website, email or toll free 800 number." Defs. Ex. 1 at 38:6-40-13 (Herbst Dep. Tr.); Defs. Ex. 19 (SAI00047); Defs. Ex. 20 (SAI000033); Defs. Ex. 8 at 22 (Shoreline's Response to RFA No. 39). Afterwards, on May 7, 2018, in the evening, Ms. Herbst emailed the individuals on SAFE's customer list informing them that SAFE would be working with Blade because "[u]nfortuantely, it appears that Shoreline Aviation no longer wishes to work with [SAFE]." Defs. Ex. 20 (SAI000033); Herbst Decl. ¶ 53.

The record also establishes that the customers were not Shoreline's but were actually individuals that Ms. Herbst/SAFE had previously booked flights for. Defs. Resp. to Plaintiff's Proposed Undisputed Fact Nos. 2-3, 33; *see also* Pl.'s Exs. 13, 67, 125.

40. As a result of Herbst's efforts to poach Shoreline customers, many of them purchased through Blade instead in 2018 and 2019. SAI000139-42 (Pl.'s Ex. 8); SAI003393 (Pl.'s Ex. 35); SAI006864 (Pl.'s Ex. 43); SAFE00000434-70 (Pl.'s Ex. 62); SAFE00005604-16 (Pl.'s Ex. 82); BLADE 0000005 (Pl.'s Ex. 83); BLADE 0000051 (Pl.'s Ex. 85); BLADE 0000063 (Pl.'s Ex. 86); BLADE 0001838 (Pl.'s Ex. 100); BLADE 0002531-32 (Pl.'s Ex. 108); BLADE 0002553-56 (Pl.'s Ex. 109); BLADE 0004916-17 (Pl.'s Ex. 116); BLADE 0005368-69 (Pl.'s Ex. 117); BLADE 0005570-71 (Pl.'s Ex. 118); BLADE 0005577-78 (Pl.'s Ex. 119); BLADE 0005584-85 (Pl.'s Ex. 120); BLADE 0005612-13 (Pl.'s Ex. 121); BLADE 0005772-73 (Pl.'s Ex. 124); BLADE 0005894-96 (Pl.'s Ex. 126); BLADE 0005903-15 (Pl.'s Ex. 128).

- <u>Defendants' Response</u>: Disputed. The record establishes that the referenced customers were not Shoreline's and Ms. Herbst had no contractual obligation to book customers for Shoreline's flights. *See* Resp. to Plaintiff's Proposed Undisputed Fact Nos. 2-3, 33. Further, the

documents cited by Shoreline only establish that certain individuals, in the past, had purchased flights on Shoreline's seaplanes, and then at another time purchased a seat on a Blade plane.

The record also establishes that there are a host of reasons for why passengers might have decided to book a flight with Blade over Shoreline, including because Blade offered amenities that Shoreline did not, such as a waiting lounge that served cocktails; access to Porsches that would transport passengers from New York to the Hamptons if a flight was canceled; and a mobile application that allowed for passengers to arrange for helicopter and seaplane flights on their own. Defs. Ex. 31 at 276:14-277:25 (Collingwood Dep. Tr.); Pl. Ex. 148 ¶ 6.

41. A commission report for sales booked by SAFE for Blade between May 7, 2018 and September 30, 2018 (the "2018 commission report") shows that at least 160 Shoreline customers (Pl.'s Ex. 146) booked with Blade for the 2018 summer season. SAFE00000434-70 (Pl.'s Ex. 62); SAI003161-3233 (Defs.' Ex. 12); SAI007775-76 (Pl.'s Ex. 54).

- <u>Defendants' Response</u>: Disputed. The record establishes that the referenced

customers were not Shoreline's and SAFE had no contractual obligation to book customers for Shoreline's flights. *See* Resp. to Plaintiff's Proposed Undisputed Fact Nos. 2-3, 33. Further, the exhibits cited by Shoreline only demonstrate that certain individuals, in the past, had purchased flights on Shoreline's seaplanes, and then subsequently purchased a seat on a Blade plane.

42. Herbst/SAFE earned $188,562 in commissions from Blade for seaplane commuter ticket sales between May 7, 2018 and September 30, 2018. SAFE00000434-70 (Pl.'s Ex. 62).

- <u>Defendants' Response</u>: Undisputed.

43. Herbst and SAFE understood that their cooperation and agreements with Blade made Herbst and SAFE vulnerable to legal actions. BLADE0001945-46 (Pl.'s Ex. 101).

- <u>Defendants' Response</u>: Disputed. Shoreline cites an email reflecting negotiations

between Blade and SAFE concerning their partnership. The email does not demonstrate or refer to Herbst/SAFE's knowledge regarding "legal actions." Furthermore, there is no provision in the

executed agreements between SAFE and Blade regarding SAFE's understanding of legal liability. Defs. Ex. 21 (Blade 0000609 to Blade 0000616); Defs. Ex. 22 (Blade 0008161 to Blade 0008172).

44.  The purpose of Shoreline's operating agreements with the Town of East Hampton, dated May 15, 1993, May 15, 1994, and May 15, 1995 (collectively, the "Operating Agreements"), was to set forth the standards and conditions for Shoreline's operations at East Hampton Airport. SAI000340-55 (Pl.'s Ex. 19) at SAI000343; SAI000358-71 (Defs.' Ex. 7) at SAI000360; SAI000392-404 (Pl.'s Ex. 20) at SAI000393; Answer (Pl.'s Ex. 140) ¶ 11.

- Defendants' Response: Undisputed, although the documents cited demonstrate that Shoreline's operations at East Hampton Airport including its use of SAS for the performance of booking, ticketing, and checking-in services.

45.  The Operating Agreements' Paragraph 16(B) concern Shoreline's non-exclusive right to operate at East Hampton Airport as a provider of air transportation of passengers, not Shoreline's relationship with Herbst, SAS, and/or SAFE. SAI000340-55 (Pl.'s Ex. 19) at SAI000340, SAI000352; SAI000358-71 (Defs.' Ex. 7) at SAI000368; SAI000392-404 (Pl.'s Ex. 20) at SAI000401.

- Defendants' Response: Disputed.  SAS is a party to the Operating Agreements, and the Agreements state that nothing therein "shall be construed to grant or authorized the granting of an exclusive right to [Shoreline]." Defs. Ex. 7 at § 16 (B) (SAI000358 to SAI000371); *see also* Defs. Ex. 2 at 156:15-158:11 (Collingwood Dep. Tr.); Defs. Ex. 9 at 1 (SAI000406 to SAI000411).

46.  The Operating Agreements' Paragraph 16(B) was intended to comply with 49 U.S.C. § 47107(a)(4), which provides, in relevant part, that "a person providing, or intending to provide, aeronautical services to the public will not be given an exclusive right to use the airport." U.S.C. § 47107(a)(4).

- Defendants' Response: Disputed.  U.S.C. § 47107(a)(4) is not a part of the record and there is nothing in the Operating Agreement indicating that paragraph 16 (B) was intended to comply with U.S.C. § 47107(a)(4) or to be limited in any way. Defs. Ex. Ex. 7 at § 16 (B) (SAI000358 to SAI000371); Defs. Ex. Ex. 9 (SAI000406 to SAI000411).

47.  Shoreline's revenues attributable to seaplane commuter flights between New York City and East Hampton decreased by $839,848.51 in 2018. Murphy Dep. 154:22–159:20, July 21, 2022 ("Murphy Dep.") (Pl.'s Ex. 139); SAI007979-83 (Pl.'s Ex. 57) at SAI007979 (2017 revenues of

$2,619,351.66 in Sound Commuter Fees); SAI007984-88 (Pl.'s Ex. 58) at SAI007984 (2018 revenues of $1,012,386.39 in Commuter Fees plus $767,116.76 in Sound Commuter Fees).

- _Defendants' Response_: Disputed. The proposed fact in paragraph 47 is insufficiently supported by the record. Shoreline cites to summary financial documents, which have not been authenticated or verified for accuracy as the underlying data has not been introduced into the record. _See_ Pl.'s Ex. 57 and 58. Additionally, Shoreline's citation to the deposition testimony of its accountant is likewise insufficient as she testified about the aforementioned summary documents without a proper foundation. _See_ Ex. 33 at 39:21-40:5, 50:3-59:25; 165:19-194:15; _see also_ Pl.'s Ex. 139 at 160:3-162:10 (Murphy Dep. Tr.).

48. Shoreline's expenses attributable to seaplane commuter flights between New York City and East Hampton (which include Aircraft Expenses, Fuel, Pilot Expenses, Payroll–Mechanics, Payroll–Pilots, Advertising & Marketing Expense, and Total Payroll) increased by $770,387.99 in 2018. Murphy Dep. 160:3–163:18 (Pl.'s Ex. 139); SAI007979-83 (Pl.'s Ex. 57) (total 2017 commuter expenses of $2,076,790.04); SAI007984-88 (Pl.'s Ex. 58) (total 2018 commuter expenses of $2,847,178.03).

- _Defendants' Response_: Disputed. The proposed fact in paragraph 48 is insufficiently supported by the record. Shoreline cites to summary financial documents, which have not been authenticated or verified for accuracy as the underlying data has not been introduced into the record. _See_ Pl.'s Ex. 57 and 58. Additionally, Shoreline's citation to the deposition testimony of its accountant is likewise insufficient as she testified about the aforementioned summary documents without a proper foundation and she does not have a foundation to speak about Shoreline's expenses. _See_ Ex. 33 at 39:21-40:5, 50:3-59:25; 165:19-194:15; _see also_ Pl.'s Ex. 139 at 160:3-162:10 (Murphy Dep. Tr.).

49. As a result of Herbst/SAFE's actions, Shoreline suffered damages in the amount of $1,675,758.50, consisting of (a) $1,610,236.50 in lost profits in 2018 when Shoreline customers were diverted to Blade; and (b) $65,522 in unearned commissions paid to Herbst/SAFE. SAI000042-43 (Pl.'s Ex. 2); SAI000049-51 (Pl.'s Ex. 3); SAI006564 (Pl.'s Ex. 40); SAI006575 (Pl.'s Ex. 41); SAI006816 (Pl.'s Ex. 42); SAI007390-97 (Pl.'s Ex. 47); SAI007875-7970 (Pl.'s Ex. 55) ¶¶ 17-20, Exs. B-D; SAI007979-83 (Pl.'s Ex. 57); SAI007984-88 (Pl.'s Ex. 58); SAI009182-

84 (Pl.'s Ex. 59); SAFE00000124-25 (Pl.'s Ex. 61); Collingwood Dep. 91:7-13 (Defs.' Ex. 2); Murphy Dep. 154:22–163:18 (Pl.'s Ex. 139).

- <u>Defendants' Response</u>:  Disputed. The proffered fact is at odds with Shoreline's pleadings, interrogatory responses and initial disclosures, none of which include lost profits as a category of damages. Dkt. Nos. 1 and 34; Defs. Exs. 5, 29, and 30. Additionally, Shoreline has failed to identify a single person that either SAFE or Ms. Herbst caused not to book a flight on Shoreline, much less any lost profits. The record establishes that there were multiple reasons why Shoreline's profits may have declined in 2018 relative to 2017. *See* Ex. 33 at 50:3-59:25; 165:19-194:15. The record also demonstrates that Shoreline was not profitable for several years, including in 2018, for reasons unrelated to the termination of SAFE's and Shoreline's booking arrangement. Defs. Ex. 13 at 95:24-101:17 (Migliore Dep. Tr.).

The record demonstrates that Ms. Herbst nor SAFE "diverted" any customers to Blade as they were not under a contractual obligation to book customers for flights with Shoreline. *See* Resp. to Plaintiff's Proposed Undisputed Fact Nos. 3, 33 and 13-15. Additionally, the record demonstrates that Shoreline, in fact, did receive $655,220 from flights related to the commission at issue, so SAFE in fact did earn the commissions. Defs. Ex. 8 at 25 (Shoreline's Response to RFA No. 46); Defs. Ex. 2 at 258:6-12 (Collingwood Dep. Tr.).

Dated: New York, New York
     October 27, 2023

GLENN AGRE BERGMAN & FUENTES LLP

By:   */s/ Lindsey (Reid) Skibell*
Lindsey Reid Skibell
Jewel K. Tewiah
1185 Avenue of the Americas
New York, New York 10036
rskibell@glennagre.com
jtewiah@glennagre.com
(212) 970-1610
*Attorneys for Cynthia L. Herbst, Sound Aircraft Flight Enterprises, Inc., and Ryan A. Pilla*

## PROOF OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via email, on October 27, 2023, upon counsel for Shoreline Aviation:

**Alex Kriegsman**
Kriegsman PC
279 Main Street
Sag Harbor, NY 11963
KriegsmanPC.com

*/s/ Lindsey (Reid) Skibell*

L. Reid Skibell